TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>BLUE BEE, INC.,<br><br>            Debtor. | Case No. 2:16-bk-23836-SK<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF JEFF SUNGHAK KIM IN SUPPORT OF DEBTOR'S EMERGENCY "FIRST DAY" MOTIONS**<br><br>Date:      [To be set]<br>Time:      [To be set]<br>Courtroom:  1575<br>Location:   255 E. Temple Street<br>                 Los Angeles, California |

1

I, Jeff Sunghak Kim, hereby declare as follows:

1. I am over 18 years of age. I am the co-founder and President of Blue Bee, Inc., d/b/a ANGL, the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), and am therefore familiar with the business operations and financial books and records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify as a witness, I could and would competently testify thereto.

2. I have access to the Debtor's books and records. As the co-founder and President of the Debtor, I am familiar with the history, organization, operations and financial condition of the Debtor. The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own personal knowledge and my review of the Debtor's books and records.

3. I make this declaration in support of the following emergency "first day" motions filed concurrently herewith by the Debtor:

   a. "Debtor's Emergency Motion For An Interim Order Authorizing The Debtor To Use Cash Collateral On An Interim Basis Pending A Final Hearing" (the "CC Motion");

   b. "Debtor's Emergency Motion For Authority To (1) Pay Pre-Petition Priority Wages; And (2) Honor Employment And Benefit Policies" (the "Wage Motion");

   c. "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant to 11 U.S.C. § 366" (the "Utility Motion");

   d. "Debtor's Emergency Motion For Order Authorizing The Debtor To Maintain Pre-Petition Credit Card Depository Bank Account" (the "Cash Management Motion"); and

   e. "Debtor's Emergency Motion For Entry Of An Order Authorizing The Debtor To Honor Certain Prepetition Obligations To Customers" (the "Customer Programs Motion").

2

**A.     Background Information and Events Leading to Bankruptcy Filing.**

4.     The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on October 19, 2016 (the "Petition Date").  The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.     The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers.  The Debtor currently owns and operates twenty-one (21) retail stores located primarily in shopping malls throughout the state of California (collectively, the "Retail Stores," and individually, a "Retail Store").  Since the opening of its first Retail Store in 1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing designer fashion to a wider audience.

6.     The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by my wife Young Ae Kim and me, and was dissolved on August 30, 2013. All of the assets of Angl, Inc. were transferred to, and all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.  The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  My wife Young Ae Kim and I continue to be actively involved in the Debtor's business operations as the Secretary and President of the Debtor, respectively.

7.     The Debtor is headquartered near the Fashion District in downtown Los Angeles, California and currently employs a workforce of approximately 110 employees.  In 2015, the Debtor generated annual gross revenues of more than $24 million.

8.     After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The Debtor currently operates the Retail Stores that are located in the state of California, while the Debtor's affiliates, Angl, Inc.-NV, a Nevada corporation, operates retail stores in the state of

Nevada, and Angl, Inc.-AZ, an Arizona corporation, operates retail stores in the state of Arizona. The online retail business for the brand ANGL is operated by another affiliate of the Debtor, ShopAngl.com, Inc. The vast majority of the new retail stores (approximately 43 stores) were opened within the last seven years. This large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

9. The high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, has left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors. As a result of the Debtor's defaults, numerous landlords began commencing actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of the Retail Stores. While the Debtor has already closed a number of its less profitable retail store locations, leaving open approximately 21 Retail Stores as of the Petition Date, the Debtor requires time to evaluate the viability of the remaining Retail Stores and identify other ways to decrease operational costs and increase profitability. In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

10. Through its bankruptcy case, the Debtor intends to identify the core Retail Stores around which the Debtor can successfully reorganize, to expeditiously close those Retail Stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the Retail Stores (particularly during the upcoming holiday season), all of which I believe will enable the Debtor to formulate and pursue confirmation of a plan of reorganization which allows

the Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

**B.    The Cash Collateral Motion (the "CC Motion")[1].**

11.    The Debtor's primary assets are as follows:

a.    <u>Cash</u>.    As of the Petition Date, the Debtor had cash on hand of approximately $93,000.

b.    <u>Security Deposits</u>.  As of the Petition Date, the Debtor had security deposits with landlords and other parties in the total sum of approximately $87,013.

c.    <u>Inventory</u>.  As of the Petition Date, the Debtor had inventory with an estimated cost value of approximately $3,500,000.

d.    <u>Other Assets</u>.  As of the Petition Date, the Debtor had furniture, fixtures and equipment ("<u>FF&E</u>") with a net book value of $6,299,306 and an estimated aggregate fair market value of at least $1,000,000.

