TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | ) Case No. 2:16-bk-23836-SK |
| | ) |
| BLUE BEE, INC., | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) **NOTICE OF MOTION AND MOTION** |
| | ) **FOR ENTRY OF ORDER AUTHORIZING** |
| | ) **DEBTOR TO USE CASH COLLATERAL** |
| | ) **THROUGH AND INCLUDING APRIL 22,** |
| | ) **2017; MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES; DECLARATION OF** |
| | ) **JEFF SUNGHAK KIM IN SUPPORT** |
| | ) **THEREOF** |
| | ) |
| | ) Date:      January 19, 2017 |
| | ) Time:      8:30 a.m. |
| | ) Courtroom:  1575 |
| | ) Location:   255 E. Temple Street |
| | )            Los Angeles, California |
| | ) |
| | ) |
| | ) |
| | ) |

1

**TABLE OF CONTENTS**

**MEMORANDUM OF POINTS AND AUTHORITIES**........................................................ **4**

**I.    STATEMENT OF FACTS** ........................................................................... **4**

   **A.    Background** ........................................................................................ **4**

   **B.    Post-Petition Operations And Use Of Cash Collateral To Date** .................. **6**

   **C.    The Debtor's Primary Assets And Secured Debts** ........................................ **7**

   **D.    The Need For Use Of Cash Collateral And Proposed Operating
         Budget** ........................................................................................ **11**

**II.    DISCUSSION** ........................................................................................ **12**

   **A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate
         Its Business And To Maintain And Preserve The Value Of Its Assets** ....... **12**

   **B.    The Debtor's Prepetition Secured Creditors Are Adequately Protected
         By A Substantial Equity Cushion, The Continued Operation Of The
         Debtor's Business And Other Forms Of Adequate Protection** .................... **13**

**III.    PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE
        MOTION HAVE BEEN SATISFIED** ........................................................ **18**

**IV.    CONCLUSION** ........................................................................................ **19**

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*In re Dynaco Corporation*
  162 B.R. 389 (Bankr. D.N.H. 1993) ..............................................................13, 16

*In re Immenhausen Corp.*
  164 B.R. 347 (Bankr. M.D. Fla. 1994) .................................................................16

*In re McCombs Properties VI, Ltd.*
  88 B.R. 261 (Bankr. C.D. Cal. l988)..........................................................13, 14, 16

*In re McGowan*
  6 B.R. 241 (Bankr. E.D. Pa. 1980) ......................................................................14

*In re Mellor*
  734 F.2d 1396 (9th Cir. 1984) .......................................................................13, 14

*In re Newark Airport/Hotel Ltd. Partnership*
  156 B.R. 444 (Bankr. D.N.J. 1993) ......................................................................16

*In re O'Connor*
  808 F.2d 1393 (10th Cir. 1987) .....................................................................13, 16

*In re Oak Glen R-Vee*
  8 B.R. 213 (Bankr. C.D. Cal. 1981).....................................................................13

*In re Opelika Manufacturing Corporation*
  66 B.R. 444 (Bankr. N.D. Ill. 1986) ....................................................................14

*In re Rogers Development Corp.*
  2 B.R. 679 (Bankr. E.D. Vir. 1980) .....................................................................14

*In re Stein*
  19 B.R. 458. (Bankr. E.D. Pa. 1982) ..............................................................15, 16

*In re Triplett*
  87 B.R. 25 (Bankr. W.D.Tex. 1988).....................................................................15

*In re Tucson Industrial Partners*
  129 B.R. 614 (9th Cir. BAP 1991)........................................................................13

*Matter of Pursuit Athletic Footwear, Inc.*
  193 B.R. 713 (Bankr. D. Del. 1996) .....................................................................16

*United Savings Association v. Timbers of Inwood Forest Associates*
  108 S.Ct. 626 (1988)..........................................................................................14

**FEDERAL STATUTES**

11 U.S.C. § 363 ............................................................................................................2, 12

11 U.S.C. § 363(a) ...............................................................................................................12

11 U.S.C. § 363(c)(1) ..........................................................................................................12

11 U.S.C. § 363(c)(2)(A) .....................................................................................................13

11 U.S.C. § 363(c)(2)(B) .....................................................................................................13

11 U.S.C. § 1107(a) .............................................................................................................12

11 U.S.C. § 361(1) ...............................................................................................................14

11 U.S.C. § 361(2) ...............................................................................................................14

11 U.S.C. § 363(c)(2) ..............................................................................................12, 13, 17

11 U.S.C. § 363(c)(2)(A) .....................................................................................................14

11 U.S.C. § 1107 ...................................................................................................................4

11 U.S.C. § 1108 ...................................................................................................................4

**FEDERAL RULES**

Fed. R. Bankr. P. 4001 .....................................................................................................2, 18

Fed. R. Bankr. P. 9013-1 ......................................................................................................2

Fed. R. Bankr. P. 9014 .........................................................................................................2

Fed. R. Evid. 201 ........................................................................................................8, 9, 10

1    **PLEASE TAKE NOTICE** that a hearing will be held on January 19, 2017 at 8:30

2    a.m., before the Honorable Sandra R. Klein, United States Bankruptcy Judge for the Central

3    District of California, Los Angeles Division, in Courtroom "1575" located at 255 East Temple

4    Street, Los Angeles, California, for the Court to consider the motion (the "Motion") filed by

5    Blue Bee, Inc., a California corporation d/b/a Angl and the debtor and debtor-in-possession in

6    the above-captioned Chapter 11 bankruptcy case (the "Debtor"), for the entry of an order,

7    pursuant to 11 U.S.C. § 363, authorizing the Debtor to use cash collateral in accordance with the

8    Debtor's operating budget for the 13-week period from January 22, 2017 through and including

9    April 22, 2017 (the "Budget"), a copy of which is attached as **Exhibit "1"** to the Declaration of

10   Jeff Sunghak Kim annexed hereto (the "Kim Declaration").  The full basis for the Motion is

11   described in the Memorandum of Points and Authorities and the Kim Declaration attached

12   hereto.

13        The Motion is based upon 11 U.S.C. § 363, Rules 4001 and 9014 of the Federal Rules

14   of Bankruptcy Procedure, and Local Bankruptcy Rules 4001-2 and 9013-1, the supporting

15   Memorandum of Points and Authorities and the Kim Declaration attached hereto, the

16   statements, arguments and representations of counsel to be made at the hearing on the Motion,

17   and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

18        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

19   1(f), any opposition to the Motion must be in writing, filed with the Court and served upon the

20   United States Trustee as well as counsel for the Debtor at the address set forth in the upper left-

21   hand corner of the first page of this Notice and Motion by no later than fourteen (14) days

22   before the date of the hearing on the Motion.

23        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

24   1(h), the failure to file and serve a timely opposition to the Motion may be deemed by the Court

25   to constitute consent to the granting of the relief requested in the Motion.

26   / / /

27   / / /

28   / / /

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order in substantially the form attached as **Exhibit "3"** to the Kim Declaration annexed hereto:

(1)    granting the Motion in its entirety;

(2)    authorizing the Debtor to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court; and

(3)    granting such other and further relief as the Court deems just and proper.

Dated: December 29, 2016                    BLUE BEE, INC.

By: _____
              TIMOTHY J. YOO
              JULIET Y. OH
              LEVENE, NEALE, BENDER, YOO
                 & BRILL L.L.P.
              Attorneys for Debtor and
              Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. STATEMENT OF FACTS

**A.    Background.**

1.    On October 19, 2016 (the "Petition Date"), Blue Bee, Inc., a California corporation d/b/a Angl and the debtor and debtor-in-possession herein (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").    The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers.    As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California (collectively, the "Retail Stores," and individually, a "Retail Store").    Since the opening of its first Retail Store in 1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing designer fashion to a wider audience.

3.    The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by Jeff Sunghak Kim and his wife, Young Ae Kim, and was dissolved on August 30, 2013.    Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.    The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.    Jeff Sunghak Kim and his wife, Young Ae Kim, continue to be actively involved in the Debtor's business operations as the President and Secretary of the Debtor, respectively.

4.    The Debtor is headquartered near downtown Los Angeles, California and currently employs a workforce of approximately 110 employees.    In 2015, the Debtor generated annual gross revenues of more than $24 million.

5.      After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The vast majority of these new retail stores (approximately 43 stores) were opened within the last seven years.  This large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

6.      The high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors.  As a result of the Debtor's defaults, numerous landlords commenced actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of its Retail Stores.  While the Debtor had already closed a number of its less profitable retail store locations, leaving open approximately 21 Retail Stores as of the Petition Date, the Debtor required time to evaluate the viability of its remaining Retail Stores and identify other ways to decrease operational costs and increase profitability.  In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

7.      Through its bankruptcy case, the Debtor intends to identify the core Retail Stores around which the Debtor can successfully reorganize, to expeditiously close those Retail Stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the Retail Stores, all of which the Debtor believes will enable it to formulate and pursue

5

1    confirmation of a plan of reorganization which allows the Debtor to restructure its existing debt

2    in a cohesive and efficient manner while continuing to operate its longstanding business.

3    **B.        Post-Petition Operations And Use Of Cash Collateral To Date.**

4        8.        Shortly after the Petition Date, on October 24, 2016, the Debtor filed an

5    emergency motion [Doc. No. 9] (the "First CC Motion") seeking an order, among other things,

6    authorizing the Debtor to use cash collateral in accordance with the Debtor's initial 13-week

7    operating budget submitted therewith (the "Initial Budget").

8        9.        On November 1, 2016, the Court entered an interim order granting the First CC

9    Motion on an interim basis, pending a final hearing which was set for November 30, 2016 at

10    9:30 a.m. [Doc. No. 36] (the "Interim Order").

11        10.        On November 16, 2016, the Debtor filed a status report in advance of the final

12    hearing on the First CC Motion [Doc. No. 51], pursuant to which the Debtor submitted a revised

13    version of the Initial Budget (the "Revised Initial Budget").

14        11.        On December 14, 2016, the Court entered a final order granting the First CC

15    Motion on a final basis and authorizing the Debtor to use cash collateral in accordance with the

16    Revised Initial Budget, subject to the terms and conditions set forth on the record of the Court at

17    the final hearing on the First CC Motion held on November 30, 2016 [Doc. No. 68] (the "Final

18    Order," and together with the Interim Order, the "First CC Orders")).

19        12.        Pursuant to the First CC Orders, the Debtor has been using its cash collateral in

20    accordance with the Revised Initial Budget to operate its business.

21        13.        The Debtor's authority to use cash collateral pursuant to the First CC Orders will

22    expire on or about January 21, 2017.  The Debtor has therefore filed this Motion to seek an

23    order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's

24    operating budget for the 13-week period from January 22, 2017 through and including April 22,

25    2017 (the "Budget"), a copy of which is attached as **Exhibit "1"** to the Declaration of Jeff

26    Sunghak Kim annexed hereto (the "Kim Declaration").

27        14.        The Debtor has begun performing a detailed store-by-store analysis of its 21

28    Retail Stores to determine which of the Retail Stores are profitable (or potentially profitable if

1   rent concessions can be successfully negotiated) and which of the Retail Stores are not

2   profitable and therefore must be closed on an expeditious basis.  The Debtor has also begun

3   negotiations with certain of its landlords to try to obtain rent concessions which would reduce

4   rent to a level that would render currently underperforming Retail Stores profitable.

