TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:16-bk-23836-SK |
| BLUE BEE, INC., | Chapter 11 |
| Debtor. | **MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO REJECT CERTAIN UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASES PURSUANT TO 11 U.S.C. § 365 AND ABANDON ANY REMAINING PERSONAL PROPERTY LOCATED AT THE LEASED PREMISES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JEFF SUNGHAK KIM FILED IN SUPPORT THEREOF** |
| | Date:         January 19, 2017 |
| | Time:         8:30 a.m. |
| | Courtroom:  1575 |
| | Location:    255 E. Temple Street |
| | Los Angeles, California |

1

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** .......................................................... **6**

**I.     STATEMENT OF FACTS** ....................................................................................... **6**

    **A.     Background** ................................................................................................. **6**

    **B.     The Retail Store Leases Proposed To Be Rejected** .................................. **8**

**II.     DISCUSSION** .......................................................................................................... **15**

    **A.     The Debtor Should Be Authorized To Reject The Leases For The
    Retail Stores** ............................................................................................. **15**

    **B.     The Debtor Should Be Authorized To Abandon The Personal Property
    Remaining At The Retail Stores As Of The Applicable Vacate Dates** ........ **17**

**III.     CONCLUSION** ....................................................................................................... **18**

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*In re Central Fla. Metal Fabrication, Inc.*
 190 B.R. 119 (Bankr. N.D.Fla. 1995) ........................................................................15

5

6

*In re Continental Country Club, Inc.*
 114 B.R. 763 (Bankr. M.D.Fla. 1990) ......................................................................15

7

*In re Gucci*
 193 B.R. 411 (S.D.N.Y. 1996)....................................................................................15

8

9

*In re Klein Sleep Products, Inc.*
 78 F.3d 18 (2d. Cir. 1996) ..........................................................................................15

10

11

*In re Prime Motors Inns*
 124 B.R. 378 (Bankr. S.D.Fla. 1991) .......................................................................16

12

*In re Trans World Airlines, Inc.*
 261 B.R. 103 (Bankr. D. Del. 2001) ........................................................................16

13

14

*NLRB v. Bildisco (In re Bildisco)*
 682 F.2d 72 (3d Cir. 1982)........................................................................................15

15

*Pacific Shores Development, LLC v. At Home Corporation (In re At Home Corporation)*
 392 F.3d 1064 (9th Cir. 2004) ............................................................................16, 17

16

17

**FEDERAL STATUTES**

18

11 U.S.C. § 105(a) ..........................................................................................2, 4, 16

19

11 U.S.C. § 365 ......................................................................................................16

20

11 U.S.C. § 365(a) ..........................................................................................2, 4, 15

21

22

11 U.S.C. § 554(a) ..................................................................................................18

23

11 U.S.C. § 1107 ..................................................................................................3, 6

24

11 U.S.C. § 1108 ..................................................................................................3, 6

25

**FEDERAL RULES**

26

Fed. R. Bankr. P. 6006..........................................................................................2, 4

27

Fed. R. Bankr. P. 9013-1.......................................................................................2, 4

28

Pursuant to 11 U.S.C. §§ 105(a) and 365(a), Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1, Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), hereby files this motion (the "Motion") for the entry of an order:

(A)   authorizing (but not requiring) the Debtor to reject up to seven (7) of the Debtor's unexpired non-residential real property leases (collectively, the "Leases," and individually, a "Lease") relating to the Debtor's retail stores which are identified in the table below (collectively, the "Retail Stores," and individually, a "Retail Store"),[1] with the rejection of such Leases to be deemed effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the "Vacate Date"):

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| Glendale II Mall Associates, LLC c/o Glendale Galleria 110 N. Wacker Drive Attn: Law/Lease Admin. Dept. Chicago, IL 60606 | Glendale Galleria (#31) | 2101 Galleria Way Glendale, California |
| La Cienega Partners Limited Partnership c/o The Taubman Company Attn: General Counsel 200 East Long Lake Road #300 P.O. Box 200 Bloomfield Hills, MI 48303 | Beverly Center (#27) | 8500 Beverly Blvd., #6622 Los Angeles, California |
| Rancho Mall, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | Rancho Cucamonga Victoria Gardens (#38) | 12543 South Main Street, #1615 Rancho Cucamonga, California |

[1] True and correct copies of the Leases for the Retail Stores which are proposed to be rejected are collectively attached as **Exhibit "A"** to the Declaration of Jeff Sunghak Kim annexed to this Motion.

2

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| The Retail Property Trust c/o M.S. Management Associates, Inc. 225 West Washington St. Indianapolis, IN 46204-3438 | Brea Mall (#43) | 2110 Brea Mall, #2110 Brea, California |
| South Bay Center SPE, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | South Bay Galleria (#14) | 1815 Hawthorne Blvd., #258 Redondo Beach, California |
| Temecula Towne Center Associates LP Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | The Promenade in Temecula (#17) | 40820 Winchester Road, #2610 Temecula, California |
| W/A SVT Holdings VI, LLC 900 N. Michigan Avenue, Suite 1900 Chicago, IL 60611 Attn: David S. Joseph, II | Simi Valley Town Center (#12) | 1555 Simi Town Center Way, #135 Simi Valley, California |

and;

(B)     authorizing the Debtor to abandon any of its remaining personal property assets located at each of the Retail Stores as of the applicable Vacate Date.

The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers. The Debtor currently owns and operates twenty-one (21) retail stores located primarily in shopping malls throughout the state of California. The Debtor is headquartered in Los Angeles, California, and currently employs a workforce of approximately 110 employees. The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on October 19, 2016 (the "Petition Date"). The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3

1    For the reasons set forth in detail in the Memorandum of Points and Authorities annexed

2    hereto, the Debtor has determined, in the exercise of its sound business judgment, that granting

3    the Debtor authority to immediately reject the Leases relating to the seven (7) Retail Stores

4    identified above is in the best interests of the estate.  While the Debtor is currently still operating

5    out of the Retail Stores, the retail operations at each of the Retail Stores have been, and continue

6    to be, unprofitable and are likely to only deplete the Debtor's resources if the Debtor does not

7    immediately reject the Leases.  Given the ongoing post-petition rent obligations for the Retail

8    Stores, and the fact that the Debtor will not likely be in a position to operate profitably at such

9    Retail Stores unless meaningful rent concessions can be successfully negotiated with the

10    respective landlords, there will be significant financial losses to the Debtor and its bankruptcy

11    estate, and the accrual of significant administrative rent claims in favor of the respective landlords

12    without a corresponding benefit to the Debtor's estate, if the Leases are not immediately rejected.

13    Accordingly, by this Motion, the Debtor is seeking authority to reject the Leases for the

14    Retail Stores (or some portion of them), effective as of the later of (i) December 31, 2016 and (ii)

15    the Vacate Date for each applicable Retail Store.  While the Debtor anticipates vacating most, if

16    not all, of the Retail Stores by December 31, 2016, the Debtor may actually vacate certain of the

17    Retail Stores on or before January 31, 2017.

18    In addition, by this Motion, the Debtor is seeking Court authority to abandon any of the

19    Debtor's remaining personal property assets located at each of the Retail Stores as of the

20    applicable Vacate Date.

21    The Motion is based upon 11 U.S.C. §§ 105(a) and 365(a), Bankruptcy Rule 6006, and

22    Local Bankruptcy Rule 9013-1, the Memorandum of Points and Authorities and the Declaration

23    of Jeff Sunghak Kim annexed hereto, the entire record of the Debtor's bankruptcy case, the

24    statements, arguments and representations of counsel to be made at the hearing on the Motion,

25    and any other evidence properly presented to the Court.

26    **WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

27    (1)    affirming the adequacy of the notice given;

28    (2)    granting the Motion in its entirety;

4

(3)    authorizing the Debtor to reject the Leases for the Retail Stores, or some portion of them in the discretion of the Debtor, with such rejection to be deemed effective as of the later of (a) December 31, 2016 and (b) the Vacate Date for each such applicable Retail Store;

(4)    authorizing the Debtor to abandon any of its remaining personal property assets located at each of the Retail Stores as of the applicable Vacate Date; and

(5)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  December 29, 2016        BLUE BEE, INC.

By:_____
       TIMOTHY J. YOO
       JULIET Y. OH
       LEVENE, NEALE, BENDER, YOO
         & BRILL L.L.P.
       Attorneys for Chapter 11 Debtor and
       Debtor in Possession

<div style="text-align:center">

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

</div>

**A.    Background.**

1.    Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on October 19, 2016 (the "Petition Date").  The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers.  As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California.  Since the opening of its first retail store in 1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing designer fashion to a wider audience.

3.    The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by Jeff Sunghak Kim and his wife, Young Ae Kim, and was dissolved on August 30, 2013.   Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.  The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  Jeff Sunghak Kim and his wife, Young Ae Kim, continue to be actively involved in the Debtor's business operations as the President and Secretary of the Debtor, respectively.

4.    The Debtor is headquartered near downtown Los Angeles, California and currently employs a workforce of approximately 110 employees.  In 2015, the Debtor generated annual gross revenues of more than $24 million.

5.    After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The vast majority of these new retail stores (approximately 43 stores) were opened within the last seven years.  This large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

6.    The high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors.  As a result of the Debtor's defaults, numerous landlords commenced actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of its retail stores.  While the Debtor had already closed a number of its less profitable retail store locations, leaving open approximately 21 retail stores as of the Petition Date, the Debtor required time to evaluate the viability of its remaining retail stores and identify other ways to decrease operational costs and increase profitability.  In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

7.    Through its bankruptcy case, the Debtor intends to identify the core retail stores around which the Debtor can successfully reorganize, to expeditiously close those retail stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the retail stores (particularly during the upcoming holiday season), all of which the Debtor believes will enable it to formulate and pursue confirmation of a plan of reorganization which allows the

Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

**B.    The Retail Store Leases Proposed To Be Rejected.**

8.    By this Motion, the Debtor is seeking authority to reject up to seven (7) of the Debtor's unexpired non-residential real property leases (collectively, the "Leases," and individually, a "Lease") relating to the Debtor's retail stores which are identified in the table below (collectively, the "Retail Stores," and individually, a "Retail Store"),[2] with the rejection of such Leases to be deemed effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the "Vacate Date"):

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| Glendale II Mall Associates, LLC c/o Glendale Galleria 110 N. Wacker Drive Attn: Law/Lease Admin. Dept. Chicago, IL 60606 | Glendale Galleria (#31) | 2101 Galleria Way Glendale, California |
| La Cienega Partners Limited Partnership c/o The Taubman Company Attn: General Counsel 200 East Long Lake Road #300 P.O. Box 200 Bloomfield Hills, MI 48303 | Beverly Center (#27) | 8500 Beverly Blvd., #6622 Los Angeles, California |
| Rancho Mall, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | Rancho Cucamonga Victoria Gardens (#38) | 12543 South Main Street, #1615 Rancho Cucamonga, California |

---

[2] True and correct copies of the Leases for the Retail Stores which are proposed to be rejected are collectively attached as **Exhibit "A"** to the Declaration of Jeff Sunghak Kim (the "Kim Declaration") annexed hereto.  Income statements for the Retail Stores, which reflect the financial performance of each Retail Store during the last approximately twelve months, are collectively attached as **Exhibit "B"** to the Kim Declaration annexed hereto.

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| The Retail Property Trust c/o M.S. Management Associates, Inc. 225 West Washington St. Indianapolis, IN 46204-3438 | Brea Mall (#43) | 2110 Brea Mall, #2110 Brea, California |
| South Bay Center SPE, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | South Bay Galleria (#14) | 1815 Hawthorne Blvd., #258 Redondo Beach, California |
| Temecula Towne Center Associates LP Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | The Promenade in Temecula (#17) | 40820 Winchester Road, #2610 Temecula, California |
| W/A SVT Holdings VI, LLC 900 N. Michigan Avenue, Suite 1900 Chicago, IL 60611 Attn: David S. Joseph, II | Simi Valley Town Center (#12) | 1555 Simi Town Center Way, #135 Simi Valley, California |

Each of the Leases identified above are described in detail below.

### *Lease For Store #31 (Glendale Galleria)*

9.     Prior to the Petition Date, the Debtor entered into a written Lease agreement dated as of May 4, 2011 with landlord Glendale II Mall Associates, LLC to lease the premises located at 2101 Galleria Way, Glendale, California ("Store #31").  A true and correct copy of the Lease for Store #31 is included in Exhibit "A" to the Kim Declaration annexed hereto.

10.     While the Debtor is currently still operating out of Store #31, the retail operations at Store #31 have been, and continue to be, unprofitable.  An income statement for Store #31, which essentially provides a "four-wall" analysis of Store #31's financial performance during the last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed hereto.  As the income statement for Store #31 indicates, Store #31 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into

9

1  account the corporate overhead expenses attributable to each of the Debtor's retail stores

2  (including Store #31), the Debtor has concluded that, unless meaningful rent concessions can be

3  successfully negotiated with the landlord, Store #31 is simply not profitable enough to sustain and

4  will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

5  Lease associated therewith.

6         ***Lease For Store #27 (Beverly Center)***

7        11.    Prior to the Petition Date, the Debtor entered into a written Lease agreement

8  (entitled Temporary Inline Space License Agreement) dated as of May 25, 2016 with landlord La

9  Cienega Partners Limited Partnership to lease the premises located at 8500 Beverly Boulevard,

10  #6622, Los Angeles, California ("Store #27").  A true and correct copy of the Lease for Store #27

11  is included in Exhibit "A" to the Kim Declaration annexed hereto.

12        12.    While the Debtor is currently still operating out of Store #27, the retail operations

13  at Store #27 have been, and continue to be, unprofitable.  An income statement for Store #27,

14  which essentially provides a "four-wall" analysis of Store #27's financial performance during the

15  last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

16  hereto.  As the income statement for Store #27 indicates, Store #27 has not operated profitably or

17  has operated at a small net profit during the last approximately twelve months.  After taking into

18  account the corporate overhead expenses attributable to each of the Debtor's retail stores

19  (including Store #27), the Debtor has concluded that, unless meaningful rent concessions can be

20  successfully negotiated with the landlord, Store #27 is simply not profitable enough to sustain and

21  will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

22  Lease associated therewith.

23        ***Lease For Store #38 (Rancho Cucamonga Victoria Gardens)***

24        13.    Prior to the Petition Date, the Debtor's predecessor, Angl, Inc., entered into a

25  written Lease agreement dated as of August 2, 2012 with landlord Rancho Mall, LLC to lease the

26  premises located at 12543 South Main Street, #1615, Rancho Cucamonga, California ("Store

27  #38").  A true and correct copy of the Lease for Store #38 is included in Exhibit "A" to the Kim

28  Declaration annexed hereto.  Prior to the Petition Date, on or about August 30, 2013 (when Angl,

1   Inc. was dissolved), the Lease for Store #38 was assumed by and/or assigned to the Debtor and,

2   as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store

3   #38 and to perform all rent payment and other obligations as the effective tenant under the Lease

4   for Store #38 since such date.

5          14.    While the Debtor is currently still operating out of Store #38, the retail operations

6   at Store #38 have been, and continue to be, unprofitable.  An income statement for Store #38,

7   which essentially provides a "four-wall" analysis of Store #38's financial performance during the

8   last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

9   hereto.  As the income statement for Store #38 indicates, Store #38 has not operated profitably or

10  has operated at a small net profit during the last approximately twelve months.  After taking into

11  account the corporate overhead expenses attributable to each of the Debtor's retail stores

12  (including Store #38), the Debtor has concluded that, unless meaningful rent concessions can be

13  successfully negotiated with the landlord, Store #38 is simply not profitable enough to sustain and

14  will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

15  Lease associated therewith.

16          ***Lease For Store #43 (Brea Mall)***

17          15.    Prior to the Petition Date, the Debtor entered into a written Lease agreement dated

18  as of February 28, 2014 with landlord The Retail Property Trust to lease the premises located at

19  2110 Brea Mall, #2110, Brea, California ("Store #43").  A true and correct copy of the Lease for

20  Store #43 is included in Exhibit "A" to the Kim Declaration annexed hereto.

21          16.    While the Debtor is currently still operating out of Store #43, the retail operations

22  at Store #43 have been, and continue to be, unprofitable.  An income statement for Store #43,

23  which essentially provides a "four-wall" analysis of Store #43's financial performance during the

24  last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

25  hereto.  As the income statement for Store #43 indicates, Store #43 has not operated profitably or

26  has operated at a small net profit during the last approximately twelve months.  After taking into

27  account the corporate overhead expenses attributable to each of the Debtor's retail stores

28  (including Store #43), the Debtor has concluded that, unless meaningful rent concessions can be

1    successfully negotiated with the landlord, Store #43 is simply not profitable enough to sustain and

2    will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

3    Lease associated therewith.

4           ***Lease For Store #14 (South Bay Galleria)***

5           17.    Prior to the Petition Date, the Debtor's principals, Jeff Sunghak Kim and his wife,

6    Young Ae Kim, entered into a written Lease agreement dated as of April 24, 2006 with landlord

7    South Bay Center SPE, LLC to lease the premises located at 1815 Hawthorne Boulevard, #258,

8    Redondo Beach, California ("Store #14").  A true and correct copy of the Lease for Store #14 is

9    included in Exhibit "A" to the Kim Declaration annexed hereto.  At some point prior to the

10   Petition Date, the Lease for Store #14 was assumed by and/or assigned to the Debtor by the

11   Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to

12   exclusively operate, Store #14 and to perform all rent payment and other obligations as the

13   effective tenant under the Lease for Store #14.

14          18.    The original term of the Lease for Store #14 has expired and, therefore, the Debtor

15   has effectively been leasing the premises on a month-to-month basis at the same rental rate which

16   existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

17          19.    While the Debtor is currently still operating out of Store #14, the retail operations

18   at Store #14 have been, and continue to be, unprofitable.  An income statement for Store #14,

19   which essentially provides a "four-wall" analysis of Store #14's financial performance during the

20   last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

21   hereto.  As the income statement for Store #14 indicates, Store #14 has not operated profitably or

22   has operated at a small net profit during the last approximately twelve months.  After taking into

23   account the corporate overhead expenses attributable to each of the Debtor's retail stores

24   (including Store #14), the Debtor has concluded that, unless meaningful rent concessions can be

25   successfully negotiated with the landlord, Store #14 is simply not profitable enough to sustain and

26   will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

27   Lease associated therewith.

28

1        ***Lease For Store #17 (The Promenade in Temecula)***

2        20.        Prior to the Petition Date, the Debtor's principals, Jeff Sunghak Kim and his wife,

3   Young Ae Kim, entered into a written Lease agreement dated as of August 3, 2006 with landlord

4   Temecula Towne Center Associates LP to lease the premises located at 40820 Winchester Road,

5   #2610, Temecula, California ("Store #17").  A true and correct copy of the Lease for Store #17 is

6   included in Exhibit "A" to the Kim Declaration annexed hereto.  At some point prior to the

7   Petition Date, the Lease for Store #17 was assumed by and/or assigned to the Debtor by the

8   Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to

9   exclusively operate, Store #17 and to perform all rent payment and other obligations as the

10  effective tenant under the Lease for Store #17.

11       21.        The original term of the Lease for Store #17 has expired and, therefore, the Debtor

12  has effectively been leasing the premises on a month-to-month basis at the same rental rate which

13  existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

14       22.        While the Debtor is currently still operating out of Store #17, the retail operations

15  at Store #17 have been, and continue to be, unprofitable.  An income statement for Store #17,

16  which essentially provides a "four-wall" analysis of Store #17's financial performance during the

17  last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

18  hereto.  As the income statement for Store #17 indicates, Store #17 has not operated profitably or

19  has operated at a small net profit during the last approximately twelve months.  After taking into

20  account the corporate overhead expenses attributable to each of the Debtor's retail stores

21  (including Store #17), the Debtor has concluded that, unless meaningful rent concessions can be

22  successfully negotiated with the landlord, Store #17 is simply not profitable enough to sustain and

23  will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

24  Lease associated therewith.

25       ***Lease For Store #12 (Simi Valley Town Center)***

26       23.        Prior to the Petition Date, the Debtor's principals, Jeff Sunghak Kim and his wife,

27  Young Ae Kim, entered into a written Lease agreement dated as of March 2, 2006 with Simi

28  Valley Mall, LLC (the predecessor to the current landlord, W/A SVT Holdings VI, LLC) to lease

the premises located at 1555 Simi Town Center Way, #135, Simi Valley, California ("Store #12"). A true and correct copy of the Lease for Store #12 is included in Exhibit "A" to the Kim Declaration annexed hereto. At some point prior to the Petition Date, the Lease for Store #12 was assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store #12 and to perform all rent payment and other obligations as the effective tenant under the Lease for Store #12.

24.    The original term of the Lease for Store #12 has expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month basis at the same rental rate which existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

25.    While the Debtor is currently still operating out of Store #12, the retail operations at Store #12 have been, and continue to be, unprofitable. An income statement for Store #12, which essentially provides a "four-wall" analysis of Store #12's financial performance during the last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed hereto. As the income statement for Store #14 indicates, Store #12 has not operated profitably or has operated at a small net profit during the last approximately twelve months. After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #12), the Debtor has concluded that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #12 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

26.    Although the Debtor has attempted to negotiate rent concessions with many, if not all, of the landlords of the Retail Stores, the Debtor's efforts to negotiate agreements with such landlords to reduce rent to a level which would render the Retail Stores profitable have not been successful to date.

27.    Based on the foregoing, and given the ongoing post-petition rent obligations for the Retail Stores, and the fact that the Debtor will not likely be in a position to operate profitably at such Retail Stores unless meaningful rent concessions can be successfully negotiated with the respective landlords, there will be significant financial losses to the Debtor and its bankruptcy

14

estate, and the accrual of significant administrative rent claims in favor of the respective landlords without a corresponding benefit to the Debtor's estate, if the Leases are not immediately rejected.

28.     Accordingly, by this Motion, the Debtor is seeking to reject all of the Leases for the Retail Stores, effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the "Vacate Date").   While the Debtor anticipates vacating most, if not all, of the Retail Stores by December 31, 2016, the Debtor may actually vacate certain of the Retail Stores on or before January 31, 2017.

29.     In addition, by this Motion, the Debtor is seeking Court authority to abandon any of the Debtor's remaining personal property assets located at each of the Retail Stores of the applicable Vacate Date.

30.     The Debtor believes that the rent and other obligations payable under the Leases are generally at or above the current market.   Accordingly, the Debtor does not believe that the marketing and assignment of the Leases to third parties would result in any net recovery for its bankruptcy estate.

## II.

## DISCUSSION

**A.     The Debtor Should Be Authorized To Reject The Leases For The Retail Stores.**

Barring certain exceptions not herein relevant, Section 365(a) of the Bankruptcy Code authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor."   A debtor in possession may assume or reject executory contracts for the benefit of the estate.   *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2d. Cir. 1996); *In re Central Fla. Metal Fabrication, Inc.*, 190 B.R. 119, 124 (Bankr. N.D.Fla. 1995); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996).   In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it.   *In re Continental Country Club, Inc.*, 114 B.R. 763, 767 (Bankr. M.D.Fla. 1990); *see also In re Gucci, supra*, 193 B.R. at 415; *NLRB v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the

1  estate, the 'business judgment' test.").  The business judgment standard requires that the court

2  follow the business judgment of the debtor unless that judgment is the product of bad faith, whim,

3  or caprice.  *In re Prime Motors Inns*, 124 B.R. 378, 381 (Bankr. S.D.Fla. 1991), *citing Lubrizol*

4  *Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475

5  U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *see also In re Trans World Airlines, Inc.*, 261

6  B.R. 103, 121 (Bankr. D. Del. 2001).

7        The Debtor has determined that, unless meaningful rent concessions can be successfully

8  negotiated with the respective landlords, the seven (7) Retail Stores discussed above are not

9  profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor

10  does not immediately reject the Leases associated therewith.  Each day that the Leases relating to

11  the Retail Stores remain in place results in significant financial losses (and increased

12  administrative expense) to the Debtor's bankruptcy estate, which must be avoided to preserve the

13  value of the Debtor's assets, conserve the Debtor's resources and cash, and maximize the Debtor's

14  ability to successfully reorganize in this case.  Accordingly, the Debtor submits that it is

15  reasonable and appropriate to grant the Debtor authority to immediately reject the Leases for the

16  Retail Stores.

17        By this Motion, the Debtor is seeking to have the effective date of the rejection of the

18  Leases be deemed the later of December 31, 2016 and the Vacate Date for each applicable Lease

19  (*i.e.*, the date that the Debtor actually vacates each applicable Retail Store).  As noted above, the

20  Debtor anticipates that it will be vacating most, if not all, of the Retail Stores by December 31,

21  2016.  With respect to those Retail Stores that the Debtor is not able to vacate by December 31,

22  2016, the Debtor anticipates vacating such Retail Stores by no later than January 31, 2017.

23        The Ninth Circuit has held that a bankruptcy court, in exercising its equitable powers under

24  11 U.S.C. § 105(a), may approve the rejection of a nonresidential lease retroactive to the motion

25  filing date when necessary or appropriate to carry out the provisions of 11 U.S.C. § 365.  *Pacific*

26  *Shores Development, LLC v. At Home Corporation (In re At Home Corporation)*, 392 F.3d 1064,

27  1071 (9th Cir. 2004) (rejection of unexpired nonresidential lease retroactive to motion filing date

28  was not "abuse of discretion" under the circumstances presented in the case, and the landlord's

16

possession of the leased premises is not a requirement for such retroactive relief).  Here, the Debtor is seeking to have the effective date of the rejection of the Leases be deemed the ***later of*** December 31, 2016 or the Vacate Date (which the Debtor anticipates will occur no later than January 31, 2017).  Accordingly, the effective date of the rejection of the Leases will be no earlier than December 31, 2016, which is still after the date of the filing of this Motion.  Based on the Ninth Circuit's holding in *In re At Home Corporation,* the Debtor submits that the effective date of the rejection of the Leases proposed herein is reasonable, appropriate and warranted under the circumstances of this case, particularly where, as here, the landlords of the Retail Stores will have notice of the proposed rejection of the Leases (by way of this Motion) and will have regained possession of their respective premises on or prior to the effective lease rejection date.

Additionally, the Debtor has determined, in its reasonable business judgment, that there is no net benefit that can be realized from an attempt to market and assign the Leases for the Retail Stores.  As a result, the Debtor has determined that the cost to the Debtor of continuing to occupy the Retail Stores, and of performing its obligations under the Leases for the Retail Stores and incurring unnecessary administrative expenses, is burdensome, and that the immediate rejection of the Leases for the Retail Stores is therefore in the best interests of the Debtor's estate and creditors.

For all of the reasons set forth above, the Debtor submits that it is in the best interests of the Debtor and its bankruptcy estate to grant the relief requested in this Motion and to authorize the Debtor to reject the Leases for the Retail Stores in accordance with the terms and conditions set forth herein.

**B.      The Debtor Should Be Authorized To Abandon The Personal Property Remaining At The Retail Stores As Of The Applicable Vacate Dates.**

The Debtor believes that it will remove all owned personal property assets (the "Remaining Personal Property") located at the Retail Stores as of the applicable Vacate Date(s).  However, out of an abundance of caution and solely to the extent that the Debtor retained (or retains) any ownership interest in any Remaining Personal Property, the Debtor seeks authority to

17

1  abandon any Remaining Personal Property that remain at the Retail Stores as of the Vacate

2  Date(s).

3      The Debtor seeks to abandon any Remaining Personal Property described above as is,

4  where is, and in accordance with section 554(a) of the Bankruptcy Code.  Section 554(a) provides

5  that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is

6  burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C.

7  § 554(a).  The Debtor believes that the costs associated with liquidating any Remaining Personal

8  Property at the Retail Stores will likely approach or exceed the value of such assets.  Accordingly,

9  the Debtor believes that the Remaining Personal Property at the Retail Stores, if any, has

10  inconsequential value to the Debtor's estate and should be abandoned as requested herein.

11                          **III.**

12                     **<u>CONCLUSION</u>**

13      **WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

14      (1)    affirming the adequacy of the notice given;

15      (2)    granting the Motion in its entirety;

16      (3)    authorizing the Debtor to reject the Leases for the Retail Stores, or some portion of

17  them in the discretion of the Debtor, with such rejection to be deemed effective as of the later of

18  (a) December 31, 2016 and (b) the Vacate Date for each such applicable Retail Store;

19      (4)    authorizing the Debtor to abandon any of its remaining personal property assets

20  located at each of the Retail Stores as of the applicable Vacate Date; and

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

18

1          (5)      granting such other and further relief as the Court deems just and proper under the

2    circumstances.

3    Dated:  December 29, 2016                    BLUE BEE, INC.

4

5

6                                                By:_____

7                                                    TIMOTHY J. YOO
                                                    JULIET Y. OH
8                                                    LEVENE, NEALE, BENDER, YOO
                                                      & BRILL L.L.P.
9                                                    Attorneys for Chapter 11 Debtor and
                                                    Debtor in Possession
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19

## DECLARATION OF JEFF SUNGHAK KIM

I, Jeff Sunghak Kim, hereby declare as follows:

1.      I am over 18 years of age.  I am the co-founder and President of Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession herein (the "Debtor"), and am therefore familiar with the business operations and financial books and records of the Debtor.  I have personal knowledge of the facts set forth below and, if called to testify as a witness, I could and would competently testify thereto.

2.      I have access to the Debtor's books and records.  As the co-founder and President of the Debtor, I am familiar with the history, organization, operations and financial condition of the Debtor.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my review of the Debtor's books and records.

3.      I make this declaration in support of the Debtor's motion to which this declaration is attached (the "Motion") which seeks the entry of an order: (A) authorizing (but not requiring) the Debtor to reject up to seven (7) of the Debtor's unexpired non-residential real property leases (collectively, the "Leases," and individually, a "Lease") relating to the Debtor's retail stores which are identified in the Motion (collectively, the "Retail Stores," and individually, a "Retail Store"), with the rejection of such Leases to be deemed effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the "Vacate Date"); and (B) authorizing the Debtor to abandon any of its remaining personal property assets located at each of the Retail Stores (the "Remaining Personal Property") as of the applicable Vacate Date.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

4.      The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 19, 2016 (the "Petition Date").  The Debtor is continuing to operate its business,

manage its financial affairs and operate its bankruptcy estate as a debtor in possession.

5.     The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers.  As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California.  Since the opening of its first retail store in 1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing designer fashion to a wider audience.

6.     The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by my wife, Young Ae Kim, and me, and was dissolved on August 30, 2013.  Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.  The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  My wife, Young Ae Kim, and I continue to be actively involved in the Debtor's business operations as the Secretary and President of the Debtor, respectively.

7.     The Debtor is headquartered near downtown Los Angeles, California and currently employs a workforce of approximately 110 employees.  In 2015, the Debtor generated annual gross revenues of more than $24 million.

8.     After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The vast majority of these new retail stores (approximately 43 stores) were opened within the last seven years.  This large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

9.     The high cost of expansion combined with decreasing store sales as a result of a

21

general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors.  As a result of the Debtor's defaults, numerous landlords commenced actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of its retail stores.  While the Debtor had already closed a number of its less profitable retail store locations, leaving open approximately 21 retail stores as of the Petition Date, the Debtor required time to evaluate the viability of its remaining retail stores and identify other ways to decrease operational costs and increase profitability.  In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

10.    Through its bankruptcy case, the Debtor intends to identify the core retail stores around which the Debtor can successfully reorganize, to expeditiously close those retail stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the retail stores (particularly during the upcoming holiday season), all of which I believe will enable the Debtor to formulate and pursue confirmation of a plan of reorganization which allows the Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

11.    By the Motion, the Debtor is seeking authority to reject some or all of the Leases relating to the seven (7) Retail Stores identified in the Motion, with the rejection of such Leases to be deemed effective as of the later of December 31, 2016 and the actual Vacate Date.  True and correct copies of the Leases for the seven (7) Retail Stores which are proposed to be rejected are collectively attached as **Exhibit "A"** hereto.

12.    Income statements for the Retail Stores, which reflect the financial performance of each Retail Store during the last approximately twelve months, are collectively attached as **Exhibit "B"** hereto.

22

### *Lease For Store #31 (Glendale Galleria)*

13.    Prior to the Petition Date, the Debtor entered into a written Lease agreement dated as of May 4, 2011 with landlord Glendale II Mall Associates, LLC to lease the premises located at 2101 Galleria Way, Glendale, California ("Store #31").  A true and correct copy of the Lease for Store #31 is included in Exhibit "A" hereto.

14.    While the Debtor is currently still operating out of Store #31, the retail operations at Store #31 have been, and continue to be, unprofitable.  An income statement for Store #31, which essentially provides a "four-wall" analysis of Store #31's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #31 indicates, Store #31 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #31), I believe that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #31 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

### *Lease For Store #27 (Beverly Center)*

15.    Prior to the Petition Date, the Debtor entered into a written Lease agreement (entitled Temporary Inline Space License Agreement) dated as of May 25, 2016 with landlord La Cienega Partners Limited Partnership to lease the premises located at 8500 Beverly Boulevard, #6622, Los Angeles, California ("Store #27").  A true and correct copy of the Lease for Store #27 is included in Exhibit "A" hereto.

16.    While the Debtor is currently still operating out of Store #27, the retail operations at Store #27 have been, and continue to be, unprofitable.  An income statement for Store #27, which essentially provides a "four-wall" analysis of Store #27's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #27 indicates, Store #27 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #27), I believe that,

1    unless meaningful rent concessions can be successfully negotiated with the landlord, Store #27 is

2    simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

3    Debtor does not immediately reject the Lease associated therewith.

4    ### *Lease For Store #38 (Rancho Cucamonga Victoria Gardens)*

5    17.    Prior to the Petition Date, the Debtor's predecessor, Angl, Inc., entered into a

6    written Lease agreement dated as of August 2, 2012 with landlord Rancho Mall, LLC to lease the

7    premises located at 12543 South Main Street, #1615, Rancho Cucamonga, California ("Store

8    #38").    A true and correct copy of the Lease for Store #38 is included in Exhibit "A" hereto.

9    Prior to the Petition Date, on or about August 30, 2013 (when Angl, Inc. was dissolved), the

10    Lease for Store #38 was assumed by and/or assigned to the Debtor and, as a result, the Debtor has

11    been exclusively operating, and continues to exclusively operate, Store #38 and to perform all

12    rent payment and other obligations as the effective tenant under the Lease for Store #38 since

13    such date.

14    18.    While the Debtor is currently still operating out of Store #38, the retail operations

15    at Store #38 have been, and continue to be, unprofitable.    An income statement for Store #38,

16    which essentially provides a "four-wall" analysis of Store #38's financial performance during the

17    last approximately twelve months, is included in Exhibit "B" hereto.    As the income statement for

18    Store #38 indicates, Store #38 has not operated profitably or has operated at a small net profit

19    during the last approximately twelve months.    After taking into account the corporate overhead

20    expenses attributable to each of the Debtor's retail stores (including Store #38), I believe that,

21    unless meaningful rent concessions can be successfully negotiated with the landlord, Store #38 is

22    simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

23    Debtor does not immediately reject the Lease associated therewith.

24    ### *Lease For Store #43 (Brea Mall)*

25    19.    Prior to the Petition Date, the Debtor entered into a written Lease agreement dated

26    as of February 28, 2014 with landlord The Retail Property Trust to lease the premises located at

27    2110 Brea Mall, #2110, Brea, California ("Store #43").    A true and correct copy of the Lease for

28    Store #43 is included in Exhibit "A" hereto.

24

20.     While the Debtor is currently still operating out of Store #43, the retail operations at Store #43 have been, and continue to be, unprofitable.  An income statement for Store #43, which essentially provides a "four-wall" analysis of Store #43's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #43 indicates, Store #43 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #43), I believe that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #43 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

***Lease For Store #14 (South Bay Galleria)***

21.     Prior to the Petition Date, my wife, Young Ae Kim, and I entered into a written Lease agreement dated as of April 24, 2006 with landlord South Bay Center SPE, LLC to lease the premises located at 1815 Hawthorne Boulevard, #258, Redondo Beach, California ("Store #14").  A true and correct copy of the Lease for Store #14 is included in Exhibit "A" hereto.  At some point prior to the Petition Date, the Lease for Store #14 was assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store #14 and to perform all rent payment and other obligations as the effective tenant under the Lease for Store #14.

22.     To the best of my knowledge, the original term of the Lease for Store #14 has expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month basis at the same rental rate which existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

23.     While the Debtor is currently still operating out of Store #14, the retail operations at Store #14 have been, and continue to be, unprofitable.  An income statement for Store #14, which essentially provides a "four-wall" analysis of Store #14's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #14 indicates, Store #14 has not operated profitably or has operated at a small net profit

25

1   during the last approximately twelve months.  After taking into account the corporate overhead

2   expenses attributable to each of the Debtor's retail stores (including Store #14), I believe that,

3   unless meaningful rent concessions can be successfully negotiated with the landlord, Store #14 is

4   simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

5   Debtor does not immediately reject the Lease associated therewith.

6   ### *Lease For Store #17 (The Promenade in Temecula)*

7   24.     Prior to the Petition Date, my wife, Young Ae Kim, and I entered into a written

8   Lease agreement dated as of August 3, 2006 with landlord Temecula Towne Center Associates

9   LP to lease the premises located at 40820 Winchester Road, #2610, Temecula, California ("Store

10  #17").  A true and correct copy of the Lease for Store #17 is included in Exhibit "A" hereto.  At

11  some point prior to the Petition Date, the Lease for Store #17 was assumed by and/or assigned to

12  the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating,

13  and continues to exclusively operate, Store #17 and to perform all rent payment and other

14  obligations as the effective tenant under the Lease for Store #17.

15  25.     To the best of my knowledge, the original term of the Lease for Store #17 has

16  expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month

17  basis at the same rental rate which existed at the end of the lease term (or such lower rate

18  mutually agreed to by the parties).

19  26.     While the Debtor is currently still operating out of Store #17, the retail operations

20  at Store #17 have been, and continue to be, unprofitable.  An income statement for Store #17,

21  which essentially provides a "four-wall" analysis of Store #17's financial performance during the

22  last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for

23  Store #17 indicates, Store #17 has not operated profitably or has operated at a small net profit

24  during the last approximately twelve months.  After taking into account the corporate overhead

25  expenses attributable to each of the Debtor's retail stores (including Store #17), I believe that,

26  unless meaningful rent concessions can be successfully negotiated with the landlord, Store #17 is

27  simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

28  Debtor does not immediately reject the Lease associated therewith.

### *Lease For Store #12 (Simi Valley Town Center)*

27.    Prior to the Petition Date, my wife, Young Ae Kim, and I entered into a written Lease agreement dated as of March 2, 2006 with Simi Valley Mall, LLC (the predecessor to the current landlord, W/A SVT Holdings VI, LLC) to lease the premises located at 1555 Simi Town Center Way, #135, Simi Valley, California ("Store #12").  A true and correct copy of the Lease for Store #12 is included in Exhibit "A" hereto.  At some point prior to the Petition Date, the Lease for Store #12 was assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store #12 and to perform all rent payment and other obligations as the effective tenant under the Lease for Store #12.

28.    To the best of my knowledge, the original term of the Lease for Store #12 has expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month basis at the same rental rate which existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

29.    While the Debtor is currently still operating out of Store #12, the retail operations at Store #12 have been, and continue to be, unprofitable.  An income statement for Store #12, which essentially provides a "four-wall" analysis of Store #12's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #14 indicates, Store #12 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #12), I believe that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #12 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

30.    Although the Debtor has attempted to negotiate rent concessions with many, if not all, of the landlords of the Retail Stores, the Debtor's efforts to negotiate agreements with such landlords to reduce rent to a level which would render the Retail Stores profitable have not been successful to date.

27

31.   Based on the foregoing, and given the ongoing post-petition rent obligations for the Retail Stores, and the fact that the Debtor will not likely be in a position to operate profitably at such Retail Stores unless meaningful rent concessions can be successfully negotiated with the applicable landlords, I believe there will be significant financial losses to the Debtor and its bankruptcy estate, and the accrual of significant administrative rent claims in favor of the respective landlords without a corresponding benefit to the Debtor's estate, if the Leases are not immediately rejected.

32.   While I anticipate that the Debtor will be vacating most, if not all, of the Retail Stores by December 31, 2016, the Debtor may actually vacate certain of the Retail Stores on or before January 31, 2017.

33.   I believe that the costs associated with liquidating any Remaining Personal Property at the Retail Stores will likely approach or exceed the value of such assets. Accordingly, I believe that the Remaining Personal Property at the Retail Stores, if any, has inconsequential value to the Debtor's estate and should be abandoned as requested in the Motion. Accordingly, by the Motion, the Debtor is also seeking Court authority to abandon any of the Debtor's Remaining Personal Property located at each of the Retail Stores as of the applicable Vacate Date(s).

34.   I believe that the rent and other obligations payable under the Leases are generally at or above the current market. Accordingly, I do not believe that the marketing and assignment of the Leases to third parties would result in any net recovery for the Debtor's bankruptcy estate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 29th day of December, 2016, at Los Angeles, California.

JEFF SUNGHAK KIM

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT "A"**

[Leases to be Rejected]

# Glendale Galleria (#31)

TENANT
COPY

# GLENDALE GALLERIA

## *ANGL*
## *Space No. 0FU01*

### TABLE OF CONTENTS

REFERENCE PROVISIONS

| ARTICLE | | ARTICLE | |
|---|---|---|---|
| 1 | Leased Premises, Term and Use | 31 | Remedies |
| 2 | Original Construction | 32 | Successors and Assigns |
| 3 | Rental Commencement Date | 33 | Representations |
| 4 | Rental | 34 | Waiver |
| 5 | Definition of Net Sales | 35 | Holding Over |
| 6 | Records and Audits | 36 | Interpretation |
| 7 | Taxes | 37 | Advertising and |
| 8 | Subordination and Attornment | | Promotional Service |
| 9 | Additional Construction | 38 | Quiet Enjoyment |
| 10 | Condition of Leased Premises | 39 | Waiver of Redemption |
| 11 | Tenant's Repairs and Maintenance | 40 | Fees |
| 12 | Alterations | 41 | Tenant's Property |
| 13 | Fixtures and Personal Property | 42 | Lease Status |
| 14 | Liens | 43 | Recording |
| 15 | Laws and Ordinances | 44 | Force Majeure |
| 16 | Environmental Services | 45 | Construction of Lease |
| 17 | Joint Use Areas and Operating Expenses | 46 | Security Deposit |
| 18 | Damage to Leased Premises | 47 | Captions |
| 19 | Insurance | 48 | Severability |
| 20 | Indemnification | 49 | Objection to Statements |
| 21 | Assignment, Subletting and | 50 | Liability of Landlord |
| | Ownership | 51 | No Option |
| 22 | Access to Leased Premises | 52 | Execution of Documents |
| 23 | Defaults by Tenant | 53 | Corporate Tenant |
| 24 | Surrender of Leased Premises | 54 | Printed Provisions |
| 25 | Tenant's Conduct of Business | 55 | Entire Agreement |
| 26 | Rules and Regulations | 56 | No Third-Party Rights |
| 27 | Eminent Domain | 57 | Financial Statements |
| 28 | Attorneys' Fees | 58 | Other Locations |
| 29 | Sale of Leased Premises by Landlord | 59 | Tenant's Failure |
| 30 | Notices | 60 | Ownership |
| | | 61 | Special Provisions |

AFFIDAVIT

EXHIBITS

| EXHIBIT A, A-1 | Plans of Leased Premises |
|---|---|
| EXHIBIT B | Site Plan |
| EXHIBIT C | Description of Landlord/Tenant Work |
| EXHIBIT F | Operating Charge for Heating, Ventilation, Air-Conditioning, Water and Sewer and Electricity |

# GLENDALE GALLERIA

THIS LEASE is between **GLENDALE II MALL ASSOCIATES, LLC** , **a Delaware limited liability company,** ("Landlord"), and **ANGL, INC., a California corporation** ("Tenant"). The date of this Lease is _____ May  4 _____, 20 _11_ ("Effective Date"). The Leased Premises are located in the **GLENDALE GALLERIA** ("Shopping Center") in the City of Glendale, County of Los Angeles, and State of California.

## REFERENCE PROVISIONS

The following references define terms used in the specified Articles and elsewhere in this Lease and shall be construed in accordance with the provisions and conditions in this Lease:

1.01    Leased Premises:  **0FU01 GLENDALE GALLERIA containing approximately 1,779 square feet of floor area   and approximately 16'6" lineal feet of frontage**

[ARTICLE 1(a)]

1.02    Expiration Date:  **August 31, 2021, or if later, 120 full calendar months following the Rental Commencement Date.**

[ARTICLE 1(b)]

1.03    Permitted Use:  Only for the retail sale of **women's and misses' ready-to-wear clothing and accessories, including, but not limited to, costume jewelry, perfumes, cosmetics, make-up and hair products, and footwear; provided, however, Tenant shall not allocate more than 15% of the gross leasable floor area to the display and sale of footwear and for no other use or purpose whatsoever.**

[ARTICLE 1(c)]

1.04    Submittal date for preliminary plans:  **April 01, 2011**

[ARTICLE 2(d)]

Submittal date for final plans and specifications:  **May 01, 2011**

[ARTICLE 2(d)]

1.05    Beginning Work Date:  **Not later than seven (7) days after the later of the date (i) Tenant has received a copy of the fully executed Lease from Landlord; (ii) Landlord has approved Tenant's plans and specifications for the Leased Premises, provided same were diligently prepared and timely submitted to Landlord; and (iii) Tenant has received all necessary permits for Tenant's Work provided that such permits were diligently pursued by Tenant; and (iv) Landlord has delivered unencumbered possession of the Leased Premises to Tenant.**

**Notwithstanding anything to the contrary, Tenant shall not be required to accept possession of the Leased Premises, nor shall the same be deemed delivered prior to the date of June 1, 2011, unless Tenant, in its discretion, elects to accept possession at an earlier date.**

[ARTICLE 2(e)]

1.06    Opening Date:  **Not later than ninety (90) days after the Beginning Work Date.**

[ARTICLE 3]

1.07    Minimum Annual Rental:

[ARTICLE 4(a)]

Rental Commencement Date ("RCD") through the 36th full calendar month following the RCD
**$115,635.00** per year                    **($9,636.25** per month)
The 37th full calendar month following the RCD through the 84th full calendar month following the RCD
**$128,088.00** per year                    **($10,674.00** per month)
The 85th full calendar month following the RCD through Expiration Date
**$140,541.00** per year                    **($11,711.75** per month)

1.08    Percentage Rate:  **6%**

[ARTICLE 4(b)]

1.09    Annual Sales Base:

[ARTICLE 4(b)]

Rental Commencement Date ("RCD") through the 36th full calendar month following the RCD
**$1,445,437.50** per year
The 37th full calendar month following the RCD through the 84th full calendar month following the RCD
**$1,601,100.00** per year
The 85th full calendar month following the RCD through Expiration Date
**$1,756,762.50** per year

1.10   Address of Landlord:

[ARTICLES 4 and 30]

Landlord's Notice Address                          Landlord's Payment Address:
**GLENDALE II MALL ASSOCIATES, LLC**               GLENDALE II MALL ASSOCIATES, LLC
c/oGLENDALE GALLERIA                               2828 Paysphere Circle
110 N. Wacker Dr.                                  Click here to enter text.
Chicago, IL  60606                                 Chicago, IL 60674
Attn:  Law/Lease Administration Department

With a copy to:
**GLENDALE GALLERIA**
100 W. Broadway
Glendale, CA  91210
Attn:  General Manager

1.11   Notice and Billing Address of Tenant:

[ARTICLE 30]

Notice:
**ANGL, INC.**
**2301-2313 E. 51st Street**
**Vernon, CA 90058**
**Attn:  Jeff Kim, President**

1.12   Additional Gross Leasable Area Annual Rental Increase:  **Not applicable**

[ARTICLE 4(c)]

1.13   Anchor Minimum Annual Rental Increase:  **Not applicable**

[ARTICLE 4(d)]

1.14   Trade Name:  "ANGL" or any other trade name using the name "ANGL"

[ARTICLE 25]

1.15   **Intentionally omitted**

[ARTICLE 37]

1.16   Initial Assessment:  **Not applicable**

[ARTICLE 37]

1.17   Key Money:  **Not Applicable**

1.18   Construction Allowance:  **Not Applicable**

[ARTICLE 2]

1.19   Security:  **Not Applicable**

[ARTICLE 46]

1.20   Radius:  **1 mile**

[ARTICLE 58]

1.21   **Intentionally Omitted**

[ARTICLE 16]

1.22   Operating Expenses Payment:  **$60,788.43 ($34.17** per square foot) per year for the calendar year **2011**,
payable in equal monthly installments, subject to the annual increases provided in the Lease.

[ARTICLE 7]

1.23   Kiosk Restriction: Landlord shall not permit any temporary or permanent kiosk, RMU, floating retail unit, or cart to be installed within 10 feet of the front lease line of the Leased Premises, with the exception of any such units which exist as on the date of this Lease, as shown on Exhibit B hereto; provided, however, any such existing kiosk, RMU, floating retail unit, or cart or replacement thereof shall neither be increased in size or height, nor moved any closer to the storefront of the Leased Premises or laterally toward the storefront entrance.

1.24   Chargeback Waiver: Notwithstanding anything to the contrary contained in EXHIBIT C attached hereto or otherwise, the construction chargeback items which Tenant shall be obligated to pay Landlord in connection with the construction of the Leased Premises pursuant to EXHIBIT C or otherwise shall be waived. Notwithstanding the foregoing, the construction deposit, temporary electric charges, construction trash removal charges and barricade costs contained in EXHIBIT C shall not be waived, reduced or capped in any way.

In the event Landlord erects Tenant's barricade, Tenant shall reimburse Landlord for all costs related to the barricade including, but not limited to the cost of materials and supplies, painting graphics and signage and the removal or demolition of the barricade, not to exceed $65.00 per lineal foot.

1.25   Not Applicable

1.26   A. Not Applicable

B. Not Applicable

1.27   Termination Right: Provided Tenant is open and operating for business in the Leased Premises and not otherwise in default of the terms of this Lease beyond written notice and any applicable cure period, if Tenant's Net Sales (as defined in ARTICLE 5) made from the Leased Premises fail to exceed $1,000,000.00 in the 37th through 48th consecutive full calendar month following the Rental Commencement Date, Tenant shall have the right to terminate this Lease upon 30 days' advance written notice to Landlord given any time within 365 days following the end of the 48th consecutive full calendar month following the Rental Commencement Date.

If the Nordstrom department store closes after the 48th consecutive full calendar month following the Rental Commencement Date and if Tenant's Net Sales (as defined in ARTICLE 5) made from the Leased Premises (a) decrease by more than 15% as a direct result thereof compared to a corresponding measurement period in the previous year (where Nordstrom was not so closed) ("Sales Decrease"), (b) the Sales Decrease continues for 12 consecutive months, and (c) Tenant is open and operating for business in the Leased Premises and not otherwise in default of the terms of this Lease beyond written notice and any applicable cure period, then Tenant shall have the right, retroactive to the first day of the Sales Decrease, to pay to Landlord, in lieu of Minimum Annual Rental and Percentage Rental and all additional rent other than consumables, an amount equal to 8% of Net Sales for each and every month ("Substitute Rent").   Tenant shall give Landlord 30 day's prior written notice of Tenant's intention to exercise such right. Substitute Rent shall be payable monthly, in arrears, within 20 days following the end of each calendar month.  In the event the Sales Decrease continues for an additional 6 consecutive months (18 months in the aggregate), then Tenant shall have the right to terminate this Lease by written notice to Landlord.  Tenant's notice of termination must be given within 60 days after the expiration of said 18 month period.  This Lease shall then terminate upon a date which shall be 60 days following the date of the notice.  In the event Tenant has not sent the notice of its intent to terminate within said 60-day period, then Tenant's right to pay Substitute Rent shall cease and Tenant shall resume paying all Minimum Annual Rental and Percentage Rental and all other rents under the Lease as if this Reference Provision 1.26 was not in place.

If Tenant's Net Sales (as defined in ARTICLE 5) made from the Leased Premises fail to exceed $1,000,000.00 in the 37th through 48th consecutive full calendar month following the Rental Commencement Date, Landlord shall have the right to terminate this Lease upon 30 days advance written notice to Tenant given any time within 180 days following the end of the 48th consecutive full calendar month following the Rental Commencement Date.  Notwithstanding the above, if Tenant's Net Sales made from the Leased Premises exceed $1,000,000.00 in any of the first 4 full Lease Years, the aforesaid right becomes null and void.

1.28   Not Applicable

1.29   Not Applicable

1.30   Not applicable

1.31   Not Applicable

1.32   Not Applicable

1.33   Not Applicable

1.34    Anchors:    An "anchor" for all purposes under this Lease is any operation, building, store or business, whether owned or leased, which leases or occupies 50,000 contiguous square feet or more of space in the Shopping Center open and operating under a single trade name.  A "variety or specialty store" is (aa) an occupant which leases or occupies between 30,000 and 49,999 contiguous square feet of space in the Shopping Center operating under a single trade name.  An "outparcel" is any operation, land, building, store or business whether occupied or vacant and whether owned or leased, that is not an anchor or variety or specialty store and is separated by vehicular access or parking area from the Main Mall Building(s) or does not have an entrance accessible to the customers of the Shopping Center directly from the Main Mall Building(s).

References to articles are for convenience and designate some of the other provisions where references to the particular Reference Provisions appear.  If there is a conflict between a Reference Provision and the other provisions of this Lease, the former shall control.

## ARTICLE 1 - Leased Premises, Term and Use

(a)     Landlord leases to Tenant and Tenant takes from Landlord in consideration of the covenants and agreements in this Lease, the premises ("Leased Premises") being that portion of the building measured to the center of common walls and the outside faces of exterior walls, on the drawings attached to this Lease and made a part of this Lease as "EXHIBIT A" and "EXHIBIT A-1". The Leased Premises shall include corridors and passageways for the exclusive use of the Leased Premises **as of the date of delivery to Tenant of possession thereof,** columns, stairs, elevators and any construction or equipment located in the Leased Premises, as well as pipes, conduits, electrical wires and drainage lines that directly serve the Leased Premises. The Shopping Center includes all buildings, land, improvements, additions, extensions and deletions which may be made from time to time, and may include adjacent parcels of land not owned, leased or controlled by Landlord but which are operated as an integral part of the Shopping Center. The Leased Premises are described further in the Reference Provisions. **As soon as reasonably practical after Tenant takes possession of the Leased Premises, Tenant's architect may measure the square footage of the Leased Premises.  In the event the parties are unable to agree on the actual square footage thereof, they shall appoint an independent third party architect to measure the square footage of the Leased Premises, whose determination will be binding.  The cost of such third party architect shall be equally split by the parties.**  If the square footage of the Leased Premises is different than the amount set forth in Reference Provision 1.01, all rental and additional rental and amounts based upon the square footage of the Leased Premises shall be proportionately adjusted **as of the Rental Commencement Date,** and the parties shall execute an amendment to this Lease memorializing the adjustments. If Tenant constructs a mezzanine in the Leased Premises, the square footage of the Leased Premises shall be increased in an amount equal to the square footage of the mezzanine, and all rental, additional rental and amounts based upon the square footage of the Leased Premises shall be proportionately adjusted.  The Parties shall execute an amendment to this Lease memorializing the adjustment.  A mezzanine shall not be permitted if the Leased Premises are located on an upper level.

EXHIBITS A, A-1 and B are for informational purposes only, and are not a warranty, representation or agreement that the Leased Premises, Shopping Center or other areas will be as shown on the Exhibits, or that other occupants if shown on the Exhibits will be in the Shopping Center.  Tenant has not been granted any easements of light, air or access.  Tenant's rights are limited to the use and occupancy of the Leased Premises and the license to use the Joint Use Areas as they may exist from time to time, all subject to the terms, covenants, conditions and provisions of this Lease. **Tenant's right to use the Joint Use Areas on a non-exclusive basis shall not be revocable, provided Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure period, and the same does not infringe upon Landlord's other rights under this Lease.**

(b)     The term of this Lease ("Term") shall begin on the **Rental** Commencement Date and end on the Expiration Date in the Reference Provisions.

(c)     The Leased Premises shall be used and occupied only for the Permitted Use in the Reference Provisions, and for no other use or purpose whatsoever.  Unless specifically noted in the Reference Provisions, Tenant does not have exclusive rights to sell any particular merchandise or provide any particular services in the Shopping Center.

**(d) Notwithstanding anything to the contrary contained herein, in the event Tenant's initial construction is delayed due to Landlord's abatement of hazardous materials discovered in the Leased Premises, and such hazardous materials were not placed in the Leased Premises by Tenant, its employees, agents, or contractors, then the Opening Date of the Lease shall be delayed by an equal number of days that such construction was delayed, unless Tenant chooses to open prior to said delayed Opening Date, in which case the Opening Date shall be the date Tenant opens for business in the Leased Premises.**

## ARTICLE 2 - Original Construction

(a)     ~~Landlord may make minor changes to the Leased Premises.~~ Landlord may**,  subject to the terms of the Lease,** ~~also~~ make changes, reductions and additions without restriction in other areas of the Shopping Center (including all Joint Use Areas and all buildings and other improvements), whether the changes are requested by other tenants or deemed desirable by Landlord. **Notwithstanding anything to**

the contrary contained in this Lease, Landlord shall not
materially, adversely affect access to or visibility of the
Leased Premises, or materially adversely interfere with Tenant's
conduct of business in the Leased Premises.

Notwithstanding anything to the contrary contained in the Lease,
Landlord shall (i) not perform changes or make any
installations, alterations or replacements in the Leased
Premises except in areas above a finished ceiling, if any, below
a finished floor, within existing walls and column areas or in
immaterial storage areas, all in locations which will have no
material interference with Tenant's business; and (ii) promptly
restore the Leased Premises, at its sole cost and expense, to
its former condition following any work or activity of Landlord.

(b)     If ~~(1) within 24 months following the Opening Date, construction has not begun on the Shopping Center site, or (2)~~ within 36 months following the Opening Date, the Leased Premises has not been delivered to Tenant by Landlord, this Lease may be terminated by either party by notifying the other in writing, within 30 days thereafter. Tenant releases Landlord and Landlord's contractor from any claim for damages against Landlord or Landlord's contractor for any delay in the date on which the Leased Premises shall be ready for delivery to Tenant.

(c)     Landlord ~~agrees~~ **shall not be required** to perform ~~its~~ **any** construction work ("Landlord's Work") in the Leased Premises. ~~substantially in accordance with the Exhibits.~~ All other work on the Leased Premises shall be done by Tenant, at Tenant's expense ("Tenant's Work"). **Tenant accepts the Leased Premises in its "as-is" condition and shall construct the Leased Premises to resemble Tenant's store in Northridge Fashion Center, in accordance with Landlord's design criteria and subject to Landlord's final approval of Tenant's final plans for the Leased Premises.** Tenant's Work shall include, but not be limited to, the installation of storefronts and storefront signs, customer entrance doors, floor covering, plastering, interior decorating, wall and ceiling treatment, completion of the air conditioning system and fire sprinkler system, extension of electrical service to the Leased Premises, connection of plumbing lines to Landlord's system, the installation of electric lights and fixtures and all other electrical work. The design and installation of mechanical and electrical systems shall comply with the requirements attached and made a part of this Lease as the Exhibits. All signs and electrical work for the signs shall be installed by Tenant at Tenant's expense. They shall be of such character, design, size and at such locations as Landlord may approve. They shall be in accordance with the Exhibits, which is attached and made a part of this Lease. Tenant agrees not to install any **exterior** signs until they have been approved by Landlord. ~~Food Court Tenants shall conform to the Design and Operation Criteria contained in EXHIBIT FC "Operational Requirements for Food Court Tenants" attached and made a part of this Lease. If Tenant is prevented from beginning construction in the Leased Premises by the Beginning Work Date because of the failure of Landlord to substantially complete Landlord's Work within the Leased Premises, the Opening Date shall be extended by 1 working day for each working day that Tenant is prevented. The certification of Landlord's architect that Landlord's Work is substantially complete and in accordance with the plans and specifications shall be conclusive and binding upon the parties.~~ **In the event there is a conflict between the Lease and Tenant's approved plans, Tenant's Landlord-approved plans shall control. Tenant will perform only such work and provide and install only such materials as are set forth in Tenant's Landlord-approved plans and specifications.**

(d)     Approval of the plans and specifications by Landlord shall not create any responsibility by Landlord for their accuracy, sufficiency or compliance with laws or rules and regulations. Tenant shall be solely responsible for the plans and specifications. When Landlord has approved Tenant's plans and specifications, Landlord shall return one set of approved plans to Tenant. Such approved plans shall show the date of Landlord's approval and shall be made a part of this Lease as "Exhibit P", whether or not physically attached hereto. Tenant agrees not to begin Tenant's Work until Landlord has approved the plans and specifications. **Landlord shall make commercially reasonable efforts to respond to Tenant's plans within 10 days following receipt.**

(e)     **Provided Tenant has received possession,** Tenant shall begin Tenant's Work by the Beginning Work Date specified in the Reference Provisions, proceed with it diligently and complete it in strict accordance with EXHIBIT P. Upon completion of Tenant's Work Tenant shall provide a certificate furnished by or otherwise satisfactory to Landlord from Tenant's contractor stating that no asbestos-containing materials or other Hazardous Materials as defined in ARTICLE 15 were used in the construction of the Leased Premises. Tenant shall complete the installation of fixtures, trade fixtures, improvements, equipment, stock and inventory prior to the Opening Date.

NOTWITHSTANDING ANYTHING CONTAINED IN THIS LEASE TO THE CONTRARY, **BUT SUBJECT TO ARTICLES 2(e) and 44**, TENANT IS REQUIRED TO OPEN FOR BUSINESS TO THE PUBLIC

IN THE LEASED PREMISES ON OR BEFORE THE OPENING DATE SPECIFIED IN THE REFERENCE
PROVISIONS. ~~, UNLESS REQUESTED TO DELAY THE OPENING DATE PURSUANT TO ARTICLE 3(b).~~

~~If Tenant does not begin Tenant's Work by the Beginning Work Date, Landlord shall have the right to terminate this Lease by notifying Tenant in writing and providing a cure period, not to exceed 5 days. Tenant shall pay Landlord as liquidated damages the cost of any work done by Landlord for Tenant (representing the actual cost plus 15% for overhead), including, without limitation, electrical work, plumbing, concrete floor slabs, and heating and air conditioning equipment and facilities, if any.~~ If Tenant has not completed Tenant's Work and opened its store for business to the public by the **date that is thirty (30) days after the** Opening Date (subject to ARTICLE 3), Landlord shall be entitled to declare the same a default. In addition to (and not in lieu of) Landlord's other rights and remedies, Tenant's rental shall nevertheless begin on the Opening Date **and from and after the 31ˢᵗ day after the Opening Date** at the per day rate of **$175.00.** ~~the greater of either: (i) 1/10th of the monthly installment of Tenant's Minimum Annual Rental; or (ii) $1,000.00.~~ Late performance will cause Landlord to incur losses, damages and costs not contemplated under this Lease, the exact amount of which are extremely impractical to fix. The costs include, without limitation, processing and accounting charges. The parties agree that these late charges are liquidated damages, represent a reasonable estimate of Landlord's costs and expenses and are fair compensation to Landlord for the loss suffered by Landlord.

## ARTICLE 3 - Rental Commencement Date

(a)    The rental payments shall begin to accrue on the earlier of the following dates ("Rental Commencement Date"): (i) the Opening Date **, even if Tenant opens for business in the Leased Premises prior to the end of the 90th day after the Beginning Work Date.** ~~; or (ii) the date on which Tenant shall open the Leased Premises for business to the public.~~

~~(b)    Notwithstanding any provision to the contrary contained in this Lease, if applicable, Tenant agrees if requested by Landlord to delay the opening of the Leased Premises for business in order to coincide with the grand opening of the Shopping Center or a grand re-opening in the case of a major renovation ("Grand Opening"). In that event, Tenant's obligation to pay rental shall begin on the Grand Opening Date.~~

## ARTICLE 4 - Rental

Tenant shall pay Landlord as rental for the use and occupancy of the Leased Premises, at the times and in the manner provided, the following sums of money per annum without deduction or set-off and without prior demand:

(a)    MINIMUM ANNUAL RENTAL:  The Minimum Annual Rental shall be payable in 12 equal monthly installments in advance, upon the 1st day of each and every month during the periods of time specified in the Reference Provisions.

If under ARTICLE 3 rental begins on a day other than the 1st day of a month, the monthly installment of Minimum Annual Rental for the period from the beginning date until the 1st day of the month next following shall be prorated accordingly. All past due rental, additional rental, and other sums due Landlord under this Lease shall bear interest **, provided that the same are not paid within 10 days after Tenant has received written notice from Landlord of any such delinquency in payment,** from the due date until paid by Tenant, at the rate of 2% above the Prime Rate (as defined below), not to exceed the maximum rate of interest allowed by law in the state where the Shopping Center is located (the "Interest Rate"). The interest shall be deemed to be additional rental. All rental provided for in this Lease shall be paid to Landlord at the address in the Reference Provisions or to another payee or address that Landlord designates.

"Prime Rate" wherever it appears in the Lease means the prime rate (or base rate) reported in the Money Rates column or section of The Wall Street Journal as being the base rate on corporate loans at large U.S. money center commercial banks (whether or not that rate has been charged by any bank). If The Wall Street Journal ceases publication of the prime rate, Prime Rate shall mean the highest rate charged by Bank One (or its successor) on short term unsecured loans to its most creditworthy large corporate borrowers. If The Wall Street Journal (i) publishes more than one prime rate or base rate, the higher or highest of the rates shall apply, or (ii) publishes a retraction or correction of that rate, the rate reported in that retraction or correction shall apply.

(b)    PERCENTAGE RENTAL:  Tenant shall pay Landlord as "Percentage Rental" at the times and in the manner provided below, an amount equal to the Percentage Rate of all Net Sales (defined in ARTICLE 5) in excess of the Annual Sales Base for the calendar year specified in the Reference Provisions. ~~In addition to and not in lieu of Percentage Rental, Tenant shall pay to Landlord an amount equal to eight percent (8%) of all monies and other revenues received by Tenant, without regard to the Annual Sales Base, for material and/or information digitally downloaded from the internet or any other remote source to any software format now in existence or hereafter created and sold to customers in, at or from the Leased Premises ("Digital Download Rent"). Sale of such software and the material or information contained therein must be within Tenant's Permitted Use. Income received by Tenant resulting from such sales shall be separately stated monthly and otherwise recorded and documented as set forth in ARTICLE 6 hereof, but the amount thereof shall not be included in Net Sales applied to the Annual Sales~~

~~Base in any year. Any Digital Download Rent due from Tenant to Landlord for any month during the Term shall be payable within thirty (30) days after the end of the month in which the monies or other revenues were received.~~

~~Percentage Rental shall be paid monthly no later than the 15th day of the month, except that if the Rental Commencement Date is other than the first day of a month, the Net Sales during the first partial month shall be added to the Net Sales of the next month. The amount of each payment of Percentage Rental shall be equal to the amount of Net Sales in excess of the Monthly Sales Base for the immediately preceding month multiplied by the Percentage Rate. The Annual Sales Base and/or the Monthly Sales Base shall be prorated for any partial calendar year upon the basis of 1/12th for each full month of the partial calendar year, plus an amount equal to 1/360ths for each day if the Rental Commencement Date is other than the first day of the month. At the end of each calendar year Percentage Rental shall be adjusted to a calendar year basis and the balance of the Percentage Rental due shall be paid within 60 days after the end of that calendar year (including the last calendar year). If at the end of the calendar year, the amount of the Percentage Rental paid by Tenant exceeds the amount of Percentage Rental required to be paid by Tenant for that calendar year, Tenant shall receive a credit for the excess, and the excess shall be deducted by Tenant from the next payments of Percentage Rent due (or after the last calendar year, Landlord shall refund the excess to Tenant after Landlord's receipt of Tenant's certified statement of Net Sales covering the last calendar year).~~ Each calendar year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rental due. The amount of Net Sales of any calendar year shall not be carried over into any other calendar year. **Percentage Rental shall be paid beginning in the month in which the Net Sales for any calendar year shall exceed the Annual Sales Base for the applicable calendar year. Thereafter, Percentage Rental shall be paid monthly on all additional Net Sales made during the remainder of that calendar year (or partial year, as the case may be). Payments shall be made no later than the 15th day of the next following month. As soon as practical after the end of each Lease Year (or after the expiration or termination of the Term, if earlier), but in no event later than 60 days after the end of the applicable period, the Percentage Rental paid or payable shall be adjusted between Landlord and Tenant based upon the Net Sales. If, at the end of the Lease Year, the amount of Percentage Rental paid by Tenant exceeds the amount of Percentage Rental required to be paid by Tenant for that Lease Year, Tenant shall receive a credit against payments of Rent due for the excess (or if at the end of the Lease Term, Landlord shall refund the excess to Tenant).**

**Notwithstanding the foregoing, the Net Sales generated by Tenant during any partial Lease Year shall be aggregated with the Net Sales generated by Tenant during the next succeeding full Lease Year or, if at the end of the Term, the prior full Lease Year, and Tenant shall pay Percentage Rent at the rate set forth in Reference Provision 1.08 with respect to such period if and to the extent that the Net Sales generated by Tenant during such aggregated period exceed the product of the Annual Sales Base otherwise applicable during the partial Lease Year multiplied by a fraction, the numerator of which shall be the actual number of days in such aggregated period, and the denominator of which shall be three hundred sixty (360).**

**The applicable Annual Sales Base amount above which Tenant is required to pay Percentage Rental pursuant to ARTICLE 4(b) shall be reduced in proportion to Tenant's failure to conduct its business as aforesaid.**

~~Net Sales during any calendar month in which Tenant does not continuously and without interruption conduct its business shall be deemed to be the greater of: (i) Net Sales during that calendar month or (ii) Net Sales during the calendar month in which Net Sales were the highest.~~ This paragraph shall not apply to any calendar month in which the Leased Premises are closed for business with the prior written consent of Landlord, or if the closing of the Leased Premises is expressly permitted by this Lease **or due to the events covered by ARTICLE 44.**

"Lease Year" for all purposes under this Lease shall mean the 12 calendar months between the period February 1 through and including January 31, except that if the Rental Commencement Date is not February 1, then the period immediately following the Rental Commencement Date up to and including the next succeeding January 31 shall be a partial Lease Year; "calendar year" for all purposes under this Lease shall mean the 12 calendar months between the period January 1 through and including December 31, except that if the Rental Commencement Date is not January 1, then the period immediately following the Rental Commencement Date up to and including the next succeeding December 31 shall be a partial calendar year.

c)    ~~ADDITIONAL GROSS LEASABLE AREA MINIMUM ANNUAL RENTAL INCREASE:  After the Opening Date, should either (i) the Shopping Center be renovated at a cost in excess of $_____; (ii) the Shopping Center be expanded by an addition of at least 50,000 feet of leasable area; or (iii) a lifestyle village or wing be added to the Shopping Center regardless of whether such addition occurs as a replacement for an anchor or not, the Minimum Annual Rental shall automatically be increased in accordance with the Reference Provisions, and the Annual Sales Base shall be increased accordingly. Any such increase shall commence on the first day after the completion of any of the events set forth in (i) - (iii) above and continue during the remainder of the Term.~~

(d)    ~~ANCHOR MINIMUM ANNUAL RENTAL INCREASE:  For each anchor (as defined in this Lease) that is added to the Shopping Center after the Opening Date, the Minimum Annual Rental shall automatically be increased in accordance with the Reference Provisions, and the Annual Sales Base shall be increased accordingly. The increase shall continue during the remainder of the Term.~~

(e)    If Minimum Annual Rental or additional rental is not paid within 10 days after ~~it is due~~ **notice to Tenant of the amount overdue**, Tenant shall also pay Landlord, as liquidated damages, a **one-time** late payment fee equal to the greater of $100.00 or 5% of the delinquent rental for each and every month, or part of every month that the rental remains unpaid**, not to exceed $250.00**. The fee shall not excuse Tenant from the timely payment of rental. If Landlord receives 2 or more checks from Tenant which are returned by Tenant's bank for insufficient funds, Tenant agrees that all future checks **for the next ensuing 3 months** shall be either bank certified, cashiers' or treasurers' checks. All bank service charges resulting from bad checks shall be borne by Tenant.

(f)    In addition to Minimum Annual Rental, Tenant shall pay, as additional rental, all sums of money required to be paid pursuant to ARTICLE 4(b) (Percentage Rental), 7 (Taxes), 16 (Environmental Services), 17 (Joint Use Areas and Operating Expenses) and all other sums of money or charges required to be paid by Tenant under this Lease (collectively referred to in this Lease as "additional rental"). All amounts shall be paid to Landlord's Payment Address as shown in Reference Provision 1.10. If the amounts or charges are not paid at the time provided in this Lease, they shall nevertheless be collectible as additional rental with the next installment of Minimum Annual Rental falling due, but nothing in this Lease shall be deemed to suspend or delay the payment of any amount of money or charge at the time it becomes due and payable or to limit any other remedy of Landlord. All amounts of Minimum Annual Rental and additional rental payable in a given month (also collectively referred to in this Lease as "rent" or "rental") shall be deemed to be a single rental obligation, and shall survive the expiration of the Term or the earlier termination of this Lease. Any payment by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord at the time of such payment shall be treated as a payment on account. The acceptance by Landlord of a check for a lesser amount with an endorsement or statement thereon, or any letter accompanying such check stating that such lesser amount is payment in full shall be given no effect, and Landlord may accept such check on account without prejudice to any other rights or remedies which Landlord may have against Tenant. **Any additional rent for periods of less than a full Lease Year shall be pro-rated based on a 365 day year.**

### ARTICLE 5 - Definition of Net Sales

Net Sales shall include (as of the date of the transaction) the entire amount of the sale price of all goods and merchandise sold (including gift and merchandise certificates when redeemed), leased, rented or licensed and the charges for all services and all other receipts in, upon or from any part of the Leased Premises or as a result of Tenant's agreement, if any, to link its website to the Shopping Center's website, whether (wholly or partially) for cash or credit, and shall include sales from vending machines (including but not limited to mechanical and electronic machines, except telephone and postage stamp machines); mail and telephone orders received or filled at the Leased Premises; equipment leased; reimbursements; uncollected and uncollectible credit accounts and bank checks and charges for bank credit cards; all deposits not refunded to purchasers; orders taken **and paid for at the Leased Premises**, although the orders may be filled elsewhere (including, but not limited to, orders which are accepted or transmitted by means of electronic, telephonic, video, computer or other electronic or technology based system, regardless of whether the orders are accepted or filled at the Leased Premises or accepted or filled by Tenant or its parent, subsidiary or affiliate at any other location); all monies or other things of value which Tenant is entitled to receive. The following shall be deducted or excluded, as the case may be, from Net Sales, provided such exclusions are specifically itemized **in Tenant's books and records**: (a) refunds to customers ~~to the extent that such refunds relate to (i) a prior inclusion of the same transaction or (ii) returns of merchandise purchased from other physical store locations of Tenant~~; (b) sales, use, excise, retailer's, occupation or similar taxes imposed in a specific amount, or percentage upon, or determined by, the amount of sales; (c) interest, service, finance or sales carrying charges paid by customers for extension of credit on sales, if not included in the merchandise sale price; (d) returns to shippers and manufacturers; (e) sales not in the ordinary course of Tenant's business, of **fixtures, furniture,** machinery or equipment which Tenant has the right to remove from the Leased Premises **or other bulk sales not in the ordinary course of business**; and (f) the value of any exchange or transfer of merchandise between stores of Tenant if it is made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale made in, at, or from the Leased Premises; **(g) sums and credits received in the settlement of claims for loss of or damage to merchandise; (h) shipping charges; (i) sales to employees at a**

discount not to exceed 3% of total Net Sales; (j) bad debts and bad checks (or in lieu thereof, fees paid to a service provider that guarantees checks), not to exceed 3% of total Net Sales; (k) gift and merchandise certificates until redeemed; (l) the price allowed on all merchandise returned by customers for credit or the amount of credit, discounts and allowances made in lieu of acceptance thereof; (m) any portion of the consideration for a layaway sale made by Tenant that is not yet received by Tenant; Tenant will only include the portion of any down payment or payments on account actually received from the customer; (n) credit card fees paid to companies issuing credit cards; and (o) charges for gift wrapping.

## ARTICLE 6 - Records and Audits

Tenant agrees to accurately record all sales in accordance with generally accepted accounting practices (showing all of its sales separately from its other stores), and to maintain sufficient original records which accurately summarize all transactions relating to the Leased Premises (including the sales of any subtenant, licensee or concessionaire). Original records shall include but not be limited to: sales documents, sequentially numbered tapes and readout totals of cash registers or point of sale devices, sales returns and allowance detail, cash receipts, payroll journals, accounts receivable, disbursement journals, bank statements, deposit slips, inventory records, purchase orders, receiving records, sales journals or daily sales reports, orders accepted by means of electronic, telephonic, video, computer or another electronic or other technology based system, state sales and use tax returns ~~(and all documentation used to prepare the returns)~~, and a complete general ledger. Documentation and itemization of specific sales exclusions shall also be maintained. Records shall be preserved (properly totaled) by Tenant either (a) at the Leased Premises or (b) at the home or regional offices of Tenant (provided Landlord shall be notified in writing of the address at which the records are maintained) and made available to Landlord at the Leased Premises or the offices, upon demand, for a period of at least 3 years after the year in which the sales occurred **not to exceed, however, 1 year after the termination of the Lease** (however, if any audit is begun by Landlord or if there is a dispute regarding Tenant's Net Sales, Tenant's records shall be retained by Tenant until a final resolution of the audit or dispute). The receipt by Landlord of a statement of Net Sales or Percentage Rental shall not constitute an admission of its correctness. Tenant agrees to deliver to Landlord a statement of each month's sales on or before the ~~5th~~ **15**th day of the following month, and by January 31 of each year of the Term an annual statement **signed** ~~certified by a Certified Public Accountant or~~ by a financial officer, owner or partner of Tenant, of the Net Sales made during the preceding year. If the Term expires or is terminated on a date other than December 31, then a like statement for the partial calendar year in which expiration or termination occurs shall be delivered within 30 days after expiration or termination. Landlord shall be entitled, at Landlord's expense, to have at any time and from time to time an audit of the Net Sales made during any period covered by the annual statement and account and to recalculate the rental payable for that period. If there is a deficiency in the payment of percentage or additional rental, the deficiency shall be immediately due and payable with interest at the Interest Rate, and the interest shall be additional rental, from the date when the payments should have been made. If there is an overpayment by Tenant, it shall be credited by Landlord against payments due. If Net Sales have been understated by more than **3%** **and as a result thereof, Tenant shall owe Landlord additional percentage rental** ~~2%~~ or Tenant fails to record, maintain or make available the required sales supporting documentation, Tenant shall ~~be in default, and shall~~ pay the cost of the audit and all other related costs and expenses. If Tenant is late furnishing Landlord any monthly sales statement, Landlord shall have the right, without notice, to conduct an audit at Tenant's sole **reasonable** cost. If Tenant does not furnish the sales documentation referred to above or otherwise impedes Landlord's audit of Tenant's Net Sales, Landlord shall be entitled, in addition to Landlord's other rights and remedies, to estimate Tenant's annual Net Sales as 125% of the Net Sales for the preceding year, and bill Tenant for any Percentage Rental which may be due based upon the estimated Net Sales, **provided that the resulting amount shall be adjusted when and if the actual amount owing for such year shall be determined. Tenant shall not be required to maintain all of the records specified above if Tenant maintains other records which are equally reliable and accurate and contain the same information that would otherwise be contained in the records that Tenant has failed to maintain. Tenant hereby notifies Landlord that Tenant will retain all sales records at Tenant's principal office. Tenant shall retain and make available for examination by Landlord state sales and use tax returns only to the extent that the returns relate only to the business activity at the Leased Premises. If such returns are filed on a consolidated basis, Tenant shall only make the worksheets therefor relating to the business activity of Tenant at the Leased Premises available to Landlord for examination.**

**ARTICLE 7 - Taxes**

(a)    (i) Effective upon the Rental Commencement Date, Tenant shall pay, without deduction or set-off of any kind **(except as may be otherwise expressly provided in this Lease)**, its proportionate share of all real property taxes and assessments which may be levied or assessed against the retail portion of the Shopping Center during the Term by any lawful authority for each calendar year including, without limitation, all Impositions as defined below in this subpart (a)(i) and the cost of any contest, review or negotiation of an assessment by Landlord, as described in (c) below (collectively "Property Taxes"). Property Taxes shall exclude taxes and assessments actually ~~paid by~~ **payable by** anchors or outparcel occupants for land and buildings owned or leased by anchors and outparcels whether the anchors and outparcels are occupied or vacant and whether or not the real property taxes thereon are separately billed or assessed. Notwithstanding anything to the contrary contained in this Lease, Property Taxes shall include any form of tax or assessment, license fee, license tax, tax or excise on rent, or any other levy, charge, or similar imposition ("Impositions") imposed by any governmental authority or political subdivision having jurisdiction, or any school, agricultural, lighting, drainage, management, roadway, water, levee, utility or other improvement or special assessment district, on any interest of Landlord or Tenant in the Leased Premises, the Shopping Center or the underlying realty. The Impositions shall include but not be limited to: (aa) any partial or total substitute impositions for real property taxes; (bb) any impositions imposed upon owners of real estate (including any water and sewer tax assessment) rather than upon persons generally, as well as any tax which may become a lien on the land, buildings or other improvements in the Shopping Center, or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Leased Premises; (cc) any Impositions upon this Lease or any document to which Tenant is a party creating or transferring an interest or an estate in the Leased Premises, and (dd) any impositions for offsite property or facilities that provide an easement required to be maintained for the benefit of or that serves the Shopping Center.

(ii)    Tenant's proportionate share shall be the product which results by multiplying the Property Taxes (less any payment actually made by variety and specialty stores, and by anchors and outparcels as excluded in subpart (a)(i) above) by a fraction, the numerator of which shall be the number of square feet of floor area in the Leased Premises and the denominator of which shall be the total number of square feet of gross leasable floor area in the main mall building(s) (as **reasonably** determined by Landlord ~~in its sole discretion~~; **[provided that in the case of an enclosed multi-tenant mall building encompassing the majority of the gross leasable areas of the Shopping Center, the Main Mall Building shall be such building]** hereafter "Main Mall Building(s)") of the Shopping Center which are occupied or producing rent, including the Leased Premises, determined as of August 1 of each year (exclusive of the building areas utilized for non-retail exhibits; recreational purposes, including, without limitation, ice rinks; space operated for a not-for-profit purpose, including, without limitation, museums; the building areas occupied by anchor buildings and outparcels whether the anchors and outparcels are occupied or vacant and whether or not the portion of Property Taxes thereon are separately billed or assessed; and variety and specialty stores [collectively, the "Excluded Areas"]). Tenant's share of Property Taxes shall not, however, be calculated on the basis of less than 80% of the gross leasable area of the Main Mall Building(s) of the Shopping Center determined as of August 1 of each year (minus the Excluded Areas).

**Notwithstanding anything to the contrary in this ARTICLE 7, Tenant's share of Property Taxes shall not be calculated in such a manner so as to subsidize any "lifestyle" or outdoor area occupied by the other tenants which "lifestyle" or outdoor areas are not physically connected to the Main Mall Building (or are tenants that do not have direct entrances within the Main Mall Building), unless such tenants are otherwise variety or specialty stores or anchors.**

(iii)    Notwithstanding anything to the contrary contained in the Lease, an outparcel may at Landlord's sole discretion be considered part of the Shopping Center for purposes of the definition of Property Taxes and the calculation of Tenant's share of Property Taxes under ARTICLE 7, provided that if the Landlord considers an outparcel to be part of the Shopping Center **and includes the gross leasable area of the outparcel in the denominator used in determining Tenant's pro-rata share** for such purposes Landlord shall include any payments toward Property Taxes actually made by the outparcel occupant before the calculation of Tenant's share of Property Taxes.

(b)    From time to time, Landlord shall notify Tenant in writing of Landlord's **reasonable** estimate of Tenant's monthly installments due with respect to Property Taxes. Such monthly installments shall be paid on or before the 1st day of each calendar month, in advance. If Landlord is required however under a mortgage to escrow Property Taxes, Landlord may, but shall not be obligated to, use the amount required to be escrowed as a basis for the estimate of the monthly installments. Upon confirmation of all Property Tax bills attributed to any calendar year during the Term, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of the Property Taxes for that year. If the total amount paid by Tenant for any calendar year during the Term is less than the actual amount due from Tenant for that year, as shown on the statement, Tenant shall pay Landlord the deficiency within ~~10~~ **30** days after demand by Landlord. If the total amount paid by Tenant for any calendar year exceeds the amount due from Tenant for that calendar year, Landlord shall credit the excess

against payments due **or refund same if the overpayment is discovered after the expiration of the Lease**. Tenant's liability for its proportionate share of Property Taxes for the calendar years in which this Lease begins and ends shall be subject to a prorata adjustment based on the number of days in those years. Landlord's and Tenant's obligations under this ARTICLE 7 shall survive the expiration of the Term. An official tax bill (or copy), if available, shall be submitted by Landlord to Tenant, upon request by Tenant, and shall be conclusive evidence of the amount of the tax assessed or levied, the items taxed and the installments. **Provided that it is available, an official tax bill or copy thereof shall be submitted by Landlord to Tenant, upon request of the same by Tenant, and shall be prima facie evidence of the amount of tax assessed or levied, the items taxed and installments thereof, subject to any refunds owed to Tenant. Within 60 days after request by Tenant, Landlord shall provide Tenant with such back-up information substantiating the manner and calculation of Tenant's proportionate share. Until Landlord provides such back-up information, Tenant shall not be required to pay any increase in its proportionate share of Property Taxes. Upon receipt of the back-up information and substantiation of the increase, Tenant shall pay any deficiency within 30 days.**

**Notwithstanding anything to the contrary contained in the Lease, Tenant's share of Property Taxes pursuant to this ARTICLE 7 for the calendar year 2011 is estimated to be $10.07 per square foot of gross leasable area of the Leased Premises. The foregoing figure is for informational purposes only and Landlord makes no representation that Tenant's pro-rata share will be equal to such amount. Tenant shall not be required to pay any late fees, interest or penalties if Landlord pays Property Taxes or assessments late.**

(c)      If Landlord contests, reviews or negotiates any tax or assessment upon the Shopping Center, Tenant agrees to pay its proportionate share of Landlord's **reasonable** ~~expenses, whether~~ third party **expenses** ~~or internal,~~ including but not limited to legal, tax consultant and appraisal fees, **provided, however, any third-party fees shall be reasonably competitive.** Tenant's proportionate share of such expenses shall be calculated and paid in the manner set forth in ARTICLE 7(a). Tenant shall not have the right to withhold any payments to Landlord notwithstanding anything to the contrary contained in this Lease, nor shall Landlord be obligated to withhold the payment of Property Taxes levied or assessed against the Shopping Center. If Tenant pays an amount in excess of its proportionate share of Property Taxes for any year as the result of a subsequent reduction in total Property Taxes for that year, the excess shall be refunded to Tenant (the "Net Refund") when all refunds to which Landlord is entitled from the taxing authority for that year are received by Landlord. The term "Net Refund" means the refund plus interest, if any thereon less appraisal, engineering, expert testimony, attorneys', printing and filing fees and all other costs and expenses of the contest, review or negotiation to the extent that such fees, costs and expenses have not been previously included in taxes under this ARTICLE 7. ~~, and less an administrative fee equal to 15% of the original refund.~~

(d)      Notwithstanding anything to the contrary in this Article 7 or elsewhere in this Lease, any excise, transaction, sales or privilege tax (except income, transfer, estate or inheritance tax) imposed upon Landlord on account of, attributed to, or measured by rental or other charges payable by Tenant shall be paid by Tenant **under this Lease** to Landlord. **Nothing in this Lease shall be construed to include as "real property tax assessments" any franchise, corporate, personal property, capital levy, capital stock, excess profits, revenue, gift, devolution or succession tax payable by Landlord or any other tax, assessment, charge or levy upon, or measured, in whole or in part, by income to Landlord generated from the rent payable hereunder by Tenant.**

.

### ARTICLE 8 - Subordination and Attornment

(a)      Tenant's rights shall be subordinate to the interest of any ground lessor and to the lien of any mortgage or deed of trust in force or later placed against the Shopping Center, upon any building placed later upon the Shopping Center and to all advances made upon the security thereof. No ground lessor nor the mortgagee or beneficiary named in the mortgage or trust deed shall disturb Tenant's peaceable possession of the Leased Premises if Tenant is not in default under this Lease **beyond any applicable notice and cure period.** Any mortgagee or beneficiary of Landlord may, at its option, subordinate its mortgage or trust deed to this Lease. This

ARTICLE 8(a) is self-operative, and no further documentation of Tenant's subordination and attornment is required; however, Tenant shall execute any subordination agreement requested by Landlord, any mortgagor or beneficiary of Landlord upon written request. Tenant shall accept performance of any of Landlord's obligations hereunder by any mortgagee or beneficiary of Landlord.

(b)      If any proceedings are brought for foreclosure, or if the power of sale under any mortgage, deed of trust or deed to secure debt made by Landlord covering the Leased Premises is exercised, Tenant shall attorn to the purchaser upon the foreclosure or sale and recognize the purchaser as the Landlord under this Lease.

(c)      Landlord covenants that it is or will be a party to a certain agreement or agreements with the anchors in the Shopping Center (the "Agreement"), which may be amended from time to time. The Agreement shall not prevent Tenant from using the Leased Premises for the purpose set forth in Reference Provision 1.03. This Lease is subject and subordinate to the Agreement and any amendments to or modifications of the Agreement. **Landlord represents and warrants that nothing in such Agreement or in any amendments or modifications thereto now increases or hereafter will increase Tenant's obligations under this Lease nor now increases nor hereafter will decrease its rights under this Lease.**

(d)      ~~Tenant agrees to make such reasonable modifications to this Lease as may be reasonably required in connection with the obtaining of financing or refinancing of the Shopping Center or any portion thereof or interest therein, so long as such modifications do not change the economic terms hereof or materially affect Tenant's rights, increase Tenant's obligations, or reduce Landlord's obligations hereunder.~~

### ARTICLE 9 - Additional Construction

Landlord reserves the right at any time to make alterations or additions to, subdivide, change the building dimensions and storefront lines **excluding adjacent leased premises,** build additional stories on the building in which the Leased Premises are contained or on any other building or buildings in the Shopping Center, and to build adjoining the Shopping Center. Landlord also reserves the right at any time to construct other buildings, structures or improvements including, but not limited to, surface, elevated or double-deck parking facilities and to erect temporary scaffolds and other aids to construction. **Landlord shall not impair access to or visibility of the Leased Premises or otherwise materially adversely affect Tenant's business.**

**Landlord may, once during the Term of this Lease, but not in the first 5 years, elect to relocate Tenant to another location with substantially the same square footage, frontage (with no less frontage on the main mall corridor), and configuration, and with comparable access and visibility in the Shopping Center within the relocation zone ("Relocation Zone") set forth in the Exhibit A-2 ("Substitution Space"), provided the following conditions are satisfied: (i) Tenant is given at least 180 days' notice of the proposed relocation (and additional permitting time as may be necessary if the permitting in the jurisdiction takes more than 30 days); (ii) the proposed relocation date and the size configuration (including an LOD), frontage and location of all of the Substitution Spaces then available or to become available shall be set forth in Landlord's notice and in the event more than one (1) comparable Substitution Space are available within the Relocation Zone, then Tenant shall have the right and option to choose from all such spaces; (iii) the relocation is necessary due to the material expansion of the Shopping Center or addition of an anchor store which expansion or addition requires that Landlord recapture and incorporate the Leased Premises and immediately adjacent tenants to accommodate the same; (iv) Landlord assumes and shall promptly reimburse Tenant for all costs related to the relocation, including without limitation, planning, permitting, the construction of improvements and sign(s) in and for the Substitution Space in accordance with Tenant's plans and specifications, which improvements shall be similar in kind and nature to those in the Leased Premises prior to such relocation, or in Tenant's discretion, to resemble Tenant's latest prototype, the cost of any new fixtures (trade fixtures and otherwise) required; and**

(v) Tenant shall not be required to vacate the Leased Premises until all improvements and sign(s), fixturing, and merchandising are complete in and for the Substitution Space or agreed temporary space and it is ready to open for business.  In the event of any material interference with Tenant's business or the access to or visibility of the Leased Premises or Substitution Space as a result of Landlord's expansion, addition or relocation work, Tenant shall be entitled, in addition to its other remedies, to an abatement of Minimum Annual Rental and additional rental in proportion to the extent of such interference until such interference no longer exists.  If Tenant reasonably believes it has to close for purposes of relocating, all rent and charges shall be fully abated during the time Tenant is not operating for business in the Shopping Center.  In no event shall Tenant be required to relocate during the months of July, August, November or December.  In the event the new Leased Premises are smaller than the existing Leased Premises, all rents and charges shall be decreased proportionately.

In the event Landlord and Tenant cannot agree on Substitution Space, either party may terminate this Lease upon 60 days written notice to the non-terminating party. The termination shall be effective on the 60th day following the notice date and Tenant shall vacate the Leased Premises on or before such date.

In the event either party exercises its right to terminate this Lease pursuant to the foregoing provision, Landlord shall reimburse Tenant an amount equal to Tenant's unamortized leasehold improvements costs, amortized on a straight-line basis over the Term of this Lease. Independent of the foregoing and notwithstanding anything to the contrary in this Lease, Landlord may elect to relocate Tenant to another location in the Shopping Center for any reason, even absent construction or related reasons, at Landlord's expense.

## ARTICLE 10 - Condition of Leased Premises

Tenant's taking possession of the Leased Premises shall be conclusive evidence of Tenant's acceptance of the Leased Premises in good order and satisfactory condition and "as-is", including patent and latent defects. Landlord shall remain liable for latent defects in its construction for 1 year after the acceptance of the Leased Premises. Tenant agrees that no representations about the condition of the Leased Premises, nor promises to decorate, alter, repair or improve the Leased Premises have been made by Landlord or its agents to Tenant.  Tenant also agrees that no representations have been made to Tenant that any other tenants will lease space in the Shopping Center nor have any promises been made that Tenant has the exclusive right to sell any merchandise, goods or services.  Tenant hereby waives any implied warranties , including but not limited to of  fitness, and  suitability. and habitability. Landlord represents that at all times during the Term, it will maintain the Shopping Center as a first-class regional shopping center.

## ARTICLE 11 - Repairs and Maintenance

Landlord shall, at its expense, be responsible for all structural repairs to the Leased Premises, repairs to the foundations, slab, and all utility facilities, lines, pipes, conduits and similar equipment serving the Leased Premises on a non-exclusive basis. Landlord shall not be responsible for damage to Tenant's property or personal injury caused by any defects or other conditions, or the consequences thereof, except in the case of Landlord's willful misconduct, negligent or intentional act or omission of Landlord or any agent, representative, employee or contractor of Landlord or by the failure of Landlord to discharge its obligations under this Lease. Landlord shall not be liable to Tenant for any damage to merchandise, trade fixtures or personal property of Tenant in the Leased Premises, including without limitation damage by water leakage, seepage, water discharge from a sprinkler system or water damage

caused by leakage from other occupants **to the extent that the provisions of ARTICLE 19(d) are applicable.** Beginning on the Commencement Date, Tenant shall be liable for the repairs, replacements and maintenance of the Leased Premises, except those for which Landlord is responsible under this ARTICLE 11. Tenant shall keep the Leased Premises in good order and repair, clean, sanitary and safe ~~and shall notify Landlord, in writing, prior to beginning any repair. The notice shall specify the repair work to be performed~~. Tenant's repairs, replacements and maintenance obligations shall include, but not be limited to, its heating and cooling equipment; other equipment; fixtures; improvements; floor covering; the exterior and interior portions of all doors, door locks, security gates, and windows; plumbing and sewage facilities which are not Landlord's obligation; walls; ceilings; and plate glass. **Except with respect of maintenance and repair costs related to the portions of the Leased Premises  required to be maintained, repaired and replaced by Landlord under this Lease,** Tenant shall be solely responsible for maintenance and repair costs related to the Leased Premises. Tenant agrees to keep the interior of the Leased Premises in a clean and sightly appearance. If Tenant refuses or neglects to make repairs or maintain the Leased Premises, in a manner reasonably satisfactory to Landlord, Landlord shall have the right, upon giving Tenant reasonable written notice, to make the repairs or perform the maintenance on behalf of Tenant. Tenant shall reimburse Landlord promptly upon receipt of a bill. ~~The interior and storefront of the Leased Premises shall be painted, redecorated and refurbished by Tenant at least once every 5 years.~~ Landlord has no obligation to do work which Landlord is not expressly required to perform under this Lease or which, under this Lease, Tenant is required to perform. The performance of that work by Landlord shall not constitute a waiver of Tenant's default.

## ARTICLE 12 - Alterations

Tenant shall not make any structural, electrical, storefront, exterior, major interior or mechanical alterations to the Leased Premises without obtaining the written consent of Landlord, **which consent shall not be unreasonably withheld, delayed or conditioned by Landlord.** Tenant shall not interfere with any work in the Shopping Center, and shall not cause the closing, interruption or impairment of Tenant's normal conduct of business, **except for a remodeling of the Leased Premises approved by Landlord, provided Tenant uses only such time as reasonably necessary to remodel the Leased Premises.** All alterations, additions, improvements and Tenant's Work shall become, upon expiration of the Term, or the earlier termination of this Lease, the property of Landlord without any payment by Landlord. All such work by Tenant shall be made under the supervision of a competent architect or competent licensed structural engineer and shall be in accordance with plans and specifications approved in writing by Landlord before the start of the work. Landlord's approval of Tenant's plans and specifications shall not create a responsibility or liability of Landlord for their accuracy, sufficiency or compliance with laws or rules and regulations. The work shall be in accordance with necessary governmental approvals and permits. Tenant shall obtain approvals and permits at its sole expense. The work shall be done in a good and workmanlike manner and diligently prosecuted to completion. The Leased Premises shall at all times be a complete unit except during the performance of work. Work done by Tenant without Landlord's consent shall be returned to its original condition, at Tenant's expense, upon request by Landlord. **Notwithstanding the provisions of this ARTICLE 12, Tenant shall have the right to make interior, nonstructural, non-storefront alterations and improvements to the Leased Premises without the prior approval of Landlord to the extent that such alterations or improvements do not cost in excess of $50,000.00 in any Lease Year.**

## ARTICLE 13 - Fixtures and Personal Property

Trade fixtures, signs and other personal property of Tenant not permanently affixed to the Leased Premises shall remain the property of Tenant. Tenant shall have the right, provided Tenant is not in default, to remove its trade fixtures, signs and other personal property. Tenant shall not however, during the Term, render the Leased Premises unsuitable for conducting the type of business specified in Reference Provision 1.03 by removing personal property unless Tenant immediately replaces it with personal property of comparable or better quality**, except at the expiration of the Term of this Lease.** Tenant, at its expense, shall immediately repair damage to the Leased Premises caused by the removal of such trade fixtures, signs and other personal property. Upon the expiration or earlier termination of this Lease, Tenant shall leave the Leased Premises in a neat and clean condition, free of debris. All trade fixtures, signs, and other personal property installed in or to the Leased Premises by Tenant must be new or like new when installed or attached. Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operation in the Leased Premises as well as upon its trade fixtures, leasehold improvements (including but not limited to merchandise and other personal property in, on or upon the Leased Premises). If Tenant's property is assessed with Landlord's property, the assessment shall be equitably divided between Landlord and Tenant. Landlord shall determine the basis of prorating the assessments and that determination shall be binding. No taxes, assessments, fees or charges referred to in this ARTICLE 13 shall be considered Property Taxes under ARTICLE 7. Tenant's

obligation to perform the provisions of this ARTICLE 13 shall survive the Expiration Date or the earlier termination of this Lease.

## ARTICLE 14 - Liens

Tenant shall not permit a lien or claim to attach to the Leased Premises and shall promptly cause the lien or claim to be released. If Tenant contests the lien or claim, Tenant shall indemnify Landlord and, if requested, deposit with Landlord a cash or surety bond in a form and with a company **reasonably** satisfactory to Landlord in an amount equal to twice the amount of the contested lien or claim. If Tenant shall fail to cause a lien to be discharged or bonded, within ~~10~~ **60** days after being notified of the filing of the lien, in addition to any other right or remedy, Landlord may discharge the lien by paying the amount claimed to be due. The amount paid by Landlord, together with interest at the Interest Rate and all costs and expenses, including reasonable attorneys' fees incurred by Landlord, shall be due and payable by Tenant to Landlord as additional rental on the 1st day of the next following month. Tenant shall immediately give Landlord written notice of the recording of a lien against the Leased Premises or the Shopping Center arising out of work done by or at the direction of Tenant.

## ARTICLE 15 - Laws and Ordinances

(a)     Tenant shall comply with all laws, ordinances, codes, orders and regulations affecting the construction, use, occupancy, alteration, cleanliness, safety and operation of the Leased Premises, which are in force now or later. Tenant shall comply with the regulations, requirements and recommendations of any insurance underwriter, inspection bureau or similar agency. **Tenant shall notify Landlord if Tenant has received notice which states that any condition or occurrence regarding the Leased Premises will result in liability to Landlord.** Tenant shall notify Landlord if Tenant has received notice of, or has knowledge of any condition or occurrence that might result in liability to Landlord. Tenant shall give Landlord, upon Landlord's request, information **within its knowledge or possession** regarding the environmental condition of the Leased Premises so Landlord can determine if Landlord must comply with any rule, regulation, order, act, law or statute pertaining to the environmental condition of the Leased Premises or the Shopping Center, and for Landlord to accurately complete a form or otherwise provide information required under any rule, regulation, order, act, law or statute. Tenant shall permit Landlord to comply with those recommendations and requirements. **Tenant shall not be obligated to perform any work on or about the Leased Premises which is structural in nature or which would otherwise be the Landlord's obligation under this Lease or at law nor to undertake any work to remove or otherwise remediate hazardous materials nor to comply with The Americans With Disabilities Act, except in the latter case where only interior, non-structural work is required of Tenant.** In addition, Tenant agrees to comply, to the extent that the same may be applicable to the Leased Premises and as same may be amended from time to time, with the standards and requirements of the Williams-Steiger Act (PL91-596), known as the "Occupational Safety and Health Act of 1970," notwithstanding the fact that Tenant may otherwise be exempted from the provisions of said Act, and the Americans with Disabilities Act of 1990. **Landlord shall comply with all laws, ordinances, codes, orders and regulations affecting the construction, use, occupancy, alteration, cleanliness, safety and operation of the Joint Use Areas, which are in force now or later.**

(b)     Tenant shall not: (i) permit an **illegal** ~~immoral~~ practice in the Leased Premises; (ii) use or allow the Leased Premises to be used or occupied in a manner that might invalidate or increase the rate of or make inoperative an insurance policy carried on the Leased Premises or on property, buildings or improvements in the Shopping Center; (iii) keep, use or permit in the Leased Premises inflammable fluids or explosives without the prior written permission of Landlord, or engage in hazardous activities; (iv) use the Leased Premises for a purpose which might create a nuisance or injure the reputation of the Leased Premises or the Shopping Center; (v) deface or injure the Leased Premises or any portion of the Shopping Center; (vi) overload the floors; (vii) commit or suffer waste; (viii) install electrical equipment that overloads lines; or (ix) conduct any sampling, testing, or drilling to locate any Hazardous Material without Landlord's prior written approval, **which approval shall not be unreasonably withheld, delayed or conditioned by Landlord** Tenant shall, upon demand, reimburse Landlord for extra premiums caused by Tenant's use or occupancy of the Leased Premises, whether or not Landlord has consented to the use and occupancy **if such extra premiums are a result of Tenant's acts or omissions.** A schedule issued by the organization making the insurance rates on the Leased Premises, showing the components of the rates, shall be conclusive evidence of the items and charges which make up the hazard and other insurance rates on the Leased Premises. Tenant shall, at Tenant's expense, make from time to time whatever **reasonable** changes are necessary to comply with the requirements of the insurance inspectors, underwriters and governmental authorities in connection with electrical and fire prevention systems and equipment **that serve the Leased Premises exclusively. It is understood and agreed that the use of the**

**Leased Premises in accordance with Reference Provisions Section 1.03 will, in no way, cause the invalidation of, the increase in the cost of, or to make inoperative any insurance carried by Landlord.**
.

(c)   **Unless caused by the negligent or intentional act or omission of Landlord or any agent, representative, employee or contractor of Landlord or by the failure of Landlord to discharge its obligations under this Lease,** Tenant shall not have a claim against Landlord, and Landlord shall not be liable for damages, demands, expenses, fees, fines, penalties, suits, proceedings, claims, actions and causes of action arising out of or in any way connected with Tenant's use or occupancy of the Leased Premises, if the use or occupancy is prohibited or substantially impaired by any law, ordinance, regulation or by legal, governmental or other public authority.

(d)   Tenant shall not **knowingly** cause or permit any Hazardous Material (defined below) to be brought upon, transported through, stored, kept, used, discharged or disposed in or about the Leased Premises or the Shopping Center (collectively "Property") by Tenant, its agents, employees or contractors. Tenant shall notify Landlord immediately of the presence or of disposal of Hazardous Material on or near the Leased Premises, and of any notice by a party alleging the presence of Hazardous Material on or near the Leased Premises. However, Hazardous Materials brought upon, transported, used, kept or stored in or about the Property which is necessary for Tenant to operate its business for the use permitted under Reference Provision 1.03 of this Lease shall be brought upon, transported, used, kept and stored only in the quantities necessary for the usual and customary operation of Tenant's business and in a manner that complies with: (i) all laws, rules, regulations, ordinances, codes or any other governmental restriction or requirement of all federal, state and local governmental authorities having jurisdiction and regulating the Hazardous Material; (ii) permits (which Tenant shall obtain prior to bringing the Hazardous Material in, on or about the Property) issued for the Hazardous Material; and (iii) all producers' and manufacturers' instructions and recommendations, to the extent they are stricter than laws, rules, regulations, ordinances, codes or permits. If Tenant, its agents, employees or contractors, in any way breaches the obligations in the preceding sentence; or if the presence of Hazardous Material on the Property caused or **knowingly** permitted by Tenant results in the release or threatened release of Hazardous Material on, from or under the Property; or if the presence on, from or under the Property of Hazardous Material otherwise arises out of the operation of Tenant's business then, without limitation of any other rights or remedies available to Landlord under this Lease or at law or in equity, Tenant shall indemnify, defend, protect and hold harmless Landlord (and Landlord's parents, subsidiaries, affiliates, employees, partners, agents, mortgagees or successors to Landlord's interest in the Leased Premises) (collectively "Indemnify") from any and all claims, sums paid in settlement of claims, judgments, damages, clean-up costs, penalties, fines, costs, liabilities, losses or expenses (including, without limitation, attorneys', consultants' and experts' fees and any fees by Landlord to enforce the Indemnity) which arise during or after the Term as a result of Tenant's breach of the obligations or the release or contamination of the Property, including, without limitation: diminution in value of the Property; damages for the loss of, or the restriction on the use of, rentable or usable space or any amenity of the Property; damages arising from any adverse impact on the sale or lease of the Property; and damage and diminution in value to the Property or other properties, whether owned by Landlord or by 3rd parties. This Indemnity includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or groundwater on, under or originating from the Property. **Notwithstanding anything in this paragraph to the contrary, Tenant's liability shall not exceed the costs of the cleanup, containment or elimination of the Hazardous Materials upon the Leased Premises or the Shopping Center by virtue of Tenant's breach of its promise made to refrain from contaminating the Leased Premises and the Shopping Center under this Paragraph (d).** Without limiting the foregoing, if the presence of Hazardous Material on the Property caused or **knowingly** permitted by Tenant results in the contamination, **or** release or threatened release of Hazardous Material on, from or under the Property or other properties, Tenant shall promptly take all actions at its sole cost and expense which are necessary to return the Property and other properties to the condition existing prior to the introduction of the Hazardous Material; provided that Landlord's written approval of the actions shall be obtained first (which approval shall not be unreasonably withheld) and so long as such actions do not have or would not potentially have any material, adverse long-term or short-term effect on Landlord or on the Property or other properties. This Indemnity shall survive the Expiration Date or earlier termination of this Lease and shall survive any transfer of Landlord's interest in the Property. "Hazardous Material" means any hazardous, radioactive or toxic substance, material or waste, including, but not limited to, those substances, materials and wastes (whether or not mixed, commingled or otherwise combined with other substances, materials or wastes) listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or substances, materials and wastes which are or become regulated under any applicable local, state or federal law including, without limitation, any material, waste or substance which is (i) a petroleum product, crude oil or any faction thereof, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. Section 1251, et seq. (33 U.S.C. Section 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. Section 1317), (v) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq. (42 U.S.C. Section 6903) or (vi) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and

Liability Act, 42 U.S.C. Section 9601, et seq. (42 U.S.C. Section 9601), as all of the foregoing may be amended from time to time. **Landlord shall deliver the Leased Premises free of all Hazardous Material, including asbestos and ACM. Tenant shall have no responsibility or liability for Hazardous Material which has been installed or otherwise transported through, stored, kept, used, discharged or disposed of in or about the Leased Premises by Landlord, its agents, employees or contractors or prior occupants of the Leased Premises. If the presence of asbestos or other Hazardous Material (other than any such material brought into the Leased Premises by Tenant) is confirmed in the Leased Premises during the Term of this Lease, then Landlord will remove and dispose of it in compliance with applicable laws and regulations. If the Hazardous Material was originally installed by anyone other than Tenant, then Landlord will be liable for the costs of the cleanup, containment or elimination of the Hazardous Material, and Landlord shall restore the Leased Premises to the condition existing prior to such removal, and Landlord's liability shall not exceed the aforesaid costs (and if Tenant is required to close the Leased Premises by reason of such work, Tenant shall be entitled to an abatement of all rental and charges for the period of closure). If closure continues for more than six (6) months, Tenant may terminate this Lease by providing Landlord written notice of the same.**

## ARTICLE 16 - Environmental Services

(a)     Tenant shall pay for all utilities used in the Leased Premises during the Term. Tenant shall, if required by Landlord or applicable code, provide and pay for its own meters for heat, air conditioning, water, gas, electricity and all other utilities, and shall pay all water and sewage charges (and all other charges for utilities used in the Leased Premises), rentals and taxes imposed by governmental authority or otherwise. Landlord may at its election provide Tenant with or designate a third party provider to provide Tenant with any or all of the utilities used in the Leased Premises. If Landlord or its designee provides Tenant with the utilities used in the Leased Premises, Tenant shall purchase such utilities from Landlord or its designee and may not purchase such utilities from any other source **provided that the utilities provided by Landlord or its designee are sufficient to meet Tenant's requirements as indicated by the approved plans.** Landlord agrees, however, that the charge to Tenant for utilities furnished by Landlord shall not exceed that which Tenant would be required to pay for if Tenant purchased such utilities, with a comparable level and quality of service and equipment, directly from the local public utility company, but not less than Landlord's cost to provide such utilities.

(b)     Heating, ventilation and air conditioning for the Leased Premises will be in accordance with the Exhibits.

(c)     Tenant shall be responsible for completing the installation of the heating, ventilation and air conditioning system within the Leased Premises, as provided for in the **approved plans** EXHIBITS. Tenant, at Tenant's expense, shall maintain the heating, ventilation and air conditioning equipment which exclusively serve or are within the Leased Premises. Tenant shall use best efforts to conserve energy in the operation of its heating, ventilation and air conditioning. Tenant shall upon request by Landlord supply Landlord with evidence satisfactory to Landlord that Tenant is fulfilling Tenant's obligations under ARTICLE 16 of the Lease to maintain the heating, ventilation and air conditioning equipment within the Leased Premises.

(d)     Landlord has, at its cost and expense, preinstalled a potable water distribution system and a sewer system which will provide water and sewer service to the Leased Premises in accordance with the EXHIBITS. Tenant, at Tenant's expense, shall be responsible for completing the installation of the water and sewer systems within the Leased Premises in accordance with the EXHIBITS.

(e)     If Tenant shall require natural gas for the normal operation of Tenant's business, such utility service shall be available in accordance with the EXHIBITS. All natural gas service shall be arranged by the Tenant and all such work shall be done in accordance with the EXHIBITS.

(f)     In addition to the Minimum Annual Rental, Tenant shall pay, as additional rental, in advance on the first day of the month during the Term (prorated for any fractional month), without deduction set-off of any kind, a charge to Landlord for any services **as determined by a meter to be installed by Tenant,** furnished by Landlord to the Leased Premises under this ARTICLE 16 (the "Environmental Charge"). In the event of any dispute, Tenant shall pay the bill for all such **utilities** utility furnished to the Leased Premises in accordance with Landlord's billing, and such payment shall not prejudice Tenant's position. The

~~Environmental Charge shall be adjusted from time to time by Landlord's engineer, shall be initially based on a typical store layout that is comparable to Tenant's utility usage and shall be subject to adjustment by Landlord from time to time. If Tenant fails to make any applicable payment of the Environmental Charge to Landlord within ten (10) days from the date such payment is due, or upon failure of Tenant to pay any other sums of rental or other charges due under the provisions of this Lease in full, Landlord may, without limitation, cut off and discontinue any such utilities furnished by Landlord to the Leased Premises, without any liability to Landlord.~~

(g)     If Landlord or Landlord's third party designee is furnishing utilities to Tenant during the Term, Landlord or such designee may cease furnishing any of such utilities without responsibility to Tenant except to connect or cause to be connected to the service facilities another **immediately** available source of supply.  Notwithstanding anything contained in this Lease to the contrary, Landlord or such designee shall not be responsible or liable for damages or injuries sustained by Tenant or those claiming by, through or under Tenant, because of the interruption, discontinuance, quality or quantity of any utility used in or for the Leased Premises, (whether or not supplied by Landlord or such designee, and regardless of the reason or cause of the interruption or discontinuance).  Tenant shall not be relieved from the performance of its obligations if an interruption or discontinuance occurs **except that in the event that any utility service to the Leased Premises is interrupted, impaired or terminated for a period of 24 or more consecutive hours, Tenant shall have the right to close its business being conducted upon the Leased Premises and, should any such interruption, impairment or termination caused by the acts of Landlord continue for a period of 48 or more consecutive hours, then, in addition to Tenant's closure right, Tenant shall be entitled to an abatement of all Minimum Annual Rental and additional rental until service is restored**. Landlord may take any energy management measures it deems necessary for energy conservation including, but not limited to, **non-discriminatory** control of all Tenant's energy consumption **, so long as the same do not materially adversely affect Tenant's business being conducted upon the Leased Premises**.

(h)     Landlord shall keep in good order and repair and shall maintain the telephone raceway and interface wiring system and shall make any necessary repairs to or replacements of such telephone raceway and/or interface wiring system (except that Landlord's obligation shall not include repair or replacement of service extensions, wiring or other telephone systems exclusively servicing the Leased Premises and that Tenant shall**, subject to ARTICLE 19(d) ,** reimburse Landlord for any and all repairs thereto necessitated by any acts, omissions to act or negligence of Tenant or Tenant's agents, employees and contractors).

(i)     Tenant agrees that garbage and refuse shall be kept in an adequate container so as not to be visible to the public, within the Leased Premises, for collection at reasonable times specified by Landlord and at Tenant's **reasonable and competitive** cost.  In lieu and instead of the foregoing provisions of this subsection (i), Landlord, or a contractor selected by the Landlord, at its option, may purchase or lease a garbage compactor for the use of tenants and occupants of the Shopping Center.  If Landlord, or a contractor selected by the Landlord, purchases or leases said garbage compactor for the use of tenants in the Shopping Center, then Tenant agrees to use the same for the disposal of its garbage and refuse to the exclusion of all other garbage collection companies, **provided the rates therefore are reasonable and competitive**.  Tenants shall pay monthly, in advance, the charges therefor, based upon Landlord's, or a contractor selected by Landlord, reasonable estimate of the amount of the refuse and garbage generated and the frequency of use by Tenant.  Tenant shall cause its garbage and refuse to be taken to such garbage compactor within the Shopping Center; and it is understood and agreed that Tenant's monthly charge as aforementioned will not include pick-up service.  The aforementioned monthly charge as estimated by Landlord, or a contractor selected by Landlord, shall be adjusted from time to time based upon the garbage generated by Tenant and/or changes in rates for refuse collection**, but in all events the rates shall be reasonable and competitive**.  Tenant shall store soiled or dirty linen in approved fire rating organization metal containers with self-closing fusible link covers.  In addition to the foregoing **if Tenant fails to do so following notice and opportunity to cure**, Landlord may cause the removal of all debris, rubbish, material and equipment during the construction of Tenant's store and/or during the time preceding the initial opening date of the Shopping Center, and charge the cost thereof to Tenant as provided in the EXHIBITS.  Tenant shall pay Landlord such charge within 10 days of billing.

(j)     During the Term, Landlord shall keep in good order and repair and shall maintain the sprinkler system in the Leased Premises, including checking, testing and servicing thereof, and shall make any necessary repairs to or replacements of such sprinkler system except that Tenant**, subject to ARTICLE 19(d) ,** shall pay any and all charges billed by Landlord in connection with all repairs and replacements thereto necessitated by any acts, omissions to act or negligence of Tenant or Tenant's agents, employees and contractors.  All modifications to such sprinkler system that Tenant may desire shall be performed as provided in the EXHIBITS.  Should the utility company furnishing water to the Shopping Center levy, assess or impose upon Landlord a sprinkler system backup charge, then Tenant shall pay to Landlord its proportionate share thereof, which shall be in an amount equal to the product obtained by multiplying said charge by a fraction, the numerator of which shall be the gross leasable area of the Leased Premises and the denominator of which shall be the gross leasable area in the Shopping Center served by such sprinkler system determined as of the date such charge is billed to Tenant; and shall be paid by Tenant within ~~10~~ **30**  days after billing by Landlord.

### ARTICLE 17 - Joint Use Areas and Operating Expenses

(a)      The "Joint Use Areas" shall consist of all parking areas, parking facilities, approaches, streets, sidewalks, malls, driveways, loading platforms, canopies, elevators, escalators, ramps, storm drainage facilities, exits, entrances, sprinkler mains, landscaped areas, comfort stations, light facilities, computer facilities, cable facilities, telecommunications facilities, washrooms, lounges and shelters, utility lines, roofs, roadways and other facilities available for joint use or benefit designated by Landlord, as they may from time to time exist and be available to the tenants in the Shopping Center, their employees, officers, agents, customers, licensees and invitees.

(b)      Landlord shall, subject to events beyond its reasonable control, maintain or cause to be maintained the Joint Use Areas in good order and repair.  The Joint Use Areas and other facilities in and about the Shopping Center shall at all times be subject to the control and management of Landlord and other parties that Landlord may designate. Landlord shall have the right at any time to redesignate, modify, alter, close, restrict, expand, reduce and change the Joint Use Areas, **provided that any such activity shall not materially adversely affect Tenant's business.  Subject to the provisions of ARTICLE 2(a)**, Landlord shall also have the right to permit entertainment events, the placement of kiosks, carts, advertising and other displays in the Joint Use Areas, and to convert the Joint Use Areas into retail areas.  The activities and uses may be temporary or permanent. **If, for any reason within the control of Landlord, Landlord shall be unable to perform its obligations under this ARTICLE 17, and if such failure (i) shall continue for more than 48 hours, and (ii) causes the Leased Premises to be untenantable and/or materially adversely affects Tenant's business operations from the Leased Premises, then and in that event only, Minimum Annual Rental, additional rental and all other charges due under this Lease shall abate until the date on which Landlord shall resume the performance of such obligations.**

(c)      Operating Expenses shall consist of all expenditures relating to operating, managing, equipping, policing, protecting, lighting, repairing, cleaning, replacing and maintaining the Joint Use Areas in the same or improved condition as when originally installed, including any rental and lease payments paid for machinery and equipment used in the maintenance of the Joint Use Areas and the personnel costs to implement those services, compliance with statutes, laws, codes, rules and regulations, even if applicable after the Effective Date; maintaining parking spaces for employees, customers and other parties; music; maintenance of the roof; removal of snow, ice, rubbish, dirt and debris; garbage collection service; planting, replanting and replacing flowers and landscaping; costs and expenses of utilities including, but not limited to, maintaining lighting facilities and storm drainage and detention systems (whether on or off the Shopping Center); sewage treatment plant; domestic water wells, pumps, and similar facilities and equipment; heating and cooling the enclosed portion of the Shopping Center; pest extermination; the alarm service charge if a supervised fire sprinkler alarm system is installed; premiums for liability, property, damage, fire and rental interruption insurance (if carried by Landlord); the cost of the personnel reasonably required to implement all of the foregoing, including the policing of the Joint Use Areas and the directing of traffic and parking of automobiles on the parking area; insurance aggregate allocations and losses borne by Landlord as a result of deductibles or self-insured retention limits carried by Landlord under an insurance policy or self insurance by Landlord; costs of adjusting an insured casualty; wages; unemployment, social security and personal property taxes; all other expenditures made for the use or benefit of the Joint Use Areas; direct or indirect costs of advertising, marketing and promotion of the Shopping Center as set forth in Article 37, including the cost of marketing and customer service personnel.; and maintenance of the sprinkler grid in tenant spaces of the Shopping Center. Tenant's payment of Operating Expenses for the first calendar year shall be the amount specified in Reference Provision 1.22.  Tenant's payment shall increase during the second and each subsequent calendar year to an amount equal to the product obtained by multiplying Tenant's payment for the previous calendar year by 105%.  As Tenant's obligation to pay Operating Expenses is predetermined and not subject to adjustment except as expressly provided herein, Tenant shall have no express or implied right to examine, inspect or audit Landlord's records pertaining to Operating Expenses.  Landlord shall have the right hereunder, in its sole and absolute discretion,  to allocate all or a portion of any of Tenant's payments under this Lease including, but without limitation, Minimum Annual Rent and Operating Expenses Payment, toward Operating Expenses.

### ARTICLE 18 - Damage to Leased Premises

If the Leased Premises are damaged, destroyed or rendered partially untenantable by fire or other insured casualty, **under the coverage which Landlord is obligated to carry pursuant to ARTICLE 19 hereof or required to be insured under this Lease by Landlord, then** Landlord shall promptly repair and restore the Leased Premises in accordance with Landlord's Work. From the date of the fire or casualty until the **date which is the earlier of Tenant's reopening or 75 days after the Leased Premises are so**

**repaired and restored by Landlord provided the Leased Premises have been rendered in whole or in part untenantable by casualty,** ~~Leased Premises are repaired and restored,~~ Minimum Annual Rental and additional rental, ~~except for any additional rental due under ARTICLE 7,~~ shall abate in the proportion that the part of the Leased Premises destroyed or rendered untenantable bears to the total Leased Premises. Landlord shall not be required to repair or restore the Leased Premises or any part of the Shopping Center as the result of an uninsured casualty. If ~~50%~~ **33 1/3%** or more of either the Leased Premises or the Shopping Center is destroyed or rendered untenantable by fire or other casualty during the last 3 years of the Term (based upon the replacement cost compared with the market value of the improvements immediately prior to the fire or other casualty as shown by the certificate of Landlord's architect), either party shall have the right to terminate this Lease, **but Landlord may terminate only if it terminates the leases of all similarly situated tenants.** The termination shall be effective on the date of casualty by Landlord or Tenant giving the other, within 90 days after the casualty, written notice of termination. If the notice is given within the 90 day period, this Lease shall terminate and Minimum Annual Rental and additional rental shall abate from the date of the casualty. Landlord shall promptly repay Tenant any rental paid in advance which had not been earned at the date of the casualty. If the notice is not given and Landlord is required or elects to repair or rebuild the Leased Premises, Tenant shall repair and replace its **leasehold improvements,** `merchandise, signs, goods, trade fixtures, furnishings, equipment, furniture and other personal property to a condition at least equal to its condition prior to its damage or destruction and, if Tenant has closed, Tenant shall promptly reopen for business. Landlord shall not be required to expend more for repair or restoration of the Leased Premises or the Shopping Center than the amount of insurance proceeds paid Landlord (or, if Landlord is self-insured, the amount of insurance proceeds which would have been paid Landlord if Landlord was not self-insured). Except as expressly provided to the contrary, this Lease shall not terminate nor shall there be an abatement of Minimum Annual Rental or additional rental as the result of a fire or other casualty.

**Tenant shall have the option to cancel this Lease (i) should the Leased Premises be destroyed to the extent of at least 33-1/3% of the replacement cost by an uninsured casualty; (ii) if the destruction, no matter the percentage destroyed, is in such a location as to render the Leased Premises unsuitable for the purposes leased, as reasonably determined by Tenant; (iii)Landlord does not elect to rebuild within 45 days of said destruction or does not proceed diligently to complete the work; or (iv) if Landlord is required or elects to rebuild and fails to complete such work within 365 days of the casualty. Should Landlord so elect to rebuild, or should this Lease be cancelled or terminated pursuant to this ARTICLE 18, Minimum Annual Rental payments and all other charges and items of additional rent payable hereunder, shall abate from the date of such uninsured casualty until the earlier of the date Tenant re-opens for business in the Leased Premises or 75 days after the Leased Premises are so rebuilt in the same manner or the date on which the Leased Premises shall reopen for business to the public, whichever shall earlier occur, or until the date upon which any such cancellation or termination of this Lease shall become effective. If 50% of the Joint Use Area in the Shopping Center, or a lesser portion provided that Tenant's business operations in the Leased Premises are materially affected thereby, is destroyed by casualty as defined in ARTICLE 18, Tenant shall pay only Percentage Rental until Landlord elects to rebuild and substantially rebuilds the Joint Use Area of the Shopping Center and they are re-opened to the public.**

### ARTICLE 19 - Insurance

(a)     Landlord agrees to carry, or cause to be carried, the following insurance coverages and types:

     (i)     Workers' Compensation Insurance in statutory amounts;

     (ii)     Employer's Liability Insurance in the amount of $1,000,000 per person for each accident, or disease;

     (iii)     Commercial General Liability Insurance on the Joint Use Areas providing coverage of not less than $1,000,000 per occurrence, with a $2,000,000 aggregate.

     (iv)     Commercial Property Insurance including special form perils endorsement insuring Landlord's property in the Shopping Center for the full replacement value. This insurance will exclude Tenant's Work

and Tenant's merchandise, signs, goods, trade fixtures, furnishings, equipment, furniture and other personal property).

(v)     Landlord will have the right to carry or cause to be carried additional types of insurance in whatever limits Landlord chooses, including coverage under blanket insurance policies which may be allocated by Landlord among the properties owned or managed by Landlord which in Landlord's opinion Landlord deems appropriate.

(b)     Tenant agrees to carry the following insurance coverages and types:

(i)     Workers' Compensation Insurance in statutory amounts;

(ii)    Employer's Liability Insurance in the amount of $1,000,000 per person for each accident, or disease;

(iii)   Commercial General Liability Insurance including products and completed operations coverages of not less than $1,000,000 per occurrence, with a $2,000,000 per location aggregate (for Shopping Centers in the states of New York, Texas and California these limits shall be $3,000,000 per occurrence with a $5,000,000 per location aggregate). The fire legal liability limit shall be not less than $1,000,000. This policy shall contain a Contractual Liability Endorsement. This policy shall also include an Additional Insured Endorsement containing the names of the Additional Insureds identified below. The policy must have a Waiver of Subrogation endorsement in favor of all Additional Insureds. Any deductible/self-insured retention in excess of $5,000 per occurrence requires Landlord's written consent.

(iv)    Commercial Property Insurance including special form perils endorsement insuring Tenant's property, including plate glass, in the Shopping Center for the full replacement value, without deduction for depreciation. This policy shall have an Agreed Value Endorsement. This insurance must include all of Tenant's Work, improvements and betterments, Tenant's inventory, merchandise, signs, goods, trade fixtures, furnishings, equipment, furniture, wall coverings, floor coverings, and other personal property). Tenant shall insure for loss from flood, including coverage for water damage from all causes including but not limited to sprinkler damage, sewer discharge or backup, water line breakage, and overflow from other Tenant's spaces or from the Joint Use Areas. Where available, Tenant shall insure for earthquake. Landlord shall be named as a loss payee with respect to the coverage for Tenant's betterments and improvements. The policy must have a Waiver of Subrogation endorsement in favor of all Additional Insureds. The deductible/self-insured retention shall not exceed $5,000 per occurrence without Landlord's written consent.

(v)     Loss of Business Income Insurance, including Extra Expense and Contingent Business income coverage. The insurance limits for this insurance shall be based upon a minimum of 12 months business income with a 60-day extended period of indemnity endorsement.

(vi)    Boiler and Machinery insurance, including mechanical breakdown, covering rooftop HVAC units and any separate heating units or boilers which serve only the Leased Premises. Such coverage shall be for the full replacement value of the units without deduction for depreciation.

(vii)   If in Landlord's reasonable judgment there is a need for additional or different types of insurance, Tenant shall obtain upon Landlord's request the insurance at Tenant's sole expense.

(viii)  Automobile liability coverage, including owned, non-owned and hired automobiles, with limits of not less than $1,000,000 combined single limit for bodily injury and property damage.

(c)     All policies of insurance (including policies of Tenant's contractors and subcontractors) shall contain a Waiver of Subrogation Endorsement in favor of all Additional Insureds. If Tenant is permitted to self-insure for any of the insurance coverages required to be provided, Tenant hereby waives against Landlord, its parents, partners, joint venturers, subsidiaries and affiliates, against the property manager, and against the Additional Insureds if not listed above, all claims, including any and all rights of subrogation which may exist, for all losses and damages no matter how caused, which were or could have been insured for under any policy of insurance required to be obtained by Tenant. This waiver of liability and waiver of subrogation expressly includes any cause of loss due to the sole or concurrent negligence of any Additional Insured. If Tenant shall, for any reason, fail to obtain from its insurance carrier(s) the required Waiver of Subrogation Endorsement, the Tenant shall fully and completely defend and indemnify the Landlord and all Additional Insureds from any claims and demands, including lawsuits, brought against Landlord and/or the Additional Insureds by any insurance company which insured Tenant for a paid loss and which seeks to recover amounts paid under Tenant's policy.

(d)     Tenant shall provide a Certificate of Insurance to Landlord evidencing all of the required coverages and Endorsements prior to taking possession of the Premises. The Certificate of Insurance must remain current (or be replaced with a current Certificate) at all times during the period of Tenant's tenancy. All policies of insurance must be written by insurance carriers licensed to do business in the state in which the Shopping Center is located and have an A.M. Best's rating of not less than A:VII. All Tenant's liability policies shall be endorsed to be primary and non-contributory to policies of the Landlord and the Additional Insureds, and shall contain either a cross-liability endorsement or separation of insureds provision which permits the limits of liability under Tenant's policies to apply separately to each Additional Insured. Each policy shall contain a provision that the insurance company shall give all Additional Insureds 30 days written notice in advance of any cancellation, lapse, reduction in amount of coverage

or any other adverse change to the policy or insurer. **Tenant shall be permitted to satisfy its insurance obligations under this ARTICLE 19 by adding the Leased Premises to its blanket insurance policies, provided Landlord's coverage is not diminished thereby.**

(e)     The Additional Insureds who shall be named on Tenant's policies shall include the Landlord, (and if Landlord elects, its parent, subsidiaries, and affiliates), any owner or occupant in or adjoining the Shopping Center (including anchor tenants), any joint venturer or partner of Landlord, and any mortgagee or beneficiary of any part of the Shopping Center.

<div align="center">

**ARTICLE 20 - Indemnification**

</div>

**Unless caused by the negligent or intentional acts or omission of Landlord or any agent, representative, employee or contractor of Landlord or by the failure of Landlord to discharge its obligations under this Lease,** Excluding the willful misconduct of the indemnitee, Tenant shall indemnify, defend and save harmless Landlord, its parents, partners, subsidiaries, affiliates and any anchor, owner or **anchor** operator which is or may be in the Shopping Center **(Tenant shall have no obligation to indemnify any tenant or occupant of space within the Shopping Center except anchor stores)**, their agents, officers and employees from and against liability, claims, demands, expenses, fees, fines, penalties, suits, proceedings, actions, and causes of action arising out of or connected with Tenant's use, occupancy, management or control of the Leased Premises or Tenant's operations or activities in the Shopping Center (whether or not occurring or resulting in damage or injury within the Leased Premises or the Joint Use Areas). This obligation to indemnify shall include reasonable legal and investigation costs and all other reasonable costs, expense and liabilities from the 1st notice that any claim or demand is or may be made.  Tenant's obligation shall become effective beginning on the date Tenant **or its agents enter** is delivered the Leased Premises.  Tenant's indemnification obligation shall survive the expiration of the Term or the earlier termination of this Lease.

**Landlord shall indemnify Tenant against liabilities, claims, demands, expenses fees, fines, penalties, suits, proceedings, actions, and causes of action arising out of or connected with the Landlord's management or control of the Joint Use Areas or Landlord's operations or activities in the Joint Use Areas, except any matter arising out of or in connection with ARTICLE 15(d). This obligation to indemnify shall include reasonable legal and investigation costs and all other reasonable costs, expenses and liabilities from the 1st notice that any claim or demand is or may be made.  Landlord's indemnification obligation shall survive the expiration of the Term or the earlier termination of this Lease.**

<div align="center">

**ARTICLE 21 - Assignment, Subletting and Ownership**

</div>

**(a)   Tenant acknowledges that Tenant's agreement to operate in the Leased Premises for the use permitted in the Reference Provisions herein for the Term hereof, was a primary inducement and precondition to Landlord's agreement to Lease the Leased Premises to Tenant.  Accordingly, Tenant shall not transfer, assign, sublet, enter into license or concession agreements, change ownership or hypothecate this Lease or the Tenant's interest in and to the Leased Premises in whole or in part, or otherwise permit occupancy of all or any part thereof by anyone with, through, or under it, without first procuring the written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned by Landlord.  Landlord and Tenant agree, by way of example and without limitation, that it shall be reasonable for Landlord to withhold its consent if any of the following situations exist or is reasonably likely to exist:**

(i)   the contemplated use of the Leased Premises conflicts
      with the Permitted Use as set forth in Reference
      Provision 1.03 of this lease;

(ii)  in Landlord's reasonable business judgment, the
      proposed assignee or sublessee lacks sufficient
      business reputation or experience to operate a
      successful business of the type and quality permitted
      and required under the lease;

(iii) in Landlord's reasonable business judgment, the
      proposed assignee does not have a net worth of at
      least $2 million;

(iv)  Landlord has had previously dealings with the proposed
      assignee which have resulted in material non-
      performance or default on the part of the proposed
      assignee; and/or

(v)   the proposed assignment or subletting would breach any
      covenant of Landlord respecting radius, location, use
      or exclusivity in any other lease, financing
      agreement, or other agreement relating to the Shopping
      Center.

Any such attempt at transfer, assignment, subletting, license or
concession agreement, change of ownership or hypothecation
without Landlord's written consent shall be void and confer no
rights upon any third person.  The prohibitions of this ARTICLE
21 shall be construed to refer to any acts or events referred to
when they occur by operation of law, legal process,
receivership, bankruptcy or otherwise.  Notwithstanding any
permitted subletting or granting of concession or license, the
Leased Premises shall be used and operated as a single store.

(b)  The consent by Landlord to any transfer, assignment,
subletting, license or concession agreement, change of ownership
or hypothecation shall not constitute a waiver of the necessity
for such consent to any subsequent attempted transfer,
assignment, subletting, license or concession agreement, change
of ownership or hypothecation.  Receipt by Landlord of rental
due hereunder from any party other than Tenant shall not be
deemed to be consent to any such assignment or subletting, nor
relieve Tenant of its obligation to pay rental or other charges
for the full Term of this Lease.

(c)  Each transfer, assignment, subletting, license or
concession agreement and hypothecation to which there has been
consent shall be by instrument in writing, in form reasonably
satisfactory to Landlord, and shall be executed by the
transferor, assignor, sublessor, licensor, concessionaire,
hypothecator or mortgagor, and the transferee, assignee,
sublessee, licensee, concessionaire, or mortgagee shall agree in
writing for the benefit of the Landlord to assume, be bound by,
and perform the terms, covenants and conditions of this Lease to
be done, kept and performed by Tenant and to retain all
accounting records which Tenant is obligated to retain
hereunder.  One executed copy of such written instrument shall
be delivered to Landlord.  Failure to first obtain in writing
Landlord's consent or failure to comply with the provisions of
this ARTICLE 21 shall operate to prevent any such transfer,
assignment, subletting, license, concession agreement or
hypothecation from becoming effective.  If an assignment shall
be deemed to have occurred under this Lease as a result of the
transfer of corporate stock of Tenant, the transferee of the
stock shall not be obligated to assume and perform the terms,

covenants and conditions of this Lease, however, Tenant shall in
no way be relieved from its obligations of the terms, covenants
and conditions of this Lease.

(d)  If Tenant (or any Guarantor of this Lease) is a corporation
and if the control thereof changes (more than 50% of the issued
and outstanding shares of Tenant's stock entitled to vote for
directors of Tenant has been transferred) at any time during the
Term hereof, Tenant shall so notify Landlord and such transfer
shall be deemed an assignment of this Lease. If Tenant (or any
Guarantor of this Lease) is a partnership or entity other than a
corporation (including, but not limited to, a sole
proprietorship) and if the control thereof changes at any time
during the Term hereof (if Tenant is a partnership, such change
will include, but not be limited to the withdrawal of a partner
or partners from said partnership and the dissolution of said
partnership), Tenant shall so notify Landlord and such transfer
shall be deemed an assignment of this Lease.. Notwithstanding
anything to the contrary contained in this Lease, Tenant shall
have the right, without the consent of Landlord, to assign this
Lease or sublet all or a portion of the Leased Premises to a
corporation or other entity which:

    i.   is Tenant's parent; or

    ii.  is a wholly-owned subsidiary of Tenant; or

    iii. is a corporation or other entity of which Tenant or
        Tenant's parent owns or the shareholders or owners of
        Tenant or Tenant's parent own in excess of fifty
        percent (50%) of the outstanding capital stock or
        other ownership interest; or

    iv.  as a result of a consolidation, merger or other
        reorganization with Tenant and/or Tenant's parent,
        shall own all or substantially all of the assets,
        capital stock or other ownership interest of Tenant or
        Tenant's parent; or

    v.   acquires or is acquiring all or substantially all of
        the outstanding capital stock or other ownership
        interest of Tenant (the phrase "all or substantially
        all of the outstanding capital stock or other
        ownership interest of Tenant" being herein defined to
        mean at least 60% of the issued and outstanding
        capital stock or other ownership interest of Tenant
        entitled to vote for directors of Tenant) or all or
        substantially all of the assets of Tenant; or

    vi.  acquires or is acquiring all or substantially all of
        the stores of Tenant operating under the same trade
        name as is then in use at the Leased Premises; or

    vii. as a result of a change of the domicile of Tenant or
        the reincorporation of Tenant in another jurisdiction
        shall own all or substantially all of the assets of
        Tenant.

Any assignment or subletting pursuant to (i)-(vii) above,
inclusive, may only be subject to the following conditions:  (a)
Tenant shall remain fully liable during the unexpired term of
this Lease, except with respect to (iv) and (vii) above; and (b)
any such assignment or subletting shall be subject to all of the

terms, covenants and conditions of this Lease.  In addition, any assignment or subletting pursuant to (iv), (v), (vi) or (vii) above will be subject to the condition that the assignee or subtenant shall have a net worth equal to, or greater than, $2,000,000.00.

The transfer of shares of stock or other ownership interest of Tenant to or among the immediate members of the family of a shareholder or owner, to a living trust for estate planning purposes or by will or intestacy, or to existing shareholders or owners of Tenant or to Tenant shall not be deemed an assignment of this Lease or the subletting of the Leased Premises or a change of control of Tenant.

In no event may a sale, issuance or transfer of the stock of Tenant or its parent to the public or public trading of the stock of Tenant or its parent constitute an assignment of this Lease, a subletting of the Leased Premises or a change of control of Tenant.

Moreover, a hypothecation of shares of stock of Tenant shall not be deemed an assignment of this Lease or subletting of the Leased Premises unless and until either the person to whom said shares have been so hypothecated obtains the right to vote said shares for directors of Tenant prior to any foreclosure of any security interest in said shares or acquires all right, title and interest of the hypothecator in said shares.

(e)  If Landlord's consent to a transfer is required under this Lease, Tenant agrees to pay to Landlord an amount equal to $750.00 to reimburse Landlord for attorney's fees and administrative expense involved with the review, processing and/or preparation of any documentation in connection with an assignment, subletting, license or concession agreement, change of ownership or control, hypothecation or other transfer of this Lease or Tenant's interest in the Leased Premises.

(f)  If Landlord shall not be permitted to terminate this Lease because of the provisions of Title 11 of the United States Code relating to Bankruptcy, as amended ("Bankruptcy Code"), Tenant as a debtor in possession or any trustee for Tenant, agrees promptly, within no more than 15 days upon request by Landlord to the Bankruptcy Court, to assume or reject this Lease, and Tenant on behalf of itself and any trustee agrees not to seek or request any extension or adjournment of any application to assume or reject this Lease by Landlord with such Court.  In no event after the assumption of this Lease shall any then existing default remain uncured for a period in excess of the earlier of ten (10) days or the time period set forth herein.  In the event of a filing of a petition under the Bankruptcy Code, Landlord shall have no obligation to provide Tenant with any service or utilities as herein required unless Tenant shall have paid and is current in all payments of Operating Charges for environmental services, Joint Use Area Costs and other charges for services.

(g)  If the Minimum Annual Rental, Percentage Rental, or any additional rental and/or charges attributable to Tenant's leasehold interest in the Leased Premises required to be paid arising from any subletting of the entire Leased Premises requiring Landlord's consent, exceeds the rental and/or charges reserved hereunder, then Tenant shall pay to Landlord, on demand, 50% of the entire amount of such excess allocable to

**this Lease, which shall be deemed additional rental.** ~~(a) Tenant acknowledges that its agreement to operate in the Leased Premises for the use permitted in the Reference Provisions for the Term was a primary inducement and precondition to Landlord's agreement to lease the Leased Premises to Tenant. Additionally, the parties agree that the successful commercial profitability of the Shopping Center is based on the appropriate mix of retail and nonretail activity and that Landlord has leased the Leased Premises to Tenant because, in Landlord's opinion, Tenant's presence and commercial activity during the Term will significantly contribute to the profitability, viability and success of the Shopping Center. Accordingly, Tenant shall not transfer, assign, sublet, enter into license or concession agreements, change ownership or hypothecate this Lease or Tenant's interest in and to the Leased Premises in whole or in part, or otherwise permit occupancy of all or any part of the Leased Premises by anyone with, through or under it. Any of these acts shall be considered a "transfer" for the purposes of ARTICLE 21. Any attempt at a transfer shall be null and void and confer no rights upon a 3rd person. These prohibitions shall be construed to refer to events occurring by operation of law, legal process, receivership, bankruptcy or otherwise. Notwithstanding any permitted transfer, the Leased Premises be used and operated as a single store.~~

~~Notwithstanding the foregoing, and without conferring any rights upon Tenant, Tenant shall submit the request for a transfer, in writing, with sufficient time and information for Landlord to make an informed decision regarding the qualifications of the proposed transferee. In any event, Landlord may upon receipt of a request to transfer, instead of consenting to or denying the proposed transfer, terminate Tenant's obligations under the Lease and regain possession of the Leased Premises. Tenant may, within 15 days of receipt of the notice of termination, withdraw its request for the transfer by written notice to Landlord, and continue in possession under the terms of the Lease. Landlord's right to terminate the Lease because of that request shall in that event be inoperable. If Landlord exercises its termination right, Tenant shall surrender possession of the Leased Premises on the termination date specified in Landlord's notice, which shall not be less than 30 nor more than 60 days of receipt of the notice of termination in accordance with the provisions of this Lease.~~

~~(b)   Landlord's consent to a transfer shall not constitute a waiver of Landlord's right not to consent to a subsequent transfer. The receipt of rental or additional rental from any party other than Tenant shall not be deemed to be a consent to a transfer, nor shall that receipt relieve Tenant of its obligation to pay rental or additional rental for the Term. Tenant shall not have a claim and waives the right to any claim against Landlord for damages because of the refusal, withholding or delaying by Landlord of consent. Tenant's only remedies shall be an action for specific performance or an injunction to enforce a consent requirement.~~

~~(c)   Each transfer to which Landlord has consented shall be in writing, in a form satisfactory to Landlord and executed by the transferor and transferee. The transferee shall agree, in writing, to assume, be bound by and perform the covenants and conditions of this Lease. Tenant shall deliver to Landlord a statement within 30 days after the end of each calendar year, and within 30 days after the expiration or earlier termination of the Term, specifying each transfer in effect during the period covered by the statement, as well as: (a) the date of the transfer document's execution and delivery; (b) the square footage of the rentable area demised and the term; and (c) a computation in reasonable detail showing the amounts, if any, paid and payable by Tenant to Landlord for the transfer pursuant to this subsection. Tenant shall not be released from liability or relieved of its obligations, unless Landlord expressly agrees otherwise in writing. If the Minimum Annual Rental, Percentage Rental, additional rental or other payment to be paid to Tenant from a transfer exceeds the rental and additional rental Tenant is required to pay Landlord under this Lease, then Tenant shall pay to Landlord the entire amount of the excess, without prior demand, which shall be deemed additional rental.~~

~~(d)   If Tenant (or a guarantor of the Lease) is a nonpublic corporation and the control of the corporation changes, Tenant shall notify Landlord. If the control changes (whether or not Tenant has notified Landlord), Landlord may declare the change to be a default, effective 60 days from the date of the notice from Tenant, or the date on which Landlord first has knowledge of the change, whichever occurs first. The provisions of the preceding sentence shall not be applicable if control of the corporation changes as the result of a public offering which occurs on a major security exchange. If Tenant (or a guarantor of the Lease) is a partnership or entity other than a corporation (including, but not limited to, a sole proprietorship) and if the control changes (if Tenant is a partnership, a change shall include, but not be limited to, the withdrawal of a partner or partners from the partnership or the dissolution of the partnership), Tenant shall notify Landlord. If the control changes (whether or not Tenant has notified Landlord), Landlord may declare the change a default, effective 60 days from the date of the notice from Tenant, or the date on which Landlord first has knowledge of the change, whichever occurs first. The receipt by Landlord of rental from a party other than Tenant shall not be deemed notice of change in control or ownership of Tenant.~~

~~(e)   Tenant agrees to pay Landlord $400 plus one month's installment of Minimum Annual Rental to reimburse Landlord for attorneys' fees and administrative expense for the review, processing or preparation of any document in connection with a transfer, whether or not Landlord's consent to the transfer is required or obtained.~~

~~(f)   If Landlord is not permitted to terminate this Lease because of the provisions of Title 11 of the United States Code relating to Bankruptcy, as amended ("Bankruptcy Code"), Tenant agrees, as a debtor in possession or any trustee for Tenant, within 15 days after Landlord's request to the Bankruptcy Court, to assume or reject this Lease. Tenant, on behalf of itself and any trustee, agrees not to seek or request an extension or adjournment of the application to assume or reject this Lease. In no event after the assumption of this Lease shall an existing default remain uncured for a period more than the earlier of 10 days or the time period specified in this Lease. If a filing of a petition under the Bankruptcy Code occurs, Landlord shall not have an obligation to provide Tenant with services or utilities unless Tenant has paid and is current in all payments of rental and additional rental.~~

~~(g)   If Tenant receives Landlord's consent to a transfer under ARTICLE 21(a), and if Landlord does not terminate the Lease under ARTICLE 21(d), the Minimum Annual Rental payable to Landlord shall not be less than the highest annual combined Minimum Annual Rental and Percentage Rental payable by Tenant during any previous year.~~

~~All of the other obligations, covenants and conditions shall remain unamended.~~

## ARTICLE 22 - Access to Leased Premises

Tenant agrees that Landlord, its agents, employees, servants or any person authorized by Landlord **, on reasonable advance notice to Tenant, which may be verbal,** may enter the Leased Premises to: (a) inspect its condition; (b) make repairs, additions or improvements to any part of the Shopping Center, including the Leased Premises; (c) exhibit the Leased Premises to prospective purchasers of the Shopping Center; (d) ~~place notices during the last 60 days of the Term in the Leased Premises at such places as may be determined by Landlord~~; (e) perform construction on or near the Leased Premises **(however, Landlord shall not perform construction within the Leased Premises without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed)**; and (f) post notices of non-responsibility.

**Landlord agrees to use diligent efforts to keep such entries to a minimum and, further, during any such entry, Landlord shall use diligent efforts not to disturb or inconvenience Tenant in the conduct of Tenant's business in the Leased Premises. In the event Landlord shall enter the Leased Premises under non-emergency situations in order to perform alterations, improvements, additions and/or repairs thereto, and as a result thereof, Tenant cannot, in the exercise of reasonable business judgment, operate its business and in fact closes the entire Leased Premises to the public, and if such closing continues for a period of 48 hours or more, Landlord agrees that the Minimum Annual Rental and all additional rental and all charges payable by Tenant payable by Tenant hereunder shall be abated from the date of such closure until such time as the condition giving rise to said closure has been corrected, at which time Tenant shall resume the payments required hereunder.**

## ARTICLE 23 - Default by Tenant

(a)    The following shall be a default by Tenant:

(i)    The failure to pay when due an installment of rental, or any other payment required to be made in whole or in part, if the failure shall continue for more than 10 days after written notice **from Landlord to Tenant** that same is past due, provided that any such notice given by Landlord shall be in lieu of, and not in addition to, any notice required by state law; and/or

(ii)    The abandonment or vacation of the Leased Premises or any part of it; and/or

(iii)    The failure to observe or perform any other provision of this Lease, if the failure continues for ~~10~~ **15** days after written notice to Tenant; if the default cannot reasonably be cured within ~~10~~ **15**  days, Tenant shall not be in default if Tenant begins to cure the default within ~~10~~ **15**  days and diligently cures the default; and/or

(iv)    The making by Tenant of a general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless a petition ~~filed against Tenant~~ is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Leased Premises or of Tenant's interest in this Lease if possession is not restored to Tenant within 30 days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Leased Premises, or of Tenant's interest in this Lease, if the seizure is not discharged within 30 days; and/or

(v)    **If within any one 12-month period of the Lease Term hereof, Tenant shall have been in default in the payment of**

**the rent hereunder more than 3 times and Landlord because of such defaults shall have served upon Tenant within said 12-month period 4 or more 10-day written notices of Tenant's failure to pay rent. A default under this ARTICLE 23(a)(v) shall be deemed non-curable default.** ~~The failure more than twice within a 12-month period to make any payment of rental, provided Landlord has given Tenant the required written notices in each case. The 3rd failure shall be a non-curable default.~~

(b)     In addition to any other remedies available to Landlord at law or in equity for default, Landlord shall have the immediate option to terminate this Lease and the rights of Tenant by written notice to Tenant. If Landlord elects to terminate, Landlord shall have the right to recover from Tenant as damages:

(i)     The worth at the time of the award of any unpaid rental which has been earned at the time of termination; and

(ii)     The worth at the time of the award of the amount by which the unpaid rental which would have been earned after termination until the time of award exceeds the amount of rental loss Tenant proves could have been reasonably avoided; and

(iii)     The worth at the time of award of the amount by which the unpaid rental for the balance of the Term after the time of award exceeds the amount of rental loss Tenant proves could be reasonably avoided; and

(iv)     Any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations (including the costs and expenses of recovering the Leased Premises and reasonable attorneys' fees) or which would be likely to result from Tenant's failure; and

(v)     At Landlord's election, other amounts permitted by applicable law.

(c)     The word "rental" shall mean the Minimum Annual Rental and all other sums required to be paid by Tenant under this Lease. The word "award" means a judgment issued or rendered in favor of Landlord in a proceeding or action to recover damages from Tenant. The phrase "at the time of the award" means the date of entry of such a judgment. All sums, other than Minimum Annual Rental, shall be computed based on the average monthly amount accruing during the 24 month period preceding the default. However, if it becomes necessary to compute the rental before the 24 month period has occurred, the rental shall be computed on the basis of the average monthly amount accruing during that shorter period. As used in paragraphs (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest at the Interest Rate. As used in paragraph (iii) above, the "worth at the time of the award" is computed by discounting that amount at the discount rate of the Federal Reserve Bank of Chicago, at the time of award, plus 1%. In order to determine the amounts payable under ARTICLE 23, Percentage Rental shall be included as additional rental and determined based on the average annual Net Sales for the ~~36~~ **24** months (or, if Tenant has been operating in the Leased Premises less than ~~36~~ **24** months, on the average Net Sales for the 12 month period) preceding the termination of Tenant's right to possession of the Leased Premises.

(d) Landlord shall also have the right if Tenant defaults under this Lease to terminate Tenant's right to possession of the Leased Premises (without terminating this Lease) and reenter the Leased Premises and remove all persons and property from the Leased Premises. The property may be stored at Tenant's cost. Landlord shall not be liable to Tenant for loss or damage resulting from an entry by Landlord. Tenant shall pay as additional rental, upon demand, expenses incurred or paid by Landlord because of Landlord's entry. If 2 or more or any combination of individuals, corporations, partnerships or other business associations ("Individuals") sign this Lease as Tenant or guarantee this Lease as Guarantors, the liability of each individual group to pay rental and perform the obligations under this Lease shall be joint and several. The failure or refusal by Landlord to proceed against all the (or any combination of the) Individuals comprising Tenant or against Tenant or against 1 or more of the Guarantors shall not be a release or waiver of rights which Landlord may possess against the others, nor shall the granting by Landlord of a release of or execution of a covenant not to sue any 1 or more of the (or any combination of the) Individuals comprising the Tenant or the Guarantors be a release or waiver in whole or in part of rights which Landlord may possess against the others. **The venue of any legal suit or action for enforcement of any provision of this Lease by Landlord or Tenant shall be the appropriate court in the state and county in which the Shopping Center is located.** ~~If either party institutes legal suit or action for enforcement of an obligation, Landlord may determine the venue.~~ Landlord shall not be in default unless and until Landlord shall have failed to perform its obligations under this Lease for 30 days (or within such additional time as is reasonably required) after written notice to Landlord properly specifying Landlord's failure to perform the obligations. Landlord shall not be in default until and unless a court of competent jurisdiction has determined that Landlord is in default. ~~To the extent permitted by applicable law, Tenant waives notice of reentry (or institution of legal proceedings), including the right to receive notice pursuant to any statute or judicial decision of law. Notwithstanding anything to the contrary contained in ARTICLE 23, any written notice, other than as specifically set forth in this ARTICLE 23, required by a statute or law enacted now or later is waived by Tenant, to the extent permitted under that statute or law.~~

**Landlord shall use commercially reasonable efforts to mitigate damages in the event of a Tenant default.**

(e)     If all or any part of the Leased Premises are vacated or abandoned by Tenant, or if Landlord elects to reenter or take possession of the Leased Premises pursuant to legal proceedings or notice, and if Landlord does not elect to terminate this Lease, then Landlord may from time to time, without terminating this Lease, either recover rental as it becomes due or relet the Leased Premises or any part of it for any length of time, rental and conditions that Landlord in its sole discretion deems advisable. Landlord shall have the right to make alterations and repairs to the Leased Premises. If Tenant has left all or any of its trade fixtures, furniture, furnishings, signs, stock or other personal property in the Leased Premises, that shall not preclude a determination that a vacation or abandonment has occurred.

(f)     If Landlord elects to relet, rental received by Landlord from reletting shall be applied: 1st, to the payment of indebtedness other than rental due Landlord from Tenant; 2nd, to the payment of the cost of reletting; 3rd, to the payment of the cost of alterations and repairs to the Leased Premises; 4th, to the payment of rental due and unpaid; and the remainder, if any, shall be applied to the payment of future rental that may become due. If the rental received from reletting during any month which is applied to the payment of rental is less than the rental payment during that month by Tenant, Tenant shall pay the deficiency to Landlord. The deficiency shall be calculated and paid monthly. Tenant shall also pay Landlord, as soon as ascertained, the costs and expenses incurred by Landlord to relet or make alterations and repairs not covered by the rental received from the reletting of the Leased Premises.

(g)     A reentry or taking possession of the Leased Premises by Landlord shall not be construed to be an election to terminate this Lease, nor shall it cause a forfeiture of rental remaining to be paid during the balance of the Term, unless a written notice of that intention is given to Tenant or the termination is decreed by a court of competent jurisdiction. Notwithstanding a reletting without termination by Landlord because of default by Tenant, Landlord may at any time after reletting elect to terminate this Lease for any default.

(h)     Tenant expressly waives any right or defense it may have to claim a merger, and neither the commencement of an action or proceeding nor the settlement of, or entering of judgment for any action or proceeding shall bar Landlord from bringing subsequent actions or proceedings, based upon other or subsequently accruing claims, or based upon claims or events which have previously accrued and not been resolved in any prior action, proceeding or settlement. The parties waive trial by jury in any action, proceeding or counterclaim brought by either of the parties against the other, regardless of whether such action, proceeding or counterclaim is related to a default under this Lease.

## ARTICLE 24 - Surrender of Leased Premises

Tenant shall, upon expiration of the Term, or the earlier termination of this Lease, surrender to Landlord, without damage, injury, disturbance or payment, the Leased Premises including, without limitation, all apparatus, equipment, alterations, improvements and additions by either party to, in, upon or about the Leased Premises. **in good condition and repair, reasonable wear and tear and damage not required to be repaired by Tenant under this Lease excepted.** If Tenant shall be in default, Tenant shall not have the right to remove trade fixtures, signs and other personal property. They shall remain or become, as the case may be, the property of Landlord. Tenant, at its sole expense, shall immediately repair damage to the Leased Premises caused by Tenant vacating the Leased Premises or by Tenant's removal of trade fixtures, signs and other personal property. Tenant shall comply with all laws and governmental regulations applicable to the removal and repair of the property. Tenant shall not create a disturbance or health problem for customers, agents, invitees or other parties in the Shopping Center as result of the removal or repair. Any property not removed may be deemed by Landlord to be abandoned by Tenant and may be retained by Landlord or may be removed and stored for Tenant, at Tenant's sole cost. Tenant shall surrender the Leased Premises to Landlord free of Hazardous Material **placed thereon by Tenant or its employees or agents (if in violation of the law)** and free of any violation of any environmental rule or regulation **(if caused by Tenant and verified by** Upon surrender of the Leased Premises, Tenant shall provide Landlord with a report by experts acceptable to Landlord **and Tenant** showing the Leased Premises free of **to contain** Hazardous Material. Tenant's obligation to observe and perform the provisions of this ARTICLE 24 shall survive the expiration of the Term or earlier termination of this Lease.

## ARTICLE 25 - Tenant's Conduct of Business

(a)     Tenant covenants to continuously and uninterruptedly operate within the entire Leased Premises the business it is permitted to operate under Reference Provision 1.03, except any portion of the Leased Premises while that portion is untenantable because of fire or other casualty. Tenant agrees to conduct its business at all times in a first-class manner consistent with reputable business standards and practices, and to maintain within the Leased Premises a stock of merchandise and trade fixtures adequate to service and supply the usual demands of its customers. Tenant shall keep the Leased Premises in a neat, safe, clean and orderly condition. Tenant also agrees to conduct Tenant's business under the Trade Name set forth in the Reference Provisions, which Tenant represents that it **uses for stores similar to that to be operated at the Leased Premises** has a right to use. Tenant further agrees to keep open the Leased Premises and operate its business at the **commercially reasonable** hours and on the days and evenings of the week determined from time to time by Landlord in Landlord's sole and absolute discretion, **provided that Tenant**

shall only be obligated to be open during such times provided that at least 2 anchors and 80% of the gross leasable area of the Shopping Center devoted to in-line retail tenants are also obligated to be open and operating for business at such times. To the extent that Landlord shall rely on the area of other retail tenants which are obligated to be open but are not in fact open for business, Landlord shall use all commercially reasonable efforts to cause such tenants to be open. ~~A vacation or abandonment of other premises by any other tenant, occupant or anchor in the Shopping Center shall not release Tenant from its obligations under this Lease, notwithstanding anything to the contrary contained in this Lease.~~

Notwithstanding anything to the contrary contained in this Lease, Tenant may change its Trade Name to the Trade Name used at the majority of its other stores in the state in which the Shopping Center is located operating under the same Trade Name as is in use at the Leased Premises or is forced to do so by any court or governmental decree or any compromise in lieu thereof. Tenant shall have the right to close for business to the public no more than 2 days per Lease Year for the purpose of conducting inventory, upon at least 10 days advance written notice to Landlord.

If Tenant shall request Landlord's approval to open the Leased Premises for business for periods other than as set forth above and Landlord shall approve such request (which approval shall be in Landlord's sole and absolute discretion), Tenant shall pay for any additional costs incurred by Landlord in connection with such extended hours, including but not limited to the cost of security, heating, ventilating and air-conditioning the Leased Premises and the Joint Use Areas required in order to access the Leased Premises, and any extra maintenance and/or repair to the Joint Use Areas required as a result of such extended operating period. Additionally, Tenant shall be responsible for any such extraordinary additional maintenance, security or other costs which are incurred by Landlord as a result of Tenant's use of the Leased Premises during normal operating hours.

(b)     The parties agree that because of the difficulty or impossibility of determining Landlord's damages, if Tenant fails to keep open the Leased Premises and operate its business during the hours and on the days and evenings of the week determined by Landlord, in addition to and not in lieu of Landlord's other rights and remedies, Tenant shall pay Landlord liquidated damages of $~~150~~ **$100** per ~~hour~~ **day** or fraction of the ~~hour~~ **day**, as the case may be, that Tenant fails to keep open and operate the Leased Premises and operate its business. Landlord and Tenant agree that this amount represents a reasonable estimate of the damages that Landlord would suffer.

Notwithstanding the foregoing, no such liquidated damages shall be imposed as a result of late openings or early closings not exceeding (i) one hour not more than two times in any calendar year, or (ii) fifteen minutes not more than six times in any calendar year.

Tenant shall be permitted to close its business at the Leased Premises for a period of no more than 45 days for remodeling which has been approved by Landlord, if approval is required.

### ARTICLE 26 - Rules and Regulations

Tenant shall require its employees, agents and contractors to comply with the **reasonable and non-discriminatory** rules and regulations made by Landlord from time to time regarding the operation of the Shopping Center or the Leased Premises including, but not limited to, the following:

(a)     Tenant shall not put on the glass and supports of the windows (~~nor within 24 inches of any window~~), doors or exterior walls of the Leased Premises any signs, advertising placards, names, insignias, trademarks or descriptive material. No signs or other items shall be placed within the Leased Premises if they **substantially** ~~materially~~ obstruct a view of the Leased Premises. Tenant shall not place vents, structures, improvements or obstructions on the exterior of the Leased Premises without Landlord's written consent. Landlord shall have the right, without giving notice to Tenant and without liability, to restore the Leased Premises and remove property from the Leased Premises unless the size, type, color, location, copy, nature and display qualities of the property were approved by Landlord in writing. The cost of the restoration and removal of property shall be paid for by Tenant promptly upon receipt of a bill. Tenant shall not place a sign on the roof of the Leased Premises notwithstanding anything in this Lease to the contrary. **Notwithstanding any provision of the Lease, Tenant may place decals, decorations and graphics on the interior of the Leased Premises so long as the same are professionally prepared, consistent with the family oriented**

**nature of the Shopping Center, and do not substantially
interfere with the view of the interior of the Leased Premises
from the adjacent mall.**

(b)    No awning or other projections shall be attached to the outside walls of the Leased Premises or the Shopping Center without the written consent of Landlord **, which consent shall not be unreasonably withheld, conditioned, or delayed.**

(c)    Loading and unloading of goods shall be done only at the times, in the areas and through the entrances designated by Landlord.

(d)    Garbage shall be kept in the kind of container approved by Landlord's fire and casualty consultants and shall be removed and deposited daily in mass disposal containers in the manner prescribed from time to time by Landlord.  Landlord shall provide or designate a service for collection of garbage from designated mass disposal containers.

(e)    Except solely for Tenant's own internal operations use within the Leased Premises, no radio or television aerials or other receivers and/or equipment, infrared transmitters/receivers, cabling, telecommunications systems (including but not limited to switching, relay, hub or booster systems) shall be erected or placed within the Leased Premises or on the roof or walls (interior or exterior) of the Leased Premises or the Shopping Center without the written consent of Landlord, which may be withheld in Landlord's sole discretion.  If Landlord's consent is not received, anything erected or placed on the roof or elsewhere within the Shopping Center may be removed, without notice, and any damage to the walls or roof or elsewhere within the Shopping Center shall be the responsibility of Tenant.  Tenant's access to the roof is limited to the maintenance of equipment installed with Landlord's approval and inspections for damage.  Tenant shall not go on the roof without the written approval of Landlord.

(f)    **Sounds and images from** ~~No~~ loudspeakers, televisions, phonographs, radios, flashing lights, machinery or other devices shall **not unreasonably emanate** ~~be heard or seen~~ outside of the Leased Premises ~~without the prior written consent of Landlord.~~

(g)    No auction, fire, bankruptcy or selling-out sales shall be conducted without the written consent of Landlord.

(h)    Tenant shall keep its display windows and signs illuminated every day of the Term during the hours designated by Landlord **but no longer than hours that are one hour before Tenant is obligated to open for business and one hour after Tenant is permitted to close its business on any day.**

(i)    **Tenant shall not place obstructions, garbage, refuse, improvements, merchandise or displays in the Joint Use Areas immediately adjoining the Leased Premises.** ~~Areas immediately adjoining the Leased Premises shall be kept clear by Tenant, and Tenant shall not place nor permit obstructions, garbage, refuse, improvements, merchandise or displays in those areas.~~

(j)    Tenant and its employees shall not park motor vehicles in parts of the parking area which may be designated for customer parking. Tenant shall furnish Landlord the state automobile license numbers assigned to the vehicles of Tenant's employees within 5 days after request by Landlord. Tenant shall notify Landlord of changes to the numbers within 5 days after the changes occur. If Tenant or Tenant's employees continue to park in the customer parking areas, after notice is given to Tenant by Landlord, Landlord may, in addition to any other remedies Landlord may have, charge Tenant $25 per day, for each day or partial day, per vehicle parked in the customer parking areas, attach violation stickers or notices to the vehicles and have the vehicles removed at Tenant's expense. **Notwithstanding the foregoing, Landlord shall not be entitled to remove any vehicle of Tenant or of any employee of Tenant that is improperly parked within the Shopping Center unless it first gives Tenant's on-site store manager at least one hour's prior notice of Landlord's intention to do so.**

(k)    Tenant shall use the pest extermination contractor that Landlord may choose, and when Landlord requires Tenant to do so.  Tenant shall not keep or permit any animals in the Leased Premises, unless expressly allowed by in this Lease, or unless used by disabled persons.

(l)    ~~If Landlord installs a central music system in the Shopping Center, and Tenant desires to purchase another music system, Tenant may, at Landlord's option, purchase the system from Landlord (provided Landlord's charge is competitive with any similar service available to Tenant).~~

(m)    Tenant shall not carry on any trade or occupation or operate any instrument, apparatus or equipment which emits an odor or causes a noise outside the Leased Premises or which is offensive.

(n)      Tenant shall not put temporary signs or fixtures (including portable trade fixtures, displays and folding tables) for the display of merchandise within 3 feet of either side of any entrance to the Leased Premises. Merchandise displays shall not extend beyond the frontage line of the Leased Premises **except within show windows, and except that Tenant shall have the  right to place professionally prepared pedestal signs of a reasonable size in the set-back area between the leaseline and the front entrance to the Leased Premises without the consent of the Landlord.**

(o)      Tenant shall store and stock in the Leased Premises only goods, wares, merchandise and other property necessary for the conduct of Tenant's business.

(p)      Tenant shall not use or permit the Leased Premises to be used for living, sleeping, residential or lodging purposes.

(q)      Tenant shall not use the plumbing for a purpose other than that for which it is constructed.  No grease or foreign substance shall be put in the plumbing, and the expense of any resulting breakage, stoppage or damage (whether on or off the Leased Premises) shall be borne by Tenant **subject to the provisions of Article 19(d).**

(r)      Tenant shall not in the Joint Use Areas:

(i)      vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter;

(ii)      exhibit any sign, placard, banner, notice or other written material;

(iii)      distribute any circular, booklet, handbill, placard or other material;

(iv)      solicit membership in any organization, group or association or contribution;

(v)      parade, patrol, picket, demonstrate or engage in conduct that might interfere with or impede the use of the Joint Use Areas by any customer, invitee or employee, create a disturbance, attract attention or harass, annoy, disparage or be detrimental to the interest of any of the other tenants;

(vi)      use the Joint Use Areas for any purpose when none of the retail establishments within the Shopping Center are open for business;

(vii)      panhandle, beg or solicit funds; nor

(viii)      solicit business.

(s)      Tenant shall have the responsibility for protecting the Leased Premises from theft, robbery and pilferage, and shall keep non-customer doors locked.

(t)      No symbol, design, name, mark or insignia adopted for or used by Landlord in the Shopping Center shall be used by Tenant without the prior written consent of Landlord.

(u)      In the event Tenant requires the use of telecommunication, high-speed network or data transmission services from the Leased Premises, Landlord may require Tenant to contract for such services through Landlord or one of Landlord's designated service providers, provided that the cost thereof is comparable to that available to Tenant from another provider, given a comparable level and quality of service and equipment.  Landlord's liability relative to such services shall be the same as that for provision of utilities as set forth in ARTICLE 16(g).

Landlord shall have all remedies provided in this Lease for the breach of any of the provisions of ARTICLE 26. Tenant agrees **after the 2nd violation in any calendar year** to pay Landlord, upon demand, in addition to and not in lieu of Landlord's other remedies, ~~$70~~ **50.00** per violation of any of the rules and regulations, **after notice of the same from Landlord and opportunity to cure.** Landlord shall have the right to grant variances of the rules and regulations, and shall enforce the rules and regulations at its sole discretion. **No rule or regulation may increase an obligation or impair a right of Tenant under this Lease.**


## ARTICLE 27 - Eminent Domain

(a)      If the entire Leased Premises is appropriated or taken under eminent domain by any public or quasi-public authority, this Lease shall terminate on the date of the taking.  Landlord and Tenant shall be released from liability accruing after that date.  If more than 25% of the square footage of floor area (including a mezzanine, if any) of the

Leased Premises is taken under eminent domain by any public or quasi-public authority, or if because of the appropriation or taking, regardless of the amount taken, the remainder of the Leased Premises is not usable for the purposes specified in Reference Provision 1.03, either Landlord or Tenant shall have the right to terminate this Lease as of the date Tenant is required to vacate a portion of the Leased Premises which has been taken, by giving notice to the other in writing within 60 days after the date of the taking. Landlord and Tenant shall be released from liability accruing after that date.

(b)      Whether or not this Lease is terminated, Landlord shall be entitled to the entire award or compensation and any portion of any compensation awarded for the diminution in value of the leasehold interest or fee of the Leased Premises, but Tenant's right to receive compensation or damages for Tenant's fixtures and tangible personal property shall not be affected. **Notwithstanding any provision herein, Tenant may seek its own award.** If this Lease is terminated, rental, additional rental and other charges for the last month of Tenant's occupancy shall be prorated, and Landlord shall refund to Tenant rental, additional rental or other charges paid in advance.

(c)      If Landlord and Tenant elect not to terminate this Lease, Tenant shall remain in the portion of the Leased Premises which has not been appropriated or taken. Landlord agrees, at Landlord's cost and expense, to restore the remaining portion of the Leased Premises to the quality and character that existed prior to the appropriation or taking as soon as reasonably possible. The Minimum Annual Rental shall be adjusted, on an equitable basis, taking into account the relative value of the portion taken compared to the portion remaining. A voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be an appropriation or taking under eminent domain. Tenant shall not have a claim against Landlord because of a taking.

## ARTICLE 28 - Attorneys' Fees

If, during the Term or afterwards, either party institutes an action, proceeding or counterclaim against the other relating to this Lease, or a default, the unsuccessful party shall reimburse the successful party for the **reasonable expense of attorneys' fees and disbursements incurred therein by the successful party.** ~~total amount of court costs, expenses and reasonable attorneys' fees actually incurred up to $10,000, the parties waiving any statute, rule of law or public policy to the contrary.~~ The parties agree to confirm this agreement in writing at the start of the action, proceeding or counterclaim. The giving of a notice of default by Landlord shall constitute part of an action or proceeding under this Lease, entitling Landlord to reimbursement of its reasonable expenses of attorneys' fees and disbursements, even if an action or proceeding is not commenced in a court of law and whether or not the default is cured. This ARTICLE 28 shall survive the expiration or termination of this Lease.

## ARTICLE 29 - Sale of Leased Premises by Landlord

In the event of the sale or exchange of the Leased Premises or the Shopping Center and the assignment of this Lease, Landlord shall be relieved of all liability for the covenants and obligations in or derived from this Lease **,** **provided that any transferee assumes in writing Landlord's obligations under this Lease or amendments or modifications thereof,** or arising out of any act, occurrence or omission relating to the Leased Premises or this Lease. The covenants, representations and obligations of Landlord shall be binding on Landlord only during the period that Landlord has an ownership interest in the Shopping Center.

## ARTICLE 30 - Notices

Notices and demands shall be given in writing sent by certified mail or by nationally recognized overnight courier service, addressed to Landlord and to Tenant at the addresses specified in the Reference Provisions or at the addresses which were last specified by notice by Landlord or Tenant. Notices or demands shall be deemed to have been given, made or communicated on the date they were **received or rejected.** ~~deposited in the United States mail as certified mail, with postage fully prepaid or with the nationally recognized overnight courier service.~~

## ARTICLE 31 - Remedies

All rights and remedies of Landlord and Tenant under this Lease or at law are cumulative, and the exercise of one or more rights or remedies shall not exclude or waive the right to the exercise of any others. All rights and remedies may be exercised and enforced concurrently, whenever and as often as desirable.

## ARTICLE 32 - Successors and Assigns

All covenants, promises, conditions, representations and agreements shall be binding upon, apply and inure to Landlord and Tenant and their heirs, executors, administrators, successors and assigns. The provisions of ARTICLE 21 hereof shall not be affected by this ARTICLE 32.

## ARTICLE 33 - Representations

Tenant agrees that Landlord, its employees and agents have made no representations, inducements or promises about the Leased Premises, the Shopping Center or this Lease, or about the characteristics or conditions regarding or pertaining to the Leased Premises or the Shopping Center, unless the representations, inducements and promises are in this Lease. Tenant has independently investigated the potential for the success of its operations in the Shopping Center. Therefore, no claim or liability, or cause for termination, shall be asserted by Tenant against Landlord, its employees and agents, for, and they shall not be liable because of, the breach of any representations, inducements or promises not expressly in this Lease.

~~Any claim, demand, right or defense by Tenant which is based upon or arises in connection with this Lease or the negotiation of this Lease prior to its execution shall be barred unless Tenant commences an action or interposes a legal proceeding or defense within 1 year after the date of the inaction, omission or occurrence of the event, or the action to which the claim, demand, right or defense relates.~~

## ARTICLE 34 - Waiver

The failure by Landlord or Tenant to insist upon strict performance by the other of any of the covenants, conditions, provisions, rules and regulations and agreements in this Lease, or to exercise a right, shall not be a waiver of any rights or remedies and shall not be a waiver of a subsequent breach or default. A surrender of the Leased Premises shall not occur by Landlord's acceptance of rental or by other means unless Landlord accepts the surrender in writing. A payment by Tenant or receipt by Landlord of an amount less than the monthly rental shall not, nor shall the endorsement, statement, check, letter accompanying a check or payment of rental, be an accord and satisfaction. Landlord may accept a check or payment without prejudice to its right to recover the balance of rental due and pursue any other remedy. A waiver by Landlord for one tenant shall not constitute a waiver for another tenant.

## ARTICLE 35 - Holding Over

If Tenant remains in possession of the Leased Premises after the expiration of the Term without a new lease (even if Tenant has paid and Landlord has accepted rental), Tenant shall be deemed to be occupying the Leased Premises as a tenant from month to month, subject to the covenants, conditions and agreements of this Lease. The monthly rental shall be computed based on ~~1/6th~~ $1/9^{th}$ of the rental payable to Landlord during the last 12 month period of the Term. If Tenant fails to surrender the Leased Premises on the termination of this Lease, Tenant shall, in addition to other liabilities to Landlord, indemnify, defend and hold Landlord harmless from loss and liability resulting from that failure including, but not limited to, claims made by a succeeding tenant. The exercise of Landlord's rights shall not be interpreted to allow Tenant to continue in possession, nor shall it be deemed an election to extend the Term beyond a month-to-month basis. If Landlord, in its sole discretion, determines to permit Tenant to remain in the Leased Premises on a month-to-month basis, the month-to-month tenancy shall be terminable on 30 days prior written notice given by either party to the other party. **Tenant shall not be considered as holding over possession of the Leased Premises merely because, after its vacation thereof, the Tenant has left items of property upon the Leased Premises.**

**Notwithstanding anything to the contrary contained in this Lease, if Tenant remains in possession of the Leased Premises after the expiration of the Term and Tenant and Landlord are involved in good faith negotiations for an extension or renewal of this Lease, the rental provisions of this ARTICLE 35 shall not apply, provided however such negotiations shall not exceed 90 days beyond the Term. The monthly rental in this instance shall be computed on the basis of 1/12th of the Minimum Annual rental payable by Tenant to Landlord during the last 12 month period of the Term.**

## ARTICLE 36 - Interpretation

Only the relationship of Landlord and Tenant is created by this Lease. No provision of this Lease or act of either party shall be construed to create the relationship of principal and agent, partnership, or joint venture or enterprise.

## ARTICLE 37 - Advertising and Promotional Service

As part of Operating Expenses, Landlord may furnish and maintain professional advertising, marketing and sales promotions which are intended to promote the Shopping Center and/or benefit sales therein. Such advertising and promotion services may be provided in whole or in part by a 3rd party provider or by Landlord or by an affiliate, subsidiary or other related company of Landlord. The nature and extent of such advertising and sales promotion services shall be within Landlord's sole and absolute discretion, and the portion of Minimum Annual Rental and/or Operating Expenses Payment used by Landlord for such advertising and sales promotion services as set forth in ARTICLE 7 shall constitute the entire obligation of Tenant to contribute to the cost of such services. ~~Tenant shall pay Landlord the initial assessment specified in the Reference Provisions, for advertising and promotional activities, in a lump sum within 10 days after demand.~~

## ARTICLE 38 - Quiet Enjoyment

Landlord has the right, power and authority to enter into this Lease. Tenant, or any permitted assignee or sublessee of Tenant, upon the payment of the rental and performance of Tenant's other covenants, shall and may peaceably and quietly have, hold and enjoy the Leased Premises during the Term. This covenant shall be construed as a covenant running with the land. It shall not be construed as a personal covenant of Landlord.

## ARTICLE 39 - Waiver of Redemption

Tenant waives any right of redemption if Tenant is evicted or dispossessed for any cause, or if Landlord obtains possession of the Leased Premises because of the default of Tenant or otherwise. The rights given to Landlord are in addition to rights that may be given to Landlord by statute or otherwise.

## ARTICLE 40 - Fees

Tenant warrants and represents that it has not had negotiations with or dealt with a realtor, broker or agent in connection with this Lease. **Landlord and** Tenant agrees to pay and hold **the other** ~~Landlord~~ harmless from the cost, expense or liability (including the costs of suit and reasonable attorneys' fees) for compensation, commissions or charges claimed by a realtor, broker or agent regarding this Lease.

## ARTICLE 41 - Tenant's Property

Except for the **negligence or** willful misconduct of Landlord, its agents or employees, Landlord, its agents and employees shall not be liable, and Tenant waives all claims, for damage to persons, property and Tenant's business sustained by Tenant (or anyone claiming through Tenant) located on the Leased Premises. **Unless caused by the negligent or intentional act or omission of Landlord or any agent, representative, employee or contractor of Landlord or by the failure of Landlord to discharge its obligations under this Lease,** Property kept or stored on the Leased Premises shall be kept or stored at the sole risk of Tenant, and Tenant shall indemnify, defend and hold Landlord harmless from any claims arising out of damage to the same or damage to Tenant's business, including subrogation claims by Tenant's insurance carrier.

## ARTICLE 42 - Lease Status

Within ~~10~~ **30** days of Landlord's written request, Tenant shall without charge execute, acknowledge and deliver to Landlord an instrument required under this Lease or an instrument prepared by Landlord containing the commencement and termination dates of this Lease, the Rental Commencement Date, and if true, that (a) this Lease is a true copy of the Lease between the parties, (b) there are no amendments (or stating the amendments), (c) the Lease is in full force and effect and that, to the best of Tenant's knowledge, there are no offsets, defenses or counterclaims of rental or in the performance of the other covenants and conditions to be performed by Tenant, (d) no default has been declared by either party and that Tenant has no knowledge of any ~~facts or circumstances which it believes would constitute~~ a default by either party and (e) any other matters reasonably requested by Landlord **relating to the performance of Landlord and Tenant of their respective obligations under this Lease.** ~~Tenant shall remain liable to Landlord for damages sustained by Landlord because of the failure by Tenant to execute, acknowledge and deliver the instrument.~~ The failure of Tenant to execute, acknowledge and deliver the instrument shall be an acknowledgment by Tenant that the statements contained in the instrument are correct. Anyone transacting with Landlord shall have

the right to rely on the accuracy of the statements contained in the instrument, whether it is signed by Tenant or deemed acknowledged by Tenant pursuant to this ARTICLE 42.

## ARTICLE 43 - Recording

Tenant shall not record this Lease, a memorandum, "short form" or other reference to this Lease, without the written consent of Landlord.

## ARTICLE 44 - Force Majeure

If either party is delayed, hindered or prevented from the performance of an obligation because of strikes, lockouts, labor troubles, the inability to procure materials, power failure, restrictive governmental laws or regulations, riots, insurrection, war **, terrorism, act of God** or another reason not the fault of the party delayed, but not including financial inability, the performance shall be excused for the period of delay. The period for the performance shall also be extended for a period equal to the period of delay. **After the date that rent commences under ARTICLE 3,** Tenant shall not be excused from the prompt payment of rental, additional rental or other payments. It shall be a condition of Tenant's right to claim an extension that Tenant notify Landlord, in writing, within 10 days after the occurrence of the cause, specifying the nature of the cause and the period of time necessary for performance.

## ARTICLE 45 - Construction of Lease

Tenant has read and understands this Lease. The rule of construction that a document should be construed most strictly against the party which prepared the document shall not be applied, because both parties have participated in the preparation of this Lease.

## ARTICLE 46 - Security

(a)    Letter of Credit. The Security Deposit shall be in the form of a clean, irrevocable, non documentary and unconditional letter of credit (the "Letter of Credit") issued by and drawable upon any commercial bank which is a member of the New York Clearing House Association or other bank satisfactory to Landlord, trust company, national banking association or savings and loan association with offices for banking purposes in the City of Chicago (the "Issuing Bank"), which has outstanding unsecured, uninsured and unguaranteed indebtedness, or shall have issued a letter of credit or other credit facility that constitutes the primary security for any outstanding indebtedness (which is otherwise uninsured and unguaranteed), that is then rated, without regard to qualification of such rating by symbols such as "+" or " " or numerical notation, "Aa" or better by Moody's Investors Service and "AA" or better by Standard & Poor's Rating Service, and has combined capital, surplus and undivided profits of not less than $500,000,000. Such Letter of Credit shall (i) name Landlord as beneficiary, (ii) be in the amount of the Security Deposit, (iii) have a term of not less than one year, (iv) permit multiple drawings, (v) be fully transferable by Landlord without the payment of any fees or charges by Landlord, and (vi) otherwise be in form and content satisfactory to Landlord. Any fees or charges associated with the Letter of Credit, or any renewal thereof shall be the sole responsibility of Tenant. If upon any transfer of the Letter of Credit, any fees or charges shall be so imposed, then such fees or charges shall be payable solely by Tenant and the Letter of Credit shall so specify. The Letter of Credit shall provide that it shall be deemed automatically renewed, without amendment, for consecutive periods of one year each thereafter during the Term (and in no event shall the Letter of Credit expire prior to the 45th day following the Expiration Date) unless the Issuing Bank sends a notice (the "Non-Renewal Notice") to Landlord by certified mail, return receipt requested, not less than 45 days next preceding the then expiration date of the Letter of Credit stating that the Issuing Bank has elected not to renew the Letter of Credit. Landlord shall have the right, upon receipt of the Non-Renewal Notice, to draw the full amount of the Letter of Credit, by sight draft on the Issuing Bank, and shall thereafter hold or apply the cash proceeds of the Letter of Credit pursuant to the terms of this Lease, until Tenant delivers to Landlord a substitute Letter of Credit which meets the requirements of this ARTICLE 46. The Issuing Bank shall agree with all drawers, endorsers and bona fide holders that drafts drawn under and in compliance with the terms of the Letter of Credit will be duly honored upon presentation to the Issuing Bank at an office location in Chicago, Illinois. The Letter of Credit shall be subject in all respects to the International Standby Practices, International Chamber of Commerce, Publication No. 590.

(b)    Application of Security. If (i) an Event of Default by Tenant occurs in the payment or performance of any of the terms, covenants or conditions of this Lease, including the payment of Rent, or (ii) Tenant fails to make any installment of Rent as and when due, Landlord may apply or retain the whole or any part of the cash Security Deposit or may notify the Issuing Bank and thereupon receive all or a portion of the Security Deposit represented by the Letter of Credit and use, apply, or retain the whole or any part of such proceeds or the unused cash proceeds of a prior Letter of Credit, as the case may be, to the extent required for the payment of any Minimum Annual Rental or additional rent or any other sum as to which Tenant is in default including (i) any sum which Landlord may expend or may be required to expend by reason of Tenant's default, and/or (ii) any damages to which Landlord is entitled pursuant to this Lease, whether such damages accrue before or after summary proceedings or other reentry by

~~Landlord. If Landlord applies or retains any part of the Security Deposit, Tenant, upon demand, shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full Security Deposit on hand at all times during the Term. If Tenant shall comply with all of the terms, covenants and conditions of this Lease, the Security Deposit shall be returned to Tenant after the expiration date of the Letter of Credit and after delivery of possession of the Leased Premises to Landlord in the manner required by this Lease.~~

~~(c)    Transfer. Upon a sale or other transfer of the Shopping Center or the Leased Premises, or any financing of Landlord's interest therein, Landlord shall have the right to transfer the Security Deposit to its transferee or lender. With respect to the Letter of Credit, within 5 days after notice of such transfer or financing, Tenant, at its sole cost, shall arrange for the transfer of the Letter of Credit to the new landlord or the lender, as designated by Landlord in the foregoing notice or have the Letter of Credit reissued in the name of the new landlord or the lender. Upon such Transfer Tenant shall look solely to the new landlord or lender for the return of such Letter of Credit (or any unused cash proceeds of the Letter of Credit), and the provisions hereof shall apply to every transfer or assignment made of the Security Deposit to a new landlord. Tenant shall not assign or encumber or attempt to assign or encumber any Letter of Credit (or any unused cash proceeds of the Letter of Credit), and neither Landlord nor its successors or assigns shall be bound by any such action or attempted assignment, or encumbrance.~~

~~(d)    Neither Landlord's right to possession of the Leased Premises for non-payment of rental or for any other reason, nor any other right of Landlord, shall be affected because Landlord holds the deposit.~~

## ARTICLE 47 - Captions

Captions are for convenience and reference only. The words contained in the captions shall not be deemed to explain, modify, amplify or aid in the interpretation, construction or meaning of this Lease. The use of masculine or neuter genders shall include the masculine, feminine and neuter genders. The singular form shall include the plural if the context requires. "Landlord" and "Tenant" means "Landlord" and "Tenant" and "their agents and employees", unless the context requires otherwise.

## ARTICLE 48 - Severability

If any provision of this Lease or any paragraph, sentence, clause, phrase or word is judicially or administratively held invalid or unenforceable, that shall not affect, modify or impair any other paragraph, sentence, clause, phrase or word. The parties acknowledge that certain charges, fees and other payments are deemed "additional rental" in order to enforce Landlord's remedies, and shall not be construed to be "rent" if rent controls are imposed.

## ARTICLE 49 - Objection to Statements

Tenant's failure to object to a statement, invoice or billing within one year after receipt shall constitute Tenant's acquiescence. Tenant shall be required to provide Landlord with a specific and detailed list of Tenant's objections at the time Tenant makes its objection to Landlord. The statement, invoice or billing shall be an account stated between Landlord and Tenant. **Notwithstanding anything contained in this Lease to the contrary, Landlord's failure to provide any statement under this Lease or otherwise notify Tenant of an outstanding amount or adjustment within one (1) year after the charge has accrued or adjustment made, shall relieve Tenant of its obligations to satisfy the same.**

## ARTICLE 50 - Liability of Landlord

Landlord's liability under this Lease or arising out of the relationship of the parties shall be limited to Landlord's interest in the Shopping Center. Judgments rendered against Landlord shall be satisfied solely out of the **rents, profits, and** proceeds of the sale of Landlord's interest in the Shopping Center which have been received **or are receivable** by Landlord. No personal judgment shall apply against Landlord upon extinguishment of its rights in the Shopping Center. A personal judgment shall not create a right of execution or levy against Landlord's assets. The provisions of this ARTICLE 50 shall inure to Landlord's successors and assigns. These provisions are not designed to relieve Landlord from the performance of its obligations under this Lease, but to limit the personal liability of Landlord in case of a judgment against Landlord. Tenant's right to obtain injunctive relief or specific performance or to have any other right or remedy which may be awarded Tenant by law or under this Lease shall not be limited however. No personal liability is assumed by nor shall at any time be enforceable against Landlord.

## ARTICLE 51 - No Option

The submission of this Lease is not a reservation of or option for the Leased Premises or any other space in the Shopping Center, and vests no right in Tenant. This Lease shall become effective only upon proper execution and delivery by the parties.

## ARTICLE 52 - Execution of Documents

Tenant shall pay Landlord $400 ~~plus one month's installment of Minimum Annual Rental (plus charges, if any, from Landlord's mortgagee)~~ to reimburse Landlord for the administrative and legal expense for the review, preparation and processing of any document **(except for any document for which Landlord is entitled to a fee pursuant to ARTICLE 21(e) herein)** sent to Landlord at Tenant's request, whether or not the document is executed by Landlord, **when Landlord's consent is requested, required, or obtained.**

## ARTICLE 53 - Corporate Tenant

If Tenant is or will be a corporation or partnership or limited liability company of any kind, ~~the persons executing this Lease on behalf of~~ Tenant covenant**s** and represent**s** that Tenant is a duly incorporated or duly qualified (if foreign) corporation or partnership, as the case may be (including without limitation a limited liability corporation and a limited liability partnership) and is authorized to do business in the State where the Shopping Center is located (evidence shall be supplied Landlord upon request). Tenant also covenants and represents that the person or persons, partner or member executing this Lease on behalf of Tenant is (if a corporation) an officer of Tenant, and is (if a corporation or partnership of any kind) authorized to sign and execute this Lease.

## ARTICLE 54 - Printed Provisions

The printed provisions of this Lease and written or typed additions shall be given equal weight for the interpretation of this Lease. The deletion of any portion of this Lease shall not create an implication regarding the intent of the parties, and this Lease shall be read and interpreted as if the deleted portion had never been in this Lease.

## ARTICLE 55 - Entire Agreement

This Lease is the only agreement between the parties for the Leased Premises. An amendment, modification or supplement to this Lease shall not be effective unless it is in writing and executed by the parties.

## ARTICLE 56 - No Third-Party Rights

This Lease shall not confer rights or benefits, including third-party beneficiary rights or benefits to anyone that is not a named party to this Lease, including any individual, corporation, partnership, trust, unincorporated organization, governmental organization or agency or political subdivision.

## ARTICLE 57 - Financial Statements

(a)      Tenant acknowledges that it has provided Landlord with its financial statement or annual report ("Statement") and represents that the Statement is a primary inducement to Landlord's agreement to lease the Leased Premises to Tenant. Landlord has relied on the accuracy of the Statement in order to enter into this Lease. Tenant represents that the information contained in the Statement is true, complete and correct in all material aspects. This representation is a precondition to the Lease.

(b)      At the request of Landlord, unless Tenant is a publicly traded company, Tenant shall, not later than 30 days following such request, furnish to Landlord its most recent **unaudited financial statement that Tenant generally releases to third parties.** ~~balance sheet for at least the most recent fiscal year, a statement of income and expense for that year and an opinion of an independent certified public accountant satisfactory to Landlord (or a certificate of the chief financial officer, owner or partner of Tenant) indicating the financial statement has been prepared in conformity with generally accepted accounting principles consistently applied and fairly present the financial condition and results of the operations of Tenant for that year.~~

## ARTICLE 58 - Other Locations

If during the Term: (a) Tenant, its parent, subsidiary, franchisor, or franchisee, the Guarantor of this Lease; (b) any person, firm, corporation or other entity having a **controlling** ~~an~~ interest in any of the above parties; or (c) any other person, firm or corporation controlling or controlled by Tenant or any of the above parties, shall directly or indirectly, either individually or as a partner, shareholder, agent, employee or otherwise, own, operate, maintain or have an affiliation, investment or interest in a **retail business** ~~business similar to or in competition with the one operated at the Leased Premises~~ within the radius specified in Reference Provision 1.20 as measured from the perimeter of the Shopping Center (except those carried on **or those having executed leases** as of the Commencement Date) **and such business is operated under the same or substantially similar trade name as the Leased Premises are then being operated** then ~~that shall constitute a default. At Landlord's option, in addition to Landlord's other remedies,~~ the Net Sales from any other business within the specified radius shall be included in the Net Sales of the Leased Premises during each year. The Percentage Rental shall be computed on the aggregate of the annual Net Sales made on, in or from the Leased Premises and on, in or from any other business located within the radius. Tenant shall submit monthly sales statements and maintain records of the sales and transactions of the other business. Landlord shall have the right to examine and audit those statements and records as though they were made on, in or from the Leased Premises. A substantial increase in size or other substantial change in the business at locations in existence on the Commencement Date, or change in location to a location within the radius, shall remove the exemption created for that location. "Radius" shall mean a geometric measurement and not the actual distance over roads. **Notwithstanding the above radius restriction, if Tenant after the Commencement Date acquires a chain of stores as a result of an acquisition or merger or any transfer under the assignment and subletting provisions of the Lease, or is otherwise acquired by a chain, the leases attributable thereto shall not be subject to this Section. Further, this Section shall not apply to the expansion and/or relocation of any of the above stores within the same shopping center. The radius restriction shall not apply to (i) merchandise sold or licensed to others for resale; (ii) any sales in department stores or boutique stores or a department operating within department stores or other stores, (iii) sales of merchandise from Tenant's distribution or other corporate facilities, and (iv) outlet stores or merchandise sold in outlet or other discount stores.**

## ARTICLE 59 - Tenant's Failure

This Lease shall be governed by the laws of the State in which the Shopping Center is located and shall be deemed made and entered into in the county in which the Shopping Center is located. If Tenant fails to comply with and perform any of its covenants, conditions or agreements, Landlord shall have the right, but not be obligated **following the applicable notice and cure period,** to perform the covenants, conditions or agreements. Tenant shall pay to Landlord on demand as additional rental, a sum equal to the amount spent by Landlord for the performance, plus ~~15%~~ **10%** of such amount to defray supervision and overhead. If Landlord performs any covenants, conditions or agreements, Landlord, its agents or employees may enter the Leased Premises. That entry and performance shall not constitute an eviction of Tenant in whole or in part, nor relieve Tenant from the performance of the covenants, conditions and agreements. Landlord, its agents and employees shall not be liable for claims for **any non-negligent** loss or damage to Tenant or anyone claiming through or under Tenant.

## ARTICLE 60 - Ownership

(a)     If the ownership of the Shopping Center is in a Real Estate Investment Trust, then Landlord and Tenant agree that Minimum Annual Rental, Percentage Rental and all additional rental paid to Landlord under this Lease (collectively referred to in this Section as "Rent") shall qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations (the "Regulations"). Should the Code or the Regulations, or interpretations of them by the Internal Revenue Service contained in Revenue Rulings, be changed so that any Rent no longer qualifies as "rent from real property" for the purposes of Section 856(d) of the Code and the Regulations, other than by reason of the application of Section 856(d)(2)(B) or 856(d)(5) of the Code or the Regulations, then Rent shall be adjusted so that it will qualify (provided however that any adjustments required pursuant to this Section shall be made so as to produce the equivalent (in economic terms) Rent as payable prior to the adjustment).

(b)     Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or Landlord's affiliates or by one or more third parties hired by Landlord or Landlord's affiliates. Tenant agrees that upon Landlord's written request it will enter into direct agreements with the parties designated by Landlord to provide

such services, provided that no such contract shall result in Tenant having to pay, in the aggregate, more money for the occupancy of the Leased Premises under the terms of this Lease, or Tenant's receiving fewer services or services of a lesser quality than it is otherwise entitled to receive under the Lease **or increasing the obligations of Tenant under this Lease nor decreasing of the rights of Tenant under this Lease**.

### ARTICLE 61 - Special Provision

(a) ~~Tenant shall, in addition to the Net Sales reporting requirements contained in ARTICLE 6, separately state the gross taxable sales made during the preceding year for California state sales tax reporting purposes.~~ ~~Tenant waives the provisions of California Civil Code Sections 1941 and 1942 or any successor or similar legislation with respect to Landlord's obligations for tenantability of the Leased Premises and Tenant's right to make repairs and deduct the expenses of such repairs from rent or to vacate the Leased Premises.~~ ~~Tenant also waives the provisions of California Civil Code Section 1931(1), or any successor or similar legislation as to Tenant's right to terminate this Lease for landlord's failure to maintain or repair the Leased Premises.~~ Tenant waives the provisions of California Civil Code Sections 1932(2) and 1933(4), or any successor or similar legislation, with respect to any damage or destruction of the Leased Premises. Any notice other than as specifically set forth in ARTICLE 23 shall be in lieu of and not in addition to any notice required under California Code of Civil Procedure Section 1161 or any similar or successor statute. Each party waives the provisions of California Code of Civil Procedure Section 1265.130, or any successor or similar legislation, allowing the Superior Court upon petition of either party to terminate this Lease for a partial taking of the Leased Premises.

The exhibits are incorporated by reference into this Lease.

If Tenant is a CORPORATION, the authorized signatory shall sign on behalf of the corporation and indicate the capacity in which they are signing. The Lease must be executed by the president ~~or vice president and attested by the secretary or assistant secretary~~, unless the bylaws or a resolution of the board of directors provides otherwise. In that case, the bylaws or a certified copy of the resolution shall be attached to this Lease. ~~The appropriate corporate seal must be affixed to the Lease.~~

**TENANT:**

ANGL, INC., a California corporation

dba "ANGL"

By:_____
          Authorized Signatory

**LANDLORD:**

**GLENDALE II MALL ASSOCIATES, LLC,**
**a Delaware** limited liability company

By:_____
          Authorized Signatory

**AFFIDAVIT**

The undersigned has signed a Lease dated ___May 4___, 20_11_, with **GLENDALE II MALL ASSOCIATES, LLC, a Delaware limited liability company** for the occupancy of Space No. 0FU01 **GLENDALE GALLERIA**. The Lease business terms were negotiated with **ERIKA PLUMMER**, as representative of the Landlord. No representative, agent or employee of the Landlord represented, suggested, promised or implied that the undersigned would be given an exclusive use in the Shopping Center for the operation of the business to be conducted in the Leased Premises, or that the Landlord would not lease space in the Shopping Center to a competing or other tenant. Nor has any representative, agent or employee of Landlord made any representations, inducements or promises about the Leased Premises or the entry into the Lease, unless expressly in the Lease. Nor has any representative, agent or employee made any representations, inducements or promises about the characteristics or conditions regarding or pertaining to the Leased Premises or the Shopping Center, unless expressly in the Lease. The undersigned has independently investigated the potential for the success of its operations in the Shopping Center and has not relied upon any representations, inducements or promises by Landlord's representatives, agents or employees, other than those contained in the Lease.

TENANT:    ANGL, INC.
d/b/a:      **ANGL**

By:

Its: _Jeff Sunghak Kim - President_

Sworn to before me this _25th_ day of _April_, 20_11_.

_____
Notary Public

STEPHEN N. CHO
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMMISSION # 1843704
MY COMM. EXPIRES MAY 6, 2013



SPACE # FU01
1779 SQ. FT.

TARGET
3 FLOORS

BUILDING "AU"

BUILDING "BU"

BUILDING "HU"

JCPenney
2 FLOORS

BUILDING "CU"

BUILDING "DU"

N

BUILDING "GU"

BUILDING "FU"

BUILDING "EU"

MACY'S
3 FLOORS

NOTE:
EXHIBIT A IS FOR INFORMATIONAL PURPOSES. ONLY AND IS INTENDED ONLY AS A GENERAL DESCRIPTION OF EXISTING OR CONTEMPLATED IMPROVEMENTS TO BE MADE AS A
PART OF THE SHOPPING CENTER, PROVIDED THAT LANDLORD MAKES NO REPRESENTATION THAT ANY FUTURE DEVELOPMENT WILL OCCUR AS SHOWN.

SPECIFIC NAMES, LOCATIONS, DIMENSIONS OF ANY STORES, ENTRANCES, OR IMPROVEMENTS ARE NOT INTENDED TO BE, NOR SHOULD BE RELIED UPON AND ARE SUBJECT
TO CHANGE, MODIFICATION AND DELETION BY LANDLORD OR OTHER PARTIES, AND ARE NOT A REPRESENTATION OF, OR WARRANTY AS TO THE OPENING OR CONTINUED
OPERATION OF ANY STORE NAMED OR DEPICTED IN THIS EXHIBIT A.

UPPER-LEVEL

EXHIBIT A

GLENDALE GALLERIA
GLENDALE, CALIFORNIA

GENERAL GROWTH
110 NORTH WACKER DRIVE, CHICAGO, IL 60606



NOTE:
LANDLORD DOES NOT GUARANTEE THAT INTERNAL CHANGES HAVE NOT OCCURRED SINCE THESE PLANS HAVE BEEN PREPARED, AND RECOMMENDS THAT THIS SPACE BE FIELD VERIFIED BY THE TENANT TO ENSURE THE ACCURACY OF THESE DRAWINGS.
ALL TENANT LEASE AREAS ARE MEASURED FROM THE CENTERLINE OF INTERIOR PARTITION, FROM THE OUTSIDE FACE OF EXTERIOR WALL, FROM THE FULL THICKNESS OF CORRIDOR AND SHAFT WALLS AND FROM THE EDGE OF SLAB AT ANCHOR STORE WALL.

| TENANT: ANGL | | DATE: 02/08/11 | NOT TO SCALE |
| --- | --- | --- | --- |
| SPACE #: FU01 | AREA: 1779 | DRAWN BY: NAP | |

| EXHIBIT A-1 | GLENDALE GALLERIA<br>GLENDALE, CALIFORNIA | GENERAL GROWTH<br>110 NORTH WACKER DRIVE, CHICAGO, IL 60606 |
| --- | --- | --- |

TARGET
3 FLOORS

BUILDING "AU"

BUILDING "BU"

BUILDING "HU"

JCPenney
2 FLOORS

BUILDING "CU"

BUILDING "DU"

BUILDING "OU"

BUILDING "IU"

BUILDING "EU"

MACY'S
3 FLOORS

RELOCATION ZONE

NOTE:

EXHIBIT A IS FOR INFORMATIONAL PURPOSES  ONLY AND IS INTENDED ONLY AS A GENERAL DESCRIPTION OF EXISTING OR CONTEMPLATED IMPROVEMENTS TO BE MADE AS A
PART OF THE SHOPPING CENTER, PROVIDED THAT LANDLORD MAKES NO REPRESENTATION THAT ANY FUTURE DEVELOPMENT WILL OCCUR AS SHOWN.

SPECIFIC NAMES, LOCATIONS, DIMENSIONS OF ANY STORES, ENTRANCES, OR IMPROVEMENTS ARE NOT INTENDED TO BE, NOR SHOULD BE RELIED UPON AND ARE SUBJECT
TO CHANGE, MODIFICATION AND DELETION BY LANDLORD OR OTHER PARTIES, AND ARE NOT A REPRESENTATION OF, OR WARRANTY AS TO THE OPENING OR CONTINUED
OPERATION OF ANY STORE NAMED OR DEPICTED IN THIS EXHIBIT A.

**UPPER-LEVEL**

M:\ORC\Teams\Development Teams\CAD_Centers\Mall Plans\CALIFORNIA\GLENDALE GALLERIA\Exhibits\3802-EU01.dwg 2/8/2011 Pyzik, Natalie A.

| EXHIBIT A-2 | GLENDALE GALLERIA<br>GLENDALE, CALIFORNIA |  GENERAL GROWTH<br>110 NORTH WACKER DRIVE, CHICAGO, IL 60606 |

M:\ORG\Teams\Development Teams\CAD_Centers\Mall Plans\CALIFORNIA\GLENDALE GALLERIA\Exhibits\3802-FU01.dwg 2/8/2011 Pyjik, Natalie A.

TARGET
3 FLOORS

BUILDING "A"

BUILDING "B"

BUILDING "H"

JCPenney
2 FLOORS

FOODCOURT

BUILDING "C"

BUILDING "G"

N

GRAPHIC SCALE

BUILDING "D"

BUILDING "F"

BUILDING "E"



RELOCATION ZONE

MACY'S
3 FLOORS

NOTE:
EXHIBIT A IS FOR INFORMATIONAL PURPOSES. ONLY AND IS INTENDED ONLY AS A GENERAL DESCRIPTION OF EXISTING OR CONTEMPLATED IMPROVEMENTS TO BE MADE AS A
PART OF THE SHOPPING CENTER, PROVIDED THAT LANDLORD MAKES NO REPRESENTATION THAT ANY FUTURE DEVELOPMENT WILL OCCUR AS SHOWN.

SPECIFIC NAMES, LOCATIONS, DIMENSIONS OF ANY STORES, ENTRANCES, OR IMPROVEMENTS ARE NOT INTENDED TO BE, NOR SHOULD BE RELIED UPON AND ARE SUBJECT
TO CHANGE, MODIFICATION AND DELETION BY LANDLORD OR OTHER PARTIES, AND ARE NOT A REPRESENTATION OF, OR WARRANTY AS TO THE OPENING OR CONTINUED
OPERATION OF ANY STORE NAMED OR DEPICTED IN THIS EXHIBIT A.

LOWER LEVEL

EXHIBIT A-2

GLENDALE GALLERIA
GLENDALE, CALIFORNIA

GENERAL GROWTH
110 NORTH WACKER DRIVE, CHICAGO, IL 60606



VICINITY MAP

SITE PLAN

NOTE:

EXHIBIT B IS FOR INFORMATIONAL PURPOSES ONLY AND IS INTENDED ONLY AS A GENERAL DESCRIPTION OF EXISTING OR CONTEMPLATED IMPROVEMENTS TO BE MADE AS A PART OF THE SHOPPING CENTER, PROVIDED THAT LANDLORD MAKES NO REPRESENTATION THAT ANY FUTURE DEVELOPMENT WILL OCCUR AS SHOWN.

SPECIFIC NAMES, LOCATIONS, DIMENSIONS OF ANY STORES, ENTRANCES, OR IMPROVEMENTS ARE NOT INTENDED TO BE, NOR SHOULD BE RELIED UPON AND ARE SUBJECT TO CHANGE, MODIFICATION AND DELETION BY LANDLORD OR OTHER PARTIES, AND ARE NOT A REPRESENTATION OF, OR WARRANTY AS TO THE OPENING OR CONTINUED OPERATION OF ANY STORE NAMED OR DEPICTED IN THIS EXHIBIT B.

| EXHIBIT B | GLENDALE GALLERIA | GENERAL GROWTH |
|---|---|---|
| | GLENDALE, CALIFORNIA | 110 NORTH WACKER DRIVE, CHICAGO, IL 60606 |

**DESCRIPTION LANDLORD/TENANT WORK**

**EXHIBIT C**

**ALL TENANTS**

**GLENDALE GALLERIA**
**GLENDALE, CALIFORNIA**

Tenant accepts the Leased Premises in its "as-is" condition **subject, however, to the other provisions of this Lease.** Tenant, at Tenant's expense, shall complete any improvements that may be required for Tenant's use of the Leased Premises. If Tenant's design is not feasible with the existing utility locations, such as mechanical, electrical, plumbing or fire protection, any alterations to the existing utility locations shall be completed by Tenant at Tenant's expense, subject to Landlord's prior approval. **Notwithstanding anything to the contrary herein, Tenant may reuse, at its sole risk, any existing facilities located within the Leased Premises provided same are in good condition or are put in good condition by Tenant.** All such work shall be in accordance with this Exhibit "C", the Tenant Criteria Manual and other information contained within the Tenant Package reference below. All work to be performed by Landlord in delivering the Leased Premises to Tenant shall be limited to those items expressly set forth in Exhibit "C" and Article 2 of the Lease, some of which may be performed by Landlord on behalf of, and for Tenant as is more fully described herein. **In the event of any conflict or inconsistency between the terms and provisions of the Lease, the Exhibits and the final plans approved by Landlord, then the approved final plans shall prevail.**

A.    **TENANT PACKAGE**

   Tenant Package   Landlord shall provide a "Tenant Package" to better identify the Leased Premises and provide details in describing conditions of the shell structure. This package may contain such items as:

   a.    Lease exhibit drawing indicating approximate Leased Premises.

   b.    Dimensional floor plan drawings, if available. Tenant shall not rely on such plans or drawings and must field-verify physical dimensions and existing conditions in the Leased Premises prior to and during Tenant Work (defined in ARTICLE 2 of the Lease).

   c.    Criteria Manual containing Tenant-required drawing submissions information, sign criteria, architectural, electrical and mechanical information necessary for the preparation of Tenant's plans, typical detail sheets, and other information.

   d.    By the execution of Tenant's Lease, Tenant acknowledges receipt of the Tenant Package and by this reference, it is incorporated in the Lease.

B.    **TENANT PLAN SUBMITTAL REQUIREMENTS**

   1.    Tenant Working Drawings
         Tenant shall provide working drawings consisting of architectural, mechanical, electrical, plumbing, structural, life safety, specifications and supporting calculation data, prepared by a registered architect and licensed engineer of the state in which the Shopping Center is located as deemed necessary by Landlord. Refer to Tenant Package for details. Tenant agrees to comply with the schedule set forth in 2 below.

   2.    Tenant Plan Submittal & Additional Requirements
         a.    By the submittal date for preliminary plans and specifications specified in the Reference Provisions, Tenant agrees to notify Landlord of the identity and mailing address of the licensed architect engaged by Tenant for the preparation of plans for Tenant's Work. At the same time Tenant, at Tenant's expense, shall cause Tenant's architect to prepare and deliver to Landlord for Landlord's approval one (1) preliminary drawing submittal for Tenant's Work, adhering to the requirements as described in the Tenant Package.

         b.    If Tenant does not furnish Landlord with the identity of Tenant's architect or furnish Landlord with drawings and specifications by the required date, Landlord shall have the right, in addition to any other right or remedy at law or in equity, to cancel and terminate this Lease by written notice to Tenant. Landlord shall in addition to all other remedies, be entitled to retain and have recourse to any bond, deposit or advance rental previously deposited by Tenant under this Lease as liquidated damages.

         c.    By the submittal date for final plans and specifications specified in the Reference Provisions, Tenant, at Tenant's expense, shall cause Tenant's architect to prepare and

deliver to Landlord for Landlord's approval three (3) sets of final working drawings and specifications for Tenant's Work, adhering to the requirements as described in the Tenant Package.

d.   Landlord shall review Tenant's drawings and specifications and notify Tenant within ~~15~~ **10** days of their receipt if they do not meet with Landlord's approval **subject to the other provisions of this Lease**. Tenant shall, within 10 days of the receipt of notification, revise and resubmit the drawings and specifications **to the permitting authority**. When Landlord has approved Tenant's drawings and specifications, Landlord shall initial and return one (1) set of approved drawings to Tenant **or "approved as noted" drawings**. That set shall show the date of Landlord's approval, and shall be made a part of this Lease as "EXHIBIT P." **Landlord shall not unreasonably disapprove any elements of Tenant's then prototype for the chain.**

e.   If any changes and/or revisions are made in Tenant's working drawings and specifications after Landlord's initial approval, Tenant shall deliver to Landlord one set of revised working drawings and specifications for additional approval.

f.   No approval by Landlord shall be valid unless signed in writing by Landlord or Landlord's representative.

g.   Tenant shall prepare its plans and perform Tenant's Work in compliance with Landlord's requirements, governing statutes, ordinances, regulations, codes and insurance rating boards. ~~Tenant shall pay Landlord for review of final plans at the rate of $0.50 per square foot of space in the Leased Premises, plus $0.25 per square foot for each required additional review of final plans.~~ Landlord's approval does not relieve Tenant of its obligation to complete Tenant's Work in accordance with the terms of the Lease, nor of the necessity of Tenant's compliance with the laws, rules, regulations and ordinances of local governing authorities.

h.   Any approval by Landlord or Landlord's architect shall neither obligate Landlord in any manner whatsoever with respect to the finished product, design and/or construction by Tenant nor be deemed to be a modification or amendment to the provisions of the Lease **but shall evidence that Tenant's plans or construction, as the case may be, are in compliance with the Lease.** Any deficiency in design or construction, with or without prior approval of Landlord, shall be solely the responsibility of Tenant. Tenant shall be solely responsible for corrections in Tenant's Work and its working drawings and specifications required by governmental authority.

i.   Notwithstanding anything to the contrary contained in this Lease, Tenant shall comply with the Americans with Disabilities Act of 1990 ("ADA"), and any amendment to the ADA, as well as applicable state, local laws, regulations, ordinances and independent inspections. Compliance will include, but not be limited to, the design, construction, and alteration of the Leased Premises as well as access to, employment of and service to individuals covered by the ADA, **but shall be limited to the Leased Premises and within 5 feet of the storefront.** ~~Upon completion of work, Tenant's or Tenant's architect must supply to Landlord a letter, satisfactory to Landlord, stating that the Leased Premises have been designed and constructed in accordance with and are in compliance with the ADA.~~

j.   Within ~~10~~ **60** days after opening for business in the Leased Premises, Tenant shall provide Landlord with one set of **record** "~~as-built~~" drawings and specifications indicating the changes from EXHIBIT P made during the performance of Tenant's Work. **Record** ~~As-built~~ drawings shall accurately locate all underground utilities and equipment installed. **Record** ~~As-built~~ drawings shall be delivered to Landlord prior to final inspection of the Leased Premises.

## C.    STRUCTURE

1.    <u>Building Shell</u>

a.   Landlord may provide, at its option, a concrete floor slab within the interior of the Leased Premises at Tenant's expense. ~~In the event Landlord provides a concrete floor slab based on the area of the Leased Premises, Tenant shall pay Landlord $3.00 per square foot for concrete slab.~~ Such concrete slab shall be installed in accordance with the requirements as described in the Tenant Criteria Manual. Any tenant whose requirements exceed the designed live load shall furnish Landlord with load information prepared by a licensed structural engineer. At Landlord's option, Landlord may, at Tenant's expense, submit structural information to its engineer for verification.

b.   Tenant is responsible for maintaining the integrity of the concrete slab. Any alterations to Landlord's slab shall be executed in accordance with the requirements described in the Tenant Criteria Manual.

c.   Upper and lower level suspended slab floor penetrations shall be core-drilled; no saw cutting or trenching is permitted. All floor penetrations shall be sleeved and sealed as required in the Tenant Criteria Manual.

d.   Structural modifications and or additions by Tenant to Landlord's structure is subject to Landlord's prior approval. Tenant shall submit structural calculations, which have been prepared by a licensed structural engineer, to Landlord for review by Landlord's engineer, at Tenant's expense.

2.   <u>Roof Penetrations</u>
Roof penetrations by Tenant shall be held to a minimum. Penetrations, flashing and patching of the roofing system shall be made by Landlord's roofing contractor, subject to Landlord's prior approval **not to be unreasonably withheld.** ~~, at Tenant's expense.~~ Any structural framing or structural calculations required by Landlord as a result of Tenant's roof penetrations shall be performed at Landlord's option by Landlord's contractor, at Tenant's expense **provided the cost thereof is comparable with the cost charged for similar services with similar equipment by other reputable contractors servicing the geographical area in which the Shopping Center is located.** Any associated curbs, rails, skids, etc. which can impact the roof system shall be designed in accordance with the manufacturer's recommendations and installed by Landlord's approved roofing contractor, at Tenant's expense **provided the cost thereof is comparable with the cost charged for similar services with similar equipment by other reputable contractors servicing the geographical area in which the Shopping Center is located.**

3.   <u>Waterproof Membrane</u>
All food tenants, high water use tenants such as, beauty salons, pet stores, etc., lower and upper level tenants whose design includes water being present, such as in kitchens or restrooms, shall install and maintain a waterproof membrane approved by Landlord throughout the Leased Premises. A water test shall be performed by Tenant. Tenant is responsible for maintaining liquid-tight capacities of the floor and other boundaries of the Leased Premises.

4.   <u>Fireproofing</u>
Landlord may provide, at its option, fire retardant material on its structure within the Leased Premises. Tenant shall be required to protect fireproofing and damage to fireproofing shall be repaired by Tenant as necessary to meet the requirements and recommendations of applicable code and local inspectors, at Tenant's expense.

## D.   STOREFRONTS

1.   <u>Neutral Piers and Bulkhead</u>
Landlord may provide, at its option, vertical neutral surfaces or structural columns at the lease line separating Tenant storefront construction from another adjacent space. ~~Tenant shall pay Landlord $200.00 for neutral piers and $6.50 per lineal foot of bulkhead soffit.~~ The storefront area will be left open for Tenant construction between the edges of the neutral surfaces and between the mall finished floor and the underside of the horizontal soffit.

2.   <u>Additional Storefront Requirements</u>
a.   Landlord has established design criteria regulating materials and construction of the storefronts and signage so that tenant storefronts contribute to the overall design concept of the Shopping Center. In order to contribute to this theme, the overall storefront design must conform to the design criteria as described in the Tenant Criteria Manual. Landlord has the right to reject storefronts which do not meet the design criteria and to accept and approve unusual designs that deviate from the required criteria, all at Landlord's sole discretion, **subject to the other provision of this Lease.**

b.    Tenant is responsible for constructing a complete storefront to the full height and for making a suitable attachment or termination of construction to the bulkhead soffit and proper closure against each neutral pier. Refer to Tenant Criteria Manual for details. Tenant shall be solely responsible for the repair of damage it causes to Landlord's finish material.

c.    Tenant's storefront shall be self-supporting. Limited lateral bracing is permitted from Landlord's structure. The storefront or any part of the interior cannot be suspended from Landlord's bulkhead framing or structure.

## E.    DEMISING WALLS AND EXITS

1.    Demising Walls

a.    Landlord shall provide light gauge metal studs or unfinished masonry separating the Leased Premises from adjacent space. ~~Tenant shall pay Landlord $10.00 per linear foot for demising partitions.~~

b.    Tenant is responsible for furnishing gypboard on all demising partitions and surfaces in accordance with code and as described in the Tenant Criteria Manual.

c.    Tenants are prohibited from allowing music or other sounds to emanate from their space into an adjacent Tenant space or into the mall common area. Tenants who generate sound levels greater than 40 decibels, or as otherwise deemed necessary by Landlord, shall insulate their space against sound transmission. Methods to prevent sound transmission must be thoroughly detailed on Tenant's plans and is subject to Landlord's approval, as described in the Tenant Criteria Manual.

d.    Tenant is responsible for providing Landlord with anticipated load and weight calculations for any wall hung fixtures. If Landlord deems necessary, Tenant shall provide backing and bracing support to demising walls to compensate for loading imposed by Tenant's wall-hung fixtures at Tenant's expense.

e.    Tenant is responsible for the construction of any wall in which an expansion joint occurs, the construction of such wall shall be in accordance with acceptable construction design practices and applicable codes.

2.    Service Doors
Tenant is responsible for furnishing and installing a service door connecting to service corridors or mall exterior service areas. The door shall comply with applicable code requirements and Landlord requirements as described in the Tenant Criteria Manual. **Tenant may reuse any existing service door provided such complies with applicable building/safety codes.** ~~In the event Landlord has installed any such doors, frames and hardware, then Tenant shall reimburse Landlord for the cost thereof at $1000.00 per door.~~

3.    Exit Requirements
Tenant is responsible for providing all exit requirements and exit identifications within the Leased Premises in accordance with requirements of applicable code and subject to approval by the local building authority.

## F.    INTERIOR FINISHES, FURNISHINGS AND EQUIPMENT

1.    Floor Finish
Tenant is responsible for all floor finish covering materials for the Leased Premises and shall make a smooth, level transition with the mall floor at the lease line. In the event that Tenant is required to match Landlord's floor tile at Tenant's lease line and closure line, Tenant shall pay Landlord $15.00 per square foot for Landlord selected floor tile **not to exceed Landlord's actual cost**. Tenant shall protect and repair any damage to Landlord's floor finish material **caused by Tenant or its contractors or agents**, at Tenant's expense.

2.    Wall Finish
Tenant is responsible for the installation of finished walls on the demising partitions, including any necessary additional supports, wall blocking, fire tapping and wall finishes, at Tenant's expense.

3.    Ceilings
Ceiling height limitations are created by existing conditions and floor-to-floor heights vary throughout the Shopping Center. Where building conditions permit, higher ceilings may be allowed with the written approval of Landlord. Any relocation of or modification to existing

piping, conduit and/or ductwork necessitated by Tenant's installation of a ceiling shall be at Tenant's expense. If the area above the ceiling is a return air plenum, ceilings are required throughout the Leased Premises including, without limitation, stock and toilet rooms.

4. <u>Access Panels</u>
Tenant is responsible for providing access panels throughout the Leased Premises. Tenant shall at minimum provide 24" x 24" flush mount access panels in the ceiling within the Leased Premises at dampers, HVAC equipment and elsewhere as required by Landlord or as required by code in order to provide access to the equipment.

5. <u>Furnishings and Equipment</u>
Tenant is responsible for furnishing and installing all fixtures, furnishings, equipment, shelving, trade fixtures, leasehold improvements, interior decorations, graphics, signs, mirrors, coves and decorative light fixtures and other special effects, as first approved and permitted by Landlord and in accordance with all applicable federal, state, local laws, regulations and ordinances.

## G.   SIGNAGE

1. <u>Tenant Signage Submittal</u>
   a. Tenant shall submit sign manufacturer's shop drawings to Landlord depicting sign, lettering dimensions, overall dimensions, color, materials, mounting details, quantities and location of the sign in relation to each elevation, as described in the Tenant Criteria Manual. Signs, permits and related or resulting construction shall be Tenant's responsibility. All signs shall be installed under the supervision of Landlord. The sign contractor shall repair any damage caused by its work.

   b. Landlord's final written approval is required prior to sign fabrication **not to be unreasonably withheld**. Tenant shall not be permitted to open for business in the Leased Premises without a sign that has been approved in writing by Landlord and which conforms to applicable building and electrical codes.

2. <u>Interior Signage Requirements</u>
   a. No signage shall be applied to storefront or hung within 4'-0 **2'** from the lease line without Landlord's written approval. Refer to Tenant Criteria Manual for additional information.

   b. No signs shall be allowed beyond the lease line without Landlord's written approval.

   c. No flashing, action, moving or audible signs are permitted.

   d. No television or projection screens are permitted within 15 feet of the lease line without Landlord's written approval, **not to be unreasonably withheld**.

   e. Signs may be vertical, horizontal, and be illuminated. Multiple signing may be permitted on multi-directional storefronts but only with Landlord's prior written approval.

   f. The length of horizontal lettering shall not exceed 50% of the horizontal storefront length. The proportional ratio of the proposed signage length to the overall horizontal storefront length shall be left to the sole discretion of Landlord.

   g. Landlord reserves the right to regulate signage location throughout the mall and near Anchor stores.

   h. Wording is limited to the trade name of the store. Landlord shall review logos on a case-by-case basis.

   i. Sign shall be on a timer set to illuminate during mall hours.

   j. No sign manufacturer's identification, decals or registered trademark shall be permitted.

   k. Tenant shall keep the sign in good repair at all times.

## H.   HEATING VENTILATION AND AIR CONDITIONING

1. <u>Landlord provided Heating, Ventilation and Air Conditioning System, "HVAC System"</u>
Landlord may provide, at its option **(unless Tenant otherwise elects to purchase its own**, the HVAC system to the Leased Premises, as defined in the Tenant Criteria Manual. Tenant is responsible for design and installation, at its sole expense, of the mechanical system within the Leased Premises from Landlord's distribution point.

2. <u>Tenant provided Roof Top Unit, "RTU System"</u>

a.    Tenant may, at its sole expense, upon prior written approval of Landlord, install and operate a supplemental RTU System on the roof of the Shopping Center. The RTU System shall supplement, and not replace, any existing air conditioning unit, and shall be compatible with the Landlord-provided air conditioning system in all respects including, but not limited to, roof integrity, structure, air flow, electric load, life safety alarm system and utility capacity.

b.    In the event Landlord does not provide the HVAC system, Tenant is required to design and install the RTU System to the Leased Premises as defined in the Tenant Criteria Manual.

c.    Landlord may provide, at its option, universal roof supports for roof-mounted equipment. Tenant shall reimburse Landlord for all **reasonable and competitive** associated costs.

d.    Tenant shall locate the RTU System and provide structural modifications in order to comply with the Shopping Center's structural load limits. Tenant shall submit structural calculations, which have been prepared by a licensed structural engineer, to Landlord for review by Landlord's engineer, at **Landlord's** ~~Tenant's~~ expense. Landlord may require modifications to Tenant's design and construction.

e.    Tenant shall not install or operate the RTU System without the prior written approval of Landlord, **not to be unreasonably withheld.** Tenant shall not enter the roof without prior permission from a representative of Landlord, **not to be unreasonably withheld**.

f.    Tenant shall supply Landlord with maintenance agreements, plans and specifications for the installation and operation of the RTU System.

g.    Notwithstanding anything to the contrary contained in the Lease, Tenant shall have no right to an abatement, deduction or set-off in rental if Tenant's RTU System is or becomes inoperable.

3.    <u>Additional Tenant Requirements</u>

a.    Tenant is responsible for providing the mechanical system within the Leased Premises, including but not limited to maintenance, supply metal ductwork, grilles, registers, electrical wiring, controls, heating, heat detection and circuitry necessary for the satisfactory operation of an air conditioning system. Refer to Tenant Criteria Manual for details.

b.    Tenant is responsible for the design of all ductwork and accessories for air distribution in accordance with the procedures described in the American Society of Heating, Refrigerating, and Air Conditioning Engineering Guide ("ASHRAE"), and in accordance with the latest methods recommended in the Sheet Metal and Air Conditioning Contractors National Association ("SMACNA") low velocity duct manual, and as otherwise set forth by code.

c.    In the event Landlord provides a pre-approved mechanical contractor, Tenant will be required to use Landlord's contractor for the ~~purchase and~~ installation of Tenant's HVAC unit, heating & cooling equipment and HVAC curb, all at Tenant's sole expense **provided the cost thereof is comparable with the cost charged for similar services with similar equipment by other reputable contractors servicing the geographical area in which the Shopping Center is located.** Refer to Tenant Criteria Manual for details. **Tenant shall not be obligated to purchase the HVAC unit from Landlord.** Refer to Tenant Criteria Manual for details.

d.    Tenant is responsible for providing the Leased Premises with its own thermostat(s) in accordance with the requirements of the Tenant Criteria Manual.

e.    Tenant shall provide plans, specifications and calculations required in connection with the installation and operation of Tenant's HVAC System. Any review of the plans, specifications and calculations performed by Landlord or Landlord's engineer, as Landlord deems necessary, shall be at Tenant's expense.

f.    Tenant is required to route HVAC condensation lines as directed by code and the mall on-site representative.

g.    Tenant is responsible for providing Landlord copies of air test and balance reports upon completion of work.

h.     Tenant shall reimburse Landlord, at Landlord's option, for any measurement system(s) required by Landlord for measuring Tenant's consumption of conditioned air.

i.     Landlord may provide, at its option, a smoke evacuation and control system within the Leased Premises. ~~In the event Landlord provides a smoke evacuation and control system, Tenant shall pay Landlord $3.00 per square foot.~~

j.     Tenants HVAC System and related rooftop equipment must be compatible with Landlord's life safety/ smoke exhaust system. Alterations to and interface with Landlord's life safety/smoke exhaust system shall be by Landlord's contractor at Tenant's sole expense **but reasonable and competitive**.

k.     Tenant may be required to provide and install, at Tenant's expense, heat or smoke detectors within the Leased Premises to shut down the heating, air conditioning and ventilation whenever an abnormal condition is detected. In addition, these devices may be required by local code authorities as part of the fire prevention smoke removal system. Refer to Tenant Criteria Manual for details.

l.     Landlord shall have the right to require Tenant to cease operation of the Tenant's HVAC System if it is causing damage to any of the structural or mechanical elements of the Shopping Center, interfering with or diminishing any service provided by Landlord or others, or interfering with any other tenant's business.

## I.     TOILET EXHAUST SYSTEM

a.     Landlord may provide, at its option, a common toilet exhaust system to the Leased Premises, as defined in the Tenant Criteria Manual. Tenant shall design and install a toilet exhaust system and connect to Landlord's exhaust duct system within the Leased Premises.

b.     In the event Landlord does not provide the common toilet exhaust system, Tenant is required to design and install the exhaust system for the Leased Premises, per code and as defined in the Tenant Criteria Manual.

## J.     SPECIAL EXHAUST AND MAKE-UP AIR SYSTEMS

1.     Special Exhaust Systems
Odors produced by tenants such as food service, beauty salons, pet shops, etc. must be exhausted to the atmosphere through a tenant-furnished exhaust system. Tenant shall design and install an engineered exhaust and make-up air system to maintain a negative pressure in the Leased Premises to keep odors from disturbing Landlord, customers and other tenants. The location and minimum distance of exhaust fans from any air intakes shall be as directed by Landlord and in accordance with applicable code. Refer to Tenant Criteria Manual for details.

2.     Make-Up Air Systems
Make-up air systems as referenced in 1 above shall be furnished and installed by Tenant, upon Landlord's approval, utilizing secondary mall air. If Tenant uses more than 10% of Landlord's air supply for Tenant's special exhaust system, Tenant shall be responsible for an adjusted operating charge.

3.     Exhaust Discharge
a.     Tenant is responsible for providing mushroom-type exhaust discharge outlets. All roof-mounted equipment shall be approved by Landlord and installed on curbs per the specifications in the Tenant Criteria Manual. All roof flashing shall be performed by Landlord's roofing contractor at Tenant's expense. Projections above 3'-0" will require approval by Landlord and may require additional screening by Tenant.

b.     Tenant shall provide a residue trough grease containment system, approved by Landlord, on all roof-mounted grease exhaust discharge equipment. The containment system shall be cleaned and replaced on a regular basis.

4.     Damper Control and Interlock
Tenant shall provide damper controls with automatic fan shutdown and interlock to maintain the original design air balance approved by Landlord and in accordance with applicable code. The control system must be able to shut down its fans in case of fire.

## K.     UTILITIES

1.     Electric Service
a.     Landlord shall provide the main electric distribution system as more fully described in the Tenant Criteria Manual.

b.      Landlord may provide, at its option, an empty electrical conduit to the Leased Premises and associated electrical equipment serving the Leased Premises. ~~In the event Landlord provides electrical conduit and equipment, Tenant shall pay Landlord $800.00 for the empty electrical conduit and $2,500.00 for electrical equipment.~~

c.      ~~In the event Landlord provides a Cable Tap Box assembly ("CTBA") switch terminal to the Leased Premises, Tenant shall pay Landlord $2,500.00.~~

d.      ~~Landlord will furnish electric service within the Leased Premises of not more than 15 watts per square foot. Tenant's electrical requirements for the space shall be determined from Tenant's electrical engineering plans in accordance with the National Electrical Code ("NEC"). If the electrical service described above exceeds the minimum electric service required by the NEC and as Tenant's plans indicate, Tenant shall relinquish to Landlord such excess service. Electrical system within the Leased Premises shall be "as-is" with all electrical upgrades and modifications by Tenant at Tenant's expense, upon Landlord's approval.~~

2.    <u>Tenant Electrical Requirements</u>

a.      Tenant is responsible for providing a complete electrical system from Landlord's distribution point within the Leased Premises. This shall include, but not be limited to, all necessary labor, branch and main circuit breakers, panels, transformers, connection to HVAC power supply, temperature controls and connection to Landlord's smoke detector or smoke evacuation system, if required.

b.      Tenant shall pull copper conductors in conduit and make final connections at Landlord's electrical distribution panel. Conductors shall be continuous with no splices between the switchgear in the distribution room and panels within the Leased Premises.

c.      Tenant's electrical engineer shall include an electrical riser line diagram and a complete electrical panel schedule (quantities and sizes of lamps, appliances, signs, water heaters, etc.), indicating individual and total demand of all electrical loads.

d.      Electrical materials and equipment shall be new and installed per code and shall bear the Underwriters Laboratories label. All wire must be copper.

e.      Lighting fixtures shall be furnished and installed by Tenant, and shall be of a type approved by applicable codes. Recessed fixtures in furred spaces shall be connected by a flexible metal conduit and run to a branch circuit outlet box which is independent of the fixture. Fluorescent ballast shall have individual non-resetting overload protection.

f.      Panel board furnished and installed by Tenant for lighting and power within the Leased Premises shall be equal to type NLAB class panels, and shall meet the requirements of applicable code.

g.      A floor-mounted transformer shall be furnished and installed by Tenant, as required.

3.    <u>Water Service</u>

      Landlord may provide, at its option, a cold water supply line at or near the boundary of the Leased Premises. The water service will terminate with a valve connection. ~~Tenant shall pay Landlord $300.00 per valve connection.~~

4.    <u>Sanitary Service</u>

      Landlord may provide, at its option sanitary sewer stubs at or near the boundary of the Leased Premises. ~~Tenant shall pay Landlord $1,000.00 per sanitary sewer stub.~~

5.    <u>Vent Stub</u>

      Landlord may provide, at its option, plumbing vent stacks throughout the Shopping Center. ~~Tenant shall pay Landlord $500.00 per vent connection.~~

6.    <u>Tenant Plumbing Requirements</u>

a.      Tenant is responsible for providing a complete plumbing system from Landlord's point of service within the Leased Premises. This shall include, but not be limited to, all necessary labor, connections to supply stubs, piping, vents, clean-outs, fixtures, etc. necessary for the satisfactory operation of a plumbing system.

b.      Lower Level - Tenant is responsible for connecting to Landlord's sewer stubs where provided. Upper Level - Tenant is responsible for providing the floor penetrations for connecting plumbing to sanitary sewer stubs. All floor penetrations shall be sleeved and sealed as required in the Tenant Criteria Manual to prevent the penetration of odors or liquids to any space below the Leased Premises. Floor penetrations shall be core-drilled; no saw cutting is permitted. All horizontal sanitary sewer lines shall be installed above the ceiling of a lower level tenant and the lines shall be insulated to prevent condensation.

c.   Tenant is responsible for providing cleanouts in accordance with applicable codes.

d.   Where more than one tenant is required to attach to a single sanitary and/or vent stub, the first installing tenant shall install a plugged "Y" branch fitting for future connections, at that tenant's expense. Tenant shall run piping to the nearest stack and connect to the opening provided by Landlord.

7.   Water Meter
Tenant is responsible for connecting at the point of service and installing an accessible water meter or accessible remote readout, and extending service according to Tenant's requirements, in accordance with Code and the Tenant Criteria Manual.

8.   Water Heaters
Tenant is responsible for providing electric water-heaters for domestic water usage in the Leased Premises. Electric water-heaters shall be automatic and shall be limited to 12-gallon capacity or as per code. Water heaters must have a pressure relief valve discharge piped to the nearest drain in the Leased Premises.

9.   Toilet Facilities
Tenant is responsible for providing toilet facilities in compliance with ADA within the Leased Premises, and shall provide and maintain a Landlord approved waterproof membrane, at Tenant's expense. A minimum of one water closet, one lavatory and one cleanout, in accordance with code, is required in the Leased Premises. Food court tenants shall not be subject to this requirement unless required by applicable code. Upper level tenants shall not place toilet facilities over Landlord's electrical service room.

10.  Natural Gas Service
If natural gas service is available from the local utility company, Landlord shall arrange for the installation of the meter banks and mains at the designated locations throughout the Shopping Center. Landlord may provide, at its option, a natural gas line to the Leased Premises. ~~Tenant shall pay Landlord $2,000.00 for natural gas line.~~ All piping, associated work and meter for extension of services to the Leased Premises shall be provided by Tenant, at Tenant's expense, in accordance with applicable code, and subject to Landlord's approval.

11.  Telephone
Landlord shall arrange with the telephone company to install telephone service to the main telephone terminal. Landlord may provide, at its option, a raceway from the main telephone terminal to the Leased Premises. All telephone work for extension of services to the Leased Premises shall be provided by Tenant, at Tenant's expense, in accordance with applicable code, and subject to Landlord's approval.

## L.   SPECIAL FOOD TENANT REQUIREMENTS

1.   ~~Food Preparation Extinguishing Systems~~
a.   ~~Tenant shall design and install automatic extinguishing equipment in accordance with the National Fire Protection Association Standard latest edition. The extinguishing system shall be an Underwriters Laboratories approved pre-engineered system with the following features:~~

i.   ~~Protection of the hood and duct;~~
ii.  ~~Surface protection for deep fat fryer, griddle, broiler and range;~~
iii. ~~Automatic devices for shutting down fuel or power supply to the appliances. These devices must be of the manual reset type;~~
iv.  ~~Provided with a simple means to manually activate the fire extinguishing equipment within a path of ingress or egress. The means of manual activation shall be mechanical (not electrical) and must be clearly identified.~~

b.   ~~Tenant shall ensure that extinguishing system is inspected in accordance with code. Tenant shall enter into an inspection agreement with a firm qualified by the system manufacturer to perform such inspections. The systems vendor shall submit plans and other pertinent information on the proposed system to Landlord for prior review and approval.~~

2.   ~~Grease Removal and Cleaning~~
a.   ~~Tenant shall remove grease from all exposed surfaces of the Leased Premises daily. Additionally, Tenant agrees to retain a dependable bonded degreasing service for the Leased Premises on a minimum monthly basis throughout the term of this Lease to clean and degrease the entire kitchen area, ranges, cooking equipment, broilers, stoves, hoods, vents, exhaust and blower systems, filters and all associated ductwork to prevent grease accumulation. If Tenant fails to do so, Landlord may maintain the system and charge Tenant at three times Landlord's cost.~~

b.   ~~Copies of maintenance and cleaning reports shall be submitted to Landlord's on-site~~

~~representative.~~

   ~~c.~~   ~~Underwriters Laboratories approved grease-extracting hoods with water-wash-down cycle or conventional range hood with washable grease filters in accordance with applicable code are acceptable and subject to Landlord's fire protection engineer's approval.~~

~~3.~~  ~~Grease Interceptor~~
   ~~a.~~   ~~Landlord may provide, at its option, a common grease trap system for food tenants. Tenant shall pay Landlord $3.00 per square foot for the common grease trap system.~~

   ~~b.~~   ~~If Tenant is unable to connect to Landlord's common grease trap system, Tenant shall install, (in accordance with applicable code and subject to Landlord's approval), a dedicated grease trap system and indicate the location of the dedicated grease trap system on its plumbing plans.~~

   ~~c.~~   ~~All food-related tenants shall connect all sinks and floor drains within the Leased Premises (except toilet facility fixtures and drains) to the grease line in accordance with applicable code, and subject to Landlord's approval.~~

~~4.~~  ~~Grease Trap Service and Removal~~
   ~~a.~~   ~~Tenant is responsible for properly maintaining its grease trap system. If Tenant fails to do so, Landlord may maintain the system and charge Tenant at three times Landlord's cost. Tenant shall not place any grease into trash compactor, normal garbage containers, floor & sink drains or toilets. Landlord may provide, at its option, grease containers in a designated area for grease removal. In the event Landlord does not provide grease containers, Tenant is responsible to provide the grease container in a designated area as defined by Landlord. Tenant may be required to use Landlord's pre-approved removal service at Tenant's sole expense.~~

   ~~b.~~   ~~Copies of maintenance and cleaning reports shall be submitted to Landlord's on-site representative.~~

## M.    FIRE PROTECTION SYSTEM

1.   Tenant Sprinkler System
   a.   Landlord may provide, at its option, a complete wet sprinkler fire protection grid system within the Leased Premises. ~~Tenant shall pay Landlord $3.00 per square foot for the sprinkler fire protection grid system.~~

   b.   Landlord may provide, at its option, a blind flange connection for Tenant's sprinkler system stubbed in the Leased Premises. ~~Tenant shall pay Landlord $1,000.00 for blind flange connection.~~

   c.   Tenant shall design and install an engineered wet sprinkler fire protection system within the Leased Premises. In the event Landlord provides a pre-approved sprinkler contractor Tenant will be required use Landlord's contractor for such work at Tenant's expense **provided the cost is reasonable and competitive**.

   d.   Tenant's fire protection system shall comply with the requirements of the applicable building codes, fire marshal and be approved by Landlord's insurance carrier. Any modifications or additions to the sprinkler system, main relocation, or installation of any necessary sprinkler heads shall be engineered, fabricated and installed by Tenant at Tenant's expense **provided the cost is reasonable and competitive**. Refer to Tenant Criteria Manual for details.

   e.   Tenant's sprinkler drawings and hydraulic calculations shall be prepared by a licensed engineer of the state in which the Shopping Center is located. Drawings are subject to Landlord's approval.

   f.   Tenant shall pay Landlord $350.00 per shutdown for Tenant's sprinkler system tie-in to Landlord's sprinkler system.

2.   Tenant Fire System
   a.   Landlord may provide, at its option, a connection for a fire alarm system within or adjacent to the Leased Premises. ~~Tenant shall pay Landlord a charge of $1,000.00 for the fire alarm point of connection.~~ In the event Landlord completes final fire alarm system hookup, it shall be at Tenant's expense, **provided the cost is reasonable and competitive.**. Refer to Tenant Criteria Manual for details.

   b.   Tenant may be required to design and install an engineered fire alarm system within the Leased Premises. Tenant's fire alarm system shall be compatible with Landlord's system and comply with the requirements of the applicable building codes, fire marshal and be

approved by Landlord's insurance carrier. Refer to Tenant Criteria Manual for details.

    c.    Tenant's fire alarm drawings shall be prepared by a licensed engineer of the state in which the Shopping Center is located. Drawings are subject to Landlord's approval.

3.    <u>Tenant Fire Extinguishers</u>
Tenant shall provide and install fire extinguishers in the Leased Premises. The number of extinguishers provided by Tenant shall be as required by applicable building codes, fire marshal and be approved by Landlord's insurance carrier.

# N.    CONSTRUCTION REQUIREMENTS

1.    <u>Construction Deposit</u>
Tenant shall cause its general contractor to deposit with Landlord, without liability for interest, the sum of $5000.00 **$3,000.00** prior to construction start. This sum shall be applied toward any costs incurred by Landlord or Landlord's contractor to repair any damage to Landlord's property and to complete any part of Tenant's Work which Tenant or Tenant's contractor fails to complete within the time period required by ARTICLE 2 of the Lease. This remedy shall be in addition to and not in lieu of any other rights and remedies of Landlord. The balance of the deposit shall be returned to Tenant's general contractor after Tenant's Work has been reviewed and accepted by Landlord.

2.    <u>Construction Barricade</u>
Landlord may require Tenant to erect a barricade that complies with mall standards at the start of Tenant's Work, at Tenant's expense. In the event Landlord has previously erected a barricade or if Tenant fails to erect a barricade and Landlord elects to erect a barricade on Tenant's behalf, Tenant shall pay Landlord $85.00 **$65.00** per lineal foot for the barricade. Tenant's barricade may not be dismantled without Landlord's prior approval. **Tenant may paint the barricade and apply its own graphics, subject to Landlord's reasonable approval.**

3.    <u>Construction Trash Removal</u>
Tenant is responsible for trash removal during construction, fixturing and stocking at Tenant's expense. Tenant shall break its boxes down and place its trash daily in the containers provided. Trash accumulation shall not be permitted overnight in the Leased Premises, Joint Use Areas or service corridors. In the event Landlord provides construction trash removal, Tenant shall pay Landlord a single charge equal to the greater of **$400.00.** $750.00 or $0.75 per square foot of the Leased Premises. Compliance with Landlord's recycling program is mandatory.

4.    <u>Temporary Electric</u>
Landlord may provide, at its option, temporary electrical service in general areas during construction. Tenant shall request, in writing, permission to connect to the temporary service and distribute temporary service to the Leased Premises in accordance with applicable code. In the event Landlord provides temporary electrical service, Tenant shall pay Landlord a single charge equal to the greater of **$500.00.** $750.00 or $0.75 per square foot of the Leased Premises.

5.    <u>Contractor Requirements</u>
    a.    Tenant and or Tenant's contractor shall not commence any work without checking in with Landlord's on-site representative and supplying all required pre-construction documents. Documents shall include but not be limited to a copy of building permit, Certificate of Insurance and contractor's license.

    b.    Tenant shall ensure that all Tenant's contractors are bondable and licensed in the state where the Shopping Center is located. Landlord shall have the right to **reasonably** approve Tenant's contractors and subcontractors **consistent with the Tenant Criteria Manual**; however, approval shall not constitute the assumption of any responsibility or liability by Landlord for the actions of Tenant's contractors or subcontractors or the quality or sufficiency of Tenant's Work.

    c.    Tenant's contractor or subcontractor shall not post signs in any part of the Shopping Center, on construction barricades or in the Leased Premises without approval from Landlord.

    d.    All supplies necessary for construction, fixturing or merchandising the Leased Premises must be delivered through designated truck docks and down the service corridors.

    e.    The contractor may perform "noisy" construction, such as jack hammering, saw cutting, core drilling, etc., only during hours approved by Landlord's on-site representative, **provided the contractor may perform such work in**

**a manner and during times which will not require the payment of overtime or premium pay.** The Landlord's on-site representative will terminate any construction activity that is deemed excessively noisy or dusty or which is disruptive to the normal operations of the adjacent tenants and/or the mall.

    f.    Tenant's contractor shall obtain Landlord's approval regarding all drilling, welding or other attachment to Landlord's structural system **which approval shall not be unreasonably withheld.** Approval by Landlord shall be in writing before the start of Tenant's Work, and must be clearly identified on Tenant's drawings. Landlord approval of the drawings does not relieve Tenant's contractor of the responsibility to make a request in writing prior to starting Tenant's Work.

    g.    Tenant's contractor shall supply fire extinguishers during construction, in accordance with code.

6.    <u>Tenant's Work</u>

    a.    Tenant shall conform to and comply with all federal, state, county and local laws, ordinances, permits, rules and regulations in the performance of Tenant's Work or in the performance of any alterations, additions or modifications. **Tenant's contractor shall not be obligated to provide a performance or completion bond with respect to Tenant's Work.**

    b.    Tenant's Work shall be coordinated with Landlord's Work as well as with the work of other tenants in the Shopping Center so that Tenant's Work shall not interfere with or delay completion of other construction in the Shopping Center.

    c.    In the event Tenant's Work and Landlord's Work shall progress simultaneously, Landlord shall not be liable for any injury to persons or damage to property of Tenant, or of Tenant's employees, licensees or invitees from any cause **other than gross negligence or willful misconduct of Landlord or its agents or employees** ~~whatsoever~~ occurring upon or about the Leased Premises, and Tenant shall and will indemnify, defend and save Landlord harmless from any and all liability and claims arising out of or connected with any injury or damage. Tenant acknowledges that these provisions become effective beginning upon the date Tenant or its agents first enter the Leased Premises. This obligation to indemnify shall include reasonable attorneys' fees and other reasonable costs, expenses and liabilities incurred by Landlord and its attorneys from the first notice that any claim or demand is to be made or may be made.

    d.    Work performed by Tenant or Tenant's contractor shall be performed so as to avoid a labor dispute. If there is a labor dispute **as a result of the work performed by Tenant or its contractor,** Tenant shall immediately undertake whatever action may be **reasonably** necessary to eliminate the dispute including, but not limited to, (i) removing all disputants from the job site until the labor dispute is over, (ii) seeking an injunction in the event of a breach of contract action between Tenant and Tenant's contractor and (iii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute. If, during the period of initial construction of the Leased Premises, any of Tenant's employees, agents or contractors strike, ~~or if picket lines or boycotts or other visible activities objectionable to Landlord are conducted or carried out against Tenant or its employees, agents or contractors,~~ Tenant shall immediately close the Leased Premises and remove all **disputants** ~~employees~~ until the dispute giving rise to the strike, picket line, boycott or objectionable activity has been settled to Landlord's satisfaction.

    e.    Tenant agrees that it will **take commercially reasonable measures** not, at any time prior to or during this Lease, including the period of the performance of Tenant's Work, **to** either directly or indirectly employ or permit the employment of any contractor, or use any materials in the Leased Premises, if the use of the contractor or the materials would, in Landlord's sole **but reasonable** opinion, create a difficulty, strike or jurisdictional dispute with other contractors engaged by Tenant or Landlord or others, or would in any way disturb the construction, maintenance or operation of the Shopping Center. If any interference or conflict occurs, Tenant, upon demand by Landlord, shall cause all contractors or all materials causing the interference, difficulty or conflict, to leave or be removed from the Shopping Center immediately.

    f.    Tenant's Work shall be subject to inspection by Landlord during the course of construction for the purpose of determining the quality of the workmanship and

adherence to Landlord requirements. Tenant shall require its contactor to cooperate with Landlord and correct any deficiencies noted by Landlord. All work performed by Tenant during the Term of the Lease shall be performed in accordance with this Lease, all exhibits thereto, the Tenant Design Manual and as directed by Landlord's representative **subject to the other provisions of this Lease.**

g. All work by Tenant, including repair work, shall be performed in a first-class workmanlike manner and shall be in a good and usable condition at completion. ~~Tenant shall require any person performing work to guarantee that the work is free from any and all defects in workmanship and materials for one (1) year from the date of completion. Tenant shall also require any such person to be responsible for the replacement or repair, without additional charge, of work done or furnished by or through such person which shall become defective within one (1) year after substantial completion of the work. The correction of work shall include, without additional charge, all expenses and damages in connection with the removal, replacement or repair of any part of work which may be damaged or disturbed.~~ All warranties or guarantees for materials or workmanship on or regarding Tenant's Work shall be contained in the contract or subcontract. The contract shall be written so that all warranties and guarantees shall inure to the benefit of both Landlord and Tenant, as their respective interests appear **or shall be assignable,** and so that either party can directly enforce the contract.

h. In the event Tenant or Tenant's contractor fails to perform Tenant's Work, or any part of Tenant's Work, in a manner satisfactory to Landlord within 10 days after receipt of Landlord's punch list, Landlord shall have the right, in addition to and in lieu of Landlord's other rights and remedies, to perform the work and Tenant shall pay Landlord for **reasonable and competitive** costs incurred by Landlord in such performance.

## O.    INSURANCE REQUIREMENTS

Tenant's contractor must fulfill the following insurance requirements, and shall maintain at no expense to Landlord:

a. Workers' Compensation Insurance within statutory limits and Employer's Liability Insurance with limits of not less than $100,000.

b. General Liability Insurance with limits of not less than $2,000,000 combined single limit for bodily injury and property damage, including personal injury, Contractual Liability coverage specifically endorsed to cover the indemnity provisions contained herein and Contractor's Protective Liability coverage if contractor uses subcontractors.

c. Motor Vehicle Liability Insurance in the Contractor's name, including owned, non-owned, leased and hired car coverage with limits of not less than $2,000,000 combined single limit per occurrence for bodily injury and property damage.

d. Tenant shall cause each of its contractors to agree to name Landlord, the parents, subsidiaries and affiliates of Landlord and if Landlord elects, any owner or other occupant in or adjoining the Shopping Center, as Additional Insureds on Contractor's Commercial General Liability Insurance and Motor Vehicle Liability Insurance. In addition to the insurance Tenant is required to maintain under ARTICLE 19, Tenant **or its contractor** shall maintain Builders Risk Insurance including water damage and earth movement for the full replacement cost of Tenant's Work, **provided that Builders Risk Insurance shall only be required to the extent of any Construction Allowance provided to Tenant pursuant to Reference Provision 1.18 of this Lease.**

e. Each of Tenant's contractors shall ~~also, to the fullest extent permitted under the law,~~ protect, defend, save harmless and indemnify Landlord, the parents, subsidiaries and affiliates of Landlord, and if Landlord elects, any owner or other occupant in or adjoining the Shopping Center, and their employees, officers and agents against any and all liability claims, demands or expenses incurred on account of any injury or damage, alleged or real, arising out of or in any way connected with any act or omission to act on the part of the indemnitor.

f. Certificate evidence of the required insurance shall be furnished to Landlord before the start of Tenant's Work. Insurance carriers shall have an AM Best's rating of A-VII or better, and shall be registered or authorized to do business in the state in which the Shopping Center is located.

## P.    GENERAL

1.    Landlord's Access
Landlord, Tenant or any local utility company shall have the right, subject to Landlord's approval, to run utility lines, pipes, ducts, etc. above the Leased Premises. It shall be Tenant's responsibility to provide flush-mounted access panels in its finished work where required by Landlord.

2.    Additional Landlord's Work
Landlord shall have the right to charge Tenant for **the reasonable and competitive costs associated with** certain improvements and other work performed by Landlord or caused to be performed by Landlord at Tenant's **advance** request within the Leased Premises although they may not be itemized in the Lease. This work shall be paid for by Tenant as additional rental upon notice by Landlord. Landlord has no duty, however, to do any work which Landlord is not specifically and expressly required to perform under this Lease or which, under any provisions of this Lease, Tenant may be required to perform. The performance of work by Landlord shall not constitute a waiver of Tenant's default in failing to perform the work

3.    Hazardous Materials
Tenant shall comply with any existing or future city, state, county or federal regulations or legislation regarding the control of pollution. Tenant shall not use or install, nor shall permit its contractors to use or install, any building materials containing asbestos or other Hazardous Material. ~~Upon expiration of the Term or the earlier termination of this Lease, Tenant shall provide Landlord with a statement signed by Tenant that the Leased Premises do not contain any Hazardous Material. If Tenant fails to do so, Landlord shall have the right to have the Leased Premises inspected for the presence of Hazardous Material, and if Hazardous Materials are present in the Leased Premises, to take all actions which are necessary to return the Leased Premises to the condition it was in prior to the presence of Hazardous Material in the Leased Premises, all at Tenant's expense.~~ This obligation by Tenant shall survive the Expiration Date or earlier termination of this Lease and shall survive any transfer of Landlord's interest in the Shopping Center.

4.    Tenant's Refuse
Tenant is responsible for keeping the Leased Premises, the corridor, mall or arcade adjacent to the Leased Premises broom clean and free of trash **resulting from the action of Tenant, its contractor and other agents**. If Landlord removes Tenant's or Tenant's contractor's trash, the charge to Tenant will be **150% of** ~~three (3) times~~ Landlord's cost. Any material, whether trash or otherwise, placed outside of the Leased Premises for more than 24 hours shall be subject to removal and disposal without notice.

5.    Certificate of Occupancy
Tenant is responsible for obtaining a Certificate of Occupancy **(or its equivalent)** promptly following completion of Tenant's Work, and shall promptly forward a copy of it to Landlord prior to Tenant opening for business in the Leased Premises. Tenant shall not be permitted to open for business without a Certificate of Occupancy **(or its equivalent)**. Upon completion of Tenant's Work or any alterations under ARTICLE 12 of the Lease, Tenant shall submit **a conforming copy of** an original contractor's notarized affidavit **affirming that all** ~~, all subcontractors' original notarized affidavits and original notarized final waivers of lien, as well as any original notarized lien waivers that Landlord may require from~~ contractors, subcontractors, laborers, and material suppliers **have been paid in full**. The documents must be in a form and detail **reasonably** satisfactory to Landlord.

6.    Lien Protection
a.    Neither Landlord nor any mortgage lender of Landlord shall be liable for any labor or materials furnished to Tenant upon credit, and no mechanics or other lien for labor or materials shall attach to or affect any interest of Landlord or the mortgage lender in the Leased Premises or the Shopping Center. Nothing in this Lease shall be deemed or construed to constitute Tenant as Landlord's agent or contractor for the performance of Tenant's Work. Tenant acknowledges that Tenant's Work is to be performed solely for the benefit of Tenant. Nothing in this Lease shall be construed as constituting the consent or request of Landlord to any contractor for the performance of labor or the furnishing of any materials for Tenant, nor as giving Tenant authority to contract as the agent of or for the benefit of Landlord.

b.    If Landlord's insurance premium or real estate tax assessment increases as a result of Tenant's improvements to the Leased Premises **due to Tenant's specific use or design of the Leased Premises**, Tenant shall pay the increase as additional rental upon notice from Landlord.

7.    Square Footage Calculations
The calculations of the dimensions and square footage of the Leased Premises are from the

centerline of interior partitions, from the outside face of exterior walls, and from the full thickness of corridor and shaft walls. No deductions are allowed for the space occupied by columns, interior partitions, or other interior construction or equipment installed or placed in the Leased Premises. The Leased Premises shall not include any space above the bottom of the structural framework supporting the upper level or roof of the Shopping Center, as the case may be, or below the floor level of the Leased Premises.

EXHIBIT F

**OPERATING CHARGE FOR HEATING, VENTILATION,
AIR CONDITIONING, WATER AND SEWER AND ELECTRICITY**

LANDLORD SUPPLIED UTILITIES

**GLENDALE GALLERIA
GLENDALE, CALIFORNIA**

This EXHIBIT F provides information and sets forth requirements for operating charge for water, sewer and heating, ventilation and air conditioning system ("HVAC system").

## I. OPERATING CHARGE FOR HEATING, VENTILATION AND AIR CONDITIONING

### A. GENERAL

1. The operating charge provides for and is limited to heating, ventilation and air conditioning. The operating charge, when established in accordance with this EXHIBIT F (the "Operating Charge"), shall become part of the additional rental due under the Lease.

2. Tenant shall be charged it's pro rata share for heating, ventilation and air conditioning services to be calculated in accordance with the terms of this EXHIBIT F. Tenant agrees to accept and use the services, and to pay for the services without deduction or set-off of any kind on the first day of each month.

3. The Operating Charge for each year shall include all items of cost and expense which in usual accounting practice are treated as operating costs and expenses, including but not limited to, water and sewer service costs, personal property and equipment depreciation, electricity, supplies, wages and other compensation (including those of supervisory personnel), worker's compensation insurance, payroll taxes, compressor insurance and ordinary maintenance repairs, to which costs and expenses (excluding water and sewer costs) shall be added 15%. The Operating Charge shall include all costs and expenses of operation during hours when the Shopping Center is open, and all costs and expenses of operation which may be necessary to bring the Leased Premises to the proper temperature determined by Landlord during hours when the Shopping Center is not open.

### B. METHOD OF CALCULATING THE OPERATING CHARGE

1. As part of Tenant's plans, Tenant shall provide to Landlord a complete description of all electrical, heating, ventilating, air conditioning and gas consuming devices, showing the quantities and capacities of the equipment per the tenant print package.

2. Tenant agrees to accept and use such ventilating and air conditioning and to pay for such use without deduction or setoff of any kind, as additional rental, in advance, on the first day of each month during the term hereof, commencing upon the date on which rental is determined to commence under the provisions of ARTICLE 3 hereof and ending upon termination date of this lease (prorata for any fractional month), a charge herein called the "Tenant's Share of Operating Costs". Landlord shall notify Tenant of the estimated amount of the monthly Tenant's Share of Operating Costs for the leased premises prior to the commencement of the term of the lease. As used in this lease the term Tenant's Share of     Operating Costs means the product which results by multiplying the operating costs for each operating year by the percentage that the gross square foot area of the leased premises is of the gross area of all stores or store spaces in said Shopping  Center which are connected to Landlord supplied HVAC system and are occupied or producing rent. Within one hundred twenty (120) days following  the end of each calendar year , Landlord shall furnish to Tenant a statement, showing the total operating costs for the calendar year just expired, the amount of Tenant's Share of Operating Costs made by Tenant during such calendar year. If Tenant's Share of Operating Costs for such calendar year shall exceed Tenant's payment so made, Tenant shall pay to Landlord the deficiency within ten (10) working days after receipt of said statement. If Tenant's payment shall exceed Tenant's share of Operating Costs, as shown on such statement, Tenant shall be entitled to offset the excess against payments next thereafter becoming due under the lease. If Tenant fails to make such payment to Landlord within ten (10) days from the date such payment is due, or upon failure of Tenant to pay any other sums of rental, percentage rental, of other charges due under the provisions of this lease in full, without prejudice to any other remedy which Landlord may have on account thereof, Landlord may cut off and discontinue any such service furnished to the leased premises, without any liability to Landlord. Any action by landlord pursuant to the provisions of the ARTICLE 16 (2) shall not be construed as an eviction or disturbance of possession or an election by Landlord to terminate this lease

## II. OPERATING CHARGE FOR WATER AND SEWER

METHOD OF CALCULATING THE OPERATING CHARGE FOR WATER AND SEWER

1. Tenant shall provide Landlord with complete plumbing plans and specifications which shall show the quantities and capacities of all water consuming devices.

1. Tenant shall be required to furnish and install, at Tenant's expense, a water meter for determination of charges for water service. The Tenant's water and sewer operating charge shall include but not be limited to taxes, assessments, charges, fees and surcharges.

III. OPERATING CHARGE FOR ELECTRICITY

1. Tenant shall pay any and all charges and costs of service for electricity and any other utilities used in connection with the operation of the Leased Premises. Such services shall be purchased by Tenant from Landlord, if Landlord elects to supply the same; provided, however, that as to such services as public utility companies are prepared to furnish to the Leased Premises, Landlord's charges therefore shall not exceed the rates charged or permitted to be charged by such public utility companies to retail consumers for the same or similar services. Payment for the foregoing services shall be made monthly within 10 days following the date of Landlord's bill therefore to Tenant.

IV. **TENANT INSTALLED HVAC SYSTEM**

This section shall be applicable to tenants supplementing the services of the Landlord provided HVAC or not receiving the services of the Landlord provided HVAC.
**A. GENERAL**

2  Tenant, at Tenant's sole expense, shall supply an HVAC System pre-approved by Landlord which shall provide heating, cooling and ventilation to the Leased Premises.

3  Tenant may be required to use Landlord's pre-approved mechanical contractor for the purchase and installation of Tenant's HVAC unit and roof curb at Tenant's sole expense.

4  Tenant is responsible for the design, installation, distribution and the maintenance of the HVAC System, including but not limited to, the installation ductwork, electrical wiring, temperature controls, heating and heat detection, at Tenant's sole expense.

5 The HVAC System and related rooftop equipment must be compatible with Landlord's life safety system. Interface with Landlord's life safety system shall be by Landlord's contractor at Tenant's sole expense.

6  Roof penetrations:  All required penetrations of the roof shall be performed by Landlord's roofing contractor at Tenant's sole expense, after notification in writing to Landlord subject to Landlord's prior written approval. Any structural framing required by Landlord's engineer or as a result of Tenant's roof penetrations or placement of the roof top HVAC equipment shall be performed by Landlord's engineer at Tenant's sole expense.  Tenant's roof curb(s) for its HVAC equipment shall be compatible with Landlord's roof as deemed by Landlord in Landlord's sole opinion.

**B. MAINTENANCE OF TENANT SUPPLIED HVAC**

1.  Landlord may require Tenant to use Landlord's pre-approved contractor for maintenance of Tenant's HVAC unit at Tenant's sole expense.

2.  If Tenant is required to maintain the HVAC System, maintenance shall be by Tenant at Tenant's sole expense.  Tenant shall supply Landlord with evidence of a maintenance contract with a mechanical contractor pre-approved by Landlord.

**A.  V.    OPERATING CHARGE FOR GAS**

Tenant shall furnish and install, at Tenant's expense, a gas meter to determine charges for gas service and shall be solely responsible for the charges for all utilities used or consumed in the Premises. Gas service from local utility may be available at specific areas of the shopping center only. Tenants must obtain Landlord's express written approval in advance to use gas in their space. Tenant shall be responsible for connecting to gas service, installing all piping and equipment and for providing a gas meter, all at Tenant's expense.

# Beverly Center (#27)

<u>TEMPORARY INLINE SPACE LICENSE AGREEMENT</u>

This License Agreement is entered into this 25TH day of ___MAY___, 2016, by and between LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP ("Licensor"), and BLUE BEE, INC., the address of which is 2301 E. 51st Street, Vernon, CA 90058-2812 ("Licensee").  This License Agreement consists of the Data Sheet, the Special Provisions and the Standard Provisions commencing with Paragraph 1 and continuing through Paragraph 34 (hereinafter at times referred to as the "Agreement"), all of which are incorporated in full as if set forth at this point.

For good and valuable consideration, the receipt and sufficiency of which is acknowledged, Licensor and Licensee agree as follows:

<div align="center">DATA SHEET</div>

| | | |
|---|---|---|
| Paragraph 1 (a) | **REGIONAL RETAIL DEVELOPMENT:** | Beverly Center |
| | **LICENSED PREMISES:** | Space 6622 |
| | **SQUARE FOOTAGE OF PREMISES FOR RETAIL:** | 1,568 |

Licensee shall use the front 1,568 square feet of the Licensed Premises for retail space and all or part of the remaining square feet may be used as storage.

| | | |
|---|---|---|
| | **TOTAL SQUARE FOOTAGE OF PREMISES:** | 1,568 |
| Paragraph 3 | **LICENSE COMMENCEMENT DATE (LCD):** | 6/1/2016 |
| | **LICENSE TERMINATION DATE (LTD):** | 6/30/2017 |
| Paragraph 4 | **LICENSEE NAME:** | Blue Bee, Inc. |
| | **TRADE NAME:** | ANGL |

Paragraph 5      **USE CLAUSE:**

For the retail sale of apparel, with maximum of 12% dedicated to handbags and accessories including costume jewelry and scarves complimentary to the apparel offering. All accessories will be appropriate to the apparel lines carried in the Licensed Premises.

Paragraph 6      **MINIMUM RENT:**

| | | | |
|---|---|---|---|
| 6/1/2016 | To | 10/31/2016 | $16,000.00/Monthly |
| 11/1/2016 | To | 12/31/2016 | $17,500.00/Monthly |
| 1/1/2017 | To | 6/30/2017 | $16,500.00/Monthly |

Payable on or before the first day of each month or partial month.  The first month's Minimum Rent shall be paid at the time of executing this Agreement.

**PERCENTAGE RENT:**

| | | | |
|---|---|---|---|
| 6/1/2016 | To | 6/30/2016 | 10% of Gross Sales in excess of $160,000.00/Month |
| 7/1/2016 | To | 9/30/2016 | 10% of Gross Sales in excess of $480,000.00/Quarter |
| 10/1/2016 | To | 12/31/2016 | 10% of Gross Sales in excess of $510,000.00/Quarter |
| 1/1/2017 | To | 3/31/2017 | 10% of Gross Sales in excess of $480,000.00/Quarter |
| 4/1/2017 | To | 6/30/2017 | 10% of Gross Sales in excess of $480,000.00/Quarter |

~~Payable no later than the date five (5) days following expiration of each month or partial month during which Licensee operates its business.~~ Percentage Rent shall be payable no later than the date fifteen (15) days following expiration of each quarter or partial quarter during which Licensee operates its business (i.e., due on July 15th, October 15th, January 15th, April 15th).

**OTHER CHARGES:**

| | | | | |
|---|---|---|---|---|
| Additional Minimum Rent | 6/1/2016 | To | 6/30/2017 | $240.00/Month |
| Electric Utility | 6/1/2016 | To | 6/30/2017 | $583.00/Month |
| Water Charges | 6/1/2016 | To | 6/30/2017 | $5.60/Month |

Payable on or before the first day of each month or partial month. The first month's Other Charges shall be paid at the time of executing this Agreement.

Paragraph 7        **SECURITY DEPOSIT:**

Thirteen Thousand AND 00/100 Dollars ($13,000.00)

Payable at the time of executing this Agreement.

**PAYMENT ADDRESS:**

Payment of all Minimum Rent, Percentage Rent, and Other Charges due under this Agreement shall be made payable to and sent to:

LA CIENEGA PARTNERS LIMITED PARTNERSHIP
Department 58801
PO Box 67000
DETROIT, MI 48267-0588

Rent and Other Charges due at time of execution of this Agreement (i.e. Security Deposit and first month's Minimum Rent and Other Charges) shall be returned with two (2) originals of this Agreement executed by Licensee. All payments of Rent and Other Charges shall be paid by company check, cashier's check, money order or in certified funds on the dates set forth above. Please indicate Trade Name and Space number on all checks.

**SPECIAL PROVISIONS**

The following special provisions (if any) shall supersede any conflicting terms or provisions found elsewhere in this Agreement:

1)  Force Majeure - Except for the obligation to pay monies due and owing, neither party shall be liable for any delay or failure in performance due to events outside the party's reasonable control, including without limitation, acts of God, earthquake, flood, labor disputes, shortages of supplies, riots, war, fire, epidemics and delays of common carriers or other circumstances beyond its reasonable control. The obligations and rights of the excused party shall be extended on a day to day basis for the time period equal to the period of excusable delay.

2)  First Month's Minimum Rent and Other Charges shall be prorated based upon the actual number of days from the LCD through the end of such month.

3)  Licensee's Security Deposit from its previous Agreement in the amount of $13,000.00 under the License Agreement dated July 28, 2015 for Space 6621 shall be transferred to this Agreement. Notwithstanding anything to the contrary, it is understood that any such default shall not result in a forfeiture of the Security Deposit; however, refund shall be delayed until such default is cured, and the amount of the Security Deposit remaining, i.e., less any amounts applied by Licensor as permitted under this Agreement, shall be promptly refunded to Licensee.

4)  Licensor shall have the unconditional right to relocate Licensee either prior to or after Licensee commences operations within the Licensed Premises at Licensee's' sole cost and expense, in an alternative location as designated by Licensor (the "Alternative Location") upon thirty (30) days' prior written notice. However, Licensor shall not exercise this right where the relocation would occur from the date of full execution of this License Agreement through 12/31/16. In the event of relocation to the Alternative Location after Licensee has commenced operations within the Licensed Premises, Licensee shall be open for business and commence operating no later than thirty (30) days following the date Licensor notified Licensee that the Alternative Location is available for Licensee's occupancy.  In the event Licensor elects to relocate Licensee then Licensee shall have fifteen (15) days from receipt of the relocation notice to accept or reject the Alternative Location. In the event Licensee rejects the Alternative Location and the License Agreement is hereby terminated then licensee shall vacate the Licensed Premises on or before the effective date stated in the relocation notice from Licensor.  Licensor shall reimburse Licensee for prorated portion of the Minimum Rent paid during the month of such termination.

5)  Licensor shall have the right to termination this Agreement upon forty-five (45) days' prior written notice to Licensee, unless Licensee is in default, in which event, the provisions of Paragraph 19 shall apply. However, Licensor shall not exercise such termination right where the termination would occur on or before 12/31/16 unless Licensee is in default, in which event, the provisions of Paragraph 19 shall apply.

6)  Beverly Center Contact List:
    8500 Beverly Blvd., Suite 501
    Los Angeles, CA 90048
    Phone: 310-854-0071
    Fax: 310-854-6376
    General Manager: Ralph Barnes - ext. 7516
    Facilities Superintendent: Victor Lieu - ext. 7524

## EXECUTION/ACKNOWLEDGMENT

Licensor and Licensee have signed ~~and sealed~~ this Agreement as of the day and year first above written on page 1 of this Agreement.

The obligation of Licensee for payment of rent and charges under this License Agreement shall survive the expiration or earlier termination of the term of this License Agreement.  Licensee covenants that neither Licensee nor any attorney or other representative for Licensee shall disclose the contents of this License Agreement to any other person or entity, except that Licensee may disclose any such information to its parent subsidiary, affiliates, or its or their employees, agents, attorneys, accountants, lenders, financial analysts, consultants, auditors, assignees, subtenants, purchasers, brokers, or as required by any court or government agency..  Licensee shall be fully responsible for the actions of its attorneys and representatives.  By its execution of this License Agreement, Licensee acknowledges and agrees that it has read this License Agreement, understands the contents hereof, and is signing this License Agreement as its own free act and deed, and as the free act and deed of their representatives signing on Licensee's behalf, without any persuasion or coercion by any person or entity, and with full advice of counsel.

Licensee's Initials

In the presence of:

_Sheila P. Francisco_
Print name of witness:

BLUE BEE, INC. (LICENSEE)

By: _____

_Jeff Sunghak Kim_
Print name of person signing this Agreement:

Its: _President_

Licensee Tax ID/SSN:     80-0950433
Work Phone:              (323) 582-7123

### ACKNOWLEDGMENT OF LICENSEE
BLUE BEE, INC.

STATE OF _CALIFORNIA_
COUNTY OF _LOS ANGELES_

On this _19_ day of _MAY_____, 2016, before me personally appeared _JEFF SUNGHAK KIM_, to me personally known, who, being by me duly sworn, did say that they are, respectively, the _PRESIDENTS_ of the corporation/company/individual (referred herein as "Licensee") and which executed the within instrument on behalf of said Licensee and acknowledged before me said instrument to be the free act and deed of said corporation.

HAROLD A. UTOMAKILI
COMM. # 2019155
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 9, 2017

_____
Notary Public

In the presence of:

_Donna Nagle_

LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP (LICENSOR)

By: _____
Chris B. Heaphy
Its: Authorized Signatory

### ACKNOWLEDGMENT OF LICENSOR
LA CIENEGA PARTNERS LIMITED PARTNERSHIP

STATE OF MICHIGAN
COUNTY OF OAKLAND

On this _25TH_ day of _MAY_____, 2016, before me personally appeared Chris B. Heaphy, to me known to be the person who executed the foregoing document and acknowledged before me he was duly authorized and did execute same on behalf of Licensor.

_Donna Nagle_
Notary Public



DONNA NAGLE
NOTARY PUBLIC
State of Michigan
My Commission Expires
November 11, 2021

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On _MAY 19, 2016_ before me, _____ HAROLD A. UTOMAKILI , NOTARY PUBLIC_____,

(here insert name and title of the officer)

personally appeared __JEFF SUNGHAK KIM_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

HAROLD A. UTOMAKILI
COMM. # 2019155
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 9, 2017

Signature:_____     **(Seal)**

**STANDARD PROVISIONS**

1.  **Licensed Premises**

    (a)   Licensor grants to Licensee a license (the "License") to use the Licensed Premises and access thereto described on the Data Sheet solely in accordance with the Use Clause and for no other purpose. This License shall extend only to the Licensed Premises located in the Regional Retail Development and not to any other portion of the Regional Retail Development.

    (b)   Licensee has inspected the Licensed Premises and accepts the Licensed Premises in an "as is" condition and acknowledges that the Licensed Premises are adequate to meet its needs. Licensor shall have no responsibility for, and shall assume no liability for, the condition of the Licensed Premises upon delivery to Licensee.

    (c)   ~~Licensor shall have the unconditional right to relocate Licensee either prior to or after Licensee commences operations within the Licensed Premises, at Licensee's sole cost and expense, to an alternative location as designated by Licensor (the "Alternative Location") upon fifteen (15) days' prior written notice. In the event of relocation to the Alternative Location after Licensee has commenced operations within the Licensed Premises, Licensee shall be open for business and commence operating no later than fifteen (15) days following the date Licensor notifies Licensee that the Alternative Location is available for Licensee's occupancy.~~ See Special Provision 4.

    (d)   ~~Licensor shall provide certain criteria, drawings and exhibits for Licensee's use.~~ Licensee may not make any structural changes to the Licensed Premises without the prior written approval of Licensor. ~~Licensee must submit full architectural drawings (the "Plans and Specifications") prior to Licensor execution of this Agreement.~~ Licensor, in its sole discretion, may approve or disapprove such structural changes and may require Licensee to restore the Licensed Premises to original condition at the expiration or termination of this Agreement. ~~Licensor, at Licensor's sole option, may provide personnel to set up the displays at the Licensed Premises. Licensee shall be permitted to enter the Licensed Premises upon distribution of fully executed Agreement, for purposes of painting, patching and repairing as Licensor deems necessary and for installation of improvements and personal property (provided the Licensed Premises are vacant and are available to Licensee by such date).~~ Licensee shall not undertake any construction in, nor affix or attach any improvements or items of personal property to, the Licensed Premises either prior to or during the License Period without first receiving the prior written approval of Licensor. Licensee shall abide by the Rules of Construction for the Regional Retail Development, including insurance, permitting (if applicable), security deposit, list of contractor(s), etc. A pre-construction meeting shall take place prior to start-up. ~~Any such improvements or personal property shall be deemed to have been attached to the Licensed Premises and to have become the property of Licensor upon such attachment, provided, in the event of Licensee's relocation after commencement of Licensee's operations, expiration of the License Period or termination of this Agreement, Licensor may designate those items which Licensee shall remove. Licensee shall remove same and, in accordance with Licensor's direction, place the Licensed Premises (through repair or otherwise) in a clean and orderly condition equal to or better than that existing as of the date hereof at Licensee's sole cost and expense. Licensor will erect and remove any required barricade at Licensor's cost. Removal of barricade shall be done by Licensor only upon Licensee's compliance with all requirements under this Agreement.~~ Any such permanent improvements shall be deemed to have been attached to the Licensed Premises and to have become the property of Licensor upon such attachment. At the expiration of this Agreement, Licensee shall remove its personal property, fixtures, furniture and equipment and repair any damage caused by said removal and otherwise return the Licensed Premises in good condition and repair, ordinary wear and tear and damage by casualty excepted. During the License Period, Licensee shall be responsible for daily sweeping, cleaning, and all other maintenance of the Licensed Premises as required in Section 17.

    (e)   Possession of the Licensed Premises by Licensee shall not be permitted and shall not be deemed to be lawful unless and until all of the following pre-conditions have been met:

        (i)    This Agreement has been executed and delivered by both parties;

        (ii)   Licensor has furnished Licensee with a "Premises Availability Letter" stating the Licensed Premises have been made available to Licensee;

        (iii)  Licensor shall have reviewed and approved in writing the Plans and Specifications (as defined in Paragraph 15 below); provided, however, Licensee shall only be required to install a new sign and add its fixtures, furniture and equipment, so no Plans and Specifications will be required;

        (iv)   Licensee shall have paid ~~its first Minimum Rent payment,~~ the Security Deposit ~~and any Other Charges due (if applicable)~~;

        (v)    Licensee shall have provided Licensor with a copy of an insurance certificate, as described in Paragraph 24 below; and,

(vi)     Certificate of Occupancy and/or any other pertinent documents required under state or local ordinances are provided by Licensee to Licensor.

Any entry by Licensee prior to the above conditions having been met shall be an unlawful trespass. Licensor shall deliver possession to License promptly upon satisfaction of the foregoing requirements

(f)     Licensee acknowledges that Licensor has made no representations regarding anticipated sales levels, and that Licensee has been given no exclusive rights to sell, or offer for sale, any particular product or services. Other occupants of the Regional Retail Development may sell, or offer for sale, products or services offered by Licensee. Licensee has made its own determination as to the suitability of the Licensed Premises and the Regional Retail Development for Licensee's use and business, and acknowledges that it is entering into this Agreement based solely on its own investigation and not based on any representations or warranties of Licensor or its representatives.

(g)     A vacation of premises or cessation of operations by any other licensee or tenant in the Regional Retail Development shall not in any way release Licensee from Licensee's obligations under this Agreement.

2.    **Early Open**

In the event Licensee elects to open prior to the License Commencement Date and the space is available, Licensee may open up to thirty-one (31) days before the License Commencement Date provided, however, that Licensee's forgoing right to open early is expressly subject to satisfaction of all the pre-conditions set forth in Paragraph 1 (d) (i) through (vi) above. Licensee will be billed for any applicable Other Charges and Minimum Rent in the amount stated for Licensee's first full month of occupancy after the License Commencement Date prorated by the actual number of days Licensee occupies the Licensed Premises during the early opening. During the early open period, Licensee's Percentage Rent owed shall be calculated the same as during Licensee's first month of occupancy under this Agreement, with the Gross Sales amount prorated by the actual number of days Licensee is open during such month. Such Percentage Rent shall be payable no later than the date five (5) days following expiration of each month or partial month.

3.    **Term; Period of Operation**

Licensee shall open and commence operation of its business in the Licensed Premises on the License Commencement Date set forth on the Data Sheet and shall close and cease operating its business on the License Termination Date set forth on the Data Sheet, unless this Agreement is sooner terminated as provided herein (the "License Period"). During the License Period, Licensee shall be obligated to continuously operate its business in one hundred percent (100%) of the Licensed Premises during all the days and hours the Regional Retail Development is open to the public as established from time to time by Licensor. ~~Failure to maintain said hours (includes late opening and early closing) will subject Licensee to a Two Hundred Fifty Dollar ($250.00) fine per day per occurrence. Payment of the fine shall not prejudice the rights of Licensor to pursue other remedies available under this Agreement, at law or in equity.~~ Licensee shall not vacate or otherwise permit the Licensed Premises to be left unattended at any time during the License Period. If prior to the expiration of the License Period Licensee vacates the Licensed Premises or leaves the Licensed Premises unattended, Licensee shall remain obligated for all of the Rent and Other Charges due hereunder throughout the License Period, in addition to Licensor having all rights under Paragraph 22 and Paragraph 23, below.

4.    **Trade Name**

Licensee shall operate its business in the Licensed Premises only under the Trade Name set forth on the Data Sheet so long as the same is not in violation of any applicable law. Licensee shall not change such advertised trade name or character of the business operated in the Licensed Premises. Licensee shall not use any name, trademark or logo belonging to Licensor, or used by Licensor in designating the Regional Retail Development, without obtaining Licensor's prior written approval.

5.    **Permitted Use**

Licensee shall use and occupy the Licensed Premises for the use set forth on the Data Sheet and for no other purpose. Any Use Clause violations will subject Licensee to a ~~One Thousand Dollar ($1,000.00)~~ Five Hundred Dollar ($500.00) fine per occurrence. Payment of the fine shall not prejudice the rights of Licensor to pursue other remedies available under this Agreement, at law or in equity.

6.    **Rent and Other Charges**

Licensee agrees to pay all Minimum Rent, Percentage Rent and Other Charges due hereunder as and when the same are due as set forth in this Agreement. Minimum Rent and Percentage Rent are sometimes collectively referred to herein as "Rent". In addition to Minimum Rent and Percentage Rent, Licensee shall be responsible for obtaining and making timely payment for all utilities (including water/sewer charge) used at the Licensed Premises. Any and all such payments shall be made in such a manner as designated by Licensor, and shall be payable

to Licensor, or such other party as Licensor shall designate. ~~The Other Charges are subject to annual adjustment and shall be based on retail square footage of the Licensed Premises as set forth on the Data Sheet. Licensor shall notify Licensee in writing of such adjustments to the Other Charges indicated on the Data Sheet.~~ Licensee's proportionate share of real estate taxes, common area expenses, promotional expenses, and insurance costs are included in Licensee's Minimum Rent.

7. **Security Deposit**

Licensee shall pay to Licensor upon execution of this Agreement, a Security Deposit in the amount set forth on the Data Sheet. Licensor may, at its option, apply the Security Deposit to remedy defaults in the payment of Rent or Other Charges or other sums due from Licensee, or to repair or clean the Licensed Premises. If any portion of such amount is applied, Licensee shall promptly deposit with Licensor sufficient funds to maintain the initial amount. Licensor may commingle such Security Deposit with its own funds and the Security Deposit shall bear no interest. The Security Deposit shall be refunded to Licensee following the expiration of the License Period, provided that Licensee is not in default under this Agreement. The Security Deposit will not be refunded if Licensee does not fulfill all of its obligations as set forth in this Agreement. Any additional Rent, Other Charges or other sums due after application of Security Deposit shall be promptly paid by Licensee to Licensor. Acceptance by Licensor of proposed Licensee's Security Deposit does not constitute part performance and Licensor reserves the right not to execute this Agreement and returning Security Deposit to proposed Licensee.

8. **Signs and Visual Merchandising**

~~Licensee shall submit drawings for use of a storefront sign of professional quality.~~ All signage used at the Licensed Premises shall conform to the sign criteria established by Licensor. The size, content, design and location of all signage shall be subject to the prior written approval of Licensor. Licensee shall not use any handwritten or computer generated signs. All signs shall be subject to Licensor's <u>reasonable</u> approval. Licensee's use of display fixtures and Licensee's overall display of merchandise is subject to Licensor's approval. ~~In the event that Licensor appoints a freelance visual merchandiser for the Licensed Premises based on an unsatisfactory submission of initial renderings on the part of Licensee, the visual merchandiser's fee will be at the Licensee's expense.~~ Licensee will comply with Visual Merchandising standards of Licensor as to all retail square footage used by Licensee in the Licensed Premises.

9. **Gross Sales**

The term "Gross Sales" shall include the entire amount of the actual sales price, whether for cash or otherwise, of all merchandise or services sold, and all other receipts on account of business conducted in or from the Licensed Premises (excluding sales tax). A "sale" shall occur when (i) the sale is reflected in Licensee's books and records, (ii) Licensee receives all or any portion of the sales price, or (iii) the applicable goods and services are delivered to a customer.

<u>The term 'Gross Sales' shall not include the following:</u>

(i)   <u>Any sums and/or credits received in the settlement of claims for loss of or damage to merchandise, including, without limitation, insurance proceeds (other than business interruption insurance proceeds which compensate Licensee for loss of sales or income);</u>

(ii)   <u>The amount of discount on price allowed on all merchandise traded in by customers for credit.</u>

(iii)   <u>Any and all separately stated alteration workroom charges and delivery charges, provided that no profit is intended or derived by Licensee;</u>

(iv)   <u>Interest, service or sales carrying charges or other charges, other than credit card company fees, however, denominated, paid by customers for extension of credit on sales, provided the same are separately stated and not included in the merchandise sales price and provided, further, that no profit is intended or derived by Licensee.</u>

(v)   <u>Receipts from any permitted pay telephones and vending machines provided that no profit is intended or derived by Licensee;</u>

(vi)   <u>The amount of the discount on sales to employees at a discount provided the same shall not exceed two percent (2%) of Gross Sales per annum;</u>

(vii)   <u>Gift certificates, or similar vouchers, until such time as the same shall have been converted into a sale by redemption;</u>

(viii)   <u>Bad debts when written off of the books of Licensee to the extent same shall not exceed one percent (1%) of Gross Sales per annum, provided any recoveries on account of such bad debts shall be included in Gross Sales when received by Licensee;</u>

(ix)   <u>A bulk sale of all or substantially all of Licensee's assets not in the ordinary course of Licensee's business;</u>

(x)   <u>Gift wrapping charges rendered at no profit to Licensee solely for the convenience of Licensee's customers;</u>

(xi)   <u>So called 'layaway' sales or installment sales except to the extent Licensee shall have received payments thereon;</u>

(xii) Mail, catalog, telephone, cable television, computer, or other electronic order sales which are neither placed at, solicited from, filled from, or paid for at the Licensed Premises;

(xiii) Gratuities and tips added to customer's checks to the extent the gratuities and tips are retained by Licensee's employees; nor

(xiv) Sales of used fixtures and equipment not in the ordinary course of Licensee's business and not to exceed one-half of one percent (.5% of Gross Sales per annum)

10.    **Records and Books of Account**

Licensee shall prepare and keep at its corporate office full, complete and proper books and source documents, in accordance with generally accepted accounting principles, of all Gross Sales from the Licensed Premises. Source documents shall include, without limitation: (i) cash register tapes or point of sale terminal computer documentation, (ii) sales tax records, and (iii) such other sales records normally examined by an independent certified public accountant pursuant to generally accepted auditing standards while performing an audit. All records and books of account shall be available for examination and copying at its corporate office by Licensor upon ~~twenty-four (24) hours'~~ seven (7) days' notice.

11.    **Gross Sales Reports**

Licensee shall furnish Licensor within five (5) days after the end of each month during the License Period a complete written statement, in detail acceptable to Licensor and certified by Licensee to be true and correct, of Licensee's Gross Sales during such month or partial month. Failure to submit timely Gross Sales Reports shall subject Licensee to a fine in the amount of ~~Two Hundred Fifty Dollars ($250.00)~~ One Hundred Dollars ($100.00) per day. Payment of the fine shall not prejudice the rights of Licensor to pursue other remedies available under this Agreement, at law or in equity.

12.    **Audit**

At its option, Licensor may, at any time during the License Period, and for one (1) full calendar year following the expiration date of the License Period, upon ~~three (3)~~ seven (7) days days' prior written notice to Licensee, arrange for an auditor selected by Licensor to conduct a complete audit (including a physical inventory) of the records and operations of Licensee's business transacted in or from the Licensed Premises. Licensee shall make available to Licensor's auditor at its corporate office, all records referenced in Paragraphs 10 and 11 above at the time of audit. In the event Licensee's records vary by one percent (1%) or more and additional Percentage Rent is owed, then Licensee shall pay the costs of the audit plus any deficiency within three (3) days following Licensor's demand. In the event the records made available for audit are inadequate, in the opinion of Licensor's auditor, to accurately determine Gross Sales for the period in question, then Licensor shall be entitled to collect, as additional fees, an amount equal to fifty percent (50%) of the aggregate License Fees payable with respect to the period in question.

13.    **Late Payment Fees**

All Minimum Rent, Percentage Rent, Other Charges or other sums due shall be due and payable on or before the designated due dates. Payment shall be deemed to have been made when actually received by Licensor. In the event that Licensee shall fail to deliver to Licensor any installment of Minimum Rent, Percentage Rent, Other Charges or other sums ~~by the due date thereof~~ within ten (10) days after notice to Licensee of the amount overdue, Licensee shall pay Licensor for each and every day until the late payments are made an amount equal to the greater of (a) ~~Five Hundred Dollars ($500.00)~~ One Hundred Dollars ($100.00) and (b) 150% of 1/30th of the Minimum Rent due for such month ("Late Payment Fee"). Interest will accrue on all Late Payment Fees (i.e. not made within ten (10) days after notice from Licensor to Licensee) at a rate of twelve percent (12%) per annum. In addition, Licensee will be responsible for payment of all of Licensor's collection costs, including attorneys' fees. Payment of the Late Payment Fees shall not prejudice the rights of Licensor to pursue other remedies available under this Agreement, at law or in equity.

14.    **Nature of License**

No legal title, easement or other possessory interest in real estate, including any leasehold interest in the Licensed Premises, or any appurtenances thereto, shall be deemed or construed to have been created or vested in Licensee by anything contained in this Agreement. Licensee shall have no recourse against Licensor's partners, agents, contractors, employees, invitees or other licensees for breach of contract under this Agreement or otherwise and none of the direct or indirect partners or members comprising the partnership or company which is the Licensor shall be liable hereunder for breach of contract or otherwise.

15.    **Conduct of Business**

(a)    Licensee shall be open for business and operate continuously during all days and hours established by Licensor during the term of this Agreement. Licensee shall conduct its business in the Licensed Premises in a first-class manner and shall abide by all rules and regulations existing or established by Licensor from time to time for tenants and licensees in the Regional Retail Development. Licensee acknowledges that Licensor's rules and regulations expressly prohibit Licensor's agents and employees from receiving or accepting gifts or anything of value from Licensor's tenants and licensees and the granting of gifts or anything of value by Licensor and Licensor's agents and employees to Licensor's tenants and licensees at the Regional Retail Development. Licensee agrees that it shall not offer or provide gifts or anything of value to Licensor's officers, directors, stockholders, beneficiaries, partners, members, representatives, agents and employees, including without limitation discounts on Licensee's merchandise, except that discounts which are provided to all of Licensor's employees at the Regional Retail Development shall be permitted. Licensee hereby assumes all responsibility for obtaining and keeping effective all licenses, permits and approvals necessary to allow the operation of the business described in the Use Clause stated on the Data Sheet hereof, and shall otherwise comply with all applicable governmental rules and regulations concerning such operation and with the requirements of Licensor's insurance carriers. No food products of any kind shall be sold from the Licensed Premises unless permitted by Licensor. Licensee's business must be attended by employees at all times. Licensee shall not distribute handbills, pamphlets or other literature of any kind or nature from the Licensed Premises or within the Regional Retail Development. Licensee shall not use or allow the Licensed Premises to be used for any improper, immoral, or objectionable purposes as determined by Licensor in its sole judgment. Licensee shall not keep or display any merchandise in the common area of the Regional Retail Development adjacent to or outside of the Licensed Premises or otherwise obstruct said areas. Licensee ~~shall not sell gift cards~~ may sell gift cards as long as Licensee provides its customers with a customer service phone number along with a list of its permanent store locations where customers can redeem gift cards. However, if Licensee only has temporary store locations, then the deleted sentence shall remain intact and Licensee shall not be allowed to sell gift cards. Licensee shall honor all gift cards issued by the Regional Retail Development and honor said gift cards in the same manner as American Express Credit Cards. Licensee agrees that it will conduct its business in good faith, and will not do any act tending to injure the reputation of the Regional Retail Development (or any part thereof) as determined by Licensor. Any violations of the above will subject Licensee to a One Hundred Dollar ($100.00) fine per occurrence unless stated otherwise elsewhere in this Agreement).

(b)    Licensee shall display and sell only first-quality, current season merchandise and Licensee's sales practices shall be in accord with the standards and practices in enclosed first-class full-retail-price regional shopping centers. Licensee represents and warrants that all merchandise sold from the Licensed Premises is legitimate and complies with all licensing expectations and laws. Licensor may require Licensee to remove any goods or products that are alleged or suspected of violating licensing laws and/or any alleged or suspected illegal duplication of merchandise; failure to comply with Licensor's removal request may result in an immediate termination of this Agreement in Licensor's sole discretion. Licensee shall not offer any goods or services which Licensor determines, in its sole discretion, to be inconsistent with the image of a first-class, family-oriented regional retail development, nor shall Licensee display or sell any goods containing portrayals which Licensor determines, in its sole discretion, to be lewd, graphically violent or pornographic. Licensee shall not sell, keep or display any paraphernalia in the Licensed Premises used in the preparation or consumption of any controlled substances. Any violations will subject Licensee to a ~~One Thousand Dollar ($1,000.00)~~ Five Hundred Dollars ($500.00) fine per occurrence.

(c)    ~~Licensee is to accept all returns on merchandise with either a cash or credit card account refund. Licensee shall not issue store credits for returned merchandise. Signs posted on the Licensed Premises that read 'No Exchanges' or 'Exchanges Only' are expressly prohibited. Licensee will stand behind its merchandise and honor all returns. If returns are not honored, Licensee will be billed for the merchandise returned and/or a debit from Licensee's Security Deposit will be deducted by the Licensor to cover the returned merchandise.~~ Licensee must state its company policy with regard to refunds, exchanges and store credits. Licensee must provide its customers with a customer service phone number along with a list of store locations where customers can redeem credit vouchers. Such policy must be posted in the Licensed Premises and be printed on its sales receipts. Any violations will subject Licensee to a One Hundred Dollar ($100.00) fine per occurrence.

(d)    Licensee shall require its employees to wear appropriate attire at all times while at the Regional Retail Development (Professional or Business Casual is expected attire). Licensee agrees to operate its business in a professional manner including, but not limited to, mode of dress. Licensor reserves the right, at its sole discretion, to determine the appropriateness of any attire at any time. Any violations will subject Licensee to a One Hundred Dollar ($100.00) fine per occurrence.

(e)    Licensee and Licensee's employees and/or agents (for purposes of this section, collectively, "Licensee") shall adhere to the following sales and product demonstration selling practices and prohibitions: (i) Licensee shall not solicit business in the parking areas or other common areas, or any part of the Regional Retail Development other than in the Licensed Premises; (ii) Licensee shall not approach customers outside of the Licensed Premises in any manner and are not to "hawk" or "call out" to customers outside the Licensed Premises in any manner, whether verbally, by the use of noise makers, by pursuing customers with Licensee's product and motioning to customers to visit the Licensee's unit while passing or otherwise; (iii) when approached by customers

inside the Licensed Premises, Licensee must not "hawk" or call out to customers and must maintain a normal speaking tone at all times; (iv) if a customer indicates they are not interested in a product, all sales approaches are to cease immediately; (v) Licensee shall not give away any promotional items which could create a nuisance or require Licensor to incur additional common area expenses; (vi) Licensee and its employees operating the Licensed Premises must conduct themselves in a professional and courteous manner at all times; (vii) Licensee must not leave the Premises beyond "an arm's reach" at any time; (viii) Licensee cannot, at any time or under any circumstances, walk into common areas of the Regional Retail Development with products in hand; (ix) Licensee cannot, at any time, call out to customers walking through the Regional Retail Development, including without limitation by asking customers any of the following questions: "May I ask you a Question?", "Hello, can I show you this product?", "Hello, how are you doing today?"; (x) Licensee shall not physically intercept a customer who is walking past the Premises or touch a customer of the Regional Retail Development at any time; (xi) should a customer indicate they are not interested in a product sold by Licensee, Licensee must cease all sales presentations to such customers immediately; (xii) "No Return Policies" are expressly prohibited at all times and no such signage may be posted at the Premises; (xiii) returns by customers must be accepted by Licensee without aggression.

Infractions of the terms and conditions set forth in this subparagraph (e) will result in a (i) ONE THOUSAND DOLLAR ($1,000.00) Five Hundred Dollars ($500.00) fine for the first occurrence; and (ii) Licensor shall have the right, but not the obligation, to either continue to charge the foregoing fine for any subsequent violation of this Paragraph or to terminate the License Agreement immediately, in which case Licensee shall not be entitled to a refund of any portion of its security deposit, and will be obligated to pay for the full term of the License Agreement.

(f)     Payment of any fines stated throughout this Agreement shall not prejudice the rights of Licensor to pursue other remedies available under this Agreement, at law or in equity.

16.    **Care of Licensed Premises**

Licensee, at Licensee's expense, shall at all times keep the Licensed Premises (including the service areas adjacent to the Licensed Premises, display windows and signs) orderly, neat, safe, clean and free from rubbish and dirt and vermin and shall store all trash, garbage and other solid waste within the Licensed Premises. Licensee shall not burn any trash or garbage at any time in or about the Regional Retail Development. Trash removal charges are not included in Rent. Licensee will be billed directly from the solid waste disposal contractor designated for the Regional Retail Development. Licensor may direct Licensee to use, at Licensee's expense, solid waste disposal contractors at such intervals as Licensor may require. Licensee shall not store anything in service or exit corridors. Licensee agrees that all receiving and delivery of goods and merchandise, and all removal of merchandise, supplies, equipment, trash and garbage shall be made only by way of or in the areas provided by Licensor. Licensee shall not use or permit the use of any portion of the Licensed Premises as sleeping quarters, lodging rooms, or for any unlawful purposes. Licensee shall not install any radio or television or other similar device exterior to the Licensed Premises and shall not erect any aerial antennae on the roof or exterior walls of any building within the Regional Retail Development.

17.    **Maintenance**

Licensee, at Licensee's expense, shall keep and maintain a first-class appearance, in a condition at least equal to that which existed when Licensee initially opened the Licensed Premises for business; and in good order, condition and repair (some reasonable wear excepted) as reasonably determined by Licensor (including replacement of parts and equipment, if necessary) the Licensed Premises and every part thereof and any and all appurtenances thereto wherever located, including, but without limitation, the interior surfaces of the exterior walls, the exterior and interior portion of all doors, door frames, door checks, other entrances, windows, window frames, plate glass, storefronts, all plumbing and sewage facilities within the Licensed Premises, including free flow up to the main sewer line, fixtures, ventilation, heating and air conditioning and electrical systems (whether or not located in the Licensed Premises), sprinkler systems, walls, floors and ceilings, and all other repairs, replacements, renewals and restorations, interior and exterior, ordinary and extraordinary, foreseen and unforeseen, and all other work performed by or on behalf of Licensee or otherwise in accordance with the provisions of this Agreement.

Licensee shall keep and maintain the Licensed Premises in a clean, sanitary and safe condition in accordance with the rules of the Regional Retail Development and laws of the State in which the Regional Retail Development is located and in accordance with all directions, rules and regulations of the health officer, fire marshal, building inspector, or other proper officials of the governmental agencies having jurisdiction, and Licensee shall comply with all requirements of law, ordinances and otherwise, affecting the Licensed Premises, all at the sole cost and expense of Licensee. At the time of the expiration or sooner termination of the tenancy created herein, Licensee shall surrender the Licensed Premises in good order, condition and repair, reasonable wear and tear, and damage by fire or other casualty excepted.

18.    **Covenant to Hold Harmless**

Licensee covenants to indemnify, defend and hold harmless Licensor and its officers, directors, stockholders, beneficiaries, partners, members, representatives, agents and employees from and against any and all claims, allegations, actions, damages, liability, cost and

expense, including attorneys' fees, in connection with all losses, including loss of life, personal injury and/or damage to property, arising out of any occurrence in, upon or at the Licensed Premises, or the occupancy or use by Licensee of the Licensed Premises or any part thereof, or arising from or out of Licensee's failure to comply with any provisions hereunder, or occasioned wholly or in part by any act or omission of Licensee, its concessionaires, agents, contractors, suppliers, employees, servants, customers or licensees (except for loss or damage resulting solely from the negligence of Licensor).  The indemnifications in this paragraph shall survive expiration or early termination of this Agreement.

19.    **Default**

~~If Licensee or any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with Licensee fails to observe or perform any of its obligations under this Agreement or any other agreement with Licensor or any person or entity which, directly or indirectly, controls, is controlled by or is under common control with Licensor, then Licensee shall be in default hereunder, and, in addition to the rights and remedies available to Licensor elsewhere under this Agreement or at law or equity, Licensor may, at its option, exercise one or more of the following remedies~~If Licensee fails to observe or perform any of its obligations under this Agreement, it being understood that Licensee shall have ten (10) days after notice from Licensor to cure any monetary default and thirty (30) days after notice from Licensor to cure any non-monetary default (provided, however, Licensee shall not be considered in breach of this Agreement if the nature of the failure is such that the same cannot reasonably be cured within said 30-day period, as long as Licensee commences to cure the same within said 30-day period and diligently pursues the same to completion), then Licensee shall be in default hereunder, and, in addition to the rights and remedies available to Licensor elsewhere under this Agreement or at law or equity, Licensor may, at its option, exercise one or more of the following remedies:

(a)    Declare this Agreement terminated and the License ended (in which event this Agreement and the License shall expire, cease and terminate and Licensee shall vacate and surrender the Licensed Premises to Licensor within five (5) days' of written notice, but shall remain liable for all obligations arising during the balance of the original stated term as here and after provided as if this Agreement had remained in full force and effect) and Licensor shall have the right to bring proceedings to recover possession from Licensee holding over;

(b)    Obtain specific performance of the covenants and obligations of Licensee under this Agreement; or,

(c)    Perform such obligation on behalf of Licensee in which event the costs and expenses paid or incurred by Licensor in performing Licensee's obligations shall be immediately due and payable to Licensor following receipt of Licensor's invoice.

In addition, Licensor shall be entitled to immediately recover from Licensee an amount equal to all of the costs and expenses (including, without limitation, reasonable attorneys' fees) paid or incurred by Licensor as a result of Licensee's default under this Agreement.

20.    **Expiration or Termination**

~~Licensee understands and agrees that Licensee's rights under this Agreement may be terminated at any time for any reason by Licensor upon fifteen (15) days' prior written notice to Licensee.~~  Upon expiration of the License Period, or termination of this Agreement, Licensee shall remove all persons and items of its property from the Licensed Premises and shall vacate the Regional Retail Development.  Licensee shall have access to the Licensed Premises through the date two (2) days after the License Termination Date, unless this Agreement is terminated early by Licensor, then Licensee shall vacate the Licensed Premises on the date stated in the termination letter.  If termination results from Licensor's need for Licensee's space, then a pro rata portion of the license fees paid will be refunded to Licensee.  Licensor shall be entitled to re-enter the Licensed Premises after said date.  After that time, Licensee shall have no right or claim to possession of the Licensed Premises and Licensor may take appropriate measures to evict Licensee.  In the event Licensee shall not remove its property from the Regional Retail Development by said date, then such property shall be deemed abandoned by Licensee and Licensor may dispose of the same without liability to Licensor.  If Licensee fails to return all keys to the Licensed Premises to the Regional Retail Development Management upon Licensee's vacate date, a charge of Two Hundred Fifty Dollars ($250.00)~~Five Hundred Dollars ($500.00)~~ will be deducted from Licensee's Security Deposit.  If Licensee does not have a Security Deposit, Licensee will be charged a key replacement fee in the amount of Two Hundred Fifty Dollars ($250.00)~~Five Hundred Dollars ($500.00)~~. See Special Provision 5.

21.    **Holding Over**

In the event Licensee remains in the Licensed Premises after the License Termination Date or the earlier termination of this Agreement, Licensee will be considered to be "holding over."  Licensee will be billed for any applicable utilities pursuant to the Data Sheet plus Minimum Rent in the amount equal to 150% of the amount stated for Licensee's last full month of occupancy prorated by the actual number of days Licensee occupies the Licensed Premises during the holdover period.  During the holdover period, Licensee's Percentage Rent and Other Charges or other sums owed pursuant to the Data Sheet shall be the same as during Licensee's last month of occupancy under this Agreement and shall be payable on applicable due dates.

Any holding over by Licensee after expiration or termination of this Agreement without Licensor's prior written consent shall entitle Licensor at its option to re-enter the Licensed Premises and padlock or otherwise secure the entrances to the Licensed Premises as Licensor deems necessary. Furthermore, in the event of any such holding over, Licensee shall be liable to Licensor for all expenses, costs and damages by any other tenant or licensee to whom Licensor may have leased or licensed all or any part of the Licensed Premises effective upon termination of this Agreement. Anything in this paragraph to the contrary notwithstanding, the acceptance of any Minimum Rent and/or Percentage Rent paid by Licensee pursuant to this paragraph shall not preclude Licensor from commencing and prosecuting a holdover or summary eviction proceeding. Nothing contained in this paragraph shall (i) imply any right of Licensee to remain in the Licensed Premises after the expiration or termination of this Agreement without the execution of a new License Agreement or Modification of License Agreement; (ii) imply any obligation of Licensor to grant a new license agreement or (iii) be construed to limit any right or remedy that Licensor has against Licensee as a holdover occupant or trespasser.

22.    **Jury Waiver**

Licensor and Licensee waive their right to trial by jury, including any rights to an advisory jury, in any action, proceeding, or counterclaim (i) brought by either Licensee or Licensor against the other party hereto, with respect to any issue or defense raised therein; and (ii) on any matters whatsoever arising out of, or in any way connected with, (a) this Agreement, (b) the relationship of Licensee and Licensor, (c) Licensee's use and occupancy of the Licensed Premises, and/or (d) the Licensor's responsibilities with respect to the Regional Retail Development, including, but not limited to, summary proceedings and possession actions, and any emergency statutory or other statutory remedies.

23.    **No Mechanic's Lien**

Licensee shall not permit any Mechanic's Lien to be filed against the Licensed Premises by reason of any work, labor, services, or materials performed at or furnished to the Licensed Premises or the Licensee.

24.    **Insurance**

Licensee shall maintain the following insurance policies from and after the date on which the Licensed Premises are available to Licensee, and continuing during the License Period:

(a)    Commercial general liability on an occurrence basis with a minimum limit of Two Million Dollars ($2,000,000.00) for bodily injury and property damage. Policy must include product liability insurance with a minimum limit of Two Million Dollars ($2,000,000.00);

(b)    All risk property insurance, including theft coverage, which insures Licensee's merchandise, fixtures, furnishings, equipment and all other items of personal property;

(c)    Workers Compensation as required by law, with statutory limits for specific State.

The general liability policy shall designate Licensor, its managing agent (The Taubman Company LLC) and all other parties in interest designated by Licensor, as an additional insured. The certificate of insurance shall state that the general liability insurance is primary and non-contributory with respect to any insurance policies carried by Licensor, but only as respects the operations of Licensee.

All of the required insurance policies shall include a waiver by the insurance company of all rights of subrogation against Licensor and Licensor's agents, employees, and representatives that may arise by reason of any payment under such policy, or by reason of any act or omission of Licensor's agents, employees, or representatives. Licensee shall provide Licensor with a certificate of insurance prior to taking possession of the Licensed Premises, the certificate will provide evidence that all of the insurance policies required under this section are in effect, and that the required policies will not be cancelled without thirty (30) day advance notice to Licensor. Licensee shall be permitted to satisfy its insurance obligations under this License Agreement by adding the Licensed Premises to its blanket, umbrella, or excess liability policies.

25.    **Notices**

All notices, demands, requests or other instruments which may be or are required to be given hereunder, if sent to Licensee ~~by facsimile, by~~ overnight mail service such as FedEx, UPS, etc., to the address set forth on the first page of this Agreement, ~~or via hand delivery to the Licensed Premises~~ shall be deemed to have been delivered on the date of receipt or refusal thereof; and, if sent to Licensor, by certified mail, return receipt requested, or overnight mail service such as FedEx, UPS, etc. shall be sent to: Licensor, c/o The Taubman Company, 200 East Long Lake Road - Ste. 300, P.O. Box 200, Bloomfield Hills, MI 48303-0200, Attn: General Counsel, or such other address as Licensor may establish from time to time, shall be deemed to have been delivered on the third (3rd) day following receipt.

26.    **Financial Statements**

Upon Licensor's request, Licensee shall promptly furnish Licensor from time to time, with financial statements (including, without limitation, balance sheet and operating statements including an annual profit and loss statement for the business conducted at the Licensed Premises) reflecting the current financial condition of Licensee as well as evidence of ownership or controlling interests in Licensee and in any entities which directly or indirectly control or manage Licensee.

27.    **Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the State in which Regional Retail Development is located in and shall not be modified, altered or amended, except in writing as agreed to by the parties hereto.

28.    **Transfer and Assignment**

Licensee shall not, voluntarily or involuntarily, by operation of law or otherwise, assign or transfer this Agreement or any rights hereunder, nor may Licensee sublet any portion of the Licensed Premises or its obligations under this Agreement.  Licensor's interest in this Agreement may be freely transferred and assigned without Licensee's consent.

29.    **Personal Property and Rent Tax**

Licensee shall be responsible for, and shall pay, prior to delinquency, any and all taxes, assessments, levies, fees and other governmental charges levied or assessed against or with respect to all personal property, trade fixtures and equipment in, on, or located at, or within the Licensed Premises and all alterations, additions or improvements made by Licensee or any previous licensee to the Licensed Premises. Licensee shall be responsible for, and agrees to pay directly to Licensor, any and all sales tax on Minimum Rent, Percentage Rent, Other Charges, storage fees and all other charges that may be assessed or charged in connection with the occupancy, possession or tenancy of the Licensed Premises for each month or partial month during the term of this Agreement including, without limitation, applicable State sales tax (the foregoing shall be hereinafter called "Rent Taxes").  Payment of Rent Taxes shall be due at the same time as the payment of Minimum Rent, Percentage Rent and all Other Charges.

30.    **Right of Entry**

Licensor or Licensor's agents shall have the right to enter the Licensed Premises at all reasonable times to examine the same and to show the Licensed Premises to prospective licensees or tenants.

31.    **Compliance with the Law**

Licensee shall at all times comply with all applicable laws, rules, regulations and ordinances with respect to Licensee's operations  and the portions of the Licensed Premises required to be maintained by Licensee.  Neither Licensee nor any of its officers, employees, directors, affiliates, shareholders, members, partners or owners is listed as a "Specially Designated Person" on or is in violation of any United States laws relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224, effective September 23, 2001, and the U.S. Bank Secrecy Act of 1970, both as amended from time to time.  Licensee further warrants that no investigation, inquiry or charge is pending against Licensee or any of its officers, employees, directors, affiliates, shareholders, partners or owners under any laws or orders described in this paragraph.

32.    **Confidential Hotline**

Licensor strives to maintain the highest ethical standards regarding all our business relationships.  If you have any reason to believe that such standards are being compromised concerning this Agreement or otherwise, please call our independently-operated, toll-free, 24-hours-a-day confidential hotline at 1-888-773-2513 or report the matter on our independently-operated, confidential website at https://iwf.tnwgrc.com/taubman. Both the hotline and website are completely confidential and anonymous.

33.    **Estoppel Statement**

Licensee shall, without charge, at any time and from time to time, within ten (10) twenty (20) days after receipt by Licensee of written request therefore from Licensor deliver a duly executed and acknowledged certificate or statement to any person, firm or corporation designated by Licensor, certifying: (a) that the Agreement is unmodified and in full force and effect, or if there has been any modification, that the same is in full force and effect as modified, and stating any such modification; (b) the date of commencement of the term of the Agreement; (c) that Rent and Other Charges are paid currently without any off-set or defense thereto; (d) the dates to which the Rent and Other Charges payable hereunder by Licensee have been paid, and the amount of Rent and Other Charges, if any, paid in advance; (e) whether or not there is then

existing any claim of Licensor's default hereunder and, if so, specifying the nature thereof; and (f) any other matters relating to the status of this Agreement as shall be requested by Licensor.

34.    **Entire Agreement**

This Agreement is and shall be considered to be the only agreement between the parties hereto relating to the subject matter hereof. All prior negotiations, representations and agreements between the parties are merged herein. This Agreement may be amended or modified only by written instrument executed by both Licensor and Licensee. This Agreement shall not be binding and or effective until signed by both Licensor and Licensee. Licensee has not relied upon any representation of Licensor or its agents, other than any items contained in this Agreement as an inducement to enter into this Agreement. Licensee specifically disclaims any reliance whatsoever upon public disclosures made by Licensor or Licensor's managing agent regarding any aspect of the Regional Retail Development. Licensee agrees that the terms of this Agreement shall remain strictly confidential and shall not be disclosed to any other third party. Licensee will be considered in default for any breach or disclosure of the terms of this Agreement and Licensor may exercise any and all rights available to it according to the terms of this Agreement. Licensee shall not record this Agreement or any memorandum, affidavit or other notice of this Agreement in any public records.



**BLOOMINGDALES**

**MACY'S**

KEY
PUBLIC REST ROOMS
BRU / RETAIL
(RECHARGING UNIT)
ELEVATION CHANGE

FUJI KODAK

TYPICAL BAY

# BEVERLY CENTER

## LEASING PLAN - 6TH LEVEL

AN URBAN RETAIL DEVELOPMENT
LOS ANGELES, CA

Taubman
205 E. LONG LAKE ROAD
BLOOMFIELD HILLS, MI 48303-0200

1

## _1ST_ MODIFICATION OF LICENSE AGREEMENT

This Modification of License Agreement, made and entered into as of this _26TH_ day of _MARCH_ , 2015, by and between LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP, as Licensor, and BLUE BEE, INC., as Licensee.

WITNESSETH;

WHEREAS, Licensor and Licensee did heretofore make and enter into a certain License Agreement, dated _October 20, 2014_ (The "Agreement"), for a retail business to be operated under the trade name "ANGL", covering premises identified as Space 7788 in the Regional Retail Development commonly known as BEVERLY CENTER; and,

WHEREAS, the parties hereto are presently desirous of modifying said Agreement in the manner hereinafter set forth.

NOW, THEREFORE, for and in consideration of the covenants herein contained and other good valuable consideration, the receipt and adequacy of which are confessed and acknowledged by each of the parties hereto, it is agreed as follows:

1    The License Commencement Date shall be changed from 11/1/14 to 11/24/14.
     Minimum Rent, Percentage Rent and Other Charges shall be adjusted accordingly.

2    This Modification of License Agreement and any exhibits attached hereto and the License Agreement referenced above, set forth all the covenants, promises, agreements, conditions and understandings between Licensor and Licensee concerning the Licensed Premises, and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than those set forth in the License Agreement and as modified herein by this Modification of License Agreement. Licensee has not relied upon any representation of Licensor or its agents, other than any items contained in the License Agreement and modified by this Modification of License Agreement as an inducement to enter into this Modification of License Agreement. Licensee specifically disclaims any reliance whatsoever upon public disclosures made by Licensor or Licensor's managing agent regarding any aspect of the Regional Retail Development. Except as expressly modified in this Modification of License Agreement, all of the terms, covenants and conditions of said License Agreement shall remain in full force and effect and are hereby ratified and confirmed. Licensee agrees that the terms of this Modification of License Agreement shall remain strictly confidential and shall not be disclosed to any other third party. Licensee will be considered in default of the License Agreement for any breach or disclosure of the terms of this Modification of License Agreement and Licensor shall exercise any and all rights available to it according to the terms of the Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hand and seal the day and year first above written and declare this Modification of License Agreement to be binding on them, their respective successors and permitted assigns.
IN THE PRESENCE OF:

_Donna Nagle_

LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP (Licensor)

By: _____

Its: Authorized Signatory

_____

_Sheila P. Francisco_
Print name of witness:

BLUE BEE, INC. (Licensee)

By: _____

_Jeff Sunghak Kim - President_
Print name of person signing this Agreement:

Licensee Tax ID:  80-0950433

3

ACKNOWLEDGMENT OF LICENSOR
LA CIENEGA PARTNERS LP

STATE OF MICHIGAN
COUNTY OF OAKLAND

On this _25TH_ day of _MARCH_____, 2015, before me personally appeared
_____CHRIS HEAPHY_____, to me known to be the person who executed the foregoing Modification
of License Agreement and acknowledged before me that he was duly authorized and did execute same on behalf of
Licensor LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP.

_Donna Nagle_
Notary Public

DONNA NAGLE
NOTARY PUBLIC
State of Michigan
My Commission Expires
November 11, 2021

ACKNOWLEDGMENT OF LICENSEE
BLUE BEE, INC.

STATE OF _CALIFORNIA_
COUNTY OF _LOS ANGELES_

On this ___2___ day of _MARCH_____, 2015, before me personally appeared
_JEFF SUNGHAK KIM_____, to me personally known, who, being by me duly
sworn, did say that they are, respectively, the _PRESIDENT_____of the
corporation/company/individual (referred herein as "Licensee") and which executed the within instrument on behalf of said
Licensee and acknowledged before me said instrument to be the free act and deed of said corporation.

HAROLD A. UTOMAKILI
COMM. # 2019155
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 9, 2017

_____
Notary Public

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On _MARCH 2, 2015_ before me, _HAROLD A. UTOMAKILI_ _____Notary Public,
(here insert name and title of the officer)

personally appeared _JEFF SUNGHAK KIM_ _____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

HAROLD A. UTOMAKILI
COMM. # 2019155
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. MAY 9, 2017

Signature: _____    **(Seal)**

# Taubman



November 18, 2016

**VIA 2nd DAY AIR**

Blue Bee, Inc.
Attn: Mr. Jeff Kim
2301 E. 51st Street
Vernon, CA 90058

RE:    **ANGL**
       **BEVERLY CENTER**

Dear Tenant:

Enclosed please find one (1) copy of the fully executed First Modification of License Agreement for Space 6622.

Should you have any questions, please do not hesitate to contact the Specialty Leasing Agent at the Center.

Sincerely,

THE TAUBMAN COMPANY

Donna Nagle
Legal Assistant

Enclosure

cc:    Lease Administration

200 East Long Lake Road
Suite 300
Bloomfield Hills, Michigan
48304-2324

T 248.258.6800
www.taubman.com

## _1ST_ MODIFICATION OF LICENSE AGREEMENT

This Modification of License Agreement, made and entered into as of this _18th_ day of _November_,
2016, by and between LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP, as
Licensor, and BLUE BEE, INC., as Licensee.

WITNESSETH;

WHEREAS, Licensor and Licensee did heretofore make and enter into a certain License Agreement, dated
_May 25, 2016_ (The "Agreement"), for a retail business to be operated under the trade name "ANGL",
covering premises identified as Space 6622 in the Regional Retail Development commonly known as BEVERLY CENTER;
and,

WHEREAS, the parties hereto are presently desirous of modifying said Agreement in the manner hereinafter set forth.

NOW, THEREFORE, for and in consideration of the covenants herein contained and other good valuable consideration,
the receipt and adequacy of which are confessed and acknowledged by each of the parties hereto, it is agreed as follows:

1    August 2016 - October 2016 Minimum Rent shall be changed from $16,000.00/month to $10,000.00/month.
     November 2016 - December 2016 Minimum Rent shall be changed from $17,500.00/month to $12,000.00/month.

2    August 2016 - October 2016  Percentage Rent Breakpoint shall be changed from $160,000.00/month
     $100,000.00/month.
     November 2016 - December 2016  Percentage Rent Breakpoint shall be changed from $175,000.00/month
     $120,000.00/month.

3    This Modification of License Agreement and any exhibits attached hereto and the License Agreement referenced
     above, set forth all the covenants, promises, agreements, conditions and understandings between Licensor and
     Licensee concerning the Licensed Premises, and there are no covenants, promises, agreements, conditions or
     understandings, either oral or written, between them other than those set forth in the License Agreement and as
     modified herein by this Modification of License Agreement. Licensee has not relied upon any representation of
     Licensor or its agents, other than any items contained in the License Agreement and modified by this Modification of
     License Agreement as an inducement to enter into this Modification of License Agreement. Licensee specifically
     disclaims any reliance whatsoever upon public disclosures made by Licensor or Licensor's managing agent
     regarding any aspect of the Regional Retail Development. Except as expressly modified in this Modification of
     License Agreement, all of the terms, covenants and conditions of said License Agreement shall remain in full force
     and effect and are hereby ratified and confirmed. Licensee agrees that the terms of this Modification of License
     Agreement shall remain strictly confidential and shall not be disclosed to any other third party. Licensee will be
     considered in default of the License Agreement for any breach or disclosure of the terms of this Modification of
     License Agreement and Licensor shall exercise any and all rights available to it according to the terms of the
     Agreement.

2

IN WITNESS WHEREOF, the parties hereto have set their hand and seal the day and year first above written and declare this Modification of License Agreement to be binding on them, their respective successors and permitted assigns.

IN THE PRESENCE OF:

LA CIENEGA PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP (Licensor)

By: _____

Its: Authorized Signatory

BLUE BEE, INC. (Licensee)

By: _____

Sheila P. Francisco

Jeff Sunghak Kim — President

Print name of witness:

Print name of person signing this Agreement:

Licensee Tax ID:  80-0950433

ACKNOWLEDGMENT OF LICENSOR
LA CIENEGA PARTNERS LP

STATE OF MICHIGAN
COUNTY OF OAKLAND

On this _18th_ day of _November_____, 2016, before me personally appeared
_____CHRIS HEAPHY____, to me known to be the person who executed the foregoing Modification of License
Agreement and acknowledged before me that he was duly authorized and did execute same on behalf of Licensor LA CIENEGA
PARTNERS LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP.


_____
Notary Public

DONNA NAGLE
NOTARY PUBLIC
State of Michigan
My Commission Expires
November 11, 2021

ACKNOWLEDGMENT OF LICENSEE
BLUE BEE, INC.

STATE OF _CALIFORNIA_
COUNTY OF _Los Angeles_

On this _October 14, 20_ day of _October_____, 2016, before me personally appeared
_____JEFF S. KIM_____, to me personally known, who, being by me duly sworn, did say
that they are, respectively, the _____OWNER / PRESIDENT_____ of the corporation/company/individual (referred herein as
"Licensee") and which executed the within instrument on behalf of said Licensee and acknowledged before me said instrument to be the
free act and deed of said corporation.


_____
Notary Public

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                     )

County of __Los Angeles__         )

On _October 14, 2016_ before me, __JAMES I. UTOMAKILI ( NOTARY PUBLIC)__,
      *Date*                        *Here Insert Name and Title of the Officer*

personally appeared ___Jeff S. Kim___
                              *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature __/s/_____
               *Signature of Notary Public*

JAMES I. UTOMAKILI
COMM. # 2072699
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JULY 22, 2018
MGC1

*Place Notary Seal Above*

---

━━━━━━━━━━━━━━━ **OPTIONAL** ━━━━━━━━━━━━━━━
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____
Document Date: _____ Number of Pages: _____
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

# Rancho Cucamonga Victoria Gardens (#38)

# FORESTCITY

**Richard D. Tomsick**
Corporate Counsel

Direct Number (216) 416-3282
ricktomsick@forestcity.net

**Legal Department**
50 Public Square
Suite 1360
Cleveland, OH  44113-2267

Phone (216) 621-6060
Fax (216) 263-6206
www.forestcity.net

File No.:  L-11503

August 2, 2012

**VIA FEDERAL EXPRESS – 2 DAY**

Sheila Francisco
ANGL
2301-2313 E. 51st St.
Vernon, CA 90265

Re:    **ANGL – Victoria Gardens**

Dear Ms. Francisco:

Enclosed for your file please find one (1) fully executed Lease for the referenced Premises.

Thank you for your cooperation in this matter.

Very truly yours,

*Richard Tomsick/jmf*

Richard D. Tomsick

RDT:jmf
Encl.

cc:    Steven Berman, Esq. (w/attachment)(via email)
Mark Himmelman
Sandra Montgomery
Mary Rositano
Holly Gilbert
Christine Pham

L-11503
H:\w97\rdt\L11503lse.doc
RDT:jmf
5/1/12
6/8/12
7/5/12
7/16/12

## VICTORIA GARDENS

### Rancho Cucamonga, California

### LANDLORD

==============================================================

### RANCHO MALL, LLC,
#### a Delaware limited liability company

### TENANT

==============================================================

ANGL, INC.,
a California corporation

d/b/a

ANGL

Unit No.  1615

## TABLE OF CONTENTS

Section 1.0 - Basic Lease Provisions. ...................................................................................1
Section 1.1 - Defined Terms. .................................................................................................4
Section 2.1 - Exhibits. .............................................................................................................5
Section 3.1 - Premises...........................................................................................................5
Section 3.2 - Gross Leasable Area of the Premises............................................................5
Section 3.3 - Revisions to Premises GLA.............................................................................6
Section 3.4 - Landlord's Reservation.....................................................................................6
Section 4.1 - Tenant's Use of Common Areas. ....................................................................6
Section 4.2 - Management and Operation of Common Areas. .............................................7
Section 5.1 - Site Plan and Leasing Plan. ............................................................................7
Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.............................7
Section 6.0 - Construction Allowance....................................................................................8
Section 6.1 - Landlord's Responsibilities...............................................................................8
Section 6.2 - Tenant's Responsibilities. ................................................................................8
Section 6.3 - Tenant's Trade Fixtures ...................................................................................9
Section 6.4 - Labor Cooperation. ..........................................................................................9
Section 7.1 - Submission of Plans and Specifications. ......................................................10
Section 8.1 - Operation and Use of Premises. ...................................................................10
Section 8.2 - Tenant's Covenant to Operate. .....................................................................10
Section 8.3 - Prohibitions on Use. .......................................................................................11
Section 8.4 - Manner of Operation of Business. .................................................................11
Section 9.1 - Commencement Date Agreement. .................................................................13
Section 9.2 - Holding Over....................................................................................................13
Section 9.3 - Expiration of the Term of the Lease. .............................................................13
Section 10.1 - Rent Commencement Date...........................................................................13
Section 10.2 - Delay or Failure to Deliver Premises to Tenant. .........................................13
Section 10.3 - Tenant's Failure to be Open by the Outside Date.......................................14
Section 11.1 - Fixed Minimum Rent. ....................................................................................14
Section 11.2 - Percentage Rent. ..........................................................................................14
Section 11.3 - Additional Rent..............................................................................................17
Section 11.4 - Real Estate Taxes.........................................................................................17
Section 11.5 - Utility and Insurance Costs...........................................................................18
Section 12.1 - Utility Service Charges..................................................................................19
Section 12.2- Discontinuance of Service..............................................................................20
Section 12.3- Interruption of Service. ...................................................................................20
Section 12.4- Premises Sprinkler System. ...........................................................................21
Section 13.1 – Storefront Sign. ............................................................................................21
Section 13.2 - Interior Signs and Advertising.......................................................................21
Section 14.1 - Repairs by Landlord. .....................................................................................21
Section 14.2 - Repairs By Tenant. .......................................................................................22
Section 14.3 - Alterations and Remodeling. .........................................................................22
Section 15.1 - Lien Indemnification by Tenant.....................................................................23
Section 16.1 - Indemnification. .............................................................................................23
Section 16.2 - Tenant's Insurance Requirements.................................................................23
Section 16.3 - Waiver of Subrogation...................................................................................25
Section 16.4 - Landlord Not Responsible for Acts of Others...............................................25
Section 17.1 - Rules and Regulations. .................................................................................25
Section 17.2 - Rubbish..........................................................................................................25
Section 17.3 - Lighting. .........................................................................................................25
Section 17.4 - Merchandise Display, Loading and Unloading. ............................................25
Section 17.5 - Obstruction of Passageways. .......................................................................25
Section 17.6 - Employee Parking. ........................................................................................26
Section 18.1 - Subordination of Lease. ................................................................................26
Section 18.2 - Attornment by Tenant....................................................................................26
Section 18.3 - Landlord as Attorney-in-Fact for Tenant. .....................................................26
Section 19.1 - Landlord's Right to Repair.............................................................................26
Section 19.2 - Landlord's Right to Affix to Exterior .............................................................27
Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant. ..........................27
Section 20.1 - Landlord's Consent Required. .......................................................................27
Section 20.2 - Insolvency Proceedings. ...............................................................................27
Section 20.3 - Transfer of Corporate Shares. ......................................................................27
Section 20.4 - Assignment to Related Entity. .......................................................................28
Section 20.5 - Transfer of Other Business Interests............................................................28
Section 20.6 - Acceptance of Rents by Landlord.................................................................29
Section 20.7 - No Release of Liability. .................................................................................29
Section 20.8 - Administrative Fee. ........................................................................................29

Section 21.1 - Landlord's Obligation to Repair and Reconstruct..............................................29
Section 21.2 - Option to Terminate. ....................................................................................30
Section 21.3 - Demolition of Landlord's Building. ................................................................30
Section 22.1 - Effect of Taking. ..........................................................................................30
Section 22.2 - Compensation and Awards. .........................................................................30
Section 22.3 - Condemnation or Breach of Lease. .............................................................30
Section 23.1 - Default. .......................................................................................................31
Section 23.2 - Remedies and Damages. .............................................................................31
Section 23.3 - Remedy for Failure to Open or Operate.' .....................................................32
Section 23.4 - Repeated Default. .......................................................................................32
Section 23.5 - Waiver of Rights of Redemption. ..................................................................33
Section 24.1 - Restriction on Tenant. .................................................................................33
Section 24.2 - Imposition of Damages.................................................................................33
Section 25.1 - Notices to Tenant and Landlord. ..................................................................33
Section 25.2 - Notices to Mortgagee. .................................................................................33
Section 26.1 - Accord and Satisfaction................................................................................34
Section 26.2 - Complete Agreement. ..................................................................................34
Section 26.3 - Consents......................................................................................................34
Section 26.4 - Brokerage. ...................................................................................................34
Section 26.5 - Effective Date of Lease. ...............................................................................34
Section 26.6 - Estoppel Certificates. ..................................................................................34
Section 26.7 - Force Majeure..............................................................................................35
Section 26.8 - Interpretation................................................................................................35
Section 26.9 - Memorandum of Lease. ................................................................................35
Section 26.10 - Quiet Enjoyment.........................................................................................35
Section 26.11 - Rent Demand..............................................................................................35
Section 26.12 - Section and Title Headings. ........................................................................35
Section 26.13 - Successors and Assigns. ...........................................................................35
Section 26.16 - Transfer of Landlord's Interest....................................................................36
Section 26.17 - Litigation.....................................................................................................36
Section 26.18 – Non-Discrimination. ...................................................................................36
Section 26.19 – Patriot Act..................................................................................................37

L-11503
H:\w97\rdt\L11503lse.doc
RDT:jmf
5/1/12
6/8/12
7/5/12
7/16/12

# L E A S E

THIS LEASE MADE AND ENTERED INTO AT Cleveland, Ohio, this *2nd* day of *August*, 2012, by and between RANCHO MALL, LLC, a Delaware limited liability company ("Landlord"), having an address for purposes hereof at Terminal Tower, 50 Public Square, Suite 1360, Cleveland, Ohio 44113-2267; and ANGL, INC., a California corporation ("Tenant"), having an address for purposes hereof at 2301-2313 E. 51st Street, Vernon, CA 90058, Attn: President.

## WITNESSETH

### ARTICLE I

### INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are an integral part of this Lease, and are referred to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties. They are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

(a)   Shopping Center:                                      (Article I, Section 1.1 [g])
          Victoria Gardens

(b)   Unit No.:          1615

(c)   Approximate
       Premises GLA:       2,363 square feet.

(d)   Term of Lease:
                         Ten (10) Lease Years commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined).

(e)   Rent Commencement
                         Date: All Rents commence ninety (90) days from the later to occur of (i) Landlord's delivery of possession of the Premises to Tenant, and (ii) Tenant's receipt of a fully-executed copy of this Lease, without regard to whether or when the Tenant shall open the Premises for business to the public. Landlord shall use commercially reasonable efforts to deliver possession to Tenant on January 2, 2013, and Tenant shall neither be required to accept possession prior to said date, nor shall the same be deemed delivered prior to said date.

(f)   Term Expiration
       Date:             The day prior to the tenth (10th) anniversary of the Rent Commencement Date. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs.

(g)   Fixed Minimum
Rent:

(Article XI, Section 11.1)

(i)   $60.00 per square foot of Premises GLA,
$141,780.00 per Lease Year,
$11,815.00 per month, for Lease Year One (1);

(ii)   $61.80 per square foot of Premises GLA,
$146,033.50 per Lease Year,
$12,169.45 per month, for Lease Year Two (2);

(iii)   $63.65 per square foot of Premises GLA,
$150,404.95 per Lease Year,
$12,533.75 per month, for Lease Year Three (3);

(iv)   $65.56 per square foot of Premises GLA,
$154,918.28 per Lease Year,
$12,909.86 per month, for Lease Year Four (4);

(v)   $67.53 per square foot of Premises GLA,
$159,573.39 per Lease Year,
$13,297.78 per month, for Lease Year Five (5);

(vi)   $69.56 per square foot of Premises GLA,
$164,370.28 per Lease Year,
$13,697.52 per month, for Lease Year Six (6);

(vii)   $71.65 per square foot of Premises GLA,
$169,308.95 per Lease Year,
$14,109.08 per month, for Lease Year Seven (7);

(viii)   $73.80 per square foot of Premises GLA,
$174,389.40 per Lease Year,
$14,532.45 per month, for Lease Year Eight (8);

(ix)   $76.01 per square foot of Premises GLA,
$179,611.63 per Lease Year,
$14,967.64 per month, for Lease Year Nine (9);

(x)   $78.29 per square foot of Premises GLA,
$184,999.27 per Lease Year,
$15,416.61 per month, for Lease Year Ten (10);

(xi)   Fixed Minimum Rent   (Article III, Section 3.3)
Subject to adjustment if Premises GLA is revised:
  X   yes         no.

(h)   Percentage Rent:

(Article XI, Section 11.2)

(i)   6% of Gross Revenue in excess of $2,363,000.00
("Annual Breakpoint") for Lease Year One (1);

(ii)   6% of Gross Revenue in excess of $2,433,890.00
("Annual Breakpoint") for Lease Year Two (2);

(iii)   6% of Gross Revenue in excess of $2,506,749.17
("Annual Breakpoint") for Lease Year Three (3);

(iv)   6% of Gross Revenue in excess of $2,581,971.33
("Annual Breakpoint") for Lease Year Four (4);

(v)   6% of Gross Revenue in excess of $2,659,556.50
("Annual Breakpoint") for Lease Year Five (5);

(vi)   6% of Gross Revenue in excess of $2,739,504.67
("Annual Breakpoint") for Lease Year Six (6);

(vii)   6% of Gross Revenue in excess of $2,821,815.83
("Annual Breakpoint") for Lease Year Seven (7);

(viii)    6% of Gross Revenue in excess of $2,906,490.00
("Annual Breakpoint") for Lease Year Eight (8);

(ix)    6% of Gross Revenue in excess of $2,993,527.17
("Annual Breakpoint") for Lease Year Nine (9);

(x)    6% of Gross Revenue in excess of $3,083,321.17
("Annual Breakpoint") for Lease Year Ten (10);

(i)    Additional Rent:                          (Article XI, Section 11.3)
Additional Rent shall be charged in the initial amount of $17.54
per square foot of Premises GLA for Lease Year One (1) which
shall be subject to annual compounded increases equal to five
percent (5%) of the immediately preceding Lease Year's
Additional Rent.

(j)    Real Estate Taxes:                       (Article XI, Section 11.4)
Tenant's Proportionate Share, which is currently estimated to be
$7.13 per square foot of Premises GLA for Lease Year One (1);
payable monthly on estimated bill.

(k)    Common Area Utility                      (Article XI, Section 11.5)
and Insurance Costs: Tenant's Proportionate Share, which is currently estimated to be
(and not to exceed) $1.35 per square foot of Premises GLA for
Lease Year One (1) for Common Area Utility Costs; and which is
currently estimated to be $1.32 per square foot of Premises GLA
for Lease Year One (1) for Insurance Costs; payable monthly on
an estimated bill.

(l)    Premises Utilities:                      (Article XII, Section 12.1)
Payable by Tenant as billed per metered, submetered or
estimated and adjusted billing.

(m)    Trade Name:                             (Article VIII, Section 8.1)
Angl or any trade name used by Tenant in a majority of its stores
which includes the name "Angl"

(n)    Permitted Use:                          (Article VIII, Section 8.1)
Tenant shall use and occupy the Premises solely for the retail sale
of women's and misses' ready-to-wear clothing and related
accessories, which shall be the primary use, and such ancillary
uses including, but not limited to, handbags, costume jewelry
(provided, however, Tenant shall not allocate more than ten
percent (10%) of Premises GLA to the display and sale of
costume jewelry), perfumes, cosmetics, make-up and hair
products, and footwear (provided, however, Tenant shall not
allocate more than fifteen percent (15%) of Premises GLA to the
display and sale of footwear).    Except as provided in the
immediately preceding sentence with respect to the area
limitations for costume jewelry and footwear, in no event shall any
one (1) item of ancillary sales constitute more than five percent
(5%) of Premises GLA.    Notwithstanding the foregoing to the
contrary, in no event shall the aggregate of all such so-called
ancillary uses comprise more than twenty-five percent (25%) of
Premises GLA in their entirety.

(o)    Tenant's Billing Address:
2301-2313 E. 51st Street
Vernon, CA 90058
Attn: Accounting

(p)    Tenant's Notice Address:                 (Article XXV, Section 25.1)
2301-2313 E. 51st Street
Vernon, CA 90058
Attn: President

3

(q)   Landlord's Notice Address:                                    (Article XXV, Section 25.1)
      Terminal Tower
      50 Public Square
      Suite 1360
      Cleveland, Ohio 44113-2267

(r)   Landlord's Mortgagee's                                        (Article XXV, Section 25.2)
      Notice Address:

      TIAA-CREF
      c/o Commercial Loan Services
      1500 CityWest Blvd
      Suite 240
      Houston, Texas 77042

(s)   Address for
      Payment of Rents
      Including Percentage
      Rent:                      Rancho Mall, LLC
                                 Post Office Box 72439
                                 Cleveland, Ohio 44192

(t)   Address for Percentage Rent
      Reports:                   Forest City Commercial Management, Inc.
                                 700 Terminal Tower
                                 50 Public Square
                                 Cleveland, Ohio 44113
                                 Attn: Lease Administration Department

                                 or fax to (216) 263-4806

(u)   Guarantor:                 None

(v)   Security Deposit:          None

(w)   Construction Allowance:    None

Section 1.1 - Defined Terms.

       Wherever used in this Lease, the following terms shall be construed to mean as follows:

       (a)     "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

       (b)     "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, servants, customers and invitees.

       (c)     "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

       (d)     "Major Tenants" shall mean JC Penney; AMC Theatres, Macy's (East); and Macy's (West), and any other tenants located in the Shopping Center whose floor area exceeds seventy-five thousand (75,000) contiguous square feet operating under a single trade name ("Major Tenant Threshold").

4

(e)    "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 1615, and further being a space containing approximately 2,363 square feet of floor space. The Premises are hatched on Exhibit B for the sole purpose of more specifically locating said area.

(f)    "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(g)    "Shopping Center" shall mean those buildings, land (excluding outparcels, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "Victoria Gardens" located in the City of Rancho Cucamonga, San Bernardino County, California, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time. Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

(h)    "Tenant's Proportionate Share" shall mean a fraction the numerator of which is the Premises GLA and the denominator of which is the total number of square feet of gross leasable retail area in the Shopping Center, excluding the number of square feet of all spaces exceeding the Major Tenant Threshold ("Center GLA"), which is actually occupied ("Occupied Center GLA") (except that the Occupied Center GLA may not be less than eighty (80%) of aggregate Center GLA).

(i) "GROUND LEASE" shall mean the Ground Lease dated July 22, 2003 ("Ground Lease") pursuant to which Landlord leases the Shopping Center land from FC Victoria Gardens-C, Inc., and LC Cucamonga Commercial, Inc., collectively the "Ground Lessor". Landlord and Tenant acknowledge and agree that the Ground Lease shall be deemed to be an "Encumbrance" pursuant to the provisions of Article XVIII.

<div align="center">

ARTICLE II
EXHIBITS

</div>

Section 2.1 - Exhibits.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A    -    Site Plan of the Shopping Center - attached hereto.

EXHIBIT B    -    Leasing Plan of the Shopping Center - attached hereto.

EXHIBIT C    -    Tenant Handbook for Shopping Center - containing sign and design criteria - not attached but incorporated herein by reference.

<div align="center">

ARTICLE III
PREMISES

</div>

Section 3.1 - Premises.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (e), subject to all conditions and easements of record (provided that none shall materially increase Tenant's obligations or materially decrease Tenant's rights under this Lease) for the Term of the Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - Gross Leasable Area of the Premises.

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall. Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or

bracing within the Premises or along the demising walls, but deductions shall be made for the
areas occupied by major vertical duct shafts or pipe chases.

Section 3.3 - <u>Revisions to Premises GLA.</u>

      The Premises GLA set forth in Section 1.0 (c) has been determined pursuant to the
provisions of Section 3.2 by reference to either "CAD" or scaled architectural drawings of the
Premises. Landlord and Tenant acknowledge that, irrespective of whether or not the Premises
shall have been constructed as of the date of this Lease, Tenant may re-measure the Premises
after Tenant's leasehold improvements have been constructed, and in the event that Landlord's
final as-built field or CAD measurements of the Premises after all leasehold improvements have
been constructed therein should disclose a different square footage than the Premises GLA set
forth in Section 1.0 (c) above ("Final Revised Premises GLA"), then Landlord agrees to notify
Tenant in writing of the Final Revised Premises GLA. Tenant further acknowledges and agrees
that such notice by Landlord shall be deemed sufficient to amend the Premises GLA set forth in
Section 1.0 (c), such amendment being deemed self-operative without the necessity of further
formal mutual acknowledgment or documentation between Landlord and Tenant.  When so
finally determined, the Final Revised Premises GLA shall be used as the numerator in
computing Tenant's Proportionate Share of all prorated charges and in all computations of
Rents if such has been determined on a square foot (as opposed to a fixed rate) basis as set
forth in Section 1.0 (g).  If the Rents should be revised, Landlord's revised billing to Tenant shall
be deemed sufficient notice of such Rent revisions and the Percentage Rent Annual
Breakpoints set forth in Section 1.0 (h) herein shall be correspondingly adjusted.
Notwithstanding the foregoing, for purposes of the calculation of Rents (if such has been
determined on a square foot [as opposed to a fixed rate] basis), in no event shall the Final
Revised Premises GLA be deemed greater than the Premises GLA set forth in Section 1.0 (c)
above.

Section 3.4 - <u>Landlord's Reservation.</u>

      Landlord reserves to itself the roof and exterior walls of the building containing the
Premises and all space above the ceiling within the Premises to accommodate the Shopping
Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements.
If Landlord installs any such conduit, piping, ducting or venting, Landlord shall paint or otherwise
treat the same to match existing systems and repair any damage caused to the Premises as a
result of any such work.  Landlord and its agents further reserve the right on behalf of
themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when
necessary or desirable through the air space above Tenant's ceiling, within existing columns or
within the existing walls of the Premises, and to maintain, repair, alter, replace or remove same
in non-sales areas locations which will not materially interfere with Tenant's use of the Premises
and repair any damage to the Premises as a result of such activities. Landlord shall not install
any columns within the Premises other than those depicted on Exhibit B attached hereto.  To
the extent that Landlord permits the installation of or installs anything above Tenant's ceiling,
Landlord shall indemnify Tenant for any cost, expense, losses or liability that Tenant may suffer
as a result of such installation or the presence of such items above the ceiling of the Premises.
Notwithstanding anything to the contrary, if Landlord's actions within the Premises materially
interfere with Tenant's business, there shall be an equitable abatement of Rents to the extent of
said interference until cessation thereof.  For purposes of determining "materially" with respect
to any interference in this Lease, as a condition precedent to Tenant's right to an equitable
abatement, Tenant shall first prove to Landlord's reasonable good faith and diligent satisfaction
that the adverse effect on Tenant's Gross Revenue was the direct result of Landlord's actions,
which adverse effect can mean a change in trend, not necessarily a strict decrease in sales,
subject to taking into consideration other factors such as weather conditions and special sales
events.  In support thereof, Tenant shall submit to Landlord Tenant's Gross Revenue reports for
periods as are reasonably necessary to determine said adverse effect and such other
information as shall be reasonably requested by Landlord.

<div align="center">ARTICLE IV<br>COMMON AREAS</div>

Section 4.1 - <u>Tenant's Use of Common Areas.</u>

      (a)    Landlord grants to Tenant and its agents, employees and customers, a non-
exclusive license, right, in common with other tenants, which will not be revocable, in whole or in
part, so long as Tenant is not in a material Default of its obligations under this Lease, subject to
the reasonable, non-discriminatory rules and regulations promulgated by Landlord, to use the
Common Areas in common with other tenants and occupants of the Shopping Center, their
agents, employees and customers during the Term of this Lease, and any renewal period

<div align="center">6</div>

thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

(b)    Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas. Notwithstanding anything contained to the contrary in this Lease, Landlord shall not place any kiosk, cart, stand or other obstruction (other than typical common-area low-height mall amenities such as seating (provided that the same shall not materially interfere with access to or visibility of Tenant's storefront and sign) from the edge of any point on the front lease line of the Premises to the nearest curb ("Restricted Area").

(c)    Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - Management and Operation of Common Areas.

Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in a first-class manner and in the best interest of the Shopping Center. Subject to the applicable provisions of this Lease, Landlord will have the right (1) to establish, modify and enforce reasonable, non-discriminatory rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable, non-discriminatory rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

ARTICLE V
CHANGES AND ADDITIONS TO
SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - Site Plan and Leasing Plan.

The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.

Subject to the applicable provisions of this Lease, Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. No such changes, rearrangements or other construction shall permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law. Notwithstanding anything herein to the contrary, unless compelled by Applicable Law, Landlord agrees not to place any obstruction within, or to make any material change to, the area bounded by the front line of the Premises and extending to the curb in front of the store as depicted on the lease plan attached hereto on Exhibit "B" as "Protected Area" (the "Protected Area"), provided that the foregoing covenant by Landlord shall not apply to any existing items within the Protected Area, such as benches, landscaping, planters, bollards, flowerpots, and the like, and shall not impair Landlord's right to replace and maintain the same from time to time.

ARTICLE VI
IMPROVEMENTS

Section 6.0 - <u>Construction Allowance</u>.

INTENTIONALLY OMITTED.

Section 6.1 - <u>Landlord's Responsibilities</u>.

Tenant acknowledges that it is accepting the Premises in its present "as-is" condition.

Section 6.2 - <u>Tenant's Responsibilities</u>.

On or before the Rent Commencement Date, Tenant shall, at its own expense and in accordance with Exhibit C and the Tenant's Landlord-approved plans and specifications, construct the improvements to the Premises which are described in this Section 6.2. In the event that Tenant fails to open the Premises with Tenant's Work substantially completed on or before November 1, 2013, Tenant shall thereupon pay damages for such delay in the amount of fifty percent (50%) of Fixed Minimum Rent, calculated on a per diem basis, for each day of such delay in completing Tenant's Work and opening Tenant's store for business to the public, in addition to the payment of Fixed Minimum Rent and all other Rents and charges hereunder.

(a)    Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work. Tenant acknowledges that, unless otherwise specifically provided herein, it or its contractor shall be responsible for paying all fees whatsoever which are charged by the applicable governmental authority in connection with, or as a condition of, the issuance of Tenant's permits.

(b)    Remodel the leasehold improvements of the Premises to resemble the Tenant's latest "prototype" as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein; provided, however, Tenant shall not be required to remodel any non-sales area of the Premises and may reuse certain existing leasehold improvements that would be consistent with said design, such as, but not limited to, the dressing rooms ("Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality, except as otherwise set forth on Tenant's approved plans in keeping with the Tenant's design of the Premises.

(c)    Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)    If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefore at a cost of approximately $50.00 per lineal foot; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives. Notwithstanding the foregoing, Tenant shall have the right to install its own storefront barricade if it elects and paints same and places thereon its own graphics. Landlord shall not place its graphics on the barricade.

(e)    Tenant shall reimburse Landlord for the cost of any temporary utilities (if utilized, at the rate of $0.30 per square foot per month) and dumpster usage (at the rate of $.35 per square foot per month) which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor. Landlord shall direct and designate to Tenant's general contractor, the location for placement of Tenant's dumpster. Additionally, Tenant shall also pay for water and sewer capital capacity fees imposed by the water and sewer district of the City of Rancho Cucamonga ("CRCWD") which shall be payable directly to the CRCWD or the public utility pursuant to the provisions of Section 12.1(a) and Tenant's share of Landlord's master water meter fee which in no event shall exceed the fee Tenant would otherwise pay if it were able to obtain its own water meter.

(f)    In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall first agree in writing upon the price and Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than thirty (30) days following receipt of Landlord's billing.

(g)    Performance Bond:  Tenant and Tenant's contractors may be required to post a payment or performance bond or any other security to insure the proper completion of Tenant's Work.

(h)    Architect Review Fee:  Notwithstanding anything in Exhibit C or any other criteria of Landlord Tenant shall not be required to pay any architect's or similar type review fee in connection with Landlord's review of Tenant's plans for any construction.

(i)    Construction Chargebacks:  Except for the charges listed in Section 6.2(e) above and sprinkler drain-down expense, if any (at a cost of approximately $375.00 per occurrence), notwithstanding anything in Exhibit C or any other criteria of Landlord, Tenant shall not be responsible for any chargebacks in connection with the construction and/or preparation of the premises for Tenant's use except the following as further set forth herein the body of the Lease.

(j)    Required Contractors:  Notwithstanding anything in Exhibit C or any other criteria of Landlord, in the event that Tenant is required to use Landlord's contractor's or vendors (e.g. for roof or sprinkler systems), their prices must be competitive or Tenant may use a contractor who will not void warranty.

(k)    Reuse:    Tenant, in its remodeling referred to in 6.2(b), may ·reuse structural/mechanical/electrical and plumbing improvements currently in use in the Premises, provided such use will not alter the general appearance of the Premises to resemble Tenant's latest prototype.

Section 6.3 - Tenant's Trade Fixtures.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus.  If Tenant is in Default under this Lease, Landlord shall, by Court order and under judicial process, have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State (or Commonwealth) in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured.  Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Section 6.4 - Labor Cooperation.

Tenant shall use reasonable efforts to perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center.  Specifically, Tenant agrees to comply with Labor Code Section 1720 et. seq. and its implementing regulations regarding the payment of prevailing wages (the "Prevailing Wage Law"), if applicable, with regard to the construction of Tenant's leasehold improvements.  Tenant shall be solely responsible for determining and effectuating compliance with any applicable Prevailing Wage Law.  In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall use reasonable efforts to immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

## ARTICLE VII
## PLANS AND SPECIFICATIONS

Section 7.1 - <u>Submission of Plans and Specifications</u>.

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C, complete plans and specifications for all of Tenant's Work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval. Notwithstanding the foregoing or anything to the contrary, Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the date for completion of the remodel as provided in Section 6.2. No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written reasonable consent. Landlord's written approval of any plans and specifications for Tenant's Work shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws; provided, however, Landlord's approval of such plans and specifications shall be deemed Landlord's agreement that the same are in compliance with the Lease, including any supplemental design criteria. In the event of a conflict between the Landlord-approved Tenant plans, specifications and sign drawings and the Lease, including any supplemental design criteria, the Landlord-approved Tenant plans, specifications and sign drawings shall prevail.

## ARTICLE VIII
## USE

Section 8.1 - <u>Operation and Use of Premises</u>.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I, and for no other business or purpose except Tenant may, change its trade name then in use at the Premises: (x) if it changes the trade name of a majority of other stores operated by it in California under that trade name simultaneously to the new trade name, and (y) with Landlord's consent, which shall not unreasonably be withheld (provided that it shall not be unreasonable for Landlord to withhold consent if such name would conflict with or cause confusion with the name of any other occupant of the Shopping Center, would violate community standards of decency, or otherwise be objectionable to Landlord due to its risqué or vulgar nature); or (y) if Tenant is required to do so by any court or other governmental decree or any compromise in lieu thereof. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I. Notwithstanding anything to the contrary, in the event Tenant elects to change its trade name as provided in this Lease, Tenant shall be permitted to close the Premises for a period not to exceed 60 days to remodel the same to correspond to its then current design for the concept operated under the new trade name pursuant to plans and specifications approved by Landlord, which approval shall not be unreasonably withheld, delayed or conditioned; provided, however, such right to close shall not affect Tenant's monetary obligations under the Lease during any such period of closure; and, further provided, that Tenant shall be permitted to close the Premises for such remodeling purposes in connection with a name change only one (1) time during the ten (10) year Term, and such period of closure shall not occur during the fourth (4th) quarter of any calendar year.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

Section 8.2 - <u>Tenant's Covenant to Operate</u>.

Tenant agrees to complete Tenant's Work and re-open the Premises for business to the public fully fixtured, stocked and staffed on the date for completion of the remodel as provided in Section 6.2, and thereafter throughout the Term of this Lease, to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, Mondays through Saturdays from 10:00 A.M. to 9:00 P.M. and on Sundays from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by

Landlord for the operation of the Shopping Center, except for closures due to damage, destruction, remodeling or force majeure.  Tenant shall have no right to quit the Premises, cease to operate its business, or cancel or terminate this Lease, unless such right is expressly granted to Tenant herein.  Notwithstanding any other requirements set forth in this Lease, Tenant shall have the right to close its store for business one (1) business day each quarter in order to conduct an inventory of its store and Tenant shall have the right to close its store for business on the following days: (1) Easter Sunday; (2) Thanksgiving Day; and (3) Christmas Day.

(b)  Operating Co-Tenancy.  Notwithstanding anything to the contrary contained in this Lease, in the event (i) tenants occupying less than seventy-five percent (75%) of the GLA of the Shopping Center are open for business, or (ii) less than two (2) of the Major Tenants are open for business (either [i] or [ii] or both shall be hereinafter "Operating Co-Tenancy Failure"), and such Operating Co-Tenancy Failure shall persist for a period of twelve (12) months and during such 12–month period Tenant's sales shall decline by more than ten percent (10%) from the sales for the preceding 12-month period (herein, a "Sales Decline"), then provided Tenant is not in Default of this Lease, Tenant shall have the right to pay to Landlord, in lieu of all Rents except Premises utilities, an amount equal to ten percent (10%) of its monthly Gross Revenue ("Substitute Rent") until the Operating Co-Tenancy Failure is cured.  If at any time during the Operating Co-Tenancy Failure there shall cease to be a Sales Decline, Tenant shall not be entitled to pay Substitute Rent and shall immediately resume paying full Rents otherwise required hereunder.  On or before the twentieth (20th) day of each calendar month during the Operating Co-Tenancy Failure, Tenant shall submit a written statement to Landlord of the total Gross Revenue made from the Premises for the immediately preceding calendar month and shall tender therewith payment of the Substitute Rent provided above.  In the event that the Operating Co-Tenancy Failure shall continue for a period of twelve (12) consecutive calendar months from the date the Operating Co-Tenancy Failure first occurred, then provided Tenant is not in Default of this Lease, commencing on the first day of the thirteenth (13th) consecutive calendar month and continuing for sixty (60) days thereafter, Tenant shall be permitted to terminate this Lease by giving Landlord sixty (60) days prior written notice of its election to do so.  In the event Tenant does not notify Landlord that it intends to terminate the Lease within the aforesaid sixty (60) day period, Tenant's right to terminate shall be deemed null and void and of no further force and effect and Tenant shall resume paying the full Rents originally set forth in this Lease without further right to pay Substitute Rent pursuant to this Section 8.2 (b) for that particular Operating Co-Tenancy Failure.

Section 8.3 - Prohibitions on Use.

(a) Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b)  Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will unreasonably disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center, or in the treatment of its customers that results in multiple complaints.

(c)  Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

Section 8.4 - Manner of Operation of Business.

(a)  Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade.  Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to meet the ordinary and customary needs of Tenant's customers.

(b)  Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)    For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws. The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not knowingly cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees, except as may be in accordance with all laws, including cleaning or other solvents or solutions used by Tenant in the ordinary course of its business. This obligation shall survive the expiration or earlier termination of this Lease. If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or knowingly permitted by Tenant results in unlawful contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of this Lease as a result of such contamination. This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center. Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or knowingly permitted by Tenant results in any unlawful contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

Landlord represents and covenants with Tenant that, to the best of its knowledge, the Premises does not contain any asbestos or asbestos-containing materials or other Hazardous Materials and agrees that, in the performance of any work by Landlord, it will not use or install, or permit its contractors to use or install, Hazardous Materials. If Landlord breaches this covenant, then Landlord, at its sole cost and expense, shall undertake such measures as are reasonably appropriate under the circumstances, or as may be required by law, to either abate or remove and dispose of such Hazardous Materials in compliance with all the applicable laws and regulations and to otherwise repair and restore the Premises to substantially the same condition as existed immediately prior to the abatement or removal work. Landlord shall prosecute diligently to completion any such abatement or removal work and use reasonable efforts to minimize any interference with Tenant's business. If Tenant is required to close the Premises during the period the equitable abatement or removal work is performed, Tenant shall be entitled to an abatement of all Rents and other charges for the period of closure. Tenant will promptly reopen for business after the abatement or removal and repair work of Landlord is completed.

(d)    Landlord and its agents shall have the right, on reasonable notice to the store manager, but not the duty, to inspect the Premises during business hours to determine whether Tenant is complying with the terms of this Section 8.4. If Tenant is not in compliance with Section 8.4(c) of this Lease, Landlord shall have the right, but not the obligation, after reasonable notice to Tenant, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense. Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby, except for the negligence or willful misconduct of Landlord or its agents, servants or employees.

12

## ARTICLE IX
## TERM

Section 9.1 - <u>Commencement Date Agreement</u>.

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

Section 9.2 - <u>Holding Over</u>.

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days' prior written notice to the other party. Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant immediately prior to expiration of the Term, plus all other charges due under the Lease. Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any thirty (30) day period for the following thirty (30) day period. Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

Section 9.3 - <u>Expiration of the Term of the Lease</u>.

(a)    This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)    For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)    Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair, except for ordinary wear and tear and casualty loss.

(d)    Notwithstanding anything contained herein, in the event Tenant fails to achieve annual Gross Revenue from the Premises of at least Nine Hundred Forty-Five Thousand Dollars ($945,000.00) ("Sales Threshold") during the fifth (5th) Lease Year, Landlord or Tenant shall have the one-time right to cancel this Lease upon one hundred twenty (120) days prior written notice to the other. To be effective, such right must be exercised by either party within one hundred eighty (180) days following the end of the fifth (5th) Lease Year. Such cancellation right shall lapse and be of no further force and effect if: (i) notice of cancellation is not served in a timely manner; or (ii) the Sales Threshold is attained or exceeded during the fifth (5th) Lease Year.

## ARTICLE X
## RENT COMMENCEMENT DATE

Section 10.1 - <u>Rent Commencement Date</u>.

As used in this Lease, the term "Rent Commencement Date" shall be as defined in Article I. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

Section 10.2 - <u>Delay or Failure to Deliver Premises to Tenant</u>.

INTENTIONALLY OMITTED.

Section 10.3 - <u>Tenant's Failure to be Open by the Outside Date</u>.

INTENTIONALLY OMITTED.

<div align="center">

ARTICLE XI
RENT
</div>

Section 11.1 - <u>Fixed Minimum Rent</u>.

(a)    Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, except as otherwise expressly provided to the contrary herein, during each Lease Year of the Term hereof, the Fixed Minimum Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month.  Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)    Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within ten (10) days following written notice from Landlord specifying the amount overdue of said Rents, then Tenant shall pay a late charge equal to five percent (5%) of the amount overdue due Landlord, plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

Section 11.2 - <u>Percentage Rent</u>.

(a)    <u>Amount</u>.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint set forth in Article I.

(b)    <u>Payment</u>.

(i)    The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)    Upon submission of Tenant's statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made promptly to the respective parties.

(iii)    Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

(c)    <u>Gross Revenue.</u>

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant. The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received.  Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of

<div align="center">14</div>

mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter. Any deposit not refunded shall be included in Gross Revenue.

(d) Exclusions from Gross Revenue.

Notwithstanding the foregoing, "Gross Revenue" shall not include (or may be deducted from Gross Revenue):

(i)     Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made.

(ii)    The amount of any sales, use or gross receipts tax, or excise tax and other similar taxes now or hereafter upon the sale of merchandise or services imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)   The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)    Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)     Revenue from the sale of trade fixtures after use in the Premises.

(vi)    Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)   Revenue from vending machines for Tenant's employees use only.

(viii)  The price allowed on all merchandise traded in by customers for credit or the amount of credit for discounts and allowances made in lieu of acceptance thereof.

(ix)    Goods transferred to another store or warehouse owned by or affiliated with Tenant.

(x)     Alteration workroom charges and delivery charges.

(xi)    Interest, service or sales carrying charges or other charges, however denominated, paid by customers for extension of credit on sales and where not included in the merchandise sales price.

(xii)   Gift certificates, or like vouchers, until such time as the same shall have been converted into a sale by redemption;

(xiii)  Discount sales to Tenant's employees, the annual aggregate of which shall not exceed three (3%) percent of Tenant's annual Gross Revenue.

(xiv)   Bad debts, not to exceed two percent (2%) of Gross Revenue during any Lease Year or in lieu thereof payment to a service to preclude bad debt not to exceed two percent (2%) of Gross Revenue.

(xv)    Credit card charges not to exceed two percent (2%) of Gross Revenue during any Lease Year.

(xvi)   Bulk non-retail sales of Tenant's merchandise not in the ordinary course of Tenant's business.

(e) Reporting.

(i)     On or before the twentieth (20th) day of each month of each Lease Year, commencing in the second month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)    On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement signed by an officer of Tenant of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)    For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register or a computer device having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied.  Should Tenant elect (i) above, Tenant agrees that the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register.  If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)    If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein within ten (10) days after written notice from Landlord, Landlord may do any or both of the following: (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver.  Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)    All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)    Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(f)    Books and Records.

(i)    Tenant agrees to prepare and maintain for each Lease Year and to keep at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied.  Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon ten (10) days written notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue.  Landlord shall also have the right to request such other records and/or accounts which are reasonably necessary under standard accounting methods to accurately determine Gross Revenue.  All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)    If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records.  If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove.  Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

(iii)    In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable

costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand. If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent, except in the event of the last year of the Term hereof, in which case, Landlord shall refund any such excess to Tenant within twenty (20) days after the expiration of the Term.

Section 11.3 - Additional Rent.

(a)    Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center. Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine. Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term hereof in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the applicable Lease Year. The amount due for any partial Lease Year shall be prorated accordingly.

Section 11.4 - Real Estate Taxes.

(a) (i) For purposes of this Lease, the term "Real Estate Taxes" shall mean all ad valorem taxes, assessments, charges, levies, fees and other governmental charges, general and special, ordinary and extraordinary, of any kind and nature whatsoever, including, but not limited to, assessments with respect to a community facilities district assessment and a landscape maintenance district assessment (the "District Assessments") to finance various on-site improvements for the benefit of the Shopping Center, which shall be laid, assessed, levied, or imposed upon the Shopping Center or any part thereof and which are payable at any time during the Term hereof, and further, Real Estate Taxes shall include Landlord's reasonable administrative costs as well as any and all costs, including reasonable attorney fees, incurred by Landlord in contesting or negotiating the taxes with any governmental authority. Real Estate Taxes shall not include franchise, estate, inheritance, sales, use, succession, capital levy, transfer, net income and excess profits taxes imposed upon Landlord. In addition, the term Real Estate Taxes shall mean (if applicable) all payments made by Landlord in lieu of real property taxes pursuant to tax increment financing provided to Landlord by any public agency or authority. Landlord represents and warrants to Tenant that Tenant's Proportionate Share of Real Estate Taxes shall not exceed the amount of Real Estate Taxes that Tenant would otherwise have paid hereunder if Landlord had not received such tax increment financing.

(ii) Landlord and Tenant recognize and acknowledge that there may be changes in the current real property tax system and that there may be imposed new forms of taxes, assessments, charges, levies or fees, or there may be an increase in certain existing taxes, assessments, charges, levies or fees placed on, or levied in connection with, the ownership, leasing, occupancy or operation of the Shopping Center or the Premises, all of which shall be included within the definition of Real Estate Taxes. For purposes of funding special assessment districts of the type funded by real property taxes, such funding shall also be included within the meaning of Real Estate Taxes. With respect to any general or special assessments which may be levied against or upon the Premises or the Shopping Center, including, but not limited to, the District Assessments, and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in installments, there shall be included within the meaning of Real Estate Taxes with respect to any tax fiscal year, only the amount currently payable on such bond for such tax fiscal year, or the periodic installment for such tax fiscal year.

In addition to Real Estate Taxes, should any governmental taxing authority acting under any present or future law, ordinance, or regulation, levy, assess, or impose any business, occupancy, privilege or excise tax or any tax and/or assessments imposed upon the Rents payable by Tenant to Landlord (other than an income or franchise tax upon Landlord's net income), either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, Tenant shall be responsible for and shall pay such taxes and/or assessments directly to the appropriate taxing authority, or Tenant shall reimburse Landlord for the amount thereof, as the case may be, upon receipt of an invoice therefor from Landlord.

(b)    The Premises, its leasehold improvements and the underlying realty will not be separately assessed for tax purposes but instead will be assessed as part of a larger parcel or parcels of land and improvements comprising the Shopping Center. Accordingly, Tenant agrees to pay its Proportionate Share (as defined in Section 1.1 [h]) of said Real Estate Taxes,

17

in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of said Real Estate Taxes as estimated by Landlord for the applicable fiscal year. Tenant's Proportionate Share hereunder for any partial fiscal year shall be prorated on a per diem basis.

To the extent that the Shopping Center consists of more than one tax parcel, including, but not limited to, separate tax parcels for one or more of the Major Tenants, the following shall apply:

(x)    Landlord shall have the right and option to compute Tenant's Proportionate Share of Real Estate Taxes based on the building area of the particular tax parcel on which the Premises is located.

(y)    In the event that a separate bill for Real Estate Taxes is rendered by the taxing authority with respect to the building, land and improvements owned or leased by a Major Tenant, then Real Estate Taxes shall be deemed to exclude taxes and assessments attributable to such Major Tenant and the floor area of such Major Tenant shall be correspondingly excluded from the denominator of Tenant's Proportionate Share.

(z)    In the event that any Major Tenant's building, land and improvements are separately assessed for purposes of Real Estate Taxes but no separate tax bill is rendered with respect to such Major Tenant, or in the event that any Major Tenant's building, land and improvements are not separately assessed for purposes of Real Estate Taxes but are included as part of other building, land and improvements in the Shopping Center, then to the extent, if any, that any such Major Tenant contribute(s) towards Real Estate Taxes attributable to the Shopping Center, Real Estate Taxes shall be reduced by the amount of any such Major Tenant's contribution(s) and the floor area of any such contributing Major Tenant shall be excluded from the denominator of Tenant's Proportionate Share.

(c)    Within one hundred twenty (120) days following the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail, together with a copy of the applicable tax bill showing the actual amount of Real Estate Taxes applicable to the Shopping Center and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within thirty (30) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such fiscal year, such surplus shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.    If there are sufficient ensuing monthly installments remaining for Tenant to recover any excess payments made by Tenant, then Landlord shall immediately refund to Tenant a sum of money equal to the difference between the sum of any such excess payments and the sum of the ensuing monthly installments. Tenant shall not be responsible for paying any impact fees nor shall taxes include any penalty or interest for the late payment by Landlord of taxes.

(d)    Tax Bill:  Landlord shall provide Tenant with a receipted copy of the tax bill upon Tenant's written request or special assessments related to the Shopping Center.

Section 11.5 - Utility and Insurance Costs.

(a)    Tenant shall pay to Landlord its Proportionate Share (as defined in Section 1.1 [h]) of the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning. Tenant shall also pay to Landlord its Proportionate Share of the costs of customary types of insurance coverage carried with respect to the Shopping Center, including, but not limited to, commercial general liability insurance, rent insurance and property insurance in commercially reasonable amounts as Landlord deems necessary (such utility costs and insurance costs are collectively "Utility and Insurance Costs").

(b) Tenant's Proportionate Share of Utility and Insurance Costs shall be paid by Tenant, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of Utility and Insurance Costs as estimated by Landlord for each fiscal year.  Tenant's

18

Proportionate Share of Utility and Insurance Costs hereunder for any partial fiscal year shall be prorated on a per diem basis.

Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Utility and Insurance Costs and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

ARTICLE XII
PREMISES UTILITY SERVICES

Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)     Water and Sewer Services. Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in Exhibit C. Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date, as herein defined. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on submetered readings, adjusted quarterly. Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)     Telephone Service. Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises. Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)     Gas Service. To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto. Tenant shall pay all charges therefor directly to the providing utility.

(d)     Electricity Service. Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP"). Tenant shall arrange with ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP. In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the date of Tenant's execution of this Lease, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent:

19

(i)  Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials;

(ii)  Prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damage;

(iii)  Prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center;

(iv)  Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers;

(v)  ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord;

(vi)  ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur;

(vii)  ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and

(viii)  ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

(e)  Heating, Ventilating and Air-Conditioning ("HVAC").

Tenant is to provide its own equipment and facilities for heating, ventilating and air-conditioning the Premises ("Premises HVAC System") described in Exhibit C. Tenant shall operate and maintain same during the Term of this Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.

Section 12.2 - Discontinuance of Service.

Landlord reserves the right, with thirty (30) days' prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same remain unpaid by Tenant. Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment. If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

Section 12.3 - Interruption of Service.

Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease. Notwithstanding anything contained herein to the contrary, Landlord will agree to allow Tenant to temporarily cease operating and to abate Rents for the duration of a utility termination or interruption for more than twenty-four (24) consecutive hours ("UI") if such UI has a material detrimental impact on Tenant's ability to operate from the Premises, and: (i) the utility service is being provided by Landlord; (ii) the UI is caused by the

willful or negligent act or omission of Landlord or its agents or employees; or (iii) the cause of the UI is covered by Landlord's rent insurance.

Section 12.4 - Premises Sprinkler System.

In the event applicable codes require fire sprinkler protection, Landlord shall provide a sprinkler connection for the Premises to Landlord's bulk main designated in Landlord's drawings. Tenant shall design and install all extensions and facilities to and within the Premises from Landlord's connection.

If, at any time during the Term of this Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection for the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises, the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association ("NFPA") No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

<div align="center">

ARTICLE XIII
SIGNS
</div>

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair. Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises, provided that, in the event that Landlord shall permit the majority of non-Major store tenants to place such advertising material or signage less than four feet (4') from any customer door or lease line or the surface of the display window, then Tenant shall have a similar right to place such advertising material closer to its lease line or window surface, provided, however that in no event shall Tenant be permitted to place any such material closer than two feet (2') from such surfaces. All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity. Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises. Notwithstanding the foregoing or anything to the contrary, professionally-prepared signs consistent with Tenant's signs in its other stores under the same trade name in similar type or regional malls shall not require Landlord's approval.

<div align="center">

ARTICLE XIV
REPAIRS AND ALTERATIONS
</div>

Section 14.1 - Repairs by Landlord.

(a)    Landlord shall keep the roof, structural portions, the exterior of the Premises, floor slab, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease, subject to the provisions of Section 16.3 herein; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does

hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs within thirty (30) days after receipt of an itemized invoice therefor.

(b)    As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any non-structural alterations to the Premises required to comply with Applicable Laws. It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA. Notwithstanding anything to the contrary, Tenant shall not be obligated to perform any work on or about the Premises which is structural in nature or which would otherwise be Landlord's obligation under this Lease or at law nor to undertake any work to remove or otherwise remediate hazardous materials nor to comply with The Americans With Disabilities Act ("ADA"), except in the latter case where only interior, non-structural work is required of Tenant.

(c)    Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

Section 14.2 - Repairs By Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times. All repairs to the Premises, equipment or facilities therein or thereabout, other than those repairs required to be made by Landlord pursuant to Section 14.1 and those repairs necessitated by the acts or omissions of Landlord and/or its agents, employees or contractors, shall be made by Tenant. Said repairs shall include, but not be limited to, all necessary painting, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems above and under the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises. All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

(c)    Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless Tenant has previously notified Landlord in writing of the need for such repairs or unless Landlord has actual knowledge of the need therefor and Landlord has failed to commence said repairs following receipt of Tenant's written notification or such knowledge, and has not diligently pursued said repairs to completion.

Section 14.3 - Alterations and Remodeling.

(a)    Tenant, at its own expense, shall have the right to make such interior alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any major remodeling of the interior of the Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material or structural alterations to the Premises or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made without Landlord's prior written consent. Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws; provided, however, Landlord's approval of such plans and specifications shall be deemed Landlord's agreement that the same are in compliance with the Lease, including any supplemental design criteria. All such alterations, changes and improvements shall be made in accordance with the provisions of Exhibit C and shall become the property of Landlord upon installation (to the extent paid for by Landlord under this Lease) and the remainder at the expiration of the Term and shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)    Tenant further agrees not to make any alterations, additions or changes to any storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall

first have been obtained.  In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord. Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3; subject, however, to the waiver of subrogation provisions of Section 16.3.

<div align="center">

ARTICLE XV
LIENS

</div>

Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant.  Tenant shall indemnify and save harmless Landlord against all loss, liability, costs, attorney fees, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center, the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days receipt of notice of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord.  Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

<div align="center">

ARTICLE XVI
INDEMNITY AND INSURANCE

</div>

Section 16.1 - Indemnification.

(a)    Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)    Landlord shall defend, indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damage, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming both Tenant as insured and designating Landlord as an additional insured, in the following amounts:

(a)    Commercial General Liability Insurance.  Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad

<div align="center">23</div>

form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors coverage, in an amount not less than Two Million Dollars ($2,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(b)     Worker's Compensation Insurance.  Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

(c)     Personal Property, Alterations, Improvements and Betterments.  Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease. Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed. If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, Tenant's receipt of plan approval and permits and re-delivery of possession of the Premises by Landlord to Tenant, if applicable, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right, following reasonable notice to Tenant and opportunity to cure, to make all necessary repairs.  If the insurance proceeds described above are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds.  However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments.  This paragraph is only applicable if the Lease is not terminated pursuant to Article XXI hereof.

(d) Additional Hazards.  Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form insurance coverage.  In addition, Tenant shall use best efforts not to keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage.  In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of this Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center.  Said additional premiums shall be payable by Tenant to Landlord within fifteen (15) days following written notice from Landlord

(e)     Blanket Policies.  Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies. Tenant may self-insure for plate glass and maintain commercially reasonable deductibles as to any of its policies.

(f)     Certificate(s) of Insurance.  Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter.  The coverage evidenced by such certificate(s) of insurance will be licensed to do business in the state where the Shopping Center is located, and rated at least A/VII in the most current edition of Best's Insurance Report. All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage.     Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, upon ten (10) days written notice to Tenant, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

(g)     Notice of Loss.  Tenant shall use commercially reasonable efforts to notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.  However, Tenant's failure to comply with the notice requirements of this subsection shall in no way be deemed to constitute a default under this Lease.

24

Section 16.3 - Waiver of Subrogation.

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant (or any of their respective officers, directors or shareholders) shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril generally covered by fire and extended coverage or special form insurance coverage, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

Section 16.4 - Landlord Not Responsible for Acts of Others.

Except as caused by the negligence or willful misconduct of Landlord and/or its agents, servants, or employees or contractors, but otherwise subject to the waiver of right of recovery provisions of Section 16.3, Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC. None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease, unless the negligence or willful misconduct of Landlord and/or its agents, servants or employees, subject, however, to the waiver of subrogation provisions of Section 16.3.

ARTICLE XVII
GENERAL PROVISIONS

Section 17.1 - Rules and Regulations.

Landlord reserves the right, at any time and from time to time, to impose reasonable and non-discriminatory rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center.  Tenant agrees to comply with such reasonable and non-discriminatory rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease, provided no such rules or regulations shall materially increase Tenant's obligations or reduce its rights under this Lease.

Section 17.2 - Rubbish.

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord; Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord.  In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager.  If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

Section 17.3 - Lighting.

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

Section 17.4 - Merchandise Display, Loading and Unloading.

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

Section 17.5 - Obstruction of Passageways.

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

Section 17.6 - Employee Parking.

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord. Tenant shall furnish Landlord with state automobile license numbers assigned to vehicles used by Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees shall fail to park their vehicles in such designated parking areas, then, after the second (2nd) violation by the same vehicle, without limiting any other remedy which Landlord may pursue in the event of Tenant's Default hereunder, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as a part of Rents, the sum of Ten Dollars ($10.00) per day for each vehicle parked in violation of the provisions of this Section 17.6. Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.

### ARTICLE XVIII
### SUBORDINATION AND ATTORNMENT BY TENANT

Section 18.1 - Subordination of Lease.

This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance"). Any Encumbrance shall be prior and paramount to this Lease and to the rights of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises. Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required. However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form. Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

Section 18.2 - Attornment by Tenant.

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease. Tenant agrees that it will, upon twenty (20) days written request of Landlord, execute, acknowledge and deliver any and all reasonable instruments necessary or desirable to give effect or notice of such attornment, and failure of Tenant to execute any such document or instrument within the time period provided and following an additional five (5) days notice shall constitute a Default by Tenant under the terms of this Lease. In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

Section 18.3 - Landlord as Attorney-in-Fact for Tenant.

INTENTIONALLY OMITTED.

### ARTICLE XIX
### RIGHTS OF LANDLORD

Section 19.1 - Landlord's Right to Repair.

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its

option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within fifteen (15) days following receipt of Landlord's billing.

Section 19.2 - Landlord's Right to Affix to Exterior.

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant.

Landlord shall have the right, but not the obligation, upon fifteen (15) days' written notice to Tenant, an opportunity for Tenant to cure the same, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease, provided that Tenant shall have the reasonable right to object to the validity of such payment, or Tenant's obligation to make the same. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

ARTICLE XX
ASSIGNMENT AND SUBLETTING

Section 20.1 - Landlord's Consent Required.

(a)     Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name. In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

(b)     Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)     Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

Section 20.2 - Insolvency Proceedings.

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts or leases.

Section 20.3 - Transfer of Corporate Shares.

(a)     In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an attempted assignment in violation of this Lease, and Landlord shall, at Landlord's election: (x) be entitled to deem Tenant in Default under this Lease, which shall nevertheless, be subject to the notice and cure provisions of Article XXIII; or (y) be deemed to be null and void and of no effect.

27

(b) Notwithstanding anything contained in this Lease, Tenant shall have the right, without the prior consent of Landlord, to assign or sublet the Premises to a corporation or other entity which:

(i)    is Tenant's parent corporation; or

(ii)    is a wholly-owned subsidiary of Tenant; or

(iii)    is a corporation of which Tenant or Tenant's parent corporation owns or the shareholders of Tenant or Tenant's parent corporation owns in excess of fifty percent (50%) of the outstanding capital stock; or

(iv)    as a result of a consolidation, merger or other reorganization with Tenant and/or Tenant's parent corporation, shall own all or substantially all of the capital stock of Tenant or Tenant's parent corporation; or

(v)    acquires or is acquiring all or substantially all of the outstanding capital stock of Tenant or all or substantially all of the assets of Tenant; or

(vi)    acquires or is acquiring all or substantially all of the non-outlet retail mall stores of Tenant then operating under the Trade Name then in use at the Premises; or

(vii)    as a result of a change of the domicile of Tenant or the reincorporation of Tenant in another jurisdiction shall own all or substantially all of the assets of Tenant.

Any assignment or subletting pursuant to the above shall be subject to the following conditions:

(a)    Tenant shall remain fully liable during the unexpired term of this Lease, except with respect to (iv) and (vii) above, if Tenant is not a surviving entity; and

(b)    any such assignment or subletting shall be subject to all of the terms, covenants and conditions of this Lease.

Furthermore, the transfer of shares of stock of Tenant to or among the immediate members of the family of a shareholder, to a living trust for estate planning purposes or by will or intestacy, or to existing shareholders of Tenant or to Tenant shall not be deemed an assignment of this Lease or the subletting of the Premises. In no event shall a sale, issuance or transfer of the stock of Tenant or of Tenant's parent to the public constitute an assignment or subletting of this Lease. Moreover, a hypothecation of shares of stock of Tenant shall not be deemed an assignment of this Lease or subletting of the Premises unless and until either the person to whom said shares have been so hypothecated obtains the right to vote said shares for directors of Tenant prior to any foreclosure of any security interest in said shares or acquires all right, title and interest of the hypothecator in said shares.

Section 20.4 - Assignment to Related Entity.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises, without prior Landlord consent, to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation. Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - Transfer of Other Business Interests.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in

28

such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - No Release of Liability.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

Section 20.8 - Administrative Fee.

Where Landlord's consent is required pursuant to the provisions of this Article XX, Tenant shall pay Landlord an administrative fee of Seven Hundred Fifty Dollars ($750.00) in order to compensate Landlord and any of its affiliated entities for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting which requires Landlord's prior consent. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not said proposed assignment or subletting actually occurs.

ARTICLE XXI
DAMAGE OR DESTRUCTION

Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)     If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated. If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)     If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c)     If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work. Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)     Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

29

Section 21.2 Landlord's <u>Option to Terminate</u>.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof. In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event. If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore.

Section 21.3 - <u>Demolition of Landlord's Building</u>.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed, or (ii) the date the Premises so restored has re-opened for business.

<div align="center">ARTICLE XXII<br>CONDEMNATION</div>

Section 22.1 - <u>Effect of Taking</u>.

(a)   In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)   In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)   For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)   If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - <u>Compensation and Awards</u>.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord. Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate. Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment. Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - <u>Condemnation or Breach of Lease</u>.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

<div align="center">30</div>

ARTICLE XXIII
DEFAULT

Section 23.1 - Default.

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)     Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)     Deleted.

(c)     Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)     Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)     Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)     If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein and following five (5) days notice from Landlord to Tenant and Tenant's failure to cure, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)     Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)     With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - Remedies and Damages.

(a)     If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)     Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

(ii)     Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; or

(iii)     If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)     Terminate this Lease by written notice to Tenant; and

(v)     Landlord shall be obligated to mitigate its damages in a commercially reasonable manner in the event Tenant Defaults.

31

(b)   Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part. However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)   In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, commercially reasonable subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)   In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last full Lease Year immediately preceding such termination, and if less than a full Lease Year shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)   In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable attorney fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1 above, Landlord and Tenant each covenants and agrees that in the event that Tenant (i) Deleted; or (ii) vacates or abandons the Premises; or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.1 hereof, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to one half (1/2) of the Fixed Minimum Rent reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat such action or omission by Tenant as a Default under the Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity. The liquidated damages payable to Landlord as a result of Tenant's failure to be open for business in violation of the Lease shall not be applicable as of the date Landlord elects to terminate the Lease or Tenant's right to possession. Tenant shall not be liable for occasional de minimus failures to continuously use and occupy the Premises, for example, a late opening or early closing, of no more than ½ hour each. The liquidated damages payable to Landlord as a result of Tenant's failure to be open for business in violation of the Lease shall not be applicable prior to 10:00 am or after 9:00 pm Monday through Friday, prior to 10:00 am or after 7:00 pm on Saturday, and prior to 11:00 am or after 6:00 pm on Sunday.

Section 23.4 - Repeated Default.

(a)   Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any of the same Rents of Fixed Minimum Rent, Percentage Rent, Real Estate taxes and Common Area Utility and Insurance Costs, due Landlord from Tenant, or the payment of any of the same other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)    In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

## Section 23.5 - Waiver of Rights of Redemption.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

## ARTICLE XXIV
## COMPETITION

## Section 24.1 - Restriction on Tenant.

Tenant agrees that for as long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate, manage, or have any interest in any retail non-outlet store operated under the same trade name as then in use at the Premises ("Competing Store") within a radius of five (5) miles of the perimeter of the Shopping Center ("Restricted Area"). A Competing Store shall not include (i) stores operated under a different trade name but as a different concept and having a substantially different merchandising mix than at the Premises (e.g., a store selling primarily (1) accessories or (2) footwear), (ii) merchandise manufactured by or for Tenant that is sold or licensed to others on a wholesale basis or for resale to the public from a location not operated or controlled by Tenant or any affiliate of Tenant, such as in, but not limited to, a boutique store; and (iii) any sales of Tenant's products in department stores or a department or concession operating within department stores or other stores.

## Section 24.2 - Imposition of Damages.

In the event that Tenant shall violate the provisions of Section 24.1 above, Landlord may, as its sole remedy, effective as of the date such Competing Store opens for business within the Restricted Area, include the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder.

## ARTICLE XXV
## NOTICES

## Section 25.1 - Notices to Tenant and Landlord.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter. Any such written notice shall be deemed given upon refusal, receipt, rejection, failure to accept or inability to deliver as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers. Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

## Section 25.2 - Notices to Mortgagee.

Tenant shall give written notice to Landlord's mortgagee, at Landlord's mortgagee's notice address set forth in Article I, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord. Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default. Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

ARTICLE XXVI
MISCELLANEOUS

Section 26.1 - Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties. This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

Section 26.3 - Consents.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

Section 26.4 - Brokerage.

Landlord and Tenant acknowledge that Randi Shenker of Austin & Associates ("Acknowledged Broker"), is entitled to a fee for broker's services rendered in bringing together the parties to this Lease. Landlord shall be responsible for paying whatever fee is determined to be due and owing Acknowledged Broker as a result of this transaction pursuant to a separate agreement. Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease other than the Acknowledged Broker, or in the event Tenant has had any such dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions or charges claimed by any broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith). Landlord warrants that it has had no dealings with any broker or agent in connection with this Lease other than the Acknowledged Broker, or in the event Landlord has had any such dealings, Landlord covenants and agrees to pay, hold harmless and indemnify Tenant from and against any and all costs, expenses or liability for any compensation, commissions or charges claimed by any broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - Effective Date of Lease.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

Section 26.6 - Estoppel Certificates.

Tenant agrees at any time and from time to time, but no more than twice per year, within twenty (20) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied

34

upon by any prospective purchaser of the fee or mortgage or assignee of any mortgage on the fee of the Premises.

Section 26.7 - Force Majeure.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in default or Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

Section 26.8 - Interpretation.

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

Section 26.9 - Memorandum of Lease.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

Section 26.10 - Quiet Enjoyment.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - Rent Demand.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - Section and Title Headings.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - Waiver.

(a)     Landlord and Tenant shall each have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord or Tenant in refraining from so doing at any time(s). No failure by either party hereto to insist upon the strict performance of any term or condition of this Lease, no failure by either party hereto to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by

35

Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver by such party of any such breach, term, condition or right.

(b)    No term or condition of this Lease required to be performed by Landlord or Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by the waiving party.

(c)    A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon the execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center. If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes, in writing, Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

Section 26.17 - Litigation.

(a)    Any claim, demand, right or defense of any kind by either party which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless such party seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, upon the other party within twelve (12) months after the date of such occurrence of the billing, event or action upon which the adjustment, claim, demand, right or defense relates, whichever applies.

(b)    To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)    If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)    Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

Section 26.18 -- Non-Discrimination.

Tenant herein covenants by and for itself, its heirs, executors, administrators, successors and assigns, and all persons claiming under or through it, and this Lease is made

36

and accepted upon and subject to the following conditions: that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises herein leased nor shall tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

Section 26.19 – Patriot Act.

Tenant hereby represents, covenants and warrants to Landlord that, to its knowledge: (i) Tenant (which, for the purpose of this certification, includes its partners, members, principal shareholders, except for those who are members of the public who hold Tenant's stock), to the best of its knowledge, is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including Executive Order No. 13224 – Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOTACT) of 2001 (Public Law 107 56) (the "USA Patriot Act"), enacted October 26, 2001, as amended, and Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction pursuant to the Executive Order, the Patriot Act or any other law, order, rule, or regulation; (ii) Tenant is currently in compliance with and will at all times during the Term of this Lease (including any extension thereof) remain in compliance with the Executive Order, the USA Patriot Act and regulations of the Office of Foreign Assets Control of the United States Department of the Treasury, and any statute, executive order and other governmental action relating thereto; and (iii) Tenant is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

**LANDLORD:**

RANCHO MALL, LLC,
a Delaware limited liability company

By:    RM Member, LLC,
a California limited liability company,
its sole member

        By:    Forest City Rental Properties
Corporation, an Ohio corporation,
its Administrative Member

        By: _____
Duane F. Bishop, Jr., Vice President

STATE OF OHIO           )
                          )
COUNTY OF CUYAHOGA    )

On _August 2_, 2012 before me, _JANET M. FRANKLIN_ personally appeared Duane F. Bishop Jr., who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Ohio that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

JANET M FRANKLIN
NOTARY PUBLIC - OHIO
MY COMMISSION EXPIRES 05-20-16

37

**TENANT:**

ANGL, INC.,
a California corporation

By: _____

Its: _Jeff Sunghak Kim_
     _President_


STATE OF CALIFORNIA    )
                       )
COUNTY OF _Los Angeles_ )

On _July 27, 2012_, 2012, before me, _JAMES I. UTOMAKILI (NOTARY PUBLIC)_
personally appeared _JEFF Sunghak Kim_, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

JAMES I. UTOMAKILI
COMM. #1893600
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. JULY 22, 2014
7/27/2012

*This Instrument Prepared By*:
Richard D. Tomsick, Esq.
Terminal Tower
50 Public Square, Suite 1360
Cleveland, Ohio 44113-2267
(216) 416-3282

38



Site Map

# VICTORIA GARDENS
### RANCHO CUCAMONGA, CALIFORNIA
## FOREST CITY TENANT COORDINATION/CONSTRUCTION
945 TERMINAL TOWER, CLEVELAND, OHIO 44113

VG_SITE
PAGE 1 OF 1

VICTORIA GARDENS
RANCHO CUCAMONGA
California

EXHIBIT A

SITE PLAN



# VICTORIA GARDENS

RANCHO CUCAMONGA, CALIFORNIA

EXHIBIT B

LEASING PLAN

EXHIBIT C

TENANT HANDBOOK

[TO BE FORWARDED UNDER SEPARATE COVER]

# Brea Mall (#43)

# SIMON® | PROPERTY GROUP, INC.

January 30, 2014
Via EMail

Blue Bee, Inc.
2301 E. 51st Street
Vernon, CA 90058
Attn:  President

Reference:        DELIVERY OF PREMISES
                  Angl                        Brea Mall  #4821
                  Space #: 2110               Brea, CA

**To Whom It May Concern:**

Pursuant to the Lease, please consider this official notification that the delivery date for the above-referenced Premises is:

Date of Delivery: 02/03/2014

Sincerely,

*Mark Petterson*

Mark Petterson
Senior Tenant Coordinator  (317) 263-7785

Copy:    anglinheaven@yahoo.com Mall Manager, Central Files
TC05.1
las



**SIMON**® | **PROPERTY GROUP, INC.**

Anne K. Smith
Direct Dial: (317) 685-7282
Facsimile (317) 685-7355
ansmith@simon.com

February 28, 2014

*VIA SECOND DAY FEDERAL EXPRESS DELIVERY*

Ms. Sheila Francisco
Blue Bee, Inc.
2301 East 51st Street
Vernon, CA  90058

RE:　*Angl*
　　Room 2110
　　Brea Mall
　　Brea, California

Dear Ms. Francisco:

We are pleased to enclose one (1) fully-executed copy of the Lease for the above-referenced location.

We are extremely happy to have concluded these negotiations and, take this opportunity to wish you success at Brea Mall.

Very truly yours,

THE RETAIL PROPERTY TRUST

Anne K. Smith
Attorney at Law

AKS/nfm
Enclosure

LEASE

BY AND BETWEEN

THE RETAIL PROPERTY TRUST,

a Massachusetts Business Trust

AND

BLUE BEE, INC.,

a California corporation

BREA MALL

LEASE

THIS LEASE made this ___28___ day of ___February___, 20_14_, by and between THE RETAIL PROPERTY TRUST, a Massachusetts Business Trust, FEIN 13-6874673 ("Landlord"), and BLUE BEE, INC., a California corporation ("Tenant");

WITNESSETH THAT, in consideration of the rents, covenants and agreements hereinafter set forth, such parties enter into the following agreement:

ARTICLE I

BASIC LEASE INFORMATION AND DEFINITIONS

Section 1.1.    Basic Lease Information.
This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease, shall have the meanings set forth in this Section:

(a)    Center: Brea Mall, situated in the City of Brea, County of Orange, State of California.

(b)    Premises: Room 2110. Landlord shall have the right to change the room designation upon written notice to Tenant.

(c)    Store Floor Area: 2,617 square feet.

(d)    Lease Term: Commencing on the Commencement Date and continuing until the last day of ~~January next following the end of~~ the tenth (10th) Lease Year.

(e)    Commencement Date: The earlier of (i) the date the Tenant opens for business, or (ii) the Required Completion Date.

(f)    Required Completion Date: The earlier of (i) the *90th* day after the ~~earlier~~ *later* of (a) the date specified in such notice as the date when Tenant can commence Tenant's Work *and Tenant receives a copy of the fully executed Lease,* ~~or~~ (b) the date Landlord has notified Tenant that the Premises are ready for commencement of Tenant's Work *and Landlord delivers exclusive possession thereof to Tenant in writing, with Landlord's Work substantially complete, (c) the date of Tenant's receipt of Landlord's approval of its plans, specifications and sign drawings, but this condition shall apply only if Tenant submits Tenant's Plans and any required submissions pursuant to the timetable set forth in Section 3.2, and (d) the date of Tenant's receipt of permits and approvals from local governmental authorities, provided Tenant applies for the same within five (5) days following Landlord's approval of Tenant's Plans and diligently pursues the issuance of the same,* or (ii) May 4, 2014. *Tenant shall deliver a copy of its building permit to the mall office prior to commencement of Tenant's Work.*

*Notwithstanding the foregoing to the contrary, the contingency period in the foregoing clause (d) shall be deemed reduced on a day-for-day basis if Tenant at any time fails to exercise its reasonable efforts to diligently obtain all such permits.*

*Landlord anticipates giving Tenant possession of the Premises on or after February 3, 2014 (the "Anticipated Delivery Date"). In no event is Tenant obligated to accept possession of the Premises, nor shall the Premises be deemed delivered prior to such date or before Tenant's receipt of a fully executed copy of the Lease. In the event that possession of the Premises is not delivered to Tenant within six (6) months following the Anticipated Delivery Date, Tenant shall have the right to terminate the Lease upon notice to Landlord, given at any time thereafter but prior to delivery of possession of the Premises.* ~~; provided, however, and notwithstanding anything to the contrary, in no event shall Tenant be required to accept delivery of possession, commence or complete construction, or open for business, nor shall the Commencement Date occur or be deemed to occur during the period of August 15, 2014 through the end of February 2015 unless Tenant in fact opens during such period of time.~~

(g)    Minimum Annual Rent: A Minimum Annual Rent of $50.00 per square foot of Store Floor Area, or One Hundred Thirty Thousand Eight Hundred Fifty and 00/100 Dollars ($130,850.00) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the Commencement Date and continuing thereafter through and including the last day of the first (1st) Lease Year;

A Minimum Annual Rent of $51.50 per square foot of Store Floor Area, or One Hundred Thirty-Four Thousand Seven Hundred Seventy-Five and 50/100 Dollars ($134,775.50) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the second (2nd) Lease Year of the Lease Term;

A Minimum Annual Rent of $53.04 per square foot of Store Floor Area, or One Hundred Thirty-Four Thousand Eight Hundred Five and 68/100 Dollars ($138,805.68) per annum (based on the Store Floor Area),

-1-

payable in equal monthly installments, in advance upon the first day of each and every month during the third (3rd) Lease Year of the Lease Term;

A Minimum Annual Rent of $54.63 per square foot of Store Floor Area, or One Hundred Forty-Two Thousand Nine Hundred Sixty-Six and 71/100 Dollars ($142,966.71) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the fourth (4th) Lease Year of the Lease Term;

A Minimum Annual Rent of $56.27 per square foot of Store Floor Area, or One Hundred Forty-Seven Thousand Two Hundred Fifty-Eight and 59/100 Dollars ($147,258.59) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the fifth (5th) Lease Year of the Lease Term;

A Minimum Annual Rent of $57.96 per square foot of Store Floor Area, or One Hundred Fifty-One Thousand Six Hundred Eighty-One and 32/100 Dollars ($151,681.32) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the sixth (6th) Lease Year of the Lease Term;

A Minimum Annual Rent of $59.70 per square foot of Store Floor Area, or One Hundred Fifty-Six Thousand Two Hundred Thirty-Four and 90/100 Dollars ($156,234.90) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the seventh (7th) Lease Year of the Lease Term;

A Minimum Annual Rent of $61.49 per square foot of Store Floor Area, or One Hundred Sixty Thousand Nine Hundred Nineteen and 33/100 Dollars ($160,919.33) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the eighth (8th) Lease Year of the Lease Term;

A Minimum Annual Rent of $63.33 per square foot of Store Floor Area, or One Hundred Sixty-Five Thousand Seven Hundred Thirty-Four and 61/100 Dollars ($165,734.61) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month during the ninth (9th) Lease Year of the Lease Term; and

A Minimum Annual Rent of $65.23 per square foot of Store Floor Area, or One Hundred Seventy Thousand Seven Hundred Six and 91/100 Dollars ($170,706.91) per annum (based on the Store Floor Area), payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the tenth (10th) Lease Year of the Lease Term and continuing thereafter through and including the last month of the Lease Term.

(h)     Percentage Rent Rate:  Six percent (6%).

(i)     Sales Breakpoint: $2,180,833.33 per annum for each Lease Year from the Commencement Date through and including the expiration of the first (1st) Lease Year;

$2,246,258.33 per annum during the second (2nd) Lease Year;
$2,313,428.00 per annum during the third (3rd) Lease Year;
$2,382,778.50 per annum during the fourth (4th) Lease Year;
$2,454,309.83 per annum during the fifth (5th) Lease Year;
$2,528,022.00 per annum during the sixth (6th) Lease Year;
$2,603,915.00 per annum during the seventh (7th) Lease Year;
$2,681,988.83 per annum during the eighth (8th) Lease Year;
$2,762,243.50 per annum during the ninth (9th) Lease Year; and
$2,845,115.17 per annum for each Lease Year during the remainder of the Lease Term (prorated for any Partial Lease Year).

(j)     Taxes:  Calculated as set forth in Section 4.5.

(k)     Operating Cost Charge ("OC Charge"): Provided Tenant's Commencement Date occurs on or before December 31, 2014, Tenant's Base Year OC Charge shall be: Twenty and 00/100 Dollars ($20.00) per square foot of Store Floor Area per annum (computed on an annualized basis for any partial calendar year), subject to adjustment as set forth herein. In the event Tenant's Commencement Date is January 1, 2015 or thereafter, Tenant's Base Year OC Charge shall be increased in accordance with the following. For and with respect to each and every calendar year or partial calendar year after the 2014 Base Year, the annual OC Charge shall be increased on the first day of each such calendar year or partial calendar year by an annual amount equal to five percent (5%) of the OC Charge payable by Tenant to Landlord for the immediately preceding calendar year (computed on an annualized basis for any partial calendar year).

(l)     Central Plant Charge: Three and 15/100 Dollars ($3.15) per square foot of Store Floor Area per annum, subject to adjustment as set forth herein (Section 7.2).

(m)     Trade Name: <u>ANGL</u> *or any trade name using the word "ANGL".*

(n)     Permitted Use: The Premises shall be occupied and used by Tenant solely for the purpose of conducting therein the business of the retail sale of women's and misses', ready-to-wear clothing, footwear and

-2-

accessories, including, but not limited to handbags, costume jewelry, eyewear, perfumes, cosmetics, make-up and hair products, and such other incidental merchandise as may from time to time be sold in a majority of Tenant's other stores operated under the trade name then in use at the Premises; provided, however, Tenant shall not allocate more than fifteen percent (15%) of the gross leasable floor area to the display and sale of footwear and shall not allocate more than five percent (5%) in the aggregate to the display and sale of cosmetics, makeup and hair products, and Tenant shall not use or permit or suffer the use of the Premises for any other business or purpose.

(o)    Promotional Fund Fixed Contribution: ~~The greater of~~ One and 50/100 Dollars ($1.50) per square foot of Store Floor Area per annum, ~~or $1,000.00,~~ subject to adjustment as set forth herein (Section 14.1).

(p)    Media Fund Charge: ~~The greater of~~ One and 50/100 Dollars ($1.50) per square foot of Store Floor Area per annum, ~~or $1,000.00,~~ subject to adjustment as set forth herein (Section 14.3).

(q)    Security Deposit: *INTENTIONALLY DELETED* (Section 15.1).

(r)    Notice Address:

|  |  |  |
|---|---|---|
| Landlord | | THE RETAIL PROPERTY TRUST |
| | c/o | M.S. Management Associates Inc. |
| | | 225 West Washington Street |
| | | Indianapolis, Indiana  46204-3438 |
| | | |
| Tenant | | BLUE BEE, INC. |
| | | 2301 East 51st Street |
| | | Vernon, California  90058 |
| | | Attn: President |

(s)    Remittance Address:        THE RETAIL PROPERTY TRUST
                                  P.O. Box 51163
                                  Los Angeles, California  90051-5463

Section 1.2.    Definitions.
    (a)    "Center" shall mean, as the same may be changed from time to time, the land and buildings and other improvements from time to time constituting an integrated shopping center which Landlord and others have constructed or caused to be constructed.

    (b)    "Landlord's Tract" shall mean that portion (or portions) of the land in the Center and the buildings and other improvements thereon which at any time in question Landlord owns or which Landlord leases as tenant under a sale leaseback or under a ground lease or sublease, it being understood that Landlord may not own or control portions of the Center.  Landlord reserves unto itself the unlimited right to modify the configuration of Landlord's Tract at any time for the purpose of incorporating additional Major Tenants and other buildings within the Center, *subject to the provisions set forth in this Lease.*

## ARTICLE II

## LEASED PREMISES AND TERM

Section 2.1.    Leased Premises.
    Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises as depicted on Exhibit "A".  The Store Floor Area shall be measured to the center line of all party or adjacent tenant walls, to the exterior faces of all other walls and to the ~~building~~ *lease* line where there is no wall.  The parties agree that Landlord's determination of the Store Floor Area shall be final, binding and conclusive.

    *Notwithstanding the foregoing, not later than sixty (60) days following the Commencement Date, Tenant may (but shall not be obligated to) cause the Store Floor Area of the Premises to be remeasured, at Tenant's cost and expense.  If the Store Floor Area of the Premises, as remeasured by Tenant, is more or less than the Store Floor Area as set forth above and Landlord agrees with the remeasurement, then the Minimum Annual Rent and additional rent charges (and Landlord's Contribution, if any) shall be adjusted as of the Commencement Date based upon the square footage of the Premises as so remeasured, and any underpayment or overpayment of rent disclosed by such remeasurement shall be promptly paid or credited to Tenant's account, as applicable.  For purposes of this Lease, the parties agree that for purposes of calculating Minimum Rent, Percentage Rent and additional rent charges based upon the Store Floor Area of the Premises, if the measurement of the Premises shall differ from the figure set forth in Section 1.1(c), the Minimum Rent, Percentage Rent and additional rent based upon the Store Floor Area of the Premises shall not increase by more than the greater of two and one-half percent (2.5%) of the actual Store Floor Area of the Premises or one hundred (100) square feet.  Should the Store Floor Area of the Premises as determined by Tenant not be agreed to by Landlord, Landlord may have the Store Floor Area of the Premises remeasured.  Following such remeasurement, should Landlord and Tenant be unable to agree upon the Store Floor Area of the Premises, then Landlord and Tenant will jointly select and pay for an independent, professional architect or engineer whose calculation of the Store Floor Area of the Premises will be binding and conclusive and the Minimum Annual Rent and additional rent charges (and Landlord's Contribution, if any) will be adjusted accordingly.*

-3-

Section 2.2.    Roof and Walls.

*Subject to the provisions of this Article II,* Landlord shall have the exclusive right to use all or any part of the side and rear walls of the Premises and the roof for any purpose, including but not limited to erecting signs or other structures on or over all or any part of the same, erecting scaffolds and other aids to the construction and installation of the same, and installing, maintaining, using, repairing and replacing pipes, ducts, conduits and wires leading through, to or from the Premises and serving other parts of the Center in locations which do not materially interfere with Tenant's use of *or access to the* Premises *provided (unless existing) such pipes, ducts, conduits and wires are located above the ceiling (and if there is no ceiling, tight to the roof deck) or below the floor or in non-sales areas of the Premises.* Tenant shall have no right whatsoever in the exterior of exterior walls of the Premises or the roof or any portion of the Center outside the Premises, except as provided in Exhibit "B" hereof. *However, Tenant may use the space above the interior surface of the Premises for the purposes of installing any electrical conduits, utility lines, fixtures or other equipment. In exercising its rights hereunder, Landlord shall use reasonable efforts to minimize interference with Tenant's use, occupancy and enjoyment of the Premises. If the exercise of rights by Landlord shall materially interfere with Tenant's business, including access to the Premises such that Tenant cannot open for or unable to conduct its business, for more than three (3) consecutive days, then Minimum Annual Rent and all items of additional rent shall abate after said three (3) day period and such abatement shall continue until such time as there is no material interference; provided, however, if any repairs, alterations, improvements or additions are work which Tenant has covenanted herein to do and has failed so to do, then Minimum Annual Rent and all items of additional rent shall in no manner abate. For purposes of the foregoing, "cannot open for or unable to conduct its business" shall include a material interference with access to the Premises.*

Section 2.3.    Lease Term.

The term of this Lease (hereinafter called "Lease Term") shall commence upon the Commencement Date and shall thereafter end on the last day of ~~January next following~~ the number of Lease Years set forth in Article I unless sooner terminated as herein provided.

Section 2.4.    Lease Year Defined.

"Lease Year," as used herein, means a period of twelve (12) consecutive months during the Lease Term, the first full Lease Year commencing on the Commencement Date and continuing through the twelfth (12th) full calendar month occurring on or after the Commencement Date. "Partial Lease Year" means that portion of the Lease Term prior to the first full Lease Year or following the last full Lease Year.

Section 2.5.    Relocation of Premises. *INTENTIONALLY DELETED.*

Section 2.6.    Modifications to the Center.

Notwithstanding anything in this Lease contained, Landlord reserves the right to change or modify and add to or subtract from the size and dimensions of the Center or any part thereof, the number, location and dimensions of buildings and stores, the size and configuration of the parking areas, entrances, exits and parking aisle alignments, dimensions of hallways, malls and corridors, the number of floors in any building, the location, size and number of tenants' spaces and kiosks which may be erected in or fronting on any mall or otherwise, the identity, type and location of other stores and tenants, and the size, shape, location and arrangement of Common Areas (hereinafter defined), and to design and decorate any portion of the Center as it desires, but the general character of the Center and the *size and* ~~approximate~~ location of the Premises in relation to the Major Tenants (as defined in Section 4.2 herein) shall not be ~~substantially~~ *materially* changed.

*Notwithstanding the foregoing provision, Landlord shall not (i) materially interfere with ingress to or egress from or visibility of the Premises or Tenant's business in the Premises, or (ii) alter the traffic flow in proximity to Tenant so as to materially restrict access by Tenant's customers to exits and/or Major Tenants. In the exercise of its rights hereunder, Landlord will not interfere with public access into the Premises from the Center except in the case of an emergency or for repairs in which event Landlord will use reasonable efforts to minimize the interference with Tenant's business. The foregoing provisions shall not be construed so as to prevent or prohibit Landlord from constructing or causing to be constructed kiosks anywhere within the Common Areas of the Center. Notwithstanding anything to the contrary, except for any kiosk, cart, RMU or obstruction in existence as of the date of this Lease as shown on Exhibit "A" or any replacements thereof, no kiosks, carts, RMUs or obstructions shall be permitted within fifteen feet (15') directly in front of the storefront (including, if this is a corner space, any side mall portion thereof with windows, displays or signage) of the Premises. With respect to existing kiosks, carts, RMUs or obstructions, Landlord agrees that the same (and any replacements thereof) shall not be increased in size or height, or moved any closer to the Premises or laterally toward the storefront entrance then as shown on Exhibit "A".*

If at any time (a) Landlord is required by any laws, ordinances, rules or regulations of any governmental agency having jurisdiction over the Center to provide additional parking on Landlord's Tract, or (b) Landlord proposes to increase the total rentable floor area within the Center which would require additional parking in the Center, Landlord may elect to provide such additional parking *at no cost to Tenant* by constructing deck or elevated or subterranean parking facilities, hereinafter referred to as "Deck Parking". ~~In the event Landlord so elects, Tenant shall pay its proportionate share of the capital expense of providing such Deck Parking. Tenant's proportionate share shall be determined by (a) multiplying the total capital expense of providing such Deck Parking by a fraction, the numerator of which is the Store Floor Area of the Premises and the denominator of which is the total rentable floor area in Landlord's Tract, either existing, or proposed by Landlord, as the case may be, at the time of providing such Deck Parking; and (b) multiplying the figure derived pursuant to the foregoing subsection (a) by a fraction, the numerator of which is the number of full calendar months remaining in the term of the Lease, and the denominator of which shall be the greater of (i) the number of months required to amortize the permanent financing obtained by Landlord to finance the capital expense of providing such Deck Parking, or (ii) fifteen (15) years. Tenant shall pay its proportionate share of the capital expense of providing such Deck Parking in equal monthly installments commencing upon the date the Deck Parking is~~

-4-

~~open for public use and continuing thereafter on the first day of every calendar month during the remaining term hereof, plus interest thereon at the rate of nine percent (9%) per annum.~~

## ARTICLE III

## TENANT'S WORK

Section 3.1.    Tenant's Work.
        Tenant agrees to accept the Premises in its present "as is" condition. Further alterations of this room will be at the Tenant's sole expense and deemed to be Tenant's Work, including, but not limited to, all work designated as Tenant's Work in Exhibit "B", and Tenant shall do and perform all Tenant's Work diligently and promptly and in accordance with the following provisions.

        *Tenant shall be permitted to reuse some or all of the existing improvements, provided such improvements are placed in like new condition by Tenant and meet current code requirements and Landlord's criteria.*

        *Landlord shall deliver exclusive possession of the Premises, in broom clean condition, free of all movable furniture, fixtures and equipment and the sign of the prior occupant.*

Section 3.2.    Tenant's Obligations Before Commencement Date.
        As soon as reasonably possible hereafter, Landlord shall deliver to Tenant the Tenant Information Package *(including a Lease Outline Drawing of the Premises)* and the same shall become a part hereof by this reference as Exhibit "B-1" (hereinafter referred to as "Tenant Information Package"). Within forty five (45) days after the date of this Lease or the date of receipt of a drawing of the Premises and Tenant Information Package, whichever is later, Tenant will submit to Landlord one (1) reproducible set (sepia) and three (3) copies of plans and specifications, prepared by a registered architect or engineer, of all Tenant's Work to be done within the Premises (hereinafter called "Tenant's Plans"), prepared in conformity with Exhibit "B" and the Tenant Information Package. Within *fifteen (15)* days after receipt of Tenant's Plans, Landlord shall notify Tenant of any failures of Tenant's Plans to conform to Exhibit "B", the Tenant Information Package or otherwise to meet with Landlord's *reasonable* approval. Tenant shall within fifteen (15) days after receipt of any such notice cause Tenant's Plans to be revised to the extent necessary to obtain Landlord's *reasonable* approval and resubmitted for Landlord's approval. *Landlord shall review the revised and resubmitted Tenant's Plans within fifteen (15) days of receipt from Tenant.* When Landlord has approved the original or revised Tenant's Plans, Landlord shall sign and return (which signature and return may be transmitted electronically) one (1) set of approved Tenant's Plans to Tenant and the same shall become a part hereof by this reference as Exhibit "B-2". Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications. Tenant shall not commence any of Tenant's Work until Landlord has approved Exhibit "B-2," unless prior Landlord approval has been obtained in writing. *In the event of a conflict between the Landlord-approved Tenant Plans and the Lease, including any supplemental design criteria and the Tenant Information Package, the Plans shall prevail except with respect to the scope of Landlord's Work, if any. If Tenant is required to use a Landlord-designated contractor, or Landlord is required to perform work for Tenant, the rates for such work shall be competitive. Landlord shall not unreasonably withhold, delay or condition approval of Tenant's Plans, specifications and sign drawings so long as they comply with the design criteria for the Center.*

        Landlord shall notify Tenant not less than fifteen (15) days in advance of the time when Tenant can commence Tenant's Work; and Tenant shall commence such work ~~not later than the date specified in such notice (although Landlord may not have completed Landlord's Work on such date and may be in the Premises concurrently with Tenant),~~ *and* complete the same in ~~strict~~ *substantial* accordance with Exhibits "B" and "B-2", install all store and trade fixtures, equipment, stock in trade, merchandise and inventory, and open for business therein not later than the Required Completion Date. Tenant hereby releases Landlord and its contractors from any claim whatsoever for damages against Landlord or its contractors for any delay in the date on which the Premises shall be ready for delivery to Tenant. In the event possession of the Premises is not delivered to Tenant within two (2) years of the date of this Lease, then this Lease automatically shall become null and void and neither party shall have any liability or obligation to the other hereunder.

Section 3.3.    Failure of Tenant to Perform.
        ~~Because of the difficulty or impossibility of determining Landlord's damages resulting from Tenant's failure to open for business fully fixtured, stocked and staffed on the Commencement Date, including, but not limited to, damages from loss of Percentage Rent (hereinafter defined) from Tenant and other tenants, diminished saleability, leasability, mortgageability or economic value of the Center or Landlord's Tract,~~ *If* Tenant fails to commence Tenant's Work ~~within the time provided above and proceed with the same diligently, or~~ *and* to open for business fully fixtured, stocked and staffed on ~~or before~~ *the date that is thirty (30) days after* the Commencement Date, ~~or to perform any of its obligations to be performed prior to the Required Completion Date,~~ Landlord may, without notice or demand, in addition to the right to exercise any other remedies and rights herein or at law provided, collect rent from the Commencement Date in an amount equal to the Minimum Annual Rent (hereinafter defined) and other additional rent and other amounts payable by Tenant hereunder, and, in addition thereto, an amount equal to fifty percent (50%) of 1/365ths of the Minimum Annual Rent for each day that Tenant has failed to open for business on and after the *thirty-first (31st) day after the* Commencement Date, which latter amount shall be in lieu of Percentage Rent that might have been earned had Tenant opened in timely fashion. ~~In addition, Landlord may terminate this Lease, in which event Landlord shall have the right to recover, as liquidated damages and not as a penalty, a sum equal to the Minimum Annual Rent payable for one (1) Lease Year, plus all expenses incurred by Landlord pursuant to this Section, plus the cost of any alterations or repairs which Landlord in its sole discretion deems advisable to relet the Premises. In the event that Tenant fails to make timely submission of Tenant's Plans as provided in this Lease, then Landlord shall have the right, in addition to its other rights~~

-5-

~~and remedies as herein provided, to collect from Tenant a sum which shall be One Hundred and 00/100 Dollars ($100.00) per calendar day for each day that Tenant's Plans are not so submitted. All remedies in this Lease or at law provided shall be cumulative and not exclusive.~~

Section 3.4.    Condition of Premises.

*Subject to the applicable provisions of this Lease,* Tenant's taking possession of the Premises shall be conclusive evidence of Tenant's acceptance thereof in good order and satisfactory condition. ~~Tenant shall acknowledge taking possession of the Premises in writing.~~ *Subject to the applicable provisions of this Lease,* Tenant agrees that Landlord has made no representations as to conformance with applicable laws respecting the condition of the Premises or the presence or absence of Hazardous Materials (hereinafter defined) in, at, under or abutting the Premises or the environment. *Subject to the applicable provisions of this Lease,* Tenant also agrees that no representations respecting the condition of the Premises, no warranties or guarantees, expressed or implied, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to workmanship or any defects in material, and no promise to decorate, alter, repair or improve the Premises either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein.

Section 3.5.    Certification.

Within *sixty (60)* days after the date Tenant *completes Tenant's Work* and opens for business in the Premises, Tenant shall deliver to Landlord the following: (a) Tenant's affidavit stating that the work to be performed by Tenant pursuant to the terms of this Lease has been completed in ~~strict~~ *substantial* compliance with Exhibit "B" and Tenant's Plans, as approved by Landlord, ~~and that no security interest under the Uniform Commercial Code or chattel mortgages are outstanding or have been filed,~~ it being intended that any such affidavit may be relied upon by Landlord and that any deliberate misstatement by Tenant shall constitute an event of default hereunder; (b) an affidavit of any general contractor performing Tenant's Work stating that all subcontractors, laborers and material men who have performed work on or furnished materials to the Premises (whose names and addresses shall be recited in the affidavit) *in excess of $3,000.00* have been paid in full and that all liens therefor that have or might be filed have been discharged of record or waived; (c) a complete release and waiver of lien with respect to the Premises from any general contractor and all subcontractors who have performed work on or furnished material to the Premises *in excess of $3,000.00*, or in lieu thereof, an attorney's certification that the lien period for the work performed on Tenant's behalf in the Premises has expired and that no liens in connection therewith have been filed; (d) Tenant's written acceptance of the Premises stating that Landlord has completed all of Landlord's Work, if any, required to be performed by Landlord pursuant to the terms of this Lease and that Tenant reserves no claims, offsets or backcharges, or stating those claimed; (e) any monies owing to Landlord for the cost of any work done for or on behalf of Tenant, as set forth in Exhibit "B" annexed hereto or otherwise; and (f) all certificates and approvals with respect to the work performed by Tenant or on Tenant's behalf that may be required by any governmental authorities as a condition for the issuance of an occupancy certificate for the Premises together with a copy of any occupancy certificate issued by the proper governmental authority for the Premises.

Section 3.6.    **CALIFORNIA ACCESSIBILITY DISCLOSURE.**

Pursuant to Section 1938 of the California Civil Code, Landlord hereby advises Tenant that the Premises, as delivered to Tenant, has not undergone an inspection by a Certified Access Specialist (CASp). Landlord makes no representations or warranties with respect to the Premises complying with any applicable federal, state and local standards, codes, rules and regulations governing physical access for persons with disabilities at places of public accommodation, including, but not limited to, the Americans with Disabilities Act of 1990, California's Unruh Civil Rights Act, California Building Standards Code, or California Health and Safety Code (collectively, the "Accessibility Laws"). Tenant is solely responsible for complying with all Accessibility Laws with respect to the Premises. ~~and for engaging a CASp to perform an inspection describing whether or not the Premises meets all construction-related accessibility standards found in the Accessibility Laws. To the extent the CASp inspection report indicates that the Premises does not meet all of the Accessibility Laws, Tenant shall immediately make all alterations or renovations required to bring the Premises into compliance with the Accessibility Laws. Within thirty (30) days of the Required Completion Date, Tenant shall deliver to Landlord a copy of the CASp inspection report demonstrating that the Premises is in full compliance with the Accessibility Laws.~~

ARTICLE IV

RENT

Section 4.1.    Minimum and Percentage Rent.

Tenant covenants and agrees to pay to Landlord, without notice or demand, *except as expressly provided in this Lease or by law,* at the Remittance Address, the Minimum Rent set forth in Article I, in advance upon the first day of each and every month of the Lease Term. If actual Store Floor Area is modified in accordance with Section 2.1, the Minimum Annual Rent and the Sales Breakpoint shall be deemed automatically increased or decreased based upon the Store Floor Area as thus determined, and any overpayments or underpayments of Minimum Monthly Rent and Percentage Rent to Landlord shall be adjusted accordingly. The failure of Tenant to object to any statement, invoice, or billing presented by Landlord, within *ninety (90)* days after receipt of such statement, invoice, or billing based on Store Floor Area, shall constitute Tenant's acquiescence to the actual Store Floor Area as so determined by Landlord. *Upon the written request of either party, Landlord and Tenant shall execute a certificate setting forth the actual Commencement Date, expiration date and the Store Floor Area contained in the Premises.*

In addition to the payment of Minimum Rent, Tenant covenants and agrees to pay to Landlord, without notice or demand, at the Remittance Address, an amount, if any, equal to the Percentage Rent Rate applied against that portion of Tenant's Adjusted Gross Sales during each Lease Year or Partial Lease Year in excess of the Sales Breakpoint for

such period (hereinafter referred to as "Percentage Rent"). ~~In the event of a Partial Lease Year, the Sales Breakpoint shall be determined by multiplying the Sales Breakpoint for the full Lease Year, by a fraction, the numerator of which shall be the number of days contained in such Partial Lease Year and the denominator of which shall be 365 days.~~ If Minimum Rent for any Lease Year or Partial Lease Year is reduced or abated for any reason, the Sales Breakpoint shall be reduced in direct proportion to the reduction or abatement of Minimum Rent for the period of time that such reduction or abatement of Minimum Rent is in effect. If the Sales Breakpoint changes during a Lease Year, the Sales Breakpoint for that Lease Year shall be appropriately adjusted. *Notwithstanding anything to the contrary contained in this Lease, for purposes of calculating Percentage Rent for the Partial Lease Year at the beginning or the end of the Lease Term, Tenant's Adjusted Gross Sales during the Partial Lease Year shall be deemed to be the total Adjusted Gross Sales for the first or the final twelve (12) month period of the Lease Term, as the case may be, multiplied by a fraction the numerator of which is the number of calendar days in the Partial Lease Year and the denominator of which is 365. Percentage Rent for such first or final Partial Lease Year shall be due and payable to Landlord within forty-five (45) days following the expiration of the first full twelve (12) months of the Lease Term or the end of the Lease Term, as applicable, together with the statement of Gross Sales and Adjusted Gross Sales required by Section 4.3. The foregoing shall not affect the provisions of this Lease relating to the computation of Percentage Rent for any full Lease Year of the Lease Term.*

Section 4.2.     Miscellaneous Rent Provisions.

If Tenant shall fail to pay any installment of Minimum Rent, Percentage Rent or any item of additional rent within *ten (10)* days after the date *that Landlord advises Tenant in writing that* the same became due and payable, then Tenant shall pay to Landlord a late payment service charge ("Late Charge") covering administrative and overhead expenses equal to the greater of (a) $250.00 or (b) 5¢ per each dollar so overdue; *provided, however, the Late Charge shall not apply for the first two (2) instances per calendar year.* Provision herein for payment of the Late Charge shall not be construed to extend the date for payment of any sums required to be paid by Tenant hereunder or to relieve Tenant of its obligation to pay all such sums at the times herein stipulated. If the Commencement Date is other than the first day of a month, Tenant shall pay on the Commencement Date a prorated partial Minimum Monthly Rent for the period prior to the first day of the next calendar month, and thereafter Minimum Monthly Rent payments shall be made not later than the first day of each calendar month. For purposes of this Lease, a "Major Tenant" is herein defined as a single tenant occupying at least *50,000* contiguous square feet of floor area *operating under a single trade name.* ~~If additional Major Tenants are added to the Center or an existing Major Tenant is replaced by a Major Tenant of higher quality, the Minimum Annual Rent and Minimum Monthly Rent herein provided for shall automatically be increased ten percent (10%) at the time each additional or higher quality Major Tenant opens for business. In addition to the foregoing, if Landlord shall, at any time during the term of this Lease, renovate or expand the Center, the cost of which exceeds Ten Million Dollars ($10,000,000.00), the Minimum Rent herein provided for shall automatically be increased ten percent (10%) upon the first day of the month following the completion of such renovation or expansion.~~

Section 4.3.     Percentage Rent.

Tenant shall (i) not later than the *twentieth (20th)* day after the close of each calendar month, deliver to Landlord at the Center office a written statement certified under oath by Tenant or an officer of Tenant, showing Gross Sales ~~and Adjusted Gross Sales~~ made in such calendar month; and (ii) not later than *forty-five (45)* days after the end of each Lease Year or Partial Lease Year, deliver to Landlord at the Center office a statement of Gross Sales ~~and Adjusted Gross Sales~~ for such Lease Year or Partial Lease Year ~~the correctness of which is certified to~~ by Tenant or an officer of Tenant. If Tenant fails to prepare and deliver any statement of Gross Sales ~~and Adjusted Gross Sales~~ required hereunder, within the time or times specified above *and after ten (10) days written notice from Landlord*, then Landlord shall have the right, in addition to the other rights and remedies set forth in this Lease, (a) to collect from Tenant a sum which shall be *$100.00* which shall be deemed liquidated damages for administrative and overhead expenses resulting from such failure, ~~and~~ *or* (b) to *reasonably* estimate Tenant's ~~Adjusted~~ Gross Sales for any non-reported period and bill Tenant's Percentage Rent accordingly. ~~Landlord reserves the right, at Landlord's option, to adjust~~ *The* Percentage Rent billings *shall be adjusted accordingly* when actual ~~Adjusted~~ Gross Sales reports are received.

Percentage Rent shall become due and payable in each Lease Year on the *twentieth (20th)* day of the month immediately following the month during which Adjusted Gross Sales exceed the Sales Breakpoint for such Lease Year, and thereafter shall be paid monthly on all additional Adjusted Gross Sales made during the remainder of such Lease Year, such payments to be made concurrently with the submission by Tenant to Landlord of the written statement of monthly Adjusted Gross Sales as provided for herein.

Tenant will preserve for at least *two (2)* years at Tenant's notice address all original books and records disclosing information pertaining to Gross Sales ~~and Adjusted Gross Sales~~ and such other information respecting Gross Sales ~~and Adjusted Gross Sales~~ as *required by generally accepted accounting principles, specifically* ~~Landlord requires,~~ including, but not limited to, cash register tapes, sales slips, sales checks, ~~gross income and~~ sales tax returns *with respect to this store only*, bank deposit records, sales journals and other supporting data including itemized records of permitted exclusions. Landlord and its agents shall have the right *upon fifteen (15) days prior written notice not more than once during any Lease Year or Partial Lease Year* during business hours to examine and audit such books and records preserved by Tenant. If such examination or audit discloses a liability for Percentage Rent three percent (3%) or more in excess of the Percentage Rent paid by Tenant for any period and at least $500.00 of Percentage Rent is owed as the result of such audit, or if Tenant's Gross Sales ~~and Adjusted Gross Sales~~ cannot be verified due to the insufficiency or inadequacy of Tenant's records, or if Tenant shall have failed to furnish Landlord any monthly statement of Gross Sales ~~and Adjusted Gross Sales~~ during any Lease Year *which is the subject of Landlord's audit*, Tenant shall promptly pay Landlord the *reasonable* cost of said audit. Tenant shall, in any event, pay to Landlord the amount of any deficiency in rents which is disclosed by such audit. If such examination or audit discloses an overpayment of Percentage Rent, then the excess, ~~less the cost of such examination or audit,~~ shall be credited to Tenant's account *for Rent or promptly refunded if during the last Lease Year*. Tenant's obligation to preserve all original books and records

-7-

shall survive the expiration of the Lease Term or the earlier termination of this Lease. *All information pertaining to Gross Sales pursuant to this Article IV shall be held in strict confidence by Landlord, its agents and employees; provided, however, Landlord may utilize the information pertaining to Gross Sales for the following purposes: (a) Landlord's financing; (b) furnishing such information to any governmental organization having proper jurisdiction; (c) furnishing such information to any court, person, agency or organization as a result of litigation; (d) furnishing such information to any prospective bona fide purchaser of Landlord's Tract; and (e) furnishing advice in connection with the promotion of the Center pursuant to Article XIV; provided, however, Landlord shall not disclose actual Gross Sales when furnishing such advice.*

Section 4.4.      Gross Sales and Adjusted Gross Sales Defined.

      As used herein, Gross Sales means the sale prices of all goods, wares and merchandise sold and the charges for all services performed by Tenant or any other person or entity in, at, or from the Premises for cash, credit or otherwise, without reserve or deduction for uncollected amounts, including but not limited to sales and services (i) where the orders originate in, at or from the Premises, regardless from whence delivery or performance is made, (ii) pursuant to mail, telephone, telegraph, catalogue, facsimile, internet, electronic, video and computer orders, and orders by means of other technology-based systems whether now existing or hereafter developed, and other orders received, placed or filled at the Premises, (iii) resulting from transactions originating in, at or from the Premises, and (iv) deposits not refunded to customers. Excluded from Gross Sales in order to determine Adjusted Gross Sales shall be: (i) exchanges *or transfers* of merchandise between Tenant's stores made only for the convenient operation of Tenant's business and not to consummate a sale made in, at or from the Premises, (ii) returns to manufacturers, *vendors, suppliers and shippers*, (iii) refunds to customers (but only to the extent included in Gross Sales *and if not previously included in Gross Sales, such refunds shall not exceed three percent (3%) of Gross Sales during any one (1) Lease Year provided the refunded merchandise is subsequently sold in, at or from the Premises and the sales price thereof is included in Gross Sales in the Lease Year in which sold and provided, further, such refunds are previously included in Gross Sales and which Tenant is claiming as a deduction or exclusion from Gross Sales are separately stated. However, if such refunds not previously included in Gross Sales are not thereafter sold in, at or from the Premises and/or are not separately stated, then no deduction or exclusion from Gross Sales shall be permitted*), (iv) sales of fixtures, machinery and equipment after use in Tenant's business in the Premises, ~~and~~ (v) sales, excise or similar tax imposed by governmental authority and collected from customers and paid out by Tenant, *(vi) sales to employees provided said sales are at a discount not to exceed two percent (2%) of annual Gross Sales, (vii) insurance proceeds, (vii) separately stated finance charges, (viii) fees paid to issuers of charge cards not to exceed one percent (1%) of Gross Sales in any Lease Year or Partial Lease Year, (viii) bad debts charged off by Tenant not in excess of two percent (2%) of Gross Sales during any one Lease Year (provided that such sales were originally included in Gross Sales when made and that any subsequent recovery of bad debts so charged off shall be included in Gross Sales in the year of recovery), (ix) supplementary services provided at Tenant's cost (such as alteration workroom fees, special order fees, boxes, postage and gift wrap fees and delivery and shipping charges, (x) the extent of any discounts to senior citizens, (xi) sale of gift certificates/cards unless and until redeemed or forfeited (unless otherwise excludable), (xii) settlements of claims for losses to merchandise to be sold from the Premises, and (xiii) sales in bulk of damaged or aged merchandise, fixtures, furniture and equipment.* No other taxes shall be deducted from Gross Sales.

Section 4.5.      Taxes.

      A.      Definition. Landlord shall pay or cause to be paid, upon the discretion of Landlord but before delinquent, all Taxes (as hereinafter defined) levied, assessed, imposed, become due and payable, or liens arising in connection with the use, occupancy or possession of or become due and payable out of or for, the Center or any part thereof during the Lease Term. As used in this Section 4.5 the term "Taxes" shall mean and include all property taxes, both real and personal, any taxes based on the gross receipts of Landlord related to the Center regardless of how captioned or titled, ~~any taxes based on the gross receipts of Landlord related to the Center regardless of how captioned or titled,~~ public and governmental charges and assessments, and all other taxes which Landlord is obligated to pay with respect to the development of the Center, including all extraordinary or special assessments or assessments against any of Landlord's personal property now or hereafter located in the Center, all *reasonable* costs and expenses including, but not limited to consulting, appraisal and *reasonable* attorneys' fees incurred by Landlord in researching, reviewing, evaluating, contesting, appealing or negotiating with public authorities (Landlord having the sole authority to conduct such a contest or enter into such negotiations) as to any of the same and all sewer, water and other utility taxes and impositions, but shall not include taxes on Tenant's machinery, equipment, inventory or other personal property or assets of Tenant, Tenant agreeing to pay all taxes upon or attributable to such excluded property without apportionment. *Taxes shall not include Landlord's general income tax, estate tax, corporate franchise tax, inheritance tax, capital tax, gift tax or personal income tax measured by the income of the Landlord from all sources or from sources other than rent alone.*

      Taxes shall not include interest and penalties due on delinquent Taxes, but shall include interest on Taxes withheld by virtue of Landlord making partial payment under protest in the event such partial payment is permitted in connection with a tax appeal proceeding. *Landlord shall include all discounts or credits for early payment of real estate taxes when determining Tenant's proportionate share, whether or not Landlord takes advantage of such discounts or credits for early payment. Whether or not Landlord shall utilize the benefit of the provisions of any statute or ordinance permitting any assessment for public settlements or improvements to be paid over a period of time, Landlord shall nevertheless be deemed to have taken such benefits so that the term "Taxes" shall include only the current annual installment of any such assessments.*

      B.      Tenant's Share. Tenant shall pay to Landlord, as additional rent, its proportionate share of all calendar year or fiscal year Taxes, such proportionate share to be prorated for periods at the beginning and end of the Lease Term which do not constitute full calendar months or years. Tenant's proportionate share of any such Taxes shall be that portion of such taxes which bears the same ratio to the total Taxes as the Store Floor Area bears to the average rentable floor area rented or occupied in the Center (hereinafter called "Rented Floor Area") during the calendar year or fiscal

year in which such Taxes constitute a lien upon the Center. The floor area of (i) Major Tenant spaces whether such spaces are vacant or occupied, (ii) any tenant in a free standing premises *which tenant is obligated to pay taxes specifically upon specific improvements or a specific parcel of land,* (iii) theaters, (iv) *full-service, sit-down* restaurants, (v) kiosks, (vi) storage spaces, (vii) any tenant *that is part of the enclosed mall building(s)* with no frontage on the enclosed mall of the Center; *however, the foregoing shall not serve to exclude tenants in a non-enclosed mall type center or a so-called "lifestyle" portion of a mixed use center,* and (viii) Common Areas, as hereinafter defined, shall not be included in the Rented Floor Area *for purposes of calculating Taxes* or rentable floor area, and any contributions to Taxes received by Landlord from such tenants (less any tax payments recaptured against any other rents or payments due Landlord) shall be deducted from Taxes prior to the calculating of Tenant's proportionate share. *It is expressly understood and agreed that there shall be no duplication of Taxes or any charges under this Lease.*

     *Landlord's estimate of Tenant's share of Taxes for calendar year 2014 is $4.99 per square foot of Store Floor Area per annum.*

     C.    <u>Payment by Tenant</u>. Tenant's proportionate share of Taxes shall be paid in monthly installments commencing with the Commencement Date, in amounts initially *reasonably* estimated by Landlord, one (1) such installment being due on the first day of each full or partial month during the Lease Term. Upon *reasonable prior written* notice from Landlord, *but not less than thirty (30) days,* such monthly installments shall increase or decrease from time to time, *but not more than two (2) times during any twelve (12) month period,* to reflect the then current estimate of the amount of any Taxes due. When the actual amount of any such Taxes is determined by Landlord, Landlord will notify Tenant of such actual amount (in a format to be determined by Landlord) and of any excess or deficiency in the amount theretofore paid by Tenant as its share of such Taxes. Any such excess will be credited to Tenant's account *or refunded to Tenant if no further payments are due under this Lease.* Tenant will pay the amount of any deficiency to Landlord within *thirty (30)* days following Landlord's notice thereof. Tenant acknowledges and stipulates that Landlord has made no representations or agreement of any kind as to the total dollar amount of such Taxes, actual or estimated, or Tenant's dollar share thereof. *Upon written request by Tenant, Landlord shall no more than once per year provide Tenant with a copy of its tax bill together with calculations showing that computation of Tenant's proportionate share.*

     D.    <u>Other Taxes</u>. Tenant's proportionate share of any governmental tax or charge (other than income tax, *corporate franchise tax, inheritance tax, estate tax, capital tax or gift tax*) levied, assessed, or imposed on account of the payment by Tenant or receipt by Landlord, or based in whole or in part upon, the rents in this Lease reserved or upon the Center or the value thereof shall be paid by Tenant including any new direct or indirect tax or surcharge against the Center, the parking areas, or the number of parking spaces in the Center or any new direct or indirect tax or surcharge in addition to or by way of substitution for any existing tax or assessment which Landlord becomes obligated to pay with respect to the Center.

     E.    <u>Larger Parcel</u>. If the land under the Center is a part of a larger parcel of land for assessment purposes (the "Larger Parcel"), the taxes and assessments allocable to the land in the Center for the purpose of determining Taxes under this Section shall be deemed a fractional portion of the taxes and assessments levied against the Larger Parcel, the numerator of which is the acreage in the Center and the denominator of which is the acreage in the Larger Parcel.

<u>Section 4.6.</u>    <u>Additional Rent</u>.
     All amounts required or provided to be paid by Tenant under this Lease other than Minimum Annual Rent and Percentage Rent shall be deemed additional rent and Minimum Annual Rent, Percentage Rent and additional rent shall in all events be deemed rent.

<u>Section 4.7.</u>    <u>Landlord's Expenses</u>.
     If Landlord ~~pays any monies or~~ incurs any *reasonable* expense to correct a breach of this Lease by Tenant or to do anything in this Lease required to be done by Tenant, or incurs any *reasonable* expense (including, but not limited to, *reasonable* attorneys' fees and court costs), as a result of Tenant's failure to perform any of Tenant's obligations under this Lease *after prior written notice following the expiration of the grace and cure periods herein,* all amounts so paid or incurred shall, on notice to Tenant, be considered additional rent payable by Tenant with the first Minimum Monthly Rent installment thereafter becoming due and payable, and may be collected as provided by *this Lease and as provided by* law in the case of rent.

<div align="center">ARTICLE V</div>

<div align="center">PARKING AND COMMON AREAS AND FACILITIES</div>

<u>Section 5.1.</u>    <u>Common Areas</u>.
     All parking areas, access roads and facilities furnished, made available or maintained by Landlord in or near the Center, including employee parking areas, truck ways, driveways, loading docks and areas, delivery areas, multi-story parking facilities (if any), package pickup stations, elevators, escalators, pedestrian sidewalks, malls, including the enclosed mall and Food Court, if any, courts and ramps, landscaped areas, retaining walls, stairways, bus stops, first-aid and comfort stations, lighting facilities, sanitary systems, utility lines, water filtration and treatment facilities and other areas and improvements provided by Landlord for the general use in common of tenants and their customers and Major Tenants in the Center (all herein called "Common Areas") shall at all times be subject to the exclusive control and management of Landlord *(in a first class manner)*, and Landlord shall have the right, from time to time, to establish, modify and enforce reasonable rules and regulations with respect to all Common Areas. Tenant agrees to comply with all rules and regulations set forth in Section 8.9 and all reasonable amendments thereto; *provided that such rules and regulations are (i) uniformly and nondiscriminatorily applied to all similarly situated tenants, (ii) do not increase*

<div align="center">-9-</div>

*Tenant's obligations or decrease its rights pursuant to the terms of this Lease, and (iii) a copy of such rules and regulations are provided to Tenant.*

*Subject to the applicable provisions of this Lease,* Landlord shall have the right from time to time to: change or modify and add to or subtract from the sizes, locations, shapes and arrangements of parking areas, entrances, exits, parking aisle alignments and other Common Areas, provided, however, that the size of parking areas on Landlord's Tract shall not be substantially reduced; restrict parking by Tenant's employees to designated areas; construct surface, sub-surface or elevated parking areas and facilities; establish and from time to time change the level or grade of parking surfaces; enforce parking charges (by meters or otherwise); add to or subtract from the buildings in the Center; and do and perform such other acts in and to said Common Areas as Landlord in its sole discretion, reasonably applied, deems advisable for the use thereof by tenants and their customers*; provided, however, in no event shall the same materially or adversely affect ingress to, egress from or visibility of the Premises; provided, however, the foregoing provisions shall not be construed so as to prevent or prohibit Landlord from constructing or causing to be constructed kiosks anywhere within the Common Areas (including the concourse areas) of the Center, but nevertheless subject to the provisions of Section 2.6 hereof. If Tenant is unable to conduct its business in the Premises due to Landlord's exercise of its rights pursuant to the foregoing for a period in excess of three (3) consecutive days, then Minimum Annual Rent and all items of additional rent shall abate after said three (3) day period and such abatement shall continue until such time as Tenant is able to normally conduct its business in the Premises. For purposes of the foregoing, "unable to conduct its business" shall include a material interference with access to the Premises.*

Section 5.2.      Use of Common Areas.

Tenant and its business invitees, employees and customers shall have the nonexclusive right, in common with Landlord and all others to whom Landlord has granted or may hereafter grant rights, to use the Common Areas subject to such reasonable regulations as Landlord may from time to time impose *in accordance with the provisions of this Lease* and the rights of Landlord set forth above. ~~If a car of Tenant, a concessionaire, employee or agent of Tenant is parked outside any area designated by Landlord for employee parking, Tenant authorizes Landlord to cause such car to be towed from the Center and Tenant shall reimburse Landlord for the cost thereof upon demand, and otherwise indemnify and hold Landlord harmless with respect thereto.~~ Tenant shall abide by all rules and regulations and cause its concessionaires, officers, employees *and* agents, ~~customers and invitees~~ to abide thereby. *Subject to the applicable provisions of this Lease,* Landlord may at any time close temporarily any Common Areas to make repairs or changes, prevent the acquisition of public rights therein, discourage noncustomer parking, or for other reasonable purposes. *If Tenant is unable to conduct its business in the Premises due to Landlord's exercise of its rights pursuant to the foregoing for a period in excess of three (3) consecutive days, then Minimum Annual Rent and all items of additional rent shall abate after said three (3) day period and such abatement shall continue until such time as Tenant is able to normally conduct its business in the Premises.* Tenant shall furnish Landlord license numbers and descriptions of cars used by Tenant and its concessionaires, officers and employees. Tenant shall not *materially* interfere with Landlord's or other tenants' rights to use any part of the Common Areas. *For purposes of the foregoing, "unable to conduct its business" shall include a material interference with access to the Premises.*

## ARTICLE VI

### COST TO OPERATE THE CENTER

Section 6.1.      Expense of Operating the Center.

Landlord will, *in a first class manner,* operate, manage, maintain and repair or cause to be operated, managed, maintained or repaired, the Center, to the extent the same is not done by any Major Tenant.

Section 6.2.      Tenant's Share of Operating Costs.

In consideration of Landlord's operation, management, maintenance and repair of the Center as provided herein, Tenant shall pay to Landlord, as additional rent, for and with respect to each and every calendar year during the Lease Term (prorated for any partial calendar year), in equal monthly installments due and payable in advance on the first day of each and every month during the Lease Term commencing with the Commencement Date, the OC Charge as calculated pursuant to Section 1.1 herein. Tenant acknowledges and agrees that, because the OC Charge is an amount agreed to by the parties, Tenant shall have no right to audit Landlord's books and records concerning the OC Charge.

## ARTICLE VII

### UTILITIES AND SERVICES

Section 7.1.      Utilities.

Tenant shall not install any equipment which can exceed the capacity of any utility facilities and if any equipment installed by Tenant requires additional utility facilities, the same shall be installed at Tenant's expense in compliance with all code requirements and plans and specifications which must be approved in writing by Landlord *which approval shall not be unreasonably withheld or delayed.* Tenant shall be solely responsible for and promptly pay all charges for use or consumption of sewer, gas, electricity, water and all other utility services *for the Premises.* Landlord may make electrical service available to the Premises, and so long as Landlord continues to provide such electrical service Tenant agrees to purchase the same from Landlord and pay Landlord for the electrical service (based upon ~~Landlord's determination from time to time of~~ Tenant's consumption of electricity), as additional rent, on the first day of each month in advance (and prorated for partial months), commencing on the Commencement Date at the same *rate* ~~cost~~ as would be charged to Tenant from time to time by the utility company which otherwise would furnish such services to the Premises if it provided such services and metered the same directly to the Premises, but in no event at a *rate* ~~cost~~ which is *more* ~~less~~ than the *rate* ~~cost~~ Landlord must pay *the utility provider for* ~~in~~ providing such electrical service *which rate shall not include a mark up or administrative fee.* Landlord may supply water or other utilities to

-10-

the Premises, and so long as Landlord continues to provide water or such other utilities Tenant shall pay Landlord for same at the same *rate* ~~cost~~ as would be charged to Tenant by the utility company which otherwise would furnish such service to the Premises if it provided such service and metered the same directly to the Premises, but in no event at a *rate* ~~cost~~ which is less than the *rate* ~~cost~~ Landlord must pay in providing such service, and in no event less than the minimum monthly charge which would have been charged by the utility company in providing such service. ~~Subject to the applicable rules and regulations of the State Public Service Commission, Landlord may provide a shared-tenant telephone service to the Premises and so long as Landlord continues to provide such telephone service Tenant agrees to purchase the same from Landlord and pay Landlord for the telephone service at the same cost as would be charged to Tenant by the utility company which otherwise would furnish such service to the Premises if it provided such service directly to the Premises, but in no event at a cost which is less than the cost Landlord must pay in providing such telephone service. Landlord shall have the right to designate an alternate third-party utility company or provider to provide any such utility service to the Premises and/or the Center.~~ *Upon Tenant's request, unless prohibited by law, Landlord shall install a Landlord-approved revenue grade check meter to monitor Tenant's electrical usage at the Premises. Such installation shall be performed at Tenant's sole reasonable cost and expense and shall be completed within forty-five (45) days after Landlord's receipt of Tenant's written approval of check meter installation quote provided by Landlord to Tenant.*

*Following installation, Landlord shall, at Landlord's sole cost:*

1.   *Read the meter on a monthly basis. Such meter readings shall be final, binding and conclusive (absent manifest error).*
2.   *Utilize such readings, when available, to retroactively adjust the electricity charges for the period from the date of the last adjustment through the date of the adjustment. Any excess will be credited to Tenant's account. Tenant will pay the amount of any deficiency to Landlord within thirty (30) days following Landlord's notice thereof.*
3.   *Utilize such readings to establish new escrows following the date of the adjustment.*
4.   *Perform all repairs and maintenance of the check meter. Landlord shall retain sole ownership of the check meter equipment.*

*Landlord shall provide to Tenant (i) copies of the meter readings of Tenant's usage and (ii) access to the check meter for Tenant's Premises upon Tenant's reasonable request.*

Tenant shall operate its heating and air conditioning so that the temperature in the Premises will be *substantially* the same as that in the adjoining mall, and set Tenant's thermostat at *substantially* the same temperature as that thermostat in the mall which is nearest the Premises. Tenant shall be responsible for the installation, maintenance, repair and replacement of air conditioning, heating and ventilation systems within and specifically for the Premises, including all components such as air handling units, air distribution systems, motors, controls, grilles, thermostats, filters and all other components. Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to periodically inspect, adjust, clean and repair such systems, including changing filters on a quarterly basis. *Upon Landlord's request,* Tenant shall promptly furnish a copy of each inspection and service report to the Center manager. Tenant shall operate ventilation so that the relative air pressure in the Premises will be *substantially* the same as or less than that in the adjoining mall as required by the Landlord. If Tenant's use of the Premises results in special exhaust requirements, Tenant shall have the exhaust fans interlocked with the make-up air units. If Tenant's use of the Premises requires a grease trap, Tenant shall contract for, in its own name, and shall pay for a qualified service contractor to inspect, clean and repair such grease trap at such intervals as may be required by Tenant's use, but in no event less frequently than once a month. Tenant shall promptly furnish a copy of the inspection and service report to the Center manager. In the event such grease trap services Tenant and other tenants in the Center, Landlord may elect to perform such inspection, cleaning and repairing, and Tenant shall pay to Landlord its proportionate share of the cost thereof based upon the number of tenants serviced by such grease trap. Tenant's proportionate share of such cost shall be due and payable within ten (10) days after billings therefor are rendered to Tenant.

In the event Tenant requires the use of *satellite* telecommunication services, including, but not limited to, credit card verification and/or other data transmission, then Tenant shall contract for such services with one of the service providers available at the Center, *so long as such service is provided at a rate which is competitive with other such services in the area in which the Center is located.*

Section 7.2.      Air Conditioning of Premises.

Landlord will provide and maintain a central plant and a system of chilled media to the Premises installed at a point determined by Landlord. Tenant agrees to purchase the chilled media services from Landlord and pay Landlord annually therefor, as additional rent, in equal monthly installments, in advance on the first day of each month the Central Plant Charge set forth in Article I, increased in the manner hereinafter provided.

The Central Plant Charge shall be recalculated from time to time on dates selected by the Landlord (but no less often than annually, each time the Landlord's utility costs are changed, and/or each time field verification indicates that Tenant's use of the system has changed.)

The current Adjusted Central Plant Charge shall be calculated by multiplying the original Central Plant Charge by a series of adjusting multipliers as follows:

$$\text{Adjusted Central Plant Charge} = \text{Central Plant Charge} \times M_1 \times M_2 \times M_3 \times M_4$$

(a)      $M_1$ = Capacity Multiplier

-11-

formula:  The Capacity Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following

$$M_1 = 1 + [0.70[BTUH/35 - 1]]$$

The factor "BTUH" shall mean Tenant's BTUH/per Sq. Ft. of Store Floor Area and shall be the calculated peak design total heat gain as determined in accordance with ASHRAE procedures. Tenant's outdoor air or exhaust that is derived via the Landlord's system, and total heat gain from the roof, lights, fan motors and other items, shall be included in calculating the BTUH/per Sq. Ft. factor of this section for purposes of determining the capacity multiplier. The peak total heat gain shall be calculated using the same sun time hour as is used by Landlord in determining the peak building heat gain; typically 1600 hours.

(b)   $M_2$ = Hours Multiplier

formula:   The Hours Multiplier shall be the greater of 1 or the multiplier arrived at by applying the following

$$M_2 = 1 + [Extra Hours/Regular Hours]$$

The term "Extra Hours" shall mean Tenant's hours use of system during times other than the originally established regular weekly hours of the Center. The term "Regular Hours" shall mean originally established regular weekly hours of the Center.

(c)   $M_3$ = Utility Cost Multiplier

following formula:   The Utility Cost Multiplier shall be the greater of 1 or the multiplier arrived at by applying the

$$M_3 = 1 + [0.70 [Current Cost/Original Cost - 1]]$$

The term "Current Cost" shall mean "Utility Cost" based on rates in effect on the selected date. The term "Original Cost" shall mean Utility Cost based on rates in effect on August 31, 2011. The term "Utility Cost" shall mean the cost to Landlord of the utilities necessary for furnishing chilled media to the Premises, including all charges made to Landlord by the public utilities furnishing the same and based on the original consumption and demands estimated for the central HVAC system and building.

(d)   $M_4$ = Maintenance Cost Multiplier

following formula:   The Maintenance Cost Multiplier shall be the greater of 1 or the multiplier arrived at by applying the

$$M_4 = 1 + [0.10 [Current CPI/Original CPI - 1]]$$

The term "Current CPI" shall mean the "Consumer Price Index" on the selected date. The term "Original CPI" shall mean the "Consumer Price Index" for October 15, 2011. The term "Consumer Price Index" as used in this Section 7.2 herein shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations.

Section 7.3.   Enforcement and Termination.

In the event of any default by Tenant, Landlord reserves the right, in addition to all other rights and remedies available to Landlord, to cut off and discontinue, without notice or liability to Tenant, any utilities or services provided in accordance with the provisions of this Article VII. Landlord shall not be liable to Tenant in damages or otherwise if any utilities or services, whether or not furnished by Landlord hereunder, are interrupted or terminated because of repairs, installation or improvements, or any cause beyond Landlord's reasonable control, nor shall any such termination relieve Tenant of any of its obligations under this Lease. Tenant shall operate the Premises in such a way as shall not waste fuel, energy or natural resources. Tenant shall cooperate with Landlord's reasonable, *nondiscriminatory* directives to reduce energy consumption, including, *if compelled to do so by a governmental authority having jurisdiction, the* installation of new energy efficient equipment or the modification or replacement of existing equipment, as the case may be. If any governmental authority shall order mandatory energy conservation or if Landlord elects voluntarily to cooperate in energy conservation at the request of any governmental authority, including, without limitation, a reduction in operating hours or lighting usage, then Tenant shall comply with such *reasonable* requirements. Landlord may cease to furnish any one or more of said utilities or services to Tenant without liability for the same, and no discontinuance of any utilities or services shall constitute a constructive eviction, *provided same are made available by a utility company, Tenant shall continue to be allowed to utilize all building systems therefor and Landlord shall continue to maintain the point of connection in the Premises. If any utility service furnished by Landlord is interrupted for a period in excess of three (3) consecutive days and, as a result thereof, Tenant is unable to operate its business in the Premises, or if any utility service, whether furnished by Landlord or a public utility, is interrupted for a period in excess of three (3) consecutive days due to Landlord making repairs or alterations or Landlord's negligence or failure to meet its obligations and, as a result thereof, Tenant is unable to operate its business in the Premises, then Minimum Annual Rent and all items of additional rent shall abate after said three (3)*

*day period and such abatement shall continue until such time as the interruption has been remedied or Tenant is again able to operate its business in the Premises, whichever event shall first occur; provided, however, if such discontinuance of utility service to the Premises is due to Landlord making repairs or alterations which Tenant has covenanted herein to do and has failed so to do, then Minimum Annual Rent and all items of additional rent shall in no manner abate.*

<div align="center">ARTICLE VIII</div>

<div align="center">CONDUCT OF BUSINESS BY TENANT</div>

Section 8.1.    Use of Premises.

The Premises shall be occupied and used by Tenant solely for the Permitted Use set forth in Article I. Tenant expressly understands and acknowledges that its Permitted Use is nonexclusive, and that other tenants may sell items identical or similar to those sold by Tenant. ~~Tenant hereby warrants that it has the full and unfettered right to use the Trade Name, set forth in Article I, for the entire Lease Term and that such use will not in any way infringe on the rights of others.~~ The Permitted Use is a material consideration to Tenant entering into this Lease so as to permit Landlord to maintain an appropriate tenant mix, or balance, both to the quality and quantity of sales, within the Center in order to achieve the maximum gross sales for all tenants and to assure the continued operation of a full service regional shopping center development.

The Premises shall not be used, whether by Tenant or any other party, for any of the following activities: (a) operation of an automated teller machine (ATM) or any other machine or device performing any of the functions typically performed by ATM's; (b) operation of one or more antennae or other transmission device for the purpose of distributing wireless frequency into the Common Areas of the Center; (c) display of signs, billboards or other advertising media not directly related to the conduct of Tenant's ~~primary~~ business; (d) operation of vending machines of any kind or character, unless (i) access to such machines is strictly limited to Tenant's employees only, and (ii) such machines are not visible to Tenant's customers or the public; or (e) any other activity that is not directly or integrally related to the conduct of Tenant's ~~primary~~ business activity or activities as described in Article I (Permitted Use) hereof.

Section 8.2.    Prompt Occupancy and Use.

*Subject to the applicable provisions of this Lease,* Tenant will occupy the Premises upon the Commencement Date and thereafter continuously operate and conduct in one hundred percent (100%) of the Premises during each hour of the entire Lease Term when Tenant is required under this Lease to be open for business the business permitted under Section 8.1 hereof, with a full staff and full stock of merchandise, using only such minor portions of the Premises for storage and office purposes as are reasonably required. The parties agree that: Landlord has relied upon Tenant's occupancy and operation in accordance with the foregoing provisions; because of the difficulty or impossibility of determining Landlord's damages which would result from Tenant's violation of such provisions, including but not limited to damages from loss of Percentage Rent from Tenant and other tenants, and diminished saleability, mortgageability and economic value, Landlord shall be entitled to liquidated damages if it elects to pursue such remedy; therefore for any day *commencing with the third (3rd) such violation after notice in any consecutive twelve (12) month period* that Tenant does not fully comply with the provisions of this Section 8.2 the Minimum Annual Rent, prorated on a daily basis, shall be increased by twenty-five percent (25%), such increased sum representing the damages which the parties agree Landlord will suffer by Tenant's noncompliance. ~~In addition to all other remedies, Landlord shall have the right to obtain specific performance by Tenant upon Tenant's failure to comply with the provisions of this Section 8.2.~~

Section 8.3.    Conduct of Business.

Such business shall be conducted under the Trade Name set forth in Article I unless another name is previously *reasonably* approved in writing by the Landlord, *but Tenant shall be permitted to change its Trade Name (a) to the trade name used by Tenant  at a majority of its other stores formerly operating under the same trade name in use at the Premises in the state where the Center is located and such name is not the same or confusingly similar to the name of any other tenant at the Center, or (b) to the trade name required by any Court or governmental decree or compromise in lieu thereof so long as such name is not the same or confusingly similar to the name of any other tenant at the Center* and in such manner as shall *meet the usual and customary needs of its customers* ~~assure the transaction of a maximum volume of business~~ in and at the Premises. Tenant's store shall be and remain open from 10:00 A.M. until 9:00 P.M. Monday through Friday, on Saturday from 10:00 A.M. until 7:00 P.M., *and* on Sunday from 11:00 A.M. until 6:00 P.M., *or such lesser hours as a majority of the Major Tenants in Landlord's Tract and eighty percent (80%) of the non-Major Tenants in the Center are open for business,* ~~and in addition, during all days, nights and hours (including Sundays as permitted by law) that any Major Tenant in the Center (as referred to in Section 4.2 above) is open for business,~~ and such other days, nights and hours as Landlord shall approve in writing. *In addition to the foregoing, Tenant shall have the right to close the Premises during any twelve (12) month period as follows: (i) two (2) non-consecutive calendar days for inventory, (ii) repairs, remodeling or decorations in the Premises which Tenant may require for a period of no more than two (2) weeks, and (iii) Thanksgiving Day, Christmas Day and New Year's Day. Tenant shall not be liable for occasional de minimus failures to continuously use and occupy the Premises, for example, a late opening or early closing, of no more than one-half (1/2) hour each.*

Section 8.4.    Operation by Tenant.

Tenant covenants and agrees that it will: not place or maintain any merchandise, vending machines or other articles in any vestibule or entry of the Premises or outside the Premises; store garbage, trash, rubbish and other refuse in rat-proof and insect-proof containers inside the Premises, and remove the same frequently and regularly and, if directed by Landlord, by such means and methods and at such times and intervals as are *reasonably* designated by Landlord, all at Tenant's *reasonable* costs, ~~including a pre-stocking charge for the removal of trash prior to the Commencement Date,~~ and, upon Landlord's *prior written* request, provide a Waste Profile Sheet or equivalent information concerning contents

<div align="center">-13-</div>

of trash; not permit any sound system audible or objectionable advertising medium visible outside the Premises *(other than permitted interior signs)*; keep all mechanical equipment free of vibration and noise and in good working order and condition; not commit or permit waste or a nuisance upon the Premises; not permit or cause odors to emanate or be dispelled from the Premises; not solicit business in the Common Areas nor distribute advertising matter to, in or upon any Common Area; not permit the loading or unloading or the parking or standing of delivery vehicles outside any area designated therefor, nor permit any use of vehicles which will interfere with the use of any Common Areas; comply with all laws, recommendations, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, including those with authority over insurance rates, with respect to the use or occupancy of the Premises, and including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act; light the show windows of the Premises and all signs each night of the year for not less than one (1) hour after the Premises is permitted to be closed; not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; not place a load on any floor in the Center which exceeds the floor load per square foot which such floor was designed to carry; store in the Premises only merchandise which Tenant intends to sell at, in or from the Premises, within a reasonable time after receipt thereof. *Notwithstanding anything contained herein to the contrary, Tenant shall in no event be obligated to make or pay for the cost of any structural change, repair or addition to its Premises not required as a result of the Permitted Use. Tenant shall be permitted, without Landlord's consent, to install and maintain within the interior of the Premises such signs and advertising materials that Tenant utilizes in at least a majority of its stores in similar shopping centers operated under the same Trade Name then in use at the Premises in the state in which the Premises is located.*

Landlord may make additional services, including but not limited to, ~~music systems,~~ pest control, trash removal, and/or trash compactor, ~~cleaning, maintenance, and security,~~ available to the Premises and, in such event, Tenant shall utilize such services, at Tenant's expense *provided that the costs charged by Landlord shall not exceed locally competitive rates for such services.*

Section 8.5.   Emissions and Hazardous Materials.
    A.      Emissions. Tenant shall not, without the prior written consent of Landlord:

    (i)     make, or permit to be made, any use of the Premises or any portion thereof which emits, or permits the emission of an unreasonable amount of dust, sweepings, dirt, cinders, fumes or odors into the atmosphere, the ground or any body of water, whether natural or artificial (including rivers, streams, lakes, ponds, dams, canals, or flood control channels), or which emits, or permits the emission of dust, sweepings, dirt, cinders, fumes or odors into the atmosphere, the ground or any body of water, whether natural or artificial (including rivers, streams, lakes, ponds, dams, canals, or flood control channels) which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (ii)    permit any vehicle on the Premises to emit exhaust which is in violation of any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (iii)   create, or permit to be created, any sound pressure level which will *materially* interfere with the quiet enjoyment of any real property adjacent to the Premises, or which will create a nuisance or violate any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement;

    (iv)    transmit, receive, or permit to be transmitted or received any electromagnetic, microwave or other radiation which is harmful or hazardous to any person or property in, on or about the Premises *and in violation of any federal, state or local law, ordinance, order, rule, regulation or code*, or anywhere else, or which interferes with the operation of any electrical, electronic, telephonic or other equipment wherever located, whether on the Premises or anywhere else;

    (v)     create, or permit to be created, any ground vibration that is discernible outside the Premises; or

    (vi)    produce or permit to be produced any intense glare, light or heat except within an enclosed or screened area and then only in such manner that the glare, light or heat shall not be discernible outside the Premises.

    B.      Hazardous Material.
    Tenant shall not, without the prior written consent of Landlord, cause or permit, knowingly or unknowingly, any Hazardous Material (hereinafter defined) to be brought or remain upon, kept, used, discharged, leaked, or emitted in or about, or treated at the Premises. As used in this Lease, "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement, and shall include asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, 42 U.S.C. 9601 et seq., the Resource Conservation and Recovery Act ("RCRA"), as amended, 42 U.S.C. 6901 et seq. *However, "Hazardous Materials" shall not include substances which are used in the ordinary course of a business similar to Tenant's business as permitted pursuant to Section 8.1 of this Lease, and Landlord's consent shall not be required with respect to the use thereof, provided, however, that such substances are used, handled, transported, disposed of or stored in strict compliance with any applicable federal, state or local law, rules, regulation, code, ordinance or any other governmental requirements. If such substances are not so used, handled, transported, disposed of or stored then they shall be deemed "Hazardous Materials" for purposes of this Lease.* To obtain Landlord's consent, Tenant shall have an "Environmental Audit" prepared by a Qualified Engineer or Environmental Professional for Landlord's

-14-

review to be relied upon by Landlord and for Landlord's use. Such Environmental Audit shall list: (1) the name(s) of each Hazardous Material and a Material Safety Data Sheet (MSDS) as required by the Occupational Safety and Health Act; (2) the volume proposed to be used, stored and/or treated at the Premises (monthly); (3) the purpose of such Hazardous Material; (4) the proposed on-premises storage location(s); (5) the type and description of such storage area(s); (6) the location of sanitary and storm drains; (7) the name(s) of the proposed off-premises disposal entity; and (8) an emergency preparedness plan in the event of a release. Additionally, the Environmental Audit shall include copies of all required federal, state, and local permits concerning or related to the proposed use, storage, or treatment of Hazardous Materials at the Premises. Tenant shall submit a new Environmental Audit whenever it proposes to use, store, or treat a new Hazardous Material at the Premises or when the volume of existing Hazardous Materials to be used, stored, or treated at the Premises expands by ten percent (10%) during any thirty (30) day period. If Landlord in its reasonable judgment finds the Environmental Audit acceptable, then Landlord shall deliver to Tenant Landlord's written consent. Notwithstanding such consent, Landlord may revoke its consent upon: (1) Tenant's failure to remain in full compliance with applicable environmental permits and/or any other requirements under any federal, state, or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement (including but not limited to CERCLA and/or RCRA), related to environmental safety, human health, or employee safety; (2) the Tenant's business operations pose or potentially pose a human health risk to other tenants; or (3) the Tenant expands its use, storage, or treatment of Hazardous Materials in a manner inconsistent with the safe operation of a shopping center. Should Landlord consent in writing to Tenant bringing, using, storing or treating any Hazardous Material in or upon the Premises, Tenant shall strictly obey and adhere to any and all federal, state or local laws, ordinances, orders, rules, regulations, codes or any other governmental restrictions or requirements (including but not limited to CERCLA and/or RCRA), which in any way regulates, governs or impacts Tenant's possession, use, storage, treatment or disposal of said Hazardous Material. In addition, Tenant represents and warrants to Landlord that: (1) Tenant shall apply for and remain in compliance with applicable RCRA and state permits; (2) Tenant shall report to applicable governmental authorities any release of reportable quantities of a hazardous substance(s) as mandated by Section 103(a) of CERCLA; (3) Tenant, within *ten (10)* days of receipt, shall send to Landlord a copy of any notice, order, inspection report, or other document issued by any governmental authorities relevant to the Tenant's compliance status with environmental or health and safety laws; and (4) Tenant shall remove from the Premises all Hazardous Materials at the termination of this Lease *placed upon the Premises by Tenant during the Lease Term.*

In addition to, and in no way limiting, Tenant's duties and obligations as set forth in Section 11.6 of this Lease, should Tenant breach any of its duties and obligations as set forth in this Section 8.5 of this Lease, or if the presence of any Hazardous Material on the Premises results in contamination of the Premises, the Center, any land other than the Center, the atmosphere, or any water or waterway (including groundwater), or if contamination of the Premises or of the Center by any Hazardous Material otherwise occurs for which Tenant is otherwise legally liable to Landlord for damages resulting therefrom, Tenant shall indemnify, save harmless and, at Landlord's option and with attorneys approved in writing by Landlord, defend Landlord, and its contractors, agents, employees, partners, officers, directors, and mortgagees, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, causes of action, and losses of any and every kind and nature (including, without limitation, diminution in value of the Premises or the Center, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises or the Center, damages arising from any adverse impact on marketing space in the Center, and sums paid in settlement of claims and for attorney's fees, consultant fees and expert fees, which may arise during or after the Lease Term or any extension thereof as a result of such contamination). This includes, without limitation, costs and expenses, incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of the presence of Hazardous Material on or about the Premises or the Center, or because of the presence of Hazardous Material anywhere else which came or otherwise emanated from Tenant or the Premises. Without limiting the foregoing, if the presence of any Hazardous Material on or about the Premises or the Center caused or permitted by Tenant results in any contamination of the Premises or the Center, Tenant shall, at its sole expense, promptly take all actions and expense as are necessary to return the Premises and/or the Center to the condition existing prior to the introduction of any such Hazardous Material to the Premises or the Center; provided, however, that Landlord's approval of such actions shall first be obtained in writing. *If the presence of any Hazardous Material on or about the Premises or the Center caused or permitted by Landlord results in any contamination of the Premises or the Center, Landlord shall, at its sole expense, promptly take all actions and expense as are necessary to return the Premises and/or the Center to the condition existing prior to the introduction of any such Hazardous Material to the Premises or the Center. Notwithstanding anything herein in this Lease which may be to the contrary, in the event any Hazardous Materials, including asbestos-containing materials (hereinafter referred to as "ACMs") are found in, at, under, above, abutting or otherwise adversely affecting the Premises and Tenant's use and occupancy thereof and such Hazardous Materials or ACMs were not placed in the Premises by Tenant, Landlord, at its sole cost and expense shall take such action as required by law to remove, remediate, abate or encapsulate such Hazardous Materials or ACMs, and the Commencement Date shall be delayed, or if Tenant cannot operate its business in the Premises all Minimum Rent and additional rent shall abate on a day-for day basis, as the case may be until the earlier of (i) the date Tenant can operate its business or (ii) such time as the Hazardous Materials or ACMs have been removed, remediated, abated or encapsulated, and Landlord shall promptly restore the Premises following any such work.*

*In no way limiting Landlord's duties and obligations as set forth in this Lease, Landlord shall not place any Hazardous Materials in the Premises after Tenant's occupancy, and if the presence of any Hazardous Materials in the Premises which were placed in the Premises by Landlord, its agents, employees and/or contractors or other tenants results in contamination of the Premises or any Hazardous Materials in the Premises prior to the lease Term, or if contamination of the Premises or of the Center by any Hazardous Material otherwise occurs for which Landlord is otherwise legally liable to Tenant for damage resulting therefrom, Landlord shall indemnify and save Tenant harmless, and, at Tenant's option, defend Tenant, and its agents, employees, officers and directors, if any, from any and all claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions, causes of action, and losses of any and every kind and nature, including, without limitation, diminution in value of the*

-15-

*Premises, damages for the loss or restriction on use of the rentable or usable space or of any amenity of the Premises or any amenity of the Center, and reasonable attorney's fees, which may arise during or within four (4) years after the expiration of the Lease Term as a result of such contamination. This includes, without limitation, costs and expenses, incurred in connection with any investigation of site conditions or any cleanup, remediation, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Materials present on or about the Premises (excluding those Hazardous Materials that were caused or permitted, knowingly by Tenant to be brought or remain upon or kept or used in or about the Premises by Tenant). Without limiting the foregoing, if the presence of any Hazardous Materials on or about the Premises or the Center caused or permitted by Landlord results in any contamination of the Premises, Landlord shall, at its sole expense, promptly take all actions as it is required by law to return the Premises or the Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or the Center. However, for purposes of this paragraph, "Hazardous Materials" shall not include substances which are used by Landlord in the ordinary course of a business similar to Landlord's business, provided, however, that such substances are used, handled, transported, stored or disposed of in strict compliance with any applicable federal, state or local law, statute, rules, regulation, code, ordinance or any other governmental restriction or requirement. If such substances are not so used, handled, transported, stored or disposed of then they shall be deemed "Hazardous Materials" for purposes hereof.*

<u>Section 8.6.</u>      <u>Painting, Decorating, Displays, Alterations.</u>

Tenant will not paint, decorate or change the architectural treatment of any part of the exterior of the Premises nor any part of the interior of the Premises visible from the exterior nor make any structural alterations, additions or changes in the Premises without Landlord's *reasonable* written approval thereto, and will promptly remove any paint, decoration, alteration, addition or changes applied or installed without Landlord's approval and restore the Premises to an acceptable condition or take such other action with respect thereto as Landlord directs. *Notwithstanding the foregoing provision, Tenant shall have the right, without the consent of Landlord, to make interior alterations, improvements and additions which are nonstructural, nonutility and nonstorefront in nature provided the cost of such interior alterations, improvements or additions does not exceed Thirty Thousand and 00/100 Dollars ($30,000.00) during any twelve (12) month period and Tenant shall have the right to perform the initial installations as otherwise set forth herein.*

Tenant will install and maintain at all times, subject to the other provisions of this Section 8.6, merchandise displays in any show windows on the Premises; the arrangement, style, color and general appearance thereof and of displays in the interior of the Premises which are visible from the exterior, including, but not limited to, window displays, advertising matter, signs, merchandise and store fixtures, shall be maintained in keeping with the character and standards of the Center.

<u>Section 8.7.</u>      <u>Other Operations.</u>

If during the Lease Term Tenant directly or indirectly operates, manages or has any interest whatsoever in any other *retail* store ~~or business~~ operated for a purpose or business similar to or in competition with all or part of the business permitted under Section 1.1 hereof *operated under the same trade name then in use at the Premises and the same concept* within five (5) miles of any boundary line of the Center, it will injure Landlord's ability and right to receive Percentage Rent (such ability and right being a major consideration for this Lease*). ~~and the construction of the Center).~~ Accordingly, if Tenant operates, manages or has such interest in any such *retail* store ~~or business~~ within such area (a "Radius Violation"), then, at Landlord's option, either (i) Tenant's Effective Rent (as defined below) shall be automatically increased by fifty percent (50%) calculated on a per diem basis for so long as the Radius Violation continues, such increase representing liquidated damages and not a penalty or (ii) one hundred percent (100%) of all sales made from any such other *retail* store ~~or business~~ shall be included in the computation of Gross Sales and Adjusted Gross Sales for the purpose of determining Percentage Rent under this Lease as though said Gross Sales and Adjusted Gross Sales had actually been made at, in or from the Premises. "Effective Rent" shall be Tenant's Minimum Annual Rent plus the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding the Radius Violation. Landlord shall have all rights of inspection of books and records with respect to such *retail* stores ~~or businesses~~ as it has with respect to the Premises; and Tenant shall furnish to Landlord such reports with respect to Gross Sales and Adjusted Gross Sales from such other *retail* store ~~or business~~ as it is herein required to furnish with respect to the Premises. *This restriction shall not apply to (i) any stores existing on the effective date of this Lease or any store opened pursuant to a lease executed prior to the effective date of this Lease, (ii) those stores which are acquired by Tenant, its parent, subsidiaries or affiliates in the course of an acquisition of any chain of at least ten (10) stores or group of at least ten (10) stores or the acquisition of Tenant by a company with another chain of at least ten (10) stores, (iii) the sale of merchandise manufactured for or licensed to others for resale, or (iv) any department operated within department stores. THE PROVISIONS OF THIS SECTION 8.7 HAVE BEEN NEGOTIATED FOR THIS LEASE AT BREA MALL ONLY*

<u>Section 8.8.</u>      <u>Sales and Dignified Use.</u>

*Except as otherwise set forth in this Lease,* Tenant shall continuously and without interruption, throughout the Lease Term in good faith, actively use, occupy and operate the entire Premises, with fixtures and decor, an inventory of goods and merchandise and a staff of sales personnel adequate, sufficient and appropriate to operate the Premises as a "first-class", "high-quality", ~~"fashionable"~~ store or business (as opposed to a "general", "promotional" or "self-service" store or business) *in Tenant's reasonable business judgment.* ~~as those standards of operation may be interpreted from time to time during the Lease Term.~~ The foregoing description is intended only as a description of the general quality of the merchandise or services Tenant may sell and the general quality of customer service, merchandising, fixturing and decor Tenant must maintain in the operation of the Premises. The foregoing description is not intended by Landlord and will not be enforced to affect the retail selling price of Tenant's merchandise or services. Tenant shall operate its business at the Premises in a respectable, reputable, tasteful, competent and dignified manner *substantially in accordance with Tenant's other retail stores with the same trade name as the Premises.* ~~in order to enhance the image of the Center as a whole and its reputation as a dignified and desirable place to shop and to achieve the maximum~~

Case 2:16-bk-23836-SK    Doc 81    Filed 12/29/16    Entered 12/29/16 16:48:37    Desc
Main Document    Page 193 of 381

~~volume of sales so that Landlord will receive the maximum amount of Percentage Rent from Tenant or percentage rent from other tenants and occupants of the Center.~~ No public or private auction or any fire, "going out of business," bankruptcy or similar sales or auctions shall be conducted in or from the Premises and the Premises shall not be used in a disreputable or immoral manner or in violation of national, state or local laws.

Section 8.9.    Rules and Regulations.
Tenant shall comply with the following rules and regulations and any *reasonable* amendments thereto as developed by Center management *of which Tenant has had thirty (30) days' advance notice*: (i) Tenant shall advise and *use reasonable efforts to* cause its vendors to deliver all merchandise before noon on Mondays through Fridays, not at other times; (ii) all deliveries are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives; (iii) tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface. In addition, wheel blocking must be available for use. Tractor trailers are to be removed from the loading areas after unloading. No parking or storing of such trailers will be permitted in the Center; (iv) except for small parcel packages, no deliveries will be permitted through the malls unless Tenant does not have a rear service door. In such event, prior arrangements must be made with the Mall Manager for delivery. Merchandise being received shall immediately be moved into Tenant's Premises and not be left in the service or receiving areas; (v) Tenant is responsible for storage and removal of its trash, refuse and garbage. Tenant shall not dispose of the following items in sinks or commodes: plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other item which the same are not designed to receive. All Store Floor Area of Tenant, including vestibules, entrances and returns, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition; (vi) other than as permitted under the provisions of the Lease, Tenant shall not permit or suffer any advertising medium to be placed on mall walls, on Tenant's mall or exterior windows, on standards in the mall, on the sidewalks or on the parking lot areas or light poles. No permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign, and trade or seasonal decoration of any size, style or material within the Center, outside the Premises; (vii) Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television. No radio, television, or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Premises, unless Landlord has previously given its written consent *which consent shall not be unreasonably withheld or delayed*; (viii) Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside its Premises, nor shall Tenant use the exterior sidewalks or exterior walkways of its Premises to display, store or place any merchandise. No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the parking lot or other Common Areas; (ix) Tenant shall not permit or suffer any portion of the Premises to be used for lodging purposes, nor conduct or permit any unusual firing, explosion or other damaging or dangerous hazard within the Premises or the Common Areas; (x) Tenant shall not permit or suffer any portion of the Premises to be used for any warehouse operation, or any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation, adult bookstore or cinema, peepshow, entertainment or sale of products of an obscene or pornographic nature or predominately sexual nature; and (xi) Tenant shall not, in or on any part of the Common Areas: (a) vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever; (b) exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Landlord; (c) distribute any circular, booklet, handbill, placard or other material, except for activities as approved in writing by Landlord; (d) solicit membership in any organization, group or association or contribution for any purpose; (e) create a public or private nuisance; (f) use any Common Areas (including the enclosed mall) for any purpose when none of the other retail establishments within the Center is open for business or employment, except for activities as approved in writing by Landlord; (g) throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind; or (h) deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Center, or the property of customers, business invitees or employees situated within the Center. *Notwithstanding the foregoing provision, all rules and regulations for the Center shall be reasonable and shall be (i) uniformly and nondiscriminately imposed and enforced with respect to the tenants of the Center, (ii) such rules and regulations shall not increase Tenant's obligations or decrease its rights with respect to this Lease, and (iii) any amendments or new rules or regulations shall be advised to Tenant in writing at least thirty (30) days' prior to the effective date.*

ARTICLE IX

MAINTENANCE OF LEASED PREMISES

Section 9.1.    Maintenance by Landlord.
Landlord shall keep or cause to be kept the foundations, roof and structural portions of the walls of the Premises *and utilities to Tenant's point of connection* in good order, repair and condition except for damage thereto due to the acts or omissions of Tenant, its agents, employees or invitees. The foregoing provision shall not prejudice Landlord's right to include the cost of maintaining the roof over the Premises within the provisions of Article VI of this Lease. Landlord shall commence required repairs as soon as reasonably practicable after receiving written notice from Tenant thereof. This Section 9.1 shall not apply in case of damage or destruction by fire or other casualty or condemnation or eminent domain, in which events the obligations of Landlord shall be controlled by Articles XVI and XVII. Except as provided in this Section 9.1 Landlord shall not be obligated to make repairs, replacements or improvements of any kind upon the Premises, or to any equipment, merchandise, stock in trade, facilities or fixtures therein, all of which shall be Tenant's responsibility, but Tenant shall give Landlord prompt written notice of any accident, casualty, damage or other similar occurrence in or to the Premises or the Common Areas of which Tenant has knowledge. *Landlord shall provide Tenant with a reasonable notice of any work which Landlord intends to perform in the Premises and shall use reasonable efforts not to interfere with Tenant's business.* Landlord will use

*reasonable efforts to avoid performing work in the Premises during the months of October, November and December.*

Section 9.2.      Maintenance by Tenant.

Tenant shall at all times, at Tenant's sole cost and expense, keep the Premises (including all entrances and vestibules) and all partitions, window and window frames and mouldings, glass, store fronts, doors, door openers, fixtures, equipment and appurtenances thereof (including lighting, heating, electrical, plumbing, *restroom* waterproofing, ventilating and air conditioning fixtures and systems *(exclusively serving the Premises)* and other mechanical equipment and appurtenances *exclusively serving the Premises)* and all parts of the Premises, and parts of Tenant's Work not on the Premises, not required herein to be maintained by Landlord, in good order, condition and repair and clean, orderly, sanitary and safe, damage by ~~unavoidable~~ casualty, *reasonable wear and tear, condemnation, eminent domain and force majeure* excepted, *excluding structural changes to the Premises unless such structural changes are required as a result of Tenant's particular manner of use as opposed to general retail use* (including but not limited to doing such things as are necessary to cause the Premises to comply with applicable laws, ordinances, rules, regulations and orders of governmental and public bodies and agencies, such as but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act). *Tenant shall only be required to make structural changes to the Premises if such changes are required as a result of Tenant's Permitted Use.* If replacement of equipment, fixtures and appurtenances thereto is necessary, Tenant shall replace the same with new or completely reconditioned equipment, fixtures and appurtenances, and repair all damages done in or by such replacement. If Tenant fails to perform its obligations hereunder, Landlord *following Tenant's failure to commence same within thirty (30) days after written* ~~without~~ notice may, but shall not be obligated to, perform Tenant's obligations or perform work resulting from Tenant's acts, actions or omissions and add the cost of the same to the next installment of Minimum Monthly Rent due hereunder. *Tenant obligations hereunder shall not extend to damage caused by the negligence or willful misconduct of Landlord or any of Landlord's agents, employees or contractors; subject, however, to the provisions of Section 11.3.*

Section 9.3.      Surrender of Premises.

At the expiration of the Lease Term, Tenant shall surrender the Premises in the same condition as they were required to be in on the Required Completion Date, reasonable wear and tear and damage by ~~unavoidable~~ casualty, *condemnation, force majeure and any other permitted alterations* excepted, and deliver all keys for, and all combinations on locks, safes and vaults in, the Premises to Landlord at Landlord's notice address as specified in Section 1.1 or, at Landlord's option, to the office of the Center's general manager.

*Upon surrender, Tenant may, in its sole discretion and at its expense, remove from the Premises, in whole or in part, trade dress, trade and service marks, or other proprietary property, and other trade distinctive improvements, fixtures, furniture, equipment and characteristics that are indicative of Tenant's business, which Tenant installs in the Premises, and to otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names, service marks, copyrights or other proprietary rights, provided Tenant shall repair any damage to the Premises caused by any removal thereof.*

ARTICLE X

ALTERATIONS AND TENANT'S LIENS

Section 10.1.      Remodeling. *INTENTIONALLY DELETED.*

Section 10.2.      Removal and Restoration by Tenant.

All *permanently affixed* alterations, changes and additions and all *permanently affixed* improvements, including leasehold improvements, made by Tenant whether part of Tenant's Work or not, shall immediately upon installation attach to the fee and become Landlord's property *(except that Tenant shall retain such indicia of ownership as shall be required for tax and insurance purposes)* and shall not be removed unless replaced by like property. If Tenant fails to remove any shelving, decorations, equipment, trade fixtures or personal property from the Premises prior to the end of the Lease Term, they shall become Landlord's property and Tenant shall repair or pay for the repair of any damage done to the Premises resulting from removing same *except for the negligence and willful misconduct of Landlord (subject, however, to the provisions of Section 11.3)* but not for painting or redecorating the Premises. *Nothing herein contained or otherwise shall be construed to give Landlord right to any of Tenant's inventory or trade fixtures, furnishings, equipment or other personal property or any proprietary property.*

Section 10.3.      Tenant's Liens.

A.      Tenant shall not suffer any mechanics' or materialmen's lien to be filed against the Premises or the Center by reason of work, labor, services or materials performed or furnished to Tenant or anyone holding any part of the Premises under Tenant. If any such lien shall at any time be filed as aforesaid, Tenant may contest the same in good faith, but, notwithstanding such contest, Tenant shall, within *sixty (60)* days after *Tenant's receipt of notice of* the filing thereof, cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction, or otherwise. In the event of Tenant's failure to release of record any such lien within the aforesaid period, Landlord may remove said lien by paying the full amount thereof or by bonding or in any other manner Landlord deems appropriate, without investigating the validity thereof, and irrespective of the fact that Tenant may contest the propriety or the amount thereof, and Tenant, upon demand, shall pay Landlord the amount so paid out by Landlord in connection with the discharge of said lien, together with interest thereon at the rate of twelve percent (12%) per annum and reasonable expenses incurred in connection therewith, including reasonable attorneys' fees, which amounts are due and payable to Landlord as additional rent on the first day of the next following month. Landlord shall have the right to deduct the expenses incurred by Landlord pursuant to this Section 10.3 from Landlord's Contribution towards Tenant's Work, if any. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate

-18-

in the Premises to any lien or liability under the lien laws of the State where the Center is located. Tenant's obligation to observe and perform any of the provisions of this Section 10.3 shall survive the expiration of the Lease Term or the earlier termination of this Lease.

B.    Tenant shall not create or suffer to be created a security interest or other lien against any improvements, additions or other construction made by Tenant in or to the Premises or against any equipment or fixtures installed by Tenant therein (other than Tenant's property), and should any security interest be created in breach of the foregoing, Landlord shall be entitled to discharge the same by exercising the rights and remedies afforded it under paragraph A of this Section.

<div align="center">

ARTICLE XI

INSURANCE

</div>

Section 11.1.    By Landlord.
    Landlord shall carry commercial general liability insurance (either through the purchase of insurance or a self-insurance plan) on those portions of the Common Areas included in Landlord's Tract providing coverage of not less than $5,000,000.00 against liability for bodily injury including death and personal injury for any one (1) occurrence and $1,000,000.00 property damage insurance, or combined single limit insurance in the amount of $5,000,000.00.

    Landlord shall also carry insurance for fire, extended coverage, vandalism, malicious mischief and other endorsements deemed advisable by Landlord, insuring all improvements on Landlord's Tract, including the Premises and all leasehold improvements thereon and appurtenances thereto (excluding Tenant's *leasehold improvements,* merchandise, trade fixtures, furnishings, equipment, personal property and excluding plate glass) for the full insurable value thereof, with such deductibles as Landlord deems *reasonably* advisable, such insurance coverage to include improvements provided by Tenant as set forth in Exhibits "B" and "B-2" as Tenant's Work (excluding wall covering, floor covering, carpeting and drapes) and Landlord's Work as defined in Exhibit "B".

Section 11.2.    By Tenant.
    Tenant agrees to carry commercial general liability insurance on the Premises during the Lease Term, covering the Tenant and naming the Landlord, Simon Property Group, Inc., and the property management company as additional insureds with terms and companies *licensed to do business in the State where the Center is located and reasonably* satisfactory to Landlord, on an Occurrence form with a limit of not less than $1,000,000.00 for any one (1) occurrence. Tenant shall also carry Umbrella or Excess insurance in an amount of not less than $2,000,000.00. Tenant's insurance will include contractual liability coverage recognizing this Lease, products and completed operations liability. Tenant shall provide notice to Landlord ~~immediately upon~~ *within ten (10) days of* receipt of any notice received by Tenant from its insurance carrier advising of non-renewal or cancellation of the policies required under this Lease. Tenant also agrees to carry insurance against fire and such other risks as are *covered by special form* ~~from time to time required by Landlord, including, but not limited to, a standard "All-Risk"~~ policy of property insurance *(or its equivalent)* protecting against all risk of physical loss or damage, including without limitation, sprinkler leakage coverage ~~and plate glass insurance covering all plate glass in the Premises (including store fronts),~~ in amounts not less than *ninety percent (90%) of* the actual replacement cost, covering all of Tenant's merchandise, trade fixtures, furnishing, wall covering, floor covering, carpeting, drapes, equipment and all items of personal property of Tenant located on or within the Premises. Upon the Commencement Date and annually thereafter, Tenant shall provide Landlord with certificates ~~or, at Landlord's request, copies of the policies,~~ evidencing that such insurance is in full force and effect and stating the terms thereof, including all endorsements at the following address (or such other address as Landlord may notify Tenant): Donald P. Pipino Company, Ltd., 7600 Market Street, Boardman, Ohio 44512. The minimum limits of the commercial general liability policy of insurance shall in no way limit or diminish Tenant's liability under Section 11.6 hereof and shall be subject to increase at any time, and from time to time, after the commencement of the fifth (5th) year of the Lease Term if Landlord in the exercise of its reasonable judgment shall deem same necessary for adequate protection *and so long as such increases are either (a) required of substantially all non-Major Tenants in the Center, (b) considered prudent, or (c) required by Landlord's lender.* Within thirty (30) days after demand therefor by Landlord, Tenant shall furnish Landlord with evidence that it has complied with such demand *but in no event shall the percentage increase in the limits be greater than the increase in the Consumer Price Index (as defined below) during the period from the Commencement Date or the date of the most recent increase, whichever is applicable, to the date the insurance increase is to be effective.* Prior to the Commencement Date, Tenant's insurance coverage shall be governed by the provisions of Exhibit "B". *Tenant may provide for the coverages set forth in this Section by coverage under Tenant's blanket policy.*

    Notwithstanding the above mentioned commercial general liability insurance policy limit for Tenant, if Tenant after obtaining Landlord's prior written consent, does or intends to bring, possess, use, store, treat or dispose any Hazardous Material (herein defined) in or upon the Premises or Center, Landlord shall have the right, as a condition to such consent, to require Tenant to purchase additional public liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) and to purchase environmental impairment liability insurance with coverage of no less than Five Million and 00/100 Dollars ($5,000,000.00) with a deductible of no greater than Fifty Thousand and 00/100 Dollars ($50,000.00) to insure that anything contaminated with or by the Hazardous Material be removed from the Premises and/or the Center, and that the Premises and/or the Center be restored to a clean, neat, attractive, healthy, sanitary and non-contaminated condition.

    *The term "Consumer Price Index" as used in this Lease shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is*

<div align="center">

-19-

</div>

*discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations.*

Section 11.3.    Mutual Waiver of Subrogation Rights.

Landlord and Tenant and all parties claiming, by, through or under them mutually release and discharge each other from all claims and liabilities arising from or caused by any casualty or hazard covered or required hereunder to be covered in whole or in part by property insurance on the Premises *or the Center* or in connection with property on or activities conducted on the Premises *or the Center*, and waive any right of subrogation which might otherwise exist in or accrue to any person on account thereof and further agree to evidence such waiver by endorsement to the required insurance policies, provided that such release shall not operate in any case where the effect is to invalidate or increase the cost of such insurance coverage (provided that in the case of increased cost, the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost thereby keeping such release and waiver in full force and effect).

Section 11.4.    Waiver.

*Except for the negligence and willful misconduct of Landlord, its agents, employees or contractors (subject, however, to the provisions of Section 11.3),* Landlord, its agents and employees, shall not be liable for, and Tenant waives all claims for, loss or damage, including but not limited to consequential damages, to person, property or otherwise, sustained by Tenant or any person claiming through Tenant resulting from any accident, casualty or occurrence in or upon any part of the Center including, but not limited to, claims for damage resulting from: (a) any equipment or appurtenances becoming out of repair; (b) Landlord's failure to keep any part of the Center in repair; (c) injury done or caused by wind, water, or other natural element; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, and steam pipes, stairs, porches, railings or walks; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Premises; (h) the escape of steam or hot water; (i) water, snow or ice upon the Premises; (j) the falling of any fixture, plaster or stucco; (k) damage to or loss by theft or otherwise of property of Tenant or others; (l) acts or omissions of persons in the Premises, other tenants in the Center, occupants of nearby properties, or any other persons; and (m) any act or omission of owners of adjacent or contiguous property. ~~or of Landlord, its agents or employees.~~ All property of Tenant kept in the Premises shall be so kept at Tenant's risk only and Tenant shall save Landlord harmless from claims arising out of damage to the same, including subrogation claims by Tenant's insurance carrier.

Section 11.5.    Insurance - Tenant's Operation.

Tenant will not do or suffer to be done anything which will contravene Landlord's insurance policies or prevent Landlord from procuring such policies in amounts and companies selected by Landlord.  If anything done, omitted to be done or suffered to be done by Tenant in, upon or about the Premises shall cause the rates of any insurance effected or carried by Landlord on the Premises or other property to be *materially* increased beyond the regular rate from time to time applicable to the Premises for use for the purpose permitted under this Lease, or such other property for the use or uses made thereof, Tenant will pay the amount of such increase promptly upon Landlord's demand and Landlord shall have the right to correct any such condition at Tenant's *reasonable* expense.  In the event that this Lease so permits and Tenant engages in the preparation of food or packaged foods or engages in the use, sale or storage of inflammable or combustible material, Tenant shall install chemical extinguishing devices (such as ansul) approved by Underwriters Laboratories and Factory Mutual and the installation thereof must be approved by the appropriate local authority. Tenant shall keep such devices under service as required by such organizations.  If gas is used in the Premises, Tenant shall install gas cut-off devices (manual and automatic). *Landlord represents that Tenant's Permitted Use of the Premises as set forth herein and as Tenant operates other stores under the same trade name and Permitted Use shall not cause an increase in premiums or the cancellation of Landlord insurance policies.*

Section 11.6.    Indemnification.

Tenant shall save harmless, indemnify, and at Landlord's option, defend Landlord, its agents and employees, and mortgagee, if any, from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with Tenant's use, occupancy, management or control of the Premises or Tenant's operations, conduct or activities in the Center.

*Landlord shall save harmless, indemnify, and at Tenant's option, defend Tenant, its agents and employees, from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of or in any way connected with Landlord's use, occupancy, management or control of the Common Areas or the rest of the Center or Landlord's operations, conduct or activities in the Premises.*

ARTICLE XII

OFFSET STATEMENT, ATTORNMENT, SUBORDINATION

Section 12.1.    Offset Statement.

Within *thirty (30)* days after Landlord's written request Tenant shall deliver, executed in recordable form, a declaration to any person designated by Landlord: (a) ratifying this Lease; (b) stating the commencement and termination dates; and (c) certifying (i) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated), (ii) that, *to Tenant's knowledge,* all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any), (iii) that, *to Tenant's knowledge,* no defenses or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed), (iv) as to advance rent, if any, paid by Tenant, (v) the date to which rent has been paid, (vi) as to the amount of security

-20-

deposited with Landlord, and (vii) such other information *to the status of the Lease or the performance of its terms by the parties* as Landlord reasonably requires. Persons receiving such statements shall be entitled to rely upon them. *Within thirty (30) days after the request by Tenant, Landlord shall deliver to Tenant a written and acknowledged statement certifying to Landlord's knowledge that (a) Tenant is the tenant under this Lease; (b) Tenant has completed its portion of the construction work in the Premises or if Tenant has not completed its portion of the construction work in the Premises, then stating the construction items to be completed by Tenant' (c) the date on which the Lease Term commenced, the date on which the Commencement Date occurred and the date on which the Lease Term expires; (d) no defaults exist under this Lease (or if defaults exist, then specifically stating such defaults); (e) this Lease is unmodified and in full force and effect or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (f) the amount of Minimum Annual Rent and all items of additional rent and the dates to which the Minimum Annual Rent and all items of additional rent have been paid; (g) Tenant is not entitled to any credit, offset or deduction against any Minimum Annual Rent and any item of additional rent (or if Tenant is entitled to a credit, offset or deduction, then stating the amount of such credit, offset or deduction); and (h) Tenant does not have any options or rights to renew or cancel this Lease (or if Tenant shall have options or rights to renew or cancel this Lease, then stating such options or rights).*

Section 12.2.    Attornment.

    Tenant shall, in the event of a sale or assignment of Landlord's interest in the Premises or the building in which the Premises is located or this Lease or Landlord's Tract, or if the Premises or such building comes into the hands of a mortgagee, ground lessor or any other person whether because of a mortgage foreclosure, exercise of a power of sale under a mortgage, termination of the ground lease, or otherwise, attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder. Tenant shall execute, at Landlord's request, any attornment agreement *reasonably acceptable to Tenant and* required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person *reasonably* requires, *provided, however, that such agreement shall create no additions to, or diminution of the rights and responsibilities contained herein.*

Section 12.3.    Subordination.

    A.    Mortgage. This Lease shall be secondary, junior and inferior at all times to the lien of any mortgage and to the lien of any deed of trust or other method of financing or refinancing (hereinafter collectively referred to as "mortgage") now or hereafter existing against all or a part of Landlord's Tract, and to all renewals, modifications, replacements, consolidations and extensions thereof, and Tenant shall execute and deliver all *reasonable* documents requested by any mortgagee or security holder to effect such subordination, *provided the mortgagee or security holder agrees in writing that if Landlord defaults under the mortgage, said mortgagee or security holder shall not disturb Tenant's possession while Tenant is not in default hereunder beyond any applicable grace or cure period provided in this Lease. If this Lease is subject and subordinate to any future ground leases or any future mortgages or other methods of financing, such subordination shall be conditioned upon Tenant's receiving, from any such ground lessor or mortgagee, an agreement, in writing, wherein such ground lessor or mortgagee agrees that in the event of the termination of the ground lease, or in the event of a foreclosure, or deed in lieu of foreclosure, or any similar action taken pursuant to said mortgage, this Lease and right of Tenant to possession of the Premises will not be terminated or disturbed except in accordance with the provisions of this Lease.* ~~Tenant shall execute, at Landlord's request, any subordination agreement required by any mortgagee, ground lessor or other such person to be executed, containing such provisions as such mortgagee, ground lessor or other person requires.~~

    B.    Construction, Operation and Reciprocal Easement Agreements. This Lease is subject and subordinate to one (1) or more construction, operation, reciprocal easement or similar agreements (hereinafter referred to as "Operating Agreements") entered into or hereafter to be entered into between Landlord and other owners or lessees of real estate (including but not limited to owners and operators of department stores) within or near the Center (which Operating Agreements have been or will be recorded in the official records of the County wherein the Center is located) and to any and all easements and easement agreements which may be or have been entered into with or granted to any persons heretofore or hereafter, whether such persons are located within or upon the Center or not, and Tenant shall execute such instruments as Landlord requests to evidence such subordination. *Landlord represents that nothing in any said Operating Agreements or other agreements, now or in the future, shall materially increase Tenant's obligations or materially decrease Tenant's rights under this Lease.*

Section 12.4.    Failure to Execute Instruments.

    Tenant's failure to execute instruments or certificates provided for in this Article XII within *twenty (20)* days after *receipt by Tenant* ~~the mailing by Landlord~~ of a written request *and an additional ten (10) days notice* shall be a default under this Lease.

ARTICLE XIII

ASSIGNMENT, SUBLETTING AND CONCESSIONS

Section 13.1.    Consent Required.

    *Except as hereinafter permitted by this Lease,* Tenant shall not sell, assign or in any manner transfer this Lease or any interest therein, nor sublet all or any part of the Premises, nor license concessions nor lease departments therein, without Landlord's prior written consent in each instance, *which shall not be unreasonably withheld, conditioned or delayed.* Under no circumstances shall Tenant mortgage, pledge or otherwise collaterally transfer its interest in this Lease. Consent by Landlord to any assignment or subletting shall not waive the necessity for consent to any subsequent assignment or subletting. This prohibition shall include a prohibition against any subletting or assignment by operation of law. If this Lease is assigned or the Premises or any part sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant and apply the same to the rent herein reserved, but no such

-21-

assignment, subletting, occupancy or collection of rent shall be deemed a waiver of any restrictive covenant contained in this Section 13.1 or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the performance by Tenant of any covenants on the part of Tenant herein contained. Any assignment: (a) as to which Landlord has consented; or (b) which is required by reason of a final nonappealable order of a court of competent jurisdiction; or (c) which is made by reason of and in accordance with the provisions of any law or statute, including, without limitation, the laws governing bankruptcy, insolvency or receivership shall be subject to all terms and conditions of this Lease, and shall not be effective or deemed valid unless, at the time of such assignment:

1.   Each assignee or sublessee shall agree, in a written agreement *reasonably* satisfactory to Landlord, to assume and abide by all of the *applicable* terms and provisions of this Lease, including those which govern the Permitted Uses of the Premises as described in Article I herein;

2.   Each assignee or sublessee has submitted a current financial statement, audited by a certified public accountant, showing a net worth and working capital in amounts *reasonably* determined by Landlord to be sufficient to assure the future performance by such assignee or sublessee of Tenant's obligations hereunder;

3.   Each assignee or sublessee has submitted, in writing, evidence satisfactory to Landlord of substantial retailing experience in shopping centers of comparable size to the Center and in the sale of merchandise and services permitted under Article I of this Lease;

4.   The business reputation of each assignee or sublessee shall meet or exceed generally acceptable commercial standards; *and*

5.   The use of the Premises by each assignee or sublessee shall not violate, or create any potential violation of applicable laws, codes or ordinances, nor violate any other agreements affecting the Premises, Landlord or other tenants in the Center. ~~and~~

6.   ~~Tenant shall pay Landlord an Assignment Fee as reimbursement to Landlord for administrative and legal expenses incurred by Landlord in connection with any assignment or subletting. The Assignment Fee initially will be One Thousand and 00/100 Dollars ($1,000.00) and shall increase by One Hundred and 00/100 Dollars ($100.00) at the end of each full Lease Year of the Lease Term.~~

In the event of any assignment or subletting as provided above *which requires Landlord's consent*, there shall be paid to Landlord, in addition to the Minimum Annual Rent and other charges due Landlord pursuant to this Lease, such additional consideration as shall be attributable to the right of use and occupancy of the Premises, whenever the same is *received* ~~receivable~~ by Tenant, ~~together with,~~ as additional rent, ~~the greatest of (i)~~ *fifty percent (50%) of* the excess, if any, of the rent and other charges payable by the assignee or sublessee over the Minimum Annual Rent and other charges payable under the Lease to Landlord by Tenant pursuant to this Lease. *Prior to determining Tenant's share of the excess, Tenant may deduct reasonable legal fees, brokerage fees and any allowance from Tenant to such assignee for tenant improvements and all other reasonable expenses of the transaction.* ~~(ii) the highest Percentage Rent payable under the Lease by Tenant during the three (3) Lease Years immediately preceding such assignment or subletting, or (iii) the increase in the Consumer Price Index (as defined below) since the Commencement Date.~~ Such additional rent shall be paid to Landlord concurrently with the payments of Minimum Annual Rent required under this Lease, and Tenant shall remain primarily liable for such payments. Notwithstanding any assignment or subletting, *except as otherwise set forth herein,* Tenant shall remain fully liable on this Lease and for the performance of all terms, covenants and provisions of this Lease.

Neither Tenant nor any other person having an interest in the possession, use, occupancy or utilization of the Premises shall enter into any lease, sublease, license, concession, assignment or other agreement for use, occupancy or utilization for space in the Premises which provides for rental or other payment for such use, occupancy, or utilization based in whole or in part on the net income or profits derived by any person from the part leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such proposed lease, sublease, license, concession, assignment or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

~~The term "Consumer Price Index" as used in this Lease shall mean "United States City Average All Items for All Urban Consumers (CPI-U, 1982-84=100)" published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the publication of the Consumer Price Index of the U.S. Bureau of Labor Statistics is discontinued, comparable statistics on the purchasing power of the consumer dollar published by a responsible financial periodical selected by Landlord shall be used for making such computations.~~

Section 13.2.    Change in Ownership.

If Tenant or the guarantor of this Lease, if any, is a corporation the stock of which is not traded on any national securities exchange (as defined in the Securities Exchange Act of 1934, as amended), then the following shall constitute an assignment of this Lease for all purposes of this Article XIII: ~~(i) the merger, consolidation or reorganization of such corporation; and/or (ii)~~ the sale, issuance, or transfer, cumulatively or in one transaction, of any voting stock, by Tenant or the guarantor of this Lease or the stockholders of record of either as of the date of this Lease, which results in a change in the voting control of Tenant or the guarantor of this Lease, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law. If Tenant or the guarantor of this Lease, if any, is a joint venture, partnership or other association, then for all purposes of this Article XIII, the sale, issuance or transfer, cumulatively or

in one transaction, of either voting control or of a twenty-five percent (25%) interest, or the termination of any joint venture, partnership or other association, shall constitute an assignment, except any such transfer by inheritance or testamentary disposition to Tenant's heirs at law. *Notwithstanding the foregoing provision, if Tenant is a corporation, then, notwithstanding the foregoing provision, a transfer of stock among the current stockholders of Tenant, or a transfer of stock among the current stockholders of Tenant and their immediate families (i.e., spouses, parents, brothers, sisters, children, grandchildren or any spouse of any such parent, brother, sister, child or grandchild) or a transfer of stock by will or devise, or a transfer of stock in connection with a public offering registered with the Securities Exchange Commission or other public trading shall not constitute an assignment for the purpose of this Lease.*

*Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right, without the necessity of obtaining Landlord's consent, without payment of any assignment fee and without triggering any right of Landlord to terminate the Lease and recapture possession of the Premises, to assign this Lease or sublet the Premises to the parent, a wholly owned subsidiary or an affiliate of Tenant upon the following conditions: (a) Tenant shall not be in default under the Lease beyond any applicable cure period on the effective date of the assignment or sublease; (b) on or before the effective date of the assignment or sublease Tenant shall (x) notify Landlord in writing of (i) the effective date of the assignment or sublease, (ii) the facts placing such assignment or sublease within the provisions of this paragraph, and (iii) any changes in the address for billings and legal notices sent to Tenant, the assignee or sublessee (y) provide Landlord with a written assumption agreement wherein such assignee or sublessee agrees to assume in writing for the benefit of Landlord all of the Tenant's obligations under the Lease and (z) provide evidence reasonably satisfactory to Landlord that such parent, subsidiary or affiliate is a legal entity in good standing in the state of its origin and is authorized to do business in the state where the Center is located. The term "affiliate" as used in this paragraph shall mean any corporation or other legal entity, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with Tenant. The term "control" as used in this paragraph shall mean the right to exercise, directly or indirectly, of more than fifty percent (50%) of the voting rights attributable to the shares of the controlled corporation or legal entity. In no event shall Tenant be released from any liability under this Lease as a result of such assignment or sublease. If such parent, subsidiary or affiliated corporation of the entity making the assignment or sublease shall at any time after the date of such assignment or sublease no longer be a parent, subsidiary or affiliated corporation of the entity making the assignment or sublease, then such event shall constitute an assignment for the purposes hereof and shall be subject to the provisions of this Article XIII.*

*Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right, without the necessity of obtaining Landlord's consent, without payment of any assignment fee and without triggering any right of Landlord to terminate the Lease and recapture possession of the Premises, to assign this Lease or sublet the Premises in the event of (1) a merger or consolidation of Tenant and another corporation or legal entity, or (2) a sale of all or substantially all of the stock, or assets or a majority of retail stores of Tenant operating under the trade name in use at the Premises, in each case upon the following conditions: (a) Tenant shall not be in default under the Lease beyond any applicable cure period on the effective date of the assignment or sublease; (b) each assignee or sublessee has submitted a current financial statement, audited or reviewed by an independent certified public accountant prepared and certified by the chief financial officer of such assignee or sublessee, showing a net worth and working capital, exclusive of goodwill and other intangible assets, at least equal to the net worth of Tenant as of the effective date of the Lease or just prior to the effective date of the assignment or sublease, whichever is greater; (c) on or before the effective date of the assignment or sublease Tenant shall (x) notify Landlord in writing of (i) the effective date of the assignment or sublease, (ii) the facts placing such assignment or sublease within the provisions of this paragraph, and (iii) any changes in the address for billings and legal notices sent to Tenant, the assignee or sublessee (y) provide Landlord with a written assumption agreement wherein such assignee or sublessee agrees to assume in writing for the benefit of Landlord all of the Tenant's obligations under the Lease and (z) provide evidence reasonably satisfactory to Landlord that such assignee or sublessee is a legal entity in good standing in the state of its origin and is authorized to do business in the state where the Center is located. In no event shall Tenant be released from any liability under this Lease as a result of such assignment or sublease, except as shall result as a matter of law.*

Section 13.3.    Right of Recapture. *INTENTIONALLY DELETED.*

ARTICLE XIV

PROMOTIONAL FUND AND ADVERTISING

Section 14.1.    Provisions Relating to Promotional Fund.
Landlord may, at its option, create and maintain an advertising and promotional fund (hereinafter referred to as the "Fund"), the primary purpose of which is to provide sums necessary for professional advertising and promotional services which benefit the tenants in the Center. In the event the Landlord does create and maintain the Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date, or (b) the date the Fund is created, the Promotional Fund Fixed Contribution set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months). The Promotional Fund Fixed Contribution shall be increased on the first day of each calendar year or partial calendar year after the Commencement Date by an amount equal to five percent (5%) of the Promotional Fund Fixed Contribution payable by Tenant to Landlord for the immediately preceding calendar year (computed on an annualized basis for any partial calendar year). In addition to its other obligations contained herein, Tenant agrees that it shall participate and cooperate in all special sales and promotions sponsored by the Fund, *provided the same is at no additional cost to Tenant.* The failure of any other tenant or any Major Tenant to contribute to the Fund shall not affect Tenant's obligations hereunder.

-23-

Section 14.2.    Advertising. *INTENTIONALLY DELETED.*

Section 14.3.    Media Fund.
    Landlord may, at its option, create and maintain a Media Fund, the primary purpose of which shall be to pay all costs and expenses associated with the purchase of electronic, print or outdoor advertising which benefit the tenants in the Center. In the event Landlord does create and maintain the Media Fund, Tenant agrees to contribute to such Fund, beginning upon the later to occur of (a) the Commencement Date or (b) the date the Media Fund is created, the Media Fund Charge set forth in Article I, payable in equal monthly installments, in advance, on the first day of each and every month (pro rated for partial months).

    The Media Fund Charge shall be increased on the first day of each calendar year or partial calendar year after the Commencement Date by an amount equal to five percent (5%) of the Media Fund Charge payable by Tenant to Landlord for the immediately preceding calendar year (computed on an annualized basis for any partial calendar year). Following the close of each calendar year, Landlord shall furnish Tenant a statement for the preceding calendar year showing the amounts expended by Landlord for media advertising. Tenant hereby authorizes Landlord to *list* ~~use~~ Tenant's Trade Name and a brief description of Tenant's business in connection with any media advertising purchased pursuant to this Section. *It is expressly understood and agreed that Tenant shall not be required to advertise in any publications.*

<center>ARTICLE XV</center>

<center>SECURITY DEPOSIT</center>

Section 15.1.    Amount of Deposit. *INTENTIONALLY DELETED.*

<center>ARTICLE XVI</center>

<center>DAMAGE AND DESTRUCTION</center>

Section 16.1.    Damage and Destruction.
    If the Premises are hereafter damaged or destroyed or rendered partially untenantable for their permitted use by fire or other casualty insured under the coverage which Landlord is obligated to carry pursuant to Section 11.1 hereof, Landlord shall promptly repair the same to substantially the condition which they were in immediately prior to the happening of such casualty (excluding *leasehold improvements,* stock in trade, fixtures, furniture, furnishings, carpeting, floor covering, wall covering, drapes and equipment), and from the date of such casualty until the *earlier of sixty (60) days after the date on which the* Premises are so repaired and restored, *or the date Tenant reopens for business* ~~only~~ the Minimum Monthly Rent *and all items of additional rent* payments payable hereunder shall abate in such proportion as the part of said Premises thus destroyed or rendered untenantable bears to the total Premises; PROVIDED, HOWEVER, that Landlord shall not be obligated to repair and restore if such casualty is not covered by the insurance which Landlord is obligated to carry pursuant to Section 11.1 hereof *and if the Premises is not so repaired, then this Lease shall terminate,* ~~or is caused directly or indirectly by the negligence of Tenant, its agents, and employees and in either of such events, no portion of the Minimum Monthly Rent and other payments payable hereunder shall abate,~~ and PROVIDED, FURTHER, that Landlord shall not be obligated to expend for any repair or restoration an amount in excess of the insurance proceeds received by Landlord therefor, *if the Premises is not so repaired, then this Lease shall terminate* and provided, further, that if the Premises be damaged, destroyed or rendered untenantable for their accustomed uses by fire or other casualty to the extent of more than fifty percent (50%) of the cost to replace the Premises during the last three (3) years of the Lease Term, then Landlord shall have the right to terminate this Lease effective as of the date of such casualty by giving to Tenant, within sixty (60) days after the happening of such casualty, written notice of such termination. If such notice be given, this Lease shall terminate and Landlord shall promptly repay to Tenant any rent theretofore paid in advance which was not earned at the date of such casualty. Any time that Landlord repairs or restores the Premises after damage or destruction, then Tenant shall promptly repair or replace its stock in trade, fixtures, furnishings, furniture, carpeting, wall covering, floor covering, drapes, equipment and Premises to the same condition as they were in immediately prior to the casualty, and if Tenant has closed its business, Tenant shall promptly reopen for business upon the completion of such repairs. *If the Premises shall be damaged to the extent of twenty percent (20%) or more of the cost of replacement during the last year of this Lease, then Tenant may elect to terminate this Lease by notice to Landlord given not more than sixty (60) days after the date of such damage.*

    *In the event of a fire or casualty (i) Landlord fails to repair and restore the Premises within one hundred eighty (180) days after the fire or casualty when required to do so or if in the reasonable estimation of an independent third party contractor, the repair or restoration would take longer than one hundred eighty (180) days, or (ii) Landlord fails to repair and restore any material portions of Common Areas or other material damaged portions of the Center within two hundred seventy (270) days after the fire or casualty or if in the reasonable estimation of an independent third party contractor, the repair or restoration would take longer than two hundred seventy (270) days, then Tenant may, as Tenant's sole remedy for failure to rebuild, cancel and terminate this Lease at any time thereafter unless prior to the exercise of such right by Tenant, Landlord substantially completes the repair or restoration.*

    Notwithstanding anything to the contrary set forth herein, in the event all or any portion of the Center shall be damaged or destroyed by fire or other cause (notwithstanding that the Premises may be unaffected thereby), to the extent the cost of restoration thereof would exceed *twenty percent (20%)* of the amount it would have cost to replace the Center in its entirety at the time such damage or destruction occurred, then Landlord may terminate this Lease *(provided Landlord terminates the leases of all other tenants in the same wing of the Center other than Major Tenants)* by giving Tenant *sixty (60)* days prior notice of Landlord's election to do so, which notice shall be given, if at all, within

<center>-24-</center>

ninety (90) days following the date of such occurrence. In the event of the termination of this Lease as aforesaid, this Lease shall cease *sixty (60)* days after such notice is given, and the rent and other charges hereunder shall be adjusted as of ~~that~~ *the* date *of the casualty. If the buildings contained in Landlord's Tract, excluding the Major Tenants, are damaged or destroyed by fire or other casualty to such an extent that there remains less than seventy-five percent (75%) of the total leasable building space contained in the Center, excluding the Major Tenants, prior to such damage or destruction, or Landlord's Tract is damaged or destroyed to such an extent that there are fewer than a majority of Major Tenants open for business, and Landlord shall fail to complete or cause to be completed the restoration of the buildings in order that the Center contains at least seventy-five percent (75%) of the total leasable building space, excluding the Major Tenants contained in the Center prior to such damage or destruction, or complete or cause to be completed the Major Tenants in order that the Landlord's Tract contains at least a majority of the Major Tenants which are open for business within eighteen (18) months after the date of such damage or destruction, then Tenant may elect to terminate this Lease upon giving Landlord notice thereof within thirty (30) days after the expiration of said eighteen (18) month period, and, upon such termination, both parties hereto shall be relieved from further obligations hereunder; provided, however, if Tenant shall fail to notify Landlord of its election to terminate this Lease within said thirty (30) day period, then Tenant shall be deemed to have waived such right of termination.*

## ARTICLE XVII

### EMINENT DOMAIN

Section 17.1.    Condemnation.

    If any portion of the Premises or *twenty-five percent (25%)* or more of the Center shall be acquired or condemned by right of eminent domain or transferred by agreement in lieu of condemnation for any public or quasi public use or purpose, or if an Operating Agreement is terminated as a result of such an acquisition or condemnation, then Landlord at its election may terminate this Lease *provided that it has terminated the leases for all other tenants in the same wing of the Center (other than Major Tenants)* by giving notice to Tenant of its election, and in such event rentals shall be apportioned and adjusted as of the date of termination. *If the remaining portion of the Premises is unsuitable for Tenant's Permitted Use, in Tenant's sole reasonable business judgment, then Tenant may elect to terminate this Lease by notice to Landlord given not more than sixty (60) days after the date possession thereof is required for public use.* If the Lease shall not be terminated as aforesaid, then it shall continue in full force and effect, and Landlord shall within a reasonable time after possession is physically taken (subject to delays due to shortage of labor, materials or equipment, labor difficulties, breakdown of equipment, government restrictions, fires, other casualties or other causes beyond the reasonable control of Landlord) repair or rebuild what remains of the Premises for Tenant's occupancy; and a just proportion of the Minimum Annual Rent *and all items of additional rent* shall be abated, according to the nature and extent of the injury to the Premises until such repairs and rebuilding are completed, and thereafter for the balance of the Lease Term.

Section 17.2.    Damages.

    Landlord reserves, and Tenant assigns to Landlord, all rights to damages on account of any taking or condemnation or any act of any public or quasi public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery of damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding. ~~If Tenant fails to execute instruments required by Landlord, or undertake such other steps as requested, Landlord shall be deemed the duly authorized irrevocable agent and attorney-in-fact of Tenant to execute such instruments and undertake such steps on behalf of Tenant.~~ However, Landlord does not reserve any damages payable for *moving expenses incurred by and* trade fixtures *and leasehold improvements* installed by Tenant at its own cost which are not part of the realty. *Nothing shall preclude Tenant from making a separate claim to the condemning authority so long as Landlord's award is not diminished or reduced.*

## ARTICLE XVIII

### DEFAULT BY TENANT

Section 18.1.    Right to Re-Enter.

    The following shall be considered for all purposes to be defaults under and breaches of this Lease: (a) any failure of Tenant to pay any rent or other amount when due hereunder *for more than ten (10) days after written notice that the same is past due*; (b) any failure by Tenant to perform or observe any other of the terms, provisions, conditions and covenants of this Lease for more than *thirty (30)* days after written notice of such failure *[or within such additional time as may reasonably be required to cure such other default if the default is of a nature that it cannot reasonably be cured within said thirty (30) day period provided Tenant commences to cure within said thirty (30) day period and thereafter diligently pursues the same until cured]*; (c) ~~a determination by Landlord that~~ *an officer of* Tenant has *willfully falsified in material respect and* submitted any false report required to be furnished hereunder; (d) anything done by Tenant upon or in connection with the Premises or the construction of any part thereof which directly or indirectly interferes in any way with, or results in a work stoppage in connection with, construction of any part of the Center or any other tenant's space *after two (2) days notice to Tenant and Tenant's failure to cure within said two (2) day period*; (e) the bankruptcy or insolvency of Tenant or the filing by or against Tenant of a petition in bankruptcy or for reorganization or arrangement or for the appointment of a receiver or trustee of all or a portion of Tenant's property, or Tenant's assignment for the benefit of creditors, *provided that in the case of an involuntary filing Tenant shall have sixty (60) days thereafter in which to dismiss such filing*; (f) if Tenant abandons or vacates or does not do business in the Premises *for three (3) full business days, subject to the provisions of Section 8.3, Section 9.1 and Section 16.1*; (g) this Lease or Tenant's interest herein or in the Premises or any improvements thereon or any property of Tenant are executed upon or attached; (h) the Premises come into the hands of any person other than expressly permitted under this

Lease; or (i) *subject to the provisions of Section 10.3,* any claim or lien is asserted or recorded against the interest of Landlord in the Premises or Center, or any portion thereof, on the account of, or extending from any improvement or work done by or at the instance, or for the benefit of Tenant, or any person claiming by, through or under Tenant or from any improvement or work the cost of which is the responsibility of Tenant. ~~or (j) the default by Tenant or any affiliate of Tenant under any other lease with Landlord or any affiliate of Landlord.~~ In any such event, and *upon* ~~without grace period,~~ demand or notice, ~~(the same being hereby waived by Tenant),~~ Landlord, in addition to all other rights or remedies it may have, shall have the right thereupon or at any time thereafter to terminate this Lease by giving notice to Tenant stating the date upon which such termination shall be effective, and shall have the right, either before or after any such termination, to re-enter and take possession of the Premises, remove all persons and property from the Premises, store such property at Tenant's expense, and sell such property if necessary to satisfy any deficiency in payments by Tenant as required hereunder, all without notice or resort to legal process and without being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby. Nothing herein shall be construed to require Landlord to give any notice before exercising any of its rights and remedies provided for in Section 3.3 of this Lease. ~~Notwithstanding anything to the contrary herein contained, if Tenant commits any default hereunder for or precedent to which or with respect to which notice is herein required, and commits such defaults within twelve (12) months thereafter, no notice shall thereafter be required to be given by Landlord as to or precedent to any such subsequent default during such twelve (12) month period (as Tenant hereby waives the same) before exercising any or all remedies available to Landlord.~~

<u>Section 18.2.</u>     <u>Right to Relet.</u>

If Landlord re-enters the Premises as above provided, or if it takes possession pursuant to legal proceedings or otherwise, it may either terminate this Lease, but Tenant shall remain liable for all obligations arising during the balance of the original stated term as hereafter provided as if this Lease had remained in full force and effect, or it may, from time to time, without terminating this Lease, make such ~~alterations and~~ repairs as it deems advisable to relet the Premises, and relet the Premises or any part thereof for such term or terms (which may extend beyond the Lease Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion deems *reasonably* advisable; upon each such reletting all rentals received by Landlord therefrom shall be applied, first, to any indebtedness other than rent due hereunder from Tenant to Landlord; second, to pay any costs and expenses of reletting, including brokers and attorneys' fees and costs of alterations and repairs; third, to rent due hereunder, and the residue, if any, shall be held by Landlord and applied in payment of future rent as it becomes due hereunder. *Landlord shall use reasonable efforts to relet the Premises and mitigate any damages.*

If rentals received from such reletting during any month are less than that to be paid during that month by Tenant hereunder, Tenant shall immediately pay any such deficiency to Landlord. No re-entry or taking possession of the Premises by Landlord shall be construed as an election to terminate this Lease unless a written notice of such termination is given by Landlord.

Notwithstanding any such reletting without termination, Landlord may at any time thereafter terminate this Lease for any prior breach or default *which remains uncured.* If Landlord terminates this Lease for any breach, or otherwise takes any action on account of Tenant's breach or default hereunder, in addition to any other remedies it may have, it may recover from Tenant all damages incurred by reason of such breach or default, including the cost of recovering the Premises, brokerage fees and expenses of placing the Premises in rentable condition, *reasonable* attorneys' fees, and an amount equal to the difference between the Minimum Rent and all items of additional rents reserved hereunder for the period which otherwise would have constituted the balance of the Lease Term and the then present rental value of the Premises for such period, both discounted in accordance with accepted financial practice to the then present worth, at the average rate established and announced for United States Treasury Bills, with a maturity of thirteen (13) weeks at the four (4) weekly auctions held immediately prior to the date of such termination [the four (4) week average bill rate], all of which shall immediately be due and payable by Tenant to Landlord. In determining the rental value of the Premises, the rental realized by any reletting, if such reletting be accomplished by Landlord within a reasonable time after the termination of this Lease, shall be deemed prima facie to be the rental value, but if Landlord shall not undertake to relet or having undertaken to relet, has not accomplished reletting, then it will be conclusively presumed that the Minimum Rent and all items of additional rent, *not including any Percentage Rent payable immediately prior to the pertinent default,* reserved under this Lease represent the rental value of the Premises for the purposes herein (in which event Landlord may recover from Tenant, the full total of all Minimum Rent and all items of additional rent due hereunder, discounted to present value as hereinbefore provided). Landlord shall, however, account to Tenant for the Minimum Rent and additional rents received from persons using or occupying the Premises during the period representing that which would have constituted the balance of the Lease Term, but only at the end of said period, ~~and only if Tenant shall have paid to Landlord its damages as provided herein,~~ and only to the extent of sums recovered from Tenant as Landlord's damages, Tenant waiving any claim to any surplus. Nothing herein contained, however, shall limit or prejudice the right of Landlord to prove and obtain as damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved.

Tenant's obligation to reimburse Landlord for *reasonable* attorneys' fees as referred to in this Lease shall include all *reasonable* legal costs, fees and expenses arising out of (i) Tenant's default in the performance or observance of any of the terms, covenants, conditions or obligations contained in this Lease and Landlord places the enforcement of all or any part of this Lease, the collection of any rent due or to become due or the recovery of possession of the Premises in the hands of an attorney or (ii) Landlord's incurring any fees or out of pocket costs in any litigation, negotiation or transaction in which Tenant causes Landlord to be involved or concerned, in either event regardless of whether or not suit is actually filed.

-26-

In the event of any breach or threatened breach by *either party* ~~Tenant~~ of any of the terms and provisions of this Lease, *the parties* ~~Landlord~~ shall have the right to *seek* injunctive relief as if no other remedies were provided for herein for such breach.

Any rights and remedies reserved by, or granted to, Landlord *or Tenant* under this Lease, at law or in equity, are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice *such party's* ~~Landlord's~~ right to exercise any or all others.

Tenant expressly waives any right to assert a defense based on merger and agrees that neither the commencement of any action or proceeding, nor the settlement thereof, nor the entry of judgment therein, shall bar Landlord from bringing any subsequent actions or proceedings from time to time.

Wherever in this Lease Landlord has reserved or is granted the right of "reentry" into the Premises, the use of such word is not intended, nor shall it be construed, to be limited to its technical legal meaning.

~~Tenant waives and releases any claim arising out of or related to the payment of percentage rent by any successor tenant in the Premises, to whom Landlord may relet the Premises, but nothing contained herein shall obligate Landlord to relet if Tenant shall default hereunder.~~

~~Except as otherwise specifically required by this Lease, Tenant waives any and all statutory and legal notice requirements.~~

Any action, suit or proceeding relating to, arising out of or in connection with the terms, conditions and covenants of this Lease may be brought by Landlord against Tenant in the *court having proper jurisdiction in the County and State in which the Center is located.* ~~Circuit or Superior Court of Marion County, Indiana.~~ Tenant hereby waives any objection to jurisdiction or venue in any proceeding before said Court. Nothing contained herein shall affect the right of Landlord to bring any action, suit or proceeding against Tenant in the courts of any other jurisdictions.

Section 18.3.    Counterclaim.
If Landlord commences any proceedings for non-payment of rent (Minimum Annual Rent, Percentage Rent or additional rent), Tenant will interpose any compulsory or mandatory counterclaim required by the applicable procedural rules of the Court. The covenants to pay rent and other amounts hereunder are independent covenants and Tenant shall have no right to hold back, offset or fail to pay any such amounts for default by Landlord or any other reason whatsoever, *unless (a) otherwise specifically provided in this Lease or (b) Tenant obtains a final non-appealable judgment from a court of competent jurisdiction which judgment specifically permits an offset.*

Section 18.4.    Waiver of Rights of Redemption.
To the extent permitted by law, Tenant waives any and all rights of redemption granted by or under any present or future laws if Tenant is evicted or dispossessed for any cause, or if Landlord obtains possession of the Premises due to Tenant's default hereunder or otherwise.

Section 18.5.    Waiver of Trial by Jury.
To the extent permitted by applicable law, ~~Tenant~~ *each party* hereby waives trial by jury in any action, proceeding or counterclaim brought by either party against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant created hereby, Tenant's use or occupancy of the Premises or any claim or injury or damage.

Section 18.6.    Bankruptcy.
A.    Assumption of Lease. In the event Tenant shall become a Debtor under Chapter 7 of the Bankruptcy Code ("Code") or a petition for reorganization or adjustment of debts is filed concerning Tenant under Chapters 11 or 13 of the Code, or a proceeding is filed under Chapter 7 and is transferred to Chapters 11 or 13, the Trustee or Tenant, as Debtor and as Debtor-In-Possession, may not elect to assume this Lease unless, at the time of such assumption, the Trustee or Tenant has:

1.    Cured or provided Landlord "Adequate Assurance" (as defined below) that:

(a)    Within *thirty (30)* days from the date of such assumption the Trustee or Tenant will cure all monetary defaults under this Lease and compensate Landlord for any actual pecuniary loss resulting from any existing default, including without limitation, Landlord's reasonable costs, expenses, accrued interest and *reasonable* attorneys' fees incurred as a result of the default;

(b)    Within thirty (30) days from the date of such assumption the Trustee or Tenant will cure all non-monetary defaults under this Lease; and

(c)    The assumption will be subject to all of the provisions of this Lease.

2.    For purposes of this Section 18.6, Landlord and Tenant acknowledge that, in the context of a bankruptcy proceeding of Tenant, at a minimum "Adequate Assurance" shall mean:

(a)    The Trustee or Tenant has and will continue to have sufficient unencumbered assets after the payment of all secured obligations and administrative expenses to assure Landlord that the Trustee or Tenant will have sufficient funds to fulfill the obligations of Tenant under this Lease, and to keep the Premises stocked with merchandise and properly staffed with

-27-

sufficient employees to conduct a fully-operational, actively promoted business in the Premises;

(b)     The Bankruptcy Court shall have entered an Order segregating sufficient cash payable to Landlord and/or the Trustee or Tenant shall have granted a valid and perfected first lien and security interest and/or mortgage in property of Trustee or Tenant acceptable as to value and kind to Landlord, to secure to Landlord the obligation of the Trustee or Tenant to cure the monetary and/or non-monetary defaults under this Lease within the time periods set forth above; and

(c)     The Trustee or Tenant at the very least shall deposit a sum equal to one (1) month's rent to be held by Landlord (without any allowance for interest thereon) to secure Tenant's future performance under the Lease.

B.     Assignment of Lease.  If the Trustee or Tenant has assumed the Lease pursuant to the provisions of this Section 18.6 for the purpose of assigning Tenant's interest hereunder to any other person or entity, such interest may be assigned only after the Trustee, Tenant or the proposed assignee have complied with all of the terms, covenants and conditions of Section 13.1 herein, including, without limitation, those with respect to additional rent and the use of the Premises only as permitted in Article I herein; Landlord and Tenant acknowledging that such terms, covenants and conditions are commercially reasonable in the context of a bankruptcy proceeding of Tenant.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment.  Any such assignee shall upon request execute and deliver to Landlord an instrument confirming such assignment.

C.     Adequate Protection.  Upon the filing of a petition by or against Tenant under the Code, Tenant, as Debtor and as Debtor-in-Possession, and any Trustee who may be appointed agree to adequately protect Landlord as follows:

(1)     To perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by Order of the Bankruptcy Court;

(2)     To pay all monetary obligations required under this Lease, including without limitation, prorated from the date of filing until the date of rejection or assumption of the Lease or the payment of Minimum Monthly Rent, and such other additional rent charges payable hereunder which is considered reasonable compensation for the use and occupancy of the Premises;

(3)     Provide Landlord a minimum thirty (30) days prior written notice, unless a shorter period is agreed to in writing by the parties, of any proceeding relating to any assumption of this Lease or any intent to abandon the Premises, which abandonment shall be deemed a rejection of this Lease; and

(4)     To perform to the benefit of Landlord otherwise required under the Code.

~~The failure of Tenant to comply with the above shall result in an automatic rejection of this Lease.~~

D.     Accumulative Rights.  The rights, remedies and liabilities of Landlord and Tenant set forth in this Section 18.6 shall be in addition to those which may now or hereafter be accorded, or imposed upon, Landlord and Tenant by the Code.

## ARTICLE XIX

## DEFAULT BY LANDLORD

Section 19.1.     Default Defined, Notice.
     Landlord shall in no event be charged with default in any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within thirty (30) days (or such additional time as is reasonably required to correct any such default) after written notice to Landlord by Tenant, specifically describing such failure.

Section 19.2.     Notice to First Mortgagee.
     If the holder of the first mortgage covering the Premises shall have given written notice to Tenant of the address to which notices to such holder are to be sent, Tenant shall give such holder written notice simultaneously with any notice given to Landlord of any default of Landlord, and if Landlord fails to cure any default asserted in said notice within the time provided above, Tenant shall notify such holder in writing of the failure to cure, and said holder shall have the right but not the obligation, within *ten (10)* days after receipt of such second notice, to cure such default before Tenant may take any action by reason of such default.

-28-

## ARTICLE XX

### TENANT'S PROPERTY

Section 20.1.      Taxes on Leasehold.
      Tenant shall be responsible for and shall pay before delinquent all municipal, county, federal or state taxes coming due during or after the Lease Term against Tenant's interest in this Lease or against personal property of any kind owned or placed in, upon or about the Premises by Tenant.

Section 20.2.      Assets of Tenant. *INTENTIONALLY DELETED.*

## ARTICLE XXI

### ACCESS BY LANDLORD

Section 21.1.      Right of Entry.
      Landlord, its agents and employees shall have the right to enter the Premises from time to time at reasonable times *upon reasonable advance notice (except in case of emergency for which Landlord shall give as much notice as is reasonably practicable)* to examine the same, show them to prospective purchasers and other persons, and make such repairs, alterations, improvements or additions as *may be allowed pursuant to this Lease or as required by law and Landlord shall restore the Premises to its former condition as existing prior to any work or activity by* Landlord. ~~deems desirable.~~ Rent shall not abate while any such repairs, alterations, improvements, or additions are being made. During the last six (6) months of the Lease Term, Landlord may exhibit the Premises to prospective tenants *during reasonable times with advance notice* and maintain upon the Premises notices deemed advisable by Landlord.  In addition, during any apparent emergency, Landlord or its agents may enter the Premises forcibly without liability therefor and without in any manner affecting Tenant's obligations under this Lease *unless such damage or loss results from the negligence or willful acts of Landlord, its agents, employees or contractors; subject, however, to the provisions of Section 11.3.*  Nothing herein contained, however, shall be deemed to impose upon Landlord any obligation, responsibility or liability whatsoever, for any care, maintenance or repair except as otherwise herein expressly provided. *Landlord shall use reasonable efforts to perform such work at a time and in a manner so as to not materially interfere with Tenant's Permitted Use of the Premises. If such repairs, alterations, improvements or additions in the Premises shall render the Premises untenantable for more than three (3) consecutive days, then Minimum Annual Rent and all items of additional rent shall abate after said three (3) day period and such abatement shall continue until such time as the Premises are again tenantable; provided, however, if such repairs, alterations, improvements or additions are work which Tenant has covenanted herein to do and has failed so to do, then Minimum Annual Rent and all items of additional rent shall in no manner abate.*

## ARTICLE XXII

### HOLDING OVER, SUCCESSORS

Section 22.1.      Holding Over.
      If Tenant holds over or occupies the Premises beyond the Lease Term (it being agreed there shall be no such holding over or occupancy without Landlord's written consent), no tenancy or interest in the Premises shall result therefrom but such holding over shall be subject to immediate eviction and removal, and Tenant shall pay Landlord for each day of such holding over a sum equal to the greater of (a) ~~twice~~ *one hundred fifty percent (150%) of* the Minimum Monthly Rent prorated for the number of days of such holding over, or (b) Minimum Annual Rent plus Percentage Rent prorated for the number of days of such holding over, plus, whichever of (a) or (b) is applicable, a prorata portion of all other amounts which Tenant would have been required to pay hereunder had this Lease been in effect. *Notwithstanding the foregoing provisions, Tenant shall not be required to pay one hundred fifty percent (150%) of the Minimum Annual Rent for such period (but shall pay Minimum Annual Rent for such period) so long as Tenant is negotiating in good faith for a new lease for the Premises; provided, however, the foregoing shall not obligate Landlord or Tenant to negotiate in good faith or otherwise for a new lease for the Premises.*

Section 22.2.      Successors.
      All rights and liabilities herein given to or imposed upon the respective parties hereto shall bind and inure to the several respective heirs, successors, administrators, executors and assigns of the parties and if Tenant is more than one (1) person, they shall be bound jointly and severally by this Lease except that no rights shall inure to the benefit of any assignee or subtenant of Tenant unless the assignment or sublease was approved by Landlord in writing as provided in Section 13.1 hereof *where such approval is required.*  Landlord, at any time and from time to time, may make an assignment of its interest in this Lease and, in the event of such assignment, Landlord and its successors and assigns (other than the assignee of Landlord's interest in this Lease) shall be released from any and all liability thereafter accruing hereunder *to the extent successor assumes Landlord's obligations.*

## ARTICLE XXIII

### QUIET ENJOYMENT

Section 23.1.      Landlord's Covenant.
      If Tenant pays the rents and other amounts herein provided, observes and performs all the covenants, terms and conditions hereof, Tenant shall peaceably and quietly hold and enjoy the Premises for the Lease Term without interruption by Landlord or any person or persons claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease.

ARTICLE XXIV

MISCELLANEOUS

Section 24.1.    Waiver.
No waiver by Landlord or Tenant of any breach of any term, covenant or condition hereof shall be deemed a waiver of the same or any subsequent breach of the same or any other term, covenant or condition. The acceptance of rent by Landlord shall not be deemed a waiver of any earlier breach by Tenant of any term, covenant or condition hereof, regardless of Landlord's knowledge of such breach when such rent is accepted. No covenant, term or condition of this Lease shall be deemed waived by Landlord or Tenant unless waived in writing.

Section 24.2.    Accord and Satisfaction.
Landlord is entitled to accept, receive and cash or deposit any payment made by Tenant for any reason or purpose or in any amount whatsoever, and apply the same at Landlord's option to any obligation of Tenant and the same shall not constitute payment of any amount owed except that to which Landlord has applied the same. No endorsement or statement on any check or letter of Tenant shall be deemed an accord and satisfaction or otherwise recognized for any purpose whatsoever. The acceptance of any such check or payment shall be without prejudice to Landlord's right to recover any and all amounts owed by Tenant hereunder and Landlord's right to pursue any other available remedy. *Any payment by Tenant shall not be a waiver of any Landlord default, or of Tenant's right to contest the amount of such payment.*

Section 24.3.    Entire Agreement.
There are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by them. Tenant acknowledges that it has independently investigated the potential for the success of its operations in the Center and has not relied upon any inducements or representations on the part of Landlord or Landlord's representatives, other than those contained in the Lease. Tenant also acknowledges and agrees that, to the extent any projections, materials or discussions have related to Tenant's projected or likely sales volume, customer traffic or profitability, Tenant understands that any and all such projections, materials and discussions are based solely upon Landlord's experiences at other properties or upon standardized marketing studies, and that such projections, materials and discussions shall not be construed as a promise or guarantee that Tenant will realize the same or similar results.

Section 24.4.    No Partnership.
Landlord *and Tenant* does not, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with ~~Tenant~~ *the other*.

Section 24.5.    Force Majeure.
If either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure material, *casualty, acts of God,* failure of power, restrictive governmental laws or regulations, riots, insurrection, war, *adverse weather,* environmental remediation work whether ordered by any governmental body or voluntarily initiated or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under this Lease, the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, the provisions of this Section 24.5 shall at no time *after the Commencement Date* operate to excuse Tenant from ~~the obligation to open for business on the Commencement Date, except in the event of an industry-wide strike, nor any obligations for~~ payment of Minimum Annual Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

Section 24.6.    Submission of Lease.
Submission of this Lease to Tenant does not constitute an offer to lease; this Lease shall become effective only upon execution and delivery thereof by Landlord and Tenant. ~~Upon execution of this Lease by Tenant, Landlord is granted an irrevocable option for sixty (60) days to execute this Lease within said period and thereafter return a fully executed copy to Tenant.~~ The effective date of this Lease shall be the date filled in on Page 1 hereof by Landlord, which shall be the date of execution by the last of the parties to execute the Lease. *Landlord and Tenant shall not be bound by the terms and provisions of this Lease until the date of mutual execution and delivery.*

Section 24.7.    Notices.
All notices to be given hereunder by either party shall be written and sent by registered or certified mail, return receipt requested, postage pre-paid or by an express mail delivery service ~~or by an electronic transmission,~~ addressed to the party intended to be notified at the address set forth in Article I. Either party may, at any time, or from time to time, notify the other in writing of a substitute address for that above set forth, and thereafter notices shall be directed to such substitute address. Notice given as aforesaid shall be sufficient service thereof and shall be deemed given as of the date received or the date on which delivery is first refused, as evidenced by the return receipt of the registered or certified mail or the express mail delivery receipt, as the case may be. A duplicate copy of all notices from Tenant shall be sent to any mortgagee *of which Tenant is advised in writing in advance* as provided for in Section 19.2.

Section 24.8.    Captions and Section Numbers.
This Lease shall be construed without reference to titles of Articles and Sections, which are inserted only for convenience of reference.

-30-

Section 24.9.    Number and Gender.
The use herein of a singular term shall include the plural and use of the masculine, feminine or neuter genders shall include all others.

Section 24.10.    Objection to Statements.
Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of *one (1) year* ~~days~~ after receipt thereof shall constitute Tenant's acquiescence with respect thereto.

Section 24.11.    Representation by Tenant.
If Tenant is or will be a corporation, ~~the persons executing this Lease on behalf of~~ Tenant hereby covenants and warrants that Tenant is a duly qualified corporation authorized to do business in the State where the Center is located, ~~that all franchise and corporate taxes have been paid to date and all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due;~~ and *Tenant represents that* the person signing this Lease on behalf of the corporation ~~is an officer of Tenant,~~ and is duly authorized to sign and execute this Lease.

~~Tenant hereby represents and warrants that: (a) there are no proceedings pending or so far as Tenant knows threatened before any court or administrative agency that would materially adversely affect the financial condition of Tenant, the ability of Tenant to enter into this Lease or the validity or enforceability of this Lease; (b) there is no provision of any existing mortgage, indenture, contract or agreement binding on Tenant which would conflict with or in any way prevent the execution, delivery or performance of the terms of this Lease; (c) the financial statement of Tenant provided to Landlord in connection with this Lease is complete and correct and fairly presents the financial condition of Tenant as of the date and for the period referred to therein and has been prepared in accordance with generally accepted accounting principles consistently applied; and (d) there have been no material adverse changes in the financial condition of Tenant since the date of such financial statement and to the knowledge of Tenant, no such material adverse changes are pending or threatened. Tenant acknowledges that Landlord is executing this Lease in reliance upon the foregoing representation and warranty and that such representation and warranty is a material element of the consideration inducing Landlord to enter into and execute this Lease.~~

Section 24.12.    Joint and Several Liability.
If Tenant is a partnership or other business organization the members of which are subject to personal liability, the liability of each such member shall be deemed to be joint and several.

Section 24.13.    Limitation of Liability.
Anything to the contrary herein notwithstanding, no general or limited partner of the Landlord, or any general or limited partner of any partner of the Landlord, or any shareholder of any corporate partner of any partner of the Landlord, or any other holder of any equity interest in the Landlord, or in any entity comprising the Landlord or its partners, shall be personally liable with respect to any of the terms, covenants, conditions and provisions of this Lease, or the performance of Landlord's obligations under this Lease, nor shall Landlord or any of said constituent parties have any liability to Tenant for any consequential damages such as, but not limited to, lost profits. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Center *or any proceeds from the sale of the Center, insurance or condemnation award,* and Tenant shall look solely to the interest of Landlord, its successors and assigns, in the Center, for the satisfaction of each and every remedy of Tenant against Landlord. Tenant shall not look to any of Landlord's other assets seeking either to enforce Landlord's obligations under this Lease, or to satisfy any money or deficiency judgment for Landlord's failure to perform such obligations, such exculpation of personal liability is and shall be absolute and without any exception whatsoever.

The term "Landlord" shall mean only the owner at the time in question of the present Landlord's interest in the Center. In the event of a sale or transfer of the Center (by operation of law or otherwise) or in the event of the making of a lease of all or substantially all of the Center, or in the event of a sale or transfer (by operation of law or otherwise) of the leasehold estate under any such lease, the grantor, transferor or lessor, as the case may be, shall be and hereby is (to the extent of the interest or portion of the Center or leasehold estate sold, transferred or leased) automatically and entirely released and discharged, from and after the date of such sale, transfer or leasing of all liability with respect to the performance of any of the terms of this Lease on the part of Landlord thereafter to be performed; provided that the purchaser, transferee or lessee (collectively, "Transferee") shall be deemed to have assumed and agreed to perform, subject to the limitations of this Section (and without further agreement between the other parties hereto, or among such parties and the Transferee) and only during and in respect of the Transferee's period of ownership of the Landlord's interest under this Lease, all of the terms of this Lease on the part of Landlord to be performed during such period of ownership, it being intended that Landlord's obligations hereunder shall, as limited by this Section, be binding on Landlord, its successors and assigns only during and in respect of their respective, successive periods of ownership.

Section 24.14.    Broker's Commission.
Each party represents and warrants that it has caused or incurred no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, and each party shall indemnify and hold the other harmless against and from all liabilities arising from any such claims caused or incurred by it (including without limitation, the cost of attorneys' fees in connection therewith).

Section 24.15.    Partial Invalidity.
If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law; provided, however, if Tenant's obligation to pay Percentage Rent or Tenant's obligation to continuously operate its business in the Premises is deemed invalid or unenforceable ~~as determined by Landlord~~ based upon the then applicable statutes or case law, then Landlord may, at any

time thereafter, terminate this Lease by giving Tenant notice of its election, and this Lease shall terminate and become null and void thirty (30) days after said notice. *Notwithstanding the foregoing provisions, so long as Tenant continues to operate its business in accordance with the provisions of Article VIII Landlord shall not have the right to terminate this Lease as the result of Tenant's obligation to continuously operate its business in the Premises being deemed invalid or unenforceable by means of a change in statutory law. If Tenant's obligation to pay Percentage Rent is deemed invalid or unenforceable by means of a change in statutory law, then the obligation to pay Percentage Rent shall be redefined as Additional Minimum Rent and shall be calculated in the same manner or in a manner which would result in Tenant paying the same amount to Landlord as if Tenant's obligation to pay Percentage Rent was not deemed invalid. Tenant and Landlord shall, to the extent required to effect the provisions of the foregoing sentence, enter into such amendments or supplements to this Lease, or a new lease or leases for the balance of the then existing Lease Term.*

Section 24.16.    Recording.

The parties agree not to place this Lease of record but each party shall, at the request of the other, execute and acknowledge so that the same may be recorded a Short Form Lease or Memorandum of Lease, indicating the Lease Term, but omitting rent and other terms, and an Agreement specifying the date of commencement and termination of the Lease Term; provided, however, that the failure to record said Short Form Lease, Memorandum of Lease or Agreement shall not affect or impair the validity and effectiveness of this Lease. ~~Tenant~~ *The party requesting recording* shall pay all costs, taxes, fees and other expenses in connection with or prerequisite to recording.

Section 24.17.    Applicable Law.

This Lease shall be construed under the laws of the State where the Center is located.

Section 24.18.    Mortgagee's Approval. *INTENTIONALLY DELETED.*

Section 24.19.    Unrelated Business Taxable Income.

A.    If at any time and from time to time during the Lease Term, Landlord is advised by its counsel or counsel to a tax exempt partner of the managing partner of Landlord that any provision of this Lease, including without limitation the provisions relating to the payment of rent and additional rent, or the absence of any provision might give rise to unrelated business taxable income within the meaning of section 512 of the Internal Revenue Code of 1986, as amended, or the regulations issued thereunder, or may jeopardize the tax-exempt status of any partner in Landlord or any partner in a partnership that is a partner in Landlord, or may prevent any such partner from obtaining such tax-exempt status, then this Lease may be unilaterally amended by Landlord in such manner as shall meet the requirements specified by counsel for Landlord and Tenant agrees that it will execute all documents or instruments necessary to effect such amendments, provided that no such amendment shall result on an estimated basis in Tenant having to pay in the aggregate more on account of its occupancy of the Premises than it would be required to pay under the terms of this Lease, or having to receive fewer services or services of lesser quality than it is presently entitled to receive under this Lease*, nor shall the same materially adversely affect Tenant's rights and obligations hereunder.*

B.    Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or the managing agent of the Center or its employees or by one or more third persons hired by Landlord or the managing agent of the Center. Tenant agrees that upon Landlord's written request it will enter into direct agreements with the managing agent of the Center or other parties designated by Landlord for the furnishing of any such services required to be furnished by Landlord herein, in form and content approved by Landlord, provided, however, that no such contract shall result on an estimated basis in Tenant having to pay in the aggregate more money on account of its occupancy of the Premises under the terms of this Lease, or having to receive fewer services or services of a lesser quality than it is presently entitled to receive under this Lease*, nor shall the same materially adversely affect Tenant's rights and obligations hereunder.*

Section 24.20.    Anti-Terrorism Law.

A.    Tenant represents and warrants to Landlord as follows:

(1)    Neither Tenant, its constituents or affiliates nor any of their respective agents (collectively, the "Tenant Parties") is in violation of any law relating to terrorism or money laundering, including, but not limited to, Executive Order No. 13224 on Terrorist Financing, the U.S Bank Secrecy Act, as amended by the Patriot Act, the Trading with the Enemy Act, the International Emergency Economic Powers Act and all regulations promulgated thereunder, all as amended from time to time (collectively, "Anti-Terrorism Law").

(2)    No action, proceeding, investigation, charge, claim, report, or notice has been filed, commenced, or threatened against any of the Tenant Parties alleging any violation of any Anti-Terrorism Law.

(3)    None of the Tenant Parties has, after due inquiry, knowledge of any fact, event, circumstance, situation or condition which could reasonably be expected to result in any action, proceeding, investigation, charge, claim, report, notice or penalty being filed, commenced, threatened or imposed against any of them relating to any violation of or failure to comply with any Anti-Terrorism Law.

(4)    None of the Tenant Parties is a "Prohibited Person". A Prohibited Person means any of the following:

(a) A person or entity that is "specially designated" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control or which is owned, controlled by or acting for or on behalf of any such person or entity;

(b) A person or entity with whom Landlord is prohibited from dealing by any Anti-Terrorism Law;

(c) A person or entity that commits, threatens, or conspires to commit or supports "terrorism", as defined in any Anti-Terrorism Law.

(5) None of the Tenant Parties:

(a) Conducts any business or transactions or makes or receives any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

(b) Engages in or conspires to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

B.      Tenant covenants that it shall not:

(1) Conduct any business or transaction or make or receive any contribution of funds, goods, or services in violation of any Anti-Terrorism Law;

(2) Engage in or conspire to engage in any transaction that evades or avoids, has the purpose of evading or avoiding or attempts to violate any of the prohibitions of any Anti-Terrorism Law.

C.      Tenant agrees promptly to deliver to Landlord (but in any event within *twenty [20]* days of Landlord's written request) any certification or other evidence requested from time to time by Landlord, in its reasonable discretion, confirming Tenant's compliance with the foregoing.

<u>Section 24.21.</u>    <u>Financial Statements.</u>
From time to time *for Landlord's legitimate business purposes, such as a sale or refinance,* upon Landlord's written request, *but not more than once per year,* Tenant shall promptly furnish to Landlord financial statements *that Tenant generally releases to third parties* prepared by *Tenant or, if available, by* Tenant's independent certified public accountant setting forth Tenant's then-current financial condition.

<u>Section 24.22.</u>    <u>Landlord's Contribution Toward Tenant's Work.</u>
When Tenant has completed all of Tenant's Work in *substantial ~~strict~~* accordance with Exhibit "B" and "B-2" by the Required Completion Date, and furnishes evidence satisfactory to Landlord of such completion and that all of Tenant's Work has been paid for in full and no liens have attached or may attach as the result thereof, and no default in, breach of, or failure to perform, this Lease exists and Tenant has paid or reimbursed Landlord all amounts owed to Landlord pursuant to this Lease and has opened its store for business and accepted the Premises in writing in a form *reasonably* prescribed by Landlord or its mortgagee, and has executed such other *related* instruments and documents as are *reasonably* required by Landlord's mortgagee to be executed, and has submitted to Landlord a completed IRS Form W-9, Landlord shall *within thirty (30) days thereafter* pay to Tenant as Landlord's Contribution, if any, for Tenant's Work the sum equal to the lesser of (i) \$30.00 per square foot of Store Floor Area, determined as provided for in Section 2.1 hereof, or (ii) the actual cost of Tenant's Work (excluding trade fixtures, furniture and furnishings or other personal property), and no more, subject to Landlord's right to deduct any Minimum Rent, Percentage Rent, additional rent, expenditures by Landlord pursuant to Section 10.3 of the Lease, or other amounts owed by Tenant to Landlord pursuant to the terms of this Lease as of the date of payment. Landlord's Contribution shall be used only for alterations, improvements, fixtures and equipment that become part of or attached or affixed to the Premises ("Permanent Improvements"), but excluding trade fixtures, furniture and furnishings or other personal property. Upon completion of Tenant's Work, Tenant shall furnish an affidavit to Landlord stating that Landlord's Contribution was used solely by Tenant for such Permanent Improvements. Tenant must submit to Landlord a completed IRS Form W-9 prior to payment of any portion of Landlord's Contribution. *Landlord and Tenant agree that the monies to be paid by Landlord to Tenant pursuant to this are being paid to Tenant for the purpose of Tenant's constructing or improving qualified long-term real property as defined in Section 110(c)(1) of the Internal Revenue Code of 1986, as amended, for use in such Tenant's trade or business at the Premises, which Premises Landlord and Tenant acknowledge constitutes retail space. It is the intent of Landlord and Tenant that Landlord and Tenant shall consider any such payment as made in accordance with Section 110 of the Internal Revenue Code of 1986, as amended, and Landlord and Tenant shall provide the Internal Revenue Service any and all information concerning such payments as may be required by the Internal Revenue Service.*

<u>**Section 24.23.**</u>    <u>**Right of Termination.**</u>
*If Tenant shall fail to attain Adjusted Gross Sales during the fifth (5th) Lease Year of the Lease Term in an amount equal to at least \$750,000.00 (the "Sales Threshold"), then Landlord or Tenant may elect to terminate this Lease by written notice to the other given within ninety (90) days after the end of such fifth (5th) Lease Year and this Lease shall terminate and be null and void one hundred eighty (180) days after delivery of such notice. In the event Tenant elects to terminate this Lease pursuant to the provisions of this Section, Tenant shall pay Landlord a termination fee equal to one hundred percent (100%) of the unamortized portion of Landlord's Contribution as set forth in Section 24.22 above, based on a straight line amortization schedule over the entire Lease Term. Such payment shall be paid on or before the effective date of termination. Despite any such election to terminate, Landlord and Tenant shall remain liable for the performance of all terms, covenants and conditions of this Lease*

-33-

*through the effective date of such termination. Notice of the exercise of the termination right contained in this Section shall only be exercised by Tenant mailing to Landlord (ATTN: Executive Vice President - Leasing), at Landlord's Notice Address, by United States mail, postage prepaid, certified or registered, return receipt requested, with a copy to the attention of Managing Attorney - Legal Leasing.*

*Notwithstanding anything herein to the contrary, Tenant shall not be entitled to terminate the Lease pursuant to the provisions of this Section if: (i) Tenant has permanently ceased operating its business in the Premises, or if Tenant fails to operate during the fifth (5th) Lease Year of the Lease Term in violation of this Lease, the Sales Threshold shall be proportionately reduced based upon the number of days Tenant failed to so operate for business, (ii) Tenant has otherwise permanently ceased operating for business in the Premises under the Permitted Use, (iii) Tenant is otherwise in default under this Lease beyond any applicable cure period, (iv) Tenant shall have assigned, sublet or otherwise transferred this Lease to another person or entity (other than as expressly permitted pursuant to the provisions of this Lease), or (v) if a Radius Violation shall have occurred.*

*Section 24.24. Special Construction Provision; Waiver of Construction Chargebacks.*
*Notwithstanding anything herein in this Lease, any exhibits attached hereto or any other documents incorporated herein or otherwise, Tenant shall not be required to pay any fee or reimburse Landlord for any work, fees or services rendered or material provided, or work performed by Landlord at Tenant's expense (commonly referred to as "Construction Chargebacks") and Landlord hereby waives all Construction Chargebacks therefor except for the following: (i) temporary utility services and facilities used by Tenant or Tenant's contractor during Tenant's construction and merchandising period, if any; (ii) removal of construction and/or merchandising rubbish and debris resulting from Tenant's Work and/or merchandising in the Premises in the event Tenant or Tenant's contractor fails to remove the same after notice and ten (10) days to cure and Landlord removes such construction and/or merchandising rubbish on Tenant's behalf; (iii) a temporary storefront or barricade if the Center is open for business to the public and Landlord installs such temporary storefront or barricade therein (at a cost not to exceed $80.00 per lineal foot) (however, Tenant reserves the right to install its own barricade if the same has not already been installed by Landlord); (iv) any roof cuts or roof openings (and directly related ancillary labor and materials necessary to re-seal or otherwise weatherproof the roof as a result of such roof cuts or roof openings) required to be made by Landlord's roofing contractor in order to accommodate Tenant's Work; (v) any structural changes to the Premises or the Center necessitated by Tenant's Work or Tenant's use of the Premises; (vi) any upgrade in Landlord's standard work requested by Tenant or required by Tenant's approved plans and specifications; and/or (vii) any work performed by Landlord at Tenant's request, such work not being part of Landlord's standard work in the Premises or the Center. Any such construction chargebacks shall be reasonable and competitive and, except as otherwise set forth in the Lease, preapproved by Tenant.*

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

IN WITNESS WHEREOF, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

(LANDLORD)

THE RETAIL PROPERTY TRUST, a Massachusetts
Business Trust

By:_____

David J. Contis, Sr. Exec. Vice President and
President Simon Malls

(TENANT)

BLUE BEE, INC., a California corporation

By:_____

Jeff Sunghak Kim,  President



# BREA MALL

| TSD# 2110 |
| Level: 02 |

# SIMON® SIMON PROPERTY GROUP
225 W. WASHINGTON ST.
INDIANAPOLIS,   IN 46204



Structural Element, must be field verified by tenant

The information in this document is confidential and a proprietary trade secret of the Landlord and may not be copied, distributed, published or disclosed without prior written permission.   Landlord retains the right to design, change, alter or modify (without prior written notice) the size and configuration of any or all of the buildings, premises, hallways, malls, corridors, kiosks, tenant spaces or common areas contained therein, including, but not limited to, the identity, size, configuration, location or arrangement of any of the foregoing.   This document does not constitute any contract or obligation by the Landlord.   Landlord makes no representations or warranties regarding the Center, any premises contained therein, or the accuracy of the information contained in this document.   It is the responsibility of Tenant or Tenant's contractor to field verify existing site conditions and dimensions.

| DBA Name: | | Date: 07/15/13 19:07 |
| Unit No.        2110 | | Scale: 1" = 20' |
| Leasing Agent: | | Corp. No.   4821 |

EXHIBIT "A"

## DESCRIPTION OF TENANT'S WORK

I. TENANT'S WORK. – Unless otherwise specifically identified as Landlord's Work, Tenant shall complete all work required to place the Premises in a finished condition ready to open for business at the Tenant's own expense. Tenant's Work includes, but is not limited to, the following:

A. GENERAL PROVISIONS: All work done by Tenant shall be governed in all respects by, and be subject to the following:

1. Payment *of Tenant's Work.* and Performance Bonds. Landlord shall have the right to require Tenant to furnish payment and performance bonds or other security in form satisfactory to Landlord for the prompt and faithful performance of Tenant's Work, assuring completion of Tenant's Work and conditioned that Landlord will be held harmless from payment of any claim either by way of damages or liens on account of bills for labor or material in connection with Tenant's Work.

2. Tenant's Work Standards. All Tenant's Work shall conform to the more stringent of applicable statutes, ordinances, regulations, codes, all requirements of Landlord's insurance carrier, all rating bureaus, and the Tenant Information Package (Exhibit "B-1") which contains the basic architectural, electrical and mechanical information necessary for the preparation of Tenant's Plans, and which by this reference is incorporated into and made a part of this Lease. Landlord reserves the right to require changes in Tenant's Work when *reasonably* necessary by reason of the aforementioned standards. *Landlord shall cooperate with Tenant at no cost to Landlord to obtain permits and certificates for the performance of Tenant's Work.* No approval by Landlord shall be deemed valid unless in writing and signed by Landlord.

3. Insurance Requirements. Prior to commencement of Tenant's Work and until completion thereof, or commencement of the Lease Term, whichever is the last to occur, Tenant shall effect and maintain Builder's Risk Insurance covering Landlord, Landlord's general contractor, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Tenant's Work in place and all materials stored at the site of Tenant's Work, and all materials, equipment, supplies and temporary structures of all kinds incidental to Tenant's Work, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises or within the Center, all to the actual replacement cost thereof at all times on a completed value basis. In addition, Tenant agrees to indemnify and hold Landlord harmless against any and all claims for injury to persons or damage to property by reason of the use of the Premises for the performance of Tenant's Work, *unless due to the negligence of Landlord, its employees, agents or contractors (subject to the provisions of Section 11.3)* and claims, fines, and penalties arising out of any failure of Tenant or its agents, contractors and employees to comply with any law, ordinance, code requirement, regulations or other requirement applicable to Tenant's Work and Tenant agrees to require all contractors and subcontractors engaged in the performance of Tenant's Work to effect and maintain and deliver to Tenant and Landlord, certificates evidencing the existence of, and covering Landlord, Tenant and Tenant's contractors, prior to commencement of Tenant's Work and until completion thereof, the following insurance coverages:

a. Worker's Compensation and Occupational Disease insurance in accordance with laws of the State in which the property is located and Employer's Liability Insurance with limits of not less than $1,000,000.00 per occurrence.

b. Commercial General Liability Insurance affording protection for bodily injury, death, personal injury and property damage, and including coverage for contractual liability, independent contractors, completed operations and products liability with limits of not less than $3,000,000.00 combined single limit per occurrence.

c. Comprehensive Automobile Liability Insurance, including coverage for "non-owned" automobiles, for property damage, bodily injury, including death resulting therefrom with limits of not less than $1,000,000.00 for any one occurrence combined single limit.

d. Owners and contractors protective liability coverage for an amount not less than $1,000,000.00.

4. Reasonable Easement. Landlord specifically reserves the right (and Tenant shall permit Landlord or its employees, agents or contractors reasonable access to the Premises for the purpose of exercising such rights, *upon at least forty-eight [48] hours notice except in the event of an emergency), subject to Article II,* to install, maintain, repair and replace in the ceiling space and/or under the concrete slab in the Premises, all such electrical,

EXHIBIT "B"
Page -1-

plumbing, HVAC and other system components that may be required to service the Common Areas or other tenants in the Center. Adequate access panels or doors shall be incorporated into Tenant's Work for inspection, service and replacement of both Landlord and Tenant equipment.

B.    **TENANT'S PLANS.** Tenant shall, at Tenant's expense, prepare and submit to Landlord for Landlord's approval, all drawings required (including signage) for the completion of the Premises as provided for herein ("Tenant's Plans"). Tenant's Plans shall indicate all proposed demolition, modification or reuse of existing improvements or equipment (if applicable), delineate all proposed new improvements or equipment including minimum of one (1) toilet room, be to scale, be prepared, stamped and signed by an architect or engineer licensed to do business in the state in which the Center is located and be in accordance with: the Federal Occupational Safety and Health Act (OSHA) and regulations promulgated thereunder; all laws, ordinances and regulations of governing authorities having jurisdiction over the premises and utility companies; the overall design and construction standards of the Center contained in Exhibit "B-1"; and the requirements of Landlord's fire and casualty insurer and/or the criteria of this Exhibit, whichever is more stringent. *In the event of a conflict between the provisions of this Exhibit "B", Tenant's Information Package and Tenant's Plans as approved by Landlord, the approved Plans shall prevail except with respect to the scope of Landlord's Work, if any.*

Tenant shall not submit plans, shop drawings or specifications which have been prepared by contractors, subcontractors or suppliers (unless otherwise specifically required in Exhibit "B-1") as such plans, shop drawings or specifications shall not be given consideration by Landlord and shall not serve to satisfy the obligations of Tenant provided for herein.

1.    Landlord's Approval of Tenant's Plans.
   a.    Approval of plans and specifications by Landlord shall not constitute the assumption of any responsibility by Landlord for their accuracy or sufficiency or conformity with applicable laws (including but not limited to the Americans with Disabilities Act of 1990 and the Williams-Steiger Occupational Safety and Health Act), and Tenant shall be solely responsible for such plans and specifications, *provided, however, Landlord's approval shall constitute Landlord's agreement that the same are in compliance with this Lease and Landlord's design criteria.* Tenant shall indemnify and hold Landlord harmless from and against any and all errors and omissions contained in Tenant's Plans, and any losses, costs, damages or claims of whatever nature (including, but not limited to attorneys' fees and costs of any kind), arising out of or in connection with such compliance. Landlord shall not be liable *to Tenant* for any loss to Tenant's property or the property of any other person during construction. *Notwithstanding anything to the contrary, Tenant shall not be required to indemnify and hold Landlord harmless for the negligence or intentional acts or omissions of Landlord, its agents, employees or contractors.*

   b.    Should any conflict arise between any of Tenant's Plans and the Lease such that, in Landlord's *reasonable* ~~sole~~ opinion, the integrity or code compliance of any existing Landlord or adjacent tenant improvements and construction is jeopardized, the applicable portion(s) of the Lease shall be determinative. Any modification of such existing improvements or construction must receive the prior written approval of Landlord and all work shall be specifically stated in writing. ~~Landlord's approval of Tenant's Plans will in no way alter, amend or waive the requirements or criteria of this Exhibit.~~

2.    Existing Conditions.
   a.    Prior to the preparation of Tenant's Plans, Tenant shall visit the Premises to verify existing conditions and construction to ensure that none of Tenant's Work shall be in conflict with any existing Landlord or adjacent tenant improvements and construction. In addition, if the Premises' concrete slab is not on grade (compacted soil), Tenant shall remove all previous floor penetrations not intended to be re-used and patch and repair the floor ~~to original condition~~ and re-seal all floor penetrations to be re-used utilizing Landlord's waterproofing specifications.

   b.    In the event Tenant's store design requires revisions to Landlord's building, mechanical, electrical or HVAC system(s), Tenant shall request, in writing, approval for such revision(s) and, if approved by Landlord, Landlord shall perform the necessary work to accommodate Tenant's request. Tenant shall reimburse Landlord for the cost of such work as provided herein.

3.    Utility Services. All utility services are subject to the limitation and capacities of existing Center facilities and equipment and the availability of service from the local serving utilities; *provided, however, the foregoing shall not affect the scope of Landlord's Work, if any, provided in Exhibit "B"*. Tenant shall, at Tenant's expense and subject to Landlord's prior written approval, provide and install any equipment necessary to adapt such existing services to Tenant's requirements.

EXHIBIT "B"
Page -2-

4. <u>Roof.</u>   Tenant shall provide any required supports, blocking, temporary flashing, counterflashing or other work necessary to complete installation of Tenant's equipment on Landlord's roof, *provided that, if required to be performed by Landlord's designated contractor, such contractor's rates are reasonably competitive within the local area.* Cant strips and weatherproofing shall be done only by contractor designated by Landlord. Tenant will be required to supplement existing construction to achieve assembly ratings, thermal values or additional criteria as required by Tenant's Work.

5. <u>Fire Protection.</u>   Modifications to Tenant's automatic fire sprinkler system shall be performed by a contractor designated by Landlord *provided that such contractor's rates are reasonably competitive within the local area* The work shall conform to Landlord's requirements and may include, but not be limited to, the cost of preparing engineered sprinkler shop drawings and the submission of such drawings to Landlord's fire insurance underwriter for approval, the relocating, re-sizing, and adding sprinkler piping or heads, draining the system and fire watch during system down-time.

6. <u>HVAC Criteria.</u>
   a. Restaurants, food service, pet shops, beauty salons, barber shops and any other occupancies which, in the sole opinion of the Landlord, produce odors or produce a high level of humidity, shall provide an exhaust system which will prevent such odors or moisture from entering the enclosed mall, other tenant spaces or any other portion of the Center. If, in the sole opinion of the Landlord, any of Tenant's roof mounted equipment accumulates grease, Tenant shall, at Tenant's expense, furnish and install grease collection and elimination facilities in accordance with Landlord's requirements (which may include the use of a Grease Guard collection pan).

   b. In the event that Tenant elects to reuse all or a portion of any existing HVAC system(s), Tenant shall indicate same on Tenant's drawings for Landlord's review. In the event Landlord permits Tenant to reuse said systems, Tenant shall employ a qualified contractor to verify, by written confirmation to Landlord, that such HVAC system(s) is fully operable and in conformance with Landlord's design criteria as provided in Landlord's drawings (said written confirmation shall include, but not be limited to, an air balance report completed by an AABC certified air balance contractor and shall indicate, at a minimum, any discrepancies between design quantities and tested quantities). If any portion of Tenant's HVAC system(s) is not fully operable or does not conform to Landlord's design criteria, Tenant shall, at Tenant's expense, have its contractor repair or replace same to comply therewith and thereafter provide Landlord with written confirmation thereof.

7. <u>Construction Deposit.</u>   Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a damage deposit in the form of a cashier's check in the amount of $3,500.00 made payable to Landlord. Landlord shall have the right to use all or any part of said damage deposit as reimbursement for any debris clean-up or damage caused by Tenant's contractor(s) to any Common Areas. *Any deduction from the deposit must be itemized. The remaining balance shall be refunded within thirty (30) days following the completion of Tenant's Work.*

8. <u>Materials and Services:</u>   Prior to commencement of construction in the Premises, Tenant's contractor shall deliver a cashier's check, made payable to Landlord, as payment for materials issued to or services provided for *Tenant or* Tenant's contractor by Landlord or for work performed by Landlord for *Tenant or* Tenant's contractor at the request of *Tenant or* Tenant's contractor. Such items are itemized in the Tenant Information Package and may include (but not be limited to): entrance floor tile; service door, frame and hardware; smoke detectors; temporary utilities; temporary sprinkler system (standard grid); sheetrock; temporary toilets; dumpster and trash removal; final connection and testing to Landlord's fire system; and governmental fees. *All such charges are specifically set forth in the Tenant Information Package delivered to Tenant prior to the execution of this Lease; provided, however, all such charges are subject to the Waiver of Chargebacks (and exceptions thereto) under Section 24.24 of the Lease.*

9. <u>Construction Rules.</u>   Tenant will abide by and cause its contractors, subcontractors, agents and employees to abide by *reasonable* rules and regulations published by Landlord from time to time, *uniformly and nondiscriminatorily enforced as to comparable tenants and circumstances* including, but not limited to, those pertaining to parking, toilet facilities, safety conduct, delivery of materials and supplies, employee egress to the Center, trash storage or collection or removal, and cooperation with Landlord's architect, general contractor and subcontractors or other agents.

10. <u>Storefront Barricade.</u>   If, in the ~~sole~~ reasonable opinion of the Landlord, a temporary storefront barricade is required for the Premises, Landlord shall install same at Tenant's expense.

11.    Signage. Tenant shall provide and install a storefront identification sign for the Premises which may include, at Landlord's discretion, multiple signs (depending upon Tenant's storefront configuration) and Tenant's established national logo or insignia, if any. Storefront identification signs shall be limited to Tenant's Trade Name as approved in this Lease or as otherwise approved in writing by Landlord. The storefront sign shall be illuminated (unless otherwise specifically approved, in writing, by Landlord). Landlord's approval of Tenant's storefront signage shall be based on the size and style of the sign and lettering, the location of the sign within the storefront, and the cohesive integration of the sign into the overall storefront design. Prohibited storefront signage includes, but is not limited to, signage which advertises or describes products, services, vendors, or departments or is informational or directional in nature, regardless if such signage is attached as a tagline to, or is included as part of, Tenant's Trade Name. *Landlord shall not unreasonably withhold its approval of Tenant's sign drawings provided they are substantially similar to a design utilized by Tenant and approved by a Landlord-affiliated entity for other enclosed mall locations.*

12.    Waterproofing. If the Premises' concrete slab is not on grade (compacted soil), Tenant shall install a waterproofing barrier membrane, in accordance with Landlord's specifications, in all areas that may be exposed to fluids or liquids including, but not limited to, restrooms, food preparation and service areas; shampoo and wash areas, laundry and dry cleaning areas, and photo processing areas.

C.    CLOSE-OUT REQUIREMENTS. Tenant's Work shall be deemed completed at such time as Tenant, at its sole expense and without cost to Landlord, shall provide:

1.    Proof of Payment. Furnish evidence *reasonably* satisfactory to Landlord that all of Tenant's Work has been completed and paid for in full *except for a good faith dispute, if any* (and that such work has been accepted by Landlord), including the costs for Tenant's Work that may have been done by Landlord and the costs for any other work done by Landlord which Landlord may be entitled to payment in accordance with the provisions of this Exhibit "B", the Tenant Information Package, or elsewhere in the Lease, that any and all liens therefor that have been or might be filed have been discharged of record or waived, and that no security interests relating thereto are outstanding.

2.    Tenant's Affidavit. Furnish an affidavit from Tenant listing all contractors and any material suppliers in the employ of said Tenant who have provided goods or services for the completion of Tenant's Work in the Premises *in excess of $3,000.00.*

3.    Tenant Contractor's Affidavit. Furnish an affidavit from Tenant's general contractor listing all parties who have furnished materials or labor or services to that contractor for completion of Tenant's Work in the Premises *in excess of $3,000.00.*

4.    Certificate of Occupancy. Furnish all certificates and other approvals with respect to Tenant's Work that may be required from any governmental authority and any board of fire underwriter's or similar body for the use and occupancy of the Premises.

5.    Record Drawings. *INTENTIONALLY DELETED.*

6.    Estoppel Certificate. Furnish a Tenant-executed estoppel certificate as may be required by Landlord or Landlord's mortgagee.

7.    CASp Report. *INTENTIONALLY DELETED.*

# South Bay Galleria (#14)

# South Bay Center SPE, LLC
50 Public Square, Suite 700
Cleveland, Ohio  44113

June 21, 2013

SONG H KIM & YOUNG A KIM
333 MOONRISE DRIVE
MALIBU, CA  90265

Attention:  LEASE ADMINISTRATION

Dear Tenant:

Enclosed please find three (3) copies of a Lease Estoppel Certificate ("Tenant Certificate") that is in conjunction with a restructuring and recapitalization of your Landlord.  Please review these documents and fill in all blanks with the requested information.

To expedite the return of these documents, I have enclosed a pre-paid return envelope which is addressed to attorneys at Goodwin Procter, LLP, Attention Linda Blake, 53 State Street, Exchange Place, Boston, MA 02109.  I request that you return all executed and completed documents by Wednesday, July 17, 2013.

Should you have any questions, I can be reached at 216-416-3040.  You may also contact Jim Zweidinger at 216-416-3132 or JimZweidinger@forestcity.net.

Thank you in advance for your cooperation regarding this important matter.

Very truly yours,

Denise Hall
Assistant Vice President

DH/jbz
Enclosures

#14



# FOREST CITY
### E N T E R P R I S E S

Kimberly A. Fennell
Paralegal

File No. L-9893

Direct Number (216) 416-3253
E-mail Address kimberlyfennell@forestcity.net

November 1, 2006

**VIA FEDERAL EXPRESS**

Mr. Song H. Kim
1204 Paloma Street
Los Angeles, CA  90021

      **Re:**    **Angl**
              **South Bay Galleria**
              **Unit No. 258**

Dear Mr. Kim:

      Enclosed you will find one (1) fully executed copy of the First Amendment of Lease for the above-referenced Premises for your files.

      If you have any questions or comments regarding the referenced Lease, please feel free to contact me.

                     Very truly yours,

                     *Kimberly A - Fennell/emp*

                     Kimberly A. Fennell
                     Paralegal

KAF:emp
Enclosures

cc:     Sandra Montgomery
       Mark Himmelman
       Sue Kutrubs

L-9893
H:\w97\kaf\amendments\L9893am1.doc
KAF:emp
8/25/06

## FIRST AMENDMENT OF LEASE

THIS FIRST AMENDMENT OF LEASE made and entered into this _31st_ day of _October_, 2006, by and between SOUTH BAY CENTER, LLC, a California limited liability company, having an address for purposes hereof at Terminal Tower, 50 Public Square, Suite 1360, Cleveland, Ohio 44113-2267 ("Landlord"); and SONG H. KIM and YOUNG A. KIM, jointly and severally, having an address for purposes hereof at 1204 Paloma Street, Los Angeles, California 90021 ("Tenant").

WITNESSETH:

WHEREAS, Landlord and Tenant entered into a certain Lease dated April 24, 2006 ("Lease") for Unit No. 258 in the South Bay Galleria Shopping Center located in Redondo Beach, California, as more fully set forth in the Lease ("Premises"); and

WHEREAS, Landlord acknowledges that Tenant experienced delays with regard to construction and permitting that were beyond their control; and

WHEREAS, Landlord and Tenant agree to amend the Rent Commencement Date as set forth below.

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00), other good and valuable consideration and of the agreements of the parties hereinafter set forth, Landlord and Tenant hereby agree as follows:

1.    Section 1.0 (e) of the Lease shall be deleted in its entirety and replaced by the following:

"(e)  Rent Commencement Date:

The earlier of (i) September 1, 2006 ("Outside Date");

or (ii) the date Tenant opens for business in the Premises."

2.    Except as expressly modified herein, all other terms and conditions of the Lease shall be unamended and remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment of Lease the day and year first written above:

Signed in the presence of:

**LANDLORD:**

SOUTH BAY CENTER, LLC, a California
limited liability company

By: Oracle-Wetmore Co., an Arizona
    limited partnership, Member

By: Tusar, Inc., General Partner

By: _____
    Duane F. Bishop, Jr., Vice President

**TENANT:**

_____
SONG H. KIM

_____
YOUNG A. KIM

2

FedEx | Ship Ma~~ager~~t-~~k-28~~3~~0~~-~~S~~K~~-~~D~~oc 81 Filed 12/29/16 Entered 12/29/16 16:48:37 Desc
Case ~~2~~a~~g~~e 1-k-28930-SK-3321-080d
Main Document Page 222 of 381



From: Origin ID: (216)416-3253
Kimberly Fennell
Forest City Enterprises
50 Public Sqaure
Suite 1360
Cleveland, OH 44113

**FedEx** ®
Express

**E**

CLS 830 306/19/23

Ship Date: 01NOV06
ActWgt: 1 LB
System#: 8533005/INET2500
Account#: S *********

REF: L-9893/South Bay



Delivery Address Bar Code

SHIP TO: (310)456-5259          BILL SENDER
**Song H. Kim**

**1204 Paloma Street**

**Los Angeles, CA 90021**



** 2DAY **

TRK# **7985 3323 6890**    FORM
0201

**90021**    -CA-US

**FRI**
Deliver By:
03NOV06

**LAX**    A1

**SA SPQA**

---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**SOUTH BAY CENTER, LLC**
**50 Public Square, Suite 1360**
**Cleveland, Ohio  44113-2203**

September 22, 2006

Song H. Kim and Young A. Kim
dba  Angl
1204 Paloma Street
Los Angeles, CA  90021

Dear Tenant:

Landlord is in the process of closing a mortgage loan for South Bay Center, LLC.

Enclosed are three (3) copies of a Lease Estoppel Certificate ("Tenant Certificate") and three (3) copies of a Subordination Non-Disturbance and Attornment Agreement ("SNDA") required by Lender as a precondition to close the loan transaction.  Please review these documents and <u>fill in any blanks</u> with the requested information.

Please execute all three copies of the Tenant Certificate and SNDA and have the signature notarized on all three SNDA documents.

To expedite the return of these documents, I have enclosed a pre-paid return envelope.  I request that you return all executed and completed documents by Friday, October 13, 2006.

Should you have any questions, I can be reached at 216-416-3040 or contact Jim Zweidinger at JimZweidinger@forestcity.net.  Thank you in advance for your cooperation regarding this important matter.

Very truly yours,

Denise Hall

Denise Hall
Assistant Vice President

DH/ss

Enclosures

# FOREST CITY
## TENANT COORDINATION/CONSTRUCTION

**VIA:**   **FAX & CERTIFIED MAIL**

May 9, 2006

Mr. Song H. Kim and Young A. Kim
1204 South Paloma Street
Los Angeles, CA 90021
Fax: 213.723.7122

RE:   Angl
      TLP #258
      South Bay Galleria
      Redondo Beach, California

Dear Mr. Song Kim and Young Kim:

Please be advised that this letter serves as the "Landlord's Official Notification" that the **"revised"** Delivery of Premises of the above referenced location is June 1, 2006, making the premises available for the Tenant to commence construction.

The Tenant may proceed with construction provided that the Lease is fully executed, has final approval of Tenant's construction documents by the Landlord, and the Tenant and/or Tenant's contractor has complied with the procedures set forth in the "Store Construction" section of the Tenant Handbook.

Please contact our office with any questions.

**FOREST CITY COMMERCIAL GROUP**

*Mary E. Rositano*

Mary E. Rositano
Director of Administration
Retail Tenant Coordination

/mr

cc:   K. Doran
      M. Himmelman
      J. Hughes
      S. Kutrubs
      S. Laslo
      D. Metzger
      S. Montgomery

h:\fctc\rtc\sb\sb258 rev turnover.doc

# FORESTCITY
### TENANT COORDINATION/CONSTRUCTION

**VIA:    CERTIFIED MAIL**

May 2, 2006

Mr. Song H. Kim and Young A. Kim
1204 Paloma Street
Los Angeles, CA 90021

RE:     Angl
        TLP #258
        South Bay Galleria
        Redondo Beach, California

Dear Mr. Song Kim and Young Kim:

Please be advised that this letter serves as the "Landlord's Official Notification" that Delivery of Premises of the above referenced location is May 6, 2006, making the premises available for the Tenant to commence construction.

The Tenant may proceed with construction provided that the Lease is fully executed, has final approval of Tenant's construction documents by the Landlord, and the Tenant and/or Tenant's contractor has complied with the procedures set forth in the "Store Construction" section of the Tenant Handbook.

Please contact our office with any questions.

**FOREST CITY COMMERCIAL GROUP**

*Mary E. Rositano*

Mary E. Rositano
Director of Administration
Retail Tenant Coordination

/mr

cc:    K. Doran
       M. Himmelman
       J. Hughes
       S. Kutrubs
       S. Laslo
       D. Metzger
       S. Montgomery

h:\fctc\rtc\sb\sb258turnover.doc

h:\fctc\rtc\sb\sb258 rev turnover.doc

# FOREST CITY
### TENANT COORDINATION/CONSTRUCTION

**DATE:**      April 25, 2006

**TO:**        Mr. Song H. Kim
               Angl
               1204 S. Paloma St.
               Los Angeles, CA  90021

**RE:**        Angl
               TLP #258
               South Bay Galleria
               Redondo Beach, CA

**VIA:**       Fed Ex

## DESCRIPTION:

Preliminary Design

## COMMENTS:

Please revise and resubmit for review and approval.

Please submit mechanical, electrical, sign shop drawings, along with material samples for review and approval.

**CC:**    Design Group Beau          SIGNED: *Jason M. Hughes* /dd
                                      Jason M Hughes
                                      Tenant Coordinator

F:\fctc\rtc\sb\sb258pd2

Original  Copy  #14

# FOREST CITY
### E N T E R P R I S E S

Deborah J. Metzger
Senior Lease Negotiator

Direct Number (216) 416-3264
E-mail Address deborahmetzger@forestcity.net

April 24, 2006

File No.

**L-9893**

**VIA FEDERAL EXPRESS**

Song H. Kim and Young A. Kim
1204 Paloma Street
Los Angeles, CA  90021

RE:    **ANGL**
          **South Bay Galleria**
          **Unit No. 258**

Dear Mr. and Mrs. Kim:

Enclosed please find one (1) fully executed copy of the referenced Lease.  If you need further assistance with respect to this Lease, please feel free to contact me.

Very truly yours,

Deborah J. Metzger
Senior Lease Negotiator

DJM:dd
Enc.

cc:    Sandra Montgomery
         Mark Himmelman

*Original #14*

L-9893
H:\w97\djm\L9893lse.doc
DJM:dd
2/1/06
Revised 3/30/06

# SOUTH BAY GALLERIA

Redondo Beach, California

## LANDLORD

========================================================================

### SOUTH BAY CENTER, LLC,
a California limited liability company

## TENANT

========================================================================

### SONG H. KIM AND YOUNG A. KIM,
jointly and severally
d/b/a
ANGL

Unit No. 258

## TABLE OF CONTENTS

Section 1.0 - Basic Lease Provisions. .................................................................................1
Section 1.1 - Defined Terms. ...............................................................................................4
Section 2.1 - Exhibits. .........................................................................................................5
Section 3.1 - Premises.........................................................................................................5
Section 3.2 - Gross Leasable Area of the Premises............................................................5
Section 3.3 - Revisions to Premises GLA.............................................................................5
Section 3.4 - Landlord's Reservation....................................................................................5
Section 4.1 - Tenant's Use of Common Areas......................................................................6
Section 4.2 - Management and Operation of Common Areas. ..............................................6
Section 5.1 - Site Plan and Leasing Plan. ...........................................................................6
Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan..............................6
Section 6.0 - Construction Allowance...................................................................................7
Section 6.1 - Landlord's Responsibilities..............................................................................7
Section 6.2 - Tenant's Responsibilities.................................................................................7
Section 6.3 - Tenant's Trade Fixtures ..................................................................................8
Section 6.4 - Labor Cooperation. .........................................................................................8
Section 7.1 - Submission of Plans and Specifications. ........................................................8
Section 8.1 - Operation and Use of Premises. .....................................................................9
Section 8.2 - Tenant's Covenant to Operate. .......................................................................9
Section 8.3 - Prohibitions on Use. ........................................................................................9
Section 8.4 - Manner of Operation of Business. ...................................................................9
Section 9.1 - Commencement Date Agreement. .................................................................10
Section 9.2 - Holding Over..................................................................................................10
Section 9.3 - Expiration of the Term of the Lease. ..............................................................11
Section 10.1 - Rent Commencement Date. .........................................................................11
Section 10.2 - Delay or Failure to Deliver Premises to Tenant. ..........................................11
Section 10.3 - Tenant's Failure to be Open by the Outside Date.........................................11
Section 11.1 - Fixed Minimum Rent. ...................................................................................12
Section 11.2 - Percentage Rent. .........................................................................................12
Section 11.3 - Additional Rent.............................................................................................14
Section 11.4 - Real Estate Taxes........................................................................................15
Section 11.5 - Utility and Insurance Costs...........................................................................16
Section 12.1 - Utility Service Charges. ................................................................................17
Section 12.2- Discontinuance of Service..............................................................................19
Section 12.3- Interruption of Service. ..................................................................................20
Section 12.4- Premises Sprinkler System. ..........................................................................20
Section 13.1 – Storefront Sign. ...........................................................................................20
Section 13.2 - Interior Signs and Advertising.......................................................................20
Section 14.1 - Repairs by Landlord. ....................................................................................21
Section 14.2 - Repairs By Tenant. .......................................................................................21
Section 14.3 - Alterations and Remodeling. .........................................................................21
Section 15.1 - Lien Indemnification by Tenant......................................................................22
Section 16.1 - Indemnification..............................................................................................22
Section 16.2 - Tenant's Insurance Requirements..................................................................22
Section 16.3 - Waiver of Subrogation...................................................................................23
Section 16.4 - Landlord Not Responsible for Acts of Others..................................................24
Section 17.1 - Rules and Regulations. .................................................................................24
Section 17.2 - Rubbish.........................................................................................................24
Section 17.3 - Lighting. ........................................................................................................24
Section 17.4 - Merchandise Display, Loading and Unloading................................................24
Section 17.5 - Obstruction of Passageways. ........................................................................24
Section 17.6 - Employee Parking..........................................................................................24
Section 18.1 - Subordination of Lease. .................................................................................25
Section 18.2 - Attornment by Tenant.....................................................................................25
Section 18.3 - Landlord as Attorney-in-Fact for Tenant. .......................................................25
Section 19.1 - Landlord's Right to Repair..............................................................................25
Section 19.2 - Landlord's Right to Affix to Exterior ...............................................................25
Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant. ..............................26
Section 20.1 - Landlord's Consent Required..........................................................................26
Section 20.2 - Insolvency Proceedings. ................................................................................26
Section 20.3 - Transfer of Corporate Shares.........................................................................26
Section 20.4 - Assignment to Related Entity. ........................................................................26
Section 20.5 - Transfer of Other Business Interests. .............................................................27
Section 20.6 - Acceptance of Rents by Landlord....................................................................27

Section 20.7 - No Release of Liability. .................................................................27
Section 20.8 - Administrative Fee. ......................................................................27
Section 21.1 - Landlord's Obligation to Repair and Reconstruct.............................27
Section 21.2 - Landlord's Option to Terminate. .....................................................28
Section 21.3 - Demolition of Landlord's Building. ...................................................28
Section 22.1 - Effect of Taking. ..........................................................................28
Section 22.2 - Compensation and Awards. ...........................................................28
Section 22.3 - Condemnation or Breach of Lease...................................................29
Section 23.1 - Default. ......................................................................................29
Section 23.2 - Remedies and Damages.................................................................29
Section 23.3 - Remedy for Failure to Open or Operate.' .........................................30
Section 23.4 - Repeated Default. ........................................................................30
Section 23.5 - Waiver of Rights of Redemption......................................................31
Section 24.1 - Restriction on Tenant. ...................................................................31
Section 24.2 - Imposition of Damages..................................................................31
Section 25.1 - Notices to Tenant and Landlord. .....................................................31
Section 25.2 - Notices to Mortgagee. ...................................................................31
Section 26.1 - Accord and Satisfaction..................................................................32
Section 26.2 - Complete Agreement. ....................................................................32
Section 26.3 - Consents......................................................................................32
Section 26.4 - Brokerage. ...................................................................................32
Section 26.5 - Effective Date of Lease. .................................................................32
Section 26.6 - Estoppel Certificates. ....................................................................32
Section 26.7 - Force Majeure...............................................................................33
Section 26.8 - Interpretation................................................................................33
Section 26.9 - Memorandum of Lease. ..................................................................33
Section 26.10 - Quiet Enjoyment..........................................................................33
Section 26.11 - Rent Demand...............................................................................33
Section 26.12 - Section and Title Headings. ...........................................................33
Section 26.13 - Successors and Assigns. ...............................................................33
Section 26.14 - No Waiver by Landlord..................................................................33
Section 26.15 - Exculpation. ................................................................................34
Section 26.16 - Transfer of Landlord's Interest.......................................................34
Section 26.17 - Litigation.....................................................................................34
Section 26.18 – Non-Discrimination. .....................................................................34
Section 26.18 - Joint and Several Liability..............................................................35

H:\w97\lb\south bay.doc
L-9893

# L E A S E

THIS LEASE MADE AND ENTERED INTO AT Cleveland, Ohio, this _24th_ day of

_April_____, 2006, by and between SOUTH BAY CENTER, LLC, a California limited

liability company, having an address for purposes hereof at Terminal Tower, 50 Public Square,

Suite 1360, Cleveland, Ohio 44113-2267 ("Landlord"); and SONG H. KIM and YOUNG A. KIM,

jointly and severally, having an address for purposes hereof at 1204 Paloma Street, Los

Angeles, CA 90021 ("Tenant").

## WITNESSETH

## ARTICLE I

## INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are an integral part of this Lease, and are referred to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties. They are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

| | | | |
|---|---|---|---|
| (a) | Shopping Center: | South Bay Galleria | (Article I, Section 1.1 [g]) |
| (b) | Unit No.: | 258 | |
| (c) | Approximate Premises GLA: | 2,618 square feet. | |
| (d) | Term of Lease: | Ten (10) Lease Years commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined). | |
| (e) | Rent Commencement Date: | The earlier of (i) August 1, 2006 ("Outside Date"); or (ii) the date Tenant opens for business. | |
| (f) | Term Expiration Date: | The day prior to the tenth (10th) anniversary of the Rent Commencement Date. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs. | |
| (g) | Fixed Minimum Rent: | (i)   $   32.00 per square foot of Premises GLA, $83,776.00 per Lease Year, $ 6,981.33 per month, for Lease Year One; | (Article XI, Section 11.1) |

(ii)   $   32.64 per square foot of Premises GLA,
       $85,451.52 per Lease Year,
       $ 7,120.96 per month, for Lease Year Two;

(iii)  $   33.29 per square foot of Premises GLA,
       $87,153.22 per Lease Year,
       $ 7,262.77 per month, for Lease Year Three;

(iv)   $   33.96 per square foot of Premises GLA,
       $88,907.28 per Lease Year,
       $ 7,408.94 per month, for Lease Year Four;

(v)    $   34.64 per square foot of Premises GLA,
       $90,687.52  per Lease Year,
       $ 7,557.29 per month, for Lease Year Five;

(vi)   $   35.33 per square foot of Premises GLA,
       $92,493.94 per Lease Year,
       $ 7,707.83 per month, for Lease Year Six;

(vii)  $   36.04 per square foot of Premises GLA,
       $94,352.72 per Lease Year,
       $ 7,862.73 per month, for Lease Year Seven;

(viii) $   36.76 per square foot of Premises GLA,
       $96,237.68 per Lease Year,
       $ 8,019.81 per month, for Lease Year Eight;

(ix)   $   37.50 per square foot of Premises GLA,
       $98,175.00 per Lease Year,
       $ 8,181.25 per month, for Lease Year Nine; and

(x)    $   38.25 per square foot of Premises GLA,
       $100,138.50 per Lease Year,
       $  8,344.88 per month, for Lease Year Ten;

(xi)   Fixed Minimum Rent          (Article III, Section 3.3)
       Subject to adjustment if Premises GLA is revised:
       __X___ yes      _____ no.

(h)    Percentage Rent:
                                      (Article XI, Section 11.2)
(i)    6% of Gross Revenue in excess of $1,396,266.67
       ("Annual Breakpoint") for Lease Year One;

(ii)   6% of Gross Revenue in excess of $1,424,192.00
       ("Annual Breakpoint") for Lease Year Two;

(iii)  6% of Gross Revenue in excess of $1,452,553.67
       ("Annual Breakpoint") for Lease Year Three;

(iv)   6% of Gross Revenue in excess of $1,481,788.00
       ("Annual Breakpoint") for Lease Year Four;

(v)    6% of Gross Revenue in excess of $1,511,458.67
       ("Annual Breakpoint") for Lease Year Five;

(vi)   6% of Gross Revenue in excess of $1,541,565.67
       ("Annual Breakpoint") for Lease Year Six;

(vii)  6% of Gross Revenue in excess of $1,572,545.33
       ("Annual Breakpoint") for Lease Year Seven;

(viii) 6% of Gross Revenue in excess of $1,603,961.33
       ("Annual Breakpoint") for Lease Year Eight;

(ix)   6% of Gross Revenue in excess of $1,636,250.00
       ("Annual Breakpoint") for Lease Year Nine; and

2

(x)      6% of Gross Revenue in excess of $1,668,975.00
         ("Annual Breakpoint") for Lease Year Ten.

(i)    Additional Rent:                          (Article XI, Section 11.3)
       Additional Rent shall be charged in the initial amount of $15.33
       per square foot of Premises GLA which shall be subject to annual
       compounded increases equal to five percent (5%) of the
       immediately preceding Lease Year's Additional Rent.

(j)    Real Estate Taxes:                        (Article XI, Section 11.4)
       Tenant's Proportionate Share; payable monthly on estimated bill.

(k)    Common Area Utility                       (Article XI, Section 11.5)
       and Insurance Costs: Tenant's Proportionate Share; payable monthly on estimated bill.

(l)    Premises Utilities:                       (Article XII, Section 12.1)
       Payable by Tenant as billed per metered, submetered or
       estimated and adjusted billing.

(m)    Trade Name:                               (Article VIII, Section 8.1)
       ANGL

(n)    Permitted Use:                            (Article VIII, Section 8.1)
       Tenant shall use and occupy the Premises solely for the retail sale
       of women's apparel and related accessories.

(o)    Tenant's Billing Address:
       1204 Paloma Street
       Los Angeles, California 90021

(p)    Tenant's Notice Address:                  (Article XXV, Section 25.1)
       Same as (o) above.

(q)    Landlord's Notice Address:                (Article XXV, Section 25.1)
       Terminal Tower
       50 Public Square
       Suite 1360
       Cleveland, Ohio 44113-2267

(r)    Landlord's Mortgagee's                    (Article XXV, Section 25.2)
       Notice Address:    Connecticut General Life Insurance Company
                          c/o CIGNA Retirement & Investment Services
                          280 Trumbull Street
                          Hartford, Connecticut  06103
                          Attention:  Commercial Mortgage Group, H-11C

                          with a copy to:
                          CIGNA Retirement & Investment Services
                          Mortgage & Real Estate Group, H-11F
                          280 Trumbull Street
                          Hartford, Connecticut 06103
                          Attention:  Real Estate Law, H-11F

(s)    Address for            Forest City Commercial Management, Inc.
       Payment of Rents,      Commercial Division
       Including              Post Office Box 72069
       Percentage Rent:       Cleveland, OH  44192-0069

(t)    Address for Percentage Rent
       Reports:               Forest City Commercial Management, Inc.
                              700 Terminal Tower
                              50 Public Square
                              Cleveland, OH  44113
                              Attn: Lease Administration Department

                              or fax to (216) 263-4806

(u)    Guarantor:             None.

3

(v)    Security Deposit:        None.

(w)    Construction Allowance:                    (Article VI, Section 6.0)
                                $25.00 per square foot of Premises GLA, payable upon
                                satisfaction of the conditions set forth in Section 6.0.

Section 1.1 - Defined Terms.

    Wherever used in this Lease, the following terms shall be construed to mean as follows:

    (a)    "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter may be in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

    (b)    "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, customers and invitees.

    (c)    "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

    (d)    "Major Tenants" shall mean those tenants located in the Shopping Center whose floor area exceeds thirty thousand (30,000) square feet ("Major Tenant Threshold"), including, but not limited to, Robinson's May; Nordstrom; and Mervyn's.

    (e)    "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 258, and further being a space containing approximately 2,618 square feet of floor space. The Premises are hatched on Exhibit B for the sole purpose of more specifically locating said area.

    (f)    "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

    (g)    "Shopping Center" shall mean those buildings, land (excluding outparcels along the perimeter of the Shopping Center, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "South Bay Galleria" located in the City of Redondo Beach, Los Angeles County, California, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time. Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

    (h)    "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Premises GLA, and the denominator of which is, with respect to all prorated charges (as defined in Article XI), the total number of square feet of actually occupied gross leasable area in the Shopping Center, excluding the number of square feet of all tenant spaces exceeding the Major Tenant Threshold, whether or not occupied and excluding the square feet of floor area of all tenants whose entrances do not exclusively front on the interior of the enclosed mall.

4

## ARTICLE II

## EXHIBITS

Section 2.1 - Exhibits.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A   -   Site Plan of the Shopping Center - attached hereto.

EXHIBIT B   -   Leasing Plan of the Shopping Center - attached hereto.

EXHIBIT C   -   Tenant Handbook for Shopping Center - containing sign and design criteria - not attached but incorporated herein by reference.

## ARTICLE III

## PREMISES

Section 3.1 - Premises.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (e), subject to all conditions and easements of record for the Term of the Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - Gross Leasable Area of the Premises.

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall. Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

Section 3.3 - Revisions to Premises GLA.

The Premises GLA set forth in Section 1.0 (c) has been determined pursuant to the provisions of Section 3.2 by reference to either "CAD" or scaled architectural drawings of the Premises.  Landlord and Tenant acknowledge that, irrespective of whether or not the Premises shall have been constructed as of the date of this Lease, in the event that Landlord's final as-built field or CAD measurements of the Premises after all leasehold improvements have been constructed therein should disclose a different square footage than the Premises GLA set forth in Section 1.0 (c) above ("Final Revised Premises GLA"), then Landlord agrees to notify Tenant in writing of the Final Revised Premises GLA.  Tenant further acknowledges and agrees that such notice by Landlord shall be deemed sufficient to amend the Premises GLA set forth in Section 1.0 (c), such amendment being deemed self-operative without the necessity of further formal mutual acknowledgment or documentation between Landlord and Tenant.  When so finally determined, the Final Revised Premises GLA shall be used as the numerator in computing Tenant's Proportionate Share of all prorated charges and in all computations of Fixed Minimum Rent if such has been determined on a square foot (as opposed to a fixed rate) basis as set forth in Section 1.0 (g).  If the Fixed Minimum Rent should be revised, Landlord's revised billing to Tenant shall be deemed sufficient notice of such rent revisions and the Percentage Rent Annual Breakpoint set forth in Section 1.0 (h) herein shall be correspondingly adjusted.

Section 3.4 - Landlord's Reservation.

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements. Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain,

repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

## ARTICLE IV

## COMMON AREAS

Section 4.1 - Tenant's Use of Common Areas.

    (a)    Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of this Lease, and any renewal period thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

    (b)    Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

    (c)    Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - Management and Operation of Common Areas.

    Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center. Landlord will have the right (1) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

## ARTICLE V

## CHANGES AND ADDITIONS TO
## SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - Site Plan and Leasing Plan.

    The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.

    Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof.  No such changes, rearrangements or other construction shall permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law.

6

# ARTICLE VI

## IMPROVEMENTS

Section 6.0 - <u>Construction Allowance</u>.

(a) Landlord shall pay to Tenant, as its total obligation hereunder, the sum of Twenty-Five Dollars ($25.00) per square foot of Premises GLA, which sum represents Landlord's contribution to Tenant's Work (as defined in Section 6.2) (hereinafter "Construction Allowance"). Such Construction Allowance shall be due and payable to Tenant; provided the following conditions have been satisfied:

(1) The Premises have been completed according to plans and specifications previously approved in writing by Landlord, including any punchlist items designated by Landlord; and

(2) A minimum of ninety-one (91) days have elapsed after Tenant has opened the Premises for business in accordance with the terms of this Lease; and

(3) Tenant has furnished Landlord with an affidavit from Tenant's General Contractor listing all subcontractors, materialmen and/or laborers (hereinafter collectively "Subcontractors") involved in Tenant's Work, and final, unconditional lien waivers from Tenant's General Contractor and all Subcontractors evidencing that the General Contractor and all Subcontractors have been paid in full for all work, material and labor furnished in connection with Tenant's Work at the Premises.

(b) In the event that there are claims or Rents unpaid, work unfinished, or liens filed for such work and labor that have not been bonded or otherwise secured, Landlord may retain from Tenant's Construction Allowance a sum sufficient to pay for said claims, Rents, work or liens and all costs resulting therefrom and to pay for said claims, Rents, work or liens, if necessary. If the amount owed to Tenant by Landlord shall not be sufficient to pay for said claims, Rents, work or liens and the costs resulting therefrom, Tenant shall forthwith pay for said claims, Rents, work or liens and the costs resulting therefrom, or if such be the case, cause such claims or liens to be properly discharged as herein provided.

(c) Tenant shall have the right at all times, and at its own expense, to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of such lien(s) upon giving adequate security to Landlord for payment of said lien(s).

(d) Notwithstanding anything contained herein, the amount of Tenant's Construction Allowance shall not exceed the documented costs of Tenant's Work.

Tenant shall request payment of the Construction Allowance in writing to Landlord upon satisfaction of the above conditions, and simultaneously therewith, shall provide Landlord with a W9 form for processing payment of the Construction Allowance.

Section 6.1 - <u>Landlord's Responsibilities</u>.

Tenant acknowledges that it is accepting the Premises in its present "as-is" condition.

Section 6.2 - <u>Tenant's Responsibilities</u>.

On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with Exhibit C:

(a) Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work.

(b) Construct the leasehold improvements as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein ("Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(c) Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)   If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives.

(e)   Tenant shall reimburse Landlord for the cost of any temporary utilities and dumpster usage which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor.

(f)   In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.3 - <u>Tenant's Trade Fixtures</u>.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State (or Commonwealth) in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Section 6.4 - <u>Labor Cooperation</u>.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center. In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

<div align="center">ARTICLE VII</div>

<div align="center">PLANS AND SPECIFICATIONS</div>

Section 7.1 - <u>Submission of Plans and Specifications</u> .

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C, complete plans and specifications for all of Tenant's work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in Exhibit C. Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the Rent Commencement Date. No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written consent. Landlord's written approval of any plans and specifications for Tenant's work shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.

<div align="center">8</div>

## ARTICLE VIII

## USE

Section 8.1 - <u>Operation and Use of Premises</u>.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I and for no other business or purpose. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

Section 8.2 - <u>Tenant's Covenant to Operate</u>.

Tenant agrees to complete Tenant's work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of this Lease to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, Mondays through Saturdays from 10:00 A.M. to 9:00 P.M. and on Sundays from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by Landlord for the operation of the Shopping Center. Tenant shall have no right to quit the Premises, cease to operate its business, or cancel or terminate this Lease, unless such right is expressly granted to Tenant herein.

Section 8.3 - <u>Prohibitions on Use</u>.

(a) Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b)    Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.

(c)    Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

Section 8.4 - <u>Manner of Operation of Business</u>.

(a)    Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade. Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to insure a maximum volume of business in and from the Premises.

(b)    Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)     For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws. The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees.  This obligation shall survive the expiration or earlier termination of this Lease.  If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of this Lease as a result of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center. Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(d)     Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Lease.  If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense.  Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

(e)     In the event Landlord should elect to establish open or closed internet site(s) with respect to the Shopping Center, Tenant agrees to participate in such site(s) and to cooperate with Landlord in making Tenant's website usable by, and accessible to, Shopping Center patrons and customers.

## ARTICLE IX

## TERM

Section 9.1 - Commencement Date Agreement.

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

Section 9.2 - Holding Over.

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party.  Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant immediately prior to expiration of the Term, plus all other charges due under the Lease. Tenant

shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period. Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

Section 9.3 - Expiration of the Term of the Lease.

(a)     This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)     For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)     Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of this Lease, except for ordinary wear and tear and casualty loss.

ARTICLE X

RENT COMMENCEMENT DATE

Section 10.1 - Rent Commencement Date.

As used in this Lease, the term "Rent Commencement Date" shall be as defined in Article I. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

Section 10.2 - Delay or Failure to Deliver Premises to Tenant.

Landlord shall give Tenant written notice of the date on which Landlord anticipates delivering possession of the Premises to Tenant. If Landlord shall be unable to deliver possession of the Premises to Tenant on the date specified in said notice for any cause within Landlord's or outside Tenant's control, including, but not limited to, delay in commencing or completing Landlord's work, if any, or the holding over of any tenant(s), or the total failure of Landlord to deliver the Premises, then in any of such events, Rents shall not commence until the earlier to occur of (i) the date Tenant opens for business; or (ii) ninety (90) days following the date that possession of the Premises is delivered to Tenant for the commencement of its leasehold improvement work. Tenant agrees to accept such abatement of Rents as liquidated damages in full satisfaction for the failure of Landlord to deliver possession of the Premises as set forth above or complete failure of delivery of possession to the exclusion of all rights and claims for damages which Tenant otherwise may have suffered as a result of Landlord's delayed or complete failure to deliver possession of the Premises to Tenant.

Section 10.3 - Tenant's Failure to be Open by the Outside Date.

Notwithstanding the rights or remedies of Landlord set forth in Article XIII, in the event Tenant does not open for business in the Premises on or before the Outside Date, except for reasons within Landlord's or outside Tenant's control, Landlord shall have the right to require Tenant to pay to Landlord, as liquidated damages and not as a penalty, an amount equal to One Hundred Fifty Dollars ($150.00) for each day beyond the Outside Date that Tenant is not open for business; which payment is intended to compensate Landlord for actual and substantial losses that Landlord may suffer as a result of Tenant's not being open for business. Nothing contained in this Section 10.3 shall be construed to waive any rights or remedies Landlord may have against Tenant, nor affect Tenant's obligation to commence payment of Rents on the Outside Date. Landlord may offset any amounts payable by Tenant hereunder against any amounts Landlord may owe Tenant.

## ARTICLE XI

## RENT

Section 11.1 - Fixed Minimum Rent.

(a)     Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, the Fixed Minimum Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month. Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)     Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

Section 11.2 - Percentage Rent.

(a)     Amount.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint set forth in Article I.

(b)     Payment.

(i)     The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)     Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)     Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

(c)  Gross Revenue.

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant. The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received.  Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter.  Any deposit not refunded shall be included in Gross Revenue.

12

(d)  <u>Exclusions from Gross Revenue</u>.

Notwithstanding the foregoing, "Gross Revenue" shall not include:

(i)  Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue.

(ii)  The amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)  The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)  Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)  Revenue from the sale of trade fixtures after use in the Premises.

(vi)  Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)  Revenue from vending machines for Tenant's employees use only.

(e)  <u>Reporting</u>.

(i)  Upon request by Landlord, Tenant agrees to furnish Landlord with daily totals of Gross Revenue made in, at and from the Premises.  Landlord agrees to use such information only for the purpose of confirming trends and determining how the Shopping Center tenants' sales compare to the same period in preceding years.  Landlord agrees to furnish Tenant with a copy of any report Landlord compiles based on such information.  Landlord acknowledges that any such daily sales reported by Tenant will not be used by Landlord to compute Percentage Rent payable by Tenant.

On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second (2nd) month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)  On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)  For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied.  Should Tenant elect (i) above, Tenant agrees that the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register.  If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)  If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following:  (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver.  The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and

for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)     All such daily, monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)     Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(f)     Books and Records.

(i)     Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied.  Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue.  Landlord shall also have the right to request such other records and/or accounts which Landlord may deem necessary to accurately determine Gross Revenue.  All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)     If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records.  If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove.  Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

(iii)     In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand.  If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

Section 11.3 - Additional Rent.

(a)     Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center.  Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine.  Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term hereof in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the applicable Lease Year.  The amount due for any partial Lease Year shall be prorated accordingly.

(b)     Should any governmental authority having jurisdiction over the Shopping Center enact or impose any future law, ordinance, regulation or requirement ("Future Law") upon Landlord, the direct effect of which is to increase Landlord's cost of operating, maintaining and managing the Shopping Center ("Operating Costs"), as compared with Landlord's Operating

14

Costs incurred for the calendar year immediately preceding the enactment of such Future Law by more than the annual percentage increase in the Additional Rent set forth in Article I, then in such event, Landlord shall notify Tenant in writing of such increase ("Extraordinary Increase") and shall furnish Tenant with reasonably suitable documentary evidence of such Extraordinary Increase and whether or not it is one-time or ongoing.  If the Future Law should result in a one-time Extraordinary Increase, Tenant's Proportionate Share of the Extraordinary Increase shall be divided into twelve (12) equal monthly increments, which shall be added to Landlord's monthly charge to Tenant for reimbursement to Landlord over the next twelve (12) month period.  However, if the Future Law should result in an ongoing Extraordinary Increase over the remaining balance of the Term, Tenant's Proportionate Share of such Extraordinary Increase shall be added to Tenant's Additional Rent and all subsequent annual compounded increases shall be applied to the increased Additional Rent amount.

Section 11.4 - Real Estate Taxes.

(a)    (i)    For purposes of this Lease, the term "Real Estate Taxes" shall mean all ad valorem taxes, assessments, charges, levies, fees and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature whatsoever, including, but not limited to, assessments for off-site public improvements for the benefit of the Shopping Center which shall be laid, assessed, levied, or imposed upon the Shopping Center or any part thereof and which are payable at any time during the Term hereof, and further, Real Estate Taxes shall include Landlord's reasonable administrative costs as well as any and all costs, including reasonable attorney fees, incurred by Landlord in contesting or negotiating Real Estate Taxes with any governmental authority.  Real Estate Taxes shall not include franchise, estate, inheritance, sales, use, succession, capital levy, transfer, net income or excess profits taxes imposed upon Landlord.  In addition, the term Real Estate Taxes shall mean (if applicable) all payments made by Landlord in lieu of real property taxes pursuant to tax increment financing provided to Landlord by any public agency or authority.  Landlord represents and warrants to Tenant that Tenant's Proportionate Share of Real Estate Taxes shall not exceed the amount of Real Estate Taxes that Tenant would otherwise have paid hereunder if Landlord had not received such tax increment financing.

(ii)    Landlord and Tenant recognize and acknowledge that there may be changes in the current real property tax system and that there may be imposed new forms of taxes, assessments, charges, levies or fees, or there may be an increase in certain existing taxes, assessments, charges, levies or fees placed on, or levied in connection with, the ownership, leasing, occupancy or operation of the Shopping Center or the Premises, all of which shall be included within the definition of Real Estate Taxes.  For purposes of funding special assessment districts of the type funded by real property taxes, such funding shall also be included within the meaning of Real Estate Taxes.  With respect to any general or special assessments which may be levied against or upon the Premises or the Shopping Center and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in periodic installments, there shall be included within the meaning of Real Estate Taxes with respect to any tax fiscal year, only the amount currently payable on such bond for such tax fiscal year, or the periodic installment for such tax fiscal year.

In addition to Real Estate Taxes, should any governmental taxing authority acting under any present or future law, ordinance, or regulation, levy, assess, or impose any business, occupancy, privilege or excise tax or any tax and/or assessments imposed upon the Rents payable by Tenant to Landlord (other than an income or franchise tax upon Landlord's net income), either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, Tenant shall be responsible for and shall pay such taxes and/or assessments directly to the appropriate taxing authority, or Tenant shall reimburse Landlord for the amount thereof, as the case may be, upon receipt of an invoice therefor from Landlord.

(b)    The Premises, its leasehold improvements and the underlying realty will not be separately assessed for tax purposes but instead will be assessed as part of a larger parcel or parcels of land and improvements comprising the Shopping Center.  Accordingly, Tenant agrees to pay its Proportionate Share (as defined in Section 1.1 [h]) of said Real Estate Taxes, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of said Real Estate Taxes as estimated by Landlord for the applicable fiscal year. Tenant's Proportionate Share hereunder for any partial fiscal year shall be prorated on a per diem basis.

To the extent that the Shopping Center consists of more than one tax parcel, including, but not limited to, separate tax parcels for one or more of the Major Tenants, the following shall apply:

(x)    Landlord shall have the right and option to compute Tenant's Proportionate Share of Real Estate Taxes based on the building area of the particular tax parcel on which the Premises is located.

(y)    In the event that a separate bill for Real Estate Taxes is rendered by the taxing authority with respect to the building, land and improvements owned or leased by a Major Tenant, then Real Estate Taxes shall be deemed to exclude taxes and assessments attributable to such Major Tenant and the floor area of such Major Tenant shall be correspondingly excluded from the denominator of Tenant's Proportionate Share.

(z)    In the event that any Major Tenant's building, land and improvements are separately assessed for purposes of Real Estate Taxes but no separate tax bill is rendered with respect to such Major Tenant, or in the event that any Major Tenant's building, land and improvements are not separately assessed for purposes of Real Estate Taxes but are included as part of other building, land and improvements in the Shopping Center, then to the extent, if any, that any such Major Tenant contribute(s) towards Real Estate Taxes attributable to the Shopping Center, Real Estate Taxes shall be reduced by the amount of any such Major Tenant's contribution(s) and the floor area of any such contributing Major Tenant shall be excluded from the denominator of Tenant's Proportionate Share.

(c)    Within one hundred twenty (120) days following the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Real Estate Taxes applicable to the Shopping Center and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year.  If the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord.  If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such fiscal year, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted.  Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder.  The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

Section 11.5 - Utility and Insurance Costs.

(a)    Tenant shall pay to Landlord its Proportionate Share (as defined in Section 1.1 [h]) of the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning.  Tenant shall also pay to Landlord its Proportionate Share of the costs of customary types of insurance coverage carried with respect to the Shopping Center, including, but not limited to, commercial general liability insurance, rent insurance and property insurance in commercially reasonable amounts as Landlord deems necessary (such utility costs and insurance costs are collectively "Utility and Insurance Costs").

(b)  Tenant's Proportionate Share of Utility and Insurance Costs shall be paid by Tenant, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of Utility and Insurance Costs as estimated by Landlord for each fiscal year.  Tenant's Proportionate Share of Utility and Insurance Costs hereunder for any partial fiscal year shall be prorated on a per diem basis.

Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Utility and Insurance Costs and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year.  If the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord.  If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted.  Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations

16

hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.


# ARTICLE XII

## PREMISES UTILITY SERVICES

Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)     Water and Sewer Services. Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in Exhibit C. Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date, as herein defined. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on submetered readings, adjusted quarterly. Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)     Telephone Service. Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises. Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)     Gas Service. To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto. Tenant shall pay all charges therefor directly to the providing utility.

(d)     Electricity Service. Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) furnish and supply Tenant's base load (lights, appliances, equipment plugs, and if applicable, HVAC equipment) electricity service ("Base Load Electricity Use") directly to Tenant on a sub-metered or estimated basis; or (ii) arrange with the local electric utility company to furnish and supply electric service to the Premises for Tenant's use as may be reasonably necessary for the operation of Tenant's business. In the event that Landlord shall elect to supply base load electricity service to the Premises, Tenant shall pay to Landlord an "Annual Energy Charge" for Tenant's Base Load Electricity Use, which shall be determined, paid and adjusted in the following manner:

(1)     Initial Determination - Tenant shall select a consultant ("Consultant") to provide Landlord with an initial load summary of Tenant's anticipated Base Load Electricity Use ("Initial Load Summary"). The Consultant's Initial Load Summary shall be based on such information which may be reasonably necessary, including, without limitation: (i) the electrical systems set forth in Tenant's final plans and specifications as approved in writing by Landlord; and (ii) Tenant's specifications for all electrical equipment and appliances to be operated in the Premises. Tenant covenants and agrees that at all times its use of electric current shall not exceed the capacity of the feeder to the Premises and the wire installations therein. Tenant shall make no alterations or additions to the electrical installations within the Premises without the prior written consent of Landlord in each instance. Landlord shall prepare an energy estimate ("Energy Estimate") of Tenant's Base Load Electricity Use based on the Consultant's Initial Load Summary and Landlord's reasonable estimates of Tenant's usage of the equipment and appliances to be operated by Tenant during Tenant's operating hours pursuant to this Lease ("Tenant's Operating Hours"). Landlord shall determine Tenant's "Annual Energy Charge" from its Energy Estimate.

17

(2)    Billing and Payment - Tenant's Annual Energy Charge shall be billed to Tenant as part of Rents in twelve (12) equal installments, each of which shall be due and payable in advance on or before the first day of each month.  In no event shall Tenant's obligation to pay its Annual Energy Charge abate, nor shall Tenant have any right of off-set or counterclaim against the payment of its Annual Energy Charge, except for those adjustments to which Tenant may be entitled as hereinafter provided.  The electric rate portion of Tenant's Annual Energy Charge shall not exceed the "Comparable Service Rate" as hereinafter described in subsection (d)(4).

(3)    Annual and Periodic Adjustments.

(i)    Annual - Landlord shall compute the adjustments, if any, for Tenant's Base Load Electricity Use during the preceding calendar year.  Such adjustments shall be based upon factors which may have caused Tenant's Base Load Electricity Use, or the costs thereof, to vary from Landlord's Energy Estimate, including, without limitation, any change in rates charged by the local utility company during such year; new taxes or any increase in existing taxes on electrical service by state or local governments; any permitted change in the use of the Premises which affects Tenant's Base Load Electricity Use; and any adjustments required as a result of Tenant's actual operating experience or seasonal requirements during Tenant's Operating Hours.  The amount of such adjustment shall be added to, or subtracted from, as the case may be, Tenant's next succeeding monthly payment(s) of Tenant's Annual Energy Charge.  Landlord shall estimate Tenant's Annual Energy Charge for each succeeding twelve (12) calendar month period based on Tenant's Base Load Electricity Use for the prior calendar year.

(ii)    Periodic.

(x)    Landlord's Energy Survey.  Landlord reserves the right, at any time during the Term of this Lease, and upon reasonable prior notice to Tenant, to make an energy survey ("Energy Survey") of the Premises during Tenant's Operating Hours to determine whether or not the installation of electricity-consuming equipment by Tenant varies from the Consultant's Initial Load Summary and/or Tenant's plans and specifications approved in writing by Landlord.  In the event of any such variance, the Annual Energy Charge based on Landlord's Energy Estimate shall be re-computed and adjusted retroactively up to one (1) year prior to the date of the Energy Survey to reflect the difference between Landlord's Energy Estimate and its revised Energy Estimate based on the Energy Survey.  Any resulting adjustments shall be added to, or subtracted from, as the case may be, Tenant's next succeeding monthly payment(s) of its Annual Energy Charge.

(y)    Check-Metering.  Landlord and Tenant shall each have the right to monitor Tenant's actual Base Load Electricity Use by installing meters ("check meters") which comply with the standards for such use set forth in the latest edition of the American Standard Code for Electricity Metering, ANSI C-12. The party desiring such monitoring shall provide written notice to the other party prior to the installation of the check meter. The check meter shall be installed in the meter base located within the Premises. Tenant agrees to make the check meter accessible to Landlord during Tenant's Operating Hours for inspection and reading. Check meter readings shall be taken over a representative period determined by Landlord which shall not be less than thirty (30) days.  If the check meter readings disclose that Tenant's actual Base Load Electricity Use differs from Landlord's Energy Estimate or Energy Survey, then Tenant's Annual Energy Charge for the next and subsequent monthly periods shall be adjusted to reflect the check meter readings.  In addition, Tenant's Annual Energy Charge shall be adjusted retroactively up to one (1) year prior to the date of installation of the check meter to reflect the difference between the Energy Estimate for such period and Tenant's Base Load Electricity Use as disclosed by the check meter readings.  Any adjustments shall be added to, or subtracted from, as the case may be, Tenant's next succeeding monthly payment(s) of its Annual Energy Charge.

(4)    Landlord's Utility Cost, as used herein, shall mean that in the event that any utility service is supplied directly to Landlord by a utility company and/or such service is redistributed or sub-metered by Landlord to Tenant, "Landlord's Utility Cost" shall not be less than that cost actually incurred by Landlord for the handling, distribution, re-distribution and billing of such service (including, but not limited to, any fuel adjustments and all taxes applicable to Landlord's utility service) nor shall the utility rate portion of Landlord's Utility Cost be in excess of the consumer rate ("Comparable Service Rate") chargeable by the utility company and "applicable" (as hereinafter defined) to a shopping center commercial customer of similar size and location as Tenant in the prevailing service area on a separately metered basis.  As used herein, however, such Comparable Service Rate would be deemed to be "applicable" to Tenant only to the extent that Tenant qualifies for such directly metered Comparable Service

18

Rate "as-is" without the necessity of either Landlord or Tenant incurring additional expense in the furnishing and/or installation of additional facilities, wiring or equipment in order to make such Comparable Service Rate available to Tenant:

(e)    Central HVAC and Premises HVAC System.

(x)    Landlord has furnished and installed a central heating, ventilating and air-conditioning system ("Central HVAC System") and shall operate and maintain the same during the Term of this Lease.  Tenant shall be required to furnish and install its own equipment and facilities for heating, ventilating, and air-conditioning   the Premises ("Premises HVAC System") and shall operate and maintain same during the Term of this Lease.  Such system shall belong to Landlord at the expiration or earlier termination of this Lease.  The Premises HVAC System shall include, but is not necessarily limited to, the Variable Air Volume ("VAV") box provided by Landlord at Tenant's expense, and all ductwork, piping, thermostatic controls and HVAC system electric wiring within the Premises, which are to be connected at the VAV box to Landlord's Central HVAC System.

Tenant agrees to operate its Premises HVAC System during Tenant's Operating Hours (as defined in Section 12.2[d]) and to balance the operation of its Premises HVAC System in conjunction with the operation of the Central HVAC System.

(y)    Landlord agrees to maintain and repair, subject to contributions by other tenants serviced by the Central HVAC System, all portions of the Central HVAC System and a portion of the Premises HVAC System, limited to the VAV control box thermostat and the ductwork connecting the VAV control box outward to the Central HVAC System ("Landlord's HVAC Maintenance Costs").  Tenant shall be responsible for maintaining, at its sole expense, all other portions of the Premises HVAC System, including, but not limited to, the VAV control box and all ductwork, piping and wiring, from the VAV Control box inward throughout the interior of the Premises.  Landlord's HVAC Maintenance Costs shall include, but not be limited to, labor, parts, materials and overhead attributed to maintaining the Central HVAC System.

(z)    Tenant's Premises HVAC Charge.  In each calendar month, Tenant shall pay to Landlord, as part of Rents due under this Lease, its share of the annual total of both Landlord's HVAC Maintenance Costs and Landlord's Utility Costs attributable to servicing the gross leasable area of the Shopping Center ("Shopping Center GLA") (herein defined collectively as the "Premises HVAC Costs"), which shall be determined as follows:

(i)    Upon the submission by Tenant to Landlord of Tenant's plans and specifications, Landlord's consulting engineer shall assign to Tenant a HVAC Factor which shall fairly represent the relationship between (1) the mechanical capacity of the equipment and system which is required to heat, ventilate and air-condition the Premises; and (2)  the total mechanical capacity of the Central HVAC System;

(ii)    In each calendar month, the Premises HVAC Costs attributable to the heating, ventilating and air-conditioning of the Shopping Center GLA shall be multiplied by a fraction, the numerator of which shall be Tenant's HVAC Factor, and the denominator of which shall be the total of all HVAC Factors assigned to the Shopping Center GLA.  The product thus obtained shall be "Tenant's Premises HVAC Charge" for such calendar month.

(iii)    Tenant's Premises HVAC Charge for each calendar month shall be paid by Tenant in such amounts as are estimated and billed by Landlord; each such charge being estimated and billed as of the first day of each calendar month.  Landlord will provide to Tenant a breakdown of the computation of Tenant's Premises HVAC Charge based upon Landlord's Utility Cost incurred for heating, ventilating and air-conditioning the Shopping Center GLA for such calendar year.

(iv)    Tenant's Premises HVAC Charge for such calendar year shall be adjusted by Landlord; the parties hereby agreeing that Tenant shall pay to Landlord or Landlord shall credit to Tenant's account (or if such adjustment is at the end of the Term, to pay Tenant, as the case may be), within thirty (30) days of such certification to Tenant, the amount necessary to effect such adjustment.  Failure of Landlord to provide the certification called for hereunder within the time prescribed above shall not relieve Tenant of its obligations hereunder.

Section 12.2 - Discontinuance of Service.

Landlord reserves the right, with thirty (30) days prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same

19

remain unpaid by Tenant. Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment. If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

Section 12.3 - Interruption of Service.

Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease.

Section 12.4 - Premises Sprinkler System.

In the event applicable codes require fire sprinkler protection, Landlord shall provide a sprinkler connection for the Premises to Landlord's bulk main designated in Landlord's drawings. Tenant shall design and install all extensions and facilities to and within the Premises from Landlord's connection.

If, at any time during the Term of this Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection for the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises, the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association ("NFPA") No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

ARTICLE XIII

SIGNS

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair. Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises. All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity. Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises.

20

ARTICLE XIV

REPAIRS AND ALTERATIONS

Section 14.1 - Repairs by Landlord.

(a)     Landlord shall keep the roof, structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease, subject to the provisions of Section 11.3 herein; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs.

(b)     As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to comply with Applicable Laws. It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.

(c)     Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

Section 14.2 - Repairs By Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times. All repairs to the Premises, equipment or facilities therein or thereabout, other than those repairs required to be made by Landlord pursuant to Section 14.1, shall be made by Tenant. Said repairs shall include, but not be limited to, all necessary painting and decorating, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems above and under the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises. All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

Section 14.3 - Alterations and Remodeling.

(a)     Tenant, at its own expense, shall have the right to make such interior alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any major remodeling of the interior of the Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material or structural alterations to the Premises or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made without Landlord's prior written consent. Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws. All such alterations, changes and improvements shall be made in accordance with the provisions of Exhibit C and shall become the property of Landlord upon installation and shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)     Tenant further agrees not to make any alterations, additions or changes to any storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall first have been obtained. In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord. Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3.

21

## ARTICLE XV

## LIENS

Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant. Tenant shall indemnify and save harmless Landlord against all loss, liability, costs, attorney fees, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center, the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord. Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

## ARTICLE XVI

## INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)    Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)    Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damages, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming both Tenant and Landlord as insureds, in the following amounts:

(a)    Commercial General Liability Insurance.   Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors  coverage, in an amount not less than Three Million Dollars ($3,000,000.00), adjusted annually for inflation,

written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

    (b)    <u>Worker's Compensation Insurance</u>.  Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

    (c)    <u>Personal Property, Alterations, Improvements and Betterments</u>.  Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease.  Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

    The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed.  If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs.  If the insurance proceeds described above are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds.  However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments.  This paragraph is only applicable if the Lease is not terminated pursuant to Article XXI hereof.

    (d)    <u>Additional Hazards</u>.  Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form insurance coverage.  In addition, Tenant shall use best efforts not to keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage.  In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of this Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center.  Said additional premiums shall be payable by Tenant to Landlord within ten (10) days following written notice from Landlord.

    (e)    <u>Blanket Policies</u>.  Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies.

    (f)    <u>Certificate(s) of Insurance</u>.  Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter.  The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report.  All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage.  Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same  within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

    (g)    <u>Notice of Loss</u>.  Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

Section 16.3 - <u>Waiver of Subrogation</u>.

    Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income,

23

even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

Section 16.4 - <u>Landlord Not Responsible for Acts of Others</u>.

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC. None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease.

<div align="center">ARTICLE XVII</div>

<div align="center">GENERAL PROVISIONS</div>

Section 17.1 - <u>Rules and Regulations</u>.

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center. Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease.

Section 17.2 - <u>Rubbish</u>.

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord. Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord. In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager. If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

Section 17.3 - <u>Lighting</u>.

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

Section 17.4 - <u>Merchandise Display, Loading and Unloading</u>.

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

Section 17.5 - <u>Obstruction of Passageways</u>.

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

Section 17.6 - <u>Employee Parking</u>.

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord. Tenant shall furnish Landlord with state automobile license numbers assigned to vehicles used by Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees shall fail to park their vehicles in such designated parking areas, then, without limiting any other remedy which Landlord may pursue in the event of Tenant's Default hereunder, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as a part of Rents, the sum of Ten Dollars ($10.00) per day for each vehicle parked in violation of the provisions of this Section 17.6. Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.

<div align="center">24</div>

## ARTICLE XVIII

## SUBORDINATION AND ATTORNMENT BY TENANT

**Section 18.1 - Subordination of Lease.**

This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance"). Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises. Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required. However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form. Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

**Section 18.2 - Attornment by Tenant.**

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease. Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on demand shall constitute a Default by Tenant under the terms of this Lease. In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

**Section 18.3 - Landlord as Attorney-in-Fact for Tenant.**

If Tenant, within twenty (20) days after submission of any instrument, fails to execute same, Landlord is hereby authorized to execute same as attorney-in-fact for Tenant.

## ARTICLE XIX

## RIGHTS OF LANDLORD

**Section 19.1 - Landlord's Right to Repair.**

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

**Section 19.2 - Landlord's Right to Affix to Exterior.**

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

Section 19.3 - <u>Landlord's Right to Make Payments on Behalf of Tenant</u>.

Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.


<div align="center">ARTICLE XX</div>

<div align="center">ASSIGNMENT AND SUBLETTING</div>

Section 20.1 - <u>Landlord's Consent Required</u>.

(a)     Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name. In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

(b)     Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)     Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

Section 20.2 - <u>Insolvency Proceedings</u>.

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

Section 20.3 - <u>Transfer of Corporate Shares</u>.

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease.

Section 20.4 - <u>Assignment to Related Entity</u>.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation. Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of

<div align="center">26</div>

Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - Transfer of Other Business Interests.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - No Release of Liability.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

Section 20.8 - Administrative Fee.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) or such other amount as Landlord shall reasonably determine to be reasonably appropriate in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not  said proposed assignment or subletting actually occurs.


ARTICLE XXI

DAMAGE OR DESTRUCTION

Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)    If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated. If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)    If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

27

(c)    If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work.  Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)    Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

Section 21.2 - Landlord's Option to Terminate.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof.  In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event.  If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore.

Section 21.3 - Demolition of Landlord's Building.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

ARTICLE XXII

CONDEMNATION

Section 22.1 - Effect of Taking.

(a)    In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)    In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)    For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)    If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - Compensation and Awards.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord.  Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate.  Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which

28

Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment.  Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - Condemnation or Breach of Lease.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

ARTICLE XXIII

DEFAULT

Section 23.1 - Default.

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)     Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)     If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)     Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)     Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)     Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)     If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)     Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)     With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - Remedies and Damages.

(a)     If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)     Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

29

(ii)    Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; or

(iii)    If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)    Terminate this Lease by written notice to Tenant.

(b)    Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part. However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)    In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)    In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)    In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable attorney fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant and/or occupants of the Shopping Center or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1 above, Landlord and Tenant each covenants and agrees that in the event that Tenant (i) fails to take possession of, construct and thereafter open the Premises for business, fully fixtured, stocked and staffed on the Rent Commencement Date; or (ii) vacates or abandons the Premises; or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.1 hereof, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to three fourths (3/4ths) of the Rents reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat such action or omission by Tenant as a Default under the Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity.

Section 23.4 - Repeated Default.

(a)    Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be

30

repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)    In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

Section 23.5 - <u>Waiver of Rights of Redemption</u>.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

ARTICLE XXIV

COMPETITION

Section 24.1 - <u>Restriction on Tenant</u>.

Tenant agrees that for as long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate, manage, or have any interest in any business which is similar or in competition with the permitted use of the Premises set forth in Article I ("Competing Store") within a radius of five (5) miles of the perimeter of the Shopping Center ("Restricted Area").

Section 24.2 - <u>Imposition of Damages</u>.

In the event that Tenant shall violate the provisions of Section 24.1 above, Landlord may, at its option, and without limiting Landlord's remedies, effective as of the date such Competing Store opens for business within the Restricted Area: (i) include seventy-five percent (75%) of the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder; or (ii) increase the Fixed Minimum Rent to the average of the annual "effective rent" (i.e., the aggregate of Fixed Minimum and Percentage Rent) payable by Tenant to Landlord during the immediately preceding two (2) Lease Years; or (iii) increase Tenant's Fixed Minimum Rent then in effect, and any future increases thereto, by fifty percent (50%).

ARTICLE XXV

NOTICES

Section 25.1 - <u>Notices to Tenant and Landlord</u>.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter.  Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers.  Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

Section 25.2 - <u>Notices to Mortgagee</u>.

Tenant shall give written notice to Landlord's mortgagee, at Landlord's mortgagee's notice address set forth in Article I, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord.  Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited

31

to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default. Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

## ARTICLE XXVI

## MISCELLANEOUS

Section 26.1 - Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties. This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

Section 26.3 - Consents.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

Section 26.4 - Brokerage.

Landlord and Tenant acknowledge that James Kim, American Realty ("Acknowledged Broker") may be entitled to a fee for broker's services rendered in bringing together the parties to this Lease. Landlord shall be responsible for paying the reasonable fee determined to be due and owing the Acknowledged Broker as a result of this transaction. Tenant warrants that it has had no dealings with any broker or agent in connection with the Lease, other than the Acknowledged Broker. In the event Tenant has had any other dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - Effective Date of Lease.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

Section 26.6 - Estoppel Certificates.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgage or assignee of any mortgage on the fee of the Premises.

32

Section 26.7 - <u>Force Majeure</u>.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

Section 26.8 - <u>Interpretation</u>.

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

Section 26.9 - <u>Memorandum of Lease</u>.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

Section 26.10 - <u>Quiet Enjoyment</u>.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - <u>Rent Demand</u>.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - <u>Section and Title Headings</u>.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - <u>Successors and Assigns</u>.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - <u>No Waiver by Landlord</u>.

(a)    Landlord shall have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord in refraining from so doing at any time(s). No failure by Landlord to insist upon the strict performance of any term or condition of this Lease, and no failure by Landlord to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver of any such breach, term, condition or right.

33

(b)      No term or condition of this Lease required to be performed by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord.

(c)      A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon the execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center. If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

Section 26.17 - Litigation.

(a)      Any claim, demand, right or defense of any kind by Tenant which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless Tenant seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of such occurrence of the billing, event or action upon which the adjustment, claim, demand, right or defense relates, whichever applies.

(b)      To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)      If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)      Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

Section 26.18 – Non-Discrimination.

Tenant herein covenants by and for itself, its heirs, executors, administrators, successors and assigns and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:   That there shall be no discrimination against or segregation of any person or group of persons on account of race, sex, marital status, age, handicaps, color, creed, religion, national origin or ancestry, in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises herein leased, nor shall Tenant, itself, or any person claiming under or through it, establish or permit any such practice

34

or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

Section 26.18 - <u>Joint and Several Liability.</u>

Since two (2) individuals are signing this Lease as Tenant, the liability of each such individual to pay Rents and to perform all other obligations hereunder shall be deemed to be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

Signed in the presence of:

**LANDLORD:**

SOUTH BAY CENTER, LLC, a California limited liability company

By: Oracle-Wetmore Co., an Arizona
    limited partnership, Member

By: Tusar, Inc., General Partner

By: _____
    Duane F. Bishop, Jr., Vice President


**TENANT:**

_____
SONG H. KIM
Social Security #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

_____
YOUNG A. KIM
Social Security #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

35



==================================

STATE OF OHIO       )

                  ) SS:

COUNTY OF CUYAHOGA)

On _____April 24_____, 2006, before me, __Doris Dowd_____, a Notary Public in and for the State of Ohio, personally appeared Duane F. Bishop, Jr.,

[X]     personally known to me -OR

[ ]     proved to me on the basis of satisfactory evidence

to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the within instrument in his authorized capacity and that, by his signature on the within instrument, the person or entity upon behalf of which he acted executed the within instrument.

WITNESS my hand and official seal.

_____

Notary Public In and For said County and State

(Seal)

==================================

Dowd
DORIS SCHUSTER, Notary Public
STATE OF OHIO
My Commission Expires May 20, 2007

---

***************************

-OPTIONAL SECTION-

CAPACITY CLAIMED BY SIGNER

Although statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on the document.

[ ] INDIVIDUAL

[X] CORPORATE OFFICER

Vice President
Title

[ ] PARTNER(S):

[X] LIMITED

[ ] GENERAL

[ ] ATTORNEY-IN-FACT

[ ] TRUSTEE(S)

[ ] GUARDIAN/CONSERVATOR

[ ] OTHER:

_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR
ENTITY(IES)

South Bay Center, LLC,
a California limited liability company
By: Oracle-Wetmore Co.,
an Arizona limited partnership,
Member
By: Tusar, Inc., General Partner
***************************

36

=================================

STATE OF _CALIFORNIA_ )
                                    ) SS:
COUNTY OF _LOS ANGELES_ )

    On _4-4-06_ , 2006,
before me, _Jung Yeun Toni Kim_ , a
Notary Public, in and for the State of
_California_ , personally appeared
_Song H. Kim & Young A Kim_,

[ ]    personally known to me -OR
[X]    proved to me on the basis of satisfactory
       evidence

to be the person(s) whose name(s) is/are subscribed
to the within instrument, and acknowledged to me that
he/she/they executed the within instrument in
his/her/their authorized capacity(ies) and that, by
his/her/their signature(s) on the within instrument, the
person or entity upon behalf of which he/she/they
acted executed the within instrument.

WITNESS my hand and official seal.

_____
Notary Public in and For said County and State

                (Seal)
=================================

**JUNG YEUN TONI KIM**
COMM. # 1463278
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
COMM. EXP. JAN. 16, 2008

***************************

              -OPTIONAL SECTION-
       CAPACITY CLAIMED BY SIGNER

Although statute does not require
the Notary to fill in the data below,
doing so may prove invaluable to
persons relying on the document.

[ ]  INDIVIDUAL
[ ]  CORPORATE OFFICER(S)

       _____
                Title(s)

       _____
                Title(s)

[ ]  PARTNER(S):
     [ ]  LIMITED
     [ ]  GENERAL

[ ]  ATTORNEY-IN-FACT
[ ]  TRUSTEE(S)
[ ]  GUARDIAN/CONSERVATOR
[ ]  OTHER:
_____


SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR
ENTITY(IES)

SONG H. KIM and YOUNG A. KIM


***************************

This Instrument Prepared By:
Deborah J. Metzger
Terminal Tower
50 Public Square, Suite 1360
Cleveland, Ohio 44113-2267
(216) 621-6060

EXHIBIT "A"

SOUTH BAY

SITE PLAN



**THE GALLERIA AT SOUTH BAY**
REDONDO BEACH, CALIFORNIA
**FOREST CITY TENANT COORDINATION/CONSTRUCTION**
945 TERMINAL TOWER, CLEVELAND, OHIO 44113

**EXHIBIT B**



SOUTH BAY GALLERIA
Richard Ellis

FOREST CITY MANAGEMENT
LOS ANGELES, CALIFORNIA
LEASING: (213) 488-0010

CONVENTION LEASE PLAN

LEVEL TWO PLAN
OCTOBER 1, 2005

EXHIBIT C

TENANT HANDBOOK

[TO BE FORWARDED UNDER SEPARATE COVER]

# The Promenade in Temecula (#17)

\# 17
Original

L-9983
h:\w97\djm\L9983lse.doc
DJM:dd
5/15/06
7/13/06

# THE PROMENADE IN TEMECULA

## TEMECULA, CALIFORNIA

## LANDLORD

==========================================================================

### TEMECULA TOWNE CENTER ASSOCIATES L.P.,
a California limited partnership

## TENANT

==========================================================================

### SONG H. KIM and YOUNG A. KIM,
jointly and severally
d/b/a
ANGL

Unit No. 2610

## TABLE OF CONTENTS

Section 1.0 - Basic Lease Provisions. ............................................................................1
Section 1.1 - Defined Terms. ...........................................................................................4
Section 2.1 - Exhibits. ......................................................................................................5
Section 3.1 - Premises......................................................................................................5
Section 3.2 - Gross Leasable Area of the Premises ......................................................5
Section 3.3 - Revisions to Premises GLA........................................................................5
Section 3.4 - Landlord's Reservation. .............................................................................5
Section 4.1 - Tenant's Use of Common Areas. ...............................................................6
Section 4.2 - Management and Operation of Common Areas. ........................................6
Section 5.1 - Site Plan and Leasing Plan. ......................................................................6
Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan........................6
Section 6.0 - Construction Allowance..............................................................................7
Section 6.1 - Landlord's Responsibilities........................................................................7
Section 6.2 - Tenant's Responsibilities. .........................................................................7
Section 6.3 - Tenant's Trade Fixtures .............................................................................8
Section 6.4 - Labor Cooperation. ....................................................................................8
Section 7.1 - Submission of Plans and Specifications....................................................8
Section 8.1 - Operation and Use of Premises. ...............................................................9
Section 8.2 - Tenant's Covenant to Operate. .................................................................9
Section 8.3 - Prohibitions on Use....................................................................................9
Section 8.4 - Manner of Operation of Business............................................................10
Section 9.1 - Commencement Date Agreement............................................................11
Section 9.2 - Holding Over.............................................................................................11
Section 9.3 - Expiration of the Term of the Lease. .......................................................11
Section 10.1 - Rent Commencement Date.....................................................................11
Section 10.2 - Delay or Failure to Deliver Premises to Tenant. ...................................11
Section 10.3 - Tenant's Failure to be Open by the Outside Date..................................12
Section 11.1 - Fixed Minimum Rent. ..............................................................................12
Section 11.2 - Percentage Rent. ....................................................................................12
Section 11.3 - Additional Rent........................................................................................15
Section 11.4 - Real Estate Taxes...................................................................................15
Section 11.5 - Utility and Insurance Costs.....................................................................16
Section 12.1 - Utility Service Charges............................................................................17
Section 12.2- Discontinuance of Service........................................................................18
Section 12.3- Interruption of Service...............................................................................18
Section 12.4- Premises Sprinkler System. .....................................................................19
Section 13.1 – Storefront Sign. ......................................................................................19
Section 13.2 - Interior Signs and Advertising. ...............................................................19
Section 14.1 - Repairs by Landlord.................................................................................19
Section 14.2 - Repairs By Tenant. ..................................................................................20
Section 14.3 - Alterations and Remodeling.....................................................................20
Section 15.1 - Lien Indemnification by Tenant. ..............................................................20
Section 16.1 - Indemnification.........................................................................................21
Section 16.2 - Tenant's Insurance Requirements...........................................................21
Section 16.3 - Waiver of Subrogation.............................................................................22
Section 16.4 - Landlord Not Responsible for Acts of Others..........................................22
Section 17.1 - Rules and Regulations. ...........................................................................23
Section 17.2 - Rubbish...................................................................................................23
Section 17.3 - Lighting. ..................................................................................................23
Section 17.4 - Merchandise Display, Loading and Unloading........................................23
Section 17.5 - Obstruction of Passageways...................................................................23
Section 17.6 - Employee Parking. ..................................................................................23
Section 18.1 - Subordination of Lease. ..........................................................................23
Section 18.2 - Attornment by Tenant..............................................................................24
Section 18.3 - Landlord as Attorney-in-Fact for Tenant. ...............................................24
Section 19.1 - Landlord's Right to Repair.......................................................................24
Section 19.2 - Landlord's Right to Affix to Exterior ........................................................24
Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant. ......................24
Section 20.1 - Landlord's Consent Required...................................................................25
Section 20.2 - Insolvency Proceedings. .........................................................................25
Section 20.3 - Transfer of Corporate Shares..................................................................25
Section 20.4 - Assignment to Related Entity...................................................................25
Section 20.5 - Transfer of Other Business Interests.......................................................25
Section 20.6 - Acceptance of Rents by Landlord............................................................26
Section 20.7 - No Release of Liability. ...........................................................................26
Section 20.8 - Administrative Fee. ..................................................................................26

Section 21.1 - Landlord's Obligation to Repair and Reconstruct. ............................................26
Section 21.2 - Landlord's Option to Terminate. ..............................................27
Section 21.3 - Demolition of Landlord's Building. ..............................................27
Section 22.1 - Effect of Taking. ..............................................27
Section 22.2 - Compensation and Awards. ..............................................27
Section 22.3 - Condemnation or Breach of Lease. ..............................................27
Section 23.1 - Default. ..............................................28
Section 23.2 - Remedies and Damages. ..............................................28
Section 23.3 - Remedy for Failure to Open or Operate.' ..............................................29
Section 23.4 - Repeated Default. ..............................................29
Section 23.5 - Waiver of Rights of Redemption. ..............................................30
Section 24.1 - Restriction on Tenant. ..............................................30
Section 24.2 - Imposition of Damages. ..............................................30
Section 25.1 - Notices to Tenant and Landlord. ..............................................30
Section 25.2 - Notices to Mortgagee. ..............................................30
Section 26.1 - Accord and Satisfaction. ..............................................30
Section 26.2 - Complete Agreement. ..............................................31
Section 26.3 - Consents. ..............................................31
Section 26.4 - Brokerage. ..............................................31
Section 26.5 - Effective Date of Lease. ..............................................31
Section 26.6 - Estoppel Certificates. ..............................................31
Section 26.7 - Force Majeure. ..............................................31
Section 26.8 - Interpretation. ..............................................32
Section 26.9 - Memorandum of Lease. ..............................................32
Section 26.10 - Quiet Enjoyment. ..............................................32
Section 26.11 - Rent Demand. ..............................................32
Section 26.12 - Section and Title Headings. ..............................................32
Section 26.13 - Successors and Assigns. ..............................................32
Section 26.14 - No Waiver by Landlord. ..............................................32
Section 26.15 - Exculpation. ..............................................33
Section 26.16 - Transfer of Landlord's Interest. ..............................................33
Section 26.17 - Litigation. ..............................................33
Section 26.18 – Miscellaneous. ..............................................33
Section 26.1 - Joint and Several Liability. ..............................................34

H:\w97\lb\temecula.doc
L-9983

## L E A S E

THIS LEASE MADE AND ENTERED INTO AT Cleveland, Ohio, this _3rd_ day of

_August_ , 2006, by and between TEMECULA TOWNE CENTER ASSOCIATES L.P.,

a California limited partnership, having an address for purposes hereof at Terminal Tower, 50

Public Square, Suite 1360, Cleveland, Ohio 44113-2267 ("Landlord"); and SONG H. KIM and

YOUNG A. KIM, jointly and severally, having an address for purposes hereof at 1204 South

Paloma Street, Los Angeles, CA  90021 ("Tenant").

### WITNESSETH

### ARTICLE I

### INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are an integral part of this Lease, and are referred to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties.  They are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

(a)   Shopping Center:                                              (Article I, Section 1.1 [g])
                       The Promenade in Temecula

(b)   Unit No.:            2610

(c)   Approximate
      Premises GLA:        2,719 square feet.

(d)   Term of Lease:
                           Ten (10) Lease Years commencing on the Rent Commencement
                           Date (as hereinafter defined) and expiring on the Term Expiration
                           Date (as hereinafter defined).

(e)   Rent Commencement
      Date:                The earlier of (i) November 1, 2006 ("Outside Date"); or (ii) the
                           date Tenant opens for business.

(f)   Term Expiration
      Date:                The day prior to the tenth (10th) anniversary of the Rent
                           Commencement Date.  In the event that the Rent Commencement
                           Date should occur on a day other than the first day of a calendar
                           month, the Term Expiration Date shall be deemed to be midnight
                           on the last day of the calendar month in which the Term Expiration
                           Date occurs.

(g)   Fixed Minimum                                                (Article XI, Section 11.1)
      Rent:                (i)   $     31.00 per square foot of Premises GLA,
                                 $84,289.00 per Lease Year,
                                 $ 7,024.08 per month, for Lease Year One;

    (ii)    $    31.62 per square foot of Premises GLA,
$85,974.78 per Lease Year,
$ 7,164.57 per month, for Lease Year Two;

    (iii)    $    32.25 per square foot of Premises GLA,
$87,687.75 per Lease Year,
$ 7,307.31 per month, for Lease Year Three;

    (iv)    $    32.90 per square foot of Premises GLA,
$89,455.10 per Lease Year,
$ 7,454.59 per month, for Lease Year Four;

    (v)    $    33.56 per square foot of Premises GLA,
$91,249.64  per Lease Year,
$ 7,604.14 per month, for Lease Year Five;

    (vi)    $    34.23 per square foot of Premises GLA,
$93,071.37 per Lease Year,
$ 7,755.95 per month, for Lease Year Six;

    (vii)    $    34.91 per square foot of Premises GLA,
$94,920.29 per Lease Year,
$ 7,910.02 per month, for Lease Year Seven;

    (viii)    $    35.61 per square foot of Premises GLA,
$96,823.59 per Lease Year,
$ 8,068.63 per month, for Lease Year Eight;

    (ix)    $    36.32 per square foot of Premises GLA,
$98,754.08 per Lease Year,
$ 8,229.51 per month, for Lease Year Nine; and

    (x)    $    37.05 per square foot of Premises GLA,
$100,738.95 per Lease Year,
$ 8,394.91 per month, for Lease Year Ten;

    (xi)    Fixed Minimum Rent    (Article III, Section 3.3)
Subject to adjustment if Premises GLA is revised:
__X___ yes    _____ no.

(h)    Percentage Rent:    (Article XI, Section 11.2)

    (i)    6% of Gross Revenue in excess of $1,404,816.67
("Annual Breakpoint") for Lease Year One;

    (ii)    6% of Gross Revenue in excess of $1,432,913.00
("Annual Breakpoint") for Lease Year Two;

    (iii)    6% of Gross Revenue in excess of $1,461,462.50
("Annual Breakpoint") for Lease Year Three;

    (iv)    6% of Gross Revenue in excess of $1,490,918.33
("Annual Breakpoint") for Lease Year Four;

    (v)    6% of Gross Revenue in excess of $1,520,827.33
("Annual Breakpoint") for Lease Year Five;

    (vi)    6% of Gross Revenue in excess of $1,551,189.50
("Annual Breakpoint") for Lease Year Six;

    (vii)    6% of Gross Revenue in excess of $1,582,004.83
("Annual Breakpoint") for Lease Year Seven;

    (viii)    6% of Gross Revenue in excess of $1,613,726.50
("Annual Breakpoint") for Lease Year Eight;

    (ix)    6% of Gross Revenue in excess of $1,645,901.33
("Annual Breakpoint") for Lease Year Nine; and

2

        (x)   6% of Gross Revenue in excess of $1,678,982.50
("Annual Breakpoint") for Lease Year Ten.

(i)     Additional Rent:                    (Article XI, Section 11.3)
Additional Rent shall be charged in the initial amount of $15.42 per square foot of Premises GLA which shall be subject to annual compounded increases equal to five percent (5%) of the immediately preceding Lease Year's Additional Rent.

(j)     Real Estate Taxes:              (Article XI, Section 11.4)
Tenant's Proportionate Share; payable monthly on estimated bill.

(k)    Common Area Utility          (Article XI, Section 11.5)
and Insurance Costs: Tenant's Proportionate Share; payable monthly on estimated bill.

(l)     Premises Utilities:              (Article XII, Section 12.1)
Payable by Tenant as billed per metered, submetered or estimated and adjusted billing.

(m)    Trade Name:                   (Article VIII, Section 8.1)
ANGL

(n)     Permitted Use:                  (Article VIII, Section 8.1)
Tenant shall use and occupy the Premises solely for the retail sale of women's apparel and related accessories.

(o)    Tenant's Billing Address:
1204 South Paloma Street
Los Angeles, California 90021

(p)    Tenant's Notice Address:          (Article XXV, Section 25.1)
Same as (o) above.

(q)    Landlord's Notice Address:        (Article XXV, Section 25.1)
Terminal Tower
50 Public Square
Suite 1360
Cleveland, Ohio 44113-2267

(r)     Landlord's Mortgagee's        (Article XXV, Section 25.2)
Notice Address:   CIGNA Corporation
Investment Law Department
900 Cottage Grove Road
Hartford, Connecticut 06152-2215
Attention: Real Estate Division, S-215A

(s)     Address for
Payment of Rents
Including Percentage
Rent:              Forest City Commercial Management, Inc.
Commercial Division
Post Office Box 72069
Cleveland, Ohio 44192-0069

(t)     Address for Percentage Rent
Reports:          Forest City Commercial Management, Inc.
700 Terminal Tower
50 Public Square
Cleveland, Ohio 44113
Attn: Lease Administration Department

or fax to (216) 263-4806

(u)    Guarantor:         None.

(v)    Security Deposit:    None.

(w)    Construction Allowance:                           (Article VI, Section 6.0)
$25.00 per square foot of Premises GLA, payable upon
satisfaction of the conditions set forth in Section 6.0.

Section 1.1 - Defined Terms.

Wherever used in this Lease, the following terms shall be construed to mean as follows:

(a)    "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter may be in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

(b)    "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, servants, customers and invitees.

(c)    "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month.  In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

(d)    "Major Tenants" shall mean those tenants located in the Shopping Center whose floor area exceeds thirty thousand (30,000) square feet ("Major Tenant Threshold"), including, but not limited to, Robinson's May; JC Penney; Sears; and Macy's.

(e)    "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 2610, and further being a space containing approximately 2,719 square feet of floor space.  The Premises are hatched on Exhibit B for the sole purpose of more specifically locating said area.

(f)    "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(g)    "Shopping Center" shall mean those buildings, land (excluding outparcels along the perimeter of the Shopping Center, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "The Promenade in Temecula" located in the City of Temecula, Riverside County, California, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time.  Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

(h)    "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Premises GLA, and the denominator of which is, with respect to all prorated charges (as defined in Article XI), the total number of square feet of actually occupied gross leasable area in the Shopping Center, excluding the number of square feet of all tenant spaces exceeding the Major Tenant Threshold, whether or not occupied, and excluding the square feet of floor area of all tenants whose entrances do not exclusively front on the interior of the enclosed mall.

4

ARTICLE II

EXHIBITS

Section 2.1 - <u>Exhibits</u>.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A - Site Plan of the Shopping Center - attached hereto.

EXHIBIT B - Leasing Plan of the Shopping Center - attached hereto.

EXHIBIT C - Tenant Handbook for Shopping Center - containing sign and design criteria - not attached but incorporated herein by reference.

ARTICLE III

PREMISES

Section 3.1 - <u>Premises</u>.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (e), subject to all conditions and easements of record for the Term of the Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - <u>Gross Leasable Area of the Premises</u>.

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall. Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

Section 3.3 - <u>Revisions to Premises GLA</u>.

The Premises GLA set forth in Section 1.0 (c) has been determined pursuant to the provisions of Section 3.2 by reference to either "CAD" or scaled architectural drawings of the Premises.  Landlord and Tenant acknowledge that, irrespective of whether or not the Premises shall have been constructed as of the date of this Lease, in the event that Landlord's final as-built field or CAD measurements of the Premises after all leasehold improvements have been constructed therein should disclose a different square footage than the Premises GLA set forth in Section 1.0 (c) above ("Final Revised Premises GLA"), then Landlord agrees to notify Tenant in writing of the Final Revised Premises GLA.  Tenant further acknowledges and agrees that such notice by Landlord shall be deemed sufficient to amend the Premises GLA set forth in Section 1.0 (c), such amendment being deemed self-operative without the necessity of further formal mutual acknowledgment or documentation between Landlord and Tenant.  When so finally determined, the Final Revised Premises GLA shall be used as the numerator in computing Tenant's Proportionate Share of all prorated charges and in all computations of Fixed Minimum Rent and Additional Rent since same have been determined on a square foot (as opposed to a fixed rate) basis as set forth in Section 1.0 (g).  If the Fixed Minimum Rent should be revised, Landlord's revised billing to Tenant shall be deemed sufficient notice of such Rent revisions and the Percentage Rent Annual Breakpoints set forth in Section 1.0 (h) herein shall be correspondingly adjusted.

Section 3.4 - <u>Landlord's Reservation</u>.

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements.

Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain, repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

## ARTICLE IV

## COMMON AREAS

Section 4.1 - Tenant's Use of Common Areas.

(a)    Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of this Lease, and any renewal period thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

(b)    Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

(c)    Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - Management and Operation of Common Areas.

Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center. Landlord will have the right (1) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

## ARTICLE V

## CHANGES AND ADDITIONS TO
## SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - Site Plan and Leasing Plan.

The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.

Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. No such changes, rearrangements or other construction shall

6

permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law.

## ARTICLE VI

## IMPROVEMENTS

Section 6.0 - Construction Allowance.

(a)    Landlord shall pay to Tenant, as its total obligation hereunder, the sum of Twenty-Five Dollars ($25.00) per square foot of Premises GLA, which sum represents Landlord's contribution to Tenant's Work (as defined in Section 6.2) (hereinafter "Construction Allowance").  Such Construction Allowance shall be due and payable to Tenant within thirty (30) days after the date that all of the following conditions have been satisfied:

(1)    The Premises have been completed according to plans and specifications previously approved in writing by Landlord, including any punchlist items designated by Landlord; and

(2)    Tenant has opened the Premises for business in accordance with the terms of this Lease; and

(3)    Tenant has furnished Landlord with an affidavit from Tenant's General Contractor listing all subcontractors, materialmen and/or laborers (hereinafter collectively "Subcontractors") involved in Tenant's Work, and final, unconditional lien waivers from Tenant's General Contractor and all Subcontractors evidencing that the General Contractor and all Subcontractors have been paid in full for all work, material and labor furnished in connection with Tenant's Work at the Premises.

(b)    In the event that there are claims or Rents unpaid, work unfinished, or liens filed for such work and labor that have not been bonded or otherwise secured, Landlord may retain from Tenant's Construction Allowance a sum sufficient to pay for said claims, Rents, work or liens and all costs resulting therefrom and to pay for said claims, Rents, work or liens, if necessary.  If the amount owed to Tenant by Landlord shall not be sufficient to pay for said claims, Rents, work or liens and the costs resulting therefrom, Tenant shall forthwith pay for said claims, Rents, work or liens and the costs resulting therefrom, or if such be the case, cause such claims or liens to be properly discharged as herein provided.

(c)    Tenant shall have the right at all times, and at its own expense, to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of such lien(s) upon giving adequate security to Landlord for payment of said lien(s).

(d)    Notwithstanding anything contained herein, the amount of Tenant's Construction Allowance shall not exceed the documented costs of Tenant's Work.

Upon satisfaction of the above conditions, Tenant shall request payment of the Construction Allowance in writing to Landlord at Forest City Commercial Management, Inc., Terminal Tower, 50 Public Square, Suite 700, Cleveland, Ohio 44113-2267, Attention: Denise Hall, and simultaneously therewith, shall provide Landlord with a W9 form for processing payment of the Construction Allowance.

Section 6.1 - Landlord's Responsibilities.

Tenant acknowledges that it is accepting the Premises in its present "as-is" condition.

Section 6.2 - Tenant's Responsibilities.

On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with Exhibit C:

(a)    Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work.

(b)    Construct the leasehold improvements as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein ("Tenant's Work").  Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to

7

commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(c)     Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)     If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives.

(e)     Tenant shall reimburse Landlord for the cost of any temporary utilities and dumpster usage which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor.

(f)     In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.3 - Tenant's Trade Fixtures.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State (or Commonwealth) in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Section 6.4 - Labor Cooperation.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center. In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

ARTICLE VII

PLANS AND SPECIFICATIONS

Section 7.1 - Submission of Plans and Specifications .

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C, complete plans and specifications for all of Tenant's work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in Exhibit C. Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the Rent Commencement Date. No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written consent. Landlord's written approval of any plans and specifications for Tenant's work shall, however, create no

8

responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.

ARTICLE VIII

USE

Section 8.1 - Operation and Use of Premises.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I and for no other business or purpose. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

Section 8.2 - Tenant's Covenant to Operate.

Tenant agrees to complete Tenant's work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of this Lease to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, Mondays through Saturdays from 10:00 A.M. to 9:00 P.M. and on Sundays from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by Landlord for the operation of the Shopping Center. Notwithstanding the foregoing, Tenant shall have the right to cease to operate its business in the Premises as specifically set forth below.

Notwithstanding the foregoing, it is acknowledged and agreed between Landlord and Tenant that commencing on the second (2nd) day of the Term of this Lease and continuing for the remainder of the Term and any renewals thereafter, Tenant shall have the right to cease operating in the Premises; provided, however, that Tenant gives Landlord's Shopping Center manager at least ten (10) days prior written notice of its intent to cease operating in the Premises, and further provided, that Tenant continues to pay all Rents due under the Lease each month as they would normally come due. Should Tenant cease operating in the Premises for a period in excess of thirty (30) days, Landlord may terminate this Lease upon written notice to Tenant. Notwithstanding anything contained herein to the contrary, the provisions of this paragraph shall be deemed null and void if on the Rent Commencement Date, Tenant does not open for business in the Premises fully fixtured, stocked and staffed and remain open for business for at least one (1) full business day.

Section 8.3 - Prohibitions on Use.

(a) Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b)    Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.

(c)    Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

9

Section 8.4 - <u>Manner of Operation of Business</u>.

(a)   Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade.  Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to insure a maximum volume of business in and from the Premises.

(b)   Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)   For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws.  The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees.  This obligation shall survive the expiration or earlier termination of this Lease.  If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of this Lease as a result of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center.  Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(d)   Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Lease.  If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense.  Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

(e)   In the event Landlord should elect to establish open or closed internet site(s) with respect to the Shopping Center, Tenant agrees to participate in such site(s) and to cooperate with Landlord in making Tenant's website usable by, and accessible to, Shopping Center patrons and customers.

10

## ARTICLE IX

## TERM

Section 9.1 - Commencement Date Agreement.

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

Section 9.2 - Holding Over.

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party. Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant immediately prior to expiration of the Term, plus all other charges due under the Lease. Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period. Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

Section 9.3 - Expiration of the Term of the Lease.

(a)    This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)    For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)    Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of this Lease, except for ordinary wear and tear and casualty loss.

## ARTICLE X

## RENT COMMENCEMENT DATE

Section 10.1 - Rent Commencement Date.

As used in this Lease, the term "Rent Commencement Date" shall be as defined in Article I. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

Section 10.2 - Delay or Failure to Deliver Premises to Tenant.

Landlord shall give Tenant written notice of the date on which Landlord anticipates delivering possession of the Premises to Tenant. If Landlord shall be unable to deliver possession of the Premises to Tenant on the date specified in said notice for any cause within Landlord's or outside Tenant's control, including, but not limited to, delay in commencing or completing Landlord's work, if any, or the holding over of any tenant(s), or the total failure of Landlord to deliver the Premises, then in any of such events, Rents shall not commence until the earlier to occur of (i) the date Tenant opens for business; or (ii) ninety (90) days following the date that possession of the Premises is delivered to Tenant for the commencement of its leasehold improvement work. Tenant agrees to accept such abatement of Rents as liquidated damages in full satisfaction for the failure of Landlord to deliver possession of the Premises as

11

set forth above or complete failure of delivery of possession to the exclusion of all rights and claims for damages which Tenant otherwise may have suffered as a result of Landlord's delayed or complete failure to deliver possession of the Premises to Tenant.

Section 10.3 - <u>Tenant's Failure to be Open by the Outside Date</u>.

<div align="center">INTENTIONALLY OMITTED.</div>

<div align="center">ARTICLE XI</div>

<div align="center">RENT</div>

Section 11.1 - <u>Fixed Minimum Rent</u>.

(a)     Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, the Fixed Minimum Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month. Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)     Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

(c)     If at any time during the Term of this Lease, a Major Tenant department store operating under the name of *Nordstrom* is added  as part of the Shopping Center, in addition to those named Major Tenant department stores listed in Section 1.1 (d) herein, Tenant acknowledges and agrees that the Fixed Minimum Rent then payable by Tenant shall be automatically increased by a one-time increase  equal to One Dollar ($1.00) per square foot of Premises GLA, commencing on the date when each such Major Tenant department store first opens for business in the Shopping Center, with a proportionate increase in Tenant's Annual Breakpoint for Percentage Rent purposes.

Section 11.2 – <u>Gross Revenue Reporting</u>.

(a)     <u>Amount</u>.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint set forth in Article I.

(b)     <u>Payment</u>.

(i)     The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)     Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)     Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

<div align="center">12</div>

(c) Gross Revenue.

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant. The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received. Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter. Any deposit not refunded shall be included in Gross Revenue.

(d) Exclusions from Gross Revenue.

Notwithstanding the foregoing, "Gross Revenue" shall not include:

(i)    Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue.

(ii)    The amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)    The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)    Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)    Revenue from the sale of trade fixtures after use in the Premises.

(vi)    Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)    Revenue from vending machines for Tenant's employees use only.

(e) Reporting.

(i)    On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second (2nd) month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)    On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)    For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied. Should Tenant elect (i) above, Tenant agrees that

13

the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register. If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)    If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following:  (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver.  The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)    All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)    Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(f)    Books and Records.

(i)    Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied.  Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue.  Landlord shall also have the right to request such other records and/or accounts which Landlord may deem necessary to accurately determine Gross Revenue.  All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)    If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records.  If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove.  Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

(iii)    In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand.  If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

Section 11.3 - <u>Additional Rent</u>.

(a)    Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center. Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine. Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term hereof in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the applicable Lease Year. The amount due for any partial Lease Year shall be prorated accordingly.

(b)    Should any governmental authority having jurisdiction over the Shopping Center enact or impose any future law, ordinance, regulation or requirement ("Future Law") upon Landlord, the direct effect of which is to increase Landlord's cost of operating, maintaining and managing the Shopping Center ("Operating Costs"), as compared with Landlord's Operating Costs incurred for the calendar year immediately preceding the enactment of such Future Law by more than the annual percentage increase in the Additional Rent set forth in Article I, then in such event, Landlord shall notify Tenant in writing of such increase ("Extraordinary Increase") and shall furnish Tenant with reasonably suitable documentary evidence of such Extraordinary Increase and whether or not it is one-time or ongoing. If the Future Law should result in a one-time Extraordinary Increase, Tenant's Proportionate Share of the Extraordinary Increase shall be divided into twelve (12) equal monthly increments, which shall be added to Landlord's monthly charge to Tenant for reimbursement to Landlord over the next twelve (12) month period. However, if the Future Law should result in an ongoing Extraordinary Increase over the remaining balance of the Term, Tenant's Proportionate Share of such Extraordinary Increase shall be added to Tenant's Additional Rent and all subsequent annual compounded increases shall be applied to the increased Additional Rent amount.

Section 11.4 - <u>Real Estate Taxes</u>.

(a)    (i)    For purposes of this Lease, the term "Real Estate Taxes" shall mean all ad valorem taxes, assessments, charges, levies, fees and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature whatsoever, including, but not limited to, assessments for off-site public improvements for the benefit of the Shopping Center which shall be laid, assessed, levied, or imposed upon the Shopping Center or any part thereof and which are payable at any time during the Term hereof, and further, Real Estate Taxes shall include Landlord's reasonable administrative costs as well as any and all costs, including reasonable attorney fees, incurred by Landlord in contesting or negotiating Real Estate Taxes with any governmental authority. Real Estate Taxes shall not include franchise, estate, inheritance, sales, use, succession, capital levy, transfer, net income or excess profits taxes imposed upon Landlord. In addition, the term Real Estate Taxes shall mean (if applicable) all payments made by Landlord in lieu of real property taxes pursuant to tax increment financing provided to Landlord by any public agency or authority. Landlord represents and warrants to Tenant that Tenant's Proportionate Share of Real Estate Taxes shall not exceed the amount of Real Estate Taxes that Tenant would otherwise have paid hereunder if Landlord had not received such tax increment financing.

(ii)    Landlord and Tenant recognize and acknowledge that there may be changes in the current real property tax system and that there may be imposed new forms of taxes, assessments, charges, levies or fees, or there may be an increase in certain existing taxes, assessments, charges, levies or fees placed on, or levied in connection with, the ownership, leasing, occupancy or operation of the Shopping Center or the Premises, all of which shall be included within the definition of Real Estate Taxes. For purposes of funding special assessment districts of the type funded by real property taxes, such funding shall also be included within the meaning of Real Estate Taxes. With respect to any general or special assessments which may be levied against or upon the Premises or the Shopping Center and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in periodic installments, there shall be included within the meaning of Real Estate Taxes with respect to any tax fiscal year, only the amount currently payable on such bond for such tax fiscal year, or the periodic installment for such tax fiscal year.

In addition to Real Estate Taxes, should any governmental taxing authority acting under any present or future law, ordinance, or regulation, levy, assess, or impose any business, occupancy, privilege or excise tax or any tax and/or assessments imposed upon the Rents payable by Tenant to Landlord (other than an income or franchise tax upon Landlord's net income), either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, Tenant shall be responsible for and shall pay such taxes and/or assessments directly to the appropriate taxing authority, or Tenant shall reimburse

15

Landlord for the amount thereof, as the case may be, upon receipt of an invoice therefor from Landlord.

(b)    The Premises, its leasehold improvements and the underlying realty will not be separately assessed for tax purposes but instead will be assessed as part of a larger parcel or parcels of land and improvements comprising the Shopping Center. Accordingly, Tenant agrees to pay its Proportionate Share (as defined in Section 1.1 [h]) of said Real Estate Taxes, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of said Real Estate Taxes as estimated by Landlord for the applicable fiscal year. Tenant's Proportionate Share hereunder for any partial fiscal year shall be prorated on a per diem basis.

To the extent that the Shopping Center consists of more than one tax parcel, including, but not limited to, separate tax parcels for one or more of the Major Tenants, the following shall apply:

(x)    Landlord shall have the right and option to compute Tenant's Proportionate Share of Real Estate Taxes based on the building area of the particular tax parcel on which the Premises is located.

(y)    In the event that a separate bill for Real Estate Taxes is rendered by the taxing authority with respect to the building, land and improvements owned or leased by a Major Tenant, then Real Estate Taxes shall be deemed to exclude taxes and assessments attributable to such Major Tenant and the floor area of such Major Tenant shall be correspondingly excluded from the denominator of Tenant's Proportionate Share.

(z)    In the event that any Major Tenant's building, land and improvements are separately assessed for purposes of Real Estate Taxes but no separate tax bill is rendered with respect to such Major Tenant, or in the event that any Major Tenant's building, land and improvements are not separately assessed for purposes of Real Estate Taxes but are included as part of other building, land and improvements in the Shopping Center, then to the extent, if any, that any such Major Tenant contribute(s) towards Real Estate Taxes attributable to the Shopping Center, Real Estate Taxes shall be reduced by the amount of any such Major Tenant's contribution(s) and the floor area of any such contributing Major Tenant shall be excluded from the denominator of Tenant's Proportionate Share.

(c)    Within one hundred twenty (120) days following the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Real Estate Taxes applicable to the Shopping Center and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such fiscal year, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

Section 11.5 - Utility and Insurance Costs.

(a)    Tenant shall pay to Landlord its Proportionate Share (as defined in Section 1.1 [h]) of the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning. Tenant shall also pay to Landlord its Proportionate Share of the costs of customary types of insurance coverage carried with respect to the Shopping Center, including, but not limited to, commercial general liability insurance, rent insurance and property insurance in commercially reasonable amounts as Landlord deems necessary (such utility costs and insurance costs are collectively "Utility and Insurance Costs").

(b)    Tenant's Proportionate Share of Utility and Insurance Costs shall be paid by Tenant, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of Utility and Insurance Costs as estimated by Landlord for each fiscal

year.  Tenant's Proportionate Share of Utility and Insurance Costs hereunder for any partial fiscal year shall be prorated on a per diem basis.

(c)     Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Utility and Insurance Costs and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year.  If the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord.  If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted.  Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant o f its obligations hereunder.  The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

<center>ARTICLE XII</center>

<center>PREMISES UTILITY SERVICES</center>

Section 12.1 - <u>Utility Service Charges</u>.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)     <u>Water and Sewer Services</u>.  Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in Exhibit C.  Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date, as herein defined. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on submetered readings, adjusted quarterly.  Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)     <u>Telephone Service</u>.  Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises.  Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)     <u>Gas Service</u>.  To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto.  Tenant shall pay all charges therefor directly to the providing utility.

(d)     <u>Electricity Service</u>.  Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP").  Tenant shall arrange with such ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP.  In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the date of Tenant's execution of this Lease, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent:

<center>17</center>

       (i)     Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials;

       (ii)    Prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damage;

       (iii)   Prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center;

       (iv)   Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers;

       (v)    ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord;

       (vi)   ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur;

       (vii)   ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and

       (viii)   ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

    (e)     Heating, Ventilating and Air-Conditioning ("HVAC").

       Tenant is to provide its own equipment and facilities for heating, ventilating and air-conditioning the Premises ("Premises HVAC System") described in Exhibit C.   Tenant shall operate and maintain same during the Term of this Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.

Section 12.2 - Discontinuance of Service.

       Landlord reserves the right, with thirty (30) days prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same remain unpaid by Tenant.  Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment. If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

Section 12.3 - Interruption of Service.

       Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease.

Section 12.4 - Premises Sprinkler System.

In the event applicable codes require fire sprinkler protection, Landlord shall provide a sprinkler connection for the Premises to Landlord's bulk main designated in Landlord's drawings. Tenant shall design and install all extensions and facilities to and within the Premises from Landlord's connection.

If, at any time during the Term of this Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection for the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises, the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association ("NFPA") No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

<div align="center">ARTICLE XIII</div>

<div align="center">SIGNS</div>

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair. Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises. All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity. Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises.

<div align="center">ARTICLE XIV</div>

<div align="center">REPAIRS AND ALTERATIONS</div>

Section 14.1 - Repairs by Landlord.

(a)    Landlord shall keep the roof, structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease, subject to the provisions of Section 11.3 herein; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs.

(b)    As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to comply with Applicable Laws. It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.

<div align="center">19</div>

(c)      Landlord shall not in any way be liable to Tenant for failure to make repairs as
herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in
writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a
reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has
not thereafter diligently pursued said repairs to completion.

Section 14.2 - Repairs By Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its
storefront(s) and the interior of the Premises in good condition and repair at all times.  All repairs
to the Premises, equipment or facilities therein or thereabout, other than those repairs required
to be made by Landlord pursuant to Section 14.1, shall be made by Tenant.  Said repairs shall
include, but not be limited to, all necessary painting and decorating, maintenance, repair and/or
replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning
systems above and under the slab and elsewhere which exclusively serve the Premises, and
any other mechanical and operational installations exclusively serving the Premises.  All such
repairs and replacements shall be made in a prompt manner so as to avoid creating additional
damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or
replace all glass contained in the Premises, including, but not limited to, all glass in doors,
storefronts, windows and entrance and service doors.

Section 14.3 - Alterations and Remodeling.

(a)      Tenant, at its own expense, shall have the right to make such interior alterations,
changes and improvements to the Premises as Tenant may deem reasonably necessary for its
use of the Premises; provided, however, that any major remodeling of the interior of the
Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material
or structural alterations to the Premises or changes in the electrical, heating, plumbing or
ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made
without Landlord's prior written consent.  Landlord's approval of Tenant's alterations shall,
however, create no responsibility or liability on the part of Landlord for their completeness,
design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have
such plans and specifications prepared in accordance with Applicable Laws.  All such
alterations, changes and improvements shall be made in accordance with the provisions of
Exhibit C and shall become the property of Landlord upon installation and shall remain upon
and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)      Tenant further agrees not to make any alterations, additions or changes to any
storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or
increase the size of same if existing unless and until the prior written consent of Landlord shall
first have been obtained.  In no event shall Tenant make or cause to be made any penetration
through the roof or floor slab of the Premises without the prior written consent of Landlord.
Tenant shall be directly responsible for any and all damages resulting from any violation of the
provisions of this Section 14.3.


ARTICLE XV

LIENS

Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting
the consent or request of Landlord, express or implied, by inference or otherwise, to any
contractor, subcontractor, laborer or materialman for the specific performance of any labor or
the furnishing of any materials or equipment for any specific improvement, alteration to or repair
of the Premises or any part thereof, nor as giving Tenant any right, power or authority to
contract for or permit the rendering of any services or the furnishing of any materials on behalf
of Landlord that would give rise to the filing of any lien against the Premises or the Shopping
Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a
result of work performed at the request or on behalf of Tenant.  Tenant shall indemnify and save
harmless Landlord against all loss, liability, costs, attorney fees, damages and interest charges
incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center,

20

the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord. Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

## ARTICLE XVI

## INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)    Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)    Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damages, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming both Tenant and Landlord as insureds, in the following amounts:

(a)    Commercial General Liability Insurance.    Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors coverage, in an amount not less than Three Million Dollars ($3,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(b)    Worker's Compensation Insurance.    Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

(c)    Personal Property, Alterations, Improvements and Betterments.    Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease. Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed. If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs. If the insurance proceeds described above

are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds. However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments. This paragraph is only applicable if the Lease is not terminated pursuant to Article XXI hereof.

(d) <u>Additional Hazards</u>. Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form insurance coverage. In addition, Tenant shall use best efforts not to keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage. In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of this Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center. Said additional premiums shall be payable by Tenant to Landlord within ten (10) days following written notice from Landlord.

(e) <u>Blanket Policies</u>. Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies.

(f) <u>Certificate(s) of Insurance</u>. Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter. The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report. All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage. Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

(g) <u>Notice of Loss</u>. Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

Section 16.3 - <u>Waiver of Subrogation</u>.

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

Section 16.4 - <u>Landlord Not Responsible for Acts of Others</u>.

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC. None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease.

## ARTICLE XVII

## GENERAL PROVISIONS

Section 17.1 - Rules and Regulations.

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center. Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease.

Section 17.2 - Rubbish.

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord. Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord. In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager. If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

Section 17.3 - Lighting.

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

Section 17.4 - Merchandise Display, Loading and Unloading.

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

Section 17.5 - Obstruction of Passageways.

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

Section 17.6 - Employee Parking.

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord. Tenant shall furnish Landlord with state automobile license numbers assigned to vehicles used by Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees shall fail to park their vehicles in such designated parking areas, then, without limiting any other remedy which Landlord may pursue in the event of Tenant's Default hereunder, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as a part of Rents, the sum of Ten Dollars ($10.00) per day for each vehicle parked in violation of the provisions of this Section 17.6. Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.

## ARTICLE XVIII

## SUBORDINATION AND ATTORNMENT BY TENANT

Section 18.1 - Subordination of Lease.

This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such

23

Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance"). Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises. Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required. However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form. Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

Section 18.2 - Attornment by Tenant.

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease. Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on demand shall constitute a Default by Tenant under the terms of this Lease. In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

Section 18.3 - Landlord as Attorney-in-Fact for Tenant.

If Tenant, within twenty (20) days after submission of any instrument, fails to execute same, Landlord is hereby authorized to execute same as attorney-in-fact for Tenant.


ARTICLE XIX

RIGHTS OF LANDLORD

Section 19.1 - Landlord's Right to Repair.

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

Section 19.2 - Landlord's Right to Affix to Exterior.

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant.

Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

24

ARTICLE XX

ASSIGNMENT AND SUBLETTING

Section 20.1 - Landlord's Consent Required.

(a)    Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name.  In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

(b)    Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)    Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

Section 20.2 - Insolvency Proceedings.

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

Section 20.3 - Transfer of Corporate Shares.

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease.

Section 20.4 - Assignment to Related Entity.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation.  Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - Transfer of Other Business Interests.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any

25

other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - No Release of Liability.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

Section 20.8 - Administrative Fee.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) or such other amount as Landlord shall reasonably determine to be reasonably appropriate in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not said proposed assignment or subletting actually occurs.

ARTICLE XXI

DAMAGE OR DESTRUCTION

Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)     If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated. If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)     If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c)     If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work. Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)     Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

26

Section 21.2 - <u>Landlord's Option to Terminate</u>.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof.  In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event.  If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore.

Section 21.3 - <u>Demolition of Landlord's Building</u>.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

<div align="center">

ARTICLE XXII

CONDEMNATION

</div>

Section 22.1 - <u>Effect of Taking</u>.

(a)    In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)    In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)    For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)    If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - <u>Compensation and Awards</u>.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord.  Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate.  Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment.  Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - <u>Condemnation or Breach of Lease</u>.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

<div align="center">27</div>

ARTICLE XXIII

DEFAULT

Section 23.1 - Default.

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)    Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)    If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)    Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)    Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)    Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)    If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)    Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)    With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - Remedies and Damages.

(a)    If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)    Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

(ii)    Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; or

(iii)    If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)    Terminate this Lease by written notice to Tenant.

28

(b)    Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part.  However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)    In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)    In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)    In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable attorney fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant and/or occupants of the Shopping Center or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1 above, Landlord and Tenant each covenants and agrees that in the event that Tenant (i) fails to take possession of, construct and thereafter open the Premises for business, fully fixtured, stocked and staffed on the Rent Commencement Date; or (ii) vacates or abandons the Premises; or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.1 hereof, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to three fourths (3/4ths) of the Rents reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat such action or omission by Tenant as a Default under the Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity.

Section 23.4 - Repeated Default.

(a)    Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)    In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

29

Section 23.5 - <u>Waiver of Rights of Redemption</u>.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

<div align="center">

ARTICLE XXIV

COMPETITION

</div>

Section 24.1 - <u>Restriction on Tenant</u>.

Tenant agrees that for as long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate, manage, or have any interest in any business which is similar or in competition with the permitted use of the Premises set forth in Article I ("Competing Store") within a radius of five (5) miles of the perimeter of the Shopping Center ("Restricted Area").

Section 24.2 - <u>Imposition of Damages</u>.

In the event that Tenant shall violate the provisions of Section 24.1 above, Landlord may, at its option, and without limiting Landlord's remedies, effective as of the date such Competing Store opens for business within the Restricted Area: (i) include seventy-five percent (75%) of the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder; or (ii) increase the Fixed Minimum Rent to the average of the annual "effective rent" (i.e., the aggregate of Fixed Minimum and Percentage Rent) payable by Tenant to Landlord during the immediately preceding two (2) Lease Years; or (iii) increase Tenant's Fixed Minimum Rent then in effect, and any future increases thereto, by fifty percent (50%).

<div align="center">

ARTICLE XXV

NOTICES

</div>

Section 25.1 - <u>Notices to Tenant and Landlord</u>.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter.  Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers.  Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

Section 25.2 - <u>Notices to Mortgagee</u>.

Tenant shall give written notice to Landlord's mortgagee, at Landlord's mortgagee's notice address set forth in Article I, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord.  Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default. Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

<div align="center">

ARTICLE XXVI

MISCELLANEOUS

</div>

Section 26.1 - <u>Accord and Satisfaction</u>.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents

<div align="center">30</div>

be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties. This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

Section 26.3 - Consents.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

Section 26.4 - Brokerage.

Landlord and Tenant acknowledge that James Kim of American Realty ("Acknowledged Broker") may be entitled to a fee for broker's services rendered in bringing together the parties to this Lease. Landlord shall be responsible for paying the reasonable fee determined to be due and owing the Acknowledged Broker as a result of this transaction. Tenant warrants that it has had no dealings with any broker or agent in connection with the Lease, other than the Acknowledged Broker. In the event Tenant has had any other dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - Effective Date of Lease.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

Section 26.6 - Estoppel Certificates.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgage or assignee of any mortgage on the fee of the Premises.

Section 26.7 - Force Majeure.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

31

Section 26.8 - Interpretation.

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

Section 26.9 - Memorandum of Lease.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

Section 26.10 - Quiet Enjoyment.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - Rent Demand.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - Section and Title Headings.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - No Waiver by Landlord.

(a)     Landlord shall have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord in refraining from so doing at any time(s). No failure by Landlord to insist upon the strict performance of any term or condition of this Lease, and no failure by Landlord to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver of any such breach, term, condition or right.

(b)     No term or condition of this Lease required to be performed by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord.

(c)     A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon the execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center. If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

Section 26.17 - Litigation.

(a)    Any claim, demand, right or defense of any kind by Tenant which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless Tenant seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of such occurrence of the billing, event or action upon which the adjustment, claim, demand, right or defense relates, whichever applies.

(b)    To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)    If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)    Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

Section 26.18 - Miscellaneous.

Tenant hereby represents, covenants and warrants to Landlord that: (i) Tenant (which, for the purpose of this certification, includes its partners, members, principal shareholders, except for those who are members of the public who hold Tenant's stock), to the best of its knowledge, is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including Executive Order No. 13224 – Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOTACT) of 2001 (Public Law 107 56) (the "USA Patriot Act"), enacted October 26, 2001, as amended, and Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction pursuant to the Executive Order, the Patriot Act or any other law, order, rule, or regulation; (ii) Tenant is currently in compliance with and will at all times during the Term of this Lease (including any extension thereof) remain in compliance with the Executive Order, the USA Patriot Act and regulations of the Office of Foreign Assets Control of the United States Department of the

Treasury, and any statute, executive order and other governmental action relating thereto; and (iii) Tenant is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

Section 26.19 - Joint and Several Liability.

Since two (2) individuals are signing this Lease as Tenant, the liability of each such individual to pay Rents and to perform all other obligations hereunder shall be deemed to be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

Signed in the presence of:

**LANDLORD:**

TEMECULA TOWNE CENTER
ASSOCIATES L.P., a California limited
partnership

By: F.C. Temecula, Inc., General Partner

By: _____
    Duane F. Bishop, Jr., Vice President

**TENANT:**

_____
SONG H. KIM
Social Security #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

_____
YOUNG A. KIM
Social Security #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

STATE OF OHIO         )
                      )   SS:
COUNTY OF CUYAHOA     )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named TEMECULA TOWNE CENTER ASSOCIATES L.P., a California limited partnership, by F.C. Temecula, Inc., General Partner, by Duane F. Bishop, Jr., its Vice President, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 3rd day of _____August_____, 2006.

_____
Notary Public

ELLA MARIE PUGACZ, Notary Public
STATE OF OHIO
My Commission Expires April 3, 2011
(Recorded in Cuyahoga County)

34

STATE OF _____ )
                                 )    SS:
COUNTY OF _____ )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named SONG H. KIM and YOUNG A. KIM, husband and wife, who acknowledged that they did sign the foregoing instrument and that the same is their free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _____ day of _____, 2006.


_____
Notary Public




This Instrument Prepared By:
Deborah J. Metzger
Terminal Tower
50 Public Square, Suite 1360
Cleveland, Ohio 44113-2267
(216) 621-6060


35

PROMENADE IN TEMECULA
SITE PLAN



# THE PROMENADE MALL

## TEMECULA, CALIFORNIA

## FOREST CITY TENANT COORDINATION/CONSTRUCTION

945 TERMINAL TOWER CLEVELAND, OHIO 44113

PM_SITE
PAGE 1 OF 1

# EXHIBIT B



EXHIBIT C

TENANT HANDBOOK

[TO BE FORWARDED UNDER SEPARATE COVER]

# Simi Valley Town Center (#12)

*Original #12*

L-9822
H:\w97\djm\L9822lse.doc
DJM:ds
11/22/05
Revised 1/10/06

## SIMI VALLEY TOWN CENTER

Simi Valley, California

## LANDLORD

===================================================================

### SIMI VALLEY MALL, LLC
a California limited liability company

## TENANT

===================================================================

### SONG H. KIM and YOUNG A. KIM,
jointly and severally
d/b/a
ANGL

Unit No. 135

## TABLE OF CONTENTS

Section 1.0 – Basic Lease Provisions. ...........................1
Section 1.1 – Defined Terms. ...................................4
Section 2.1 – Exhibits. .......................................4
Section 3.1 – Premises .......................................5
Section 3.2 – Gross Leasable Area of the Premises .............5
Section 3.3 – Revisions to Premises GLA. ......................5
Section 3.4 – Landlord's Reservation. .........................5
Section 4.1 – Tenant's Use of Common Areas. ...................5
Section 4.2 – Management and Operation of Common Areas. ........6
Section 5.1 – Site Plan and Leasing Plan. .....................6
Section 5.2 – Changes to Shopping Center Site Plan and Leasing
Plan. ........................................................6
Section 6.0 – Construction Allowance. .........................6
Section 6.1 – Landlord's Responsibilities. ....................7
Section 6.2 – Tenant's Responsibilities. ......................7
Section 6.3 – Tenant's Trade Fixtures .........................8
Section 6.4 – Labor Cooperation. ..............................8
Section 7.1 – Submission of Plans and Specifications. ..........8
Section 8.1 – Operation and Use of Premises. ..................9
Section 8.2 – Tenant's Covenant to Operate. ...................9
Section 8.3 – Prohibitions on Use. ............................9
Section 8.4 – Manner of Operation of Business. ................9
Section 9.1 – Commencement Date Agreement. ...................10
Section 9.2 – Holding Over. ..................................10
Section 9.3 – Expiration of the Term of the Lease. ...........11
Section 10.1 – Rent Commencement Date. .......................11
Section 10.2 – Delay or Failure to Deliver Premises to Tenant. 11
Section 10.3 – Tenant's Failure to be Open by the Outside Date 11
Section 11.1 – Fixed Minimum Rent. ...........................12
Section 11.2 – Percentage Rent. ..............................12
Section 11.3 – Additional Rent. ..............................14
Section 11.4 – Real Estate Taxes. ............................15
Section 11.5 – Utility and Insurance Costs. ..................16
Section 12.1 – Utility Service Charges. ......................17
Section 12.2– Discontinuance of Service. .....................18
Section 12.3– Interruption of Service. .......................18
Section 12.4– Premises Sprinkler System. .....................18
Section 13.1 – Storefront Sign. ..............................19
Section 13.2 – Interior Signs and Advertising. ...............19
Section 14.1 – Repairs by Landlord. ..........................19
Section 14.2 – Repairs By Tenant. ............................19
Section 14.3 – Alterations and Remodeling. ...................20
Section 15.1 – Lien Indemnification by Tenant. ...............20
Section 16.1 – Indemnification. ..............................21
Section 16.2 – Tenant's Insurance Requirements. ..............21
Section 16.3 – Waiver of Subrogation. ........................22
Section 16.4 – Landlord Not Responsible for Acts of Others. ...22
Section 17.1 – Rules and Regulations. ........................22
Section 17.2 – Rubbish. ......................................23
Section 17.3 – Lighting. .....................................23
Section 17.4 – Merchandise Display, Loading and Unloading.. ...23
Section 17.5 – Obstruction of Passageways. ...................23
Section 17.6 – Employee Parking. .............................23
Section 18.1 – Subordination of Lease. .......................23
Section 18.2 – Attornment by Tenant. .........................24
Section 18.3 – Landlord as Attorney-in-Fact for Tenant. .......24
Section 19.1 – Landlord's Right to Repair. ...................24
Section 19.2 – Landlord's Right to Affix to Exterior ..........24
Section 19.3 – Landlord's Right to Make Payments on Behalf of
Tenant. .....................................................24

Section 20.1 – Landlord's Consent Required. ...................24
Section 20.2 – Insolvency Proceedings. .........................25
Section 20.3 – Transfer of Corporate Shares. ..................25
Section 20.4 – Assignment to Related Entity. ..................25
Section 20.5 – Transfer of Other Business Interests. ..........25
Section 20.6 – Acceptance of Rents by Landlord. ...............25
Section 20.7 – No Release of Liability. .......................25
Section 20.8 – Administrative Fee. ............................26
Section 21.1 – Landlord's Obligation to Repair and Reconstruct.
.............................................................26
Section 21.2 – Landlord's Option to Terminate. ................26
Section 21.3 – Demolition of Landlord's Building. .............27
Section 22.1 – Effect of Taking. ..............................27
Section 22.2 – Compensation and Awards. .......................27
Section 22.3 – Condemnation or Breach of Lease. ...............27
Section 23.1 – Default. .......................................27
Section 23.2 – Remedies and Damages. ..........................28
Section 23.3 – Remedy for Failure to Open or Operate.' ........29
Section 23.4 – Repeated Default. ..............................29
Section 23.5 – Waiver of Rights of Redemption. ................29
Section 24.1 – Restriction on Tenant. .........................29
Section 24.2 – Imposition of Damages. .........................30
Section 25.1 – Notices to Tenant and Landlord. ................30
Section 25.2 – Notices to Mortgagee. ..........................30
Section 26.1 – Accord and Satisfaction. .......................30
Section 26.2 – Complete Agreement. ............................30
Section 26.3 – Consents. ......................................31
Section 26.4 – Brokerage. .....................................31
Section 26.5 – Effective Date of Lease. .......................31
Section 26.6 – Estoppel Certificates. .........................31
Section 26.7 – Force Majeure. .................................31
Section 26.8 – Interpretation. ................................31
Section 26.9 – Memorandum of Lease. ...........................31
Section 26.10 – Quiet Enjoyment. ..............................32
Section 26.11 – Rent Demand. ..................................32
Section 26.12 – Section and Title Headings. ...................32
Section 26.13 – Successors and Assigns. .......................32
Section 26.14 – No Waiver by Landlord. ........................32
Section 26.15 – Exculpation. ..................................32
Section 26.16 – Transfer of Landlord's Interest. ..............32
Section 26.17 – Litigation. ...................................33
Section 26.18 – Joint and Several Liability. ..................33

H:\w97\lb\simi valley.doc
L-9822

# L E A S E

THIS LEASE MADE AND ENTERED INTO AT Cleveland, Ohio, this _2 nd_ day of

_March_ , 2006, by and between SIMI VALLEY MALL, LLC, a California limited liability

company, having an address for purposes hereof at Terminal Tower, 50 Public Square, Suite

1360, Cleveland, Ohio 44113-2267 ("Landlord"); and SONG H. KIM and YOUNG A. KIM, jointly

and severally, having an address for purposes hereof at 23307 Bocana Street, Santa Monica,

California 90265 ("Tenant").

## WITNESSETH

## ARTICLE I

## INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are an integral part of this Lease, and are referred 'to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties. They are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

| | | | |
|---|---|---|---|
| (a) | Shopping Center: | Simi Valley Town Center | (Article I, Section 1.1 [g]) |
| (b) | Unit No.: | 135 | |
| (c) | Approximate Premises GLA: | 3,029 square feet (however, all Rents payable by Tenant hereunder shall be calculated based on 2,871 square feet of Premises GLA). | |
| (d) | Term of Lease: | Ten (10) Lease Years commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined). | |
| (e) | Rent Commencement Date: | ~~June 30~~ The earlier of (i) ~~May~~ 1, 2006 ("Outside Date"); or (ii) the date Tenant opens for business. | |
| (f) | Term Expiration Date: | The day prior to the tenth (10th) anniversary of the Rent Commencement Date. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs. | |

(g)  Fixed Minimum Rent:                                    (Article XI, Section 11.1)

    (i)  $103,356.00 per Lease Year,
        $ 8,613.00 per month, for Lease Year One;

    (ii)  $105,423.12 per Lease Year,
        $ 8,785.26 per month, for Lease Year Two;

    (iii)  $107,518.95 per Lease Year,
        $ 8,959.91 per month, for Lease Year Three;

    (iv)  $109,672.20 per Lease Year,
        $ 9,139.35 per month, for Lease Year Four;

    (v)  $111,854.16 per Lease Year,
        $ 9,321.18 per month, for Lease Year Five;

    (vi)  $114,093.54 per Lease Year,
        $ 9,507.80 per month, for Lease Year Six;

    (vii)  $116,361.63 per Lease Year,
        $ 9,696.80 per month, for Lease Year Seven;

    (viii)  $118,687.14 per Lease Year,
        $ 9,890.60 per month, for Lease Year Eight;

    (ix)  $121,070.07 per Lease Year,
        $ 10,089.17 per month, for Lease Year Nine; and

    (x)  $123,481.71 per Lease Year,
        $ 10,290.14 per month, for Lease Year Ten.

    (xi)  Fixed Minimum Rent        (Article III, Section 3.3)
        Subject to adjustment if Premises GLA is revised:
        _____ yes    ___X___ no.

(h)  Percentage Rent:                                       (Article XI, Section 11.2)

    (i)  6% of Gross Revenue in excess of $1,722,600.00
        ("Annual Breakpoint") for Lease Year One;

    (ii)  6% of Gross Revenue in excess of $1,757,052.00
        ("Annual Breakpoint") for Lease Year Two;

    (iii)  6% of Gross Revenue in excess of $1,791,982.50
        ("Annual Breakpoint") for Lease Year Three;

    (iv)  6% of Gross Revenue in excess of $1,827,870.00
        ("Annual Breakpoint") for Lease Year Four;

    (v)  6% of Gross Revenue in excess of $1,864,236.00
        ("Annual Breakpoint") for Lease Year Five;

    (vi)  6% of Gross Revenue in excess of $1,901,559.00
        ("Annual Breakpoint") for Lease Year Six;

    (vii)  6% of Gross Revenue in excess of $1,939,360.50
        ("Annual Breakpoint") for Lease Year Seven;

    (viii)  6% of Gross Revenue in excess of $1,978,119.00
        ("Annual Breakpoint") for Lease Year Eight;

    (ix)  6% of Gross Revenue in excess of $2,017,834.50
        ("Annual Breakpoint") for Lease Year Nine; and

    (x)  6% of Gross Revenue in excess of $2,058,028.50
        ("Annual Breakpoint") for Lease Year Ten.

2

(i)    Additional Rent:                      (Article XI, Section 11.3)
Additional Rent shall be charged in the initial amount of $9.98, calculated on 2,871 square foot of Premises GLA, which shall be subject to annual compounded increases equal to five percent (5%) of the immediately preceding Lease Year's Additional Rent.

(j)    Real Estate Taxes:              (Article XI, Section 11.4)
Tenant's Proportionate Share, calculated on 2,871 square feet of Premises GLA; payable monthly on estimated bill.

(k)    Common Area Utility
and Insurance Costs:        (Article XI, Section 11.5)
Tenant's Proportionate Share, calculated on 2,871 square feet of Premises GLA; payable monthly on estimated bill.

(l)    Premises Utilities:            (Article XII, Section 12.1)
Payable by Tenant as billed per metered, submetered or estimated and adjusted billing.

(m)    Trade Name:                (Article VIII, Section 8.1)
ANGL

(n)    Permitted Use:             (Article VIII, Section 8.1)
Tenant shall use and occupy the Premises solely for the retail sale of women's apparel and related accessories.

(o)    Tenant's Billing Address:
23307 Bocana Street
Santa Monica, California  90265

(p)    Tenant's Notice Address:       (Article XXV, Section 25.1)
Same as (o) above,

(q)    Landlord's Notice Address:     (Article XXV, Section 25.1)
Terminal Tower
50 Public Square
Suite 1360
Cleveland, Ohio 44113-2267

(r)    Landlord's Mortgagee's      (Article XXV, Section 25.2)
Notice Address:    U.S. Bank National Association
209 South LaSalle Street, Suite 410
Chicago, Illinois 60604
Attention:  Real Estate Banking Group

(s)    Address for
Payment of Rents
Including Percentage
Rent:    Forest City Management, Inc.
Commercial Division
Post Office Box 72069
Cleveland, Ohio 44192-0069

(t)    Address for Percentage Rent
Reports:    Forest City Commercial Management, Inc.
700 Terminal Tower
50 Public Square
Cleveland, Ohio 44113
Attn: Lease Administration Department

or fax to (216) 263-4806

(u)    Guarantor:    None.

(v)    Security Deposit:    None.

(w)    Construction Allowance:       (Article VI, Section 6.0)
$100,485.00, payable upon satisfaction of the conditions set forth in Section 6.0.

Section 1.1 - Defined Terms.

Wherever used in this Lease, the following terms shall be construed to mean as follows:

(a) "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter may be in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

(b) "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, customers and invitees.

(c) "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

(d) "Major Tenants" shall mean those tenants located in the Shopping Center whose floor area exceeds thirty thousand (30,000) square feet ("Major Tenant Threshold"), including, but not limited to, Macy's; and Robinson's May.

(e) "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 135, and further being a space containing approximately 3,029 square feet of floor space. The Premises are hatched on Exhibit B for the sole purpose of more specifically locating said area.

(f) "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(g) "Shopping Center" shall mean those buildings, land (excluding outparcels , if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "Simi Valley Town Center" located in the City of Simi Valley, Ventura County, California, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time. Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

(h) "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Premises GLA, and the denominator of which is, with respect to all prorated charges (as defined in Article XI), the total number of square feet of actually occupied gross leasable area in the Shopping Center, excluding the number of square feet of all tenant spaces exceeding the Major Tenant Threshold, whether or not occupied.

ARTICLE II

EXHIBITS

Section 2.1 - Exhibits.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A    -    Site Plan of the Shopping Center - attached hereto.

EXHIBIT B    -    Leasing Plan of the Shopping Center - attached hereto.

EXHIBIT C    -    Tenant Handbook for Shopping Center - containing sign and

4

design criteria - not attached but incorporated herein by reference.

EXHIBIT D    -    Base Building Shell Description - attached hereto.

## ARTICLE III

## PREMISES

Section 3.1 - <u>Premises</u>.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (e), subject to all conditions and easements of record for the Term of the Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - <u>Gross Leasable Area of the Premises</u>.

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall. Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

Section 3.3 - <u>Revisions to Premises GLA</u>.

The Premises GLA set forth in Section 1.0 (c) has been determined pursuant to the provisions of Section 3.2 by reference to either "CAD" or scaled architectural drawings of the Premises.  Landlord and Tenant acknowledge that, irrespective of whether or not the Premises shall have been constructed as of the date of this Lease, in the event that Landlord's final as-built field or CAD measurements of the Premises after all leasehold improvements have been constructed therein should disclose a different square footage than the Premises GLA set forth in Section 1.0 (c) above ("Final Revised Premises GLA"), then Landlord agrees to notify Tenant in writing of the Final Revised Premises GLA.  Tenant further acknowledges and agrees that such notice by Landlord shall be deemed sufficient to amend the Premises GLA set forth in Section 1.0 (c), such amendment being deemed self-operative without the necessity of further formal mutual acknowledgment or documentation between Landlord and Tenant.  When so finally determined, the Final Revised Premises GLA shall not be used as the numerator in computing Tenant's Proportionate Share of any prorated charges or in the computation of Fixed Minimum Rent, Additional Rent or Tenant's Construction Allowance since same have been determined on a fixed rate basis (as opposed to a square foot rate) basis as set forth in Article I.

Section 3.4 - <u>Landlord's Reservation</u>.

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements. Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain, repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

## ARTICLE IV

## COMMON AREAS

Section 4.1 - <u>Tenant's Use of Common Areas</u>.

(a)    Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of this Lease, and any renewal period

5

thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

(b)     Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

(c)     Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - Management and Operation of Common Areas.

Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center. Landlord will have the right (1) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

ARTICLE V

CHANGES AND ADDITIONS TO
SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - Site Plan and Leasing Plan.

The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.

Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof.   No such changes, rearrangements or other construction shall permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law.

ARTICLE VI

IMPROVEMENTS

Section 6.0 - Construction Allowance.

(a) Landlord shall pay to Tenant, as its total obligation hereunder, the sum of One Hundred Thousand Four Hundred Eighty-Five Dollars ($100,485.00) per square foot of Premises GLA, which sum represents Landlord's contribution to Tenant's Work (as defined in Section 6.2) (hereinafter "Construction Allowance"). Such Construction Allowance shall be due and payable to Tenant within thirty (30) days after the date that all of the following conditions have been satisfied:

(1)    The Premises have been completed according to plans and specifications previously approved in writing by Landlord, including any punchlist items designated by Landlord; and

(2)    Tenant has opened the Premises for business in accordance with the terms of this Lease; and

(3)    Tenant has furnished Landlord with an affidavit from Tenant's General Contractor listing all subcontractors, materialmen and/or laborers (hereinafter collectively "Subcontractors") involved in Tenant's Work, and final, unconditional lien waivers from Tenant's General Contractor and all Subcontractors evidencing that the General Contractor and all Subcontractors have been paid in full for all work, material and labor furnished in connection with Tenant's Work at the Premises.

(b)    In the event that there are claims or Rents unpaid, work unfinished, or liens filed for such work and labor that have not been bonded or otherwise secured, Landlord may retain from Tenant's Construction Allowance a sum sufficient to pay for said claims, Rents, work or liens and all costs resulting therefrom and to pay for said claims, Rents, work or liens, if necessary. If the amount owed to Tenant by Landlord shall not be sufficient to pay for said claims, Rents, work or liens and the costs resulting therefrom, Tenant shall forthwith pay for said claims, Rents, work or liens and the costs resulting therefrom, or if such be the case, cause such claims or liens to be properly discharged as herein provided.

(c)    Tenant shall have the right at all times, and at its own expense, to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of such lien(s) upon giving adequate security to Landlord for payment of said lien(s).

(d)    Notwithstanding anything contained herein, the amount of Tenant's Construction Allowance shall not exceed the documented costs of Tenant's Work.

Tenant shall request payment of the Construction Allowance in writing to Landlord upon satisfaction of the above conditions, and simultaneously therewith, shall provide Landlord with a W9 form for processing payment of the Construction Allowance.

Section 6.1 - Landlord's Responsibilities.

(a)    Landlord, at its own cost and expense, shall construct that portion of the Premises more particularly described in Exhibit C and Exhibit D.

(b)    Landlord warrants that its work shall be delivered free and clear of liens, encumbrances, violations or conditions which may constitute violations of any Applicable Laws relating to the use, occupancy and construction of the Premises and the building containing same.

(c)    By the earlier to occur of sixty (60) days following the date Tenant takes possession of the Premises or the date on which Tenant opens for business, Tenant shall notify Landlord, in writing, of any items required to be performed by Landlord which are incomplete or inadequate; otherwise, Tenant shall be deemed to have acknowledged that all work required to be performed by Landlord in connection with the Premises and any and all other obligations to be performed by Landlord on or before the opening date of the Premises have been fully performed.

Section 6.2 - Tenant's Responsibilities.

On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with Exhibit C and Exhibit D:

(a)    Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work.

(b)    Construct the leasehold improvements as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein ("Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(c)    Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)    If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives.

(e)    Tenant shall reimburse Landlord for the cost of any temporary utilities and dumpster usage, and Tenant's share of Landlord's master water meter fee charged by the City of Simi Valley, which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor.

(f)    In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.3 - Tenant's Trade Fixtures.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State (or Commonwealth) in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Section 6.4 - Labor Cooperation.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center. In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

ARTICLE VII

PLANS AND SPECIFICATIONS

Section 7.1 - Submission of Plans and Specifications .

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C, complete plans and specifications for all of Tenant's work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in Exhibit C. Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the Rent Commencement Date. No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written consent. Landlord's written approval of any plans and specifications for Tenant's work shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or

compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.

## ARTICLE VIII

## USE

Section 8.1 - Operation and Use of Premises.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I and for no other business or purpose. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

Section 8.2 - Tenant's Covenant to Operate.

Tenant agrees to complete Tenant's work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of this Lease to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, Mondays through Saturdays from 10:00 A.M. to 9:00 P.M. and on Sundays from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by Landlord for the operation of the Shopping Center. Tenant shall have no right to quit the Premises, cease to operate its business, or cancel or terminate this Lease, unless such right is expressly granted to Tenant herein.

Section 8.3 - Prohibitions on Use.

(a) Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b) Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.

(c) Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

Section 8.4 - Manner of Operation of Business.

(a) Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade. Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to insure a maximum volume of business in and from the Premises.

(b) Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)    For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws.  The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees.  This obligation shall survive the expiration or earlier termination of this Lease.  If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of this Lease as a result of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center.  Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(d)    Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Lease.  If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense.  Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

(e)    In the event Landlord should elect to establish open or closed internet site(s) with respect to the Shopping Center, Tenant agrees to participate in such site(s) and to cooperate with Landlord in making Tenant's website usable by, and accessible to, Shopping Center patrons and customers.

ARTICLE IX

TERM

Section 9.1 - Commencement Date Agreement.

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

Section 9.2 - Holding Over.

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party.  Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant

immediately prior to expiration of the Term, plus all other charges due under the Lease. Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period. Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

Section 9.3 - Expiration of the Term of the Lease.

(a)     This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)     For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)     Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of this Lease, except for ordinary wear and tear and casualty loss.

ARTICLE X

RENT COMMENCEMENT DATE

Section 10.1 - Rent Commencement Date.

As used in this Lease, the term "Rent Commencement Date" shall be as defined in Article I. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

Section 10.2 - Delay or Failure to Deliver Premises to Tenant.

Landlord shall give Tenant written notice of the date on which Landlord anticipates delivering possession of the Premises to Tenant. If Landlord shall be unable to deliver possession of the Premises to Tenant on the date specified in said notice for any cause within Landlord's or outside Tenant's control, including, but not limited to, delay in commencing or completing Landlord's work, if any, or the holding over of any tenant(s), or the total failure of Landlord to deliver the Premises, then in any of such events, Rents shall not commence until the earlier to occur of (i) the date Tenant opens for business; or (ii) ninety (90) days following the date that possession of the Premises is delivered to Tenant for the commencement of its leasehold improvement work. Tenant agrees to accept such abatement of Rents as liquidated damages in full satisfaction for the failure of Landlord to deliver possession of the Premises as set forth above or complete failure of delivery of possession to the exclusion of all rights and claims for damages which Tenant otherwise may have suffered as a result of Landlord's delayed or complete failure to deliver possession of the Premises to Tenant.

Section 10.3 - Tenant's Failure to be Open by the Outside Date.

Notwithstanding the rights or remedies of Landlord set forth in Article XIII, in the event Tenant does not open for business in the Premises on or before the Outside Date, except for reasons within Landlord's or outside Tenant's control, Landlord shall have the right to require Tenant to pay to Landlord, as liquidated damages and not as a penalty, an amount equal to One Hundred Dollars ($100.00) for each day beyond the Outside Date that Tenant is not open for business; which payment is intended to compensate Landlord for actual and substantial losses that Landlord may suffer as a result of Tenant's not being open for business. Nothing contained in this Section 10.3 shall be construed to waive any rights or remedies Landlord may have against Tenant, nor affect Tenant's obligation to commence payment of Rents on the Outside Date. Landlord may offset any amounts payable by Tenant hereunder against any amounts Landlord may owe Tenant.

ARTICLE XI

RENT

Section 11.1 - Fixed Minimum Rent.

(a)      Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, the Fixed Minimum Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month. Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)      Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

(c)      If at any time during the Term of this Lease, additional department store Major Tenant(s) are constructed containing 100,000 square feet or more as part of the Shopping Center, in addition to those named Major Tenant department stores listed in Section 1.1 (d) herein, Tenant acknowledges and agrees that the Fixed Minimum Rent then payable by Tenant shall be automatically increased by a one-time increase (for each such additional Major Tenant department store) equal to Two Dollars ($2.00) per square foot of Premises GLA, commencing on the date when each such Major Tenant department store first opens for business in the Shopping Center, with a proportionate increase in Tenant's Annual Breakpoint for Percentage Rent purposes.

Section 11.2 - Percentage Rent.

(a)      Amount.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint set forth in Article I.

(b)      Payment.

(i)      The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)      Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)      Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

(c)  Gross Revenue.

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant.

12

The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received.  Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter.  Any deposit not refunded shall be included in Gross Revenue.

(d)  Exclusions from Gross Revenue.

Notwithstanding the foregoing, "Gross Revenue" shall not include:

(i)    Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue.

(ii)    The amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)    The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)    Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)    Revenue from the sale of trade fixtures after use in the Premises.

(vi)    Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)    Revenue from vending machines for Tenant's employees use only.

(e)  Reporting.

(i)    On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)    On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)    For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied. Should Tenant elect (i) above, Tenant agrees that the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register.  If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

13

(iv)    If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following: (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver. The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)    All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)    Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(f)    Books and Records.

(i)    Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied. Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue. Landlord shall also have the right to request such other records and/or accounts which Landlord may deem necessary to accurately determine Gross Revenue. All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)    If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records. If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove. Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

(iii)    In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand. If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

Section 11.3 - Additional Rent.

(a)    Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center. Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine. Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term hereof in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the

applicable Lease Year. The amount due for any partial Lease Year shall be prorated accordingly.

(b)    Should any governmental authority having jurisdiction over the Shopping Center enact or impose any future law, ordinance, regulation or requirement ("Future Law") upon Landlord, the direct effect of which is to increase Landlord's cost of operating, maintaining and managing the Shopping Center ("Operating Costs"), as compared with Landlord's Operating Costs incurred for the calendar year immediately preceding the enactment of such Future Law by more than the annual percentage increase in the Additional Rent set forth in Article I, then in such event, Landlord shall notify Tenant in writing of such increase ("Extraordinary Increase") and shall furnish Tenant with reasonably suitable documentary evidence of such Extraordinary Increase and whether or not it is one-time or ongoing. If the Future Law should result in a one-time Extraordinary Increase, Tenant's Proportionate Share of the Extraordinary Increase shall be divided into twelve (12) equal monthly increments, which shall be added to Landlord's monthly charge to Tenant for reimbursement to Landlord over the next twelve (12) month period. However, if the Future Law should result in an ongoing Extraordinary Increase over the remaining balance of the Term, Tenant's Proportionate Share of such Extraordinary Increase shall be added to Tenant's Additional Rent and all subsequent annual compounded increases shall be applied to the increased Additional Rent amount.

Section 11.4 - Real Estate Taxes.

(a)    (i)    For purposes of this Lease, the term "Real Estate Taxes" shall mean all ad valorem taxes, assessments, charges, levies, fees and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature whatsoever, including, but not limited to, a community facilities district assessment to finance various on-site improvements for the benefit of the Shopping Center ("District Assessments"), and assessments for off-site public improvements for the benefit of the Shopping Center which shall be laid, assessed, levied, or imposed upon the Shopping Center or any part thereof and which are payable at any time during the Term hereof, and further, Real Estate Taxes shall include Landlord's reasonable administrative costs as well as any and all costs, including reasonable attorney fees, incurred by Landlord in contesting or negotiating Real Estate Taxes with any governmental authority. Real Estate Taxes shall not include franchise, estate, inheritance, sales, use, succession, capital levy, transfer, net income or excess profits taxes imposed upon Landlord. In addition, the term Real Estate Taxes shall mean (if applicable) all payments made by Landlord in lieu of real property taxes pursuant to tax increment financing provided to Landlord by any public agency or authority. Landlord represents and warrants to Tenant that Tenant's Proportionate Share of Real Estate Taxes shall not exceed the amount of Real Estate Taxes that Tenant would otherwise have paid hereunder if Landlord had not received such tax increment financing.

(ii)    Landlord and Tenant recognize and acknowledge that there may be changes in the current real property tax system and that there may be imposed new forms of taxes, assessments, charges, levies or fees, or there may be an increase in certain existing taxes, assessments, charges, levies or fees placed on, or levied in connection with, the ownership, leasing, occupancy or operation of the Shopping Center or the Premises, all of which shall be included within the definition of Real Estate Taxes. For purposes of funding special assessment districts of the type funded by real property taxes, such funding shall also be included within the meaning of Real Estate Taxes. With respect to any general or special assessments which may be levied against or upon the Premises or the Shopping Center, including, but not limited to, the District Assessments, and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in periodic installments, there shall be included within the meaning of Real Estate Taxes with respect to any tax fiscal year, only the amount currently payable on such bond for such tax fiscal year, or the periodic installment for such tax fiscal year.

In addition to Real Estate Taxes, should any governmental taxing authority acting under any present or future law, ordinance, or regulation, levy, assess, or impose any business, occupancy, privilege or excise tax or any tax and/or assessments imposed upon the Rents payable by Tenant to Landlord (other than an income or franchise tax upon Landlord's net income), either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, Tenant shall be responsible for and shall pay such taxes and/or assessments directly to the appropriate taxing authority, or Tenant shall reimburse Landlord for the amount thereof, as the case may be, upon receipt of an invoice therefor from Landlord.

(b)    The Premises, its leasehold improvements and the underlying realty will not be separately assessed for tax purposes but instead will be assessed as part of a larger parcel or parcels of land and improvements comprising the Shopping Center. Accordingly, Tenant

agrees to pay its Proportionate Share (as defined in Section 1.1 [h]) of said Real Estate Taxes, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of said Real Estate Taxes as estimated by Landlord for the applicable fiscal year. Tenant's Proportionate Share hereunder for any partial fiscal year shall be prorated on a per diem basis.

To the extent that the Shopping Center consists of more than one tax parcel, including, but not limited to, separate tax parcels for one or more of the Major Tenants, the following shall apply:

(x)    Landlord shall have the right and option to compute Tenant's Proportionate Share of Real Estate Taxes based on the building area of the particular tax parcel on which the Premises is located.

(y)    In the event that a separate bill for Real Estate Taxes is rendered by the taxing authority with respect to the building, land and improvements owned or leased by a Major Tenant, then Real Estate Taxes shall be deemed to exclude taxes and assessments attributable to such Major Tenant and the floor area of such Major Tenant shall be correspondingly excluded from the denominator of Tenant's Proportionate Share.

(z)    In the event that any Major Tenant's building, land and improvements are separately assessed for purposes of Real Estate Taxes but no separate tax bill is rendered with respect to such Major Tenant, or in the event that any Major Tenant's building, land and improvements are not separately assessed for purposes of Real Estate Taxes but are included as part of other building, land and improvements in the Shopping Center, then to the extent, if any, that any such Major Tenant contribute(s) towards Real Estate Taxes attributable to the Shopping Center, Real Estate Taxes shall be reduced by the amount of any such Major Tenant's contribution(s) and the floor area of any such contributing Major Tenant shall be excluded from the denominator of Tenant's Proportionate Share.

(c)    Within one hundred twenty (120) days following the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Real Estate Taxes applicable to the Shopping Center and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such fiscal year, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

Section 11.5 - Utility and Insurance Costs.

(a)    Tenant shall pay to Landlord its Proportionate Share (as defined in Section 1.1 [h]) of the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning. Tenant shall also pay to Landlord its Proportionate Share of the costs of customary types of insurance coverage carried with respect to the Shopping Center, including, but not limited to, commercial general liability insurance, rent insurance and property insurance in commercially reasonable amounts as Landlord deems necessary (such utility costs and insurance costs are collectively "Utility and Insurance Costs").

(b) Tenant's Proportionate Share of Utility and Insurance Costs shall be paid by Tenant, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of Utility and Insurance Costs as estimated by Landlord for each fiscal year. Tenant's Proportionate Share of Utility and Insurance Costs hereunder for any partial fiscal year shall be prorated on a per diem basis.

Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Utility and Insurance Costs and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs

due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

## ARTICLE XII

## PREMISES UTILITY SERVICES

Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)    Water and Sewer Services.  Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in Exhibit C.  Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date, as herein defined. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on submetered readings, adjusted quarterly.  Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)    Telephone Service.  Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises.  Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)    Gas Service.  To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto.  Tenant shall pay all charges therefor directly to the providing utility.

(d)    Electricity Service.  Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP").  Tenant shall arrange with such ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP. In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the date of Tenant's execution of this Lease, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent:

(i)    Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials;

(ii)    Prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damage;

(iii)   Prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center;

(iv)   Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers;

(v)   ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord;

(vi)   ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur;

(vii)   ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and

(viii)   ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

(e)   Heating, Ventilating and Air-Conditioning ("HVAC").

Tenant is to provide its own equipment and facilities for heating, ventilating and air-conditioning the Premises ("Premises HVAC System") described in Exhibit C. Tenant shall operate and maintain same during the Term of this Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.

Section 12.2 - Discontinuance of Service.

Landlord reserves the right, with thirty (30) days prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same remain unpaid by Tenant. Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment. If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

Section 12.3 - Interruption of Service.

Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease.

Section 12.4 - Premises Sprinkler System.

In the event applicable codes require fire sprinkler protection, Landlord shall provide a sprinkler connection for the Premises to Landlord's bulk main designated in Landlord's drawings. Tenant shall design and install all extensions and facilities to and within the Premises from Landlord's connection.

If, at any time during the Term of this Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection for the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises,

the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association ("NFPA") No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

## ARTICLE XIII

## SIGNS

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair. Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises. All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity. Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises.

## ARTICLE XIV

## REPAIRS AND ALTERATIONS

Section 14.1 - Repairs by Landlord.

(a)     Landlord shall keep the roof, structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease, subject to the provisions of Section 11.3 herein; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs.

(b)     As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to comply with Applicable Laws. It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.

(c)     Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

Section 14.2 - Repairs By Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times. All repairs to the Premises, equipment or facilities therein or thereabout, other than those repairs required

to be made by Landlord pursuant to Section 14.1, shall be made by Tenant. Said repairs shall include, but not be limited to, all necessary painting and decorating, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems above and under the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises. All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

Section 14.3 - Alterations and Remodeling.

(a)     Tenant, at its own expense, shall have the right to make such interior alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any major remodeling of the interior of the Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material or structural alterations to the Premises or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made without Landlord's prior written consent. Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws. All such alterations, changes and improvements shall be made in accordance with the provisions of Exhibit C and shall become the property of Landlord upon installation and shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)     Tenant further agrees not to make any alterations, additions or changes to any storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall first have been obtained. In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord. Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3.

ARTICLE XV

LIENS

Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant. Tenant shall indemnify and save harmless Landlord against all loss, liability, costs, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center, the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond

20

or other security acceptable to Landlord. Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

ARTICLE XVI

INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)    Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)    Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damages, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming both Tenant and Landlord as insureds, in the following amounts:

(a)    Commercial General Liability Insurance. Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors coverage, in an amount not less than Three Million Dollars ($3,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(b)    Worker's Compensation Insurance. Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

(c)    Personal Property, Alterations, Improvements and Betterments. Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease. Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed. If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs. If the insurance proceeds described above are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds. However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments. This paragraph is only applicable if the Lease is not terminated pursuant to Article XXI hereof.

(d)   Additional Hazards.  Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form insurance coverage.  In addition, Tenant shall use best efforts not to keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage.  In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of this Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center.  Said additional premiums shall be payable by Tenant to Landlord within ten (10) days following written notice from Landlord.

(e)   Blanket Policies.  Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies.

(f)   Certificate(s) of Insurance.  Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter.  The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report.  All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage.   Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same  within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

.    (g)   Notice of Loss.  Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

Section 16.3 - Waiver of Subrogation.

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

Section 16.4 - Landlord Not Responsible for Acts of Others.

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC.  None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease.

ARTICLE XVII

GENERAL PROVISIONS

Section 17.1 - Rules and Regulations.

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center.  Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease.

22

Section 17.2 - Rubbish.

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord. Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord. In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager. If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

Section 17.3 - Lighting.

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

Section 17.4 - Merchandise Display, Loading and Unloading.

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

Section 17.5 - Obstruction of Passageways.

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

Section 17.6 - Employee Parking.

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord. Tenant shall furnish Landlord with state automobile license numbers assigned to vehicles used by Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees shall fail to park their vehicles in such designated parking areas, then, without limiting any other remedy which Landlord may pursue in the event of Tenant's Default hereunder, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as a part of Rents, the sum of Ten Dollars ($10.00) per day for each vehicle parked in violation of the provisions of this Section 17.6. Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.


ARTICLE XVIII

SUBORDINATION AND ATTORNMENT BY TENANT

Section 18.1 - Subordination of Lease.

This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance"). Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises. Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required. However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form. Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

23

Section 18.2 – <u>Attornment by Tenant</u>.

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease. Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on demand shall constitute a Default by Tenant under the terms of this Lease. In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

Section 18.3 – <u>Landlord as Attorney-in-Fact for Tenant</u>.

If Tenant, within twenty (20) days after submission of any instrument, fails to execute same, Landlord is hereby authorized to execute same as attorney-in-fact for Tenant.

<div align="center">ARTICLE XIX</div>

<div align="center">RIGHTS OF LANDLORD</div>

Section 19.1 – <u>Landlord's Right to Repair</u>.

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

Section 19.2 – <u>Landlord's Right to Affix to Exterior</u>.

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

Section 19.3 – <u>Landlord's Right to Make Payments on Behalf of Tenant</u>.

Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

<div align="center">ARTICLE XX</div>

<div align="center">ASSIGNMENT AND SUBLETTING</div>

Section 20.1 – <u>Landlord's Consent Required</u>.

(a)    Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name. In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

<div align="center">24</div>

(b)     Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)     Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

Section 20.2 - Insolvency Proceedings.

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

Section 20.3 - Transfer of Corporate Shares.

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease.

Section 20.4 - Assignment to Related Entity.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation. Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - Transfer of Other Business Interests.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - No Release of Liability.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this

Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

Section 20.8 - Administrative Fee.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) or such other amount as Landlord shall reasonably determine to be reasonably appropriate in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not said proposed assignment or subletting actually occurs.

## ARTICLE XXI

## DAMAGE OR DESTRUCTION

Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)    If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated. If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)    If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c)    If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work. Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)    Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

Section 21.2 - Landlord's Option to Terminate.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof. In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event. If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore.

Section 21.3 - <u>Demolition of Landlord's Building</u>.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

<div align="center">ARTICLE XXII</div>

<div align="center">CONDEMNATION</div>

Section 22.1 - <u>Effect of Taking</u>.

(a)      In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)      In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)      For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)      If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - <u>Compensation and Awards</u>.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord.  Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate.  Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment.  Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - <u>Condemnation or Breach of Lease</u>.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

<div align="center">ARTICLE XXIII</div>

<div align="center">DEFAULT</div>

Section 23.1 - <u>Default</u>.

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)      Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

<div align="center">27</div>

(b)     If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)     Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)     Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)     Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)     If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)     Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)     With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - Remedies and Damages.

(a)     If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)     Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

(ii)     Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; or

(iii)     If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)     Terminate this Lease by written notice to Tenant.

(b)     Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part. However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)     In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)    In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)    In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable attorney fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant and/or occupants of the Shopping Center or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1 above, Landlord and Tenant each covenants and agrees that in the event that Tenant (i) fails to take possession of, construct and thereafter open the Premises for business, fully fixtured, stocked and staffed on the Rent Commencement Date; or (ii) vacates or abandons the Premises; or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.1 hereof, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to three fourths (3/4ths) of the Rents reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat such action or omission by Tenant as a Default under the Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity.

Section 23.4 - Repeated Default.

(a)    Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)    In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

Section 23.5 - Waiver of Rights of Redemption.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

ARTICLE XXIV

COMPETITION

Section 24.1 - Restriction on Tenant.

Tenant agrees that for as long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate,

29

manage, or have any interest in any business which is similar or in competition with the permitted use of the Premises set forth in Article I ("Competing Store") within a radius of three (3) miles of the perimeter of the Shopping Center ("Restricted Area").

Section 24.2 - Imposition of Damages.

In the event that Tenant shall violate the provisions of Section 24.1 above, Landlord may, at its option, and without limiting Landlord's remedies, effective as of the date such Competing Store opens for business within the Restricted Area: (i) include seventy-five percent (75%) of the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder; or (ii) increase the Fixed Minimum Rent to the average of the annual "effective rent" (i.e., the aggregate of Fixed Minimum and Percentage Rent) payable by Tenant to Landlord during the immediately preceding two (2) Lease Years; or (iii) increase Tenant's Fixed Minimum Rent then in effect, and any future increases thereto, by fifty percent (50%).

## ARTICLE XXV

## NOTICES

Section 25.1 - Notices to Tenant and Landlord.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter. Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers. Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

Section 25.2 - Notices to Mortgagee.

Tenant shall give written notice to Landlord's mortgagee, at Landlord's mortgagee's notice address set forth in Article I, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord. Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default. Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

## ARTICLE XXVI

## MISCELLANEOUS

Section 26.1 - Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties. This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

Section 26.3 - <u>Consents</u>.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

Section 26.4 - <u>Brokerage</u>.

Landlord and Tenant acknowledge that American Realty ("Acknowledged Broker") may be entitled to a fee for broker's services rendered in bringing together the parties to this Lease. Landlord shall be responsible for paying the reasonable fee determined to be due and owing the Acknowledged Broker as a result of this transaction. Tenant warrants that it has had no dealings with any broker or agent in connection with the Lease, other than the Acknowledged Broker. In the event Tenant has had any other dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - <u>Effective Date of Lease</u>.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

Section 26.6 - <u>Estoppel Certificates</u>.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgage or assignee of any mortgage on the fee of the Premises.

Section 26.7 - <u>Force Majeure</u>.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

Section 26.8 - <u>Interpretation</u>.

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

Section 26.9 - <u>Memorandum of Lease</u>.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

31

Section 26.10 - Quiet Enjoyment.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - Rent Demand.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - Section and Title Headings.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - No Waiver by Landlord.

(a)    Landlord shall have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord in refraining from so doing at any time(s). No failure by Landlord to insist upon the strict performance of any term or condition of this Lease, and no failure by Landlord to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver of any such breach, term, condition or right.

(b)    No term or condition of this Lease required to be performed by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord.

(c)    A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon the execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center. If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall

32

have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

Section 26.17 - Litigation.

(a)     Any claim, demand, right or defense of any kind by Tenant which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless Tenant seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of such occurrence of the billing, event or action upon which the adjustment, claim, demand, right or defense relates, whichever applies.

(b)     To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)     If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)     Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

Section 26.18 - Joint and Several Liability.

Since two (2) individuals are signing this Lease as Tenant, the liability of each such individual to pay Rents and to perform all other obligations hereunder shall be deemed to be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

Signed in the presence of:

LANDLORD:

SIMI VALLEY MALL, LLC
a California limited liability company

By:  Siena Associates, LLC,
      a California limited liability company,
      its sole member

By:     F.C. Siena, Inc.,
        a California corporation,
        Its Administrative Member

By: _____
      Duane F. Bishop, Jr.
      Vice President

TENANT:

_____
SONG H. KIM
Social Security #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

_____
YOUNG A. KIM
Social Security #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

.38

===================================

STATE OF OHIO                )
                             ) SS:
COUNTY OF CUYAHOGA)

On _March 2_____, 2006,
before me, _Doris Dowd_____, a
Notary Public in and for the State of Ohio, personally
appeared Duane F. Bishop, Jr.,

[X]    personally known to me -OR
[ ]    proved to me on the basis of satisfactory
evidence

to be the person whose name is subscribed to the
within instrument, and acknowledged to me that he
executed the within instrument in his authorized
capacity and that by his signature on the within
instrument, the person or entity upon behalf of which
he acted executed the within instrument.

WITNESS my hand and official seal.

_Doris Dowd_____
Notary Public In and For
  Said County and State

              (Seal)
===================================

DORIS ~~SCHUSTER~~ Notary Public
STATE OF OHIO
My Commission Expires May 20, 2007

***************************

-OPTIONAL SECTION-
CAPACITY CLAIMED BY SIGNER

Although statute does not require
the Notary to fill in the data below,
doing so may prove invaluable to
persons relying on the document.

[ ] INDIVIDUAL
[X] CORPORATE OFFICER

Senior Vice President
Asset and Portfolio Management
Title

[] PARTNER(S):

    [] LIMITED
    [] GENERAL

[] ATTORNEY-IN-FACT
[] TRUSTEE(S)
[] GUARDIAN/CONSERVATOR
[] OTHER:

_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR
ENTITY(IES)

SIMI VALLEY MALL, LLC,
a California limited liability company

***************************

=========================================

STATE OF _CALIFORNIA_ )
                                            ) SS:
COUNTY OF _LOS ANGELES_ )

On _2-16-06_, 2006,
before me, _JUNG YEUN TONI KIM_, a
Notary Public in and for the State of
_CALIFORNIA_, personally appeared SONG
H. KIM and YOUNG A. KIM,

[ ]    personally known to me -OR
[X]    proved to me on the basis of satisfactory
        evidence

to be the person(s) whose name(s) is/are subscribed
to the within instrument, and acknowledged to me that
he/she/they executed the within instrument in
his/her/their authorized capacity(ies) and that, by
his/her/their signature(s) on the within instrument, the
person or entity upon behalf of which he/she/they
acted executed the within instrument.

WITNESS my hand and official seal.

_____
Notary Public In and For said County and State

(Seal)

=========================================

JUNG YEUN TONI KIM
COMM. # 1463278
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
COMM. EXP. JAN. 16, 2008

*****************************

-OPTIONAL SECTION-
CAPACITY CLAIMED BY SIGNER

Although statute does not require
the Notary to fill in the data below,
doing so may prove invaluable to
persons relying on the document.

[ ] INDIVIDUAL
[ ] CORPORATE OFFICER(S)

_____
Title(s)

[ ] PARTNER(S):
        [ ] LIMITED
        [ ] GENERAL

[ ] ATTORNEY-IN-FACT
[ ] TRUSTEE(S)
[ ] GUARDIAN/CONSERVATOR
[ ] OTHER:

_____

SIGNER IS REPRESENTING:
NAME OF PERSON(S) OR
ENTITY(IES)

_____

_____

_____

*****************************

This Instrument Prepared By:
Deborah J. Metzger
Terminal Tower
50 Public Square, Suite 1360
Cleveland, Ohio 44113-2267
(216) 621-6060

35

# SIMI VALLEY TOWN CENTER

## SITE PLAN



EXHIBIT B



<u>EXHIBIT C</u>

<u>TENANT HANDBOOK</u>

[TO BE FORWARDED UNDER SEPARATE COVER]

EXHIBIT D

Base Building Shell Description
for In-Line Tenants
Simi Valley Town Center
Simi Valley, California

I.     Landlord shall provide, as part of the base building, an "empty shell" consisting of the following:

        1.     Foundations, floor slab, structural steel frame, exterior wall construction, including roof and insulation, in accordance with Landlord's base building construction documents. Interior clear height to the underside of the structure shall be 14' minimum.

        2.     Utility stub-ins, extending to a point within the Premises, in accordance with Landlord's construction documents, including:

                A.     An empty 2" electrical conduit with pull wire leading back to Landlord's switch gear. Electrical service will be 277/480 volt (retail @ 12 watts/sf and restaurants @ 20 watts/sf). Tenant, at Tenant's expense, shall provide the wire, panels, transformer and all electrical distribution within the Premises.
                B.     A 4" minimum sanitary connection below grade.
                C.     An empty 1" telephone conduit with pull wire. Tenant, at Tenant's expense, shall pull telephone wire and provide all panels and distribution within the Premises.
                D.     A domestic 3/4" water connection. Tenant, at Tenant's expense, shall provide a meter and all distribution.
                E.     A gas manifold located in accordance with Landlord's drawings for food preparation only. Tenant, at Tenant's expense, shall obtain gas meter, extend piping to the Premises, and provide all distribution within the Premises.
                F.     A 4" sprinkler tap provided from Landlord's main trunk line.
                G.     Metal stud demising walls. Tenant, at Tenant's expense, shall provide drywall and insulation, as required.

        3.     Landlord shall provide all site-related finishes, parking, landscaping, lighting and amenities in accordance with Landlord's drawings.

        4.     Tenant, at Tenant's expense, shall provide all required plumbing vents, exhaust and make-up air, and all necessary roof penetrations and curbs. Landlord's base building shell design shall provide for designated flat roof areas for HVAC equipment, plumbing vents, exhaust fans, etc.

II.    Tenant shall provide, at Tenant's expense:

        1.     All interior walls, doors, furring and drywall, ceiling treatments and finishes.
        2.     All other interior construction necessary to provide a complete finished space, including life safety, HVAC and electrical systems.
        3.     All interior and exterior Tenant signage or accent lighting.
        4.     All required grease traps/interceptors.

III.   Any Tenant-required modifications to Landlord's base building "empty shell", over and above what is shown on Landlord's construction documents, shall be provided by Landlord's contractor, at Tenant's expense.

L-9822
H:\w97\djm\L9822am1.doc
DJM:emp
5/28/10
Revised 6/30/10
Revised 7/23/10


## FIRST AMENDMENT OF LEASE

THIS FIRST AMENDMENT OF LEASE made and entered into this _____ day of _____, 2010, by and between SIMI VALLEY MALL, LLC, a Delaware limited liability company, having an address for purposes hereof at Terminal Tower, 50 Public Square, Suite 1360, Cleveland, Ohio 44113-2267 ("Landlord"); and JEFF SUNG KIM and YOUNG A. KIM, as husband and wife, having an address for purposes hereof at 2301-2313 E. 51st Street, Vernon, CA 90058 ("Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a certain Lease dated March 2, 2006 for Unit No. 135 in the Simi Valley Town Center located in Simi Valley, California, as more fully set forth in the Lease ("Premises"); and

WHEREAS, Tenant has experienced lower than expected sales in the Premises making it difficult for Tenant to remain current in satisfaction of its monetary obligations under the Lease; and

WHEREAS, Landlord and Tenant now desire to amend the Lease and to grant Tenant a temporary rent reduction and to otherwise amend the Lease as more fully set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions and agreements hereinafter set forth and for other good and valuable consideration, Landlord and Tenant hereby agree that the Lease shall be amended and modified as follows:

1.      Landlord and Tenant acknowledge that Tenant's Name "Song H. Kim" has been changed and shall hereby be amended to "Jeff Sung Kim" but it is one and same individual.

2.      Landlord and Tenant agree that for the period commencing June 1, 2010, and continuing through May 31, 2011 ("Reduction Period"), Tenant's total monthly rental charges shall be reduced by an amount equal to Four Thousand Five Hundred Dollars ($4,500.00) per month ("Reduced Rent"), which shall be applied to Tenant's account, in advance, on or before the first day of each calendar month.

3.      During the Reduction Period, Tenant shall pay Percentage Rent in an amount equal to six percent (6%) of Gross Revenue in excess of One Million Dollars ($1,000,000.00) ("Annual Breakpoint"), which shall continue to be due and payable in the manner set forth in the Lease.

4.      Except as otherwise stated herein, Tenant covenants and agrees that it shall continue to pay all utility charges required pursuant to the terms of the Lease.

5.      As a material inducement for Landlord to enter into this First Amendment of Lease, Landlord shall have the right at any time during the Reduction Period to terminate the Lease upon prior written notice to Tenant.  If Landlord so elects to terminate this Lease, the effective date of termination shall be sixty (60) days following the date of Landlord's written notice to terminate, however, not during November and December ("Termination Date"); provided, however, Tenant may vitiate Landlord's election to terminate the Lease by Tenant's election to resume payment of the full amount of all Rents due under the Lease in a notice to Landlord within thirty (30) days of Tenant's receipt of Landlord's notice of election to terminate. On or before the Termination Date, Tenant shall remove all of its movable trade fixtures, equipment and merchandise from the Premises leaving same in a broom-clean condition and shall turn over all keys to the Premises to Landlord.  Tenant shall be responsible for any damage caused to the Premises by the removal of said fixtures, equipment and merchandise, reasonable wear and tear excepted.  Tenant covenants and agrees to pay Landlord all sums accruing and/or required to be paid by Tenant pursuant to the provisions of the Lease through

the Termination Date, as and when any of such sums become due and payable, as if the Termination Date were the natural expiration date of the Lease.

Notwithstanding the foregoing, if prior to the expiration of the Reduction Period, Tenant elects to resume payment of the full amount of all Rents due under the Lease, then provided Tenant continues to pay such amounts when due pursuant to the terms of the Lease and is not in default beyond any applicable notice and cure period, Landlord shall not have the aforesaid right to terminate the Lease. Should Tenant not pay any such amounts when due under the terms of the Lease beyond any applicable notice and cure period, Landlord's right to terminate as set forth above shall immediately be reinstated unless and until any said default is cured by the Tenant.

6.    In the event Tenant defaults in the performance of any other term, condition or covenant of the Lease and the same remains uncured following notice and the applicable cure period, Landlord's agreement to the Reduced Rent granted in this First Amendment of Lease shall terminate immediately and Tenant shall be required to pay Landlord the full amount of all Rent due pursuant to the terms of the Lease as if no reduction of same had been granted until the earlier of the cure of said default or the end of the Reduction Period.

7.    In the event Tenant requests to assign its interest in the Lease or sublet the Premises other than to a related entity, the Reduced Rent granted in this First Amendment of Lease shall become null and void upon such assignment or subletting and the full amount of all Rent shall become payable thereafter as originally set forth in the Lease.

8.    As a material inducement for Landlord to enter into this First Amendment of Lease, Tenant agrees that for itself, its employees and agents that it shall not disclose to anyone the Reduced Rent granted to Tenant by Landlord pursuant to the terms of this First Amendment of Lease, except to its parent, subsidiaries, affiliates, or its or their employees, agents, attorneys, accountants, lenders, financial analysts, consultants, auditors, assignees, subtenants, purchasers, brokers, or as required by any court or governmental agency. The parties agree that this provision is a material covenant of this First Amendment of Lease and that if Tenant breaches it in any manner whatsoever, in addition to all other remedies which Landlord may have at law or in equity, the Reduced Rent granted in this First Amendment of Lease shall automatically become null and void and Tenant shall then be obligated to resume the payment to Landlord of the full amount of all Rent due pursuant to the terms of the Lease.

9.    Tenant hereby confirms that, to its knowledge, Landlord is not in default of any of its obligations under the Lease. Landlord hereby confirms that, to its knowledge, Tenant is not in default of any of its obligations under the Lease.

10.    Except for approval by Landlord's lender, Landlord represents and warrants to Tenant that no other consents of third parties are necessary for the execution, delivery, effectiveness and performance of this First Amendment of Lease. Landlord's execution of this First Amendment of Lease shall be Landlord's warranty to Tenant that Landlord's lender's approval has been obtained and no further approvals shall be required.

11.    Except as expressly modified herein, all other terms and conditions of the Lease shall be unamended and remain in full force and effect. In case of any inconsistency between the provisions of the Lease and this First Amendment of Lease, this First Amendment of Lease shall govern and control.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment of Lease the day and year first written above:

Signed in the presence of:

**LANDLORD:**

SIMI VALLEY MALL, LLC
a Delaware limited liability company

By: Siena Associates, LLC,
    a California limited liability company,
    its sole member

By:    F.C. Siena, Inc.,
    a California corporation,
    Its Administrative Member

_____

_____

By: _____
    Duane F. Bishop, Jr., Vice President

**TENANT:**

_____

_____

_____
SUNG H. KIM

_____
YOUNG A. KIM

STATE OF OHIO     )
    )
COUNTY OF CUYAHOGA     )

On _____, before me, _____, personally appeared Duane F. Bishop, Jr., who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Ohio that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

(Seal)

STATE OF CALIFORNIA     )
    )
COUNTY OF _____ )

On _____, before me, _____, personally appeared Sung A. Kim and Young A. Kim, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

3

(Seal)

4

## SECOND AMENDMENT OF LEASE

THIS SECOND AMENDMENT OF LEASE (this "**Amendment**") made and entered into this _19th_ day of _December_, 2011 (the "**Effective Date**"), by and between W/A SVT HOLDINGS VI, L.L.C., a Delaware limited liability company (successor in interest to SIMI VALLEY MALL, LLC, a Delaware limited liability company) having an address for purposes hereof at 900 N. Michigan Avenue, Suite 1900, Chicago, Illinois 60611 ("**Landlord**"), and JEFF SUNG KIM and YOUNG A. KIM, as husband and wife, having an address for purposes hereof at 2301 - 2313 E. 51st Street, Vernon, California 90058 ("**Tenant**").

### WITNESSETH:

**WHEREAS,** Landlord and Tenant entered into a certain lease agreement dated March 6, 2006, as modified by that certain First Amendment of Lease dated November 22, 2010 (collectively, the "**Lease**") for Unit No. 135 (the "**Premises**") in The Mall at Simi Valley Town Center located in Simi Valley, California (the "**Shopping Center**"), as more fully set forth in the Lease;

**WHEREAS,** pursuant to the First Amendment of Lease Tenant was granted a temporary Rent reduction; and

**WHEREAS,** Landlord and Tenant desire to further amend the Lease to extend the temporary Rent reduction period on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00), other good and valuable consideration and of the agreements of the parties hereinafter set forth, Landlord and Tenant hereby agree as follows:

1.   Capitalized Terms.  All initially capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Lease.

2.   Rent Reduction Period.  During the period commencing retroactively on November 1, 2011 and continuing through January 31, 2013 (the "**Extended Rent Reduction Period**"), Tenant's total monthly rental charges shall be reduced by an amount equal to Four Thousand Five Hundred Dollars ($4,500.00) which shall be applied to Tenant's account, in advance, on or before the first day of each calendar month.

3.   Percentage Rent. During the Extended Rent Reduction Period, Tenant shall pay Percentage Rent in an amount equal to six percent (6%) of Gross Revenue in excess of One Million Dollars ($1,000,000), which shall continue to be due and payable in the manner set forth in the Lease.

4.   Utility Payments. Tenant expressly acknowledges and agrees that it will continue to pay all utility charges at the Premises due under the Lease throughout the Extended Rent Reduction Period.

*Second Amendment of Lease*
*Simi Valley (Angl)*

5.     <u>Assignment/Sublease</u>. Except for any Permitted Assignments permitted under the Lease, in the event Tenant requests to assign or sublet its interest in the Lease, the rent reduction granted in this Amendment shall become null and void upon such assignment or subletting and all Rents shall become payable thereafter as originally set forth in the Lease.

6.     <u>Confidentiality</u>. As a material inducement for Landlord to enter into this Amendment, Tenant agrees that for itself, its employees and agents that it shall not disclose to anyone the deferred Rents and payment plan granted by Landlord pursuant to the terms of this Amendment. Any such breach of this provision shall be deemed a default under the Lease. Notwithstanding the foregoing, Tenant shall not be prohibited from providing the particulars of this Amendment with any parent, affiliate, legal counsel, lender, consultant, and for any disclosure required by administrative or legal proceedings.

7.     <u>Estoppel</u>. Tenant hereby represents and warrants to Landlord, and agrees, that the Lease is in full force and effect, that to the best of Tenant's knowledge there is no Landlord default under the Lease in existence as of the Effective Date, and to the best of Tenant's knowledge, as of the Effective Date, no event has occurred which, with the giving of notice or the passage of time, or both, would ripen into a Landlord default under the Lease. Tenant further acknowledges that the Lease has not been modified or amended in any way except as specifically set forth herein.

8.     <u>Default</u>. If Tenant is in default of any of its obligations under the Lease beyond any applicable notice and cure period, in addition to all other remedies which Landlord may have under the Lease or at law or in equity, the reduction in Rents granted in this Amendment shall automatically become null and void and Tenant shall be obligated to pay Landlord the full amount of all Rents due pursuant to the terms of the Lease for the remainder of the Term as if no reduction in Rents had been granted hereunder.

9.     <u>Landlord Notice Address</u>. The Landlord's notice address set forth in the Lease shall be deleted in its entirety and replaced with:

> W/A SVT Holdings VI, L.L.C.
> 900 N. Michigan Avenue, Suite 1900
> Chicago, Illinois 60611
> Attn: David S. Joseph, II

10.    <u>Brokers</u>. Each party hereto warrants that it has had no dealings with any brokers or finders in connection with this Amendment. Each party covenants to indemnify, defend and hold the other party harmless from all damages, liability and expense arising from any claims or demands of any other brokers or finders for any commission alleged to be due such brokers or finders in connection with their participation on behalf of the indemnifying party in the negotiation of this Amendment.

11.    <u>Integration of Amendment and Lease</u>. This Amendment and the Lease shall be deemed to be, for all purposes, one instrument. In the event of any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall, in all instances, control and prevail. Except as expressly

2

modified herein, all other terms and conditions of the Lease shall be unamended and remain in full force and effect.

12.      Authority.  Each individual signing this Amendment represents and warrants that he/she has the respective authority to sign this Amendment and bind to this Amendment the party on whose behalf such person signs.

13.      Counterparts.  This Amendment may be executed by each of the parties hereto in separate counterparts and have the same force and effect as if all of the parties had executed it as a single document.

14.      Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the State of California.

*[Remainder of page intentionally left blank; signature pages follow.]*

3

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the Effective Date.

LANDLORD:

W/A SVT HOLDINGS VI, L.L.C.,
a Delaware limited liability company

By:    Walton SVT Investors VI, L.L.C.,
     a Delaware limited liability company,
     its Sole Member

    By:    Walton REIT Holdings B-VI, L.L.C.,
         a Delaware limited liability company,
         its Sole Member

        By:    Walton REIT B-VI, L.L.C.,
             a Delaware limited liability company,
             its Managing Member

            By:    Walton Street Real Estate Fund VI-Q, L.P.,
                a Delaware limited partnership,
                its Managing Member

                By:    Walton Street Managers VI, L.P.,
                    a Delaware limited partnership,
                    its General Partner

                    By:    WSC Managers VI, Inc.,
                        a Delaware corporation,
                        its General Partner

                    By: _____
                    Name: __Robby Schwindt__
                    Title: ___Vice President___

4

*CHI 6173760lv1 November 7, 2011*

## THIRD AMENDMENT OF LEASE

THIS THIRD AMENDMENT OF LEASE (this "**Amendment**") made and entered into this _11th_ day of _December_, 2012 (the "**Effective Date**"), by and between W/A SVT HOLDINGS VI, L.L.C., a Delaware limited liability company (successor in interest to SIMI VALLEY MALL, LLC, a Delaware limited liability company) having an address for purposes hereof at 900 N. Michigan Avenue, Suite 1900, Chicago, Illinois 60611 ("**Landlord**"), and JEFF SUNG KIM and YOUNG A. KIM, as husband and wife, having an address for purposes hereof at 2301 - 2313 E. 51st Street, Vernon, California 90058 ("**Tenant**").

## W I T N E S S E T H:

**WHEREAS,** Landlord and Tenant entered into a certain lease agreement dated March 6, 2006, as modified by that certain First Amendment of Lease dated November 22, 2010, and Second Amendment of Lease dated December 19, 2011 (collectively, the "**Lease**") for Unit No. 135 (the "**Premises**") in The Mall at Simi Valley Town Center located in Simi Valley, California (the "**Shopping Center**"), as more fully set forth in the Lease;

**WHEREAS,** pursuant to the First Amendment of Lease Tenant was granted a temporary Rent reduction; and

**WHEREAS,** Landlord and Tenant desire to further amend the Lease to extend the temporary Rent reduction period on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00), other good and valuable consideration and of the agreements of the parties hereinafter set forth, Landlord and Tenant hereby agree as follows:

1.  <u>Capitalized Terms</u>. All initially capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Lease.

2.  <u>Rent Reduction Period</u>. During the period commencing retroactively on February 1, 2013 and continuing through January 31, 2014 (the "**Extended Rent Reduction Period**"), Tenant's total monthly rental charges shall be reduced by an amount equal to Four Thousand Five Hundred Dollars ($4,500.00) which shall be applied to Tenant's account, in advance, on or before the first day of each calendar month.

3.  <u>Percentage Rent</u>. During the Extended Rent Reduction Period, Tenant shall pay Percentage Rent in an amount equal to six percent (6%) of Gross Revenue in excess of One Million Dollars ($1,000,000), which shall continue to be due and payable in the manner set forth in the Lease.

4.  <u>Utility Payments</u>. Tenant expressly acknowledges and agrees that it will continue to pay all utility charges at the Premises due under the Lease throughout the Extended Rent Reduction Period.

Case 2:16-bk-23836-SK    Doc 81    Filed 12/29/16    Entered 12/29/16 16:48:37    Desc
Main Document    Page 365 of 381

5.    <u>Termination Right</u>.  Notwithstanding anything in the Lease to the contrary, Landlord shall have the option to terminate the Lease at any time upon prior written notice to Tenant.  In the event Landlord exercises the aforesaid option to terminate, the effective date of termination of the Lease shall be forty five (45) days from the date of Landlord's written notice to terminate ("**Termination Date**").  On or before the Termination Date, Tenant shall remove all of its movable trade fixtures, equipment and merchandise from the Premises leaving same in a broom-clean condition and shall turn over all keys to the Premises to Landlord.  Tenant shall be responsible for any damage caused to the Premises by the removal of said fixtures, equipment and merchandise, reasonable wear and tear excepted.  Tenant covenants and agrees to pay Landlord all sums accruing and/or required to be paid by Tenant pursuant to the provisions of the Lease through the Termination Date, as and when any of such sums become due and payable.

6.    <u>Right to Relocate</u>.  Landlord may relocate the Tenant to another area of the Shopping Center, herein referred to as the "**New Premises**", provided the New Premises shall have approximately the same rentable square footage of space and storefront lineal frontage and be similar to the Premises for Tenant's Permitted Use.  In the event the New Premises are not acceptable to Tenant, Tenant shall have the right to terminate the Lease upon written notice to Landlord given within thirty (30) days after the identification by Landlord of the New Premises. Provided that Tenant is open and operating at the Premises at the time Landlord exercises the rights granted by this paragraph, Landlord will, at Landlord's sole cost and expense, fully construct, improve and decorate the New Premises, except for Tenant's inventory, so that the New Premises are in accordance with Tenant's latest prototype, including any costs associated with the store layout and preparation of architectural drawings for the New Premises, in a manner substantially identical to the Premises, subject only to such modifications as may be necessary and approved by Tenant in order to accommodate the configuration of the New Premises. Landlord agrees to pay all reasonable costs incurred in connection with moving Tenant and Tenant's trade fixtures, inventory and other personal property to the New Premises, including any incidental costs incurred by Tenant in connection with said relocation (such as costs for new business cards and letterhead) up to a maximum of One Thousand Dollars ($1,000.00) for such incidental costs. Tenant shall not be obligated to pay any Fixed Minimum Rent or other charges for the period of time during which Tenant is closed as a result of said move.  Tenant shall not be required to relocate to any New Premises between October 1st and December 31st, inclusive. Landlord shall provide Tenant with at least three (3) months prior notice before making such relocation.  Tenant shall cooperate with Landlord in all reasonable ways to facilitate the move.

7.    <u>Assignment/Sublease</u>. Except for any Permitted Assignments permitted under the Lease, in the event Tenant requests to assign or sublet its interest in the Lease, the rent reduction granted in this Amendment shall become null and void upon such assignment or subletting and all Rents shall become payable thereafter as originally set forth in the Lease.

8.    <u>Confidentiality</u>. As a material inducement for Landlord to enter into this Amendment, Tenant agrees that for itself, its employees and agents that it shall not disclose to anyone the deferred Rents and payment plan granted by Landlord pursuant to the terms of this Amendment.  Any such breach of this provision shall be deemed a default under the Lease. Notwithstanding the foregoing, Tenant shall not be prohibited from providing the particulars of this Amendment with any parent, affiliate, legal counsel, lender, consultant, and for any disclosure required by administrative or legal proceedings.

*CHI 63204121*

9.      Estoppel. Tenant hereby represents and warrants to Landlord, and agrees, that the Lease is in full force and effect, that to the best of Tenant's knowledge there is no Landlord default under the Lease in existence as of the Effective Date, and to the best of Tenant's knowledge, as of the Effective Date, no event has occurred which, with the giving of notice or the passage of time, or both, would ripen into a Landlord default under the Lease. Tenant further acknowledges that the Lease has not been modified or amended in any way except as specifically set forth herein.

10.      Default. If Tenant is in default of any of its obligations under the Lease beyond any applicable notice and cure period, in addition to all other remedies which Landlord may have under the Lease or at law or in equity, the reduction in Rents granted in this Amendment shall automatically become null and void and Tenant shall be obligated to pay Landlord the full amount of all Rents due pursuant to the terms of the Lease for the remainder of the Term as if no reduction in Rents had been granted hereunder.

11.      Brokers. Each party hereto warrants that it has had no dealings with any brokers or finders in connection with this Amendment. Each party covenants to indemnify, defend and hold the other party harmless from all damages, liability and expense arising from any claims or demands of any other brokers or finders for any commission alleged to be due such brokers or finders in connection with their participation on behalf of the indemnifying party in the negotiation of this Amendment.

12.      Integration of Amendment and Lease. This Amendment and the Lease shall be deemed to be, for all purposes, one instrument. In the event of any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall, in all instances, control and prevail. Except as expressly modified herein, all other terms and conditions of the Lease shall be unamended and remain in full force and effect.

13.      Authority. Each individual signing this Amendment represents and warrants that he/she has the respective authority to sign this Amendment and bind to this Amendment the party on whose behalf such person signs.

14.      Counterparts. This Amendment may be executed by each of the parties hereto in separate counterparts and have the same force and effect as if all of the parties had executed it as a single document.

15.      Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the State of California.

*[Remainder of page intentionally left blank; signature pages follow.]*

3

CHI 63204121

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the Effective Date.

**LANDLORD:**

**W/A SVT HOLDINGS VI, L.L.C.,**
a Delaware limited liability company

By:    Walton SVT Investors VI, L.L.C.,
       a Delaware limited liability company,
       its Sole Member

      By:    Walton REIT Holdings B-VI, L.L.C.,
            a Delaware limited liability company,
            its Sole Member

            By:    Walton REIT B-VI, L.L.C.,
                  a Delaware limited liability company,
                  its Managing Member

                  By:    Walton Street Real Estate Fund VI-Q, L.P.,
                        a Delaware limited partnership,
                        its Managing Member

                        By:    Walton Street Managers VI, L.P.,
                              a Delaware limited partnership,
                              its General Partner

                              By:    WSC Managers VI, Inc.,
                                    a Delaware corporation,
                                    its General Partner

                                    By: _____
                                    Name: _Robby Schwindt_____
                                    Title: __Vice President_____

4

**TENANT**:

By: _____

Name: Jeff Sung Kim, an individual


By: _____

Name: Young A. Kim, an individual

1
2
3
4
5
6
7
8

# EXHIBIT "B"

9
10

[Income Statements for Retail Stores]

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Store Sales Analysis*

## P&L by Store_Dec 2015 - Nov 2016 Beverly Center

| #27 Beverly Center | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 70,737.96 | 42,443 | 8,289 | 19,058 | 827 | 4,971 | 9,298 |
| Jan-16 | 48,547.30 | 29,128 | 7,721 | 17,558 | 2,302 | 3,269 | (1,721) |
| Feb-16 | 53,012.83 | 31,808 | 5,869 | 17,558 | 1,083 | 5,871 | 1,427 |
| Mar-16 | 58,231.83 | 34,939 | 8,650 | 17,558 | 1,375 | 5,100 | 2,257 |
| Apr-16 | 57,674.42 | 34,605 | 5,575 | 17,558 | 641 | 5,459 | 5,372 |
| May-16 | 53,345.38 | 32,007 | 5,742 | 19,783 | 750 | 3,452 | 2,281 |
| Jun-16 | 28,801.05 | 17,281 | 5,585 | 17,414 | 2,834 | 5,344 | (13,897) |
| Jul-16 | 32,150.91 | 19,291 | 5,176 | 16,829 | 1,273 | 5,485 | (9,472) |
| Aug-16 | 30,290.50 | 18,174 | 7,260 | 10,829 | 1,135 | 4,151 | (5,200) |
| Sep-16 | 21,878.63 | 13,127 | 5,504 | 10,829 | 1,775 | 5,534 | (10,514) |
| Oct-16 | 22,426.09 | 13,456 | 2,619 | 10,829 | 1,079 | 6,151 | (7,222) |
| Nov-16 | 22,683.71 | 13,610 | 8,791 | 12,829 | 1,140 | 5,082 | (14,231) |
| STORE TOTAL | 499,780.61 | 299,868 | 76,780 | 188,629 | 16,213 | 59,867 | (41,622) |

**Store Sales Analysis**

## *P&L by Store_Dec 2015 - Nov 2016 Glendale Gellaria*

| #31 Glendale Gellaria | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 63,546.32 | 38,128 | 9,397 | 17,646 | 1,176 | 4,971 | 4,937 |
| Jan-16 | 35,374.67 | 21,225 | 8,627 | 19,725 | 678 | 3,269 | (11,074) |
| Feb-16 | 34,149.08 | 20,489 | 11,309 | 19,725 | 1,449 | 5,871 | (17,864) |
| Mar-16 | 48,202.27 | 28,921 | 12,553 | 19,725 | 1,111 | 5,100 | (9,567) |
| Apr-16 | 41,818.37 | 25,091 | 5,823 | 19,725 | 682 | 5,459 | (6,598) |
| May-16 | 43,850.04 | 26,310 | 6,777 | 19,725 | 1,068 | 3,452 | (4,712) |
| Jun-16 | 39,935.41 | 23,961 | 6,708 | 19,725 | 1,053 | 5,344 | (8,869) |
| Jul-16 | 43,691.22 | 26,215 | 7,436 | 19,725 | 881 | 5,485 | (7,313) |
| Aug-16 | 39,746.15 | 23,848 | 11,872 | 19,725 | 1,269 | 4,151 | (13,168) |
| Sep-16 | 34,087.09 | 20,452 | 4,945 | 19,725 | 1,043 | 5,534 | (10,795) |
| Oct-16 | 34,536.98 | 20,722 | 3,290 | 19,725 | 1,049 | 6,151 | (9,493) |
| Nov-16 | 34,285.40 | 20,571 | 8,586 | 19,725 | 994 | 5,082 | (13,816) |
| STORE TOTAL | 493,223.00 | 295,934 | 97,324 | 234,623 | 12,452 | 59,867 | (108,331) |

*Store Sales Analysis*

## *P&L by Store_Dec 2015 - Nov 2016 Brea Mall*

| #43 Brea Mall | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 48,098.96 | 28,859 | 8,953 | 19,252 | 908 | 4,971 | (5,225) |
| Jan-16 | 26,039.44 | 15,624 | 5,735 | 19,518 | 511 | 3,269 | (13,409) |
| Feb-16 | 31,065.73 | 18,639 | 4,873 | 19,518 | 505 | 5,871 | (12,128) |
| Mar-16 | 38,780.91 | 23,269 | 7,054 | 19,518 | 205 | 5,100 | (8,608) |
| Apr-16 | 33,035.85 | 19,822 | 3,645 | 19,518 | 204 | 5,459 | (9,005) |
| May-16 | 33,324.56 | 19,995 | 4,566 | 19,854 | 237 | 3,452 | (8,114) |
| Jun-16 | 542.90 | 326 | 657 | 19,854 | 786 | 5,344 | (26,315) |
| Jul-16 | - | 0 | 0 | 19,880 | 165 | 5,485 | (25,530) |
| Aug-16 | 30,728.46 | 18,437 | 3,598 | 19,894 | 209 | 4,151 | (9,414) |
| Sep-16 | 27,556.88 | 16,534 | 5,350 | 19,894 | 234 | 5,534 | (14,478) |
| Oct-16 | 30,031.20 | 18,019 | 2,901 | 19,894 | 150 | 6,151 | (11,077) |
| Nov-16 | 26,338.51 | 15,803 | 8,290 | 19,894 | 152 | 5,082 | (17,614) |
| STORE TOTAL | 325,543 | 195,326 | 55,622 | 236,487 | 4,267 | 59,867 | (160,917) |

**Store Sales Analysis**

## P&L by Store_Dec 2015 - Nov 2016 Simi Valley

| #12 Simi Valley | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 21,624.62 | 12,975 | 3,661 | 10,365 | 2,356 | 4,971 | (8,379) |
| Jan-16 | 11,162.62 | 6,698 | 3,400 | 10,365 | 891 | 3,269 | (11,227) |
| Feb-16 | 8,478.21 | 5,087 | 4,120 | 10,365 | 406 | 5,871 | (15,675) |
| Mar-16 | 13,582.51 | 8,150 | 4,982 | 10,365 | 1,030 | 5,100 | (13,328) |
| Apr-16 | 11,156.26 | 6,694 | 3,416 | 10,365 | 855 | 5,459 | (13,401) |
| May-16 | 12,591.01 | 7,555 | 3,329 | 10,365 | 855 | 3,452 | (10,446) |
| Jun-16 | 12,509.41 | 7,506 | 3,488 | 10,365 | 1,183 | 5,344 | (12,875) |
| Jul-16 | 14,903.31 | 8,942 | 3,515 | 10,365 | 1,253 | 5,485 | (11,675) |
| Aug-16 | 18,704.08 | 11,222 | 5,151 | 10,365 | 1,484 | 4,151 | (9,928) |
| Sep-16 | 12,666.91 | 7,600 | 3,530 | 10,365 | 1,453 | 5,534 | (13,282) |
| Oct-16 | 13,968.33 | 8,381 | 1,795 | 10,365 | 1,387 | 6,151 | (11,317) |
| Nov-16 | 15,394.14 | 9,236 | 5,389 | 10,365 | 1,982 | 5,082 | (13,581) |
| STORE TOTAL | 166,741.43 | 100,045 | 45,776 | 124,383 | 15,133 | 59,867 | (145,113) |

*Store Sales Analysis*

## P&L by Store_Dec 2015 - Nov 2016 South Bay

| #14 South Bay | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 33,324.08 | 19,994 | 7,773 | 16,937 | 655 | 4,971 | (10,342) |
| Jan-16 | 17,804.17 | 10,683 | 6,652 | 16,937 | 795 | 3,269 | (16,970) |
| Feb-16 | 18,405.61 | 11,043 | 4,120 | 16,937 | 406 | 5,871 | (16,290) |
| Mar-16 | 23,117.00 | 13,870 | 4,755 | 16,937 | 356 | 5,100 | (13,277) |
| Apr-16 | 20,796.71 | 12,478 | 2,836 | 16,937 | 356 | 5,459 | (13,110) |
| May-16 | 21,107.37 | 12,664 | 3,337 | 16,937 | 656 | 3,452 | (11,718) |
| Jun-16 | 20,279.59 | 12,168 | 3,265 | 16,937 | 963 | 5,344 | (14,342) |
| Jul-16 | 16,135.28 | 9,681 | 3,030 | 16,937 | 736 | 5,485 | (16,507) |
| Aug-16 | 14,886.25 | 8,932 | 4,728 | 16,937 | 870 | 4,151 | (17,754) |
| Sep-16 | 11,738.67 | 7,043 | 3,060 | 16,937 | 651 | 5,534 | (19,139) |
| Oct-16 | 13,870.92 | 8,323 | 1,896 | 16,937 | 607 | 6,151 | (17,268) |
| Nov-16 | 11,746.02 | 7,048 | 5,718 | 16,937 | 564 | 5,082 | (21,254) |
| STORE TOTAL | 223,211.65 | 133,927 | 51,172 | 203,244 | 7,614 | 59,867 | (187,970) |

**Store Sales Analysis**

### P&L by Store_Dec 2015 - Nov 2016 Temecula

| #17 Temecula | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 55,678.56 | 33,407 | 6,710 | 15,533 | 1,514 | 4,971 | 4,678 |
| Jan-16 | 23,651.59 | 14,191 | 5,146 | 15,533 | 1,162 | 3,269 | (10,919) |
| Feb-16 | 26,873.03 | 16,124 | 5,844 | 15,533 | 1,572 | 5,871 | (12,697) |
| Mar-16 | 30,812.67 | 18,488 | 8,998 | 15,533 | 1,220 | 5,100 | (12,363) |
| Apr-16 | 27,890.57 | 16,734 | 5,288 | 15,533 | 1,390 | 5,459 | (10,936) |
| May-16 | 27,454.31 | 16,473 | 4,971 | 15,533 | 1,549 | 3,452 | (9,032) |
| Jun-16 | 19,161.49 | 11,497 | 4,763 | 15,533 | 1,428 | 5,344 | (15,572) |
| Jul-16 | 29,733.41 | 17,840 | 3,446 | 15,533 | 1,335 | 5,485 | (7,959) |
| Aug-16 | 25,513.93 | 15,308 | 6,684 | 15,533 | 2,508 | 4,151 | (13,568) |
| Sep-16 | 26,072.51 | 15,644 | 4,100 | 15,533 | 1,516 | 5,534 | (11,039) |
| Oct-16 | 21,738.75 | 13,043 | 1,930 | 15,533 | 1,650 | 6,151 | (12,221) |
| Nov-16 | 23,790.58 | 14,274 | 7,465 | 15,533 | 1,774 | 5,082 | (15,580) |
| STORE TOTAL | 338,371.41 | 203,023 | 65,345 | 186,402 | 18,618 | 59,867 | (127,209) |

**Store Sales Analysis**

## P&L by Store_Dec 2015 - Nov 2016 Rancho Cucamonga

| #38 Rancho Cucamonga | Sales | Gross Margin | Payroll | Landlord | Other Occupancy | Other Selling | Cash Profit |
|---|---|---|---|---|---|---|---|
| Dec-15 | 51,179.87 | 30,708 | 7,251 | 18,162 | 1,198 | 4,971 | (874) |
| Jan-16 | 27,628.83 | 16,577 | 6,193 | 18,162 | 976 | 3,269 | (12,022) |
| Feb-16 | 30,175.64 | 18,105 | 5,691 | 18,162 | 1,050 | 5,871 | (12,668) |
| Mar-16 | 40,678.24 | 24,407 | 6,539 | 18,162 | 996 | 5,100 | (6,390) |
| Apr-16 | 31,644.22 | 18,987 | 4,443 | 18,162 | 1,252 | 5,459 | (10,328) |
| May-16 | 32,615.20 | 19,569 | 4,372 | 18,728 | 998 | 3,452 | (7,981) |
| Jun-16 | 26,087.64 | 15,653 | 5,192 | 18,728 | 1,609 | 5,344 | (15,221) |
| Jul-16 | 35,126.47 | 21,076 | 4,883 | 18,728 | 1,834 | 5,485 | (9,854) |
| Aug-16 | 30,238.30 | 18,143 | 7,458 | 18,728 | 2,133 | 4,151 | (14,326) |
| Sep-16 | 29,704.14 | 17,822 | 4,709 | 18,728 | 1,810 | 5,534 | (12,959) |
| Oct-16 | 22,786.94 | 13,672 | 1,530 | 18,728 | 1,905 | 6,151 | (14,641) |
| Nov-16 | 25,076.81 | 15,046 | 7,643 | 18,728 | 929 | 5,082 | (17,336) |
| STORE TOTAL | 382,942.31 | 229,765 | 65,905 | 221,907 | 16,687 | 59,867 | (134,600) |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO REJECT CERTAIN UNEXPIRED NONRESIDENTIAL REAL PROPERTY LEASES PURSUANT TO 11 U.S.C. § 365 AND ABANDON ANY REMAINING PERSONAL PROPERTY LOCATED AT THE LEASED PREMISES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JEFF SUNGHAK KIM FILED IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **December 29, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Marc Andrews    bankruptcycls@wellsfargo.com, andrewma@wellsfargo.com**
- **Dustin P Branch    branchd@ballardspahr.com, carolod@ballardspahr.com;hubenb@ballardspahr.com**
- **Lynn Brown    notices@becket-lee.com**
- **John H Choi    johnchoi@kpcylaw.com, christinewong@kpcylaw.com**
- **Brian D Huben    hubenb@ballardspahr.com, carolod@ballardspahr.com**
- **Dare Law    dare.law@usdoj.gov**
- **Thor D McLaughlin    tmclaughlin@allenmatkins.com, igold@allenmatkins.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Ronald M Tucker    rtucker@simon.com, cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Michael A Wallin    mwallin@slaterhersey.com, mrivera@slaterhersey.com**

**2.  SERVED BY UNITED STATES MAIL**: On **December 29, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **December 29, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

1

***Served via Attorney Service***
The Honorable Sandra R. Klein

2   United States Bankruptcy Court
Edward R. Roybal Federal Building and Courthouse

3   255 E. Temple Street, Suite 1582 / Courtroom 1575
Los Angeles, CA 90012

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is

5   true and correct.

6   ___December 29, 2016_____Stephanie Reichert_____/s/ Stephanie Reichert_____

    *Date*                          *Type Name*                    *Signature*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                        **F 9013-3.1.PROOF.SERVICE**

Blue Bee, Inc.
Leases

Glendale II Mall Associates, LLC
c/o Glendale Galleria
110 N. Wacker Drive
Attn: Law/Lease Admin. Dept.
Chicago, IL 60606

La Cienega Partners Limited Partnership
c/o The Taubman Company
Attn: General Counsel
200 East Long Lake Road #300
P.O. Box 200
Bloomfield Hills, MI 48303

Rancho Mall, LLC
Terminal Tower
50 Public Square, Suite 1360
Cleveland, OH 44113-2267

The Retail Property Trust
c/o M.S. Management Associates, Inc.
225 West Washington St.
Indianapolis, IN 46204-3438

South Bay Center SPE, LLC
Terminal Tower
50 Public Square, Suite 1360
Cleveland, OH 44113-2267

Temecula Towne Center Associates LP
Terminal Tower
50 Public Square, Suite 1360
Cleveland, OH 44113-2267

W/A SVT Holdings VI, LLC
900 N. Michigan Avenue, Suite 1900
Chicago, IL 60611
Attn: David S. Joseph, II

Ivan Gold, Esq.
Allen Matkins
3 Embarcadero Center, 12th Floor
San Francisco, CA  94111-4074

Blue Bee, Inc.
Top 20, Secured Creditors, OUST, RSN

Dare Law
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

U.S. BANK EQUIPMENT FINANCE
1310 MADRID STREET, SUITE 106
MARSHALL MN 56258

IRS/OHIO
P.O. BOX 145595
CINCINNATI OH 45250

LINE & DOT, LLC DBA LUMIERE
COLLECTIONS
1912 E. VERNON AVE., STE. 100
LOS ANGELES CA 90058

PACIFIC CITY BANK
3701 WILSHIRE BLVD., SUITE 310
LOS ANGELES CA 90010

BOARD OF EQUALIZATION
PO BOX 942879
SACRAMENTO CA 94279

TYLER MALL LIMITED PARTNERSHIP, A
DELAWARE LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

PACIFIC CITY BANK
3701 WILSHIRE BLVD., SUITE 100
LOS ANGELES CA 90010

GGP-OTAY RANCH, L.P., A DELAWARE
LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

FASHBLVD., INC.
1700 E. 58TH PL., #9
LOS ANGELES, CA 90001

VALLEY PLAZA MALL, LP, A DELAWARE
LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

Caribbean Queen Inc.
1128 S. Crocker Street
Los Angeles, CA 90021

Alythea
1016 S. Towne Ave., #106
Los Angeles, CA 90021

CA State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Brian D. Huben
Dustin P. Branch
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067

Horton Plaza, LLC
Blackmar, Principe & Schmelter, APC
600 B Street, Suite 2250
San Diego, CA 92101

Macerich Fresno LP
PO Box 849418
Los Angeles, CA 90084-9418

L'atiste
424 Towne Avenue
Los Angeles, CA 90021

Lynx Property Management Inc
924 Laguna St. Suite B
Santa Barbara, CA 93101

Paseo Nuevo Owner LLC
PO Box 780268
Philadelphia, PA 19178-0268

Macerich SMP LP
c/o David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367

Nine Planet
1022 S. Wall Street
Los Angeles, CA 90015

SEVEND
2301 E. 7th St.
Suite E-200
Los Angeles, CA 90023

Plaza Bonita, LLC
Blackmar, Principe & Schmelter, APC
600 B. Street, Suite 2250
San Diego, CA 92101

Rancho Mall LLC
PO Box 72439
Cleveland, OH 44192

The Retail Property Trust
Brea Mall
PO Box 772827
Chicago, IL 60677-2827

Shops at Mission Viejo LLC
7415 Solution Center
Chicago, IL 60677-7004

South Bay Center SPE LLC
PO Box 72056
Cleveland, OH 44192-0056

Tyler Mall Limited Partnership
SDS-12-3113
PO Box 86
Minneapolis, MN 55486-3113

W/A SVT Holdings VI LLC
PO Box 749659
Los Angeles, CA 90074-9659

Integrity Payment Systems
1700 Higgins Road # 690
Des Plaines, IL  60018

*Counsel to Caribbean Queen Inc.*
Law Offices of Jacqueline N. Anker
27 W Anapamu, Suite 325
Santa Barbara, CA 93101

*Counsel to Macerich Cerritos LLC*
David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367