TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re | ) Case No. 2:16-bk-23836-SK |
| | ) |
| BLUE BEE, INC., | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) **NOTICE OF MOTION AND MOTION** |
| | ) **FOR ENTRY OF ORDER AUTHORIZING** |
| | ) **DEBTOR TO USE CASH COLLATERAL** |
| | ) **THROUGH AND INCLUDING JANUARY** |
| | ) **20, 2018; MEMORANDUM OF POINTS** |
| | ) **AND AUTHORITIES; DECLARATION** |
| | ) **OF JEFF SUNGHAK KIM IN SUPPORT** |
| | ) **THEREOF** |
| | ) |
| | ) Date:          October 19, 2017 |
| | ) Time:          8:30 a.m. |
| | ) Courtroom:   1575 |
| | ) Location:      255 E. Temple Street |
| | )                   Los Angeles, California |
| | ) |
| | ) |
| | ) |
| | ) |

1

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** .......................................................**4**

**I.     STATEMENT OF FACTS** .........................................................................................**4**

   **A.     Background** ........................................................................................................**4**

   **B.     Postpetition Cash Collateral Use, Business Operations And
            Reorganization Efforts** ....................................................................................**6**

   **C.     The Debtor's Primary Assets And Secured Debts** ..........................................**9**

   **D.     The Need For Use Of Cash Collateral And Proposed New Operating
            Budget** ............................................................................................................**14**

**II.    DISCUSSION** ..........................................................................................................**14**

   **A.     The Debtor Must Be Authorized To Use Cash Collateral To Operate
            Its Business And To Maintain And Preserve The Value Of Its Assets** ........**14**

   **B.     The Debtor's Prepetition Secured Creditors Are Adequately Protected
            By A Substantial Equity Cushion, The Continued Operation Of The
            Debtor's Business And Other Forms Of Adequate Protection** ...................**16**

**III.   PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE
        MOTION HAVE BEEN SATISFIED** .....................................................................**20**

**IV.    CONCLUSION** .......................................................................................................**21**

i

1

# TABLE OF AUTHORITIES

2

Page(s)

3    **FEDERAL CASES**

4    *In re Dynaco Corporation*
        162 B.R. 389 (Bankr. D.N.H. 1993) ............................................................. 15, 18
5

6    *In re Immenhausen Corp.*
        164 B.R. 347 (Bankr. M.D. Fla. 1994) ............................................................. 18

7    *In re McCombs Properties VI, Ltd.*
8        88 B.R. 261 (Bankr. C.D. Cal. l988) ..................................................... 16, 17, 18

9    *In re McGowan*
        6 B.R. 241 (Bankr. E.D. Pa. 1980) ............................................................. 17
10

11   *In re Mellor*
        734 F.2d 1396 (9th Cir. 1984) ............................................................. 16, 17

12   *In re Newark Airport/Hotel Ltd. Partnership*
13       156 B.R. 444 (Bankr. D.N.J. 1993) ............................................................. 18

14   *In re O'Connor*
        808 F.2d 1393 (10th Cir. 1987) ............................................................. 16, 19
15

16   *In re Oak Glen R-Vee*
        8 B.R. 213 (Bankr. C.D. Cal. 1981) ............................................................. 15

17   *In re Opelika Manufacturing Corporation*
18       66 B.R. 444 (Bankr. N.D. Ill. 1986) ............................................................. 17

19   *In re Rogers Development Corp.*
        2 B.R. 679 (Bankr. E.D. Vir. 1980) ............................................................. 17
20

21   *In re Stein*
        19 B.R. 458. (Bankr. E.D. Pa. 1982) ............................................................. 18

22   *In re Triplett*
23       87 B.R. 25 (Bankr. W.D.Tex. 1988) ............................................................. 18

24   *In re Tucson Industrial Partners*
        129 B.R. 614 (9th Cir. BAP 1991) ............................................................. 15
25

26   *Matter of Pursuit Athletic Footwear, Inc.*
        193 B.R. 713 (Bankr. D. Del. 1996) ............................................................. 18

27   *United Savings Association v. Timbers of Inwood Forest Associates*
        108 S.Ct. 626 (1988) ............................................................. 16, 17
28

**FEDERAL STATUTES**

11 U.S.C. § 361 ........................................................................................................................ 16

11 U.S.C. § 363 ........................................................................................................... 2, 14, 15

11 U.S.C. § 363(a) .................................................................................................................. 15

11 U.S.C. § 363(c) ....................................................................................................... 15, 16, 20

11 U.S.C. § 1107 ................................................................................................................. 4, 15

11 U.S.C. § 1108 ....................................................................................................................... 4

**FEDERAL RULES**

Fed.R.Bankr.P. 4001 .......................................................................................................... 2, 20

Fed.R.Bankr.P. 9013-1 ............................................................................................................. 2

Fed.R.Bankr.P. 9014 ................................................................................................................. 2

Fed.R.Evid. 201 ................................................................................................................. 11, 12

1    **PLEASE TAKE NOTICE** that a hearing will be held on October 19, 2017 at 8:30

2  a.m., before the Honorable Sandra R. Klein, United States Bankruptcy Judge for the Central

3  District of California, Los Angeles Division, in Courtroom "1575" located at 255 East Temple

4  Street, Los Angeles, California, for the Court to consider the motion (the "Motion") filed by

5  Blue Bee, Inc., a California corporation d/b/a Angl and the debtor and debtor-in-possession in

6  the above-captioned Chapter 11 bankruptcy case (the "Debtor"), for the entry of an order,

7  pursuant to 11 U.S.C. § 363, authorizing the Debtor to use cash collateral in accordance with the

8  Debtor's operating budget for the 13-week period from October 22, 2017 through and including

9  January 20, 2018 (the "Budget"), a copy of which is attached as **Exhibit "1"** to the Declaration

10  of Jeff Sunghak Kim annexed hereto (the "Kim Declaration").  The full basis for the Motion is

11  described in the Memorandum of Points and Authorities and the Kim Declaration attached

12  hereto.

13        The Motion is based upon 11 U.S.C. § 363, Rules 4001 and 9014 of the Federal Rules

14  of Bankruptcy Procedure, and Local Bankruptcy Rules 4001-2 and 9013-1, the supporting

15  Memorandum of Points and Authorities and the Kim Declaration attached hereto, the

16  statements, arguments and representations of counsel to be made at the hearing on the Motion,

17  and any other evidence properly presented to the Court at or prior to the hearing on the Motion.

18        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

19  1(f), any opposition to the Motion must be in writing, filed with the Court and served upon the

20  United States Trustee as well as counsel for the Debtor at the address set forth in the upper left-

21  hand corner of the first page of this Notice and Motion by no later than fourteen (14) days

22  before the date of the hearing on the Motion.

23        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

24  1(h), the failure to file and serve a timely opposition to the Motion may be deemed by the Court

25  to constitute consent to the granting of the relief requested in the Motion.

26  / / /

27  / / /

28

1    **WHEREFORE,** the Debtor respectfully requests that this Court enter an order in

2    substantially the form attached as **Exhibit "2"** to the Kim Declaration annexed hereto:

3        (1)      granting the Motion in its entirety;

4        (2)      authorizing the Debtor to use cash collateral to (i) pay all of the expenses set

5    forth in the Budget, with authority to deviate from the line items contained in the Budget by up

6    to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into

7    the following week(s); and (ii) pay all quarterly fees owing to the Office of the United States

8    Trustee and all expenses owing to the Clerk of the Bankruptcy Court; and

9        (3)      granting such other and further relief as the Court deems just and proper.

10   Dated:  September 28, 2017                    BLUE BEE, INC.

11

12

13                                       By:_____

14                                           TIMOTHY J. YOO
                                             JULIET Y. OH
15                                           LEVENE, NEALE, BENDER, YOO
                                                & BRILL L.L.P.
16                                           Attorneys for Debtor and
                                             Debtor in Possession

17

18

19

20

21

22

23

24

25

26

27

28

3

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS

**A.      Background.**

1.      On October 19, 2016 (the "Petition Date"), Blue Bee, Inc., a California corporation d/b/a Angl and the debtor and debtor-in-possession herein (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").   The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.      The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers.   As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California (collectively, the "Retail Stores," and individually, a "Retail Store").

3.      The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by Jeff Sunghak Kim and his wife, Young Ae Kim, and was dissolved on August 30, 2013.   Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.   The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  Jeff Sunghak Kim and his wife, Young Ae Kim, continue to be actively involved in the Debtor's business operations as the President and Secretary of the Debtor, respectively.

4.      The Debtor is headquartered near downtown Los Angeles, California in Vernon, California and, as of the Petition Date, employed a workforce of approximately 110 employees. In 2015, the Debtor generated annual gross revenues of more than $24 million.