12.    The Debtor's senior secured lender is Pacific City Bank (the "<u>Bank</u>").  The Debtor is a borrower under two (2) separate loans with the Bank, as described below:

a.    The Debtor is the borrower under a U.S. Small Business Administration loan with the Bank (the "<u>SBA Loan</u>"), pursuant to a Loan Agreement dated July 24, 2014 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in the amount of approximately $1,660,000 under the SBA Loan.  The Bank filed UCC-1 financing statements against the Debtor and its predecessor, Angl, Inc. asserting a lien against substantially all of the assets of the Debtor and Angl, Inc.

b.    The Debtor is the borrower under a term loan bearing the Loan Number 134077 with the Bank (the "<u>Term Loan</u>"), pursuant to a Business Loan Agreement dated November 2, 2015 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in the amount of approximately $442,000 under the Term Loan.

---

[1] All terms not specifically defined herein shall have the meanings ascribed to them in the CC Motion.

13. Attached as **Exhibit "B"** hereto are copies of the pre-petition loan and collateral documents with the Bank. A summary of the financing statements recorded against the Debtor and its predecessor Angl, Inc. by the Bank is set forth in the Declaration of Juliet Y. Oh filed (the "Oh Declaration") concurrently herewith, with copies of the financing statements attached as exhibits thereto.

14. Prior to the Petition Date, the Debtor provided a commercial guaranty of the obligations of the Debtor's affiliate, Peace People, LLC, under a term loan bearing the Loan Number 133776 made by Wells Fargo Bank, N.A. ("Wells Fargo") to Peace People, LLC pursuant to a Business Loan Agreement dated February 17, 2014 (the "Wells Fargo Loan"). The commercial guaranty provided by the Debtor in connection with the Wells Fargo Loan is purportedly secured by substantially all assets of the Debtor.[2] Included in **Exhibit "B"** hereto are copies of the pre-petition loan and collateral documents with Wells Fargo. As a result of the commercial guaranty, the Debtor is currently indebted to Wells Fargo in the amount of approximately $1,500,000 under the Wells Fargo Loan.

15. Prior to the Petition Date, the Debtor obtained a secured loan in the amount of $6,000 from Fashblvd., Inc. ("Fashblvd"). Flashblvd filed a UCC-1 financing statement (Document No. 57738600002) asserting a lien against substantially all of the assets of the Debtor prior to the commencement of the Debtor's bankruptcy case on October 19, 2016. Evidence of the filing of the foregoing UCC financing statement by Fashblvd., Inc. is attached to the Oh Declaration filed concurrently herewith.

16. In addition to the financing statements filed by the Bank and Fashblvd against the Debtor and/or its predecessor, Angl, Inc., there are financing statements that have been filed against the Debtor and Angl, Inc. by the following parties[3]:

---

[2] Neither the Debtor nor counsel for the Debtor has been able to locate evidence of a UCC-1 financing statement recorded by Wells Fargo against Peace People, LLC or the Debtor. The Debtor does not concede that Wells Fargo has a valid and properly perfected security interest and lien in the Debtor's cash and other assets.

[3] A summary of the financing statements recorded against the Debtor by such other parties is set forth in the Oh Declaration filed concurrently herewith, with copies of the financing statements attached thereto.

a. <u>U.S. Bank Equipment Finance</u>.  I am advised and believe that U.S. Bank Equipment Finance has one active financing statement, filed on December 10, 2013, which purports to cover certain specified equipment leased or financed from U.S. Bank Equipment Finance.  I am advised and believe that U.S. Bank Equipment Finance does not purport to assert a security interest in the Debtor's cash.

b. <u>California State Board Of Equalization ("SBOE")</u>.  I am advised and believe that SBOE has one active state tax lien which was recorded against the Debtor on January 29, 2015.

c. <u>Line & Dot, LLC d/b/a Lumiere Collections ("L&E")</u>.  I am advised and believe that L&E has one active judgment lien which was recorded against the Debtor on September 15, 2016.  I am further advised and believe that the foregoing judgment lien, which was recorded within the 90-day period preceding the Petition Date, may be avoidable as a preferential transfer and is therefore disputed.