5         15.   In connection with its analysis of the Retail Stores, the Debtor has identified

6   seven (7) Retail Stores which the Debtor believes are unprofitable, unless meaningful rent

7   concessions can be negotiated with the respective landlords, and will only serve the deplete the

8   Debtor's resources given the ongoing post-petition rent obligations associated with such stores,

9   if the Debtor does not immediately close such stores.  Accordingly, concurrently herewith, the

10  Debtor has filed a motion, pursuant to which the Debtor seeks authority to reject its unexpired

11  non-residential real property leases for the foregoing seven (7) Retail Stores (collectively, the

12  "Rejected Stores," and individually, a "Rejected Store"), or some portion thereof in the

13  discretion of the Debtor, with the rejection of such leases to be deemed effective as of the later

14  of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable

15  Rejected Store.

16  **C.**   **The Debtor's Primary Assets And Secured Debts.**

17        16.   The Debtors' primary assets are as follows:

18        a.   Cash.   As of the Petition Date, the Debtor had cash on hand of

19  approximately $93,000.

20        b.   Security Deposits.   As of the Petition Date, the Debtor had security

21  deposits with landlords and other parties in the total sum of approximately $87,013.

22        c.   Inventory.   As of the Petition Date, the Debtor had inventory with an

23  estimated cost value of approximately $3,500,000.

24        d.   Other Assets.   As of the Petition Date, the Debtor had furniture, fixtures

25  and equipment ("FF&E") with a net book value of $6,299,306 and an estimated

26  aggregate fair market value of at least $1,000,000.

27  / / /

28  / / /

1      17.      The Debtor's senior secured lender is Pacific City Bank (the "Bank").    The

2      Debtor is a borrower under three (3) separate loans with the Bank, as described below:[1]

3                a.      The Debtor is the borrower under a U.S. Small Business Administration

4      loan with the Bank (the "SBA Loan"), pursuant to a Loan Agreement dated July 24,

5      2014 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in

6      the amount of approximately $1,660,000 under the SBA Loan.  The Bank filed UCC-1

7      financing statements against the Debtor and its predecessor, Angl, Inc. asserting a lien

8      against substantially all of the assets of the Debtor and Angl, Inc.

9                b.      The Debtor is the borrower under a term loan bearing the Loan Number

10     134077 with the Bank (the "First Term Loan"), pursuant to a Business Loan Agreement

11     dated November 2, 2015 between the Debtor and the Bank.  The Debtor is currently

12     indebted to the Bank in the amount of approximately $442,000 under the First Term

13     Loan.

14                c.      The Debtor is the borrower under a second term loan bearing the Loan

15     Number 133776 (the "Second Term Loan"), pursuant to a Business Loan Agreement

16     dated July 23, 2014 between the Debtor and the Bank.  The Debtor is currently indebted

17     to the Bank in the amount of approximately $1,500,000 under the Second Term Loan.

18     The Second Term Loan is secured by certain non-Debtor assets, including commercial

19     real property owned by the Debtor's affiliate, Peace People, LLC (the "Affiliate

20     Commercial Property"), from which the Second Term Loan is anticipated to be repaid in

21     full shortly.  Specifically, the Affiliate Commercial Property is currently in escrow to be

22     sold to a third party for the purchase price of $4,825,000, with the closing date of such

23

24

25     [1] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial notice of the *Omnibus Declaration Of Jeff Sunghak Kim In Support Of Debtor's Emergency "First Day" Motions* filed by the Debtor on October 24, 2016 [Doc. No. 12], specifically Exhibit "B" thereto, which includes copies of

26     the pre-petition loan and collateral documents with the Bank.

27         The Debtor also requests that the Court take judicial notice of the *Declaration Of Juliet Y. Oh In Support Of Debtor's Emergency Motion For An Interim Order Authorizing The Debtor To Use Cash Collateral On An Interim

28     Basis Pending A Final Hearing* [Doc. No. 11], which includes copies of the UCC-1 financing statements filed by the Debtor's alleged secured creditors.

1    sale expected to occur on or about January 30, 2017.   The sale of the Affiliate

2    Commercial Property will result in the full satisfaction of, among other things, the

3    Second Term Loan and the First Term Loan with the Bank.   A true and correct copy of

4    the escrow instructions relating to the pending sale of the Affiliate Commercial Property

5    to the buyer is attached as **Exhibit "2"** to the Kim Declaration annexed hereto.

6    　　　18.    Prior to the Petition Date, the Debtor provided a commercial guaranty of the

7    obligations of the Debtor's affiliate, Peace People, LLC, under a term loan made by Wells Fargo

8    Bank, N.A. ("Wells Fargo") to Peace People, LLC pursuant to a Business Loan Agreement

9    dated February 17, 2014 (the "Wells Fargo Loan").[2]   The commercial guaranty provided by the

10   Debtor in connection with the Wells Fargo Loan is purportedly secured by substantially all

11   assets of the Debtor (which the Debtor disputes).[3]   As a result of the commercial guaranty, the

12   Debtor is currently indebted to Wells Fargo in the amount of approximately $1,500,000 under

13   the Wells Fargo Loan.  The Wells Fargo Loan is secured by the Affiliate Commercial Property.

14   Accordingly, the pending sale of the Affiliate Commercial Property will also result in the full

15   satisfaction of the Wells Fargo Loan.

16   　　　19.    Prior to the Petition Date, the Debtor obtained a secured loan in the amount of

17   $6,000 from Fashblvd., Inc. ("Fashblvd").   Flashblvd filed a UCC-1 financing statement

18   (Document No. 57738600002) asserting a lien against substantially all of the assets of the

19   Debtor prior to the commencement of the Debtor's bankruptcy case on October 19, 2016.[4]

20

21   _____

22   　　　[2] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial
notice of the *Omnibus Declaration Of Jeff Sunghak Kim In Support Of Debtor's Emergency "First Day" Motions*
23   filed by the Debtor on October 24, 2016 [Doc. No. 12], specifically Exhibit "B" thereto, which includes copies of
the pre-petition loan and collateral documents with Wells Fargo.

24   　　　[3] Neither the Debtor nor its counsel has been able to locate evidence of a UCC-1 financing statement recorded
25   by Wells Fargo against the Debtor.  The Debtor does not concede that Wells Fargo has a valid and properly
perfected security interest and lien in the Debtor's cash and other assets.

26   　　　[4] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial
27   notice of the *Declaration Of Juliet Y. Oh In Support Of Debtor's Emergency Motion For An Interim Order
Authorizing The Debtor To Use Cash Collateral On An Interim Basis Pending A Final Hearing* [Doc. No. 11],
28   specifically Exhibit "2" thereto, which includes evidence of the filing of the UCC-1 financing statement by
Fashblvd against the Debtor.

20.    In addition to the financing statements filed by the Bank and Fashblvd against the Debtor and/or its predecessor, Angl, Inc., there are financing statements that have been filed against the Debtor and Angl, Inc. by the following parties[5]:

a.    U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance has one active financing statement (filing number 13-7390160767), filed on December 10, 2013, which purports to cover certain specified equipment leased or financed from U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance does not purport to assert a security interest in the Debtor's cash.

b.    California State Board Of Equalization ("SBOE").  SBOE has one active state tax lien (filing number 15-7447815850) which was recorded against the Debtor on January 29, 2015.

c.    Line & Dot, LLC d/b/a Lumiere Collections ("L&E").  L&E has one active judgment lien (filing number 16-7546469513) which was recorded against the Debtor on September 15, 2016.  The parties recently entered into a stipulation to avoid the foregoing judgment lien, which stipulation was approved by the Court pursuant to an order entered on December 22, 2016.

d.    Tyler Mall Limited Partnership ("Tyler Mall").  Tyler Mall has one active judgment lien (filing number 16-7542925708) which was recorded against Angl, Inc. on August 22, 2016.  The Debtor submits that the foregoing judgment lien, which was recorded within the 90-day period preceding the Petition Date, is avoidable as a preferential transfer and is therefore disputed.

e.    GGP-Otay Ranch, L.P. ("GGP").  GGP has one active judgment lien (filing number 16-7542926072) which was recorded against Angl, Inc. on August 22, 2016.  The Debtor submits that the foregoing judgment lien, which was recorded within

---

[5] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial notice of the *Declaration Of Juliet Y. Oh In Support Of Debtor's Emergency Motion For An Interim Order Authorizing The Debtor To Use Cash Collateral On An Interim Basis Pending A Final Hearing* [Doc. No. 11], specifically Exhibit "2" thereto, which includes copies of the UCC-1 financing statements filed against the Debtor.

1    the 90-day period preceding the Petition Date, is avoidable as a preferential transfer and

2    is therefore disputed.

3          f.      <u>Valley Plaza Mall, LP ("Valley Plaza")</u>.  Valley Plaza has one active

4    judgment lien (filing number 16-7545824507) which was recorded against Angl, Inc. on

5    September 12, 2016.  The Debtor submits that the foregoing judgment lien, which was

6    recorded within the 90-day period preceding the Petition Date, is avoidable as a

7    preferential transfer and is therefore disputed.

8          21.      Based on the foregoing, the Debtor believes that the Bank, Fashblvd and the

9    SBOE are the only parties that may potentially have a perfected security interest in the Debtor's

10    cash.[6]

11    **D.      The Need For Use Of Cash Collateral And Proposed Operating Budget.**

12          22.      By this Motion, the Debtor seeks an order of the Court authorizing the Debtor to

13    use its cash, during the period from January 22, 2017 through and including April 22, 2017, to

14    pay the expenses set forth in the Budget which is attached as Exhibit "1" to the Kim Declaration

15    annexed hereto, as well as all quarterly fees owing to the Office of the United States Trustee and

16    all expenses owing to the Clerk of the Bankruptcy Court.  In addition, the Debtor seeks authority

17    to deviate from the expense line items contained in the Budget, without the need for any further

18    Court order, by up to 20%, on both a line item and aggregate basis, with any unused portions to

19    be carried over into the following week(s).  The Debtor will not deviate from the Budget beyond

20    the foregoing parameters without further order of the Court.

21          23.      The Budget takes into account, among other things, the anticipated closure of the

22    seven (7) Rejected Stores in December, 2016 and January, 2017.

23          24.      The Debtor requires an order of this Court authorizing the Debtor to use cash

24    collateral in accordance with the Budget to enable the Debtor to pay all of its normal and

25    ordinary operating expenses (such as payroll, rent, utilities, insurance, and payments to vendors)

26    as they come due in the ordinary course of its business and to purchase new inventory to

27    _____

28       [6] The Debtor does not concede that such creditors have valid and properly perfected security interests and liens
in the Debtor's cash and other assets.

1    replenish merchandise that is sold to customers at the Debtor's remaining Retail Stores, which

2    in turn will facilitate the continued operation of the Debtor's business (without any disruption)

3    and the preservation and maximization of the going-concern value of the Debtor's business and

4    assets.  If the Debtor does not obtain authority to use its cash collateral, the Debtor's estate will

5    suffer immediate and irreparable harm, including, without limitation, a cessation of the Debtor's

6    business operations and a corresponding (and likely substantial) decline in the value of the

7    Debtor's business and assets.

8                              **II.    DISCUSSION**

9    **A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate Its Business**

10         **And To Maintain And Preserve The Value Of Its Assets.**

11         The Debtor's use of property of the estates is governed by Section 363 of the Bankruptcy

12   Code, which provides, in pertinent part:

13                   If the business of the debtor is authorized to be operated under
                     section. . .1108. . . of this title and unless the court orders
14                   otherwise, the trustee may enter into transactions, including the
                     sale or lease of property of the estate, in the ordinary course of
15                   business, without notice or a hearing, and may use property of the
                     estate in the ordinary course of business without notice or a
16                   hearing.