5.      After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a

4

total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The vast majority of these new retail stores (approximately 43 stores) were opened within the seven-year period prior to the Petition Date.  This large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

6.    The high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors.  As a result of the Debtor's defaults, numerous landlords began commencing actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of the Retail Stores.  While the Debtor had already closed a number of its less profitable retail store locations, leaving open 21 Retail Stores as of the Petition Date, the Debtor required time to evaluate the viability of the remaining Retail Stores and identify other ways to decrease operational costs and increase profitability.  In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

7.    Through its bankruptcy case, the Debtor intended to identify the core Retail Stores around which the Debtor can successfully reorganize and expeditiously close those Retail Stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords (a process which has now been completed), and thereafter formulate and seek confirmation of a plan of reorganization ("Plan") which restructures the Debtor's existing debt in a cohesive and efficient manner while facilitating the continued operation of the Debtor's longstanding business.

/ / /

/ / /

**B.** **Postpetition Cash Collateral Use, Business Operations And Reorganization Efforts.**

8.    Since the Petition Date, the Debtor has continued operating its business in the normal course.

9.    Shortly after the Petition Date, on October 24, 2016, the Debtor filed an emergency motion (the "First CC Motion") seeking an order, among other things, authorizing the Debtor to use cash collateral in accordance with the Debtor's initial 13-week operating budget submitted therewith (the "Initial Budget").

10.    On November 1, 2016, the Court entered an interim order granting the First CC Motion on an interim basis, pending a final hearing (the "Interim Order").  On December 14, 2016, the Court entered a final order granting the First CC Motion on a final basis and authorizing the Debtor to use cash collateral in accordance with a revised form of the Initial Budget (the "Revised Initial Budget"), subject to the terms and conditions set forth on the record of the Court at the final hearing on the First CC Motion held on November 30, 2016 (the "Final Order," and together with the Interim Order, the "First CC Orders")).

11.    On December 29, 2016, prior to the expiration of the Debtor's authority to use cash collateral pursuant to the First CC Orders, the Debtor filed a motion (the "Second CC Motion"), pursuant to which the Debtor sought an order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from January 22, 2017 through and including April 22, 2017 (the "Second Budget").

12.    On January 24, 2017, the Court entered an order granting the Second CC Motion and authorizing the Debtor to continue using cash collateral in accordance with the Second Budget and in accordance with the terms and conditions set forth in the Second CC Motion (the "Second CC Order").

13.    On March 31, 2017, prior to the expiration of the Debtor's authority to use cash collateral pursuant to the Second CC Order, the Debtor filed a motion (the "Third CC Motion"), pursuant to which the Debtor sought an order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from April 22, 2017 through and including July 22, 2017 (the "Third Budget").

14.     On April 28, 2017, the Court entered an order granting the Third CC Motion and authorizing the Debtor to continue using cash collateral in accordance with the Third Budget and in accordance with the terms and conditions set forth in the Third CC Motion (the "Third CC Order").

15.     On June 14, 2017, prior to the expiration of the Debtor's authority to use cash collateral pursuant to the Third CC Order, the Debtor filed a motion (the "Fourth CC Motion"), pursuant to which the Debtor sought an order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from July 23, 2017 through and including October 21, 2017 (the "Fourth Budget").

16.     On July 19, 2017, the Court entered an order granting the Fourth CC Motion and authorizing the Debtor to continue using cash collateral in accordance with the Fourth Budget and in accordance with the terms and conditions set forth in the Fourth CC Motion (the "Fourth CC Order").

17.     Pursuant to the Fourth CC Order, the Debtor is continuing to use its cash collateral to operate its business in accordance with the Fourth Budget and pursuant to the terms of the Fourth CC Order.

18.     The Debtor's authority to use cash collateral pursuant to the Fourth CC Order will expire on October 21, 2017.  The Debtor has therefore filed this Motion to seek an order of the Court authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from October 22, 2017 through and including January 20, 2018 (the "Budget"), a copy of which is attached as **Exhibit "1"** to the Declaration of Jeff Sunghak Kim annexed hereto (the "Kim Declaration").

19.     As noted above, the Debtor believed it was critical that it first identify the core Retail Stores around which it might ultimately be able to reorganize before the Debtor could begin exploring and formulating the terms of a feasible Plan in this case.  Accordingly, shortly after the Petition Date, the Debtor began the process of analyzing the financial performance of each of its twenty-one (21) Retail Stores (on a store-by-store basis) to determine which of the Retail Stores were currently profitable or potentially profitable if rent concessions could be

1  successfully negotiated with the landlords, and which of the Retail Stores were not profitable

2  and therefore needed to be closed on an expeditious basis.

3       20.    As a result of such analysis, during the past several months, the Debtor has

4  sought and obtained Court approval to close eight (8) of its Retail Stores and to reject the real

5  property leases associated therewith.  Based on the foregoing, the Debtor is currently operating a

6  total of thirteen (13) Retail Stores (the "Operating Retail Stores").

7       21.    On July 31, 2017, the Court entered an order authorizing the Debtor to assume

8  the real property leases for nine (9) of the Operating Retail Stores, thereby concluding the

9  Debtor's analysis and final determination regarding the assumption or rejection of the leases for

10  the Retail Stores.

11       22.    During the months that the Debtor's bankruptcy case has been pending, the

12  Debtor has worked diligently to stabilize its business operations, decrease expenses and increase

13  store revenue at its thirteen (13) Operating Retail Stores.  Although the Debtor's efforts to

14  stabilize its business operations and increase sales were hampered by, among other things, the

15  unexpectedly inclement weather in California during the 2016-2017 winter season, which in

16  turn negatively impacted the entire retail industry in California, the Debtor believes that its

17  business operations have now substantially stabilized and that it will soon be in a position to

18  accurately forecast its sales revenue and expenditures, based upon historical performance

19  (including its performance during the last approximately 9 months), to formulate and ultimately

20  support a Plan in this case.

21       23.    While the Debtor has been in the process of evaluating and formulating the

22  potential terms of a Plan, the Debtor requires additional time to complete its review of the

23  proofs of claim that have been filed by creditors in the Debtor's case (which claims will need to

24  be accounted for in any Plan), to continue to evaluate and determine the feasibility of potential

25  terms of a Plan, to continue to evaluate its business operations and to prepare accurate cash flow

26  forecasts in support of a Plan, and to complete the preparation of a Plan and disclosure statement

27  and other documents related thereto.  Based on the foregoing, the Debtor has filed concurrently

28  herewith a motion seeking the entry of a Court order extending the Debtor's exclusive periods to

2:16-bk-23836-SK    Doc 213    Filed 09/28/17    Entered 09/28/17 14:26:41    Desc
Main Document    Page 12 of 44

1    file a Plan and obtain acceptances thereof for a period of approximately thirty (30) days, to and

2    including November 16, 2017 and January 15, 2018, respectively.

3        24.    The Debtor also intends to use the brief extension of its Plan exclusivity periods,

4    if granted by the Court, to engage in discussions with its primary secured creditor, Pacific City

5    Bank (the "Bank"), regarding the potential consensual treatment of the Bank's claim against the

6    Debtor under a Plan.  As discussed in more detail below, the Bank's claim is secured by

7    substantially all assets of the Debtor and, among other things, the personal residence in Malibu,

8    California owned by the Debtor's principals, Jeff Sunghak Kim and Young Ae Kim (the

9    "Malibu Residence").  Mr. and Mrs. Kim have placed their Malibu Residence on the market and

10   have accepted an offer from a third party buyer to purchase the Malibu Residence.  Although the

11   sale of the Malibu Residence has been pending for a number of months, the sale is now on the

12   verge of closing and is anticipated to close within the next approximately thirty (30) days.  The

13   closing of the sale of the Malibu Residence will result in a substantial reduction (of

14   approximately $700,000) of the Bank's claim against the Debtor, and will therefore have a

15   significant impact upon the Debtor's discussions with the Bank regarding the potential

16   consensual treatment of the Bank's claim under a Plan.

17       25.    Based on the foregoing, the Debtor hopes to file a Plan and disclosure statement

18   in this case by mid-November 2017.

19   **C.    <u>The Debtor's Primary Assets And Secured Debts</u>.**

20       26.    The Debtor's primary assets are as follows:

21           a.    <u>Cash</u>.    As of the Petition Date, the Debtor had cash on hand of

22   approximately $93,000.  The Debtor anticipates that the amount of cash it will have on

23   hand as of October 22, 2017 will be approximately $110,000.