d. <u>Tyler Mall Limited Partnership ("Tyler Mall")</u>.  I am advised and believe that Tyler Mall has one active judgment lien which was recorded against Angl, Inc. on August 22, 2016.  I am further advised and believe that the foregoing judgment lien, which was recorded within the 90-day period preceding the Petition Date, may be avoidable as a preferential transfer and is therefore disputed.

e. <u>GGP-Otay Ranch, L.P. ("GGP")</u>.  I am advised and believe that GGP has one active judgment lien which was recorded against Angl, Inc. on August 22, 2016.  I am further advised and believe that the foregoing judgment lien, which was recorded within the 90-day period preceding the Petition Date, may be avoidable as a preferential transfer and is therefore disputed.

f. <u>Valley Plaza Mall, LP ("Valley Plaza")</u>.  I am advised and believe that Valley Plaza has one active judgment lien which was recorded against Angl, Inc. on September 12, 2016.  I am further advised and believe that the foregoing judgment lien,

Case 2:16-bk-23836-SK    Doc 12    Filed 10/24/16    Entered 10/24/16 16:46:00    Desc
                        Main Document      Page 8 of 16

1   which was recorded within the 90-day period preceding the Petition Date, may be
2   avoidable as a preferential transfer and is therefore disputed.

3      17.   Based on the foregoing, I believe that the Bank, Wells Fargo, Fashblvd and the
4   SBOE are the only parties who may have a perfected security interest in the Debtor's cash.[4]

5      18.   By the CC Motion, the Debtor seeks an order of the Court authorizing the Debtor to
6   use its cash to pay the expenses set forth in the operating budget (the "<u>Budget</u>") which is attached
7   as **Exhibit "A"** hereto, as well as all quarterly fees owing to the Office of the United States Trustee
8   and all expenses owing to the Clerk of the Bankruptcy Court. In addition, the Debtor seeks
9   authority to deviate from the expense line items contained in the Budget, without the need for any
10  further Court order, by up to 20%, on both a line item and aggregate basis, with any unused
11  portions to be carried over into the following week(s). The Debtor will not deviate from the
12  Budget beyond the foregoing parameters without further order of the Court.

13     19.   The Debtor requires an immediate order of the Court authorizing the Debtor to use
14  cash collateral in accordance with the Budget to enable the Debtor to pay all of its normal and
15  ordinary operating expenses (such as payroll, rent, utilities, insurance, and payments to vendors) as
16  they come due in the ordinary course of its business and to purchase new inventory to replenish
17  merchandise that is sold to customers at the Debtor's Retail Stores, which I believe in turn will
18  facilitate the continued operation of the Debtor's business (without any disruption) and the
19  preservation and maximization of the going-concern value of the Debtor's business and assets. If
20  the Debtor does not obtain authority to use its cash collateral, I believe the Debtor's estate will
21  suffer immediate and irreparable harm, including, without limitation, a cessation of the Debtor's
22  business operations and a corresponding (and likely substantial) decline in the value of the
23  Debtor's business and assets.

24     20.   Based on the current estimated aggregate value of the Debtor's assets (including the
25  Debtor's cash, security deposits, inventory, and FF&E), which I believe was approximately

---

[4] Neither the Debtor nor I concede that such creditors have valid and properly perfected security interests and liens in the Debtor's cash and other assets.

8

$4,680,000 as of the Petition Date, I believe the Bank, Wells Fargo, Fashblvd, SBOE and any other creditors who assert that they have perfected security interests in the Debtor's cash (collectively, the "Secured Creditors") are adequately protected by a substantial equity cushion in the Debtor's assets.

21. In addition, as further adequate protection of the Debtor's use of cash collateral, the Debtor is proposing in the CC Motion that the Secured Parties receive replacement liens against the Debtor's post-petition assets, with such replacement liens to have the same validity, priority, and extent as the prepetition liens held by the Secured Parties against the Debtor' cash.

**C.    The Wage Motion.**

22. As of the Petition Date, the Debtor employed approximately 110 non-insider employees (collectively, the "Employees," and each, an "Employee"). A list of the Employees which reflects their respective wages is attached as **Exhibit "C"** hereto.