17

18   11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with

19   respect to property of the estate, including the right to use property of the estate in compliance

20   with section 363.  11 U.S.C. § 1107(a).

21         "Cash collateral" is defined as "cash, negotiable instruments, documents of title,

22   securities, deposit accounts or other cash equivalents in which the estate and an entity other than

23   the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special

24   requirement with respect to "cash collateral," providing that the trustee or debtor in possession

25   may use "cash collateral" under subsection (c)(1) if:

26                   (A)    each entity that has an interest in such cash collateral
                     consents; or
27                   (B)    the court, after notice and a hearing, authorizes such use,
                     sale or lease in accordance with the provisions of this section.
28

                                   12

11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991).   In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

For all of the reasons discussed herein, the Debtor has no ability to continue to maintain its business operations or to preserve and maximize the value of its assets unless the Debtor is authorized to use its cash collateral to pay its projected expenses in accordance with the Budget. The Debtor's inability to pay such expenses would cause immediate and irreparable harm to the Debtor's bankruptcy estate.   Indeed, the Debtor's inability to pay its projected expenses, including payroll, rent, utilities and other operating expenses would result in the immediate shutdown of the Debtor's business and the decimation of the value (going-concern or otherwise) of the Debtor's business and assets.  The maintenance of the Debtor's business and preservation and maximization of the Debtor's inventory and other assets are of the utmost significance and importance to a successful reorganization of the Debtor through this Chapter 11 case.

**B.** **The Debtor's Prepetition Secured Creditors Are Adequately Protected By A Substantial Equity Cushion, The Continued Operation Of The Debtor's Business And Other Forms Of Adequate Protection.**

Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected.  *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).   *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

13

1    The Debtor believes that the Bank, Fashblvd, SBOE and any other creditors who assert

2    that they have perfected security interests in the Debtor's cash (collectively, the "Secured

3    Creditors") will ultimately consent to the Debtor's use of cash collateral to pay the expenses set

4    forth in the Budget in accordance with the terms and conditions set forth in this Motion.

5    Accordingly, the Debtor submits that it should be authorized to use cash collateral pursuant to

6    section 363(c)(2)(A) of the Bankruptcy Code.

7    Even if the Secured Creditors do not consent to the Debtor's use of cash collateral, the

8    Debtor submits that the value of such Secured Creditors' interests in the Debtor's cash collateral

9    will be adequately protected by a significant equity cushion.  As discussed above, the Debtor

10    believes that the Bank, Fashblvd and the SBOE are the only parties that may have a perfected

11    security interest in the Debtor's cash.

12    Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

13    *Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property

14    interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

15    Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.

16    *See also McCombs*, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the

17    secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the

18    collateral." *McCombs*, at 266.

19    The Ninth Circuit made clear in *Mellor*, *Id.* at 1401, that an equity cushion of 20% is

20    considered clear adequate protection of a secured creditor's interest in cash collateral.  *See also*

21    *In re McGowan,* 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to

22    be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Vir.

23    1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient

24    adequate protection to the creditor, even though the debtors had no equity in the property.)

25    Furthermore, in determining whether a secured creditor has equity in property, the Court

26    should consider the "entire security package" not just a portion thereof.  *In re Opelika*

27    *Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

28

1    As of the Petition Date, the Debtor was holding cash of approximately $93,000, security

2    deposits totaling $87,013, inventory valued at approximately $3,500,000 (at cost), and FF&E

3    with an estimated fair market value of at least $1,000,000.    Based on the foregoing, the

4    aggregate value of the Debtor's assets as of the Petition Date was approximately $4,680,000.

5    Although the Debtor has depleted some of its inventory since the Petition Date by selling such

6    inventory at its Retail Stores, any inventory that has been sold since the Petition Date has been

7    sold at a retail price which exceeds the value (at cost) of the inventory.    Accordingly, any

8    reduction in the value of the Debtor's inventory since the Petition Date has resulted in a

9    proportionately higher increase in the amount of cash held by the Debtor (estimated to total

10    $372,484 as of January 22, 2017), resulting in a net increase in the aggregate value of the

11    Debtor's assets since the Petition Date.

12    As noted above, the Debtor believes that the amounts owed to the Secured Creditors are

13    as follows: (i) approximately $3,602,000 to the Bank (based upon SBA Loan, the First Term

14    Loan, and the Second Term Loan), (ii) $6,000 to Fashblvd, and (iii) $24,160.38 to the SBOE.

15    Given the aggregate value of the Debtor's assets (*i.e.*, approximately $4,680,000 or higher), and

16    the total estimated amount owed to the Debtor's Secured Creditors (*i.e.*, approximately

17    $3,632,160), the Secured Creditors are adequately protected by an equity cushion of

18    approximately 28%, well in excess of the 20% equity cushion that the Ninth Circuit has

19    indicated constitutes clear adequate protection of a secured creditor's interest in cash collateral.

20    Furthermore, the Debtor submits that the value of the Secured Creditors' interest in the

21    Debtor's cash collateral will be adequately protected by, among other things, the maintenance

22    and continued operation of the Debtor's business.

23    The law is clear that the preservation of the value of a secured creditor's lien is sufficient

24    to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.

25    *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988).    *See also In re Stein*, 19 B.R. 458 (Bankr.

26    E.D.Pa. 1982).    In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral

27    where such use would enhance or preserve the value of the collateral, and allowed the debtor

28    therein to use cash collateral even though the secured party had no equity cushion for protection.

15

The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs, supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the payment of the expenses necessary for the Debtor to maintain and continue operating its business will adequately protect the Secured Creditors because, by doing so, the Debtor will be able to, among other things, maximize the value of its inventory and generate as much revenue as possible from the sale of such inventory. Other courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

1    The use of cash collateral is critical to the Debtor's ability to implement an effective

2  reorganization strategy for the benefit of all creditors.    As discussed above, through this

3  bankruptcy case, the Debtor intends to identify the core Retail Stores around which the Debtor

4  can successfully reorganize, to expeditiously close those Retail Stores which are not likely to be

5  profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the

6  landlords (a process which the Debtor has already started to undertake), to identify and

7  implement reasonable cost cutting measures and to maximize the value of the Debtor's

8  inventory by continuing its retail operations at the Retail Stores, all of which the Debtor believes

9  will enable it to formulate and pursue confirmation of a plan of reorganization which allows the

10  Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to

11  operate its longstanding business.    If the Debtor is not permitted to use cash collateral in

12  accordance with the Budget to enable the Debtor to pay all of its normal and ordinary operating

13  expenses as they come due in the ordinary course of its business and to purchase new inventory

14  to replenish merchandise that is sold to customers at the Debtor's Retail Stores, which in turn

15  will facilitate the continued operation of the Debtor's business (without any disruption) and the

16  preservation and maximization of the going-concern value of the Debtor's business and assets,

17  the Debtor will be forced to immediately halt all business operations, which will significantly

18  and negatively impact the value of the Debtor's business and assets.    Clearly, the use of cash

19  collateral will only enhance the prospect of the Debtor's reorganization.

20    In addition to the forms of adequate protection discussed above, the Debtor also

21  proposes to provide its Secured Creditors with replacement liens and security interests against

22  the Debtor's post-petition assets, with such replacement liens to have the same extent, validity,

23  and priority as the pre-petition liens held by such Secured Creditors against the Debtor's assets.

24  Such replacement liens will provide the Secured Creditors with further adequate protection.

25    Given the foregoing forms of adequate protection being provided to the Debtor's pre-

26  petition Secured Creditors for the Debtor's use of cash collateral, the Debtor submits that the

27  requirements of Bankruptcy Code Section 363(c)(2) have been satisfied and that the Debtor

28  should be authorized to use cash collateral in accordance with the terms set forth in this Motion.

## III.

## PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF

## THE MOTION HAVE BEEN SATISFIED

Rule 4001(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") sets forth the procedural requirements for obtaining authority to use cash collateral. The Debtor submits that it has complied with these procedural requirements. First, the Motion must contain a copy of the proposed form of order granting the Motion, which has been done by attaching the proposed order as **Exhibit "3"** to the Kim Declaration annexed hereto. Second, the Motion provides a concise statement of the relief requested, which was done above. Third, the Motion is required to be served on any entity with an interest in the Debtor's cash collateral, any committee appointed or the twenty largest unsecured creditors if there is no committee, and on such other parties as the Court directs. Here, the Debtor has served the Motion and all supportive papers upon the Office of the United States Trustee, all alleged secured creditors and their counsel (if known), the twenty largest unsecured creditors of the Debtor (as no committee yet exists), and all parties who have requested special notice. Accordingly, the Motion complies with the procedural requirements of Bankruptcy Rule 4001(b)-(d).

In addition, in compliance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which discloses whether the proposed order granting the Motion and authorizing the Debtor's use of cash collateral contains certain provisions of findings of fact. Accordingly, the Motion complies with the procedural requirements of Local Bankruptcy Rule 4001-2.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# IV.

## CONCLUSION

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order in substantially the form attached as **Exhibit "3"** to the Kim Declaration annexed hereto:

(1)     granting the Motion in its entirety;

(2)     authorizing the Debtor to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court; and

(3)     granting such other and further relief as the Court deems just and proper.

Dated:  December 29, 2016                    BLUE BEE, INC.

By:_____
                    TIMOTHY J. YOO
                    JULIET Y. OH
                    LEVENE, NEALE, BENDER, YOO
                        & BRILL L.L.P.
                    Attorneys for Debtor and
                    Debtor in Possession

## DECLARATION OF JEFF SUNGHAK KIM

I, Jeff Sunghak Kim, hereby declare as follows:

1.      I am over 18 years of age.  I am the co-founder and President of Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession herein (the "Debtor"), and am therefore familiar with the business operations and financial books and records of the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify as a witness, I could and would competently testify thereto.

2.      I have access to the Debtor's books and records.  As the co-founder and President of the Debtor, I am familiar with the history, organization, operations and financial condition of the Debtor.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my review of the Debtor's books and records.

3.      I make this declaration in support of the Debtor's motion to which this declaration is attached (the "Motion") which seeks the entry of an order authorizing the Debtor to use cash collateral in accordance with the Debtor's operating budget for the 13-week period from January 22, 2017 through and including April 22, 2017 (the "Budget"), a copy of which is attached as **Exhibit "1"** hereto.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

4.      On October 19, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession.

5.      The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers.  As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California (collectively, the "Retail Stores," and

individually, a "Retail Store").  Since the opening of its first Retail Store in 1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing designer fashion to a wider audience.

6.     The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by my wife, Young Ae Kim, and me, and was dissolved on August 30, 2013.  Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.  The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  My wife, Young Ae Kim, and I continue to be actively involved in the Debtor's business operations as the Secretary and President of the Debtor, respectively.

7.     The Debtor is headquartered near downtown Los Angeles, California and currently employs a workforce of approximately 110 employees.  In 2015, the Debtor generated annual gross revenues of more than $24 million.