24           b.    <u>Security Deposits</u>.    As of the Petition Date, the Debtor had security

25   deposits with landlords and other parties in the total sum of approximately $87,013.  The

26   Debtor believes that the amount of the Security Deposits remaining (for the thirteen

27   Operating Retail Stores) is approximately $53,215.

28

c.    <u>Inventory</u>.  As of the Petition Date, the Debtor had inventory with an estimated cost value of approximately $3,500,000.  In light of the reduction of the number of operating Retail Stores from twenty one (21) Retail Stores as of the Petition Date to the current thirteen (13) Operating Retail Stores, the Debtor believes that the estimated cost value of its current inventory is approximately seventy-five percent (75%) of the estimated cost value of the inventory that the Debtor had as of the Petition Date, or approximately $2,625,000.  The Debtor is generally maintaining this level of inventory in its Operating Retail Stores as the Debtor continues to purchase new merchandise to replenish merchandise sold at the Operating Retail Stores.

d.    <u>Other Assets</u>.  As of the Petition Date, the Debtor had furniture, fixtures and equipment ("<u>FF&E</u>") with a net book value of $6,299,306.  While the Debtor initially estimated that the FF&E had an estimated aggregate fair value of approximately $1,000,000, based upon discussions that the Debtor has had with a number of liquidation companies, the Debtor believes that the only FF&E that has any actual value are the FF&E contained at the thirteen (13) Operating Retail Stores (consisting of racks, shelving, and other personal property).  The Debtor estimates that the FF&E at the Operating Retail Stores has an estimated aggregate fair market value of approximately $650,000 (or approximately $50,000 per store).  The Debtor recently "downsized" from its former warehouse facility in Vernon, California to a substantially smaller office space in Vernon, California.  In connection with the move to the smaller office space, and with the consent of the Bank, the Debtor disposed of the non-store FF&E that was being maintained at its former warehouse facility, which FF&E the Debtor was not using and the Debtor determined had nominal market value (if any).[1]

---

[1] The Debtor contacted a number of liquidation companies to determine whether the non-store FF&E that was being maintained at the Debtor's former warehouse facility could be sold or otherwise liquidated for cash.  All of the liquidation companies contacted by the Debtor declined to purchase, or otherwise be retained to liquidate, such FF&E and informed the Debtor that such FF&E had no market value (and that the Debtor would likely have to pay a third party company out-of-pocket for the cost of removing and disposing of such FF&E).

1           27.     The Debtor's senior secured lender is the Bank.  As of the Petition Date, the

2 Debtor was a borrower under three (3) separate loans with the Bank, as described below:[2]

3           a.     The Debtor is the borrower under a U.S. Small Business Administration

4 loan with the Bank (the "SBA Loan"), pursuant to a Loan Agreement dated July 24,

5 2014 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in

6 the amount of approximately $1,660,000 under the SBA Loan.  The Bank filed UCC-1

7 financing statements against the Debtor and its predecessor, Angl, Inc. asserting a lien

8 against substantially all of the assets of the Debtor and Angl, Inc.  The SBA Loan is also

9 secured by a lien against the Malibu Residence owned by the Debtor's principals, Mr.

10 and Mrs. Kim.  As noted above, there is currently a sale of the Malibu Residence

11 pending, which is anticipated to close within the next approximately thirty (30) days.  It

12 is anticipated that the Bank will receive a payment of approximately $700,000 from the

13 sale of the Malibu Residence, which will then reduce the outstanding balance of the SBA

14 Loan to approximately $960,000.

15           b.     The Debtor was the borrower under a term loan bearing the Loan Number

16 134077 with the Bank (the "First Term Loan"), pursuant to a Business Loan Agreement

17 dated November 2, 2015 between the Debtor and the Bank.  The First Term Loan was

18 secured by certain non-Debtor assets, including commercial real property owned by the

19 Debtor's affiliate, Peace People, LLC (the "Affiliate Commercial Property").  The

20 Affiliate Commercial Property was recently sold to a third party purchaser, which sale

21 resulted in the full repayment and satisfaction of the First Term Loan.  Therefore, the

22 Debtor has no remaining obligations under the First Term Loan.

23

24

---

25    [2] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial notice of the *Omnibus Declaration Of Jeff Sunghak Kim In Support Of Debtor's Emergency "First Day" Motions* filed by the Debtor on October 24, 2016 [Doc. No. 12], specifically Exhibit "B" thereto, which includes copies of

26 the pre-petition loan and collateral documents with the Bank.

27    The Debtor also requests that the Court take judicial notice of the *Declaration Of Juliet Y. Oh In Support Of Debtor's Emergency Motion For An Interim Order Authorizing The Debtor To Use Cash Collateral On An Interim*

28 *Basis Pending A Final Hearing* [Doc. No. 11], which includes copies of the UCC-1 financing statements filed by the Debtor's alleged secured creditors.

2:16-bk-23836-SK    Doc 213    Filed 09/28/17    Entered 09/28/17 14:26:41    Desc
Main Document    Page 15 of 44

c.    The Debtor was the borrower under a second term loan bearing the Loan Number 133776 (the "Second Term Loan"), pursuant to a Business Loan Agreement dated July 23, 2014 between the Debtor and the Bank. The Second Term Loan was also secured by the Affiliate Commercial Property, and was fully repaid and satisfied upon the recent successful sale of the Affiliate Commercial Property.  Therefore, the Debtor has no remaining obligations under the Second Term Loan.

28.    Prior to the Petition Date, the Debtor obtained a secured loan in the amount of $6,000 from Fashblvd., Inc. ("Fashblvd").  Flashblvd filed a UCC-1 financing statement (Document No. 57738600002) asserting a lien against substantially all of the assets of the Debtor prior to the commencement of the Debtor's bankruptcy case on October 19, 2016.[3]

29.    In addition to the financing statements filed by the Bank and Fashblvd against the Debtor and/or its predecessor, Angl, Inc., there are financing statements that have been filed against the Debtor and Angl, Inc. by the following parties[4]:

a.    U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance has one active financing statement (filing number 13-7390160767), filed on December 10, 2013, which purports to cover certain specified equipment leased or financed from U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance does not purport to assert a security interest in the Debtor's cash.

b.    California State Board Of Equalization ("SBOE").  SBOE has one active state tax lien (filing number 15-7447815850) which was recorded against the Debtor on January 29, 2015.  The Debtor believes that the amount owed to SBOE which is secured by the foregoing tax lien is $24,160.38.

---

[3] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial notice of the *Declaration Of Juliet Y. Oh In Support Of Debtor's Emergency Motion For An Interim Order Authorizing The Debtor To Use Cash Collateral On An Interim Basis Pending A Final Hearing* [Doc. No. 11], specifically Exhibit "2" thereto, which includes evidence of the filing of the UCC-1 financing statement by Fashblvd against the Debtor.

[4] In accordance with Rule 201 of the Federal Rules of Evidence, the Debtor requests that the Court take judicial notice of the *Declaration Of Juliet Y. Oh In Support Of Debtor's Emergency Motion For An Interim Order Authorizing The Debtor To Use Cash Collateral On An Interim Basis Pending A Final Hearing* [Doc. No. 11], specifically Exhibit "2" thereto, which includes copies of the UCC-1 financing statements filed against the Debtor.

1           c.        Line & Dot, LLC d/b/a Lumiere Collections ("L&E").  L&E has one

2  active judgment lien (filing number 16-7546469513) which was recorded against the

3  Debtor on September 15, 2016.  The parties entered into a stipulation to avoid the

4  foregoing judgment lien, which stipulation was approved by the Court pursuant to an

5  order entered on December 22, 2016.

6           d.        Tyler Mall Limited Partnership ("Tyler Mall").  Tyler Mall has one active

7  judgment lien (filing number 16-7542925708) which was recorded against Angl, Inc. on

8  August 22, 2016.  The Debtor submits that the foregoing judgment lien, which was

9  recorded within the 90-day period preceding the Petition Date, is avoidable as a

10  preferential transfer and is therefore disputed.

11           e.        GGP-Otay Ranch, L.P. ("GGP").  GGP has one active judgment lien

12  (filing number 16-7542926072) which was recorded against Angl, Inc. on August 22,

13  2016.  The Debtor submits that the foregoing judgment lien, which was recorded within

14  the 90-day period preceding the Petition Date, is avoidable as a preferential transfer and

15  is therefore disputed.

16           f.        Valley Plaza Mall, LP ("Valley Plaza").  Valley Plaza has one active

17  judgment lien (filing number 16-7545824507) which was recorded against Angl, Inc. on

18  September 12, 2016.  The Debtor submits that the foregoing judgment lien, which was

19  recorded within the 90-day period preceding the Petition Date, is avoidable as a

20  preferential transfer and is therefore disputed.