23. Seven (7) of the Employees are paid on a semi-monthly basis (*i.e.*, on the 1st and 16th of each month), while the remaining Employees are paid on a bi-weekly basis (*i.e.*, every two weeks, on Wednesday). While the Employees who are paid on a semi-monthly basis are paid on a current basis through the date of payroll, the Employees who are paid on a bi-weekly basis are paid approximately three (3) days in arrears. So, for example, the payroll paid on October 16, 2016 (prior to the Petition Date) to those Employees who are paid on a semi-monthly basis covered the period from October 1-16, 2016, while the payroll paid on October 12, 2016 to those Employees who are paid on a bi-weekly basis covered the period from September 26 – October 9, 2016.

24. The Debtor processes the payment of wages, including all applicable federal and state withholding taxes and payroll taxes (collectively, "Wages"), to its Employees internally, using a payroll software program, and does not use any outside payroll service.

25. On Wednesday, October 26, 2016, the Debtor will owe Wages to its Employees who are paid on a bi-weekly basis for the two-week period from October 10, 2016 through and including Sunday, October 23, 2016 – four (4) days of which will constitute pre-petition

obligations. The Debtor estimates that the total payroll obligations due on Wednesday, October 26, 2016, including all payroll taxes, will be approximately $65,057. To ensure that there is no interruption or delay in the payment of Wages to those Employees who are paid on a bi-weekly basis, the Debtor must obtain Court approval of the Wage Motion by **Wednesday, October 26, 2016**.

26. On Tuesday, November 1, 2016, the Debtor will owe Wages to its 7 Employees who are paid on a semi-monthly basis for the period from Sunday, October 16, 2016 through and including Monday, October 31, 2016 – twelve (12) days of which will constitute pre-petition obligations. The Debtor estimates that the total payroll obligations due on Tuesday, November 1, 2016, including all payroll taxes, will be approximately $10,381.

27. The Debtor is *not* seeking authority to pay the pre-petition priority Wages of any employees who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code. The Employees who are the subject of the Wage Motion do not include any "insider" employees of the Debtor. Approval to pay compensation to the Debtor's "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

28. The Debtor also provides its employees with certain employment and benefit programs comparable to the programs that are typically offered by other employers within the retail industry. The following employment and benefit programs are proposed to be continued to be offered to the Debtor's Employees post-petition:

    a. *Vacation And Sick Leave Policy*. The Debtor offers a paid vacation/sick leave policy to its Employees. The accrual rates for paid vacation/sick leave are as follows: (i) Employees working within the City of Los Angeles – 48 hours (*e.g.*, six 8-hour days) per calendar year; and (ii) Employees working outside the City of Los Angeles – 24 hours (*e.g.*, three 8-hour days) per calendar year. Unused vacation/sick leave during a calendar year is not carried forward into the following calendar year(s). Employees are not permitted to "cash out" their accrued and unused vacation/sick leave. The Debtor desires

Case 2:16-bk-23836-SK    Doc 12    Filed 10/24/16    Entered 10/24/16 16:46:00    Desc
Main Document    Page 11 of 16

to continue having its existing vacation, holiday, and sick leave policies in effect, and seeks authority to honor such policies post-petition as set forth above.

      b.    ***Health Insurance Policy***.  Certain Employees – specifically, those Employees who work more than 30 hours per week – are eligible to receive company-subsidized medical insurance coverage (through Aetna California).  The Debtor subsidizes approximately 50% of the premiums for medical insurance coverage for eligible Employees.  As of the Petition Date, there were approximately nine (9) Employees who were receiving company-subsidized medical insurance coverage.  The Debtor desires to continue having its health insurance policy in effect and therefore, seeks authority to continue to honor such policy post-petition.

29.    All of the Employees included in the list attached as Exhibit "C" hereto are still employed by the Debtor.

30.    I believe that significantly all of the Employees will quit if they are not paid their salaries and benefits in full in a timely fashion.  I believe this is particularly true given that many of the Employees work on a part-time basis at the Debtor's Retail Stores.  Such Employees would have little incentive to continue working for the Debtor and could very easily acquire new employment elsewhere, particularly during the holiday selling season.  As a retail business, it is crucial for the Debtor to retain a sufficient number of Employees to operate each of its Retail Stores as well as its corporate office and warehouse facility.  The Debtor must retain the Employees to continue its business operations without interruption and to preserve and maximize the value of its assets during this Chapter 11 case.  The Debtor's personnel are familiar with the Debtor's retail operations and business philosophy, and, thus, essential to the preservation of the Debtor's business.  Therefore, the Debtor's failure to pay pre-petition Wages to the Employees and honor the Debtor's employment and benefit policies will likely result in severe disruptions to the Debtor's operations to the detriment of creditors.  The Debtor's ability to preserve the full value of its business and assets depends upon the Debtor's continued operations, which cannot occur without the efforts of the Employees.