8.     After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The vast majority of these new retail stores (approximately 43 stores) were opened within the last seven years.  I believe this large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

9.     I believe the high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors.  As a result of the Debtor's defaults, numerous landlords

commenced actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of its Retail Stores. While the Debtor had already closed a number of its less profitable retail store locations, leaving open approximately 21 Retail Stores as of the Petition Date, the Debtor required time to evaluate the viability of its remaining Retail Stores and identify other ways to decrease operational costs and increase profitability. In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

10.    Through its bankruptcy case, the Debtor intends to identify the core Retail Stores around which the Debtor can successfully reorganize, to expeditiously close those Retail Stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the Retail Stores, all of which the Debtor believes will enable it to formulate and pursue confirmation of a plan of reorganization which allows the Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

**Post-Petition Operations And Use Of Cash Collateral To Date**

11.    Shortly after the Petition Date, on October 24, 2016, the Debtor filed an emergency motion (the "First CC Motion") seeking an order, among other things, authorizing the Debtor to use cash collateral in accordance with the Debtor's initial 13-week operating budget submitted therewith (the "Initial Budget").

12.    I am advised and believe that, on November 1, 2016, the Court entered an interim order granting the First CC Motion on an interim basis, pending a final hearing which was set for November 30, 2016 at 9:30 a.m. (the "Interim Order").

13.    On November 16, 2016, the Debtor filed a status report in advance of the final hearing on the First CC Motion, pursuant to which the Debtor submitted a revised version of the Initial Budget (the "Revised Initial Budget").

14.    I am advised and believe that, on December 14, 2016, the Court entered a final order granting the First CC Motion on a final basis and authorizing the Debtor to use cash

1  collateral in accordance with the Revised Initial Budget, subject to the terms and conditions set

2  forth on the record of the Court at the final hearing on the First CC Motion held on November

3  30, 2016 (the "Final Order," and together with the Interim Order, the "First CC Orders")).

4       15.    Pursuant to the First CC Orders, the Debtor has been using its cash collateral in

5  accordance with the Revised Initial Budget to operate its business.

6       16.    The Debtor's authority to use cash collateral pursuant to the First CC Orders will

7  expire on or about January 21, 2017.  Therefore, the Debtor is seeking an order of the Court

8  authorizing the Debtor to continue using cash collateral, in accordance with the Budget, during

9  the 13-week period from January 22, 2017 through and including April 22, 2017.

10       17.    The Debtor has begun performing a detailed store-by-store analysis of its 21

11  Retail Stores to determine which of the Retail Stores are profitable (or potentially profitable if

12  rent concessions can be successfully negotiated) and which of the Retail Stores are not

13  profitable and therefore must be closed on an expeditious basis.  The Debtor has also begun

14  negotiations with certain of its landlords to try to obtain rent concessions which would reduce

15  rent to a level that would render currently underperforming Retail Stores profitable.

16       18.    In connection with its analysis of the Retail Stores, the Debtor has identified

17  seven (7) Retail Stores which the Debtor believes are unprofitable, unless meaningful rent

18  concessions can be negotiated with the respective landlords, and will only serve the deplete the

19  Debtor's resources given the ongoing post-petition rent obligations associated with such stores,

20  if the Debtor does not immediately close such stores.  Accordingly, concurrently herewith, the

21  Debtor has filed a motion, pursuant to which the Debtor seeks authority to reject its unexpired

22  non-residential real property leases for the foregoing seven (7) Retail Stores (collectively, the

23  "Rejected Stores," and individually, a "Rejected Store"), or some portion thereof in the

24  discretion of the Debtor, with the rejection of such leases to be deemed effective as of the later

25  of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable

26  Rejected Store.

27  / / /

28  / / /

**The Debtor's Primary Assets And Secured Debts**

19.    The Debtors' primary assets are as follows:

a.    <u>Cash</u>.    As of the Petition Date, the Debtor had cash on hand of approximately $93,000.

b.    <u>Security Deposits</u>.    As of the Petition Date, the Debtor had security deposits with landlords and other parties in the total sum of approximately $87,013.

c.    <u>Inventory</u>.    As of the Petition Date, the Debtor had inventory with an estimated cost value of approximately $3,500,000.

d.    <u>Other Assets</u>.    As of the Petition Date, the Debtor had furniture, fixtures and equipment ("<u>FF&E</u>") with a net book value of $6,299,306 and an estimated aggregate fair market value of at least $1,000,000.

20.    Based on the foregoing, the aggregate value of the Debtor's assets as of the Petition Date was approximately $4,680,000.  Although the Debtor has depleted some of its inventory since the Petition Date by selling such inventory at its Retail Stores, any inventory that has been sold since the Petition Date has been sold at a retail price which exceeds the value (at cost) of the inventory.  Accordingly, any reduction in the value of the Debtor's inventory since the Petition Date has resulted in a proportionately higher increase in the amount of cash held by the Debtor (estimated to total $372,484 as of January 22, 2017), resulting in a net increase in the aggregate value of the Debtor's assets since the Petition Date.

21.    The Debtor's senior secured lender is Pacific City Bank (the "<u>Bank</u>").    The Debtor is a borrower under three (3) separate loans with the Bank, as described below:

a.    The Debtor is the borrower under a U.S. Small Business Administration loan with the Bank (the "<u>SBA Loan</u>"), pursuant to a Loan Agreement dated July 24, 2014 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in the amount of approximately $1,660,000 under the SBA Loan.  I am advised and believe that the Bank filed UCC-1 financing statements against the Debtor and its predecessor, Angl, Inc. asserting a lien against substantially all of the assets of the Debtor and Angl, Inc.

b.  The Debtor is the borrower under a term loan bearing the Loan Number 134077 with the Bank (the "<u>First Term Loan</u>"), pursuant to a Business Loan Agreement dated November 2, 2015 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in the amount of approximately $442,000 under the First Term Loan.

c.  The Debtor is the borrower under a second term loan bearing the Loan Number 133776 (the "<u>Second Term Loan</u>"), pursuant to a Business Loan Agreement dated July 23, 2014 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in the amount of approximately $1,500,000 under the Second Term Loan.  The Second Term Loan is secured by certain non-Debtor assets, including commercial real property owned by the Debtor's affiliate and an entity in which I have an ownership interest, Peace People, LLC (the "<u>Affiliate Commercial Property</u>").  The Affiliate Commercial Property is currently in escrow to be sold to a third party for the purchase price of $4,825,000, with the closing date of such sale expected to occur on or about January 30, 2017.  The sale of the Affiliate Commercial Property will result in the full satisfaction of, among other things, the Second Term Loan and the First Term Loan with the Bank.  A true and correct copy of the escrow instructions relating to the pending sale of the Affiliate Commercial Property to the buyer is attached as **Exhibit "2"** hereto.

22.  Prior to the Petition Date, the Debtor provided a commercial guaranty of the obligations of the Debtor's affiliate, Peace People, LLC, under a term loan made by Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") to Peace People, LLC pursuant to a Business Loan Agreement dated February 17, 2014 (the "<u>Wells Fargo Loan</u>").  The commercial guaranty provided by the Debtor in connection with the Wells Fargo Loan is purportedly secured by substantially all assets of the Debtor (which the Debtor disputes).  As a result of the commercial guaranty, the Debtor is currently indebted to Wells Fargo in the amount of approximately $1,500,000 under the Wells Fargo Loan.  The Wells Fargo Loan is secured by the Affiliate Commercial Property.  Accordingly, the pending sale of the Affiliate Commercial Property will also result in the full satisfaction of the Wells Fargo Loan.

23.    Prior to the Petition Date, the Debtor obtained a secured loan in the amount of $6,000 from Fashblvd., Inc. ("Fashblvd").  I am advised and believe that Flashblvd filed a UCC-1 financing statement (Document No. 57738600002) asserting a lien against substantially all of the assets of the Debtor prior to the commencement of the Debtor's bankruptcy case on October 19, 2016.

24.    I am advised and believe that, in addition to the financing statements filed by the Bank and Fashblvd against the Debtor and/or its predecessor, Angl, Inc., there are financing statements that have been filed against the Debtor and Angl, Inc. by the following parties:

a.    U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance has one active financing statement (filing number 13-7390160767), filed on December 10, 2013, which purports to cover certain specified equipment leased or financed from U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance does not purport to assert a security interest in the Debtor's cash.

b.    California State Board Of Equalization ("SBOE").  SBOE has one active state tax lien (filing number 15-7447815850) which was recorded against the Debtor on January 29, 2015.

c.    Line & Dot, LLC d/b/a Lumiere Collections ("L&E").  L&E has one active judgment lien (filing number 16-7546469513) which was recorded against the Debtor on September 15, 2016.  The Debtor and L&E recently entered into a stipulation to avoid the foregoing judgment lien, which stipulation I am advised and believe was approved by the Court pursuant to an order entered on December 22, 2016.

d.    Tyler Mall Limited Partnership ("Tyler Mall").  Tyler Mall has one active judgment lien (filing number 16-7542925708) which was recorded against Angl, Inc. on August 22, 2016.  The Debtor submits that the foregoing judgment lien, which was recorded within the 90-day period preceding the Petition Date, is avoidable as a preferential transfer and is therefore disputed.

e.    GGP-Otay Ranch, L.P. ("GGP").  GGP has one active judgment lien (filing number 16-7542926072) which was recorded against Angl, Inc. on August 22,

1   2016.  The Debtor submits that the foregoing judgment lien, which was recorded within

2   the 90-day period preceding the Petition Date, is avoidable as a preferential transfer and

3   is therefore disputed.

4          f.       <u>Valley Plaza Mall, LP ("Valley Plaza")</u>.  Valley Plaza has one active

5   judgment lien (filing number 16-7545824507) which was recorded against Angl, Inc. on

6   September 12, 2016.  The Debtor submits that the foregoing judgment lien, which was

7   recorded within the 90-day period preceding the Petition Date, is avoidable as a

8   preferential transfer and is therefore disputed.

9        25.     Based on the foregoing, the Debtor contends that the Bank, Fashblvd and the

10   SBOE are the only parties that may potentially have a perfected security interest in the Debtor's

11   cash.[7]

12                     **<u>The Need For Use Of Cash Collateral And Proposed Operating Budget</u>**

13        26.     By the Motion, the Debtor seeks an order of the Court authorizing the Debtor to

14   use its cash, during the period from January 22, 2017 through and including April 22, 2017, to

15   pay the expenses set forth in the Budget which is attached as Exhibit "1" hereto, as well as all

16   quarterly fees owing to the Office of the United States Trustee and all expenses owing to the

17   Clerk of the Bankruptcy Court.  In addition, the Debtor seeks authority to deviate from the

18   expense line items contained in the Budget, without the need for any further Court order, by up

19   to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into

20   the following week(s).  The Debtor will not deviate from the Budget beyond the foregoing

21   parameters without further order of the Court.

22        27.     The Budget takes into account, among other things, the anticipated closure of the

23   seven (7) Rejected Stores in December, 2016 and January, 2017.

24   / / /

25   / / /

26   / / /

27   _____

28      [7] The Debtor does not concede that such creditors have valid and properly perfected security interests and liens
in the Debtor's cash and other assets.

28.    The Debtor requires authority to use cash in accordance with the Budget to enable the Debtor to pay all of its normal and ordinary operating expenses (such as payroll, rent, utilities, insurance, and payments to vendors) as they come due in the ordinary course of its business and to purchase new inventory to replenish merchandise that is sold to customers at the Debtor's remaining Retail Stores.