21      30.    Based on the foregoing, the Debtor believes that the Bank, Fashblvd and the

22  SBOE are the only parties that may potentially have a perfected security interest in the Debtor's

23  cash.[5]

24  / / /

25  / / /

26  / / /

27  _____

28     [5] The Debtor does not concede that such creditors have valid and properly perfected security interests and liens
in the Debtor's cash and other assets.

D.     **The Need For Use Of Cash Collateral And Proposed New Operating Budget.**

31.     By this Motion, the Debtor seeks an order of the Court authorizing the Debtor to use its cash, during the period from October 22, 2017 through and including January 20, 2018, to pay the expenses set forth in the Budget which is attached as Exhibit "1" to the Kim Declaration annexed hereto, as well as all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.  In addition, the Debtor seeks authority to deviate from the expense line items contained in the Budget, without the need for any further Court order, by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).  The Debtor will not deviate from the Budget beyond the foregoing parameters without further order of the Court.

32.     The Debtor requires an order of this Court authorizing the Debtor to use cash collateral in accordance with the Budget to enable the Debtor to pay all of its normal and ordinary operating expenses (such as payroll, rent, utilities, insurance, and payments to vendors) as they come due in the ordinary course of its business and to purchase new inventory to replenish merchandise that is sold to customers at the Debtor's Operating Retail Stores, which in turn will facilitate the continued operation of the Debtor's business (without any disruption) and the preservation and maximization of the going-concern value of the Debtor's business and assets.  If the Debtor does not obtain authority to use its cash collateral, the Debtor's estate will suffer immediate and irreparable harm, including, without limitation, a cessation of the Debtor's business operations and a corresponding (and likely substantial) decline in the value of the Debtor's business and assets.

## II.     DISCUSSION

A.     **The Debtor Must Be Authorized To Use Cash Collateral To Operate Its Business And To Maintain And Preserve The Value Of Its Assets.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code, which provides, in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the

14

1

2

3

> sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

4   11 U.S.C. § 363(c)(1).

5        A debtor in possession has all of the rights and powers of a trustee with respect to

6   property of the estate, including the right to use property of the estate in compliance with

7   section 363.  11 U.S.C. § 1107(a).

8        "Cash collateral" is defined as "cash, negotiable instruments, documents of title,

9   securities, deposit accounts or other cash equivalents in which the estate and an entity other than

10  the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special

11  requirement with respect to "cash collateral," providing that the trustee or debtor in possession

12  may use "cash collateral" under subsection (c)(1) if:

13       (A)    each entity that has an interest in such cash collateral
                consents; or
14       (B)    the court, after notice and a hearing, authorizes such use,
                sale or lease in accordance with the provisions of this section.

15

16  11 U. S. C. §363(c)(2)(A) and (B).

17       It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the

18  purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-*

19  *Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614

20  (9th Cir. BAP 1991).   In addition, where the debtor is operating a business, it is extremely

21  important that the access to cash collateral be allowed in order to facilitate the goal of

22  reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

23  collateral is necessary to operate a business."  *In re Dynaco Corporation*, 162 B.R. 389 (Bankr.

24  D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

25       For all of the reasons discussed herein, the Debtor has no ability to continue to maintain

26  its business operations or to preserve and maximize the value of its assets unless the Debtor is

27  authorized to use its cash collateral to pay its projected expenses in accordance with the Budget.

28  The Debtor's inability to pay such expenses would cause immediate and irreparable harm to the

1    Debtor's bankruptcy estate.   Indeed, the Debtor's inability to pay its projected expenses,

2    including payroll, rent, utilities and other operating expenses would result in the immediate

3    shutdown of the Debtor's business and the decimation of the value (going-concern or otherwise)

4    of the Debtor's business and assets.  The maintenance of the Debtor's business and preservation

5    and maximization of the Debtor's inventory and other assets are of the utmost significance and

6    importance to a successful reorganization of the Debtor through this Chapter 11 case.

7    **B.**    **The Debtor's Prepetition Secured Creditors Are Adequately Protected By A**

8         **Substantial Equity Cushion, The Continued Operation Of The Debtor's Business**

9         **And Other Forms Of Adequate Protection.**

10    Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize a debtor

11   in possession to use a secured creditor's cash collateral if the secured creditor consents to the

12   use of cash collateral or is adequately protected.  *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.

13   1984).  *See also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs*

14   *Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

15    The Debtor believes that the Bank, Fashblvd, SBOE and any other creditors who assert

16   that they have perfected security interests in the Debtor's cash (collectively, the "Secured

17   Creditors") will ultimately consent to the Debtor's use of cash collateral to pay the expenses set

18   forth in the Budget in accordance with the terms and conditions set forth in this Motion.

19   Accordingly, the Debtor submits that it should be authorized to use cash collateral pursuant to

20   section 363(c)(2)(A) of the Bankruptcy Code.

21    Even if the Secured Creditors do not consent to the Debtor's use of cash collateral, the

22   Debtor submits that the value of such Secured Creditors' interests in the Debtor's cash collateral

23   will be adequately protected by a substantial equity cushion.  As discussed above, the Debtor

24   believes that the Bank, Fashblvd and the SBOE are the only parties that may have perfected

25   security interests in the Debtor's cash.

26    Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

27   *Forest Associates*, 108 S.Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property

28   interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

16

1    Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.

2    *See also McCombs*, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the

3    secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the

4    collateral." *McCombs*, at 266.

5        The Ninth Circuit made clear in *Mellor*, *Id.* at 1401, that an equity cushion of 20% is

6    considered clear adequate protection of a secured creditor's interest in cash collateral.  *See also*

7    *In re McGowan,* 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion is sufficient to

8    be adequate protection); *In re Rogers Development Corp.*, 2 B.R. 679, 685 (Bankr. E.D. Vir.

9    1980) (court decided that an equity cushion of approximately 15% to 20% was sufficient

10   adequate protection to the creditor, even though the debtors had no equity in the property.)

11       Furthermore, in determining whether a secured creditor has equity in property, the Court

12   should consider the "entire security package" not just a portion thereof.  *In re Opelika*

13   *Manufacturing Corporation*, 66 B.R. 444, 447-48 (Bankr. N.D. Ill. 1986).

14       As of October 22, 2017 (the beginning date of the proposed new Budget), the Debtor

15   anticipates that it will be holding cash on hand of approximately $110,000, security deposits

16   totaling approximately $53,215, inventory valued at approximately $2,625,000 (at cost), and

17   FF&E with an estimated fair market value of approximately $650,000.  Based on the foregoing,

18   the aggregate value of the Debtor's assets as of October 22, 2017 is estimated to be $3,438,215.

19       As noted above, the Debtor believes that the total amount currently owed to the Secured

20   Creditors is approximately $1,690,160, calculated as follows: (i) approximately $1,660,000 to

21   the Bank, based upon the SBA Loan only, since both the First Term Loan and Second Term

22   Loan have now been paid off (which sum will be further reduced to approximately $960,000

23   upon the closing of the sale of the Malibu Residence owned by the Debtor's principals), (ii)

24   $6,000 to Fashblvd, and (iii) $24,160.38 to the SBOE.  Given the aggregate value of the

25   Debtor's assets (*i.e.*, approximately $3,438,215), and the total estimated amount currently owed

26   to the Debtor's Secured Creditors (*i.e.*, approximately $1,690,160), the Secured Creditors are

27   adequately protected by an equity cushion of more than 100%, which is far in excess of the 20%

28

1    equity cushion that the Ninth Circuit has indicated constitutes clear adequate protection of a

2    secured creditor's interest in cash collateral.

3         Furthermore, the Debtor submits that the value of the Secured Creditors' interest in the

4    Debtor's cash collateral will be adequately protected by, among other things, the maintenance

5    and continued operation of the Debtor's business.

6         The law is clear that the preservation of the value of a secured creditor's lien is sufficient

7    to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral.

8    *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988).  *See also In re Stein*, 19 B.R. 458 (Bankr.

9    E.D.Pa. 1982).  In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral

10   where such use would enhance or preserve the value of the collateral, and allowed the debtor

11   therein to use cash collateral even though the secured party had no equity cushion for protection.

12   The *Stein* Court determined that the use of cash collateral was necessary to the continued

13   operations of the debtor, and that the creditor's secured position could only be enhanced by the

14   continued operation of the debtor's business.  *See also In re McCombs, supra*, where the court

15   determined that the debtor's use of cash collateral for needed repairs, renovations and operating

16   expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and

17   such use would more likely increase cash collateral.

18        As reflected in the Budget, the payment of the expenses necessary for the Debtor to

19   maintain and continue operating its business will adequately protect the Secured Creditors

20   because, by doing so, the Debtor will be able to, among other things, maximize the value of its

21   inventory and generate as much revenue as possible from the sale of such inventory.   Other

22   courts have determined that a debtor's continued business operations can constitute the adequate

23   protection of a secured creditor.  *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713

24   (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr.