31. In order to attract and retain the Employees, the Debtor maintains what I believe are competitive and reasonable employment and benefit policies. I believe that maintaining good relationships with, and the morale of, the Employees requires continuing to honor the employment and benefit policies described above and in the Wage Motion which are currently in effect for the Employees.

32. All of the Employees' claims for pre-petition Wages are within the $12,850 limit which I am informed is established by the Bankruptcy Code.

33. The source of the funds to be used to pay and/or honor the pre-petition Wages and to continue honoring the Debtor's employment and benefit policies will be the Debtor's revenue, which I believe Pacific City Bank contends constitutes its cash collateral. Accordingly, concurrently herewith, the Debtor has filed a motion for entry of an order authorizing the Debtor to use cash collateral to allow the Debtor to maintain its business operations and preserve the value of the Debtor's assets. Based on the operating budget submitted in connection with the Debtor's cash collateral motion, I do not believe that approval to pay and/or honor the Employees' Wages will render the Debtor's bankruptcy estate administratively insolvent.

**D.    The Utility Motion.**

34. The Debtor conducts its business from its corporate office and warehouse facility located at 2301 East 51st Street, Los Angeles, California 90058 (the "Corporate Facility") and twenty-one (21) retail stores located primarily in shopping malls throughout the state of California (collectively, the "Retail Stores," and individually, a "Retail Store").

35. In connection with the operation of the Debtor's business, the Debtor receives water, electricity, telephone, internet, trash and/or similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies"). Given the importance of the services provided by the Utility Companies to the continued operation of the Debtor's business, it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services at the Debtor's Corporate Facility and the Retail Stores be determined promptly so that there is no interruption in the services provided.

12

36. Attached as **Exhibit "D"** hereto is a list which sets forth the name and address of each Utility Company that is currently providing utility services to the Debtor's Corporate Facility and the Retail Stores, the type of utility service provided by each Utility Company, the account number(s) associated with each Utility Company, and the amount of the cash deposit proposed to be paid to each Utility Company as adequate assurance of payment (collectively, the "Cash Deposits," and individually, a "Cash Deposit"). The Debtor requests authority to pay the proposed Cash Deposits to the Utility Companies for the utility accounts reflected in Exhibit "D" hereto, regardless of whether such utility accounts are under the name of the Debtor or its predecessor Angl, Inc.

37. The total aggregate amount of the Cash Deposits proposed to be paid to the Utility Companies by the Debtor is approximately $21,000. Generally, the Debtor is proposing to provide each Utility Company with a Cash Deposit in an amount equal to the average monthly payment based on payments made on the respective utility account(s) during the three-month period preceding the Petition Date.

38. In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

39. The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the Debtor's revenue, which I believe Pacific City Bank contends constitutes its cash collateral. Accordingly, concurrently herewith, the Debtor has filed a motion for entry of an order authorizing the Debtor to use cash collateral to allow the Debtor to maintain its business operations and preserve the value of the Debtor's assets. Based on the operating budget submitted in connection with the Debtor's cash collateral motion, I do not believe that approval to pay the Cash Deposits to the Utility Companies will render the Debtor's bankruptcy estate administratively insolvent.

**E.    The Cash Management Motion.**

40. The Debtor generates revenues from sales at its Retail Stores, a substantial portion of which are received through credit card payments made by customers at the Retail Stores.

41. In the ordinary course of the Debtor's business, the Debtor maintains agreements for each of the Debtor's Retail Stores (collectively, the "Merchant Service Agreements") with Integrity Payment Systems (the "Merchant Service Company") to process credit card sales at the Retail Stores. The Merchant Service Company processes Visa, MasterCard, Discover and American Express credit card sales. True and correct copies of the operative Merchant Service Agreements with the Merchant Service Company are attached as **Exhibit "E"** hereto.

42. Generally, the Merchant Service Company processes and transfers the credit card sales receipts to the Debtor's credit card depository bank account maintained at Comerica Bank, which account bears the account number 1894834439 (the "Depository Account"), within approximately three days and deducts its fees for such services from the Debtor's Depository Account on a monthly basis, in arrears.