29.    I do not believe the Debtor has the ability to maintain its business operations or to preserve and maximize the value of its assets unless the Debtor is authorized to use its cash to pay its projected expenses in accordance with the Budget.  I believe the Debtor's inability to pay such expenses would cause immediate and irreparable harm to the Debtor's bankruptcy estate. Indeed, the Debtor's inability to pay its projected expenses, including payroll, rent, utilities and other operating expenses would result in the immediate shutdown of the Debtor's business and the decimation of the value (going-concern or otherwise) of the Debtor's business and assets.

30.    The proposed order granting the Motion is attached as **Exhibit "3"** hereto.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 29th day of December, 2016, at Los Angeles, California.



JEFF SUNGHAK KIM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT "1"</u>**

[Budget]

**ANGL**
**13 Week Cash Flow**

| Week No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 01/22/17 | 01/29/17 | 02/05/17 | 02/12/17 | 02/19/17 | 02/26/17 | 03/05/17 | 03/12/17 | 03/19/17 | 03/26/17 | 04/02/17 | 04/09/17 | 04/16/17 | |
| Week Ending | 01/28/17 | 02/04/17 | 02/11/17 | 02/18/17 | 02/25/17 | 03/04/17 | 03/11/17 | 03/18/17 | 03/25/17 | 04/01/17 | 04/08/17 | 04/15/17 | 04/22/17 | |
| **Receipts** | | | | | | | | | | | | | | |
| **Beginning Balance** | 357,034 | 294,634 | 256,814 | 206,346 | 240,434 | 260,418 | 229,307 | 198,946 | 229,562 | 266,669 | 259,108 | 228,012 | 255,651 | 357,034 |
| Sales | 108,298 | 109,554 | 124,656 | 146,150 | 135,074 | 129,227 | 134,322 | 151,156 | 152,070 | 144,172 | 136,955 | 135,369 | 136,003 | 1,743,006 |
| Sales  Tax Collections | 9,335 | 9,444 | 10,745 | 12,598 | 11,643 | 11,139 | 11,579 | 13,030 | 13,108 | 12,428 | 11,806 | 11,669 | 11,723 | 150,247 |
| DIP Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 117,633 | 118,997 | 135,401 | 158,748 | 146,717 | 140,366 | 145,901 | 164,186 | 165,178 | 156,599 | 148,761 | 147,038 | 147,727 | 1,893,253 |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise Payments | 21,660 | 24,102 | 37,397 | 36,537 | 40,522 | 38,768 | 40,297 | 45,347 | 53,224 | 43,252 | 34,239 | 33,842 | 34,001 | 483,187 |
| Rent & Related | 16,439 | 70,875 | 109,479 | 7,000 | - | 70,875 | 109,479 | 7,000 | - | 70,875 | 109,479 | 7,000 | - | 578,500 |
| Stub Rent (October 19-31) | - | 2,500 | - | - | - | - | 2,500 | - | - | - | - | - | - | 5,000 |
| Payroll & Benefits & payroll tax | 27,800 | 52,000 | 32,400 | 54,100 | 17,200 | 54,100 | 17,200 | 54,100 | 17,200 | 42,000 | 29,300 | 42,000 | 29,300 | 468,700 |
| Sales Tax Payments (Normal Course) | 82,940 | - | - | - | 57,830 | - | - | - | 46,126 | - | - | - | - | 186,896 |
| Selling, General & Administrative | 4,500 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 52,500 |
| Bank & Credit Card Processing Fees | 2,166 | 2,191 | 2,493 | 2,923 | 2,701 | 2,585 | 2,686 | 3,023 | 3,041 | 2,883 | 2,739 | 2,707 | 2,720 | 34,860 |
| Equipment Payment | 2,879 | - | - | - | 2,879 | - | - | - | 2,879 | - | - | - | - | 8,637 |
| Insurance | 20,000 | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 20,000 | - | 80,000 |
| Maintenance & Repairs | - | 1,050 | - | - | - | 1,050 | - | - | - | 1,050 | - | - | - | 3,150 |
| Freight, Postage & Handling | 150 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,350 |
| **Total Disbursements** | 178,533 | 156,818 | 185,869 | 124,660 | 125,233 | 171,477 | 176,262 | 133,570 | 126,571 | 164,160 | 179,857 | 109,650 | 70,121 | 1,902,781 |
| **Operating Cash Flow** | (60,900) | (37,820) | (50,468) | 34,088 | 21,485 | (31,111) | (30,361) | 30,616 | 38,607 | (7,560) | (31,096) | 37,389 | 77,606 | (9,528) |
| | | | | | | | | | | | | | | |
| **Other Receipts (Disbursements)** | | | | | | | | | | | | | | |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | (9,750) | - | (9,750) |
| Utility Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CPA Fees | (1,500) | - | - | - | (1,500) | - | - | - | (1,500) | - | - | - | (1,500) | (6,000) |
| **Total Net Cash Flow** | (62,400) | (37,820) | (50,468) | 34,088 | 19,985 | (31,111) | (30,361) | 30,616 | 37,107 | (7,560) | (31,096) | 27,639 | 76,106 | (25,278) |
| **Ending Balance** | 294,634 | 256,814 | 206,346 | 240,434 | 260,418 | 229,307 | 198,946 | 229,562 | 266,669 | 259,108 | 228,012 | 255,651 | 331,757 | 331,757 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT "2"</u>**

[Escrow Instructions Relating To The Pending Sale
Of Peace People, LLC Property]



3700 Wilshire Blvd., Suite 1005, Los Angeles CA 90010
Tel 213.769.0044 • Fax 213.769.0045

**EON ESCROW, INC. IS LICENSED BY THE DEPARTMENT OF BUSINESS OVERSIGHT
OF THE STATE OF CALIFORNIA, LICENSE NUMBER 963-2671**

**SUPPLEMENTAL ESCROW INSTRUCTIONS**

Kevin Kim                                                    **Escrow No.:** 125244-KK
Escrow Officer                                              **Date:** December 15, 2016

| | |
|---|---|
| Buyer will hand EON ESCROW, INC. initial deposit in the amount of | 145,000.00 |
| As of this date not deemed by Escrow to be cleared "Good Funds" | |
| Prior to close of escrow, buyer will deposit an additional amount of | 855,000.00 |
| Buyer herein to obtain a new first trust deed loan in the amount of $ | 3,825,000.00 |

Plus closing costs and charges as required **3 business** days prior to the close of escrow

**TOTAL CONSIDERATION**                                                    **$4,825,000.00**

We, the undersigned, hand you a copy of the Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate dated December 14, 2016 including Counter Offers and Addendums (original(s) of which has/have been executed by all parties and retained by broker), (Collectively the "Agreement") by and between Peace People, LLC (hereinafter the "Seller") and Jay Lee or Assignee (hereinafter the "Buyer") for the property located at 2301-2313 E. 51st Street, Vernon, CA 90058.

A.    The following is for clarification purposes:

   1. The acceptance date of the Agreement is **December 14, 2016**.

   2. Escrow holder is authorized and instructed to use the date of **December 15, 2016** as the opening date of escrow.

   3. Escrow closing date shall be on or before **January 30, 2017**.

   4. Buyer has **30** days from acceptance to remove **Loan Contingency** which shall be **January 13, 2016**.

   5. Contingencies removal dates prior to close escrow shall refer to item no. 9 of purchase agreement dated **December 14, 2016**.

B.    **Eon Escrow, Inc.** is the escrow holder. Seller and Buyer shall pay their respective escrow fees and costs.

C.    Preliminary title report and title policies shall be issued by **First American Title Company** with the usual title company's exceptions, with a liability of **$4,825,000.00** covering property:

      ***Exact legal description shall be furnished by First American Title Company***

**PROPERTY ADDRESS IS:** 2301-2313 E. 51st Street, Vernon, CA 90058

**TITLE POLICY TO SHOW TITLE VESTED IN:** Jay Lee or Assignee (exact name and vesting to be provided to escrow holder prior to close of escrow)

**FREE FROM ENCUMBRANCES EXCEPT:**

(1)    Second Half General and special Taxes for the fiscal year2015/2016 , including bonds, special assessments, assessed against former owner, and/or assessment taxes assessed pursuant to the provisions of Chapter 498, Statutes of the State of California. (Change of Ownership will affect the taxes to be paid. A Supplemental Tax Bill will be issued and BUYER accepts all responsibility for all additional taxes due because of said reassessment. TAX BILLS ISSUED AFTER THE CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYERS AND SELLERS.)

(2)    Covenants, conditions, restrictions, reservations, rights, rights of way, and easements, and any oil, gas, or mineral reservations now of record, if any.

SELLERS INITIALS: _____/_____                    BUYERS INITIALS: _____/_____

Eon Escrow, Inc.

Date: December 15, 2016
Escrow No.: 125244-KK

(3)       First Deed of Trust to record securing a note in the amount of **$3,825,000.00**.

**INSTRUCTIONS:**

1.       **General Provisions attached to these instruction are by reference hereto incorporated herein and made a part hereof and have been read and are approved by the parties to this escrow and you are authorized to act thereunder insofar as closing of your escrow is concerned.**

2.       **Parties herein are aware that Assembly Bill 512 (Chapter 598, Statutes of 1989), which added Section 12413.1 to the Insurance Code of the State of California is effective January 1, 1990. Except** for funds deposited by **wire transfer, other electronic payment, or cash,** this law prohibits all title insurance companies, controlled escrow companies, and underwritten title companies from disbursing funds from an escrow or sub-escrow account, until the day these funds are made available to the depositor pursuant to Part 229 of Title 12 of the codes of Federal Regulations, (REG. CC). Under REG. CC items such as **cashier's checks or teller's checks** may be available for disbursement on the business day following the business day of deposit; however, other forms of deposits, **such as credit union checks, savings & loan checks, money orders, and personal checks** may cause extended delays in the closing of the escrow.

       **Eon Escrow, Inc.**, will NOT be responsible for accruals of interest resulting from compliance  with  the disbursement restrictions mandated  by  this law.   Please prepare for delayed disbursement  of funds to all recipients at the close of escrow.

       <u>**NO ESCROW DOCUMENTS WILL RECORD UNTIL THE ABOVE REQUIREMENTS HAVE BEEN MET.**</u>
       <u>**NO EXCEPTIONS!!!**</u>

3.       **CLOSING FUNDS:**  Each party acknowledges  that the close of escrow is conditioned  on check clearances. Funds to close must be in the form of a Cashier's Check drawn on a bank with clearing house in the State of California OR a wire transfer to **EON ESCROW, INC.** Trust Account, and be deposited at least (3) three business days prior to recording of documents.

4.       **1099 FORM:**  If required by law, the seller shall hand to Escrow Holder an IRS 1099 gross proceeds report, which you are to forward to the IRS in accordance with the law, and a copy thereof is to be delivered to the seller at the close of escrow.   This is NOT in lieu of any tax withholding  which may become applicable  under FIRPTA. ESCROW HOLDER IS AUTHORIZED AND INSTRUCTED TO INSERT BUYER'S PART OF REAL ESTATE TAX PAID, OVER THE SIGNATURE OF THE SELLER, ON SAID 1099, AT THE CLOSE OF ESCROW WITHOUT ANY LIABILITY ON THE PART OF ESCROW HOLDER FOR SO DOING.