25   D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen

26   Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

27

28

1  Additionally, in determining adequate protection, courts have stressed the importance of

2  promoting a debtor's reorganization.  In *In re O'Connor*, *supra*, the Tenth Circuit stated:

3

4  "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest.  Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.  Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

12  808 F.2d at 1937.

13  The use of cash collateral is critical to the Debtor's ability to implement an effective

14  reorganization strategy for the benefit of all creditors.  As discussed above, the Debtor

15  anticipates filing a Plan and disclosure statement in this case by mid-November 2017 and

16  pursuing Court approval of the disclosure statement and confirmation of the Plan immediately

17  thereafter.  Therefore, the period covered by the Budget (*i.e.*, October 22, 2017 – January 20,

18  2018) represents a highly critical period in the Debtor's case.  If the Debtor is not permitted to

19  use cash collateral during this period so that the Debtor can focus on formulating and pursuing

20  its ultimate reorganization strategy in this case, while continuing to operate the Debtor's

21  business (without any disruption) and preserving and maximizing the going-concern value of the

22  Debtor's business and assets, the Debtor will be forced to immediately halt all business

23  operations, which will significantly and negatively impact the value of the Debtor's business

24  and assets and the Debtor's ability to successfully reorganize.  Clearly, the use of cash collateral

25  will only enhance the prospect of the Debtor's successful reorganization.

26  In addition to the forms of adequate protection discussed above, the Debtor also

27  proposes to provide its Secured Creditors with replacement liens and security interests against

28  the Debtor's post-petition assets, with such replacement liens to have the same extent, validity,

19

1  and priority as the pre-petition liens held by such Secured Creditors against the Debtor's assets.

2  Such replacement liens will provide the Secured Creditors with further adequate protection.

3      Given the foregoing forms of adequate protection being provided to the Debtor's pre-

4  petition Secured Creditors for the Debtor's use of cash collateral, the Debtor submits that the

5  requirements of Bankruptcy Code Section 363(c)(2) have been satisfied and that the Debtor

6  should be authorized to use cash collateral in accordance with the terms set forth in this Motion.

7                                      **III.**

8      **PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF**

9                **THE MOTION HAVE BEEN SATISFIED**

10      Rule 4001(b) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") sets

11  forth the procedural requirements for obtaining authority to use cash collateral.  The Debtor

12  submits that it has complied with these procedural requirements.  First, the Motion must contain

13  a copy of the proposed form of order granting the Motion, which has been done by attaching the

14  proposed order as **Exhibit "2"** to the Kim Declaration annexed hereto.  Second, the Motion

15  provides a concise statement of the relief requested, which was done above.  Third, the Motion

16  is required to be served on any entity with an interest in the Debtor's cash collateral, any

17  committee appointed or the twenty largest unsecured creditors if there is no committee, and on

18  such other parties as the Court directs.  Here, the Debtor has served the Motion and all

19  supportive papers upon the Office of the United States Trustee, all alleged secured creditors and

20  their counsel (if known), the twenty largest unsecured creditors of the Debtor (as no committee

21  yet exists), and all parties who have requested special notice.  Accordingly, the Motion complies

22  with the procedural requirements of Bankruptcy Rule 4001(b)-(d).

23      In addition, in compliance with Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy

24  Rule 4001-2, the Debtor has filed concurrently herewith the mandatory Court-approved Form

25  F4001-2 (Statement Regarding Cash Collateral Or Debtor In Possession Financing) which

26  discloses whether the proposed order granting the Motion and authorizing the Debtor's use of

27  cash collateral contains certain provisions of findings of fact.  Accordingly, the Motion complies

28  with the procedural requirements of Local Bankruptcy Rule 4001-2.

## IV.

## CONCLUSION

**WHEREFORE,** the Debtor respectfully requests that this Court enter an order in substantially the form attached as **Exhibit "2"** to the Kim Declaration annexed hereto:

(1)    granting the Motion in its entirety;

(2)    authorizing the Debtor to use cash collateral to (i) pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s); and (ii) pay all quarterly fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the Bankruptcy Court; and

(3)    granting such other and further relief as the Court deems just and proper.

Dated:  September 28, 2017                    BLUE BEE, INC.

By:_____
        TIMOTHY J. YOO
        JULIET Y. OH
        LEVENE, NEALE, BENDER, YOO
            & BRILL L.L.P.
        Attorneys for Debtor and
        Debtor in Possession

**<u>DECLARATION OF JEFF SUNGHAK KIM</u>**

I, Jeff Sunghak Kim, hereby declare as follows:

1.  I am over 18 years of age. I am the co-founder and President of Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession herein (the "<u>Debtor</u>"), and am therefore familiar with the business operations and financial books and records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify as a witness, I could and would competently testify thereto.

2.  I have access to the Debtor's books and records. As the co-founder and President of the Debtor, I am familiar with the history, organization, operations and financial condition of the Debtor. The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own personal knowledge and my review of the Debtor's books and records.

3.  I make this declaration in support of the Debtor's motion to which this declaration is attached (the "<u>Motion</u>") which seeks the entry of an order authorizing the Debtor to use cash collateral in accordance with the Debtor's operating budget for the 13-week period from October 22, 2017 through and including January 20, 2018 (the "<u>Budget</u>"), a copy of which is attached as **<u>Exhibit "1"</u>** hereto. All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

4.  On October 19, 2016 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession.

5.  The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers. As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California (collectively, the "<u>Retail Stores</u>," and

individually, a "Retail Store").

6.    The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by my wife, Young Ae Kim, and me, and was dissolved on August 30, 2013.  Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes.  The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  My wife, Young Ae Kim, and I continue to be actively involved in the Debtor's business operations as the Secretary and President of the Debtor, respectively.

7.    The Debtor is headquartered near downtown Los Angeles, California in Vernon, California and, as of the Petition Date, employed a workforce of approximately 110 employees. In 2015, the Debtor generated annual gross revenues of more than $24 million.

8.    After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The vast majority of these new retail stores (approximately 43 stores) were opened within the seven-year period prior to the Petition Date.  I believe this large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

9.    I believe the high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors.  As a result of the Debtor's defaults, numerous landlords began commencing actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of the Retail Stores.  While the Debtor had already closed a number of its less

profitable retail store locations, leaving open approximately 21 Retail Stores as of the Petition Date, the Debtor required time to evaluate the viability of the remaining Retail Stores and identify other ways to decrease operational costs and increase profitability.  In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

10.    Through its bankruptcy case, the Debtor intended to identify the core Retail Stores around which the Debtor can successfully reorganize and expeditiously close those Retail Stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords (a process which has now been completed), and thereafter formulate and seek confirmation of a plan of reorganization ("Plan") which restructures the Debtor's existing debt in a cohesive and efficient manner while facilitating the continued operation of the Debtor's longstanding business.

**Post-Petition Cash Collateral Use, Business Operations And Reorganization Efforts**

11.    Since the Petition Date, the Debtor has continued operating its business in the normal course.

12.    Shortly after the Petition Date, on October 24, 2016, the Debtor filed an emergency motion (the "First CC Motion") seeking an order, among other things, authorizing the Debtor to use cash collateral in accordance with the Debtor's initial 13-week operating budget submitted therewith (the "Initial Budget").

13.    I am advised and believe that, on November 1, 2016, the Court entered an interim order granting the First CC Motion on an interim basis, pending a final hearing (the "Interim Order").  I am further advised and believe that, on December 14, 2016, the Court entered a final order granting the First CC Motion on a final basis and authorizing the Debtor to use cash collateral in accordance with a revised form of the Initial Budget (the "Revised Initial Budget"), subject to the terms and conditions set forth on the record of the Court at the final hearing on the First CC Motion held on November 30, 2016 (the "Final Order," and together with the Interim Order, the "First CC Orders")).

14.     On December 29, 2016, prior to the expiration of the Debtor's authority to use cash collateral pursuant to the First CC Orders, the Debtor filed a motion (the "Second CC Motion"), pursuant to which the Debtor sought an order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from January 22, 2017 through and including April 22, 2017 (the "Second Budget").

15.     I am advised and believe that, on January 24, 2017, the Court entered an order granting the Second CC Motion and authorizing the Debtor to continue using cash collateral in accordance with the Second Budget and in accordance with the terms and conditions set forth in the Second CC Motion (the "Second CC Order").

16.     Pursuant to the First CC Orders and the Second CC Order, the Debtor used its cash collateral in accordance with the Revised Budget and the Second Budget to operate its business.

17.     On March 31, 2017, prior to the expiration of the Debtor's authority to use cash collateral pursuant to the Second CC Order, the Debtor filed a motion (the "Third CC Motion"), pursuant to which the Debtor sought an order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from April 22, 2017 through and including July 22, 2017 (the "Third Budget").