43. The Debtor's Depository Account is used solely to deposit the credit card sales receipts generated at the Retail Stores (minus the fees of the Merchant Service Company for its credit card processing services, which are deducted on a monthly basis). Since the Petition Date, all funds deposited by the Merchant Service Company in the Depository Account have been transferred to the Debtor's debtor-in-possession operating bank account and accounted for accordingly. Going forward, the Debtor will continue to deposit into its debtor-in-possession operating bank account all funds deposited into the Depository Account.

44. Pursuant to the Cash Management Motion, the Debtor seeks to maintain its Depository Account post-petition and to continue utilizing the services of the Merchant Service Company to process credit card sales at each of the Retail Stores in the ordinary course of business. However, instead of having the Merchant Service Company deduct its fees on a monthly basis directly from the Depository Account, the Debtor proposes that the monthly fees owed to the Merchant Service Company be paid by the Debtor from the Debtor's debtor-in-possession operating bank account. I believe that the foregoing relief will allow the Debtor to continue accepting credit card payments from its customers at the various Retail Stores without any interference or disruption.

45. If the Debtor is not permitted to maintain the Depository Account and continue operating in accordance with its Merchant Service Agreements, and the Debtor loses its ability to accept credit card payments from its customers at the Retail Stores (even temporarily), I believe the Debtor's business and ability to generate revenue will be greatly disrupted. These disruptions, in turn, will hamper the Debtor's cash flow and ability to pay critical operating expenses in the ordinary course of business. In short, I believe that if the Debtor is forced to close the Depository Account, the Debtor believes that there will be significant disruptions to its operations.

46. Since the Debtor is only seeking to maintain and keep open the Depository Account for the purpose of accepting credit card receipts, with all such credit card receipts to then be transferred to the Debtor's debtor-in-possession operating bank account (from which any and all operating disbursements, including the monthly fee payments to the Merchant Service Company will be made), the Debtor will still be able to account for such credit card receipts in compliance with the reporting guidelines and requirements of the Office of the United States Trustee.

**F.     The Customer Programs Motion.**

47. The Debtor has instituted a number of customer programs to remain competitive and to enhance its customer base. By the Customer Programs Motion filed concurrently herewith, the Debtor seeks authority to continue honoring the following customer programs (collectively, the "Customer Programs"):

a. Merchandise Credits. Merchandise credits arise when a customer purchases a product in a Retail Store and later returns the product to one of the Retail Stores within fourteen (14) days after the date of purchase. Rather than provide the customer with a cash refund, the Retail Store gives the customer a merchandise credit that can be applied, up to the amount of the credit, to purchase goods in any of the Debtor's Retail Stores. Merchandise that was purchased on sale, was returned outside of the 14-day return period, and/or was returned without an original receipt may not be returned for merchandise credit.

Merchandise credits expire one (1) year after issuance, and exchanges based upon merchandise credit are only allowed up to two (2) consecutive times. Based on the Debtor's books and records, the outstanding obligations on account of unredeemed merchandise credit issued over the one-year period preceding the Petition Date totals no more than $20,000.

   b. <u>Gift Cards</u>. The Debtor sells gift cards in all denominations that are valid towards future purchases of product from the Debtor's Retail Stores ("<u>Gift Cards</u>"). Gift Cards are sold at the Debtor's Retail Stores and cannot be redeemed for cash. Gift card balances checked at any of the Debtor's Retails Stores and do not expire. Based on the Debtor's books and records, the outstanding obligations on account of unredeemed Gift Cards total approximately $30,000 as of the Petition Date. This balance represents Gift Cards issued over several years.

  48. The Debtor seeks authority in its discretion to honor the prepetition obligations incurred under the Customer Programs. The Debtor also seeks authority, in its discretion, to continue to honor the Customer Programs in the ordinary course of business. Such Customer Programs have been provided in the Debtor's ordinary course of business and I believe are essential for the Debtor to retain customer loyalty and to stay competitive in its industry.

  49. The Debtor is seeking the relief requested herein in order to maintain customer confidence during the Debtor's Chapter 11 bankruptcy case. Absent such relief, I believe the Debtor's customer relations will be severely and irreparably harmed at a time when customer loyalty and patronage is extremely critical to the Debtor's reorganization efforts and ability to maximize value for the benefit of all creditors and parties in interest.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of October, 2016 at Los Angeles, California.

                      JEFF SUNGHAK KIM