5.       **CHANGE OF OWNERSHIP:**  Buyer is aware that any person acquiring  an interest in real property must file a "Change of Ownership Statement" with the county recorder or tax assessor concurrently with recording of deed at close of escrow.

6.       **CANCELLATION FEES:**  In the event this escrow is postponed for two (2) months from the most recent closing date agreed to by the parties or the escrow is cancelled, and if the delay or cancellation was caused by either of the parties to this escrow, Eon Escrow, Inc. shall be entitled to receive an escrow administration fee in proportion to the services provided by Eon Escrow, Inc.

       SELLER'S INITIALS:  _____/_____          BUYER'S INITIALS:    _____/_____

7.       **HOLD OPEN FEES:**  In the event there is no activity in this file three (3) months after the opening of these instructions, in order to compensate  you for the administration  and monitoring  of this escrow file, you are authorized to charge and deduct a hold open fee of $50.00 per month from funds on deposit herein.

8.       **IN THE EVENT** EITHER PARTY REQUESTS CANCELLATION  OF THIS ESCROW  AT ANY TIME, ALL PARTIES ARE AWARE THAT THIS ESCROW WILL NOT BE CONSIDERED CANCELLED, AND NO FUNDS WILL BE DISBURSED  UNTIL ESCROW HOLDER  HAS RECEIVED MUTUALLY SIGNED CANCELLATION INSTRUCTIONS FROM BUYERS AND SELLER.

9.       **SELLER'S CLOSING DISCLOSURE:**  Seller herein agrees and instructs escrow to release the Seller's Closing Disclosure to Buyer's Lender without further instruction, if requested by said Lender.

       SELLER'S INITIALS:  _____/_____

10.      In accordance with Sections 18662 and 18668 of the Revenue and Taxation Code, a Buyer may be required to withhold an amount equal to 3 1/3 percent of the sales price in the case of a disposition of California real property interest by either:

       a.       A seller who is an individual with a last known address outside of California or when the disbursement instructions authorized the proceeds be sent to a financial intermediary of the Seller, OR

       b.       A corporate Seller which has no permanent place of business in California.

       c.       A seller who answers "NO" to all questions on California Form 593-C.

       The Buyer may become subject to penalty for failure to withhold an amount equal to the greater 10% of the

SELLERS INITIALS: _____/_____                          BUYERS INITIALS: _____/_____

*Page 2*

Eon Escrow, Inc.
Date: December 15, 2016
Escrow No.: 125244-KK

amount required to be withheld or five hundred dollars ($500.00).

However, notwithstanding any other provision included in the California statutes referenced above, no buyer will be required to withhold any amount or be subject to penalty for failure to withhold if:

d.    The sale price of the California real property does not exceed one hundred thousand dollars ($100,000.00); OR

e.    The Seller, who is an individual, executed a written certificate, under the penalty of perjury, that the California real property being conveyed is the seller's principal residence (as defined in Section 1034 of the Internal Revenue code).

f.    The Seller execute a written certificate (California Form 593C), under the penalty of perjury, certifying that the seller will have a LOSS for California Income Tax purposes on this sale and complete and executes California Form 593-E.

The Seller is subject to penalty for knowingly filing a fraudulent certificate for the purposes of avoiding the withholding and waivers from withholding requirement.    The penalty is $1,000.00 or 20% of the require withholding amount, whichever is greater.

The California State referenced above include provisions which authorize the Franchise Tax Board to grant reduced withholding and waiver from withholding on a case-by-case basis for real estate sales closing after December 31, 2002, the new law (AB 2065) requires buyers of California real estate to withhold state income taxes and send them to the Franchise Tax Board.  The withholding is 3 1/3 percent of the sale price.  The penalty for not complying is the greater of $500.00 or 10 percent of the withholding amount.  There are some exceptions in the law.  Withholding is not required if the total sales price is $100,000.00 or less, or for principal residences, sales resulting in a taxable loss, like kind exchanges, and some involuntary conversions.  Also exempted are sales where the seller is tax exempt or a California corporation or partnership.  Previous real estate withhold laws only applied to sales by nonresident sellers of California as estate.  This new law expands to include all individuals, residents and nonresidents.  The Franchise Tax Board will not grant individuals a waiver or reduced rate of withholding for sales with small taxable gains.

SELLERS INITIALS: _____/_____        BUYERS INITIALS:    _____/_____

*The parties to this transaction should seek the professional advice and counsel of an attorney, accountant or other tax specialist's opinion concerning the effect of this law on this transaction and should not act on any statements made or omitted by the escrow or closing officer.*

11.    **WATER CONSERVATION RETROFIT:**  Section 122.03 L.A.M.C. requires that prior to the close of escrow a Certificate of Compliance, stating that each water closet, urinal and showerhead in that particular building has been retrofitted with water savings devices, be on file with the Dept. of Water and Power.  Seller shall obtain said certificate and deposit same into escrow prior to close of escrow.  Parties are aware that this applies to all property sales, residential, commercial, and industrial.

12.    **ULTRA-LOW FLUSH TOILETS:**  Parties are aware that effective January 1, 1999 all residential, commercial, and industrial properties sold in the City of Los Angeles must have ultra-low-flush toilets installed prior to the close of escrow.  This requirement supersedes the previous practice of installing toilet tank displacement bags in all high volume toilets, and is a part of the Certificate of Compliance process.  Seller shall comply with said ordinance prior to close of escrow.

13.    **The Seller warrants that the street address of subject property is 2301-2313 E. 51st Street, Vernon, CA 90058 and the address stated is not to be verified by the escrow officer.**

**PRORATIONS:**  Prorate as of Close of Escrow
• Real Property taxes based on latest tax bill or on amount furnished by title company.

*******************************************************

THESE ESCROW INSTRUCTIONS ARE NOT INTENDED TO SUPERSEDE THE REAL ESTATE PURCHASE CONTRACT AND RECEIPT FOR DEPOSIT, BUT TO CARRY OUT ITS TERMS AND CONDITIONS IN CONSUMMATING THE PURCHASE AND SALE, EXCEPT AS MAY BE AMENDED OR MODIFIED BY THE MUTUAL WRITTEN INSTRUCTIONS OF THE PARTIES.

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW, SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED.  A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

SELLERS INITIALS: _____/_____        BUYERS INITIALS:    _____/_____

Eon Escrow, Inc.

Date:  December 15, 2016
Escrow No.:  125244-KK

## GENERAL PROVISIONS

**YOU ARE FURTHER INSTRUCTED AS FOLLOWS:**

1. All funds received shall be deposited with a State or Federal Bank in a non-interest bearing trust account with other escrow funds.  You are not responsible for any delay in closing if funds deposited are not available for immediate withdrawal.  You are authorized to deposit any funds or documents handed you under these escrow instructions, or cause the same to be deposited with any duly authorized sub-escrow agents, subject to  your order at or prior to close of escrow, in the event such deposit shall be necessary or convenient for the consummation of this escrow.  All disbursements shall be made by check of this escrow company.  You are instructed to mail all checks and documents to the parties entitled hereto by regular first class mail to their respective address shown herein.  Any funds disbursed will be issued jointly to parties designated unless otherwise instructed.

2. Your duty to act as escrow holder for the benefit of both parties does not commence until these instructions are signed by both parties, received and accepted by you.  Until such time, either party may unilaterally cancel and upon written request delivered to you, a party may withdraw funds and documents such party previously handed to you.  These instructions may be executed in counter parts, each of which so executed shall irrespective of the date of its execution and delivery,  be deemed an original, and said counterparts together shall constitute one and the same instrument.  In these instructions, wherever the context so requires, the masculine gender includes the feminine and/or neuter and the singular number includes the plural.

3. All notices, demands and instructions must be in writing.  No notice, demand, instructions, amendments, supplement or modification of these instructions shall be of any effect in this escrow until delivered in writing to you and mutually executed by all parties.  You shall have no duties to anyone except those signing these instructions.  In the event conflicting demands are made or notices served upon you with respect to this escrow, the parties hereto expressly agree that you shall have the absolute right at your election to either or both of the following:  (a) Withhold and stop all further proceedings in and the performance of this escrow so long as such disagreement shall continue, in so doing you shall not be or become liable for damages or interest to the undersigned or to any person in your failure to comply with such conflicting or adverse demands.  You shall be entitled to continue to refrain and refuse so to act until the rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and/or the money, papers and property involved herein or affected hereby, and/or all difference shall have been adjusted by mutual agreement and you shall have been notified thereof in writing signed by all the persons interested, or (b) File a suit in interpleader and obtain an order from the court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves.  In the event such interpleader suite is brought, you shall ipso facto be fully released and discharged from all obligations to further perform any and all duties or obligations imposed upon you in this escrow, and the parties jointly and severally agree to pay you all costs, expenses and reasonable attorney's fees expended or incurred by you, the amount thereof to be fixed and a judgement thereof to be rendered by the court in such suit.

4. You shall not be responsible or liable in any manner whatsoever for the sufficiency or correctness as to form, manner of execution or validity of any documents in escrow nor as to the identity, authority or rights of any person executing the same, either as to documents of records or those handed in this escrow.  Your duties hereunder shall be limited to the safekeeping of such money and documents received by you as escrow holder and for the disposition of the same in accordance with the written instructions accepted by you in this escrow.  You shall not be required to take any action in connection with the collection, maturity or apparent outlaw of any obligations deposited in this escrow unless otherwise instructed.  You shall not be liable for any of your acts or omissions done in good faith, nor any claims, demands, losses or damages made, claimed or suffered by any party to this escrow excepting such as may arise through or the cause by your willful neglect or gross misconduct.

5. The adjustments and prorations called for, shall be computed as set forth below, or as otherwise amended in writing
   (a) Taxes, including all tax bill times, except taxes on personal property not conveyed through this escrow, based on current year's taxes, or between July 1st and November 1st of each year based on immediately preceding year's taxes in each, use the figures from the tax bill handed you by the seller figures furnished you by title company, without liability on your part as to their correctness. Seller agrees to pay prior to delinquency, any taxes on real and personal property not being sold herein, which is a lien on the real property being conveyed.  You are not to be concerned with same.
   (b) Interest on Mortgage and/or Trust Deed of record, mortgage insurance premiums, funds accrued in impound account for future payment of taxes, fire or mortgage insurance, as disclosed by any beneficiary statement received in escrow. If any beneficiary statement disclosed  that the unpaid PRINCIPLE AMOUNT DUE ON ANY TRUST DEED OF RECORD IS MORE OR LESS THAN THE AMOUNT HEREIN SET FORTH, adjust the difference incase through this escrow, unless otherwise provided for herein.
   (c) Rentals and security rentals other than delinquent rents based upon statements to be handed you by Seller and approved by buyer. It is the obligation of the buyer to verify the validity of the rent statement.
   (d) Premiums on insurance policies handed you for coverage of buildings in property described herein. Seller guarantees and you shall be fully protected in assuming that, as to any insurance policies handed you, each policy is in force, has not been hypothecated and that all necessary premiums therefore have been paid. You will as my agent, assign any fore insurance handed you for use in this escrow. It is obligation to verify the acceptance of the assignment of the insurance policy by the issuing company. Make all adjustments on the basis of a thirty (30) day month. "Close of Escrow" is the day instruments are filed of record. You are authorized to record any instrument delivered through this escrow, if necessary or proper, for the issuance of title insurance as called for.