18.     I am advised and believe that, on April 28, 2017, the Court entered an order granting the Third CC Motion and authorizing the Debtor to continue using cash collateral in accordance with the Third Budget and in accordance with the terms and conditions set forth in the Third CC Motion (the "Third CC Order").

19.     On June 14, 2017, prior to the expiration of the Debtor's authority to use cash collateral pursuant to the Third CC Order, the Debtor filed a motion (the "Fourth CC Motion"), pursuant to which the Debtor sought an order authorizing the Debtor to continue using cash collateral in accordance with the Debtor's operating budget for the 13-week period from July 23, 2017 through and including October 21, 2017 (the "Fourth Budget").

20.     I am advised and believe that, on July 19, 2017, the Court entered an order granting the Fourth CC Motion and authorizing the Debtor to continue using cash collateral in

1   accordance with the Fourth Budget and in accordance with the terms and conditions set forth in

2   the Fourth CC Motion (the "Fourth CC Order").

3        21.    Pursuant to the Fourth CC Order, the Debtor is continuing to use its cash

4   collateral to operate its business in accordance with the Fourth Budget and pursuant to the terms

5   of the Fourth CC Order.

6        22.    The Debtor's authority to use cash collateral pursuant to the Fourth CC Order

7   will expire on October 21, 2017.  The Debtor has therefore filed the Motion to seek an order

8   authorizing the Debtor to continue using cash collateral in accordance with the Debtor's

9   operating budget for the 13-week period from October 22, 2017 through and including January

10  20, 2018 (the "Budget"), a copy of which is attached as **Exhibit "1"** hereto.

11       23.    As noted above, the Debtor's management believed it was critical that the Debtor

12  first identify the core Retail Stores around which it might ultimately be able to reorganize before

13  the Debtor could begin exploring and formulating the terms of a feasible Plan in this case.

14  Accordingly, shortly after the Petition Date, the Debtor's management began the process of

15  analyzing the financial performance of each of its twenty-one (21) Retail Stores (on a store-by-

16  store basis) to determine which of the Retail Stores were currently profitable or potentially

17  profitable if rent concessions could be successfully negotiated with the landlords, and which of

18  the Retail Stores were not profitable and therefore needed to be closed on an expeditious basis.

19       24.    As a result of such analysis, during the past several months, the Debtor has

20  sought and obtained Court approval to close eight (8) of its Retail Stores and to reject the real

21  property leases associated therewith.  Based on the foregoing, the Debtor is currently operating a

22  total of thirteen (13) Retail Stores (the "Operating Retail Stores").

23       25.    I am advised and believe that, on July 31, 2017, the Court entered an order

24  authorizing the Debtor to assume the real property leases for nine (9) of the Operating Retail

25  Stores, thereby concluding the Debtor's analysis and final determination regarding the

26  assumption or rejection of the leases for the Retail Stores.

27       26.    While the Debtor's management has been in the process of evaluating and

28  formulating the potential terms of a Plan, the Debtor requires additional time to complete its

review of the proofs of claim that have been filed by creditors in the Debtor's case (which claims will need to be accounted for in any Plan), to continue to evaluate and determine the feasibility of potential terms of a Plan, to continue to evaluate its business operations and to prepare accurate cash flow forecasts in support of a Plan, and to complete the preparation of a Plan and disclosure statement and other documents related thereto.  Based on the foregoing, the Debtor has filed concurrently herewith a motion seeking the entry of a Court order extending the Debtor's exclusive periods to file a Plan and obtain acceptances thereof for a period of approximately thirty (30) days, to and including November 16, 2017 and January 15, 2018, respectively.

27.    The Debtor also intends to use the brief extension of its Plan exclusivity periods, if granted by the Court, to engage in discussions with its primary secured creditor, Pacific City Bank (the "Bank"), regarding the potential consensual treatment of the Bank's claim against the Debtor under a Plan.  As discussed in more detail below, the Bank's claim is secured by substantially all assets of the Debtor and, among other things, the personal residence in Malibu, California owned by my wife and me (the "Malibu Residence").  My wife and I have placed our Malibu Residence on the market and have accepted an offer from a third party buyer to purchase our Malibu Residence.  Although the sale of our Malibu Residence has been pending for a number of months, the sale is now on the verge of closing and is anticipated to close within the next approximately thirty (30) days.  The closing of the sale of our Malibu Residence will result in a substantial reduction (of approximately $700,000) of the Bank's claim against the Debtor, and will therefore have a significant impact upon the Debtor's discussions with the Bank regarding the potential consensual treatment of the Bank's claim under a Plan.

28.    Based on the foregoing, I believe that the Debtor will be in a position to file a Plan and disclosure statement in this case by mid-November 2017.

/ / /

/ / /

/ / /

/ / /

**The Debtor's Primary Assets And Secured Debts**

29.    The Debtor's primary assets are as follows:

a.    Cash.    As of the Petition Date, the Debtor had cash on hand of approximately $93,000.  The Debtor anticipates that the amount of cash it will have on hand as of October 22, 2017 will be approximately $110,000.

b.    Security Deposits.    As of the Petition Date, the Debtor had security deposits with landlords and other parties in the total sum of approximately $87,013.  The Debtor believes that the amount of the Security Deposits remaining (for the thirteen Operating Retail Stores) is approximately $53,215.

c.    Inventory.    As of the Petition Date, the Debtor had inventory with an estimated cost value of approximately $3,500,000.  In light of the reduction of the number of operating Retail Stores from twenty one (21) Retail Stores as of the Petition Date to the current thirteen (13) Operating Retail Stores, the Debtor believes that the estimated cost value of its current inventory is approximately seventy-five percent (75%) of the estimated cost value of the inventory that the Debtor had as of the Petition Date, or approximately $2,625,000.  The Debtor is generally maintaining this level of inventory in its Operating Retail Stores as the Debtor continues to purchase new merchandise to replenish merchandise sold at the Operating Retail Stores.

d.    Other Assets.    As of the Petition Date, the Debtor had furniture, fixtures and equipment ("FF&E") with a net book value of $6,299,306.  While the Debtor initially estimated that the FF&E had an estimated aggregate fair value of approximately $1,000,000, based upon discussions that the Debtor and its counsel have had with a number of liquidation companies (including Reich Brothers, LLC, Cheaper Office Solutions, and Pope's Antiques & Auctions, Inc.), I believe that the only FF&E that has any actual value are the FF&E contained at the thirteen (13) Operating Retail Stores (consisting of racks, shelving, and other personal property).  Based upon my experience and knowledge of the retail industry, I estimate that the FF&E at the Operating Retail Stores has an aggregate fair market value of approximately $650,000 (or approximately

$50,000 per store).  The Debtor has "downsized" from its former warehouse facility in Vernon, California to a substantially smaller office space in Vernon, California.  In connection with the move to the smaller office space, and with the consent of the Bank, the Debtor disposed of the non-store FF&E that was being maintained at its former warehouse facility, which FF&E the Debtor was not using and the Debtor determined had nominal market value (if any).[6]

30.    Based on the foregoing, the aggregate value of the Debtor's assets as of October 22, 2017 is estimated to total $3,438,215.

31.    The Debtor's senior secured lender is the Bank.  As of the Petition Date, the Debtor was a borrower under three (3) separate loans with the Bank, as described below:

a.    The Debtor is the borrower under a U.S. Small Business Administration loan with the Bank (the "SBA Loan"), pursuant to a Loan Agreement dated July 24, 2014 between the Debtor and the Bank.  The Debtor is currently indebted to the Bank in the amount of approximately $1,660,000 under the SBA Loan.  The Bank filed UCC-1 financing statements against the Debtor and its predecessor, Angl, Inc. asserting a lien against substantially all of the assets of the Debtor and Angl, Inc.  The SBA Loan is also secured by a lien against the Malibu Residence owned by the Debtor's principals, Mr. and Mrs. Kim.  As noted above, there is currently a sale of the Malibu Residence pending, which is anticipated to close within the next approximately thirty (30) days.  It is anticipated that the Bank will receive a payment of approximately $700,000 from the sale of the Malibu Residence, which will then reduce the outstanding balance of the SBA Loan to approximately $960,000.

b.    The Debtor was the borrower under a term loan bearing the Loan Number 134077 with the Bank (the "First Term Loan"), pursuant to a Business Loan Agreement

---

[6] As noted herein, the Debtor and its counsel contacted a number of liquidation companies to determine whether the non-store FF&E that was being maintained at the Debtor's former warehouse facility could be sold or otherwise liquidated for cash.  All of the liquidation companies contacted by the Debtor declined to purchase, or otherwise be retained to liquidate, such FF&E and informed the Debtor that such FF&E had no market value (and that the Debtor would likely have to pay a third party company out-of-pocket for the cost of removing and disposing of such FF&E).

dated November 2, 2015 between the Debtor and the Bank.  The First Term Loan was secured by certain non-Debtor assets, including commercial real property owned by the Debtor's affiliate, Peace People, LLC (the "Affiliate Commercial Property").  The Affiliate Commercial Property was recently sold to a third party purchaser, which sale resulted in the full repayment and satisfaction of the First Term Loan.  Therefore, the Debtor has no remaining obligations under the First Term Loan.

c.    The Debtor was the borrower under a second term loan bearing the Loan Number 133776 (the "Second Term Loan"), pursuant to a Business Loan Agreement dated July 23, 2014 between the Debtor and the Bank. The Second Term Loan was also secured by the Affiliate Commercial Property, and was fully repaid and satisfied upon the recent successful sale of the Affiliate Commercial Property.  Therefore, the Debtor has no remaining obligations under the Second Term Loan.