6. Order title search immediately, regardless of consummation hereof. Seller agrees to pay to you on demand all charges and expenses incurred by you for seller, messenger fees incurred on my behalf, changes of title; California State transfer taxes on deed; for sending offset, mortgage's and/or beneficiary's statements and/or demands; drawing and acknowledging documents executed by seller; transfer of fire insurance if prorated, and seller's escrow fee as charged. Buyer agrees to pay you on demand all charges and expenses incurred by you for buyer; charges and expenses  incurred by you for buyer; charges for recording deed and any encumbrances executed by buyer; drawing and acknowledging documents executed by buyer; loan tie-in fee, messengers fee incurred on my behalf, and buyer's escrow fee as charged. Seller authorized you, out of the proceeds accruing to him at the close of escrow, to pay all broker's commissions herein after authorized by him and to pay any encumbrances necessary to place title in the condition called for in these instructions.

7. You are authorized to furnish copies of all escrow instructions, amendments, preliminary title report, notices of cancellation, and closing statements to real estate brokers, lender's agent , and/or attorney(s) for the parties involved in this transaction upon oral or written request of parties. You are not required to submit any Preliminary Title Report unless instructed to do so; however, you may do so at your discretion without incurring any liability.

8. Time is of the essence of these and all additional instructions. If the condition of this escrow have not been complied with prior to the date set forth herein as the close of escrow, or any extension thereof, you are nevertheless to complete the escrow as soon as conditions, except as to time, have been complied with us, unless written demands have been made upon you not to complete it. We jointly and severally agree that in the event of cancellation, we shall pay you a sum sufficient to pay you for any expense which you have incurred pursuant to foregoing instructions and a reasonable cancellation fee for service rendered by you. Said expense and fees to be deposited into escrow with written mutual cancellation instructions signed by all parties to pay before cancellation is effective.

9. All parties hereto further agree, jointly and severally, to pay on demand, as well as to indemnify and hold you harmless from and against all costs, damages judgments, attorney's fee, expenses, obligations and liabilities of any kind or nature which, in good faith, you may incur or sustain in connection with arising out of this escrow and you are hereby given a lien upon all the rights, titles and interest of each of the parties hereto in all escrow papers and other property and monies deposited in this escrow to protect your rights and to indemnify and reimburse you under this agreements.

10. Any amended, supplemental, or additional instructions given shall be subject to the foregoing conditions.

11. When property being conveyed is held in joint tenancy, any cash derived there from in this escrow shall be joint tenancy funds. Unless instructed to the contrary, seller proceeds shall be disbursed as title was held: (a) Joint Tenants: One check as joint tenants. (b) Community Property: One check as community property. (c) Undivided Interest: Separate check for each undivided interest.

SELLERS INITIALS:  _____/_____                          BUYERS INITIALS:  _____/_____

Eon Escrow, Inc.

Date: December 15, 2016
Escrow No.: 125244-KK

12. In exchange escrow, all references to seller and buyer shall respectively be amended to read and exchanger and exchangee. Furthermore, buyer acknowledges that one or more sellers may engage in 1031 tax deferred exchange, and in the event such seller opts to do so than buyer shall cooperate with seller at no additional cost or liability to buyer.

13. If applicable, seller shall obtain and deliver to buyer prior to close of escrow a copy of the "Report of Residential Property Records and Pending Special Assessments Liens" as required. Buyer and seller herein authorizes escrow holder to disburse fee for said report from Buyer's deposit in escrow if deemed necessary.

14. Parties are aware that subject property maybe suited within Alquist-Priolo special study zone as defined in California Public Resources Code Section 2621-2625.

15. Unless otherwise instructed, you are authorized to assign any oil, gas and/or mineral leases, disclosed of record, held by seller, by recital on the Deed conveying title to the subject property, assigning all interest of seller in said lease per description of record. Escrow holder shall assume no responsibility or liability for the legal affect or said assignment.

16. Unless otherwise instructed herein, obtain beneficiary's statements from (each) holder of loan(s) to remain of record. If any party to these instructions obtain a loan on this land involved during the pendency of this escrow, you are authorized to furnished the lender, of any one operation on its behalf, any information concerning this escrow, including, but not limited to a certified copy of the escrow instructions and any amendments there to and  closing statement.

17. The parties to these instructions authorize you to destroy these instructions and all other records in this escrow at any time after five (5) years from the close or cancellation of escrow.

18. It is agreed by the parties here to that so far as your rights and liabilities are concerned, this transaction is an escrow and not any other legal relations and you are an escrow holder only on the terms expressed herein, and you shall have no responsibility of notifying any of the parties hereto of any sale, resale, loan, exchange, or other transaction involving any property herein described or of any profit realized by any person, firm or corporation (broker, agent and parties to this and/or any other escrow included) in connection therewith regardless of the fact that such transaction(s) may be handled by you in this escrow or in another escrow.

19. Deliver assurances of title, and insurance policies, if any, to holder of senior encumbrance or his order, or if there be no encumbrances, then to the buyer or his order.

20. If seller unilaterally assigns or orders the proceeds of this escrow to be paid to other than the original parties to this escrow, such assignments or order shall be subordinate to the expenses of this escrow, lien of record on the subject property and pay directed to be made by buyer and seller together. If the result of such assignment or order would be to leave the escrow without sufficient funds to close, then you are directed to close nevertheless and to pay such assignments or orders only out of the net proceeds due seller except for such assignments or orders are received by you.

21. If applicable, buyer to provide, maintain and deliver to seller fire insurance satisfactory to and with loss payable to seller.

22. IRS REPORT REQUIREMENTS: Buyer and seller acknowledge that Internal Revenue code Section 6045(e) requires that the amount of gross proceeds from real estate transaction to be reported to the Internal Revenue Service. Buyer and seller hereby instruct the escrow holder of this transaction to comply with gross proceeds of this sale to the Internal Revenue Service on IRS form 1099-B or W-9 or any subsequently approved IRS form. Seller will instruct the escrow holder to provide to Broker, if any, herein a copy completed form.

23. TAX PRORATION: As a result of Proposition 13, unless the parties to this escrow furnish escrow holder, in writing prior to close of escrow, a dollar amount mutually agreed upon as a basis for the tax proration, escrow holder is to prorate taxes based on the latest tax figures as furnished in escrow by the title insurance company. Escrow holder is relieved of any change that may occur subsequent to the close of escrow for any additional amounts of general and special taxes which may be assessed by reason of Proposition 13.

24. ELECTRONIC / FACSIMILE SIGNATURES:  In the event Seller or Buyer utilize facsimile, email, electronic, docusign or any other similar format to transmit signed documents, Seller and Buyer each agree to accept the same and hereby instruct escrow holder to rely upon such documents as if they bore original signatures.  However, the parties herein further acknowledge that certain documents bearing non-original and/or electronic signatures may not be acceptable in said format, including but not limited to all recording documents, and the parties agree to submit documents bearing a handwritten signature upon escrow holder's request.  Escrow holder is authorized to close subject escrow based on documents received bearing signatures via facsimile, email, electronic, docusign or any other similar format submitted by either party and escrow holder shall not be required to verify the authenticity of said signature.  Escrow holder shall not be further concerned with nor held liable for same.

25. PRELIMINARY CHANGE  OF OWNERSHIP REPORT:  Buyer is aware that any person acquiring an interest in Real Property must file a "Preliminary Change of Ownership Report" with the County Recorder Tax Assessor upon recording of any documents effecting a change of ownership unless the document is accomplished by an affidavit that the transferee is not a resident of California. Failure to so file may result in an additional recording fee to buyer.

26. SUPPLEMENTAL TAX: The parties hereby acknowledge that in the event there has been a recent change in ownership of the real property preceding this escrow, the supplement real property tax bill reflecting any additional taxes arising from assessment of the real property may not be received prior to the close of escrow. Accordingly escrow holder has no responsibility or obligations to determine the existence of any such supplemental tax bill, or to make any allowance for the payment of same from escrow. The payment of any supplemental taxes which are not appearing of record prior of close of escrow as a lien against the real property is solely a matter between the parties to be handled outside of escrow, and escrow holder is not to be concerned with the disposition of same.

27. PAYMENT OF EXPENSE: If applicable, escrow holder is hereby authorized and instructed to use the funds deposited in escrow for the payment of express mail fee, messenger service fee or any other minor expenses, related to escrow processing  deemed necessary, without further authorization from the parties hereto.

28. BANK WIRE: In the event escrow holder is instructed or required to transfer or receive any funds by Bank Wires, parties agree to deposit all the necessary wiring information in writing prior to request for bank wire provide reasonable time to notice for escrow holder to comply with such request. Eon Escrow, Inc.'s sole duty and responsibility shall be to place said wire in instructions with its wiring bank upon confirmation of a) satisfaction of conditions precedent of b) document recordation at close of escrow. Eon Escrow, Inc. will NOT be held responsible for lost interest due to wire delay cause by any bank or Federal Reserve System. Escrow holder recommends that all parties make themselves aware of banking regulations with regards to placement of wires within and/or outside California. In the event there is insufficient time to place a wire upon any such confirmation or the wires have closed for the day, the parties agree to provide written instructions for an alternative method of disbursement. Without an alternative disbursement instructions, funds will be held in the Trust Account until the next opportunity for wire placement.

29. CALIFORNIA REVENUE AND TAXATION: Buyer and seller are hereby notified of withholding provisions of California Revenue and Taxation Code and 26131 (e) (1), applicable to certain sales of California real estate by nonresident sellers.

30. We, the Buyer and Seller, jointly and severally agree, that in the event of cancellation or other termination of this escrow prior to the closing thereof, we shall pay you for any expenses which you have incurred or become obliged for pursuant to these instructions, and also a reasonable escrow fee for the services contracted by us to be rendered by you, and such expenses, if any, and fees shall be paid and put in escrow before any cancellation or other termination is effective. We agree that said charges for expenses and fees may be apportioned between us in a manner which, in your sole discretion, you consider equitable, and that your decision in that regard will be binding and conclusive upon us. Any documents or funds deposited with you may be retained by you as a lien, to secure to you the reimbursement of and payment of expenses, if any, and fees above provided for.

SELLERS INITIALS:  _____/_____                    BUYERS INITIALS:  _____/_____

Eon Escrow, Inc.

Date:  December 15, 2016
Escrow No.:  125244-KK

31.  All Parties acknowledge that the Escrow Fee is typically charged to the Buyer and to the Seller, each paying their own. However, due to negotiated volume discounts for REO's, lender's restrictions on short sales, investors and repeat clients, the Parties acknowledge that the escrow fee may not be the same for the Buyer and Seller. Typical fees are allocated at a rate of two dollars per thousand ($2/1000) with a base fee of two-hundred and fifty dollars ($250.00). All other miscellaneous Escrow Fees will be charged to the benefiting party. Title and recording charges and other fees and costs associated with the closing of this escrow are to be charged in accordance with local customary practices in the County in which the Escrow office is situated.  In complex escrows or note sales, the escrow fee may be higher than the aforementioned rate of $2/1000.

IN THE EVENT OF FAILURE TO PAY FEES OR EXPENSES DUE YOU HEREUNDER, ON DEMAND, I AGREE TO PAY A REASONABLE FEE FOR ANY ATTORNEY'S SERVICES WHICH MAY BE REQUIRED TO COLLECT SUCH FEES OR EXPENSES.