32.    Prior to the Petition Date, the Debtor obtained a secured loan in the amount of $6,000 from Fashblvd, Inc. ("Fashblvd").  I am advised and believe that Flashblvd filed a UCC-1 financing statement (Document No. 57738600002) asserting a lien against substantially all of the assets of the Debtor prior to the commencement of the Debtor's bankruptcy case on October 19, 2016.

33.    I am advised and believe that, in addition to the financing statements filed by the Bank and Fashblvd against the Debtor and/or its predecessor, Angl, Inc., there are financing statements that have been filed against the Debtor and Angl, Inc. by the following parties:

a.    U.S. Bank Equipment Finance.  I am advised and believe that U.S. Bank Equipment Finance has one active financing statement (filing number 13-7390160767), filed on December 10, 2013, which purports to cover certain specified equipment leased or financed from U.S. Bank Equipment Finance.  U.S. Bank Equipment Finance does not purport to assert a security interest in the Debtor's cash.

g.    California State Board Of Equalization ("SBOE").  I am advised and believe that SBOE has one active state tax lien (filing number 15-7447815850) which was recorded against the Debtor on January 29, 2015.  Based upon the Debtor's books

1    and records, I believe that the amount owed to SBOE which is secured by the foregoing

2    tax lien is $24,160.38.

3            b.    Line & Dot, LLC d/b/a Lumiere Collections ("L&E").  I am advised and

4    believe that L&E recorded a judgment lien against the Debtor (filing number 16-

5    7546469513) on September 15, 2016.  The Debtor and L&E entered into a stipulation to

6    avoid the foregoing judgment lien, which stipulation I am advised and believe was

7    approved by the Court pursuant to an order entered on December 22, 2016.

8            c.    Tyler Mall Limited Partnership ("Tyler Mall").  I am advised and believe

9    that Tyler Mall has one active judgment lien (filing number 16-7542925708) which was

10    recorded against Angl, Inc. on August 22, 2016.  The Debtor submits that the foregoing

11    judgment lien, which was recorded within the 90-day period preceding the Petition Date,

12    is avoidable as a preferential transfer and is therefore disputed.

13            d.    GGP-Otay Ranch, L.P. ("GGP").  I am advised and believe that GGP has

14    one active judgment lien (filing number 16-7542926072) which was recorded against

15    Angl, Inc. on August 22, 2016.  The Debtor submits that the foregoing judgment lien,

16    which was recorded within the 90-day period preceding the Petition Date, is avoidable as

17    a preferential transfer and is therefore disputed.

18            e.    Valley Plaza Mall, LP ("Valley Plaza").  I am advised and believe that

19    Valley Plaza has one active judgment lien (filing number 16-7545824507) which was

20    recorded against Angl, Inc. on September 12, 2016.  The Debtor submits that the

21    foregoing judgment lien, which was recorded within the 90-day period preceding the

22    Petition Date, is avoidable as a preferential transfer and is therefore disputed.

23    34.    Based on the foregoing, I believe that the Bank, Fashblvd and the SBOE are the

24  only parties that may potentially have a perfected security interest in the Debtor's cash.[7]

25    **The Need For Use Of Cash Collateral And Proposed New Operating Budget**

26    35.    By this Motion, the Debtor seeks an order of the Court authorizing the Debtor to

27

28      [7] The Debtor does not concede that such creditors have valid and properly perfected security interests and liens in the Debtor's cash and other assets.

1  use its cash, during the period from October 22, 2017 through and including January 20, 2018,

2  to pay the expenses set forth in the Budget which is attached as Exhibit "1" hereto, as well as all

3  quarterly fees owing to the Office of the United States Trustee and all expenses owing to the

4  Clerk of the Bankruptcy Court. In addition, the Debtor seeks authority to deviate from the

5  expense line items contained in the Budget, without the need for any further Court order, by up

6  to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into

7  the following week(s). The Debtor will not deviate from the Budget beyond the foregoing

8  parameters without further order of the Court.

9      33.    The Debtor requires authority to use cash collateral in accordance with the

10  Budget to enable the Debtor to pay all of its normal and ordinary operating expenses (such as

11  payroll, rent, utilities, insurance, and payments to vendors) as they come due in the ordinary

12  course of its business and to purchase new inventory to replenish merchandise that is sold to

13  customers at the Debtor's Remaining Retail Stores. I do not believe the Debtor has the ability to

14  maintain its business operations or to preserve and maximize the value of its assets unless the

15  Debtor is authorized to use its cash to pay its projected expenses in accordance with the Budget.

16  I believe the Debtor's inability to pay such expenses would cause immediate and irreparable

17  harm to the Debtor's bankruptcy estate. Indeed, the Debtor's inability to pay its projected

18  expenses, including payroll, rent, utilities and other operating expenses would result in the

19  immediate shutdown of the Debtor's business and the decimation of the value (going-concern or

20  otherwise) of the Debtor's business and assets.

21      36.    The proposed order granting the Motion is attached as **Exhibit "2"** hereto.

22      I declare under penalty of perjury that the foregoing is true and correct to the best of my

23  knowledge.

24      Executed on this 28th day of September, 2017, at Los Angeles, California.

25

26

27  

28

JEFF SUNGHAK KIM

32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

[Budget]

**BLUE BEE, INC.**
**13 Week Cash Flow Projection**
**From 10/22/2017   To  1/20/2018**

| Week No | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 22-Oct | 29-Oct | 5-Nov | 12-Nov | 19-Nov | 26-Nov | 3-Dec | 10-Dec | 17-Dec | 24-Dec | 31-Dec | 7-Jan | 14-Jan |
| Week Ending | 28-Oct | 4-Nov | 11-Nov | 18-Nov | 25-Nov | 2-Dec | 9-Dec | 16-Dec | 23-Dec | 30-Dec | 6-Jan | 13-Jan | 20-Jan |
| | | | | | | | | | | | | | |
| Beginning Balance | 109,147 | 168,938 | 26,108 | 88,778 | 91,448 | 151,239 | 168,409 | 82,679 | 90,449 | 164,719 | 235,610 | 84,580 | 138,550 |
| | | | | | | | | | | | | | |
| Sales | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 135,000 | 135,000 | 135,000 | 135,000 | 100,000 | 100,000 | 100,000 |
| Merchandise Payments | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 46,000 | 54,000 | 54,000 | 54,000 | 54,000 | 40,000 | 40,000 | 40,000 |
| Gross Profit | 69,000 | 69,000 | 69,000 | 69,000 | 69,000 | 69,000 | 81,000 | 81,000 | 81,000 | 81,000 | 60,000 | 60,000 | 60,000 |
| | | | | | | | | | | | | | |
| Rent & Related | | 160,000 | | | | | 160,000 | | | | 160,000 | | |
| Payroll & Payroll Taxes | | 45,000 | | 45,000 | | 45,000 | | 45,000 | | | 45,000 | | 45,000 |
| General & Adminstrave | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Bank & Card Processing | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 2,700 | 2,700 | 2,700 | 2,700 | 2,000 | 2,000 | 2,000 |
| Equipment Payment | 2,879 | | | | 2,879 | | | | | 2,879 | | | |
| Insurance | | | | 15,000 | | | | 15,000 | | | | | 15,000 |
| Repair & Maintenance | | 500 | | | | 500 | | | | 500 | | | |
| Postage & Delivery | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| Miscellaneous | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Total Disbursements | 9,209 | 211,830 | 6,330 | 66,330 | 9,209 | 51,830 | 166,730 | 66,730 | 6,730 | 10,109 | 211,030 | 6,030 | 66,030 |
| | | | | | | | | | | | | | |
| Operating Cash Flow | 59,791 | (142,830) | 62,670 | 2,670 | 59,791 | 17,170 | (85,730) | 14,270 | 74,270 | 70,891 | (151,030) | 53,970 | (6,030) |
| UST Fees | | | | | | | | 6,500 | | | | | |
| Net Cash Flow | 59,791 | (142,830) | 62,670 | 2,670 | 59,791 | 17,170 | (85,730) | 7,770 | 74,270 | 70,891 | (151,030) | 53,970 | (6,030) |
| | | | | | | | | | | | | | |
| Ending Balance | 168,938 | 26,108 | 88,778 | 91,448 | 151,239 | 168,409 | 82,679 | 90,449 | 164,719 | 235,610 | 84,580 | 138,550 | 132,520 |