ESCROW COMPANIES ARE NOT AUTHORIZED TO GIVE LEGAL ADVICE.  IF YOU DESIRE LEGAL ADVICE, CONSULT YOUR ATTORNEY BEFORE SIGNING.

EACH PARTY SIGNING THESE INSTRUCTIONS HAS READ THE ADDITIONAL ESCROW CONDITIONS AND INSTRUCTIONS CONTAINED HEREIN AND APPROVES, ACCEPTS AND AGREES TO BE BOUND THEREBY.  ALL PARTIES SIGNING THIS AGREEMENT HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THESE INSTRUCTIONS.

**SELLERS:**                                                          **BUYERS:**

Peace People, LLC, a California Limited Liability Company
                                                                                        _____
                                                                                        Jay Lee or Assignee

By:      _____
            Jeff Sunghak Kim, Member

By:      _____
            Young Ae Kim, Member

1

2

3

4

5

6

7

8

# EXHIBIT "3"

9

10

[Proposed Order]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>BLUE BEE, INC.,<br><br>               Debtor. | Case No. 2:16-bk-23836-SK<br><br>Chapter 11<br><br>**[PROPOSED] ORDER GRANTING DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH AND INCLUDING APRIL 22, 2017**<br><br>Hearing:<br>Date:         January 19, 2017<br>Time:        8:30 a.m.<br>Courtroom:  1575<br>Location:    255 E. Temple Street<br>                    Los Angeles, California |

A hearing was held on January 19, 2017 at 8:30 a.m., before the Honorable Sandra R. Klein, United States Bankruptcy Judge for the Central District of California, Los Angeles Division, in Courtroom "1575" located at 255 E. Temple Street, Los Angeles, California, to consider the motion (the "Motion") filed by Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), for the entry of an order authorizing the Debtor to use its cash collateral in accordance with the Debtor's operating budget for the 13-week period from January 22, 2017 through and including April 22, 2017 (the "Budget"), a copy of which is attached as Exhibit "1" to the Declaration of Jeff Sunghak Kim annexed to the Motion and is also attached as **Exhibit "A"** hereto, and granting related relief. Appearances at the hearing on the Motion were made as set forth on the record of the Court.

The Court, having considered the Motion, all papers filed by the Debtor in support of the Motion, and the oral arguments and statements of counsel made at the hearing on the Motion, proper and adequate notice of the Motion and the hearing on the Motion having been provided, and other good cause appearing therefor,

IT IS HEREBY ORDERED AS FOLLOWS:

A.    The Motion is granted.

B.    The Debtor is authorized to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.

IT IS SO ORDERED.

###

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

## [Operating Budget]

**ANGL**

**13 Week Cash Flow**

| Week No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 01/22/17 | 01/29/17 | 02/05/17 | 02/12/17 | 02/19/17 | 02/26/17 | 03/05/17 | 03/12/17 | 03/19/17 | 03/26/17 | 04/02/17 | 04/09/17 | 04/16/17 | |
| Week Ending | 01/28/17 | 02/04/17 | 02/11/17 | 02/18/17 | 02/25/17 | 03/04/17 | 03/11/17 | 03/18/17 | 03/25/17 | 04/01/17 | 04/08/17 | 04/15/17 | 04/22/17 | |
| **Receipts** | | | | | | | | | | | | | | |
| **Beginning Balance** | 357,034 | 294,634 | 256,814 | 206,346 | 240,434 | 260,418 | 229,307 | 198,946 | 229,562 | 266,669 | 259,108 | 228,012 | 255,651 | 357,034 |
| Sales | 108,298 | 109,554 | 124,656 | 146,150 | 135,074 | 129,227 | 134,322 | 151,156 | 152,070 | 144,172 | 136,955 | 135,369 | 136,003 | 1,743,006 |
| Sales  Tax Collections | 9,335 | 9,444 | 10,745 | 12,598 | 11,643 | 11,139 | 11,579 | 13,030 | 13,108 | 12,428 | 11,806 | 11,669 | 11,723 | 150,247 |
| DIP Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | 117,633 | 118,997 | 135,401 | 158,748 | 146,717 | 140,366 | 145,901 | 164,186 | 165,178 | 156,599 | 148,761 | 147,038 | 147,727 | 1,893,253 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Merchandise Payments | 21,660 | 24,102 | 37,397 | 36,537 | 40,522 | 38,768 | 40,297 | 45,347 | 53,224 | 43,252 | 34,239 | 33,842 | 34,001 | 483,187 |
| Rent & Related | 16,439 | 70,875 | 109,479 | 7,000 | - | 70,875 | 109,479 | 7,000 | - | 70,875 | 109,479 | 7,000 | - | 578,500 |
| Stub Rent (October 19-31) | - | 2,500 | - | - | - | - | 2,500 | - | - | - | - | - | - | 5,000 |
| Payroll & Benefits & payroll tax | 27,800 | 52,000 | 32,400 | 54,100 | 17,200 | 54,100 | 17,200 | 54,100 | 17,200 | 42,000 | 29,300 | 42,000 | 29,300 | 468,700 |
| Sales Tax Payments (Normal Course) | 82,940 | - | - | - | 57,830 | - | - | - | 46,126 | - | - | - | - | 186,896 |
| Selling, General & Administrative | 4,500 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 52,500 |
| Bank & Credit Card Processing Fees | 2,166 | 2,191 | 2,493 | 2,923 | 2,701 | 2,585 | 2,686 | 3,023 | 3,041 | 2,883 | 2,739 | 2,707 | 2,720 | 34,860 |
| Equipment Payment | 2,879 | - | - | - | 2,879 | - | - | - | 2,879 | - | - | - | - | 8,637 |
| Insurance | 20,000 | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 20,000 | - | 80,000 |
| Maintenance & Repairs | - | 1,050 | - | - | - | 1,050 | - | - | - | 1,050 | - | - | - | 3,150 |
| Freight, Postage & Handling | 150 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 1,350 |
| **Total Disbursements** | 178,533 | 156,818 | 185,869 | 124,660 | 125,233 | 171,477 | 176,262 | 133,570 | 126,571 | 164,160 | 179,857 | 109,650 | 70,121 | 1,902,781 |
| **Operating Cash Flow** | (60,900) | (37,820) | (50,468) | 34,088 | 21,485 | (31,111) | (30,361) | 30,616 | 38,607 | (7,560) | (31,096) | 37,389 | 77,606 | (9,528) |
| **Other Receipts (Disbursements)** | | | | | | | | | | | | | | |
| UST Fees | - | - | - | - | - | - | - | - | - | - | - | (9,750) | - | (9,750) |
| Utility Deposit | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CPA Fees | (1,500) | - | - | - | (1,500) | - | - | - | (1,500) | - | - | - | (1,500) | (6,000) |
| **Total Net Cash Flow** | (62,400) | (37,820) | (50,468) | 34,088 | 19,985 | (31,111) | (30,361) | 30,616 | 37,107 | (7,560) | (31,096) | 27,639 | 76,106 | (25,278) |
| **Ending Balance** | 294,634 | 256,814 | 206,346 | 240,434 | 260,418 | 229,307 | 198,946 | 229,562 | 266,669 | 259,108 | 228,012 | 255,651 | 331,757 | 331,757 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH AND INCLUDING APRIL 22, 2017; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JEFF SUNGHAK KIM IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 29, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Marc Andrews    bankruptcycls@wellsfargo.com, andrewma@wellsfargo.com**
- **Dustin P Branch    branchd@ballardspahr.com,
  carolod@ballardspahr.com;hubenb@ballardspahr.com**
- **Lynn Brown    notices@becket-lee.com**
- **John H Choi    johnchoi@kpcylaw.com, christinewong@kpcylaw.com**
- **Brian D Huben    hubenb@ballardspahr.com, carolod@ballardspahr.com**
- **Dare Law    dare.law@usdoj.gov**
- **Thor D McLaughlin    tmclaughlin@allenmatkins.com, igold@allenmatkins.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Ronald M Tucker    rtucker@simon.com,
  cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Michael A Wallin    mwallin@slaterhersey.com, mrivera@slaterhersey.com**

**2. SERVED BY UNITED STATES MAIL**: On **December 29, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 29, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
The Honorable Sandra R. Klein
United States Bankruptcy Court
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1582 / Courtroom 1575
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| December 29, 2016 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| Date | Type Name | Signature |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Blue Bee, Inc.
Top 20, Secured Creditors, OUST, RSN

Dare Law
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

U.S. BANK EQUIPMENT FINANCE
1310 MADRID STREET, SUITE 106
MARSHALL MN 56258

IRS/OHIO
P.O. BOX 145595
CINCINNATI OH 45250

LINE & DOT, LLC DBA LUMIERE
COLLECTIONS
1912 E. VERNON AVE., STE. 100
LOS ANGELES CA 90058

PACIFIC CITY BANK
3701 WILSHIRE BLVD., SUITE 310
LOS ANGELES CA 90010

BOARD OF EQUALIZATION
PO BOX 942879
SACRAMENTO CA 94279

TYLER MALL LIMITED PARTNERSHIP, A
DELAWARE LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

PACIFIC CITY BANK
3701 WILSHIRE BLVD., SUITE 100
LOS ANGELES CA 90010

GGP-OTAY RANCH, L.P., A DELAWARE
LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

FASHBLVD., INC.
1700 E. 58TH PL., #9
LOS ANGELES, CA 90001

VALLEY PLAZA MALL, LP, A DELAWARE
LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

Caribbean Queen Inc.
1128 S. Crocker Street
Los Angeles, CA 90021

Alythea
1016 S. Towne Ave., #106
Los Angeles, CA 90021

CA State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Brian D. Huben
Dustin P. Branch
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067

Horton Plaza, LLC
Blackmar, Principe & Schmelter, APC
600 B Street, Suite 2250
San Diego, CA 92101

Macerich Fresno LP
PO Box 849418
Los Angeles, CA 90084-9418

L'atiste
424 Towne Avenue
Los Angeles, CA 90021

Lynx Property Management Inc
924 Laguna St. Suite B
Santa Barbara, CA 93101

Paseo Nuevo Owner LLC
PO Box 780268
Philadelphia, PA 19178-0268

Macerich SMP LP
c/o David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367

Nine Planet
1022 S. Wall Street
Los Angeles, CA 90015

SEVEND
2301 E. 7th St.
Suite E-200
Los Angeles, CA 90023

Plaza Bonita, LLC
Blackmar, Principe & Schmelter, APC
600 B. Street, Suite 2250
San Diego, CA 92101

Rancho Mall LLC
PO Box 72439
Cleveland, OH 44192

The Retail Property Trust
Brea Mall
PO Box 772827
Chicago, IL 60677-2827

Shops at Mission Viejo LLC
7415 Solution Center
Chicago, IL 60677-7004

South Bay Center SPE LLC
PO Box 72056
Cleveland, OH 44192-0056

Tyler Mall Limited Partnership
SDS-12-3113
PO Box 86
Minneapolis, MN 55486-3113

W/A SVT Holdings VI LLC
PO Box 749659
Los Angeles, CA 90074-9659

Integrity Payment Systems
1700 Higgins Road # 690
Des Plaines, IL  60018


*Counsel to Caribbean Queen Inc.*
Law Offices of Jacqueline N. Anker
27 W Anapamu, Suite 325
Santa Barbara, CA 93101

*Counsel to Macerich Cerritos LLC*
David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367