1

2

3

4

5

6

7

8

# EXHIBIT "2"

9

10

[Proposed Order]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>BLUE BEE, INC.,<br><br>              Debtor. | Case No. 2:16-bk-23836-SK<br><br>Chapter 11<br><br>**ORDER GRANTING DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH AND INCLUDING JANUARY 20, 2018**<br><br>Hearing:<br>Date: October 19, 2017<br>Time: 8:30 a.m.<br>Courtroom: 1575<br>Location: 255 E. Temple Street<br>                  Los Angeles, California |

1

1        A hearing was held on October 19, 2017 at 8:30 a.m., before the Honorable Sandra R.

2  Klein, United States Bankruptcy Judge for the Central District of California, Los Angeles

3  Division, in Courtroom "1575" located at 255 E. Temple Street, Los Angeles, California, to

4  consider the motion (the "Motion") filed by Blue Bee, Inc., a California corporation d/b/a ANGL

5  and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the

6  "Debtor"), for the entry of an order authorizing the Debtor to use its cash collateral in accordance

7  with the Debtor's operating budget for the 13-week period from October 22, 2017 through and

8  including January 20, 2018 (the "Budget"), a copy of which is attached as Exhibit "1" to the

9  Declaration of Jeff Sunghak Kim annexed to the Motion, and granting related relief.

10  Appearances at the hearing on the Motion were made as set forth on the record of the Court.

11        The Court, having considered the Motion, all papers filed by the Debtor in support of the

12  Motion, and the oral arguments and statements of counsel made at the hearing on the Motion,

13  proper and adequate notice of the Motion and the hearing on the Motion having been provided,

14  and other good cause appearing therefor,

15        IT IS HEREBY ORDERED AS FOLLOWS:

16        A.     The Motion is granted.

17        B.     The Debtor is authorized to use cash collateral to (i) pay all of the expenses set

18  forth in the Budget, with authority to deviate from the line items contained in the Budget by not

19  more than 20%, on both a line item and aggregate basis, with any unused portions to be carried

20  over into the following week(s) and (ii) pay all quarterly fees owing to the Office of the United

21  States Trustee and all expenses owing to the Clerk of the Bankruptcy Court.

22        IT IS SO ORDERED.

23

24                                  ###

25

26

27

28

1

1

# PROOF OF SERVICE OF DOCUMENT

2  I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

3

4  A true and correct copy of the foregoing document entitled **NOTICE OF MOTION AND MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH AND INCLUDING JANUARY 20, 2018; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JEFF SUNGHAK KIM IN SUPPORT THEREOF** will be served or was served (a) on the judge in

5  chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

6  **1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and

7  hyperlink to the document. On **September 28, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail

8  Notice List to receive NEF transmission at the email addresses stated below:

9  - **Franklin C Adams    franklin.adams@bbklaw.com,**
   **arthur.johnston@bbklaw.com;lisa.spencer@bbklaw.com**

10  - **Marc Andrews    bankruptcycls@wellsfargo.com, andrewma@wellsfargo.com**
   - **Dustin P Branch    branchd@ballardspahr.com,**

11  **carolod@ballardspahr.com;hubenb@ballardspahr.com**
   - **Lynn Brown    notices@becket-lee.com**

12  - **Brian W Byun    bbyun@ci.vernon.ca.us**
   - **John H Choi    johnchoi@kpcylaw.com, christinewong@kpcylaw.com**

13  - **Brian D Huben    hubenb@ballardspahr.com, carolod@ballardspahr.com**
   - **Dare Law    dare.law@usdoj.gov**

14  - **Thor D McLaughlin    tmclaughlin@allenmatkins.com, igold@allenmatkins.com**
   - **Randall P Mroczynski    randym@cookseylaw.com**

15  - **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
   - **Ernie Zachary Park    ernie.park@bewleylaw.com**

16  - **Ronald M Tucker    rtucker@simon.com,**
   **cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com**

17  - **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
   - **Michael A Wallin    mwallin@slaterhersey.com, mrivera@slaterhersey.com**

18  - **Larry D Webb    Webblaw@gmail.com,**
   **larry@webblaw.onmicrosoft.com;r51666@notify.bestcase.com**

19

20  **2.   SERVED BY UNITED STATES MAIL**: On **September 28, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a

21  true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be

22  completed no later than 24 hours after the document is filed.

23
☒ Service information continued on attached page
24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                         **F 9013-3.1.PROOF.SERVICE**

3.   **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 28, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
The Honorable Sandra R. Klein
United States Bankruptcy Court
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1582 / Courtroom 1575
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 28, 2017 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

Blue Bee, Inc.
Top 20, Secured Creditors, OUST, RSN

Dare Law
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

U.S. BANK EQUIPMENT FINANCE
1310 MADRID STREET, SUITE 106
MARSHALL MN 56258

IRS/OHIO
P.O. BOX 145595
CINCINNATI OH 45250

LINE & DOT, LLC DBA LUMIERE
COLLECTIONS
1912 E. VERNON AVE., STE. 100
LOS ANGELES CA 90058

PACIFIC CITY BANK
3701 WILSHIRE BLVD., SUITE 310
LOS ANGELES CA 90010

BOARD OF EQUALIZATION
PO BOX 942879
SACRAMENTO CA 94279

TYLER MALL LIMITED PARTNERSHIP, A
DELAWARE LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

PACIFIC CITY BANK
3701 WILSHIRE BLVD., SUITE 100
LOS ANGELES CA 90010

GGP-OTAY RANCH, L.P., A DELAWARE
LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

FASHBLVD., INC.
1700 E. 58TH PL., #9
LOS ANGELES, CA 90001

VALLEY PLAZA MALL, LP, A DELAWARE
LIMITED
PARTNERSHIP
24011 VENTURA BLVD., STE. 201
CALABASAS CA 91302

Caribbean Queen Inc.
1128 S. Crocker Street
Los Angeles, CA 90021

Alythea
1016 S. Towne Ave., #106
Los Angeles, CA 90021

CA State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Brian D. Huben
Dustin P. Branch
BALLARD SPAHR LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067

Horton Plaza, LLC
Blackmar, Principe & Schmelter, APC
600 B Street, Suite 2250
San Diego, CA 92101

Macerich Fresno LP
PO Box 849418
Los Angeles, CA 90084-9418

L'atiste
424 Towne Avenue
Los Angeles, CA 90021

Lynx Property Management Inc
924 Laguna St. Suite B
Santa Barbara, CA 93101

Paseo Nuevo Owner LLC
PO Box 780268
Philadelphia, PA 19178-0268

Macerich SMP LP
c/o David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367

Nine Planet
1022 S. Wall Street
Los Angeles, CA 90015

SEVEND
2301 E. 7th St.
Suite E-200
Los Angeles, CA 90023

Plaza Bonita, LLC
Blackmar, Principe & Schmelter, APC
600 B. Street, Suite 2250
San Diego, CA 92101

Rancho Mall LLC
PO Box 72439
Cleveland, OH 44192

The Retail Property Trust
Brea Mall
PO Box 772827
Chicago, IL 60677-2827

Shops at Mission Viejo LLC
7415 Solution Center
Chicago, IL 60677-7004

South Bay Center SPE LLC
PO Box 72056
Cleveland, OH 44192-0056

Tyler Mall Limited Partnership
SDS-12-3113
PO Box 86
Minneapolis, MN 55486-3113

W/A SVT Holdings VI LLC
PO Box 749659
Los Angeles, CA 90074-9659

Integrity Payment Systems
1700 Higgins Road # 690
Des Plaines, IL  60018

_Counsel to Caribbean Queen Inc._
Law Offices of Jacqueline N. Anker
27 W Anapamu, Suite 325
Santa Barbara, CA 93101

_Counsel to Macerich Cerritos LLC_
David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367

Michael A. Wallin
Slater Hersey & Lieberman LLP
18301 Von Karman Ave, Suite 1060
Irvine, CA 92612

Marc Andrews
Office of the General Counsel
Wells Fargo & Company
21680 Gateway Center Drive, Suite 280
Diamond Bar, CA 91765-2435