1    FRANKLIN C. ADAMS, Bar No. 85351
franklin.adams@bbklaw.com

2    BEST BEST & KRIEGER LLP
3390 University Avenue, 5th Floor

3    P.O. Box 1028
Riverside, CA  92502

4    Telephone:  (951) 686-1450
Facsimile:  (951) 686-3083

5

6    Attorneys for Creditor: Temecula Towne Center
Associates L.P., a California limited partnership

7

8

9               UNITED STATES BANKRUPTCY COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                  RIVERSIDE DIVISION

12

| | |
|---|---|
| In re: | Case No.  2:16-bk-23836-SK |
| BLUE BEE INC., | Chapter:  11 |
|           Debtor. | TEMECULA TOWNE CENTER ASSOCIATES L.P.'S MOTION FOR ORDER (1) ALLOWING AN ADMINISTRATIVE EXPENSE PRIORITY CLAIM PURSUANT TO 11 U. S. C. §365(d)(3) AND §503 FOR POST PETITION RENT; AND (2) DIRECTING IMMEDIATE PAYMENT OF THE ADMINISTRATIVE EXPENSE CLAIM; AND DECLARATION OF JEFFREY M. KURTZ IN SUPPORT THEREOF. |
| | [Filed concurrently with a Request for Judicial Notice]. |
| | [Hearing to be set by notice.] |

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

1    Temecula Towne Center Associates L.P., a California limited partnership ("Lessor"),

2    moves this Court for an Order (1) Allowing an administrative expense priority claim pursuant to

3    11 U. S. C. §§ 365(d)(3) and 503 in the amount of $64,086.71 (the "Claim") for post-petition rent

4    incurred from the date the petition was filed, to the date the debtor rejected the lease on February

5    20, 2017; and (2) Directing immediate payment of the administrative expense claim (the

6    "Motion") and alleges as follows:

7                                          **I.**

8                          **STATEMENT OF FACTS**

9        1.      On October 19, 2016, Blue Bee Inc., (the "Debtor") filed its voluntary petition

10   under Chapter 11 of the Bankruptcy Code in the Central District of California, Los Angeles

11   Division and was assigned Case Number 2:16-bk-23836-SK.

12       2.      On December 29, 2016, the Debtor filed its Motion for Entry of an Order

13   Authorizing Debtor to Reject Certain Unexpired Non-Residential Property Leases Pursuant to 11

14   U. S. C. § 365, et al. (the "Rejection Motion") (ECF No. 81).  A true copy of which is attached

15   hereto as Exhibit 1[1] and to Movant's Request for Judicial Notice (the "RJN") as Exhibit 1.

16       3.      The Lease Agreement with Lessor (the "Towne Center Lease") was one of the

17   leases that the Debtor sought to reject within the Rejection Motion.

18       4.      Pursuant to the terms of the Lease, Lessor leased to the Debtor Unit Number 2610

19   (the "Leased Property") within the Promenade In Temecula shopping center for a period of ten

20   (10) years beginning on November 1, 2006 and ending on October 31, 2016.

21       5.      The terms of the Lease requires the Debtor to pay in addition to a Fixed Minimum

22   Rent, a Percentage Rent of the gross revenue, Additional Rent, Real Estate Taxes, Common Area

23   Utility and Insurance Costs and Premises Utilities as more fully described with the Lease, a true

24   copy of which is hereto as Exhibit 2.

25       6.      On January 24, 2017 this Court entered an Order Granting Motion for Entry of

26   Order Authorizing the Debtor to Reject Certain Unexpired Non-Residential Real Property Leases

27   _____

28   [1] For the convenience of the court and in the interest of judicial economy, the exhibits to the Rejection Motion are omitted from this filing.

1    Pursuant to 11 U. S. C. § 365 and Abandon Any Remaining Personal Property Located at the

2    Leased Premises (the "Rejection Order") (ECF No. 103). A true copy of the Rejection Order is

3    attached hereto as Exhibit 3 and to the RJN as Exhibit 2.

4          7.      The Rejection Order provides that the Debtor is authorized to reject several non-

5    residential real property leases including the Towne Center Lease, with the rejection of said leases

6    to be deemed effective as of the date the Debtor vacates the retail store.

7          8.      No sum has been paid to or received by Lessor as rent for the premises for the

8    period from the date of the filing of the Petition (October 19, 2016), to February 20, 2017,

9    (November, December, January and February) the date the Debtor vacated and rejected the lease

10   (the "Hold Over Period"). See Declaration of Jeffrey M. Kurtz, General Manager Promenade

11   Temecula attached hereto.

12         9.      The Debtor is indebted to Lessor for the rent incurred during the Post-Petition

13   Hold Over Period in the amount of <u>$64,086.71</u>. A true copy of the accounting is for the Hold

14   Over Period is attached hereto as Exhibit 4.

15         10.     This claim is not subject to any setoff or counterclaim, and no security interest is

16   held for this claim.

17         11.     This claim is entitled to priority as an administrative expense under 11 U. S. C.

18   § 503(b)(1) since the Debtor utilized the Leased Property to conduct ongoing business and to

19   maintain fixtures and inventory until the date of the rejection of the leases.

20         12.     The amount of $64,086.71 became due and payable on February 20, 2017. This

21   amount is entitled to administrative priority, entitled to immediate payment and is in addition to

22   Lessor's unsecured lease rejection claim.

23                                        **II.**

24                          <u>**POINTS AND AUTHORITIES**</u>

25   **A.        <u>After Notice and a Hearing, There Shall be Allowed  an Administrative Expense,</u>**

26             <u>**For the Actual, Necessary Cots and Expenses of Preserving the Estate.**</u>

27                      § 503. Allowance of administrative expenses

28                      (a) An entity may timely file a request for payment of an

TEMECULA TOWNE CENTER ASSOCIATES
L.P.'S MOTION FOR ORDER (1) ALLOWING AN
ADMINISTRATIVE EXPENSE PRIORITY

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

1    administrative expense, or may tardily file such request if permitted
by the court for cause.

2

3    (b) After notice and a hearing, there shall be allowed administrative
expenses, other than claims allowed under section 502(f) of this
title, including--

4

5    (1)(A) the actual, necessary costs and expenses of preserving the
estate including—

6    …

7    11 U.S.C.A. § 503

8    The Debtor used the Leased Property to conduct ongoing business, to maintain fixtures

9    and inventory until the date of the rejection of the leases.  Not withstanding the benefit to the

10    Estate, this claim is entitled to priority as an administrative expense under 11 U. S. C.§§365(d)(3)

11    and 503(b)(1).

12    **B.    Claims Arising Under §365(d)(3) are Entitled to Administrative Priority.**

13    We have held that claims arising under § 365(d)(3) are entitled to
administrative priority even when they may exceed the reasonable

14    value of the debtor's actual use of the property. See *Pacific-Atlantic*,
27 F.3d at 405. We did so because the "notwithstanding section

15    503(b)(1)" proviso exempts the amount of lease obligations that a
trustee must timely pay under § 365(d)(3) from § 503(b)(1)'s

16    limitation of administrative expenses to the fair value of the debtor's
use of the property. Id. When the trustee fails to pay an obligation,

17    the amount accorded administrative priority is similarly not subject
to the § 503(b)(1) limitation. Id. We reasoned that to hold otherwise

18    would reward trustees for failing to perform lease obligations, a
result entirely at odds with § 365(d)(3)'s purpose of ensuring

19    prompt payment for landlords. Id *In re Cukierman* (9th Cir. 2001)
265 F.3d 846, 850

20

21    **C.    Lessor Is Entitled To Allowance of An Administrative Expense Priority Claim.**

22    Pursuant to Bankruptcy Code §365(d)(3) a debtor-in-possession is required to timely

23    perform all obligations required under a lease, including the obligation to pay rent at the contract

24    rate until the lease is rejected. The lessor is provided an administrative claim for all such amounts.

25    § 365. Executory contracts and unexpired leases

26    (a) Except as provided in sections 765 and 766 of this title and in
subsections (b), (c), and (d) of this section, the trustee, subject to

27    the court's approval, may assume or reject any executory contract
or unexpired lease of the debtor.

28

1     . . .

2     (D) the satisfaction of any penalty rate or penalty provision relating
to a default arising from any failure by the debtor to perform

3     nonmonetary obligations under the executory contract or unexpired
lease.

4

5     (3) For the purposes of paragraph (1) of this subsection and
paragraph (2)(B) of subsection (f), adequate assurance of future
performance of a lease of real property in a shopping center

6     includes adequate assurance--

7     (A) of the source of rent and other consideration due under such
lease, and in the case of an assignment, that the financial condition

8     and operating performance of the proposed assignee and its
guarantors, if any, shall be similar to the financial condition and

9     operating performance of the debtor and its guarantors, if any, as of
the time the debtor became the lessee under the lease;

10

11     (B) that any percentage rent due under such lease will not decline
substantially;

12     . . .

13     *11 U. S. C. Section 365*

14

15     The Court should (1) grant Lessor's claim for lease charges accruing from and after the

Petition Date with priority as provided in 11 U. S. C. §§365(d)(3), 503(a) and 503(b) in the

16

17     amount of $64,086.71; and (2) Order the Debtor  to immediately pay such claim.

18

19     Dated: October _____70_____, 2017     BEST BEST & KRIEGER LLP

20

21     By: _____
     FRANKLIN C. ADAMS

22     Attorneys for Creditor: Rancho Mall LLC,
a Delaware limited liability company

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

## III.

## DECLARATION OF JEFFREY M. KURTZ

I, Jeffrey M. Kurtz declare as follows:

1. The following facts are known to me to be true except those stated herein on information and belief and as to those I believe them to be true. If called as a witness I could and would competently testify thereto.

2. I am the General Manager for the Promenade in Temecula. My business address is 4080 Winchester Road, Suite 2000, Temecula, California 92591. My telephone number is (951) 296-0979.

3. This declaration is in support of Temecula Towne Center Associates L.P.'s Motion For Order (1) Allowing An Administrative Expense Priority Claim pursuant to 11 U. S. C. §§365(d)(3) and 503 in the amount of $64,086.71 for post-petition rent incurred from the date the Petition was filed, to the date the Debtor's rejected the lease on February 20, 2017; and (2) Directing Immediate Payment of the Administrative Expense Claim (the "Motion").

4. On December 29, 2016, the Debtor filed its Motion for Entry of an Order Authorizing Debtor to Reject Certain Unexpired Non-Residential Property Leases Pursuant to 11 U. S. C. § 365, et al. (the "Rejection Motion") (ECF No. 81). See Exhibit 1

5. The Lease Agreement with Lessor (the "Towne Center Lease") was one of the leases that the Debtor sought to reject within the Rejection Motion.

6. I requested an obtained from our Data Processing Department a copy of the Lease Agreement for the Promenade in Temecula, unit 2610 (the "Lease"). A true and exact copy of the Lease is attached hereto as Exhibit 3.

7. Pursuant to the terms of the Lease, Lessor leased to the Debtor Unit Number 2610 (the "Leased Property") within the Promenade in Temecula shopping center for ten (10) years beginning on November 1, 2006 and ending on October 31, 2016.

8. The Debtor vacated and rejected the lease on February 20, 2017.

9. No sum has been paid to or received by Lessor as rent for the premises for the period from the date of the filing of the Petition (October 19, 2016), to February 20, 2017,

TEMECULA TOWNE CENTER ASSOCIATES
L.P.'S MOTION FOR ORDER (1) ALLOWING AN
ADMINISTRATIVE EXPENSE PRIORITY

1  (November, December, January and February the date the Debtor vacated and rejected the lease

2  (the "Hold Over Period").

3      10.    I directed the Data Processing Department to prepare an accounting for the tenant

4  Angl for the time period of November 1, 2006 through the date the Debtor rejected the lease or

5  February 20, 2017.

6      11.    The Debtor is indebted to Lessor for Post-Petition Hold Over Period rent incurred

7  in the amount of $64,086.71. A true copy of the accounting is for the Hold Over Period is

8  attached hereto as Exhibit 4.

9      I declare under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct, and that I could and would competently testify thereto if called upon

11  to do so and that this declaration was executed on this ___*23RD*___, day of October, 2017

12  in the city of *TEMECULA*, California.

13

14                                          Jeffrey M. Kurtz

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
BEST BEST & KRIEGER LLP
3390 UNIVERSITY AVENUE, 5TH FLOOR
P.O. BOX 1028
RIVERSIDE, CA 92502

# EXHIBIT 1

Temecula Towne Center - Motion for Administrative Expenses 000007

TIMOTHY J. YOO (SBN 155531)
JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: tjy@lnbyb.com, jyo@lnbyb.com

Attorneys for Chapter 11 Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>BLUE BEE, INC.,<br><br>               Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:16-bk-23836-SK<br><br>Chapter 11<br><br>**MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO REJECT CERTAIN UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASES PURSUANT TO 11 U.S.C. § 365 AND ABANDON ANY REMAINING PERSONAL PROPERTY LOCATED AT THE LEASED PREMISES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF JEFF SUNGHAK KIM FILED IN SUPPORT THEREOF**<br><br>Date:       January 19, 2017<br>Time:      8:30 a.m.<br>Courtroom:  1575<br>Location:   255 E. Temple Street<br>              Los Angeles, California |

1

Case 2:16-bk-23836-SK    Doc 81    Filed 12/29/16    Entered 12/29/16 16:48:37    Desc
                Main Document        Page 2 of 381

## TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 6

I.    STATEMENT OF FACTS ................................................................................... 6

      A.    Background ................................................................................... 6

      B.    The Retail Store Leases Proposed To Be Rejected ...................................... 8

II.   DISCUSSION ....................................................................................................... 15

      A.    The Debtor Should Be Authorized To Reject The Leases For The
            Retail Stores ................................................................................... 15

      B.    The Debtor Should Be Authorized To Abandon The Personal Property
            Remaining At The Retail Stores As Of The Applicable Vacate Dates ........ 17

III.  CONCLUSION .................................................................................................... 18

i

1

# TABLE OF AUTHORITIES

2

Page(s)

3 **FEDERAL CASES**

4 *In re Central Fla. Metal Fabrication, Inc.*
      190 B.R. 119 (Bankr. N.D.Fla. 1995) ............................................................15
5

6 *In re Continental Country Club, Inc.*
      114 B.R. 763 (Bankr. M.D.Fla. 1990) ...........................................................15

7
  *In re Gucci*
8      193 B.R. 411 (S.D.N.Y. 1996)........................................................................15

9 *In re Klein Sleep Products, Inc.*
      78 F.3d 18 (2d. Cir. 1996) ..............................................................................15
10

11 *In re Prime Motors Inns*
       124 B.R. 378 (Bankr. S.D.Fla. 1991) ............................................................16

12
   *In re Trans World Airlines, Inc.*
13      261 B.R. 103 (Bankr. D. Del. 2001) ..............................................................16

14 *NLRB v. Bildisco (In re Bildisco)*
       682 F.2d 72 (3d Cir. 1982).............................................................................15
15

16 *Pacific Shores Development, LLC v. At Home Corporation (In re At Home Corporation)*
       392 F.3d 1064 (9th Cir. 2004) ..................................................................16, 17

17 **FEDERAL STATUTES**

18 11 U.S.C. § 105(a) .............................................................................................2, 4, 16

19
20 11 U.S.C. § 365.........................................................................................................16

   11 U.S.C. § 365(a) .............................................................................................2, 4, 15
21

22 11 U.S.C. § 554(a) ...................................................................................................18

23 11 U.S.C. § 1107.....................................................................................................3, 6

24 11 U.S.C. § 1108.....................................................................................................3, 6

25 **FEDERAL RULES**

26 Fed. R. Bankr. P. 6006 ...........................................................................................2, 4

27 Fed. R. Bankr. P. 9013-1 ........................................................................................2, 4

28

1    Pursuant to 11 U.S.C. §§ 105(a) and 365(a), Rule 6006 of the Federal Rules of

2    Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 9013-1, Blue Bee,

3    Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession in the above-

4    captioned Chapter 11 bankruptcy case (the "Debtor"), hereby files this motion (the "Motion") for

5    the entry of an order:

6          (A)    authorizing (but not requiring) the Debtor to reject up to seven (7) of the

7    Debtor's unexpired non-residential real property leases (collectively, the "Leases," and

8    individually, a "Lease") relating to the Debtor's retail stores which are identified in the

9    table below (collectively, the "Retail Stores," and individually, a "Retail Store"),[1] with the

10   rejection of such Leases to be deemed effective as of the later of (i) December 31, 2016

11   and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the

12   "Vacate Date"):

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| Glendale II Mall Associates, LLC c/o Glendale Galleria 110 N. Wacker Drive Attn: Law/Lease Admin. Dept. Chicago, IL 60606 | Glendale Galleria (#31) | 2101 Galleria Way Glendale, California |
| La Cienega Partners Limited Partnership c/o The Taubman Company Attn: General Counsel 200 East Long Lake Road #300 P.O. Box 200 Bloomfield Hills, MI 48303 | Beverly Center (#27) | 8500 Beverly Blvd., #6622 Los Angeles, California |
| Rancho Mall, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | Rancho Cucamonga Victoria Gardens (#38) | 12543 South Main Street, #1615 Rancho Cucamonga, California |

[1] True and correct copies of the Leases for the Retail Stores which are proposed to be rejected are collectively attached as Exhibit "A" to the Declaration of Jeff Sunghak Kim annexed to this Motion.

2

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| The Retail Property Trust c/o M.S. Management Associates, Inc. 225 West Washington St. Indianapolis, IN 46204-3438 | Brea Mall (#43) | 2110 Brea Mall, #2110 Brea, California |
| South Bay Center SPE, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | South Bay Galleria (#14) | 1815 Hawthorne Blvd., #258 Redondo Beach, California |
| Temecula Towne Center Associates LP Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | The Promenade in Temecula (#17) | 40820 Winchester Road, #2610 Temecula, California |
| W/A SVT Holdings VI, LLC 900 N. Michigan Avenue, Suite 1900 Chicago, IL 60611 Attn: David S. Joseph, II | Simi Valley Town Center (#12) | 1555 Simi Town Center Way, #135 Simi Valley, California |

and;

      (B)    authorizing the Debtor to abandon any of its remaining personal property assets located at each of the Retail Stores as of the applicable Vacate Date.

The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers. The Debtor currently owns and operates twenty-one (21) retail stores located primarily in shopping malls throughout the state of California. The Debtor is headquartered in Los Angeles, California, and currently employs a workforce of approximately 110 employees. The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on October 19, 2016 (the "Petition Date"). The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3

1    For the reasons set forth in detail in the Memorandum of Points and Authorities annexed

2    hereto, the Debtor has determined, in the exercise of its sound business judgment, that granting

3    the Debtor authority to immediately reject the Leases relating to the seven (7) Retail Stores

4    identified above is in the best interests of the estate.  While the Debtor is currently still operating

5    out of the Retail Stores, the retail operations at each of the Retail Stores have been, and continue

6    to be, unprofitable and are likely to only deplete the Debtor's resources if the Debtor does not

7    immediately reject the Leases.  Given the ongoing post-petition rent obligations for the Retail

8    Stores, and the fact that the Debtor will not likely be in a position to operate profitably at such

9    Retail Stores unless meaningful rent concessions can be successfully negotiated with the

10    respective landlords, there will be significant financial losses to the Debtor and its bankruptcy

11    estate, and the accrual of significant administrative rent claims in favor of the respective landlords

12    without a corresponding benefit to the Debtor's estate, if the Leases are not immediately rejected.

13    Accordingly, by this Motion, the Debtor is seeking authority to reject the Leases for the

14    Retail Stores (or some portion of them), effective as of the later of (i) December 31, 2016 and (ii)

15    the Vacate Date for each applicable Retail Store.  While the Debtor anticipates vacating most, if

16    not all, of the Retail Stores by December 31, 2016, the Debtor may actually vacate certain of the

17    Retail Stores on or before January 31, 2017.

18    In addition, by this Motion, the Debtor is seeking Court authority to abandon any of the

19    Debtor's remaining personal property assets located at each of the Retail Stores as of the

20    applicable Vacate Date.

21    The Motion is based upon 11 U.S.C. §§ 105(a) and 365(a), Bankruptcy Rule 6006, and

22    Local Bankruptcy Rule 9013-1, the Memorandum of Points and Authorities and the Declaration

23    of Jeff Sunghak Kim annexed hereto, the entire record of the Debtor's bankruptcy case, the

24    statements, arguments and representations of counsel to be made at the hearing on the Motion,

25    and any other evidence properly presented to the Court.

26    **WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

27        (1)    affirming the adequacy of the notice given;

28        (2)    granting the Motion in its entirety;

4

1    (3)    authorizing the Debtor to reject the Leases for the Retail Stores, or some portion of

2    them in the discretion of the Debtor, with such rejection to be deemed effective as of the later of

3    (a) December 31, 2016 and (b) the Vacate Date for each such applicable Retail Store;

4    (4)    authorizing the Debtor to abandon any of its remaining personal property assets

5    located at each of the Retail Stores as of the applicable Vacate Date; and

6    (5)    granting such other and further relief as the Court deems just and proper under the

7    circumstances.

8    Dated: December 29, 2016                    BLUE BEE, INC.

9

10

11                                              By:_____

12                                              TIMOTHY J. YOO
                                                JULIET Y. OH
13                                              LEVENE, NEALE, BENDER, YOO
                                                   & BRILL L.L.P.
14                                              Attorneys for Chapter 11 Debtor and
                                                Debtor in Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

A.    **Background**.

     1.     Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), filed a voluntary petition for relief under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on October 19, 2016 (the "Petition Date"). The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

     2.     The Debtor is a retailer doing business under the "ANGL" brand offering stylish and contemporary women's clothing at reasonable prices to its fashion-savvy customers. As of the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily in shopping malls throughout the state of California. Since the opening of its first retail store in 1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing designer fashion to a wider audience.

     3.     The Debtor is the successor-in-interest to Angl, Inc., a California corporation, which was founded by Jeff Sunghak Kim and his wife, Young Ae Kim, and was dissolved on August 30, 2013. Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for tax and other corporate restructuring and marketing purposes. The same corporate directors and officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor. Jeff Sunghak Kim and his wife, Young Ae Kim, continue to be actively involved in the Debtor's business operations as the President and Secretary of the Debtor, respectively.

     4.     The Debtor is headquartered near downtown Los Angeles, California and currently employs a workforce of approximately 110 employees. In 2015, the Debtor generated annual gross revenues of more than $24 million.

6

5.      After opening its first retail store approximately 24 years ago in 1992, the Debtor's predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015. The vast majority of these new retail stores (approximately 43 stores) were opened within the last seven years. This large expansion effort, which was conducted within a relatively compressed period of time, took a heavy financial toll on the business operations of the Debtor's predecessor as a whole as it incurred construction and other "start up" costs with the opening of each new store as well as a significant increase in operating expenses typically associated with a retail store chain operation.

6.      The high cost of expansion combined with decreasing store sales as a result of a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's landlords and vendors. As a result of the Debtor's defaults, numerous landlords commenced actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of its retail stores. While the Debtor had already closed a number of its less profitable retail store locations, leaving open approximately 21 retail stores as of the Petition Date, the Debtor required time to evaluate the viability of its remaining retail stores and identify other ways to decrease operational costs and increase profitability. In order to preserve the Debtor's rights under its lease agreements and to have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

7.      Through its bankruptcy case, the Debtor intends to identify the core retail stores around which the Debtor can successfully reorganize, to expeditiously close those retail stores which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful rent concessions from the landlords, to identify and implement reasonable cost cutting measures and to maximize the value of the Debtor's inventory by continuing its retail operations at the retail stores (particularly during the upcoming holiday season), all of which the Debtor believes will enable it to formulate and pursue confirmation of a plan of reorganization which allows the

7

Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

**B.** <u>**The Retail Store Leases Proposed To Be Rejected.**</u>

8.    By this Motion, the Debtor is seeking authority to reject up to seven (7) of the Debtor's unexpired non-residential real property leases (collectively, the "<u>Leases</u>," and individually, a "<u>Lease</u>") relating to the Debtor's retail stores which are identified in the table below (collectively, the "<u>Retail Stores</u>," and individually, a "<u>Retail Store</u>"),[2] with the rejection of such Leases to be deemed effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the "<u>Vacate Date</u>"):

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| Glendale II Mall Associates, LLC c/o Glendale Galleria 110 N. Wacker Drive Attn: Law/Lease Admin. Dept. Chicago, IL 60606 | Glendale Galleria (#31) | 2101 Galleria Way Glendale, California |
| La Cienega Partners Limited Partnership c/o The Taubman Company Attn: General Counsel 200 East Long Lake Road #300 P.O. Box 200 Bloomfield Hills, MI 48303 | Beverly Center (#27) | 8500 Beverly Blvd., #6622 Los Angeles, California |
| Rancho Mall, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | Rancho Cucamonga Victoria Gardens (#38) | 12543 South Main Street, #1615 Rancho Cucamonga, California |

---

[2] True and correct copies of the Leases for the Retail Stores which are proposed to be rejected are collectively attached as <u>**Exhibit "A"**</u> to the Declaration of Jeff Sunghak Kim (the "<u>Kim Declaration</u>") annexed hereto. Income statements for the Retail Stores, which reflect the financial performance of each Retail Store during the last approximately twelve months, are collectively attached as <u>**Exhibit "B"**</u> to the Kim Declaration annexed hereto.

8

Temecula Towne Center - Motion for Administrative Expenses 000017

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| The Retail Property Trust c/o M.S. Management Associates, Inc. 225 West Washington St. Indianapolis, IN 46204-3438 | Brea Mall (#43) | 2110 Brea Mall, #2110 Brea, California |
| South Bay Center SPE, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | South Bay Galleria (#14) | 1815 Hawthorne Blvd., #258 Redondo Beach, California |
| Temecula Towne Center Associates LP Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | The Promenade in Temecula (#17) | 40820 Winchester Road, #2610 Temecula, California |
| W/A SVT Holdings VI, LLC 900 N. Michigan Avenue, Suite 1900 Chicago, IL 60611 Attn: David S. Joseph, II | Simi Valley Town Center (#12) | 1555 Simi Town Center Way, #135 Simi Valley, California |

Each of the Leases identified above are described in detail below.

### *Lease For Store #31 (Glendale Galleria)*

9.    Prior to the Petition Date, the Debtor entered into a written Lease agreement dated as of May 4, 2011 with landlord Glendale II Mall Associates, LLC to lease the premises located at 2101 Galleria Way, Glendale, California ("Store #31"). A true and correct copy of the Lease for Store #31 is included in Exhibit "A" to the Kim Declaration annexed hereto.

10.    While the Debtor is currently still operating out of Store #31, the retail operations at Store #31 have been, and continue to be, unprofitable. An income statement for Store #31, which essentially provides a "four-wall" analysis of Store #31's financial performance during the last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed hereto. As the income statement for Store #31 indicates, Store #31 has not operated profitably or has operated at a small net profit during the last approximately twelve months. After taking into

9

1   account the corporate overhead expenses attributable to each of the Debtor's retail stores

2   (including Store #31), the Debtor has concluded that, unless meaningful rent concessions can be

3   successfully negotiated with the landlord, Store #31 is simply not profitable enough to sustain and

4   will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

5   Lease associated therewith.

6        ***Lease For Store #27 (Beverly Center)***

7        11.    Prior to the Petition Date, the Debtor entered into a written Lease agreement

8   (entitled Temporary Inline Space License Agreement) dated as of May 25, 2016 with landlord La

9   Cienega Partners Limited Partnership to lease the premises located at 8500 Beverly Boulevard,

10  #6622, Los Angeles, California ("Store #27"). A true and correct copy of the Lease for Store #27

11  is included in Exhibit "A" to the Kim Declaration annexed hereto.

12       12.    While the Debtor is currently still operating out of Store #27, the retail operations

13  at Store #27 have been, and continue to be, unprofitable. An income statement for Store #27,

14  which essentially provides a "four-wall" analysis of Store #27's financial performance during the

15  last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

16  hereto. As the income statement for Store #27 indicates, Store #27 has not operated profitably or

17  has operated at a small net profit during the last approximately twelve months. After taking into

18  account the corporate overhead expenses attributable to each of the Debtor's retail stores

19  (including Store #27), the Debtor has concluded that, unless meaningful rent concessions can be

20  successfully negotiated with the landlord, Store #27 is simply not profitable enough to sustain and

21  will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

22  Lease associated therewith.

23       ***Lease For Store #38 (Rancho Cucamonga Victoria Gardens)***

24       13.    Prior to the Petition Date, the Debtor's predecessor, Angl, Inc., entered into a

25  written Lease agreement dated as of August 2, 2012 with landlord Rancho Mall, LLC to lease the

26  premises located at 12543 South Main Street, #1615, Rancho Cucamonga, California ("Store

27  #38"). A true and correct copy of the Lease for Store #38 is included in Exhibit "A" to the Kim

28  Declaration annexed hereto. Prior to the Petition Date, on or about August 30, 2013 (when Angl,

10

1   Inc. was dissolved), the Lease for Store #38 was assumed by and/or assigned to the Debtor and,

2   as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store

3   #38 and to perform all rent payment and other obligations as the effective tenant under the Lease

4   for Store #38 since such date.

5        14.    While the Debtor is currently still operating out of Store #38, the retail operations

6   at Store #38 have been, and continue to be, unprofitable.  An income statement for Store #38,

7   which essentially provides a "four-wall" analysis of Store #38's financial performance during the

8   last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

9   hereto.  As the income statement for Store #38 indicates, Store #38 has not operated profitably or

10   has operated at a small net profit during the last approximately twelve months.  After taking into

11   account the corporate overhead expenses attributable to each of the Debtor's retail stores

12   (including Store #38), the Debtor has concluded that, unless meaningful rent concessions can be

13   successfully negotiated with the landlord, Store #38 is simply not profitable enough to sustain and

14   will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

15   Lease associated therewith.

16        ***Lease For Store #43 (Brea Mall)***

17        15.    Prior to the Petition Date, the Debtor entered into a written Lease agreement dated

18   as of February 28, 2014 with landlord The Retail Property Trust to lease the premises located at

19   2110 Brea Mall, #2110, Brea, California ("Store #43").  A true and correct copy of the Lease for

20   Store #43 is included in Exhibit "A" to the Kim Declaration annexed hereto.

21        16.    While the Debtor is currently still operating out of Store #43, the retail operations

22   at Store #43 have been, and continue to be, unprofitable.  An income statement for Store #43,

23   which essentially provides a "four-wall" analysis of Store #43's financial performance during the

24   last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

25   hereto.  As the income statement for Store #43 indicates, Store #43 has not operated profitably or

26   has operated at a small net profit during the last approximately twelve months.  After taking into

27   account the corporate overhead expenses attributable to each of the Debtor's retail stores

28   (including Store #43), the Debtor has concluded that, unless meaningful rent concessions can be

11

Temecula Towne Center - Motion for Administrative Expenses 000020

1   successfully negotiated with the landlord, Store #43 is simply not profitable enough to sustain and

2   will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

3   Lease associated therewith.

4       ***Lease For Store #14 (South Bay Galleria)***

5       17.    Prior to the Petition Date, the Debtor's principals, Jeff Sunghak Kim and his wife,

6   Young Ae Kim, entered into a written Lease agreement dated as of April 24, 2006 with landlord

7   South Bay Center SPE, LLC to lease the premises located at 1815 Hawthorne Boulevard, #258,

8   Redondo Beach, California ("Store #14"). A true and correct copy of the Lease for Store #14 is

9   included in Exhibit "A" to the Kim Declaration annexed hereto. At some point prior to the

10   Petition Date, the Lease for Store #14 was assumed by and/or assigned to the Debtor by the

11   Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to

12   exclusively operate, Store #14 and to perform all rent payment and other obligations as the

13   effective tenant under the Lease for Store #14.

14       18.    The original term of the Lease for Store #14 has expired and, therefore, the Debtor

15   has effectively been leasing the premises on a month-to-month basis at the same rental rate which

16   existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

17       19.    While the Debtor is currently still operating out of Store #14, the retail operations

18   at Store #14 have been, and continue to be, unprofitable. An income statement for Store #14,

19   which essentially provides a "four-wall" analysis of Store #14's financial performance during the

20   last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

21   hereto. As the income statement for Store #14 indicates, Store #14 has not operated profitably or

22   has operated at a small net profit during the last approximately twelve months. After taking into

23   account the corporate overhead expenses attributable to each of the Debtor's retail stores

24   (including Store #14), the Debtor has concluded that, unless meaningful rent concessions can be

25   successfully negotiated with the landlord, Store #14 is simply not profitable enough to sustain and

26   will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

27   Lease associated therewith.

28

12

### Lease For Store #17 (The Promenade in Temecula)

20.     Prior to the Petition Date, the Debtor's principals, Jeff Sunghak Kim and his wife, Young Ae Kim, entered into a written Lease agreement dated as of August 3, 2006 with landlord Temecula Towne Center Associates LP to lease the premises located at 40820 Winchester Road, #2610, Temecula, California ("Store #17"). A true and correct copy of the Lease for Store #17 is included in Exhibit "A" to the Kim Declaration annexed hereto. At some point prior to the Petition Date, the Lease for Store #17 was assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store #17 and to perform all rent payment and other obligations as the effective tenant under the Lease for Store #17.

21.     The original term of the Lease for Store #17 has expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month basis at the same rental rate which existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

22.     While the Debtor is currently still operating out of Store #17, the retail operations at Store #17 have been, and continue to be, unprofitable. An income statement for Store #17, which essentially provides a "four-wall" analysis of Store #17's financial performance during the last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed hereto. As the income statement for Store #17 indicates, Store #17 has not operated profitably or has operated at a small net profit during the last approximately twelve months. After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #17), the Debtor has concluded that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #17 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

### Lease For Store #12 (Simi Valley Town Center)

23.     Prior to the Petition Date, the Debtor's principals, Jeff Sunghak Kim and his wife, Young Ae Kim, entered into a written Lease agreement dated as of March 2, 2006 with Simi Valley Mall, LLC (the predecessor to the current landlord, W/A SVT Holdings VI, LLC) to lease

13

1    the premises located at 1555 Simi Town Center Way, #135, Simi Valley, California ("Store

2    #12"). A true and correct copy of the Lease for Store #12 is included in Exhibit "A" to the Kim

3    Declaration annexed hereto. At some point prior to the Petition Date, the Lease for Store #12 was

4    assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor

5    has been exclusively operating, and continues to exclusively operate, Store #12 and to perform all

6    rent payment and other obligations as the effective tenant under the Lease for Store #12.

7         24.    The original term of the Lease for Store #12 has expired and, therefore, the Debtor

8    has effectively been leasing the premises on a month-to-month basis at the same rental rate which

9    existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

10        25.    While the Debtor is currently still operating out of Store #12, the retail operations

11   at Store #12 have been, and continue to be, unprofitable. An income statement for Store #12,

12   which essentially provides a "four-wall" analysis of Store #12's financial performance during the

13   last approximately twelve months, is included in Exhibit "B" to the Kim Declaration annexed

14   hereto. As the income statement for Store #14 indicates, Store #12 has not operated profitably or

15   has operated at a small net profit during the last approximately twelve months. After taking into

16   account the corporate overhead expenses attributable to each of the Debtor's retail stores

17   (including Store #12), the Debtor has concluded that, unless meaningful rent concessions can be

18   successfully negotiated with the landlord, Store #12 is simply not profitable enough to sustain and

19   will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the

20   Lease associated therewith.

21        26.    Although the Debtor has attempted to negotiate rent concessions with many, if not

22   all, of the landlords of the Retail Stores, the Debtor's efforts to negotiate agreements with such

23   landlords to reduce rent to a level which would render the Retail Stores profitable have not been

24   successful to date.

25        27.    Based on the foregoing, and given the ongoing post-petition rent obligations for

26   the Retail Stores, and the fact that the Debtor will not likely be in a position to operate profitably

27   at such Retail Stores unless meaningful rent concessions can be successfully negotiated with the

28   respective landlords, there will be significant financial losses to the Debtor and its bankruptcy

14

1   estate, and the accrual of significant administrative rent claims in favor of the respective landlords

2   without a corresponding benefit to the Debtor's estate, if the Leases are not immediately rejected.

3       28.    Accordingly, by this Motion, the Debtor is seeking to reject all of the Leases for

4   the Retail Stores, effective as of the later of (i) December 31, 2016 and (ii) the date on which the

5   Debtor actually vacates the applicable Retail Store (the "Vacate Date").    While the Debtor

6   anticipates vacating most, if not all, of the Retail Stores by December 31, 2016, the Debtor may

7   actually vacate certain of the Retail Stores on or before January 31, 2017.

8       29.    In addition, by this Motion, the Debtor is seeking Court authority to abandon any

9   of the Debtor's remaining personal property assets located at each of the Retail Stores of the

10  applicable Vacate Date.

11      30.    The Debtor believes that the rent and other obligations payable under the Leases

12  are generally at or above the current market.    Accordingly, the Debtor does not believe that the

13  marketing and assignment of the Leases to third parties would result in any net recovery for its

14  bankruptcy estate.

15                                      **II.**

16                               **DISCUSSION**

17  **A.    The Debtor Should Be Authorized To Reject The Leases For The Retail Stores.**

18      Barring certain exceptions not herein relevant, Section 365(a) of the Bankruptcy Code

19  authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any

20  executory contract or unexpired lease of the debtor."    A debtor in possession may assume or reject

21  executory contracts for the benefit of the estate.    *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25

22  (2d. Cir. 1996); *In re Central Fla. Metal Fabrication, Inc.*, 190 B.R. 119, 124 (Bankr. N.D.Fla.

23  1995); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996).    In reviewing a debtor in possession's

24  decision to assume or reject an executory contract, a bankruptcy court should apply the "business

25  judgment test" to determine whether it would be beneficial to the estate to assume it.    *In re*

26  *Continental Country Club, Inc.*, 114 B.R. 763, 767 (Bankr. M.D.Fla. 1990); *see also In re Gucci,*

27  *supra*, 193 B.R. at 415; *NLRB v. Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The

28  usual test for rejection of an executory contract is simply whether rejection would benefit the

                                      15

1   estate, the 'business judgment' test."). The business judgment standard requires that the court

2   follow the business judgment of the debtor unless that judgment is the product of bad faith, whim,

3   or caprice. *In re Prime Motors Inns*, 124 B.R. 378, 381 (Bankr. S.D.Fla. 1991), *citing Lubrizol*

4   *Enterprises v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475

5   U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *see also In re Trans World Airlines, Inc.*, 261

6   B.R. 103, 121 (Bankr. D. Del. 2001).

7   The Debtor has determined that, unless meaningful rent concessions can be successfully

8   negotiated with the respective landlords, the seven (7) Retail Stores discussed above are not

9   profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor

10  does not immediately reject the Leases associated therewith. Each day that the Leases relating to

11  the Retail Stores remain in place results in significant financial losses (and increased

12  administrative expense) to the Debtor's bankruptcy estate, which must be avoided to preserve the

13  value of the Debtor's assets, conserve the Debtor's resources and cash, and maximize the Debtor's

14  ability to successfully reorganize in this case. Accordingly, the Debtor submits that it is

15  reasonable and appropriate to grant the Debtor authority to immediately reject the Leases for the

16  Retail Stores.

17  By this Motion, the Debtor is seeking to have the effective date of the rejection of the

18  Leases be deemed the later of December 31, 2016 and the Vacate Date for each applicable Lease

19  (*i.e.*, the date that the Debtor actually vacates each applicable Retail Store). As noted above, the

20  Debtor anticipates that it will be vacating most, if not all, of the Retail Stores by December 31,

21  2016. With respect to those Retail Stores that the Debtor is not able to vacate by December 31,

22  2016, the Debtor anticipates vacating such Retail Stores by no later than January 31, 2017.

23  The Ninth Circuit has held that a bankruptcy court, in exercising its equitable powers under

24  11 U.S.C. § 105(a), may approve the rejection of a nonresidential lease retroactive to the motion

25  filing date when necessary or appropriate to carry out the provisions of 11 U.S.C. § 365. *Pacific*

26  *Shores Development, LLC v. At Home Corporation (In re At Home Corporation)*, 392 F.3d 1064,

27  1071 (9th Cir. 2004) (rejection of unexpired nonresidential lease retroactive to motion filing date

28  was not "abuse of discretion" under the circumstances presented in the case, and the landlord's

16

1    possession of the leased premises is not a requirement for such retroactive relief). Here, the

2    Debtor is seeking to have the effective date of the rejection of the Leases be deemed the *later of*

3    December 31, 2016 or the Vacate Date (which the Debtor anticipates will occur no later than

4    January 31, 2017). Accordingly, the effective date of the rejection of the Leases will be no earlier

5    than December 31, 2016, which is still after the date of the filing of this Motion. Based on the

6    Ninth Circuit's holding in *In re At Home Corporation,* the Debtor submits that the effective date of

7    the rejection of the Leases proposed herein is reasonable, appropriate and warranted under the

8    circumstances of this case, particularly where, as here, the landlords of the Retail Stores will have

9    notice of the proposed rejection of the Leases (by way of this Motion) and will have regained

10    possession of their respective premises on or prior to the effective lease rejection date.

11         Additionally, the Debtor has determined, in its reasonable business judgment, that there is

12    no net benefit that can be realized from an attempt to market and assign the Leases for the Retail

13    Stores. As a result, the Debtor has determined that the cost to the Debtor of continuing to occupy

14    the Retail Stores, and of performing its obligations under the Leases for the Retail Stores and

15    incurring unnecessary administrative expenses, is burdensome, and that the immediate rejection of

16    the Leases for the Retail Stores is therefore in the best interests of the Debtor's estate and

17    creditors.

18         For all of the reasons set forth above, the Debtor submits that it is in the best interests of

19    the Debtor and its bankruptcy estate to grant the relief requested in this Motion and to authorize

20    the Debtor to reject the Leases for the Retail Stores in accordance with the terms and conditions

21    set forth herein.

22    **B.    The Debtor Should Be Authorized To Abandon The Personal Property Remaining**

23         **At The Retail Stores As Of The Applicable Vacate Dates.**

24         The Debtor believes that it will remove all owned personal property assets (the

25    "Remaining Personal Property") located at the Retail Stores as of the applicable Vacate Date(s).

26    However, out of an abundance of caution and solely to the extent that the Debtor retained (or

27    retains) any ownership interest in any Remaining Personal Property, the Debtor seeks authority to

28

17

abandon any Remaining Personal Property that remain at the Retail Stores as of the Vacate Date(s).

The Debtor seeks to abandon any Remaining Personal Property described above as is, where is, and in accordance with section 554(a) of the Bankruptcy Code. Section 554(a) provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). The Debtor believes that the costs associated with liquidating any Remaining Personal Property at the Retail Stores will likely approach or exceed the value of such assets. Accordingly, the Debtor believes that the Remaining Personal Property at the Retail Stores, if any, has inconsequential value to the Debtor's estate and should be abandoned as requested herein.

## III.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an Order:

(1)     affirming the adequacy of the notice given;

(2)     granting the Motion in its entirety;

(3)     authorizing the Debtor to reject the Leases for the Retail Stores, or some portion of them in the discretion of the Debtor, with such rejection to be deemed effective as of the later of (a) December 31, 2016 and (b) the Vacate Date for each such applicable Retail Store;

(4)     authorizing the Debtor to abandon any of its remaining personal property assets located at each of the Retail Stores as of the applicable Vacate Date; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

18

1      (5)      granting such other and further relief as the Court deems just and proper under the

2    circumstances.

3    Dated:  December 29, 2016                    BLUE BEE, INC.

4

5

6                                                By:_____

7                                                     TIMOTHY J. YOO
                                                     JULIET Y. OH
8                                                     LEVENE, NEALE, BENDER, YOO
                                                        & BRILL L.L.P.
9                                                     Attorneys for Chapter 11 Debtor and
                                                     Debtor in Possession
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Temecula Towne Center - Motion for Administrative Expenses 000028

## DECLARATION OF JEFF SUNGHAK KIM

I, Jeff Sunghak Kim, hereby declare as follows:

1.    I am over 18 years of age. I am the co-founder and President of Blue Bee, Inc., a California corporation d/b/a ANGL and the debtor and debtor-in-possession herein (the "Debtor"), and am therefore familiar with the business operations and financial books and records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify as a witness, I could and would competently testify thereto.

2.    I have access to the Debtor's books and records. As the co-founder and President of the Debtor, I am familiar with the history, organization, operations and financial condition of the Debtor. The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own personal knowledge and my review of the Debtor's books and records.

3.    I make this declaration in support of the Debtor's motion to which this declaration is attached (the "Motion") which seeks the entry of an order: (A) authorizing (but not requiring) the Debtor to reject up to seven (7) of the Debtor's unexpired non-residential real property leases (collectively, the "Leases," and individually, a "Lease") relating to the Debtor's retail stores which are identified in the Motion (collectively, the "Retail Stores," and individually, a "Retail Store"), with the rejection of such Leases to be deemed effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor actually vacates the applicable Retail Store (the "Vacate Date"); and (B) authorizing the Debtor to abandon any of its remaining personal property assets located at each of the Retail Stores (the "Remaining Personal Property") as of the applicable Vacate Date. All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

4.    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 19, 2016 (the "Petition Date"). The Debtor is continuing to operate its business,

20

1    manage its financial affairs and operate its bankruptcy estate as a debtor in possession.

2    5.    The Debtor is a retailer doing business under the "ANGL" brand offering stylish

3    and contemporary women's clothing at reasonable prices to its fashion-savvy customers.  As of

4    the Petition Date, the Debtor owned and operated twenty-one (21) retail stores located primarily

5    in shopping malls throughout the state of California.  Since the opening of its first retail store in

6    1992 along Melrose Avenue in Los Angeles, California, the Debtor has focused on bringing

7    designer fashion to a wider audience.

8    6.    The Debtor is the successor-in-interest to Angl, Inc., a California corporation,

9    which was founded by my wife, Young Ae Kim, and me, and was dissolved on August 30, 2013.

10    Substantially all of the assets of Angl, Inc. were transferred to, and substantially all of the

11    liabilities of Angl, Inc. were assumed by, the Debtor (which was formed on August 30, 2013) for

12    tax and other corporate restructuring and marketing purposes.  The same corporate directors and

13    officers of Angl, Inc. have acted as the corporate directors and officers of the Debtor.  My wife,

14    Young Ae Kim, and I continue to be actively involved in the Debtor's business operations as the

15    Secretary and President of the Debtor, respectively.

16    7.    The Debtor is headquartered near downtown Los Angeles, California and currently

17    employs a workforce of approximately 110 employees.  In 2015, the Debtor generated annual

18    gross revenues of more than $24 million.

19    8.    After opening its first retail store approximately 24 years ago in 1992, the Debtor's

20    predecessor, Angl, Inc., substantially expanded its business operations to encompass a total of

21    fifty-two (52) retail stores throughout the states of California, Nevada and Arizona by 2015.  The

22    vast majority of these new retail stores (approximately 43 stores) were opened within the last

23    seven years.  This large expansion effort, which was conducted within a relatively compressed

24    period of time, took a heavy financial toll on the business operations of the Debtor's predecessor

25    as a whole as it incurred construction and other "start up" costs with the opening of each new

26    store as well as a significant increase in operating expenses typically associated with a retail store

27    chain operation.

28    9.    The high cost of expansion combined with decreasing store sales as a result of a

21

1  general industry-wide shift in consumer shopping preferences from in-store to online shopping,

2  and the increased competition arising therefrom, left the Debtor with insufficient liquidity to meet

3  all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's

4  landlords and vendors.  As a result of the Debtor's defaults, numerous landlords commenced

5  actions to evict the Debtor and/or terminate the Debtor's lease agreements for certain of its retail

6  stores.  While the Debtor had already closed a number of its less profitable retail store locations,

7  leaving open approximately 21 retail stores as of the Petition Date, the Debtor required time to

8  evaluate the viability of its remaining retail stores and identify other ways to decrease operational

9  costs and increase profitability.   In order to preserve the Debtor's rights under its lease

10  agreements and to have an opportunity to restructure its business and financial affairs and

11  ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

12          10.     Through its bankruptcy case, the Debtor intends to identify the core retail stores

13  around which the Debtor can successfully reorganize, to expeditiously close those retail stores

14  which are not likely to be profitable and/or for which the Debtor is unable to obtain meaningful

15  rent concessions from the landlords, to identify and implement reasonable cost cutting measures

16  and to maximize the value of the Debtor's inventory by continuing its retail operations at the

17  retail stores (particularly during the upcoming holiday season), all of which I believe will enable

18  the Debtor to formulate and pursue confirmation of a plan of reorganization which allows the

19  Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to

20  operate its longstanding business.

21          11.     By the Motion, the Debtor is seeking authority to reject some or all of the Leases

22  relating to the seven (7) Retail Stores identified in the Motion, with the rejection of such Leases

23  to be deemed effective as of the later of December 31, 2016 and the actual Vacate Date.  True and

24  correct copies of the Leases for the seven (7) Retail Stores which are proposed to be rejected are

25  collectively attached as **Exhibit "A"** hereto.

26          12.     Income statements for the Retail Stores, which reflect the financial performance of

27  each Retail Store during the last approximately twelve months, are collectively attached as

28  **Exhibit "B"** hereto.

22

_**Lease For Store #31 (Glendale Galleria)**_

13.     Prior to the Petition Date, the Debtor entered into a written Lease agreement dated as of May 4, 2011 with landlord Glendale II Mall Associates, LLC to lease the premises located at 2101 Galleria Way, Glendale, California ("Store #31").  A true and correct copy of the Lease for Store #31 is included in Exhibit "A" hereto.

14.     While the Debtor is currently still operating out of Store #31, the retail operations at Store #31 have been, and continue to be, unprofitable.  An income statement for Store #31, which essentially provides a "four-wall" analysis of Store #31's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #31 indicates, Store #31 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #31), I believe that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #31 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

_**Lease For Store #27 (Beverly Center)**_

15.     Prior to the Petition Date, the Debtor entered into a written Lease agreement (entitled Temporary Inline Space License Agreement) dated as of May 25, 2016 with landlord La Cienega Partners Limited Partnership to lease the premises located at 8500 Beverly Boulevard, #6622, Los Angeles, California ("Store #27").  A true and correct copy of the Lease for Store #27 is included in Exhibit "A" hereto.

16.     While the Debtor is currently still operating out of Store #27, the retail operations at Store #27 have been, and continue to be, unprofitable.  An income statement for Store #27, which essentially provides a "four-wall" analysis of Store #27's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for Store #27 indicates, Store #27 has not operated profitably or has operated at a small net profit during the last approximately twelve months.  After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #27), I believe that,

23

1    unless meaningful rent concessions can be successfully negotiated with the landlord, Store #27 is

2    simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

3    Debtor does not immediately reject the Lease associated therewith.

4         *__Lease For Store #38 (Rancho Cucamonga Victoria Gardens)__*

5         17.    Prior to the Petition Date, the Debtor's predecessor, Angl, Inc., entered into a

6    written Lease agreement dated as of August 2, 2012 with landlord Rancho Mall, LLC to lease the

7    premises located at 12543 South Main Street, #1615, Rancho Cucamonga, California ("Store

8    #38"). A true and correct copy of the Lease for Store #38 is included in Exhibit "A" hereto.

9    Prior to the Petition Date, on or about August 30, 2013 (when Angl, Inc. was dissolved), the

10   Lease for Store #38 was assumed by and/or assigned to the Debtor and, as a result, the Debtor has

11   been exclusively operating, and continues to exclusively operate, Store #38 and to perform all

12   rent payment and other obligations as the effective tenant under the Lease for Store #38 since

13   such date.

14        18.    While the Debtor is currently still operating out of Store #38, the retail operations

15   at Store #38 have been, and continue to be, unprofitable. An income statement for Store #38,

16   which essentially provides a "four-wall" analysis of Store #38's financial performance during the

17   last approximately twelve months, is included in Exhibit "B" hereto. As the income statement for

18   Store #38 indicates, Store #38 has not operated profitably or has operated at a small net profit

19   during the last approximately twelve months. After taking into account the corporate overhead

20   expenses attributable to each of the Debtor's retail stores (including Store #38), I believe that,

21   unless meaningful rent concessions can be successfully negotiated with the landlord, Store #38 is

22   simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

23   Debtor does not immediately reject the Lease associated therewith.

24        *__Lease For Store #43 (Brea Mall)__*

25        19.    Prior to the Petition Date, the Debtor entered into a written Lease agreement dated

26   as of February 28, 2014 with landlord The Retail Property Trust to lease the premises located at

27   2110 Brea Mall, #2110, Brea, California ("Store #43"). A true and correct copy of the Lease for

28   Store #43 is included in Exhibit "A" hereto.

24

20.     While the Debtor is currently still operating out of Store #43, the retail operations at Store #43 have been, and continue to be, unprofitable. An income statement for Store #43, which essentially provides a "four-wall" analysis of Store #43's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto. As the income statement for Store #43 indicates, Store #43 has not operated profitably or has operated at a small net profit during the last approximately twelve months. After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #43), I believe that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #43 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

### *Lease For Store #14 (South Bay Galleria)*

21.     Prior to the Petition Date, my wife, Young Ae Kim, and I entered into a written Lease agreement dated as of April 24, 2006 with landlord South Bay Center SPE, LLC to lease the premises located at 1815 Hawthorne Boulevard, #258, Redondo Beach, California ("Store #14"). A true and correct copy of the Lease for Store #14 is included in Exhibit "A" hereto. At some point prior to the Petition Date, the Lease for Store #14 was assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store #14 and to perform all rent payment and other obligations as the effective tenant under the Lease for Store #14.

22.     To the best of my knowledge, the original term of the Lease for Store #14 has expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month basis at the same rental rate which existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

23.     While the Debtor is currently still operating out of Store #14, the retail operations at Store #14 have been, and continue to be, unprofitable. An income statement for Store #14, which essentially provides a "four-wall" analysis of Store #14's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto. As the income statement for Store #14 indicates, Store #14 has not operated profitably or has operated at a small net profit

25

1   during the last approximately twelve months.  After taking into account the corporate overhead

2   expenses attributable to each of the Debtor's retail stores (including Store #14), I believe that,

3   unless meaningful rent concessions can be successfully negotiated with the landlord, Store #14 is

4   simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

5   Debtor does not immediately reject the Lease associated therewith.

6          **_Lease For Store #17 (The Promenade in Temecula)_**

7       24.     Prior to the Petition Date, my wife, Young Ae Kim, and I entered into a written

8   Lease agreement dated as of August 3, 2006 with landlord Temecula Towne Center Associates

9   LP to lease the premises located at 40820 Winchester Road, #2610, Temecula, California ("Store

10   #17").  A true and correct copy of the Lease for Store #17 is included in Exhibit "A" hereto.  At

11   some point prior to the Petition Date, the Lease for Store #17 was assumed by and/or assigned to

12   the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating,

13   and continues to exclusively operate, Store #17 and to perform all rent payment and other

14   obligations as the effective tenant under the Lease for Store #17.

15       25.     To the best of my knowledge, the original term of the Lease for Store #17 has

16   expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month

17   basis at the same rental rate which existed at the end of the lease term (or such lower rate

18   mutually agreed to by the parties).

19       26.     While the Debtor is currently still operating out of Store #17, the retail operations

20   at Store #17 have been, and continue to be, unprofitable.  An income statement for Store #17,

21   which essentially provides a "four-wall" analysis of Store #17's financial performance during the

22   last approximately twelve months, is included in Exhibit "B" hereto.  As the income statement for

23   Store #17 indicates, Store #17 has not operated profitably or has operated at a small net profit

24   during the last approximately twelve months.  After taking into account the corporate overhead

25   expenses attributable to each of the Debtor's retail stores (including Store #17), I believe that,

26   unless meaningful rent concessions can be successfully negotiated with the landlord, Store #17 is

27   simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the

28   Debtor does not immediately reject the Lease associated therewith.

_**Lease For Store #12 (Simi Valley Town Center)**_

27.    Prior to the Petition Date, my wife, Young Ae Kim, and I entered into a written Lease agreement dated as of March 2, 2006 with Simi Valley Mall, LLC (the predecessor to the current landlord, W/A SVT Holdings VI, LLC) to lease the premises located at 1555 Simi Town Center Way, #135, Simi Valley, California ("Store #12"). A true and correct copy of the Lease for Store #12 is included in Exhibit "A" hereto. At some point prior to the Petition Date, the Lease for Store #12 was assumed by and/or assigned to the Debtor by the Debtor's principals and, as a result, the Debtor has been exclusively operating, and continues to exclusively operate, Store #12 and to perform all rent payment and other obligations as the effective tenant under the Lease for Store #12.

28.    To the best of my knowledge, the original term of the Lease for Store #12 has expired and, therefore, the Debtor has effectively been leasing the premises on a month-to-month basis at the same rental rate which existed at the end of the lease term (or such lower rate mutually agreed to by the parties).

29.    While the Debtor is currently still operating out of Store #12, the retail operations at Store #12 have been, and continue to be, unprofitable. An income statement for Store #12, which essentially provides a "four-wall" analysis of Store #12's financial performance during the last approximately twelve months, is included in Exhibit "B" hereto. As the income statement for Store #14 indicates, Store #12 has not operated profitably or has operated at a small net profit during the last approximately twelve months. After taking into account the corporate overhead expenses attributable to each of the Debtor's retail stores (including Store #12), I believe that, unless meaningful rent concessions can be successfully negotiated with the landlord, Store #12 is simply not profitable enough to sustain and will only serve to deplete the Debtor's resources if the Debtor does not immediately reject the Lease associated therewith.

30.    Although the Debtor has attempted to negotiate rent concessions with many, if not all, of the landlords of the Retail Stores, the Debtor's efforts to negotiate agreements with such landlords to reduce rent to a level which would render the Retail Stores profitable have not been successful to date.

27

31.   Based on the foregoing, and given the ongoing post-petition rent obligations for the Retail Stores, and the fact that the Debtor will not likely be in a position to operate profitably at such Retail Stores unless meaningful rent concessions can be successfully negotiated with the applicable landlords, I believe there will be significant financial losses to the Debtor and its bankruptcy estate, and the accrual of significant administrative rent claims in favor of the respective landlords without a corresponding benefit to the Debtor's estate, if the Leases are not immediately rejected.

32.   While I anticipate that the Debtor will be vacating most, if not all, of the Retail Stores by December 31, 2016, the Debtor may actually vacate certain of the Retail Stores on or before January 31, 2017.

33.   I believe that the costs associated with liquidating any Remaining Personal Property at the Retail Stores will likely approach or exceed the value of such assets. Accordingly, I believe that the Remaining Personal Property at the Retail Stores, if any, has inconsequential value to the Debtor's estate and should be abandoned as requested in the Motion. Accordingly, by the Motion, the Debtor is also seeking Court authority to abandon any of the Debtor's Remaining Personal Property located at each of the Retail Stores as of the applicable Vacate Date(s).

34.   I believe that the rent and other obligations payable under the Leases are generally at or above the current market. Accordingly, I do not believe that the marketing and assignment of the Leases to third parties would result in any net recovery for the Debtor's bankruptcy estate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 29th day of December, 2016, at Los Angeles, California.

JEFF SUNGHAK KIM

Temecula Towne Center - Motion for Administrative Expenses 000037

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

[Leases to be Rejected]

29

# The Promenade in Temecula (#17)

Temecula Towne Center - Motion for Administrative Expenses 000039

# 17
Original

L-9983
h:\w97\djm\L9983lse.doc
DJM:dd
5/15/06
7/13/06

THE PROMENADE IN TEMECULA

TEMECULA, CALIFORNIA

LANDLORD

========================================================================

TEMECULA TOWNE CENTER ASSOCIATES L.P.,
a California limited partnership

TENANT

========================================================================

SONG H. KIM and YOUNG A. KIM,
jointly and severally
d/b/a
ANGL

Unit No. 2610

Temecula Towne Center - Motion for Administrative Expenses 000040

## TABLE OF CONTENTS

Section 1.0 - Basic Lease Provisions. ............................................................................1
Section 1.1 - Defined Terms. .........................................................................................4
Section 2.1 - Exhibits. ...................................................................................................5
Section 3.1 - Premises. ..................................................................................................5
Section 3.2 - Gross Leasable Area of the Premises. ......................................................5
Section 3.3 - Revisions to Premises GLA. ......................................................................5
Section 3.4 - Landlord's Reservation. ............................................................................5
Section 4.1 - Tenant's Use of Common Areas. ..............................................................6
Section 4.2 - Management and Operation of Common Areas. .......................................6
Section 5.1 - Site Plan and Leasing Plan. ......................................................................6
Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan. .......................6
Section 6.0 - Construction Allowance .............................................................................7
Section 6.1 - Landlord's Responsibilities. ......................................................................7
Section 6.2 - Tenant's Responsibilities. .........................................................................7
Section 6.3 - Tenant's Trade Fixtures. ...........................................................................8
Section 6.4 - Labor Cooperation. ...................................................................................8
Section 7.1 - Submission of Plans and Specifications. ...................................................8
Section 8.1 - Operation and Use of Premises. ...............................................................9
Section 8.2 - Tenant's Covenant to Operate. .................................................................9
Section 8.3 - Prohibitions on Use. .................................................................................9
Section 8.4 - Manner of Operation of Business. ...........................................................10
Section 9.1 - Commencement Date Agreement. ...........................................................11
Section 9.2 - Holding Over. ..........................................................................................11
Section 9.3 - Expiration of the Term of the Lease. .......................................................11
Section 10.1 - Rent Commencement Date. ...................................................................11
Section 10.2 - Delay or Failure to Deliver Premises to Tenant. ....................................11
Section 10.3 - Tenant's Failure to be Open by the Outside Date. .................................12
Section 11.1 - Fixed Minimum Rent. .............................................................................12
Section 11.2 - Percentage Rent. ...................................................................................12
Section 11.3 - Additional Rent. .....................................................................................15
Section 11.4 - Real Estate Taxes. ................................................................................15
Section 11.5 - Utility and Insurance Costs. ...................................................................16
Section 12.1 - Utility Service Charges. .........................................................................17
Section 12.2 - Discontinuance of Service. .....................................................................18
Section 12.3 - Interruption of Service. ..........................................................................18
Section 12.4 - Premises Sprinkler System. ...................................................................19
Section 13.1 – Storefront Sign. .....................................................................................19
Section 13.2 - Interior Signs and Advertising. ...............................................................19
Section 14.1 - Repairs by Landlord. ..............................................................................19
Section 14.2 - Repairs By Tenant. ................................................................................20
Section 14.3 - Alterations and Remodeling. ..................................................................20
Section 15.1 - Lien Indemnification by Tenant. .............................................................20
Section 16.1 - Indemnification. .....................................................................................21
Section 16.2 - Tenant's Insurance Requirements. .........................................................21
Section 16.3 - Waiver of Subrogation. ..........................................................................22
Section 16.4 - Landlord Not Responsible for Acts of Others. ........................................22
Section 17.1 - Rules and Regulations. ..........................................................................23
Section 17.2 - Rubbish. ................................................................................................23
Section 17.3 - Lighting. .................................................................................................23
Section 17.4 - Merchandise Display, Loading and Unloading. ......................................23
Section 17.5 - Obstruction of Passageways. .................................................................23
Section 17.6 - Employee Parking. .................................................................................23
Section 18.1 - Subordination of Lease. .........................................................................23
Section 18.2 - Attornment by Tenant. ...........................................................................24
Section 18.3 - Landlord as Attorney-in-Fact for Tenant. ...............................................24
Section 19.1 - Landlord's Right to Repair. ....................................................................24
Section 19.2 - Landlord's Right to Affix to Exterior .......................................................24
Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant. ......................24
Section 20.1 - Landlord's Consent Required. ................................................................25
Section 20.2 - Insolvency Proceedings. ........................................................................25
Section 20.3 - Transfer of Corporate Shares. ...............................................................25
Section 20.4 - Assignment to Related Entity. ................................................................25
Section 20.5 - Transfer of Other Business Interests. .....................................................25
Section 20.6 - Acceptance of Rents by Landlord. ..........................................................26
Section 20.7 - No Release of Liability. ...........................................................................26
Section 20.8 - Administrative Fee. .................................................................................26

Section 21.1 - Landlord's Obligation to Repair and Reconstruct. ...............................................26
Section 21.2 - Landlord's Option to Terminate. ......................................................................27
Section 21.3 - Demolition of Landlord's Building. ...................................................................27
Section 22.1 - Effect of Taking. .........................................................................................27
Section 22.2 - Compensation and Awards. ............................................................................27
Section 22.3 - Condemnation or Breach of Lease. ...................................................................27
Section 23.1 - Default. ....................................................................................................28
Section 23.2 - Remedies and Damages. ................................................................................28
Section 23.3 - Remedy for Failure to Open or Operate.' ............................................................29
Section 23.4 - Repeated Default. ........................................................................................29
Section 23.5 - Waiver of Rights of Redemption. ......................................................................30
Section 24.1 - Restriction on Tenant. ..................................................................................30
Section 24.2 - Imposition of Damages. .................................................................................30
Section 25.1 - Notices to Tenant and Landlord. ......................................................................30
Section 25.2 - Notices to Mortgagee. ..................................................................................30
Section 26.1 - Accord and Satisfaction. ................................................................................30
Section 26.2 - Complete Agreement. ...................................................................................31
Section 26.3 - Consents. ..................................................................................................31
Section 26.4 - Brokerage. ................................................................................................31
Section 26.5 - Effective Date of Lease. .................................................................................31
Section 26.6 - Estoppel Certificates. ...................................................................................31
Section 26.7 - Force Majeure. ...........................................................................................31
Section 26.8 - Interpretation. ............................................................................................32
Section 26.9 - Memorandum of Lease. ..................................................................................32
Section 26.10 - Quiet Enjoyment. .......................................................................................32
Section 26.11 - Rent Demand. ...........................................................................................32
Section 26.12 - Section and Title Headings. ...........................................................................32
Section 26.13 - Successors and Assigns. ...............................................................................32
Section 26.14 - No Waiver by Landlord. ................................................................................32
Section 26.15 - Exculpation. .............................................................................................33
Section 26.16 - Transfer of Landlord's Interest. ......................................................................33
Section 26.17 - Litigation. ................................................................................................33
Section 26.18 – Miscellaneous. ..........................................................................................33
Section 26.1 – Joint and Several Liability. .............................................................................34

H:\w97\lb\temecula.doc
L-9983

# L E A S E

THIS LEASE MADE AND ENTERED INTO AT Cleveland, Ohio, this _3rd_ day of

_August_, 2006, by and between TEMECULA TOWNE CENTER ASSOCIATES L.P.,

a California limited partnership, having an address for purposes hereof at Terminal Tower, 50

Public Square, Suite 1360, Cleveland, Ohio 44113-2267 ("Landlord"); and SONG H. KIM and

YOUNG A. KIM, jointly and severally, having an address for purposes hereof at 1204 South

Paloma Street, Los Angeles, CA 90021 ("Tenant").

## WITNESSETH

## ARTICLE I

## INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

The following Basic Lease Provisions are an integral part of this Lease, and are referred to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties. They are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

| | | | |
|---|---|---|---|
| (a) | Shopping Center: | | (Article I, Section 1.1 [g]) |
| | | The Promenade in Temecula | |
| (b) | Unit No.: | 2610 | |
| (c) | Approximate Premises GLA: | 2,719 square feet. | |
| (d) | Term of Lease: | Ten (10) Lease Years commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined). | |
| (e) | Rent Commencement Date: | The earlier of (i) November 1, 2006 ("Outside Date"); or (ii) the date Tenant opens for business. | |
| (f) | Term Expiration Date: | The day prior to the tenth (10th) anniversary of the Rent Commencement Date. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs. | |
| (g) | Fixed Minimum Rent: | | (Article XI, Section 11.1) |
| | | (i) $ 31.00 per square foot of Premises GLA, $84,289.00 per Lease Year, $ 7,024.08 per month, for Lease Year One; | |

(ii)   $    31.62 per square foot of Premises GLA,
$85,974.78 per Lease Year,
$ 7,164.57 per month, for Lease Year Two;

(iii)   $    32.25 per square foot of Premises GLA,
$87,687.75 per Lease Year,
$ 7,307.31 per month, for Lease Year Three;

(iv)   $    32.90 per square foot of Premises GLA,
$89,455.10 per Lease Year,
$ 7,454.59 per month, for Lease Year Four;

(v)   $    33.56 per square foot of Premises GLA,
$91,249.64  per Lease Year,
$ 7,604.14 per month, for Lease Year Five;

(vi)   $    34.23 per square foot of Premises GLA,
$93,071.37 per Lease Year,
$ 7,755.95 per month, for Lease Year Six;

(vii)   $    34.91 per square foot of Premises GLA,
$94,920.29 per Lease Year,
$ 7,910.02 per month, for Lease Year Seven;

(viii)   $    35.61 per square foot of Premises GLA,
$96,823.59 per Lease Year,
$ 8,068.63 per month, for Lease Year Eight;

(ix)   $    36.32 per square foot of Premises GLA,
$98,754.08 per Lease Year,
$ 8,229.51 per month, for Lease Year Nine; and

(x)   $    37.05 per square foot of Premises GLA,
$100,738.95 per Lease Year,
$  8,394.91 per month, for Lease Year Ten;

(xi)   Fixed Minimum Rent       (Article III, Section 3.3)
Subject to adjustment if Premises GLA is revised:
__X___ yes        _____ no.

(h)   Percentage Rent:
(Article XI, Section 11.2)
(i)   6% of Gross Revenue in excess of $1,404,816.87
("Annual Breakpoint") for Lease Year One;

(ii)   6% of Gross Revenue in excess of $1,432,913.00
("Annual Breakpoint") for Lease Year Two;

(iii)   6% of Gross Revenue in excess of $1,461,462.50
("Annual Breakpoint") for Lease Year Three;
(iv)   6% of Gross Revenue in excess of $1,490,918.33
("Annual Breakpoint") for Lease Year Four;

(v)   6% of Gross Revenue in excess of $1,520,827.33
("Annual Breakpoint") for Lease Year Five;

(vi)   6% of Gross Revenue in excess of $1,551,189.50
("Annual Breakpoint") for Lease Year Six;

(vii)   6% of Gross Revenue in excess of $1,582,004.83
("Annual Breakpoint") for Lease Year Seven;

(viii)   6% of Gross Revenue in excess of $1,613,726.50
("Annual Breakpoint") for Lease Year Eight;

(ix)   6% of Gross Revenue in excess of $1,645,901.33
("Annual Breakpoint") for Lease Year Nine; and

2

        (x)  .. 6% of Gross Revenue in excess of $1,878,982.50
            ("Annual Breakpoint") for Lease Year Ten.

(i)     Additional Rent:              (Article XI, Section 11.3)
                    Additional Rent shall be charged in the initial amount of $15.42
per square foot of Premises GLA which shall be subject to annual
compounded increases equal to five percent (5%) of the
immediately preceding Lease Year's Additional Rent.

(j)     Real Estate Taxes:         (Article XI, Section 11.4)
                    Tenant's Proportionate Share; payable monthly on estimated bill.

(k)    Common Area Utility       (Article XI, Section 11.5)
     and Insurance Costs: Tenant's Proportionate Share; payable monthly on estimated bill.

(l)     Premises Utilities:        (Article XII, Section 12.1)
                    Payable by Tenant as billed per metered, submetered or
estimated and adjusted billing.

(m)   Trade Name:           (Article VIII, Section 8.1)
                    ANGL

(n)    Permitted Use:          (Article VIII, Section 8.1)
                    Tenant shall use and occupy the Premises solely for the retail sale
of women's apparel and related accessories.

(o)    Tenant's Billing Address:
                    1204 South Paloma Street
                    Los Angeles, California 90021

(p)    Tenant's Notice Address:     (Article XXV, Section 25.1)
                    Same as (o) above.

(q)    Landlord's Notice Address:   (Article XXV, Section 25.1)
                    Terminal Tower
                    50 Public Square
                    Suite 1360
                    Cleveland, Ohio 44113-2267

(r)     Landlord's Mortgagee's    (Article XXV, Section 25.2)
     Notice Address:     CIGNA Corporation
                    Investment Law Department
                    900 Cottage Grove Road
                    Hartford, Connecticut 06152-2215
                    Attention: Real Estate Division, S-215A

(s)    Address for
     Payment of Rents
     Including Percentage
     Rent:          Forest City Commercial Management, Inc.
                    Commercial Division
                    Post Office Box 72069
                    Cleveland, Ohio 44192-0069

(t)     Address for Percentage Rent
     Reports:      Forest City Commercial Management, Inc.
                    700 Terminal Tower
                    50 Public Square
                    Cleveland, Ohio 44113
                    Attn: Lease Administration Department

                    or fax to (216) 263-4806

(u)    Guarantor:     None.

(v)    Security Deposit:   None.

3

Temecula Towne Center - Motion for Administrative Expenses 000045

(w)    Construction Allowance:                               (Article VI, Section 6.0)
        $25.00 per square foot of Premises GLA, payable upon
        satisfaction of the conditions set forth in Section 6.0.

Section 1.1 - Defined Terms.

Wherever used in this Lease, the following terms shall be construed to mean as follows:

(a)    "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter may be in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

(b)    "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, servants, customers and invitees.

(c)    "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

(d)    "Major Tenants" shall mean those tenants located in the Shopping Center whose floor area exceeds thirty thousand (30,000) square feet ("Major Tenant Threshold"), including, but not limited to, Robinson's May; JC Penney; Sears; and Macy's.

(e)    "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 2810, and further being a space containing approximately 2,719 square feet of floor space. The Premises are hatched on Exhibit B for the sole purpose of more specifically locating said area.

(f)    "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(g)    "Shopping Center" shall mean those buildings, land (excluding outparcels along the perimeter of the Shopping Center, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "The Promenade in Temecula" located in the City of Temecula, Riverside County, California, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time. Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

(h)    "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Premises GLA, and the denominator of which is, with respect to all prorated charges (as defined in Article XI), the total number of square feet of actually occupied gross leasable area in the Shopping Center, excluding the number of square feet of all tenant spaces exceeding the Major Tenant Threshold, whether or not occupied, and excluding the square feet of floor area of all tenants whose entrances do not exclusively front on the interior of the enclosed mall.

4

## ARTICLE II

## EXHIBITS

Section 2.1 - Exhibits.

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

EXHIBIT A    -    Site Plan of the Shopping Center - attached hereto.

EXHIBIT B    -    Leasing Plan of the Shopping Center - attached hereto.

EXHIBIT C    -    Tenant Handbook for Shopping Center - containing sign and
design criteria - not attached but incorporated herein by reference.

## ARTICLE III

## PREMISES

Section 3.1 - Premises.

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (e), subject to all conditions and easements of record for the Term of the Lease and upon the terms and conditions set forth in this Lease.

Section 3.2 - Gross Leasable Area of the Premises.

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows:  The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall.  Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises.  No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

Section 3.3 - Revisions to Premises GLA.

The Premises GLA set forth in Section 1.0 (c) has been determined pursuant to the provisions of Section 3.2 by reference to either "CAD" or scaled architectural drawings of the Premises.  Landlord and Tenant acknowledge that, irrespective of whether or not the Premises shall have been constructed as of the date of this Lease, in the event that Landlord's final as-built field or CAD measurements of the Premises after all leasehold improvements have been constructed therein should disclose a different square footage than the Premises GLA set forth in Section 1.0 (c) above ("Final Revised Premises GLA"), then Landlord agrees to notify Tenant in writing of the Final Revised Premises GLA.  Tenant further acknowledges and agrees that such notice by Landlord shall be deemed sufficient to amend the Premises GLA set forth in Section 1.0 (c), such amendment being deemed self-operative without the necessity of further formal mutual acknowledgment or documentation between Landlord and Tenant.  When so finally determined, the Final Revised Premises GLA shall be used as the numerator in computing Tenant's Proportionate Share of all prorated charges and in all computations of Fixed Minimum Rent and Additional Rent since same have been determined on a square foot (as opposed to a fixed rate) basis as set forth in Section 1.0 (g).  If the Fixed Minimum Rent should be revised, Landlord's revised billing to Tenant shall be deemed sufficient notice of such Rent revisions and the Percentage Rent Annual Breakpoints set forth in Section 1.0 (h) herein shall be correspondingly adjusted.

Section 3.4 - Landlord's Reservation.

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements.

5

Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain, repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

## ARTICLE IV

### COMMON AREAS

Section 4.1 - Tenant's Use of Common Areas.

(a)      Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of this Lease, and any renewal period thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

(b)      Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

(c)      Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

Section 4.2 - Management and Operation of Common Areas.

Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center. Landlord will have the right (1) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

## ARTICLE V

### CHANGES AND ADDITIONS TO
### SHOPPING CENTER SITE PLAN AND LEASING PLAN

Section 5.1 - Site Plan and Leasing Plan.

The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.

Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. No such changes, rearrangements or other construction shall

6

permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law.

ARTICLE VI

IMPROVEMENTS

Section 6.0 - Construction Allowance.

(a)     Landlord shall pay to Tenant, as its total obligation hereunder, the sum of Twenty-Five Dollars ($25.00) per square foot of Premises GLA, which sum represents Landlord's contribution to Tenant's Work (as defined in Section 6.2) (hereinafter "Construction Allowance"). Such Construction Allowance shall be due and payable to Tenant within thirty (30) days after the date that all of the following conditions have been satisfied:

(1)     The Premises have been completed according to plans and specifications previously approved in writing by Landlord, including any punchlist items designated by Landlord; and

(2)     Tenant has opened the Premises for business in accordance with the terms of this Lease; and

(3)     Tenant has furnished Landlord with an affidavit from Tenant's General Contractor listing all subcontractors, materialmen and/or laborers (hereinafter collectively "Subcontractors") involved in Tenant's Work, and final, unconditional lien waivers from Tenant's General Contractor and all Subcontractors evidencing that the General Contractor and all Subcontractors have been paid in full for all work, material and labor furnished in connection with Tenant's Work at the Premises.

(b)     In the event that there are claims or Rents unpaid, work unfinished, or liens filed for such work and labor that have not been bonded or otherwise secured, Landlord may retain from Tenant's Construction Allowance a sum sufficient to pay for said claims, Rents, work or liens and all costs resulting therefrom and to pay for said claims, Rents, work or liens, if necessary. If the amount owed to Tenant by Landlord shall not be sufficient to pay for said claims, Rents, work or liens and the costs resulting therefrom, Tenant shall forthwith pay for said claims, Rents, work or liens and the costs resulting therefrom, or if such be the case, cause such claims or liens to be properly discharged as herein provided.

(c)     Tenant shall have the right at all times, and at its own expense, to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of such lien(s) upon giving adequate security to Landlord for payment of said lien(s).

(d)     Notwithstanding anything contained herein, the amount of Tenant's Construction Allowance shall not exceed the documented costs of Tenant's Work.

Upon satisfaction of the above conditions, Tenant shall request payment of the Construction Allowance in writing to Landlord at Forest City Commercial Management, Inc., Terminal Tower, 50 Public Square, Suite 700, Cleveland, Ohio 44113-2267, Attention: Denise Hall, and simultaneously therewith, shall provide Landlord with a W9 form for processing payment of the Construction Allowance.

Section 6.1 - Landlord's Responsibilities.

Tenant acknowledges that it is accepting the Premises in its present "as-is" condition.

Section 6.2 - Tenant's Responsibilities.

On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with Exhibit C:

(a)     Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work.

(b)     Construct the leasehold improvements as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein ("Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to

7

Case 2:16-bk-23836-SK    Doc 81    Filed 12/29/16    Entered 12/29/16 16:48:37    Desc
Main Document    Page 282 of 381

commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(c)    Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)    If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives.

(e)    Tenant shall reimburse Landlord for the cost of any temporary utilities and dumpster usage which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor.

(f)    In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.3 - Tenant's Trade Fixtures.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State (or Commonwealth) in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Section 6.4 - Labor Cooperation.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center. In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

ARTICLE VII

PLANS AND SPECIFICATIONS

Section 7.1 - Submission of Plans and Specifications .

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C, complete plans and specifications for all of Tenant's work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in Exhibit C. Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the Rent Commencement Date. No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written consent. Landlord's written approval of any plans and specifications for Tenant's work shall, however, create no

8

responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.

### ARTICLE VIII

### USE

Section 8.1 - <u>Operation and Use of Premises</u>.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I and for no other business or purpose. Tenant further agrees not to conduct catalog sales or internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

Section 8.2 - <u>Tenant's Covenant to Operate</u>.

Tenant agrees to complete Tenant's work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of this Lease to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, Mondays through Saturdays from 10:00 A.M. to 9:00 P.M. and on Sundays from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by Landlord for the operation of the Shopping Center. Notwithstanding the foregoing, Tenant shall have the right to cease to operate its business in the Premises as specifically set forth below.

Notwithstanding the foregoing, it is acknowledged and agreed between Landlord and Tenant that commencing on the second (2nd) day of the Term of this Lease and continuing for the remainder of the Term and any renewals thereafter, Tenant shall have the right to cease operating in the Premises; provided, however, that Tenant gives Landlord's Shopping Center manager at least ten (10) days prior written notice of its intent to cease operating in the Premises, and further provided, that Tenant continues to pay all Rents due under the Lease each month as they would normally come due. Should Tenant cease operating in the Premises for a period in excess of thirty (30) days, Landlord may terminate this Lease upon written notice to Tenant. Notwithstanding anything contained herein to the contrary, the provisions of this paragraph shall be deemed null and void if on the Rent Commencement Date, Tenant does not open for business in the Premises fully fixtured, stocked and staffed and remain open for business for at least one (1) full business day.

Section 8.3 - <u>Prohibitions on Use</u>.

(a) Tenant shall not use or permit or suffer the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b) Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.

(c) Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

9

Section 8.4 – <u>Manner of Operation of Business</u>.

(a)    Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade.  Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to insure a maximum volume of business in and from the Premises.

(b)    Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)    For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws.  The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees.  This obligation shall survive the expiration or earlier termination of this Lease.  If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of this Lease as a result of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center.  Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(d)    Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Lease.  If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense.  Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

(e)    In the event Landlord should elect to establish open or closed internet site(s) with respect to the Shopping Center, Tenant agrees to participate in such site(s) and to cooperate with Landlord in making Tenant's website usable by, and accessible to, Shopping Center patrons and customers.

Temecula Towne Center - Motion for Administrative Expenses 000052

## ARTICLE IX

### TERM

**Section 9.1 - Commencement Date Agreement.**

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

**Section 9.2 - Holding Over.**

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party. Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant immediately prior to expiration of the Term, plus all other charges due under the Lease. Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period. Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

**Section 9.3 - Expiration of the Term of the Lease.**

(a)    This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)    For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)    Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of this Lease, except for ordinary wear and tear and casualty loss.

## ARTICLE X

### RENT COMMENCEMENT DATE

**Section 10.1 - Rent Commencement Date.**

As used in this Lease, the term "Rent Commencement Date" shall be as defined in Article I. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

**Section 10.2 - Delay or Failure to Deliver Premises to Tenant.**

Landlord shall give Tenant written notice of the date on which Landlord anticipates delivering possession of the Premises to Tenant. If Landlord shall be unable to deliver possession of the Premises to Tenant on the date specified in said notice for any cause within Landlord's or outside Tenant's control, including, but not limited to, delay in commencing or completing Landlord's work, if any, or the holding over of any tenant(s), or the total failure of Landlord to deliver the Premises, then in any of such events, Rents shall not commence until the earlier to occur of (i) the date Tenant opens for business; or (ii) ninety (90) days following the date that possession of the Premises is delivered to Tenant for the commencement of its leasehold improvement work. Tenant agrees to accept such abatement of Rents as liquidated damages in full satisfaction for the failure of Landlord to deliver possession of the Premises as

11

Temecula Towne Center - Motion for Administrative Expenses 000053

set forth above or complete failure of delivery of possession to the exclusion of all rights and claims for damages which Tenant otherwise may have suffered as a result of Landlord's delayed or complete failure to deliver possession of the Premises to Tenant.

Section 10.3 - Tenant's Failure to be Open by the Outside Date.

INTENTIONALLY OMITTED.

ARTICLE XI

RENT

Section 11.1 - Fixed Minimum Rent.

(a)     Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, the Fixed Minimum Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month. Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)     Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

(c)     If at any time during the Term of this Lease, a Major Tenant department store operating under the name of *Nordstrom* is added  as part of the Shopping Center, in addition to those named Major Tenant department stores listed in Section 1.1 (d) herein, Tenant acknowledges and agrees that the Fixed Minimum Rent then payable by Tenant shall be automatically increased by a one-time increase  equal to One Dollar ($1.00) per square foot of Premises GLA, commencing on the date when each such Major Tenant department store first opens for business in the Shopping Center, with a proportionate increase in Tenant's Annual Breakpoint for Percentage Rent purposes.

Section 11.2 – Gross Revenue Reporting.

(a)     Amount.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint set forth in Article I.

(b)     Payment.

(i)     The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)     Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)     Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business. The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

12

(c) Gross Revenue.

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant. The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received. Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter. Any deposit not refunded shall be included in Gross Revenue.

(d) Exclusions from Gross Revenue.

Notwithstanding the foregoing, "Gross Revenue" shall not include:

(i)      Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue.

(ii)      The amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)      The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)      Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)      Revenue from the sale of trade fixtures after use in the Premises.

(vi)      Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)      Revenue from vending machines for Tenant's employees use only.

(e) Reporting.

(i)      On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second (2nd) month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)      On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)      For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied. Should Tenant elect (i) above, Tenant agrees that

13

the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register. If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)    If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following:  (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver.  The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)    All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)    Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(f)    Books and Records.

(i)    Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied.  Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue.  Landlord shall also have the right to request such other records and/or accounts which Landlord may deem necessary to accurately determine Gross Revenue.  All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)    If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records.  If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove.  Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

(iii)    In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand.  If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

14

Temecula Towne Center - Motion for Administrative Expenses 000056

Section 11.3 - Additional Rent.

(a)    Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center. Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine. Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term hereof in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the applicable Lease Year. The amount due for any partial Lease Year shall be prorated accordingly.

(b)    Should any governmental authority having jurisdiction over the Shopping Center enact or impose any future law, ordinance, regulation or requirement ("Future Law") upon Landlord, the direct effect of which is to increase Landlord's cost of operating, maintaining and managing the Shopping Center ("Operating Costs"), as compared with Landlord's Operating Costs incurred for the calendar year immediately preceding the enactment of such Future Law by more than the annual percentage increase in the Additional Rent set forth in Article I, then in such event, Landlord shall notify Tenant in writing of such increase ("Extraordinary Increase") and shall furnish Tenant with reasonably suitable documentary evidence of such Extraordinary Increase and whether or not it is one-time or ongoing. If the Future Law should result in a one-time Extraordinary Increase, Tenant's Proportionate Share of the Extraordinary Increase shall be divided into twelve (12) equal monthly increments, which shall be added to Landlord's monthly charge to Tenant for reimbursement to Landlord over the next twelve (12) month period. However, if the Future Law should result in an ongoing Extraordinary Increase over the remaining balance of the Term, Tenant's Proportionate Share of such Extraordinary Increase shall be added to Tenant's Additional Rent and all subsequent annual compounded increases shall be applied to the increased Additional Rent amount.

Section 11.4 - Real Estate Taxes.

(a)    (i)    For purposes of this Lease, the term "Real Estate Taxes" shall mean all ad valorem taxes, assessments, charges, levies, fees and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature whatsoever, including, but not limited to, assessments for off-site public improvements for the benefit of the Shopping Center which shall be laid, assessed, levied, or imposed upon the Shopping Center or any part thereof and which are payable at any time during the Term hereof, and further, Real Estate Taxes shall include Landlord's reasonable administrative costs as well as any and all costs, including reasonable attorney fees, incurred by Landlord in contesting or negotiating Real Estate Taxes with any governmental authority. Real Estate Taxes shall not include franchise, estate, inheritance, sales, use, succession, capital levy, transfer, net income or excess profits taxes imposed upon Landlord. In addition, the term Real Estate Taxes shall mean (if applicable) all payments made by Landlord in lieu of real property taxes pursuant to tax increment financing provided to Landlord by any public agency or authority. Landlord represents and warrants to Tenant that Tenant's Proportionate Share of Real Estate Taxes shall not exceed the amount of Real Estate Taxes that Tenant would otherwise have paid hereunder if Landlord had not received such tax increment financing.

(ii)    Landlord and Tenant recognize and acknowledge that there may be changes in the current real property tax system and that there may be imposed new forms of taxes, assessments, charges, levies or fees, or there may be an increase in certain existing taxes, assessments, charges, levies or fees placed on, or levied in connection with, the ownership, leasing, occupancy or operation of the Shopping Center or the Premises, all of which shall be included within the definition of Real Estate Taxes. For purposes of funding special assessment districts of the type funded by real property taxes, such funding shall also be included within the meaning of Real Estate Taxes. With respect to any general or special assessments which may be levied against or upon the Premises or the Shopping Center and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in periodic installments, there shall be included within the meaning of Real Estate Taxes with respect to any tax fiscal year, only the amount currently payable on such bond for such tax fiscal year, or the periodic installment for such tax fiscal year.

In addition to Real Estate Taxes, should any governmental taxing authority acting under any present or future law, ordinance or regulation, levy, assess, or impose any business, occupancy, privilege or excise tax or any tax and/or assessments imposed upon the Rents payable by Tenant to Landlord (other than an income or franchise tax upon Landlord's net income), either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, Tenant shall be responsible for and shall pay such taxes and/or assessments directly to the appropriate taxing authority, or Tenant shall reimburse

Landlord for the amount thereof, as the case may be, upon receipt of an invoice therefor from Landlord.

(b)  The Premises, its leasehold improvements and the underlying realty will not be separately assessed for tax purposes but instead will be assessed as part of a larger parcel or parcels of land and improvements comprising the Shopping Center.  Accordingly, Tenant agrees to pay its Proportionate Share (as defined in Section 1.1 [h]) of said Real Estate Taxes, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of said Real Estate Taxes as estimated by Landlord for the applicable fiscal year. Tenant's Proportionate Share hereunder for any partial fiscal year shall be prorated on a per diem basis.

To the extent that the Shopping Center consists of more than one tax parcel, including, but not limited to, separate tax parcels for one or more of the Major Tenants, the following shall apply:

(x)  Landlord shall have the right and option to compute Tenant's Proportionate Share of Real Estate Taxes based on the building area of the particular tax parcel on which the Premises is located.

(y)  In the event that a separate bill for Real Estate Taxes is rendered by the taxing authority with respect to the building, land and improvements owned or leased by a Major Tenant, then Real Estate Taxes shall be deemed to exclude taxes and assessments attributable to such Major Tenant and the floor area of such Major Tenant shall be correspondingly excluded from the denominator of Tenant's Proportionate Share.

(z)  In the event that any Major Tenant's building, land and improvements are separately assessed for purposes of Real Estate Taxes but no separate tax bill is rendered with respect to such Major Tenant, or in the event that any Major Tenant's building, land and improvements are not separately assessed for purposes of Real Estate Taxes but are included as part of other building, land and improvements in the Shopping Center, then to the extent, if any, that any such Major Tenant contribute(s) towards Real Estate Taxes attributable to the Shopping Center, Real Estate Taxes shall be reduced by the amount of any such Major Tenant's contribution(s) and the floor area of any such contributing Major Tenant shall be excluded from the denominator of Tenant's Proportionate Share.

(c)  Within one hundred twenty (120) days following the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Real Estate Taxes applicable to the Shopping Center and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year.  If the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord.  If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such fiscal year, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted.  Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder.  The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

Section 11.5 – Utility and Insurance Costs.

(a)  Tenant shall pay to Landlord its Proportionate Share (as defined in Section 1.1 [h]) of the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning.  Tenant shall also pay to Landlord its Proportionate Share of the costs of customary types of insurance coverage carried with respect to the Shopping Center, including, but not limited to, commercial general liability insurance, rent insurance and property insurance in commercially reasonable amounts as Landlord deems necessary (such utility costs and insurance costs are collectively "Utility and Insurance Costs").

(b)  Tenant's Proportionate Share of Utility and Insurance Costs shall be paid by Tenant, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of Utility and Insurance Costs as estimated by Landlord for each fiscal

16

year.  Tenant's Proportionate Share of Utility and Insurance Costs hereunder for any partial fiscal year shall be prorated on a per diem basis.

(c)  Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual cost of Utility and Insurance Costs and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year.  If the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord.  If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted.  Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant o f its obligations hereunder.  The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

## ARTICLE XII

## PREMISES UTILITY SERVICES

Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)  Water and Sewer Services.  Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in Exhibit C.  Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date, as herein defined. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on submetered readings, adjusted quarterly.  Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)  Telephone Service.  Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises.  Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)  Gas Service.  To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto.  Tenant shall pay all charges therefor directly to the providing utility.

(d)  Electricity Service.  Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP").  Tenant shall arrange with such ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP.  In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the date of Tenant's execution of this Lease, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent:

17

(i)    Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials;

(ii)    Prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damage;

(iii)    Prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center;

(iv)    Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers;

(v)    ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord;

(vi)    ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur;

(vii)    ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and

(viii)    ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

(e)    Heating, Ventilating and Air-Conditioning ("HVAC").

Tenant is to provide its own equipment and facilities for heating, ventilating and air-conditioning the Premises ("Premises HVAC System") described in Exhibit C. Tenant shall operate and maintain same during the Term of this Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.

Section 12.2 - Discontinuance of Service.

Landlord reserves the right, with thirty (30) days prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same remain unpaid by Tenant. Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment. If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

Section 12.3 - Interruption of Service.

Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease.

18

Temecula Towne Center - Motion for Administrative Expenses 000060

Section 12.4 - Premises Sprinkler System.

In the event applicable codes require fire sprinkler protection, Landlord shall provide a sprinkler connection for the Premises to Landlord's bulk main designated in Landlord's drawings. Tenant shall design and install all extensions and facilities to and within the Premises from Landlord's connection.

If, at any time during the Term of this Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection for the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises, the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association ("NFPA") No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

## ARTICLE XIII

### SIGNS

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenan t shall maintain said storefront sign(s) in good condition and repair. Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises. All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity. Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises.

## ARTICLE XIV

### REPAIRS AND ALTERATIONS

Section 14.1 - Repairs by Landlord.

(a)    Landlord shall keep the roof, structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease, subject to the provisions of Section 11.3 herein; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs.

(b)    As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to comply with Applicable Laws. It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.

19

(c)      Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

## Section 14.2 - Repairs By Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times. All repairs to the Premises, equipment or facilities therein or thereabout, other than those repairs required to be made by Landlord pursuant to Section 14.1, shall be made by Tenant. Said repairs shall include, but not be limited to, all necessary painting and decorating, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems above and under the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises. All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

## Section 14.3 - Alterations and Remodeling.

(a)      Tenant, at its own expense, shall have the right to make such interior alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any major remodeling of the interior of the Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material or structural alterations to the Premises or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made without Landlord's prior written consent. Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws. All such alterations, changes and improvements shall be made in accordance with the provisions of Exhibit C and shall become the property of Landlord upon installation and shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)      Tenant further agrees not to make any alterations, additions or changes to any storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall first have been obtained. In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord. Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3.

## ARTICLE XV

## LIENS

## Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant. Tenant shall indemnify and save harmless Landlord against all loss, liability, costs, attorney fees, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center,

20

the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord.  Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

## ARTICLE XVI

### INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)    Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)    Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damages, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming both Tenant and Landlord as insureds, in the following amounts:

(a)    Commercial General Liability Insurance.  Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors  coverage, in an amount not less than Three Million Dollars ($3,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(b)    Worker's Compensation Insurance.  Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

(c)    Personal Property, Alterations, Improvements and Betterments.  Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease.  Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed.  If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs.  If the insurance proceeds described above

21

are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds. However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments. This paragraph is only applicable if the Lease is not terminated pursuant to Article XXI hereof.

(d)    Additional Hazards. Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form insurance coverage. In addition, Tenant shall use best efforts to not keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage. In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of this Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center. Said additional premiums shall be payable by Tenant to Landlord within ten (10) days following written notice from Landlord.

(e)    Blanket Policies. Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises hereunder and other property, provided that the minimum limits required herein are provided under such policies.

(f)    Certificate(s) of Insurance. Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter. The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report. All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage. Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

(g)    Notice of Loss. Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

Section 16.3 - Waiver of Subrogation.

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

Section 16.4 - Landlord Not Responsible for Acts of Others.

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC. None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease.

Temecula Towne Center - Motion for Administrative Expenses 000064

### ARTICLE XVII

### GENERAL PROVISIONS

**Section 17.1 - Rules and Regulations.**

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center. Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease.

**Section 17.2 - Rubbish.**

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord. Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord. In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager. If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

**Section 17.3 - Lighting.**

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

**Section 17.4 - Merchandise Display, Loading and Unloading.**

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

**Section 17.5 - Obstruction of Passageways.**

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

**Section 17.6 - Employee Parking.**

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord. Tenant shall furnish Landlord with state automobile license numbers assigned to vehicles used by Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees shall fail to park their vehicles in such designated parking areas, then, without limiting any other remedy which Landlord may pursue in the event of Tenant's Default hereunder, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as a part of Rents, the sum of Ten Dollars ($10.00) per day for each vehicle parked in violation of the provisions of this Section 17.6. Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.

### ARTICLE XVIII

### SUBORDINATION AND ATTORNMENT BY TENANT

**Section 18.1 - Subordination of Lease.**

This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such

23

Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance"). Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises. Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required. However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form. Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

Section 18.2 - Attornment by Tenant.

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease. Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on demand shall constitute a Default by Tenant under the terms of this Lease. In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure of the Mortgage or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

Section 18.3 - Landlord as Attorney-In-Fact for Tenant.

If Tenant, within twenty (20) days after submission of any instrument, fails to execute same, Landlord is hereby authorized to execute same as attorney-in-fact for Tenant.

## ARTICLE XIX

### RIGHTS OF LANDLORD

Section 19.1 - Landlord's Right to Repair.

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

Section 19.2 - Landlord's Right to Affix to Exterior.

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant.

Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

Temecula Towne Center - Motion for Administrative Expenses 000066

## ARTICLE XX

### ASSIGNMENT AND SUBLETTING

Section 20.1 - Landlord's Consent Required.

(a)    Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name. In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

(b)    Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)    Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

Section 20.2 - Insolvency Proceedings.

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

Section 20.3 - Transfer of Corporate Shares.

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease.

Section 20.4 - Assignment to Related Entity.

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation. Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

Section 20.5 - Transfer of Other Business Interests.

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any

25

other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

Section 20.7 - No Release of Liability.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

Section 20.8 - Administrative Fee.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) or such other amount as Landlord shall reasonably determine to be reasonably appropriate in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not said proposed assignment or subletting actually occurs.

## ARTICLE XXI

## DAMAGE OR DESTRUCTION

Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)     If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated.  If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)     If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c)     If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work.  Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)     Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

26

Section 21.2 - Landlord's Option to Terminate.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof. In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event. If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore.

Section 21.3 - Demolition of Landlord's Building.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

### ARTICLE XXII

### CONDEMNATION

Section 22.1 - Effect of Taking.

(a)    In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)    In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)    For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)    If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - Compensation and Awards.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord. Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate. Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment. Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - Condemnation or Breach of Lease.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

27

## ARTICLE XXIII

### DEFAULT

**Section 23.1 - Default.**

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)    Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)    If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)    Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)    Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)    Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)    If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)    Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)    With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

**Section 23.2 - Remedies and Damages.**

(a)    If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)    Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

(ii)    Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; or

(iii)    If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)    Terminate this Lease by written notice to Tenant.

28

(b)    Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part. However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)    In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)    In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)    In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable attorney fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant and/or occupants of the Shopping Center or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1 above, Landlord and Tenant each covenants and agrees that in the event that Tenant (i) fails to take possession of, construct and thereafter open the Premises for business, fully fixtured, stocked and staffed on the Rent Commencement Date; or (ii) vacates or abandons the Premises; or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.1 hereof, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to three fourths (3/4ths) of the Rents reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat such action or omission by Tenant as a Default under the Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity.

Section 23.4 - Repeated Default.

(a)    Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)    In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

29

Section 23.5 - <u>Waiver of Rights of Redemption</u>.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

ARTICLE XXIV

COMPETITION

Section 24.1 - <u>Restriction on Tenant</u>.

Tenant agrees that for as long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate, manage, or have any interest in any business which is similar or in competition with the permitted use of the Premises set forth in Article I ("Competing Store") within a radius of five (5) miles of the perimeter of the Shopping Center ("Restricted Area").

Section 24.2 - <u>Imposition of Damages</u>.

In the event that Tenant shall violate the provisions of Section 24.1 above, Landlord may, at its option, and without limiting Landlord's remedies, effective as of the date such Competing Store opens for business within the Restricted Area: (i) include seventy-five percent (75%) of the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder; or (ii) increase the Fixed Minimum Rent to the average of the annual "effective rent" (i.e., the aggregate of Fixed Minimum and Percentage Rent) payable by Tenant to Landlord during the immediately preceding two (2) Lease Years; or (iii) increase Tenant's Fixed Minimum Rent then in effect, and any future increases thereto, by fifty percent (50%).

ARTICLE XXV

NOTICES

Section 25.1 - <u>Notices to Tenant and Landlord</u>.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter.  Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers.  Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

Section 25.2 - <u>Notices to Mortgagee</u>.

Tenant shall give written notice to Landlord's mortgagee, at Landlord's mortgagee's notice address set forth in Article I, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord.  Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default. Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

ARTICLE XXVI

MISCELLANEOUS

Section 26.1 - <u>Accord and Satisfaction</u>.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents

30

be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties. This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

Section 26.3 - Consents.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

Section 26.4 - Brokerage.

Landlord and Tenant acknowledge that James Kim of American Realty ("Acknowledged Broker") may be entitled to a fee for broker's services rendered in bringing together the parties to this Lease. Landlord shall be responsible for paying the reasonable fee determined to be due and owing the Acknowledged Broker as a result of this transaction. Tenant warrants that it has had no dealings with any broker or agent in connection with the Lease, other than the Acknowledged Broker. In the event Tenant has had any other dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

Section 26.5 - Effective Date of Lease.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

Section 26.6 - Estoppel Certificates.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgage or assignee of any mortgage on the fee of the Premises.

Section 26.7 - Force Majeure.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinances, restrictions or decrees, or through acts of God.

31

Section 26.8 - Interpretation.

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

Section 26.9 - Memorandum of Lease.

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

Section 26.10 - Quiet Enjoyment.

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

Section 26.11 - Rent Demand.

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

Section 26.12 - Section and Title Headings.

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

Section 26.13 - Successors and Assigns.

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

Section 26.14 - No Waiver by Landlord.

(a)    Landlord shall have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord in refraining from so doing at any time(s). No failure by Landlord to insist upon the strict performance of any term or condition of this Lease, and no failure by Landlord to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver of any such breach, term, condition or right.

(b)    No term or condition of this Lease required to be performed by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord.

(c)    A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

Temecula Towne Center - Motion for Administrative Expenses 000074

Section 26.15 - Exculpation.

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon the execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

Section 26.16 - Transfer of Landlord's Interest.

Landlord shall be liable under this Lease only while owner of the Shopping Center. If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

Section 26.17 - Litigation.

(a)    Any claim, demand, right or defense of any kind by Tenant which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless Tenant seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of such occurrence of the billing, event or action upon which the adjustment, claim, demand, right or defense relates, whichever applies.

(b)    To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)    If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)    Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

Section 26.18 – Miscellaneous.

Tenant hereby represents, covenants and warrants to Landlord that: (i) Tenant (which, for the purpose of this certification, includes its partners, members, principal shareholders, except for those who are members of the public who hold Tenant's stock), to the best of its knowledge, is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including Executive Order No. 13224 – Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOTACT) of 2001 (Public Law 107 56) (the "USA Patriot Act"), enacted October 26, 2001, as amended, and Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction pursuant to the Executive Order, the Patriot Act or any other law, order, rule, or regulation; (ii) Tenant is currently in compliance with and will at all times during the Term of this Lease (including any extension thereof) remain in compliance with the Executive Order, the USA Patriot Act and regulations of the Office of Foreign Assets Control of the United States Department of the

33

Treasury, and any statute, executive order and other governmental action relating thereto; and (iii) Tenant is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

Section 26.19 - Joint and Several Liability.

Since two (2) individuals are signing this Lease as Tenant, the liability of each such individual to pay Rents and to perform all other obligations hereunder shall be deemed to be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

Signed in the presence of:

**LANDLORD:**

TEMECULA TOWNE CENTER
ASSOCIATES L.P., a California limited
partnership

By: F.C. Temecula, Inc., General Partner

By: _____
    Duane F. Bishop, Jr., Vice President

**TENANT:**

_____
SONG H. KIM
Social Security #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

_____
YOUNG A. KIM
Social Security #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

STATE OF OHIO       )
                    )  SS:
COUNTY OF CUYAHOGA  )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named TEMECULA TOWNE CENTER ASSOCIATES L.P., a California limited partnership, by F.C. Temecula, Inc., General Partner, by Duane F. Bishop, Jr., its Vice President, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 3rd day of _August_, 2006.

_____
Notary Public

ELLA MARIE PUGACZ, Notary Public
STATE OF OHIO
My Commission Expires April 3, 2011
(Recorded in Cuyahoga County)

34

STATE OF _____ )
                                 )    SS:
COUNTY OF _____ )

    BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named SONG H. KIM and YOUNG A. KIM, husband and wife, who acknowledged that they did sign the foregoing instrument and that the same is their free act and deed.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _____ day of _____, 2006.


_____
Notary Public



This Instrument Prepared By:
Deborah J. Metzger
Terminal Tower
50 Public Square, Suite 1360
Cleveland, Ohio 44113-2267
(216) 621-6060

35

Temecula Towne Center - Motion for Administrative Expenses 000077

PROMENADE IN TEMECULA
SITE PLAN



THE PROMENADE MALL
TEMECULA, CALIFORNIA
FOREST CITY TENANT COORDINATION/CONSTRUCTION
945 TERMINAL TOWER, CLEVELAND, OHIO 44113

Case 2:16-bk-23836-SK    Doc 81    Filed 12/29/16    Entered 12/29/16 16:48:37    Desc
Main Document    Page 311 of 381

# EXHIBIT B



Temecula Towne Center - Motion for Administrative Expenses 000079

EXHIBIT C

TENANT HANDBOOK

[TO BE FORWARDED UNDER SEPARATE COVER]

# EXHIBIT "2"



# 17
Original

L-9983
h:\w97\djm\L.9983lse.doc
DJM:dd
5/15/08
7/13/08

THE PROMENADE IN TEMECULA

TEMECULA, CALIFORNIA

LANDLORD

TEMECULA TOWNE CENTER ASSOCIATES L.P.,
a California limited partnership

TENANT

SONG H. KIM and YOUNG A. KIM,
jointly and severally
d/b/a
ANGL

Unit No. 2810

## TABLE OF CONTENTS

Section 1.0 - Basic Lease Provisions ............................................................................ 1
Section 1.1 - Defined Terms .................................................................................... 4
Section 2.1 - Exhibits ........................................................................................... 5
Section 3.1 - Premises .......................................................................................... 5
Section 3.2 - Gross Leasable Area of the Premises ................................................ 5
Section 3.3 - Revisions to Premises GLA ................................................................ 5
Section 3.4 - Landlord's Reservation ..................................................................... 5
Section 4.1 - Tenant's Use of Common Areas ......................................................... 6
Section 4.2 - Management and Operation of Common Areas ................................... 6
Section 5.1 - Site Plan and Leasing Plan .............................................................. 6
Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan ................... 6
Section 6.0 - Construction Allowance ................................................................... 7
Section 6.1 - Landlord's Responsibilities .............................................................. 7
Section 6.2 - Tenant's Responsibilities ................................................................. 7
Section 6.3 - Tenant's Trade Fixtures ................................................................... 8
Section 6.4 - Labor Cooperation .......................................................................... 8
Section 7.1 - Submission of Plans and Specifications ............................................ 8
Section 8.1 - Operation and Use of Premises ........................................................ 9
Section 8.2 - Tenant's Covenant to Operate .......................................................... 9
Section 8.3 - Prohibitions on Use ......................................................................... 9
Section 8.4 - Manner of Operation of Business ..................................................... 10
Section 9.1 - Commencement Date Agreement ...................................................... 11
Section 9.2 - Holding Over .................................................................................. 11
Section 9.3 - Expiration of the Term of the Lease .................................................. 11
Section 10.1 - Rent Commencement Date ............................................................. 11
Section 10.2 - Delay or Failure to Deliver Premises to Tenant ............................... 11
Section 10.3 - Tenant's Failure to be Open by the Outside Date ............................ 12
Section 11.1 - Fixed Minimum Rent ...................................................................... 12
Section 11.2 - Percentage Rent ........................................................................... 12
Section 11.3 - Additional Rent ............................................................................. 15
Section 11.4 - Real Estate Taxes ......................................................................... 15
Section 11.5 - Utility and Insurance Costs ............................................................ 16
Section 12.1 - Utility Service Charges .................................................................. 17
Section 12.2 - Discontinuance of Service .............................................................. 18
Section 12.3 - Interruption of Service ................................................................... 18
Section 12.4 - Premises Sprinkler System ............................................................ 19
Section 13.1 - Storefront Sign ............................................................................. 19
Section 13.2 - Interior Signs and Advertising ....................................................... 19
Section 14.1 - Repairs by Landlord ...................................................................... 19
Section 14.2 - Repairs By Tenant ........................................................................ 20
Section 14.3 - Alterations and Remodeling ........................................................... 20
Section 15.1 - Lien Indemnification by Tenant ...................................................... 20
Section 16.1 - Indemnification ............................................................................. 21
Section 16.2 - Tenant's Insurance Requirements .................................................. 21
Section 16.3 - Waiver of Subrogation ................................................................... 22
Section 16.4 - Landlord Not Responsible for Acts of Others ................................... 22
Section 17.1 - Rules and Regulations ................................................................... 23
Section 17.2 - Rubbish ....................................................................................... 23
Section 17.3 - Lighting ........................................................................................ 23
Section 17.4 - Merchandise Display, Loading and Unloading .................................. 23
Section 17.5 - Obstruction of Passageways .......................................................... 23
Section 17.6 - Employee Parking ......................................................................... 23
Section 18.1 - Subordination of Lease .................................................................. 23
Section 18.2 - Attornment by Tenant .................................................................... 24
Section 18.3 - Landlord as Attorney-in-Fact for Tenant ......................................... 24
Section 19.1 - Landlord's Right to Repair ............................................................. 24
Section 19.2 - Landlord's Right to Affix to Exterior ............................................... 24
Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant .................. 24
Section 20.1 - Landlord's Consent Required .......................................................... 25
Section 20.2 - Insolvency Proceedings ................................................................. 25
Section 20.3 - Transfer of Corporate Shares ........................................................ 25
Section 20.4 - Assignment to Related Entity ......................................................... 25
Section 20.5 - Transfer of Other Business Interests ............................................. 25
Section 20.6 - Acceptance of Rents by Landlord ................................................... 26
Section 20.7 - No Release of Liability ................................................................... 26
Section 20.8 - Administrative Fee ......................................................................... 26

Temecula Towne Center Associates L.P. - The Promenade in Temecula - Administrative Exp. - 000006

Section 21.1 - Landlord's Obligation to Repair and Reconstruct. ...................................26
Section 21.2 - Landlord's Option to Terminate ...........................................................27
Section 21.3 - Demolition of Landlord's Building. ........................................................27
Section 22.1 - Effect of Taking. ...............................................................................27
Section 22.2 - Compensation and Awards. ................................................................27
Section 22.3 - Condemnation or Breach of Lease. .....................................................27
Section 23.1 - Default. ............................................................................................28
Section 23.2 - Remedies and Damages. ...................................................................28
Section 23.3 - Remedy for Failure to Open or Operate.' ..............................................29
Section 23.4 - Repeated Default. .............................................................................29
Section 23.5 - Waiver of Rights of Redemption. ..........................................................30
Section 24.1 - Restriction on Tenant. ........................................................................30
Section 24.2 - Imposition of Damages. ......................................................................30
Section 25.1 - Notices to Tenant and Landlord. ..........................................................30
Section 25.2 - Notices to Mortgagee. .......................................................................30
Section 26.1 - Accord and Satisfaction. .....................................................................30
Section 26.2 - Complete Agreement. ........................................................................31
Section 26.3 - Consents. .........................................................................................31
Section 26.4 - Brokerage. .......................................................................................31
Section 26.5 - Effective Date of Lease. ......................................................................31
Section 26.6 - Estoppel Certificates. .........................................................................31
Section 26.7 - Force Majeure. ..................................................................................31
Section 26.8 - Interpretation. ...................................................................................32
Section 26.9 - Memorandum of Lease. ......................................................................32
Section 26.10 - Quiet Enjoyment. .............................................................................32
Section 26.11 - Rent Demand. .................................................................................32
Section 26.12 - Section and Title Headings. ...............................................................32
Section 26.13 - Successors and Assigns. ..................................................................32
Section 26.14 – No Waiver by Landlord. ....................................................................32
Section 26.15 - Exculpation. ....................................................................................33
Section 26.16 - Transfer of Landlord's Interest. ..........................................................33
Section 26.17 - Litigation. .......................................................................................33
Section 26.18 – Miscellaneous. ...............................................................................33
Section 26.1 – Joint and Several Liability. ..................................................................34

H:\w97\lib\temecula.doc
L-9983

## LEASE

THIS LEASE MADE AND ENTERED INTO AT Cleveland, Ohio, this **3rd** day of

*August*, 2006, by and between TEMECULA TOWNE CENTER ASSOCIATES L.P.,

a California limited partnership, having an address for purposes hereof at Terminal Tower, 50

Public Square, Suite 1360, Cleveland, Ohio 44113-2267 ("Landlord"); and SONG H. KIM and

YOUNG A. KIM, jointly and severally, having an address for purposes hereof at 1204 South

Paloma Street, Los Angeles, CA 90021 ("Tenant").

### WITNESSETH
### ARTICLE I
### INTRODUCTORY PROVISIONS

Section 1.0 - Basic Lease Provisions.

    The following Basic Lease Provisions are an integral part of this Lease, and are referred to in other sections hereof, including, without limitation, the sections identified below which are presented in this Section 1.0 for the convenience of the parties. They are not intended to constitute an exhaustive list of all charges which may become due and payable under this Lease.

| | | | |
|---|---|---|---|
| (a) | Shopping Center: | | (Article I, Section 1.1 [g]) |
| | | The Promenade in Temecula | |
| (b) | Unit No.: | 2610 | |
| (c) | Approximate Premises GLA: | 2,719 square feet. | |
| (d) | Term of Lease: | Ten (10) Lease Years commencing on the Rent Commencement Date (as hereinafter defined) and expiring on the Term Expiration Date (as hereinafter defined). | |
| (e) | Rent Commencement Date: | The earlier of (i) November 1, 2006 ("Outside Date"); or (ii) the date Tenant opens for business. | |
| (f) | Term Expiration Date: | The day prior to the tenth (10th) anniversary of the Rent Commencement Date. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, the Term Expiration Date shall be deemed to be midnight on the last day of the calendar month in which the Term Expiration Date occurs. | |
| (g) | Fixed Minimum Rent: | | (Article XI, Section 11.1) |
| | | (i)   $   31.00 per square foot of Premises GLA, $84,289.00 per Lease Year, $ 7,024.08 per month, for Lease Year One; | |

(ii)    $    31.62 per square foot of Premises GLA,
$85,974.76 per Lease Year,
$ 7,164.57 per month, for Lease Year Two;

(iii)    $    32.25 per square foot of Premises GLA,
$87,687.75 per Lease Year,
$ 7,307.31 per month, for Lease Year Three;

(iv)    $    32.90 per square foot of Premises GLA,
$89,455.10 per Lease Year,
$ 7,454.59 per month, for Lease Year Four;

(v)    $    33.56 per square foot of Premises GLA,
$91,249.64 per Lease Year,
$ 7,604.14 per month, for Lease Year Five;

(vi)    $    34.23 per square foot of Premises GLA,
$93,071.37 per Lease Year,
$ 7,755.95 per month, for Lease Year Six;

(vii)    $    34.91 per square foot of Premises GLA,
$94,920.29 per Lease Year,
$ 7,910.02 per month, for Lease Year Seven;

(viii)    $    35.61 per square foot of Premises GLA,
$96,823.59 per Lease Year,
$ 8,068.63 per month, for Lease Year Eight;

(ix)    $    36.32 per square foot of Premises GLA,
$98,754.08 per Lease Year,
$ 8,229.51 per month, for Lease Year Nine; and

(x)    $    37.05 per square foot of Premises GLA,
$100,736.95 per Lease Year,
$ 8,394.91 per month, for Lease Year Ten;

(xi)    Fixed Minimum Rent     (Article III, Section 3.3)
Subject to adjustment if Premises GLA is revised:
__X__ yes     _____ no.

(h)    Percentage Rent:          (Article XI, Section 11.2)

(i)    6% of Gross Revenue in excess of $1,404,816.67
("Annual Breakpoint") for Lease Year One;

(ii)    6% of Gross Revenue in excess of $1,432,913.00
("Annual Breakpoint") for Lease Year Two;

(iii)    6% of Gross Revenue in excess of $1,461,462.50
("Annual Breakpoint") for Lease Year Three;

(iv)    6% of Gross Revenue in excess of $1,490,916.33
("Annual Breakpoint") for Lease Year Four;

(v)    6% of Gross Revenue in excess of $1,520,827.33
("Annual Breakpoint") for Lease Year Five;

(vi)    6% of Gross Revenue in excess of $1,551,189.50
("Annual Breakpoint") for Lease Year Six;

(vii)    6% of Gross Revenue in excess of $1,582,004.83
("Annual Breakpoint") for Lease Year Seven;

(viii)    6% of Gross Revenue in excess of $1,613,726.50
("Annual Breakpoint") for Lease Year Eight;

(ix)    6% of Gross Revenue in excess of $1,645,901.33
("Annual Breakpoint") for Lease Year Nine; and

2

Temecula Towne Center - Motion for Administrative Expenses 000086

(x) .. 6% of Gross Revenue in excess of $1,678,982.50 ("Annual Breakpoint") for Lease Year Ten.

(i) Additional Rent: (Article XI, Section 11.3)
Additional Rent shall be charged in the initial amount of $15.42 per square foot of Premises GLA which shall be subject to annual compounded increases equal to five percent (5%) of the immediately preceding Lease Year's Additional Rent.

(j) Real Estate Taxes: (Article XI, Section 11.4)
Tenant's Proportionate Share; payable monthly on estimated bill.

(k) Common Area Utility and Insurance Costs: (Article XI, Section 11.5)
Tenant's Proportionate Share; payable monthly on estimated bill.

(l) Premises Utilities: (Article XII, Section 12.1)
Payable by Tenant as billed per metered, submetered or estimated and adjusted billing.

(m) Trade Name: (Article VIII, Section 8.1)
ANGL

(n) Permitted Use: (Article VIII, Section 8.1)
Tenant shall use and occupy the Premises solely for the retail sale of women's apparel and related accessories.

(o) Tenant's Billing Address:
1204 South Paloma Street
Los Angeles, California 90021

(p) Tenant's Notice Address: (Article XXV, Section 25.1)
Same as (o) above.

(q) Landlord's Notice Address: (Article XXV, Section 25.1)
Terminal Tower
50 Public Square
Suite 1360
Cleveland, Ohio 44113-2267

(r) Landlord's Mortgagee's Notice Address: (Article XXV, Section 25.2)
CIGNA Corporation
Investment Law Department
900 Cottage Grove Road
Hartford, Connecticut 06152-2215
Attention: Real Estate Division, S-215A

(s) Address for Payment of Rents Including Percentage Rent:
Forest City Commercial Management, Inc.
Commercial Division
Post Office Box 72069
Cleveland, Ohio 44192-0069

(t) Address for Percentage Rent Reports:
Forest City Commercial Management, Inc.
700 Terminal Tower
50 Public Square
Cleveland, Ohio 44113
Attn: Lease Administration Department

or fax to (216) 263-4606

(u) Guarantor: None.

(v) Security Deposit: None.

3

(w)    Construction Allowance:                            (Article VI, Section 6.0)
$25.00 per square foot of Premises GLA, payable upon
satisfaction of the conditions set forth in Section 6.0.

Section 1.1 – Defined Terms.

Wherever used in this Lease, the following terms shall be construed to mean as follows:

(a)    "Applicable Laws" shall mean all laws, rules, orders, ordinances, directions, regulations and requirements of federal, state, county and municipal authorities now in force or which hereafter may be in force (collectively "Applicable Laws") which shall impose any duty upon Landlord or Tenant with respect to the initial improvement, use, occupation or alteration of the Premises by Tenant, including, but not limited to, requirements of the Americans with Disabilities Act ("ADA") which may be applicable thereto.

(b)    "Common Areas" shall mean the Shopping Center amenities, plaza areas, parking areas, driveways, aisles, sidewalks, loading docks, passageways, landscaping, courts, stairs, ramps, elevators, escalators, meeting rooms, public restrooms and other common service areas provided for by Landlord for the common or joint use and benefit of the tenants and occupants of the Shopping Center, their employees, agents, servants, customers and invitees.

(c)    "Lease Year" shall mean each consecutive twelve (12) month period beginning with the Rent Commencement Date, provided it has occurred on the first day of a calendar month. In the event that the Rent Commencement Date should occur on a day other than the first day of a calendar month, a Lease Year shall be each consecutive twelve (12) month period commencing on the first day of the calendar month next following the Rent Commencement Date.

(d)    "Major Tenants" shall mean those tenants located in the Shopping Center whose floor area exceeds thirty thousand (30,000) square feet ("Major Tenant Threshold"), including, but not limited to, Robinson's May; JC Penney; Sears; and Macy's.

(e)    "Premises" shall mean the specific demised space leased to Tenant by Landlord now existing or to be constructed in the Shopping Center, known as Unit No. 2810, and further being a space containing approximately 2,719 square feet of floor space. The Premises are hatched on Exhibit B for the sole purpose of more specifically locating said area.

(f)    "Rents" shall mean Fixed Minimum Rent, Percentage Rent, and any and all other sums of money required to be paid by Tenant to Landlord pursuant to this Lease whether or not any of such sums are specifically designated herein as Rents.

(g)    "Shopping Center" shall mean those buildings, land (excluding outparcels along the perimeter of the Shopping Center, if any) and Common Areas comprising the shopping center development owned by and/or ground leased to Landlord and/or the Major Tenants and known as "The Promenade in Temecula" located in the City of Temecula, Riverside County, California, as shown on Exhibit A attached hereto and made a part hereof, as the same may be changed from time to time by addition thereto or subtraction therefrom, together with the improvements constructed thereon from time to time. Notwithstanding the foregoing, Landlord expressly reserves the right, in the exercise of its sole discretion, to change the name of the Shopping Center at any time during the Term of this Lease.

(h)    "Tenant's Proportionate Share" shall mean a fraction, the numerator of which is the Premises GLA, and the denominator of which is, with respect to all prorated charges (as defined in Article XI), the total number of square feet of actually occupied gross leasable area in the Shopping Center, excluding the number of square feet of all tenant spaces exceeding the Major Tenant Threshold, whether or not occupied, and excluding the square feet of floor area of all tenants whose entrances do not exclusively front on the interior of the enclosed mall.

4

Temecula Towne Center - Motion for Administrative Expenses 000088

## ARTICLE II

### EXHIBITS

**Section 2.1 - Exhibits.**

The following exhibits are attached hereto or otherwise incorporated herein by reference and made a part of this Lease:

| EXHIBIT A | - | Site Plan of the Shopping Center - attached hereto. |
|---|---|---|
| EXHIBIT B | - | Leasing Plan of the Shopping Center - attached hereto. |
| EXHIBIT C | - | Tenant Handbook for Shopping Center - containing sign and design criteria - not attached but incorporated herein by reference. |

## ARTICLE III

### PREMISES

**Section 3.1 - Premises.**

In consideration of the payment of all Rents and the performance of all covenants as hereinafter set forth, Landlord demises unto Tenant and Tenant leases from Landlord the Premises as defined in Section 1.1 (e), subject to all conditions and easements of record for the Term of the Lease and upon the terms and conditions set forth in this Lease.

**Section 3.2 - Gross Leasable Area of the Premises.**

The gross leasable area of the Premises ("Premises GLA") shall be computed based on the lease lines of the Premises defined as follows: The lease line for common demising walls between adjoining tenants shall be the center line of the common demising wall, and on non-common demising walls such as between the Premises and service corridors, mechanical rooms, or the building exterior, the lease line shall be the outside face of the demising wall. Any recesses required to accommodate the door swing of the exit door for the Premises shall be considered part of the Premises. No deductions shall be made for existing columns or bracing within the Premises or along the demising walls, but deductions shall be made for the areas occupied by major vertical duct shafts.

**Section 3.3 - Revisions to Premises GLA.**

The Premise GLA set forth in Section 1.0 (c) has been determined pursuant to the provisions of Section 3.2 by reference to either "CAD" or scaled architectural drawings of the Premises. Landlord and Tenant acknowledge that, irrespective of whether or not the Premises shall have been constructed as of the date of this Lease, in the event that Landlord's final as-built field or CAD measurements of the Premises after all leasehold improvements have been constructed therein should disclose a different square footage than the Premises GLA set forth in Section 1.0 (c) above ("Final Revised Premises GLA"), then Landlord agrees to notify Tenant in writing of the Final Revised Premises GLA. Tenant further acknowledges and agrees that such notice by Landlord shall be deemed sufficient to amend the Premises GLA set forth in Section 1.0 (c), such amendment being deemed self-operative without the necessity of further formal mutual acknowledgment or documentation between Landlord and Tenant. When so finally determined, the Final Revised Premises GLA shall be used as the numerator in computing Tenant's Proportionate Share of all prorated charges and in all computations of Fixed Minimum Rent and Additional Rent since same have been determined on a square foot (as opposed to a fixed rate) basis as set forth in Section 1.0 (g). If the Fixed Minimum Rent should be revised, Landlord's revised billing to Tenant shall be deemed sufficient notice of such Rent revisions and the Percentage Rent Annual Breakpoints set forth in Section 1.0 (h) herein shall be correspondingly adjusted.

**Section 3.4 - Landlord's Reservation.**

Landlord reserves to itself the roof and exterior walls of the building containing the Premises and all space above the ceiling within the Premises to accommodate the Shopping Center's structural, mechanical and electrical conduit, piping, ducting or venting requirements.

5

Landlord and its agents further reserve the right on behalf of themselves or an authorized utility company to run utility lines, pipes, conduit or ductwork when necessary or desirable through the air space above Tenant's ceiling, columns or within the walls of the Premises, and to maintain, repair, alter, replace or remove same in locations which will not materially interfere with Tenant's use of the Premises.

## ARTICLE IV

## COMMON AREAS

### Section 4.1 - Tenant's Use of Common Areas.

(a)     Landlord grants to Tenant and its agents, employees and customers, a non-exclusive license, subject to the reasonable rules and regulations promulgated by Landlord, to use the Common Areas in common with other tenants and occupants of the Shopping Center, their agents, employees and customers during the Term of this Lease, and any renewal period thereof, subject to the exclusive control and management thereof at all times by Landlord and subject further to the rights of Landlord as set forth in Section 4.2 herein.

(b)     Landlord reserves the right to construct, lease and/or license kiosks, carts, and other sales areas on any portions of the Common Areas.

(c)     Tenant shall not use the Common Areas for any other purpose than designated by Landlord.

### Section 4.2 - Management and Operation of Common Areas.

Landlord will use commercially reasonable efforts to operate and maintain, or will cause to be operated and maintained, the Common Areas in the best interest of the Shopping Center. Landlord will have the right (1) to establish, modify and enforce reasonable rules and regulations with respect to the Common Areas for the general benefit of Landlord and all tenants of the Shopping Center; (2) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the parking areas and fees (if any) for use of such parking areas and other Common Areas; (3) to provide for employee parking and formulate reasonable rules and regulations for same; (4) to close such portions of said parking areas or other Common Areas to such extent as may, in the reasonable opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any right to any person or to the public therein or for any other reason in the best interest of Landlord and all tenants; (5) to close temporarily any or all portions of the Common Areas for repairs or refurbishing; (6) to discourage non-customer parking; (7) to move, remove, relocate and/or replace seats, trees, planters and other amenities; and (8) to do such other acts in and to said Common Areas and improvements in the exercise of good business management, as Landlord, in the exercise of its reasonable business judgment, shall deem advisable.

## ARTICLE V

## CHANGES AND ADDITIONS TO
## SHOPPING CENTER SITE PLAN AND LEASING PLAN

### Section 5.1 - Site Plan and Leasing Plan.

The Site Plan and Leasing Plan attached hereto as Exhibits A and B, respectively, are for the sole purpose of showing the approximate shape, design and proposed locations of buildings, tenant spaces and Common Areas located within the Shopping Center.

### Section 5.2 - Changes to Shopping Center Site Plan and Leasing Plan.

Landlord reserves the right at any time and from time to time to (a) make or permit changes or revisions in the Site Plan and/or Leasing Plan for the Shopping Center, including additions thereto, subtractions therefrom, rearrangements, alterations, or modifications or supplements to, the building areas, walkways, parking areas, driveways or other Common Areas; (b) construct other buildings or improvements in the Shopping Center and/or to make alterations thereof or additions thereto, to build additional stories on any such building or buildings, or to build adjoining same; (c) make or permit changes or revisions to the Shopping Center, including additions thereto; and (d) convey portions of the Shopping Center to others for the purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof. No such changes, rearrangements or other construction shall

6

Temecula Towne Center - Motion for Administrative Expenses 000090

permanently reduce the number of parking spaces provided by Landlord below the number of parking spaces required by law.

## ARTICLE VI

### IMPROVEMENTS

Section 6.0 - Construction Allowance.

(a)    Landlord shall pay to Tenant, as its total obligation hereunder, the sum of Twenty-Five Dollars ($25.00) per square foot of Premises GLA, which sum represents Landlord's contribution to Tenant's Work (as defined in Section 6.2) (hereinafter "Construction Allowance"). Such Construction Allowance shall be due and payable to Tenant within thirty (30) days after the date that all of the following conditions have been satisfied:

(1)    The Premises have been completed according to plans and specifications previously approved in writing by Landlord, including any punchlist items designated by Landlord; and

(2)    Tenant has opened the Premises for business in accordance with the terms of this Lease; and

(3)    Tenant has furnished Landlord with an affidavit from Tenant's General Contractor listing all subcontractors, materialmen and/or laborers (hereinafter collectively "Subcontractors") involved in Tenant's Work, and final, unconditional lien waivers from Tenant's General Contractor and all Subcontractors evidencing that the General Contractor and all Subcontractors have been paid in full for all work, material and labor furnished in connection with Tenant's Work at the Premises.

(b)    In the event that there are claims or Rents unpaid, work unfinished, or liens filed for such work and labor that have not been bonded or otherwise secured, Landlord may retain from Tenant's Construction Allowance a sum sufficient to pay for said claims, Rents, work or liens and all costs resulting therefrom and to pay for said claims, Rents, work or liens, if necessary. If the amount owed to Tenant by Landlord shall not be sufficient to pay for said claims, Rents, work or liens and the costs resulting therefrom, Tenant shall forthwith pay for said claims, Rents, work or liens and the costs resulting therefrom, or if such be the case, cause such claims or liens to be property discharged as herein provided.

(c)    Tenant shall have the right at all times, and at its own expense, to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of such lien(s) upon giving adequate security to Landlord for payment of said lien(s).

(d)    Notwithstanding anything contained herein, the amount of Tenant's Construction Allowance shall not exceed the documented costs of Tenant's Work.

Upon satisfaction of the above conditions, Tenant shall request payment of the Construction Allowance in writing to Landlord at Forest City Commercial Management, Inc., Terminal Tower, 50 Public Square, Suite 700, Cleveland, Ohio 44113-2267, Attention: Denise Hall, and simultaneously therewith, shall provide Landlord with a W9 form for processing payment of the Construction Allowance.

Section 6.1 - Landlord's Responsibilities.

Tenant acknowledges that it is accepting the Premises in its present "as-is" condition.

Section 6.2 - Tenant's Responsibilities.

On or before the Rent Commencement Date, Tenant shall at its own expense and in accordance with Exhibit C:

(a)    Secure all permits and licenses necessary for the construction of Tenant's Work and Tenant shall comply with all Applicable Laws relating to the conduct of said work.

(b)    Construct the leasehold improvements as shown in Tenant's plans and specifications as approved in writing by Landlord or Landlord's architect as more fully set forth in Section 7.1 herein ("Tenant's Work"). Any installation to be made or work to be performed by Tenant on or for the Premises shall be first approved in writing by Landlord prior to

7

commencement of any such work by Tenant. All trade fixtures installed in the Premises shall be new and of first quality.

(c)    Obtain and maintain on behalf of itself, or any of its contractors or subcontractors, all insurance protection required by Landlord in Exhibit C.

(d)    If a construction barricade is necessary during Tenant's Work, Landlord shall, at its option, either (i) install such barricade on behalf of Tenant and Tenant shall reimburse Landlord within twenty (20) days following receipt of Landlord's billing therefor; or (ii) require Tenant to erect such barricade, at Tenant's expense, in accordance with Landlord's directives.

(e)    Tenant shall reimburse Landlord for the cost of any temporary utilities and dumpster usage which shall be due and payable within twenty (20) days following receipt of Landlord's billing therefor.

(f)    In the event Landlord performs any work at the request or on behalf of Tenant which is Tenant's responsibility hereunder, Landlord shall bill Tenant for the costs thereof and Tenant shall reimburse Landlord for such costs no later than twenty (20) days following receipt of Landlord's billing.

Section 6.3 - Tenant's Trade Fixtures.

All trade fixtures, signs and apparatus (as distinguished from leasehold improvements) owned by Tenant and installed in the Premises during the Term of this Lease shall remain the property of Tenant and shall be removable at any time, including upon the expiration of the Term, provided Tenant shall not at such time be in Default of any terms or covenants of this Lease, and provided further that Tenant shall promptly repair any damage to the Premises caused by the removal of said fixtures, signs and/or apparatus. If Tenant is in Default under this Lease, Landlord shall have the benefit of any applicable lien on Tenant's property located in or on the Premises as may be permitted under the laws of the State (or Commonwealth) in which the Shopping Center is located, and in the event such lien is asserted by Landlord in any manner or by operation of law, Tenant shall not remove or permit the removal of said property until the lien has been removed and all Defaults have been cured. Any of Tenant's property not removed by Tenant on the Term Expiration Date may be deemed by Landlord as abandoned by Tenant and Landlord may order Tenant to remove said items or have the same removed at Tenant's expense.

Section 6.4 - Labor Cooperation.

Tenant shall perform or cause Tenant's contractor to perform all of Tenant's Work and any repairs, alterations or improvements to the Premises in a manner so as to avoid any labor dispute which causes or is likely to cause a stoppage or an impairment of work or delivery services or any other services in the Shopping Center. In the event there shall be any such stoppage or impairment as the result of any such labor dispute or potential labor dispute, Tenant shall immediately undertake such action as may be necessary to eliminate such dispute or potential dispute, including, but not limited to (i) removing and/or replacing any or all disputants from the job site until such time as the labor dispute no longer exists; and/or (ii) filing appropriate unfair labor practice charges in the event of a union jurisdictional dispute.

Notwithstanding the foregoing, in the event any work performed by Tenant or Tenant's contractors results in a labor dispute as set forth above, such labor dispute shall not excuse the performance by Tenant as provided for herein.

### ARTICLE VII

### PLANS AND SPECIFICATIONS

Section 7.1 - Submission of Plans and Specifications.

Tenant shall prepare, at its sole cost and expense, and in full compliance with the provisions of Exhibit C, complete plans and specifications for all of Tenant's work, including storefront design, and shall submit such plans and specifications to Landlord or Landlord's designated representative for approval in accordance with the time periods set forth in Exhibit C. Tenant shall be required to submit its plans and specifications to Landlord in a timely manner so that Tenant's construction in the Premises shall be completed on or before the Rent Commencement Date. No further material changes to said plans and specifications shall be made after such approval by Landlord without Landlord's prior written consent. Landlord's written approval of any plans and specifications for Tenant's work shall, however, create no

8

responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws since it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws.

## ARTICLE VIII

### USE

#### Section 8.1 - Operation and Use of Premises.

Tenant agrees to operate its business in the Premises under the trade name and in accordance with the permitted use specified in Article I and for no other business or purpose. Tenant further agrees not to conduct catalog sales or Internet sales in or from the Premises, except of merchandise which Tenant is permitted to sell "over-the-counter" consistent with its permitted use. Tenant recognizes that the specific limited use prescribed herein is a material consideration to Landlord in entering into this Lease. Notwithstanding the foregoing, Tenant's specific limited use hereunder shall not be construed to imply that Tenant has an exclusive right to conduct the use permitted in Article I.

If Tenant's business in the Premises is to be conducted pursuant to a franchise agreement, the existence and continuation of such franchise agreement is a material consideration to Landlord in entering into this Lease, and if such franchise agreement is terminated, Landlord shall be entitled to treat such event as a Default under this Lease and elect any of the remedies provided in Article XXIII.

#### Section 8.2 - Tenant's Covenant to Operate.

Tenant agrees to complete Tenant's work and open the Premises for business to the public fully fixtured, stocked and staffed on the Rent Commencement Date, and thereafter throughout the Term of this Lease to continuously operate in one hundred percent (100%) of the space within the Premises the permitted use prescribed in Article I, Mondays through Saturdays from 10:00 A.M. to 9:00 P.M. and on Sundays from 11:00 A.M. until 6:00 P.M., or such other operating days and hours as may be reasonably determined by Landlord for the operation of the Shopping Center. Notwithstanding the foregoing, Tenant shall have the right to cease to operate its business in the Premises as specifically set forth below.

Notwithstanding the foregoing, it is acknowledged and agreed between Landlord and Tenant that commencing on the second (2nd) day of the Term of this Lease and continuing for the remainder of the Term and any renewals thereafter, Tenant shall have the right to cease operating in the Premises; provided, however, that Tenant gives Landlord's Shopping Center manager at least ten (10) days prior written notice of its intent to cease operating in the Premises, and further provided, that Tenant continues to pay all Rents due under the Lease each month as they would normally come due. Should Tenant cease operating in the Premises for a period in excess of thirty (30) days, Landlord may terminate this Lease upon written notice to Tenant. Notwithstanding anything contained herein to the contrary, the provisions of this paragraph shall be deemed null and void if on the Rent Commencement Date, Tenant does not open for business in the Premises fully fixtured, stocked and staffed and remain open for business for at least one (1) full business day.

#### Section 8.3 - Prohibitions on Use.

(a) Tenant shall not use or permit the Premises, or any part thereof, to be used by anyone else or for any other business or purpose than that specifically defined and permitted by this Article VIII, and further provided, that Tenant shall not divert any portion of the Premises GLA for any other use other than the permitted use described above.

(b) Tenant shall not permit the Premises to be used in violation of any Applicable Laws or in a manner which in the sole judgment of Landlord will injure the reputation of, be a nuisance or annoyance, or do damage to, the other tenants of the Shopping Center or Landlord, including, without limitation, the sale of patently offensive material and merchandise and the use of audio devices, flashing lights, machinery and equipment creating noise or odors, or the committing of acts, which will disturb, impair or interfere with the use and enjoyment by other tenants of their respective premises within the Shopping Center or in the treatment of its customers that results in multiple complaints.

(c) Tenant agrees not to use or allow the Premises to be used for any auction, fire, bankruptcy or "going out of business" sale unless ordered by a court of competent jurisdiction, after reasonable notice to Landlord and an opportunity by Landlord to be heard.

9

Temecula Towne Center - Motion for Administrative Expenses 000093

**Section 8.4 - Manner of Operation of Business.**

(a)    Tenant agrees that the above business is to be conducted in a reputable manner in keeping with good practices as established in the trade. Tenant shall keep upon the Premises an adequate staff of employees and a full and complete stock of merchandise during business hours throughout the Term of this Lease so as to insure a maximum volume of business in and from the Premises.

(b)    Subject to Section 14.1 of this Lease, Tenant agrees to assume full responsibility at its own cost to keep and maintain the Premises neat, clean, in proper repair and décor, free from waste and offensive odors, and in an orderly and sanitary condition, free of vermin, rodents, bugs and other pests.

(c)    For purposes of this Lease, the term "Hazardous Materials" shall mean any substances which are (i) defined under any Environmental Laws (as defined below) as a hazardous substance, hazardous waste, hazardous material, pollutant or contaminant; (ii) petroleum hydrocarbon, including crude oil, gasoline or diesel fuel, or any fraction thereof; (iii) hazardous, toxic, corrosive, flammable, explosive, infectious, radioactive, carcinogenic or a reproductive toxicant; or (iv) otherwise regulated pursuant to any Environmental Laws. The term "Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, regulations, rules, judicial and administrative orders and decrees, permits, licenses, approvals, authorizations and similar requirements of all federal, state and local governmental agencies or other governmental authorities pertaining to the protection of human health and safety of the environment now existing or later adopted during the Term of this Lease.

Tenant shall not cause or permit any Hazardous Materials to be brought upon, kept, stored, utilized, disposed of or used in or about the Premises or Shopping Center by Tenant, its agents, employees, contractors or invitees. This obligation shall survive the expiration or earlier termination of this Lease. If Tenant breaches the obligations stated in the preceding sentence, or if the presence of Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in contamination of the Premises or Shopping Center, or if contamination of the Premises or Shopping Center by Hazardous Materials otherwise occurs for which Tenant is legally liable to Landlord for damages resulting therefrom, then in any of such events, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses (including, without limitation, the cost of clean-up, diminution in value of the Premises or Shopping Center, damages for loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or Shopping Center, damages arising from any adverse impact on marketing of space, and sums paid in settlement of claims, attorney fees, consultant fees and expert fees) which arise during or after the Term of the Lease as a result of such contamination. This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation and/or testing of site conditions or any clean-up, remediation, removal or restoration work required because of Hazardous Materials present in or on the Premises or Shopping Center. Without limiting the foregoing, if the presence of any Hazardous Materials on the Premises or Shopping Center caused or permitted by Tenant results in any contamination of the Premises or Shopping Center, Tenant shall promptly take all actions at its sole expense as are necessary to return the Premises or Shopping Center to the condition existing prior to the introduction of any such Hazardous Materials to the Premises or Shopping Center.

(d)    Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time to determine whether Tenant is complying with the terms of this Lease. If Tenant is not in compliance with any of the terms of this Lease, Landlord shall have the right, but not the obligation, to immediately enter upon the Premises to remedy said non-compliance at Tenant's expense. Landlord shall use its reasonable efforts to minimize interference with Tenant's business, but shall not be liable for any interference caused thereby.

(e)    In the event Landlord should elect to establish open or closed internet site(s) with respect to the Shopping Center, Tenant agrees to participate in such site(s) and to cooperate with Landlord in making Tenant's website usable by, and accessible to, Shopping Center patrons and customers.

10

Temecula Towne Center - Motion for Administrative Expenses 000094

## ARTICLE IX

## TERM

### Section 9.1 - Commencement Date Agreement.

At any time following full execution of this Lease, Landlord and Tenant may, upon written request to the other party, execute a supplemental agreement in a form for recording, setting forth the Rent Commencement Date and Term Expiration Date of the Term of this Lease.

### Section 9.2 - Holding Over.

If, at the expiration of the Term of this Lease, Tenant continues to occupy the Premises with or without Landlord's consent, its tenancy shall become a month-to-month tenancy terminable by either party on thirty (30) days prior written notice to the other party. Tenant's month-to-month tenancy shall be subject to all terms and conditions of this Lease, excepting the Term thereof, and Tenant shall be obligated to pay holdover Fixed Minimum Rent equal to one hundred fifty percent (150%) of the monthly Fixed Minimum Rent payable by Tenant immediately prior to expiration of the Term, plus all other charges due under the Lease. Tenant shall be further subject to any changes which Landlord has given Tenant, in writing, during any fifteen (15) day period for the following fifteen (15) day period. Notwithstanding anything contained herein to the contrary, nothing contained in this Section 9.2 shall be deemed or construed to give Tenant the right to holdover.

Notwithstanding the foregoing, Tenant shall not be permitted to holdover if Landlord gives Tenant notice that Tenant may not holdover.

### Section 9.3 - Expiration of the Term of the Lease.

(a)    This Lease shall expire on the Term Expiration Date without the necessity of any notice from either Landlord or Tenant to terminate same, and subject to Section 9.2 hereof, Tenant hereby waives notice to vacate or quit the Premises and agrees that Landlord shall be entitled to the benefit of all provisions under this Lease respecting the summary recovery of possession of the Premises from Tenant holding over to the same extent as if statutory notice had been given.

(b)    For a period of three (3) months prior to the expiration of the Term, upon reasonable prior notice to Tenant, Landlord shall have the right and may show the Premises and all parts thereof to prospective tenants during normal business hours.

(c)    Tenant shall deliver and surrender to Landlord possession of the Premises upon the Term Expiration Date or earlier termination of this Lease in as good condition and repair as the same shall be at the commencement of the Term of this Lease, except for ordinary wear and tear and casualty loss.

## ARTICLE X

## RENT COMMENCEMENT DATE

### Section 10.1 - Rent Commencement Date.

As used in this Lease, the term "Rent Commencement Date" shall be as defined in Article I. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, Tenant shall be liable for Rents due for said partial month on a prorated basis based upon a thirty (30) day month.

### Section 10.2 - Delay or Failure to Deliver Premises to Tenant.

Landlord shall give Tenant written notice of the date on which Landlord anticipates delivering possession of the Premises to Tenant. If Landlord shall be unable to deliver possession of the Premises to Tenant on the date specified in said notice for any cause within Landlord's or outside Tenant's control, including, but not limited to, delay in commencing or completing Landlord's work, if any, or the holding over of any tenant(s), or the total failure of Landlord to deliver the Premises, then in any of such events, Rents shall not commence until the earlier to occur of (i) the date Tenant opens for business; or (ii) ninety (90) days following the date that possession of the Premises is delivered to Tenant for the commencement of its leasehold improvement work. Tenant agrees to accept such abatement of Rents as liquidated damages in full satisfaction for the failure of Landlord to deliver possession of the Premises as

11

Temecula Towne Center - Motion for Administrative Expenses 000095

set forth above or complete failure of delivery of possession to the exclusion of all rights and claims for damages which Tenant otherwise may have suffered as a result of Landlord's delayed or complete failure to deliver possession of the Premises to Tenant.

Section 10.3 - Tenant's Failure to be Open by the Outside Date.

INTENTIONALLY OMITTED.

ARTICLE XI

RENT

Section 11.1 - Fixed Minimum Rent.

(a)    Tenant hereby covenants and agrees to pay to Landlord's authorized agent, at the address specified in Article I or at such other address as Landlord may, from time to time, designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, the Fixed Minimum Rent set forth in Article I; said amount(s) to be due and payable in monthly installments, in advance, on the first day of each and every calendar month. Tenant agrees at no time to pay Fixed Minimum Rent more than one (1) month in advance of its due date.

(b)    Notwithstanding anything in this Lease to the contrary, in the event Tenant fails to pay any Rents or any other amount(s) due and owing Landlord within five (5) days following the due date of said Rents, then Tenant shall pay a late charge equal to two percent (2%) per month of such monthly Rents or amount(s) due Landlord from the due date of said Rents or amount(s) plus the maximum lawful interest rate on any such sums due Landlord from the due date to the date of payment of such sums.

(c)    If at any time during the Term of this Lease, a Major Tenant department store operating under the name of *Nordstrom* is added as part of the Shopping Center, in addition to those named Major Tenant department stores listed in Section 1.1 (d) herein, Tenant acknowledges and agrees that the Fixed Minimum Rent then payable by Tenant shall be automatically increased by a one-time increase equal to One Dollar ($1.00) per square foot of Premises GLA, commencing on the date when each such Major Tenant department store first opens for business in the Shopping Center, with a proportionate increase in Tenant's Annual Breakpoint for Percentage Rent purposes.

Section 11.2 – Gross Revenue Reporting.

(a)    Amount.  In addition to Fixed Minimum Rent, Tenant covenants and agrees to pay to Landlord's authorized agent, at the address set forth in Article I, or at such other address as Landlord may from time to time designate in writing, without deduction or set-off and without demand, during each Lease Year of the Term hereof, Percentage Rent in amount(s) equal to the percentage of Gross Revenue in excess of the applicable Annual Breakpoint set forth in Article I.

(b)    Payment.

(i)    The Percentage Rent due for each Lease Year shall be payable by no later than the fifteenth (15th) day of the month immediately following the month in which Gross Revenue for the Lease Year exceeds the Annual Breakpoint for said Lease Year, and thereafter, any Percentage Rent due shall be paid monthly on all additional Gross Revenue made during the remainder of said Lease Year.  Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's written statement of monthly Gross Revenue to Landlord as set forth in subsection (e) below.

(ii)    Upon submission of Tenant's certified statement of Gross Revenue at the close of each Lease Year as provided herein, adjustments of amounts due for Percentage Rent shall be made to the respective parties.

(iii)    Notwithstanding the provision for the payment of Percentage Rent, Landlord shall not, in any event, be deemed to be a partner or associate of Tenant in the conduct of its business.  The relationship of the parties hereto shall, at all times, be solely that of Landlord and Tenant.

12

Temecula Towne Center - Motion for Administrative Expenses 000096

(c) Gross Revenue.

The term "Gross Revenue" wherever used herein shall be defined to mean the total amount of all sales of merchandise and/or services and all other receipts of all business conducted in, at, or from any part of the Premises (including any sales made via personal computer located within the Premises, "Home Shopping" television sales, catalog, direct mail, telephone or electronic sales), whether the same be for cash, barter, credit, check, charge account, gift and merchandise certificates or other disposition of value regardless of collection, and whether made by Tenant, sub-tenants, concessionaires, licensees, or assignees of Tenant. The value of each sale shall be the actual total sales price charged to the customer, and shall be reported in full in the month that the transaction occurs irrespective of when, or if, payment is received.   Gross Revenue shall include orders or sales which originate in, at, or from the Premises, whether delivery or performance is made from the Premises or from another place, and orders and sales of goods and services delivered and performed from the Premises as a result of orders taken elsewhere; orders or sales mailed, telephoned, or telegraphed which are received at or filled from the Premises; and all sales and revenue accruing by means of mechanical, self-operated, or automatic vending devices if permitted on the Premises. There shall be no deductions or exclusions from Gross Revenue, except as specifically permitted hereafter. Any deposit not refunded shall be included in Gross Revenue.

(d) Exclusions from Gross Revenue.

Notwithstanding the foregoing, "Gross Revenue" shall not include:

(i)    Merchandise returned in the amount of cash refunded, credit given, or discounts or allowances granted or exchanges made, provided that the sale price of said items was originally included in Gross Revenue.

(ii)    The amount of any sales, use or gross receipts tax, or excise tax imposed by any governmental authority directly on sales and collected from customers, provided the amount of such tax is separately recorded.

(iii)    The exchange of merchandise between stores of Tenant when such exchanges are made solely for the operation of Tenant's business and not for the purpose of consummating a sale which has been made in, at or from the Premises.

(iv)    Merchandise returned for credit to shippers, jobbers, wholesalers or manufacturers.

(v)    Revenue from the sale of trade fixtures after use in the Premises.

(vi)    Sums or credits received in settlement of claims for loss or damage to merchandise.

(vii)    Revenue from vending machines for Tenant's employees use only.

(e) Reporting.

(i)    On or before the fifteenth (15th) day of each month of each Lease Year, commencing in the second (2nd) month of the first Lease Year, Tenant shall furnish to Landlord's authorized agent at the address or fax number specified in Article I, or at such other address or fax number as Landlord may, from time to time, designate in writing, a written statement signed by Tenant showing Tenant's Gross Revenue, as herein defined, for the preceding calendar month.

(ii)    On or before the forty-fifth (45th) day following the close of each Lease Year, Tenant shall furnish to Landlord's authorized agent, at the address or fax number specified in Article I, a written statement certified by an officer of Tenant, or a certified public accountant employed by Tenant, of the Gross Revenue made in, at or from the Premises during the preceding Lease Year.

(iii)    For purposes of ascertaining the amount of reportable sales and revenue, Tenant agrees to record each and every sale at the time of the transaction (i) on a cash register having a sealed, continuous cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total); or (ii) on serially pre-numbered sales slips; or (iii) using point-of-sale recording techniques; all of the above to be in accordance with generally accepted accounting principles, consistently applied.  Should Tenant elect (i) above, Tenant agrees that

13

the continuous cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register. If Tenant chooses to record each sale on individual sales slips, Tenant agrees that said sales slips (including those canceled, voided or not used) will be retained in numerical sequence.

(iv)    If Tenant shall fail to prepare and/or deliver any statement of Gross Revenue required herein, Landlord may do any or both of the following: (i) elect to treat Tenant's failure to report as a Default under this Lease; or (ii) elect to make an audit of all books and records of Tenant which in any way pertain to Gross Revenue and to prepare the statement(s) which Tenant has failed to prepare and deliver. The statement(s) so prepared shall be conclusive on Tenant, and Tenant shall pay on demand all expenses of such audit and for the preparation of any such statement(s) and all sums as may be shown by such audit to be due as Percentage Rent.

(v)    All such monthly and annual statements and reports of Tenant's Gross Revenue shall be kept in confidence by Landlord, except in connection with a sale, mortgage, administrative or judicial proceedings.

(vi)    Upon Landlord's written request, but no more frequently than once per calendar year, Tenant agrees to furnish Landlord an audited statement of Tenant's current financial condition.

(f)    Books and Records.

(i)    Tenant agrees to prepare and maintain for each Lease Year and to keep same at the Premises, or at its principal offices, accurate books and records of all business conducted at the Premises in accordance with generally accepted accounting principles consistently applied. Said books and records shall be open and available to Landlord or Landlord's representative for examination at all reasonable times and upon reasonable notice to Tenant for the purpose of ascertaining or verifying Tenant's Gross Revenue. Landlord shall also have the right to request such other records and/or accounts which Landlord may deem necessary to accurately determine Gross Revenue. All books and records shall be retained by Tenant for examination by Landlord for a period of at least three (3) years following the end of the Lease Year for which said records apply.

(ii)    If upon inspection or examination of Tenant's books and records, Landlord determines that Tenant has failed to prepare and maintain the aforementioned books and records in the manner detailed herein, Landlord shall give Tenant sixty (60) days to cure said deficiencies and Tenant shall reimburse Landlord for all reasonable expenses incurred by Landlord in determining said deficiencies, including, but not limited to, any audit or examination fees incurred by Landlord.

If after receiving the aforesaid notice, and upon expiration of the sixty (60) day time period specified above, Tenant fails to cure the noted deficiencies, Landlord may, at its option, elect to do one or more of the following: (i) grant Tenant additional time to cure the deficiencies; or (ii) hold Tenant in Default of the Lease; or (iii) at Tenant's expense, retain a good and reputable independent accounting or bookkeeping firm to prepare the above-recited books and records. If Landlord elects the latter option, Tenant agrees and covenants that the representative(s) of said accounting or bookkeeping firm will have full right of entry and access to the Premises and existing financial records, and full cooperation by Tenant, for the purpose of establishing and maintaining the books and records recited hereinabove. Any expenses incurred by Landlord in furtherance of its rights hereunder will be considered a part of Rents due and payable by Tenant with the next due installment(s) of Rents.

(iii)    In the event an examination of Tenant's books and records shall disclose a deficiency in excess of two percent (2%) of the Gross Revenue reported for any Lease Year where Percentage Rent is due Landlord, Tenant agrees to pay to Landlord (1) the reasonable costs and expenses of such audit; and (2) any additional Percentage Rent found due and owing as a result of said audit, both of which shall be immediately paid by Tenant to Landlord upon demand. If an examination by Landlord or its representative(s) discloses that Tenant has over-reported Gross Revenue, and that as a result of said over-reporting, Tenant has overpaid Percentage Rent, Landlord shall give Tenant credit against the next due installment(s) of Rents due and owing by Tenant for such overpaid Percentage Rent.

14

Section 11.3 – Additional Rent.

(a)    Additional Rent will be applied by Landlord to the operation, maintenance, management, marketing and advertising of the Shopping Center. Allocation of Additional Rent among these costs may vary from year to year as Landlord, in the exercise of its reasonable business judgment, shall determine. Such Additional Rent shall be paid by Tenant to Landlord in equal monthly installments, in advance, on the first day of each calendar month during the Term hereof in an amount equal to one-twelfth (1/12th) of the Additional Rent due for the applicable Lease Year. The amount due for any partial Lease Year shall be prorated accordingly.

(b)    Should any governmental authority having jurisdiction over the Shopping Center enact or impose any future law, ordinance, regulation or requirement ("Future Law") upon Landlord, the direct effect of which is to increase Landlord's cost of operating, maintaining and managing the Shopping Center ("Operating Costs"), as compared with Landlord's Operating Costs incurred for the calendar year immediately preceding the enactment of such Future Law by more than the annual percentage increase in the Additional Rent set forth in Article I, then in such event, Landlord shall notify Tenant in writing of such increase ("Extraordinary Increase") and shall furnish Tenant with reasonably suitable documentary evidence of such Extraordinary Increase and whether or not it is one-time or ongoing. If the Future Law should result in a one-time Extraordinary Increase, Tenant's Proportionate Share of the Extraordinary Increase shall be divided into twelve (12) equal monthly increments, which shall be added to Landlord's monthly charge to Tenant for reimbursement to Landlord over the next twelve (12) month period. However, if the Future Law should result in an ongoing Extraordinary Increase over the remaining balance of the Term, Tenant's Proportionate Share of such Extraordinary Increase shall be added to Tenant's Additional Rent and all subsequent annual compounded increases shall be applied to the increased Additional Rent amount.

Section 11.4 – Real Estate Taxes.

(a)    (i)    For purposes of this Lease, the term "Real Estate Taxes" shall mean all ad valorem taxes, assessments, charges, levies, fees and other governmental charges, general and special, ordinary and extraordinary, of any kind or nature whatsoever, including, but not limited to, assessments for off-site public improvements for the benefit of the Shopping Center which shall be laid, assessed, levied, or imposed upon the Shopping Center or any part thereof and which are payable at any time during the Term hereof, and further, Real Estate Taxes shall include Landlord's reasonable administrative costs as well as any and all costs, including reasonable attorney fees, incurred by Landlord in contesting or negotiating Real Estate Taxes with any governmental authority. Real Estate Taxes shall not include franchise, estate, inheritance, sales, use, succession, capital levy, transfer, net income or excess profits taxes imposed upon Landlord. In addition, the term Real Estate Taxes shall mean (if applicable) all payments made by Landlord in lieu of real property taxes pursuant to tax increment financing provided to Landlord by any public agency or authority. Landlord represents and warrants to Tenant that Tenant's Proportionate Share of Real Estate Taxes shall not exceed the amount of Real Estate Taxes that Tenant would otherwise have paid hereunder if Landlord had not received such tax increment financing.

(ii)    Landlord and Tenant recognize and acknowledge that there may be changes in the current real property tax system and that there may be imposed new forms of taxes, assessments, charges, levies or fees, or there may be an increase in certain existing taxes, assessments, charges, levies or fees placed on, or levied in connection with, the ownership, leasing, occupancy or operation of the Shopping Center or the Premises, all of which shall be included within the definition of Real Estate Taxes. For purposes of funding special assessment districts of the type funded by real property taxes, such funding shall also be included within the meaning of Real Estate Taxes. With respect to any general or special assessments which may be levied against or upon the Premises or the Shopping Center and which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in periodic installments, there shall be included within the meaning of Real Estate Taxes with respect to any tax fiscal year, only the amount currently payable on such bond for such tax fiscal year, or the periodic installment for such tax fiscal year.

In addition to Real Estate Taxes, should any governmental taxing authority acting under any present or future law, ordinance, or regulation, levy, assess, or impose any business, occupancy, privilege or excise tax or any tax and/or assessments imposed upon the Rents payable by Tenant to Landlord (other than an income or franchise tax upon Landlord's net income), either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, Tenant shall be responsible for and shall pay such taxes and/or assessments directly to the appropriate taxing authority, or Tenant shall reimburse

15

Temecula Towne Center Associates L.P. – The Promenade in Temecula – Administrative Exp. – 000022

Landlord for the amount thereof, as the case may be, upon receipt of an invoice therefor from Landlord.

(b)    The Premises, its leasehold improvements and the underlying realty will not be separately assessed for tax purposes but instead will be assessed as part of a larger parcel or parcels of land and improvements comprising the Shopping Center. Accordingly, Tenant agrees to pay its Proportionate Share (as defined in Section 1.1 [h]) of said Real Estate Taxes, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of said Real Estate Taxes as estimated by Landlord for the applicable fiscal year. Tenant's Proportionate Share hereunder for any partial fiscal year shall be prorated on a per diem basis.

To the extent that the Shopping Center consists of more than one tax parcel, including, but not limited to, separate tax parcels for one or more of the Major Tenants, the following shall apply:

(x)    Landlord shall have the right and option to compute Tenant's Proportionate Share of Real Estate Taxes based on the building area of the particular tax parcel on which the Premises is located.

(y)    In the event that a separate bill for Real Estate Taxes is rendered by the taxing authority with respect to the building, land and improvements owned or leased by a Major Tenant, then Real Estate Taxes shall be deemed to exclude taxes and assessments attributable to such Major Tenant and the floor area of such Major Tenant shall be correspondingly excluded from the denominator of Tenant's Proportionate Share.

(z)    In the event that any Major Tenant's building, land and improvements are separately assessed for purposes of Real Estate Taxes but no separate tax bill is rendered with respect to such Major Tenant, or in the event that any Major Tenant's building, land and improvements are not separately assessed for purposes of Real Estate Taxes but are included as part of other building, land and improvements in the Shopping Center, then to the extent, if any, that any such Major Tenant contribute(s) towards Real Estate Taxes attributable to the Shopping Center, Real Estate Taxes shall be reduced by the amount of any such Major Tenant's contribution(s) and the floor area of any such contributing Major Tenant shall be excluded from the denominator of Tenant's Proportionate Share.

(c)    Within one hundred twenty (120) days following the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Real Estate Taxes applicable to the Shopping Center and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Real Estate Taxes due for such fiscal year, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

Section 11.5 - Utility and Insurance Costs.

(a)    Tenant shall pay to Landlord its Proportionate Share (as defined in Section 1.1 [h]) of the costs for utilities serving the interior and exterior Common Areas, including, but not limited to, electric, telephone, gas, water and heating, ventilating and air-conditioning. Tenant shall also pay to Landlord its Proportionate Share of the costs of customary types of insurance coverage carried with respect to the Shopping Center, including, but not limited to, commercial general liability insurance, rent insurance and property insurance in commercially reasonable amounts as Landlord deems necessary (such utility costs and insurance costs are collectively "Utility and Insurance Costs").

(b)    Tenant's Proportionate Share of Utility and Insurance Costs shall be paid by Tenant, in equal monthly installments, in advance, on the first day of each calendar month throughout the Term of this Lease in an amount equal to one-twelfth (1/12th) of Tenant's Proportionate Share of Utility and Insurance Costs as estimated by Landlord for each fiscal

16

year. Tenant's Proportionate Share of Utility and Insurance Costs hereunder for any partial fiscal year shall be prorated on a per diem basis.

(c)    Within one hundred twenty (120) days after the end of each fiscal year, Landlord shall furnish Tenant with a written statement in reasonable detail of the actual amount of Utility and Insurance Costs and the amount of Tenant's Proportionate Share thereof for the preceding fiscal year. If the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs due for such applicable fiscal year exceeds the aggregate of Tenant's monthly payments for said fiscal year, Tenant shall pay to Landlord such deficiency within fifteen (15) days after receipt of said statement from Landlord. If Tenant's aggregate monthly payments exceed the actual amount of Tenant's Proportionate Share of Utility and Insurance Costs, such surplus paid by Tenant shall be credited against the next ensuing installment(s) of Rents as Landlord deems appropriate until such surplus is exhausted. Failure of Landlord to provide the statement called for hereunder within the time prescribed herein shall not relieve Tenant of its obligations hereunder. The obligation of Landlord and Tenant to make the foregoing adjustment shall survive the expiration or earlier termination of this Lease.

## ARTICLE XII

## PREMISES UTILITY SERVICES

### Section 12.1 - Utility Service Charges.

As part of the Rents provided for by this Lease, Tenant agrees to pay to Landlord, as hereinafter provided, the following utility service charges:

(a)    Water and Sewer Services. Landlord shall make available water and sewer services to the Premises in the sizes and capacities as more specifically set forth in Exhibit C. Landlord shall have the option, exercisable by Landlord in its sole discretion, to (i) arrange with the local water and sewer utility company to furnish and supply water and sewer services to the Premises on a direct-metered basis; or (ii) furnish and supply water and sewer services to the Premises on a sub-metered basis, in which event Tenant agrees to purchase same from Landlord and shall pay Landlord for such services as part of Rents, on the first day of each month, in advance (prorated for partial months), commencing on the Rent Commencement Date, as herein defined. If Landlord elects to furnish water and sewer services to the Premises, charges for such services shall be billed to Tenant monthly based on submetered readings, adjusted quarterly. Tenant's cost hereunder shall not exceed that which would be charged to Tenant from time to time by the utility company which would otherwise furnish water and sewer services to the Premises and metered same directly thereto.

(b)    Telephone Service. Per Exhibit C, Landlord will provide and/or make available to the Premises the facilities necessary to enable Tenant to obtain telephone service for the Premises. Tenant shall arrange for telephone service directly with the appropriate company supplying same to the Shopping Center at Tenant's sole cost and expense and shall pay all charges therefor directly to the providing company.

(c)    Gas Service. To the extent such service may be necessary for the conduct of Tenant's business in the Premises, and to the further extent that it is feasible to run such service from the nearest available gas service point to the Premises, Tenant shall, at Tenant's sole cost and expense, but subject to Landlord's prior approval, arrange for such gas service with the utility company supplying same to the Shopping Center, including, but not limited to, any piping from such service point and metering related thereto. Tenant shall pay all charges therefor directly to the providing company.

(d)    Electricity Service. Landlord has advised Tenant of the utility company which will provide or is presently providing electricity service to the Shopping Center ("ESP"). Tenant shall arrange with such ESP to furnish and supply Tenant's electricity service requirements directly to Tenant on a direct-metered basis and Tenant shall pay all charges therefor directly to the ESP. In the event that Tenant wishes to utilize services of an alternative electric service provider ("ASP") rather than the ESP servicing the Shopping Center as of the date of Tenant's execution of this Lease, no such ASP shall be permitted to provide service to Tenant or to install its lines or other equipment within the Shopping Center without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Unless all of the following conditions are met to Landlord's reasonable satisfaction in a written agreement between the ASP and Tenant or by any other means reasonably acceptable to Landlord, it shall be reasonable for Landlord to refuse its consent:

17

(i)   Landlord shall incur no expenses whatsoever with respect to any aspect of ASP's provision of its services, including, without limitation, the cost of installation, service and materials;

(ii)   Prior to commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall supply Landlord with verification that, in Landlord's sole judgment, ASP is (a) properly insured, and (b) financially capable of covering any uninsured damages;

(iii)   Prior to the commencement of any work in or about the Premises and/or Shopping Center by the ASP, the ASP shall agree, in writing, to abide by such rules and regulations, including job site rules, and such other requirements as reasonably determined by Landlord to be necessary to protect the interest of the Shopping Center;

(iv)   Landlord reasonably determines that there is sufficient space in the Shopping Center for the placement of all of ASP's equipment and materials, including, without limitation, the electricity risers;

(v)   ASP is, in Landlord's sole judgment, licensed and reputable as shown in documents acceptable to Landlord;

(vi)   ASP agrees, in a license agreement signed by Landlord and ASP, to compensate Landlord the amount determined by Landlord for (a) space used in the Shopping Center for the storage and maintenance of ASP's equipment ("ASP's Space"), and (b) all costs that may be incurred by Landlord in arranging for access by ASP's personnel, security for ASP's equipment, and any other such costs as Landlord may incur;

(vii)   ASP agrees that Landlord shall have the right to supervise ASP's performance of any work on or about the Shopping Center, including, without limitation, any installations or repairs; and

(viii)   ASP agrees that Landlord shall have the right to enter ASP's Space at any time in the event of an emergency and at all reasonable times and upon reasonable notice for the purpose of (a) inspecting same, (b) making repairs to ASP's Space and performing work therein as may be necessary, in Landlord's judgment, or (c) exhibiting ASP's Space for purposes of the sale or financing of the Shopping Center.

(e)   Heating, Ventilating and Air-Conditioning ("HVAC").

Tenant is to provide its own equipment and facilities for heating, ventilating and air-conditioning the Premises ("Premises HVAC System") described in Exhibit C.  Tenant shall operate and maintain same during the Term of this Lease and such equipment shall belong to Landlord at the expiration or earlier termination of this Lease.

Section 12.2 - Discontinuance of Service.

Landlord reserves the right, with thirty (30) days prior written notice to Tenant, to disconnect or discontinue water, electricity, air conditioning, heating, ventilating or any other utility service without liability to Tenant whenever and during any period in which bills for same remain unpaid by Tenant.  Any such action by Landlord shall not be construed by Tenant or any other party interpreting this Lease as a constructive eviction or disturbance of possession of Tenant or an election by Landlord to terminate this Lease on account of such non-payment.  If any such utility service is discontinued or disconnected by Landlord pursuant to the foregoing, any reconnection of such utility service shall be at Tenant's sole cost and expense.

Section 12.3 - Interruption of Service.

Landlord shall not be liable or responsible for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, disruption, or defect in the supply or character of any utility service furnished to the Premises, or if the quantity or character of any utility service is no longer available or suitable for Tenant's requirements, and no such change, failure, disruption, or defect shall constitute a constructive eviction or disturbance of possession of Tenant or entitle Tenant to any abatement or diminution of Rents or relieve Tenant of any of its obligations under this Lease.

18

Section 12.4 - Premises Sprinkler System.

In the event applicable codes require fire sprinkler protection, Landlord shall provide a sprinkler connection for the Premises to Landlord's bulk main designated in Landlord's drawings. Tenant shall design and install all extensions and facilities to and within the Premises from Landlord's connection.

If, at any time during the Term of this Lease, applicable codes or governing authorities require fire sprinkler protection for the Premises, or a modification to the existing protection, and Landlord has provided a connection to the Premises as provided above, Tenant shall, at Tenant's expense, install, extend to the Premises, and/or modify or revise within the Premises, the sprinkler system to include cross mains, branch lines, drops, head facilities for proper drainage and any necessary test valves, orifices or other fire protection equipment as may be required for the Premises, all of which shall comply with Landlord's fire and casualty insurer, all applicable codes and ordinances, the National Fire Protection Association ("NFPA") No. 13 for ordinary hazard occupancies, the applicable Insurance Service Bureau, and Landlord's drawings, whichever is more stringent. Tenant's system shall be separate from other tenant systems via a separate connection to Landlord's bulk main and shall be water tested at a pressure of two hundred (200) psi for a period of two (2) hours in the presence of Landlord's representative.

## ARTICLE XIII

## SIGNS

Section 13.1 – Storefront Sign.

Tenant shall only erect such storefront sign(s) that have been previously approved in writing by Landlord in accordance with Exhibit C and Applicable Laws, including obtaining all permits and licenses for same, and Tenant shall maintain said storefront sign(s) in good condition and repair. Tenant shall not exhibit or affix any other type of sign, decal, advertisement, notice or other writing, awning, antenna or other projection to the roof or the outside walls or windows of the Premises or the building of which the Premises is a part without Landlord's written consent.

Section 13.2 - Interior Signs and Advertising.

Tenant agrees that no advertising material of any kind, except temporary price tags related to merchandise on display in the Premises, shall be placed within four feet (4') of any customer door or lease line of the Premises or on the surface of any display window(s) or customer door of the Premises. All window display advertising material and interior signs shall be in keeping with the character and standards of the Shopping Center as determined by Landlord and as more specifically described in Exhibit C, and Landlord reserves the right to require Tenant to correct any nonconformity. Any such display(s) and sign(s) shall only be related to merchandising of goods from the Premises.

## ARTICLE XIV

## REPAIRS AND ALTERATIONS

Section 14.1 - Repairs by Landlord.

(a)     Landlord shall keep the roof, structural portions, the exterior of the Premises, parking facilities and other Common Areas, and utility systems not exclusively serving the Premises in good and tenantable condition and repair during the Term of this Lease, subject to the provisions of Section 11.3 herein; provided, however, that if the need for any such repair(s) is attributable to, or results from the operation or acts of, Tenant or its agents, or is Tenant's responsibility pursuant to the terms of this Lease, then in such event, Tenant does hereby agree to, and shall reimburse Landlord for, all costs and expenses incurred by Landlord with respect to such repairs.

(b)     As used in this Article XIV, the phrase "structural portions" and "exterior of the Premises" shall not be deemed to include the Premises storefront(s), plate glass, window case(s), window frame(s), door(s), door frame(s) or any alterations to the Premises required to comply with Applicable Laws. It is expressly understood and agreed that Landlord shall be under no obligation to make any repairs, alterations, replacements or improvements to or upon the Premises resulting from compliance with the ADA.

19

Temecula Towne Center - Motion for Administrative Expenses 000103

(c)    Landlord shall not in any way be liable to Tenant for failure to make repairs as herein specifically required of Landlord unless (i) Tenant has previously notified Landlord in writing of the need for such repairs; (ii) Landlord has failed to commence said repairs within a reasonable period of time following receipt of Tenant's written notification; and (iii) Landlord has not thereafter diligently pursued said repairs to completion.

Section 14.2 - Repairs By Tenant.

It shall be Tenant's sole responsibility, at its own expense, to keep and maintain its storefront(s) and the interior of the Premises in good condition and repair at all times. All repairs to the Premises, equipment or facilities therein or thereabout, other than those repairs required to be made by Landlord pursuant to Section 14.1, shall be made by Tenant. Said repairs shall include, but not be limited to, all necessary painting and decorating, maintenance, repair and/or replacement of the electrical, plumbing, sewer and heating, ventilating and air-conditioning systems above and under the slab and elsewhere which exclusively serve the Premises, and any other mechanical and operational installations exclusively serving the Premises. All such repairs and replacements shall be made in a prompt manner so as to avoid creating additional damage and shall be in quality and class equal to the original construction.

Notwithstanding anything contained herein, Tenant shall, at Tenant's sole cost, repair or replace all glass contained in the Premises, including, but not limited to, all glass in doors, storefronts, windows and entrance and service doors.

Section 14.3 - Alterations and Remodeling.

(a)    Tenant, at its own expense, shall have the right to make such interior alterations, changes and improvements to the Premises as Tenant may deem reasonably necessary for its use of the Premises; provided, however, that any major remodeling of the interior of the Premises in excess of Ten Dollars ($10.00) per square foot of Premises GLA, and any material or structural alterations to the Premises or changes in the electrical, heating, plumbing or ventilating and air-conditioning systems thereof, or to any fire sprinklers, shall not be made without Landlord's prior written consent. Landlord's approval of Tenant's alterations shall, however, create no responsibility or liability on the part of Landlord for their completeness, design sufficiency or compliance with Applicable Laws as it is Tenant's responsibility to have such plans and specifications prepared in accordance with Applicable Laws. All such alterations, changes and improvements shall be made in accordance with the provisions of Exhibit C and shall become the property of Landlord upon installation and shall remain upon and be surrendered with the Premises upon the expiration or earlier termination of this Lease.

(b)    Tenant further agrees not to make any alterations, additions or changes to any storefront sign, exterior wall or roof of the Premises, nor shall Tenant erect any mezzanines or increase the size of same if existing unless and until the prior written consent of Landlord shall first have been obtained. In no event shall Tenant make or cause to be made any penetration through the roof or floor slab of the Premises without the prior written consent of Landlord. Tenant shall be directly responsible for any and all damages resulting from any violation of the provisions of this Section 14.3.


### ARTICLE XV

### LIENS

Section 15.1 - Lien Indemnification by Tenant.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the specific performance of any labor or the furnishing of any materials or equipment for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises or the Shopping Center.

Tenant shall allow no liens to be filed against the Premises or the Shopping Center as a result of work performed at the request or on behalf of Tenant. Tenant shall indemnify and save harmless Landlord against all loss, liability, costs, attorney fees, damages and interest charges incurred as a result of any mechanic's lien or any other claim filed against the Shopping Center,

20

Temecula Towne Center Associates L.P. - The Promenade in Temecula - Administrative Exp. - 000027

Temecula Towne Center - Motion for Administrative Expenses 000104

the Premises, or Tenant's leasehold estate therein as a result of acts or omissions of Tenant or its agents, contractors and employees.

If any lien or notice of lien on account of an alleged debt of Tenant or any other claim is filed against the Premises or any part of the Shopping Center, Tenant shall, within thirty (30) days of the filing thereof, cause the same to be discharged of record by payment, deposit, bond or other security acceptable to Landlord. Tenant shall have the right at all times and at its own expense to contest and defend on behalf of Tenant or Landlord any action involving the collection, validity or removal of any such lien upon giving adequate security to Landlord for discharge of such lien.

## ARTICLE XVI

## INDEMNITY AND INSURANCE

Section 16.1 - Indemnification.

(a)    Tenant shall defend, indemnify and save Landlord harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees), in connection with loss of life, bodily or personal injury or property damage arising from or out of the acts, failures, omissions or negligence of Tenant, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Landlord, its respective agents, contractors or employees.

(b)    Landlord shall indemnify and save Tenant harmless from any legal action, damages, loss, liability and any other expense (including reasonable attorney fees) in connection with the loss of life, bodily or personal injury or property damage, arising from or out of the acts, failures, omissions or negligence of Landlord, its agents, employees or contractors which occur in the Premises, Common Areas or other parts of the Shopping Center, unless such legal action, damages, loss, liability or other expense (including reasonable attorney fees) results from any sole act, omission or negligence of Tenant, its respective agents, contractors or employees.

Section 16.2 - Tenant's Insurance Requirements.

Tenant covenants and agrees that from and after the date that Landlord delivers possession of the Premises to Tenant, and continuing throughout the Term of this Lease or any renewal thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, naming both Tenant and Landlord as insureds, in the following amounts:

(a)    Commercial General Liability Insurance.    Tenant shall at all times keep and maintain in full force and effect commercial general liability insurance, which shall include broad form property damage liability coverage, extended bodily injury coverage, advertising injury liability coverage, contractual liability coverage and independent contractors coverage, in an amount not less than Three Million Dollars ($3,000,000.00), adjusted annually for inflation, written on a combined single limit per occurrence basis for property damage, personal injury and bodily injury or death of one or more persons.

(b)    Worker's Compensation Insurance.    Tenant shall procure worker's compensation insurance as required by law, including employer's liability insurance (stop-gap), in an amount not less than One Million Dollars ($1,000,000.00).

(c)    Personal Property, Alterations, Improvements and Betterments.    Tenant shall at all times maintain in full force and effect special form insurance, including coverage for sprinkler damage, vandalism, and malicious mischief covering all of Tenant's personal property and alterations, improvements and betterments to the Premises, including plate glass, now existing or later added, to the extent of full replacement cost as updated from time to time during the Term of this Lease. Tenant shall also procure business interruption insurance (loss of rents) for a period of not less than twelve (12) calendar months per occurrence.

The proceeds of Tenant's insurance, to the extent of the cost of any damage or loss to the Premises, shall be used for the repair and replacement of the property damaged or destroyed. If Tenant fails to commence, within thirty (30) days of availability of such insurance proceeds, and to diligently proceed to reconstruct or repair its portion of the damaged or destroyed Premises to its former condition prior to said casualty, then in such event, Landlord shall have the right to make all necessary repairs. If the insurance proceeds described above

21

are not sufficient to cover said repairs, Tenant shall be liable for all additional costs in excess of such available insurance proceeds. However, it is expressly understood and agreed that Landlord shall be under no obligation to insure, reinstall, repair or replace any such alterations, additions, improvements or betterments. This paragraph is only applicable if the Lease is not terminated pursuant to Article XXI hereof.

(d)   **Additional Hazards.**  Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by special form coverage. In addition, Tenant shall use best efforts not to keep, use or offer for sale in or upon the Premises any article which may increase the premiums for special form insurance coverage. In the event of an increase in special form insurance coverage pursuant to the above, Tenant agrees to pay such increase in premium resulting from the keeping, use, sale or offering for sale of any such prohibited articles that may be charged during the Term of this Lease for the amount of any insurance which may be carried by Landlord on the Shopping Center. Said additional premiums shall be payable by Tenant to Landlord within ten (10) days following written notice from Landlord.

(e)   **Blanket Policies.**  Tenant may maintain any of its required insurance coverages under blanket policies of insurance covering the Premises and other property, provided that the minimum limits required herein are provided under such policies.

(f)   **Certificate(s) of Insurance.**  Tenant agrees to provide to Landlord certificate(s) of insurance with respect to the above-mentioned policies prior to occupancy and at least annually thereafter. The coverage evidenced by such certificate(s) of insurance will be with insurance company(s) acceptable to Landlord, licensed to do business in the state where the Shopping Center is located, and rated at least A/X in the most current edition of Best's Insurance Report. All such certificate(s) of insurance must provide that the required insurance coverage will be for a period of not less than one (1) year and must further provide that Landlord be given written notice at least thirty (30) days prior to any material alteration, expiration, cancellation, non-renewal or replacement of such existing insurance coverage. Should Tenant fail to furnish any such notice or certificate(s) of insurance as provided hereunder, Landlord may obtain such insurance on behalf of Tenant and the premiums of same shall be deemed to be part of the Rents payable by Tenant to Landlord and Tenant shall reimburse Landlord for same within ten (10) days following Tenant's receipt of an invoice therefor from Landlord.

(g)   **Notice of Loss.**  Tenant shall promptly notify Landlord forthwith in the event of any damage to property or injury to person(s) occurring on the Premises from fire, water, or any other casualty, and further shall take immediate action to mitigate further damage.

**Section 16.3 – Waiver of Subrogation.**

Notwithstanding anything to the contrary contained elsewhere in this Lease, or prohibited by law, neither Landlord nor Tenant shall be liable to the other party or to any insurance company insuring the other party by way of subrogated rights or otherwise, for any loss or damage caused by fire or any other hazard or peril covered by fire and extended coverage or special form insurance coverage, to the extent such loss or damage is covered by insurance to any building structure or other tangible property, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such party, its agents or employees.

**Section 16.4 – Landlord Not Responsible for Acts of Others.**

Landlord shall not be responsible or liable to Tenant, or those claiming by, through or under Tenant, for any loss or damage to person(s) or property resulting from the acts or omissions of persons occupying space adjoining or adjacent to the Premises or connected to the Premises or any other part of the Shopping Center caused by, but not limited to, events such as the breaking or falling of electrical cables or wires, or the breaking, bursting, stoppage or leaking of water, gas, sewer or steam pipes or loss of HVAC. None of the above events shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rents, or relieve Tenant from any of its obligations under this Lease.

22

## ARTICLE XVII

### GENERAL PROVISIONS .

**Section 17.1 - Rules and Regulations.**

Landlord reserves the right, at any time and from time to time, to impose reasonable rules and regulations for the general welfare of the Shopping Center governing the conduct of tenants and the use thereof of the Common Areas for, without limitation, the avoidance of nuisance, and the maintenance of a good reputation, safety, order and cleanliness of the Premises and Shopping Center. Tenant agrees to comply with such rules and regulations imposed by Landlord as if same had existed and been attached hereto at the time of execution of this Lease.

**Section 17.2 - Rubbish.**

Tenant agrees to maintain the Premises, at its expense, free and clear of all rubbish, garbage and trash in containers permitted and/or required by Landlord. Tenant, at its own expense, shall dispose of all said rubbish, garbage and trash as directed by Landlord. In the event Tenant requires the services of a trash compactor, Tenant shall arrange for and coordinate said services through Landlord's Shopping Center manager. If Tenant is required to use the Shopping Center's trash compactor services, the charge for such services shall be competitive with the prevailing market rate for same.

**Section 17.3 - Lighting.**

Tenant agrees to keep the windows of the Premises properly displayed and the Premises signs and external lights, where specifically permitted, properly illuminated during the hours established by the rules and regulations of Landlord for the Shopping Center.

**Section 17.4 - Merchandise Display, Loading and Unloading.**

Tenant agrees not to display goods or merchandise outside the Premises, and to load, unload and/or deliver goods and merchandise only at such times and in such areas and through such entrances as shall be designated by Landlord.

**Section 17.5 - Obstruction of Passageways.**

Tenant agrees not to obstruct any passageways, driveways, approachways, walks, roadways, exits or entrances in, to, from or through the Common Areas or any other portion of the Shopping Center.

**Section 17.6 - Employee Parking.**

Tenant and its employees shall park their vehicles in areas designated for such purpose by Landlord. Tenant shall furnish Landlord with state automobile license numbers assigned to vehicles used by Tenant's employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord of any changes within five (5) days after such changes occur. If Tenant or its employees shall fail to park their vehicles in such designated parking areas, then, without limiting any other remedy which Landlord may pursue in the event of Tenant's Default hereunder, Landlord, after giving notice to Tenant, shall have the right to charge Tenant, as a part of Rents, the sum of Ten Dollars ($10.00) per day for each vehicle parked in violation of the provisions of this Section 17.6. Tenant agrees to notify its employees in writing of the provisions of this Section 17.6.

## ARTICLE XVIII

### SUBORDINATION AND ATTORNMENT BY TENANT

**Section 18.1 - Subordination of Lease.**

This Lease and the estate of Tenant hereunder shall be subject and subordinate to any ground lease, deed of trust, mortgage lien or charge ("Mortgage") and any reciprocal easement agreement or other operating agreement or easement ("REA") which may now encumber or which at any time hereafter may encumber all or any portion of the Shopping Center (such

23

Mortgage and REA and any replacement, renewal, modification, consolidation or extension thereof is collectively "Encumbrance"). Any Encumbrance shall be prior and paramount to this Lease and to the right of Tenant hereunder and all persons claiming through and under Tenant, or otherwise, in the Premises. Tenant's acknowledgement and agreement of subordination provided for in this Section 18.1 shall be self-operative, and no further instrument of subordination shall be required. However, Tenant covenants and agrees that, from time to time and at the request of Landlord or at the request of the holder of any Encumbrance, it will execute and deliver any instruments or certificates reasonably necessary to subordinate the Lease to such Encumbrance(s) or acknowledge or confirm the priority of any Encumbrance over this Lease or to evidence Tenant's consent to an Encumbrance; the instrument subordinating the Lease to any Mortgage shall be in the lender's customary form. Notwithstanding the foregoing, any holder of an Encumbrance may elect that this Lease shall have priority over such Encumbrance, and upon notification of such election by the holder of such Encumbrance, this Lease shall be deemed to have priority over such Encumbrance, whether this Lease is dated prior to or subsequent to the date of such Encumbrance.

**Section 18.2 - Attornment by Tenant.**

Tenant agrees that if the holder of any Encumbrance or any person claiming under said Encumbrance shall succeed to the interest of Landlord in this Lease, or in the event any ground lease is terminated, Tenant shall recognize and attorn to the successor holder as Landlord under the terms of this Lease. Tenant agrees that it will, upon the request of Landlord, execute, acknowledge and deliver any and all instruments necessary or desirable to give effect or notice of such attornment and failure of Tenant to execute any such document or instrument on demand shall constitute a Default by Tenant under the terms of this Lease. In the event of any action for the foreclosure of the Mortgage, or in the event of the termination or expiration of any ground lease, this Lease shall not terminate or be terminable by Tenant hereunder by reason of such foreclosure or termination of any such ground lease unless Tenant is specifically named and joined in any such action and unless a judgment is obtained therein against Tenant.

**Section 18.3 - Landlord as Attorney-in-Fact for Tenant.**

If Tenant, within twenty (20) days after submission of any instrument, fails to execute same, Landlord is hereby authorized to execute same as attorney-in-fact for Tenant.

## ARTICLE XIX

### RIGHTS OF LANDLORD

**Section 19.1 - Landlord's Right to Repair.**

Landlord, or its authorized agent(s), after reasonable prior written notice to Tenant, may go upon and inspect the Premises or any portion of the Shopping Center, and if Tenant has failed to commence any repairs required to be made by Tenant pursuant to the terms of this Lease within ten (10) days following receipt of written notice from Landlord, Landlord may, at its option, cause such repairs to be performed which are Tenant's obligation to perform and which Tenant has failed to do. Said work performed by Landlord shall be chargeable to Tenant and shall be due and payable to Landlord within ten (10) days following receipt of Landlord's billing.

**Section 19.2 - Landlord's Right to Affix to Exterior.**

Landlord shall have the right to install or place upon, or affix to, the roof and exterior wall(s) of the Premises, mechanical, electrical or other equipment, non-competitive signs, displays, antennas, satellite dishes, and any other objects or structures, provided same shall not materially impair the structural integrity of the building or interfere with Tenant's occupancy.

**Section 19.3 - Landlord's Right to Make Payments on Behalf of Tenant.**

Landlord shall have the right, but not the obligation, to make payments on behalf of Tenant where Tenant is in Default thereof under the terms of this Lease. Said payments by Landlord shall be considered part of Rents and shall be due and payable by Tenant within ten (10) days following Tenant's receipt of Landlord's billing therefor.

Temecula Towne Center Associates L.P. - The Promenade in Temecula - Administrative Exp. - 000031

Temecula Towne Center - Motion for Administrative Expenses 000108

## ARTICLE XX

### ASSIGNMENT AND SUBLETTING

**Section 20.1 - Landlord's Consent Required.**

(a)   Landlord has entered into this Lease with Tenant in order to obtain the benefit for the Shopping Center of the unique attraction of Tenant's trade name set forth in Article I and of the unique merchandising mix and product line associated with the business operated by Tenant under such trade name. In entering into this Lease, Landlord has specifically relied on the identity and special skill of Tenant in its ability to conduct the business identified in Article I. Accordingly, Tenant shall not mortgage, pledge, encumber, franchise, assign or in any other manner transfer this Lease, voluntarily or involuntarily, by operation of law or otherwise, nor sublet all or any part of the Premises for the conduct of any business by a third person or business entity, or for any purpose other than expressly authorized herein without Landlord's prior written consent.

(b)   Any consent by Landlord to any assignment or subletting of the Premises, or other operation by a concessionaire or licensee, shall not constitute a waiver of the necessity for such consent under any subsequent assignment or subletting or operation by a concessionaire or licensee.

(c)   Reference anywhere else in this Lease to any assignee or subtenant shall not be considered as a consent by Landlord to such assignment or subletting nor as a waiver against same, except if specifically permitted otherwise in this Article XX.

**Section 20.2 - Insolvency Proceedings.**

In the event an assignment of the Premises is caused by operation of law due to Tenant's voluntary or involuntary insolvency proceedings under the Bankruptcy Reform Act of 1978, as amended, said assignment shall be subject to any and all conditions contained in Section 365 of said act or any other section pertaining to the termination, assumption, assignment or rejection of executory contracts for leases.

**Section 20.3 - Transfer of Corporate Shares.**

In the event Tenant is a "closely-held" corporation (meaning a corporation which is not listed on a national securities exchange as defined in the Securities Exchange Act of 1934, as amended), a change in the "control" of Tenant ("control" meaning the ownership or control of more than fifty percent [50%] of Tenant's stock) without Landlord's prior written consent shall constitute an assignment in violation of this Lease, and Landlord shall, at Landlord's election, be entitled to deem Tenant in Default under this Lease.

**Section 20.4 - Assignment to Related Entity.**

Notwithstanding the foregoing provisions, Tenant shall have the right to assign or otherwise transfer this Lease or to sublet the Premises to any (x) parent corporation of Tenant; or (y) wholly owned subsidiary of Tenant; or (z) corporation which is wholly owned by the same corporation which wholly owns Tenant; provided, however, that in any of such events (i) Tenant shall remain primarily liable for all obligations under this Lease; (ii) the transferee shall, prior to the effective date of the transfer, deliver to Landlord instruments, in written form acceptable to Landlord, evidencing such transfer and its agreement to assume and be bound by all terms, conditions and covenants of this Lease to be performed by Tenant; (iii) Tenant shall not be in Default under any provisions of this Lease; and (iv) Tenant's right to make such transfer is expressly conditioned on and shall remain in effect only as long as the transferee maintains its relationship as a parent corporation or wholly owned subsidiary of Tenant or wholly owned subsidiary of Tenant's parent corporation. Any transfer of the stock of such parent or subsidiary transferee shall be deemed a change in the control of Tenant and governed by the provisions of Section 20.3 above, unless such parent corporation or subsidiary transferee is not a closely-held corporation.

**Section 20.5 - Transfer of Other Business Interests.**

If Tenant is a general or limited partnership, or is a limited liability company, or any other type of business entity other than a corporation, and if at any time during the Term hereof, the person(s) who at the time of the execution of this Lease owns the general partners' interest in such limited partnership or owns a controlling partnership interest in such general partnership, or is the managing member of the limited liability company, or a majority shareholder of any

25

other business entity other than a corporation, ceases to own such interest, such cessation of ownership shall constitute an assignment of this Lease (except as a result of transfers by bequests or inheritance).

### Section 20.6 - Acceptance of Rents by Landlord.

If this Lease is assigned, or if the Premises or any part thereof is subleased or occupied by a third party, other than Tenant, with or without Landlord's consent, Landlord may collect from such assignee, subtenant or occupant, any Rents or other charges payable by Tenant under this Lease and apply the amount collected to Rents herein reserved, but such collection by Landlord shall not be deemed a waiver of any provisions of this Lease, nor acceptance of said assignee, subtenant or occupant as a tenant of the Premises.

### Section 20.7 - No Release of Liability.

No assignment of this Lease or subletting of the Premises or any other transfer by Tenant, either with or without Landlord's consent, required or otherwise, during the Term of this Lease shall release Tenant or Guarantor(s) (if any) from any liability under the terms of this Lease nor shall Tenant or Guarantor(s) (if any) be relieved of the obligation of performing any of the terms, covenants and conditions of this Lease.

### Section 20.8 - Administrative Fee.

Tenant shall pay Landlord an administrative fee of One Thousand Dollars ($1,000.00) or such other amount as Landlord shall reasonably determine to be reasonably appropriate in order to compensate Landlord for the time and expense of reviewing, processing and documenting Tenant's request that Landlord consent to any proposed assignment or subletting. Such processing fee shall be paid to Landlord at the time that Tenant requests Landlord's consent hereunder and shall be payable to Landlord whether or not Landlord consents to Tenant's request and whether or not said proposed assignment or subletting actually occurs.

### ARTICLE XXI

### DAMAGE OR DESTRUCTION

### Section 21.1 - Landlord's Obligation to Repair and Reconstruct.

(a)    If the Premises shall be partially damaged by fire or other casualty insurable under standard special form insurance but are not thereby rendered untenantable in any manner, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall not be abated. If by reason of such occurrence, the Premises shall be rendered untenantable only in part, Landlord shall cause the Premises to be repaired, subject to subsections (c) and (d) below, and Rents shall be abated proportionately as to the portion of the Premises rendered untenantable until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(b)    If the Premises shall be rendered wholly untenantable by reason of such occurrence and the remainder of the Term of the Lease is two (2) years or more, Landlord shall cause the Premises to be repaired in accordance with subsection (c) below (subject to reasonable delays occasioned by adjustment of losses with insurance carriers or for any other cause beyond Landlord's control), and Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so repaired has re-opened for business.

(c)    If Landlord is required or elects to repair or reconstruct the Premises under the provisions of this Article XXI, its obligation shall be limited to restoring the Premises to the condition it was in when possession was delivered to Tenant for the commencement of its leasehold improvement work. Tenant, at Tenant's expense, shall promptly perform all repairs and restoration not required to be done by Landlord herein and shall promptly re-fixture and reconstruct the Premises and recommence business in all parts thereof.

(d)    Tenant shall not be entitled to any compensation or damages, other than stated herein, from Landlord for the loss of use of the whole or any part of the Premises or damage to Tenant's personal property or any inconvenience or annoyance occasioned by such damage, repair, reconstruction or restoration.

28

Section 21.2 - Landlord's Option to Terminate.

Landlord may elect to terminate this Lease if (i) the Premises are rendered wholly untenantable or damaged as a result of any cause which is not covered by Landlord's insurance; or (ii) the Premises are damaged or destroyed in whole or in part during the last two (2) years of the Term hereunder; or (iii) the Shopping Center is damaged to the extent of fifty percent (50%) or more of the gross leasable area thereof. In any of the above events, Landlord shall give Tenant notice of its election to terminate the Lease pursuant to the above within ninety (90) days after the occurrence of the applicable event. If such notice is given, the Lease shall terminate as of the date of such notice, and Rents shall be adjusted as of the date of such termination.

Tenant hereby waives any statutory rights of termination which may arise out of partial or total destruction of the Premises which Landlord is obligated to restore.

Section 21.3 - Demolition of Landlord's Building.

If the Shopping Center is so substantially damaged that it is necessary, in Landlord's reasonable judgment, to demolish all or a portion of the Shopping Center, including the Premises, for the purpose of reconstruction, then upon the date such demolition of the Premises commences, Rents shall be abated until the earlier to occur of (i) sixty (60) days after Landlord's restoration work has been substantially completed; or (ii) the date the Premises so restored has re-opened for business.

## ARTICLE XXII

## CONDEMNATION

Section 22.1 - Effect of Taking.

(a)     In the event that the whole or any part of the Premises shall be taken for public or quasi-public use or condemnation under eminent domain, this Lease shall terminate as to the part so taken on the date possession is yielded to the condemning authority.

(b)     In the event that any portion of the Shopping Center or Common Areas is taken, and such taking substantially impairs access to, or the usefulness of, the Premises for the purposes hereinbefore granted to Tenant, either party may terminate the Lease by written notice to the other party given within thirty (30) days prior to the actual physical taking.

(c)     For purposes of this Article XXII, a voluntary sale or conveyance in lieu of condemnation, but under threat of condemnation, shall be deemed an appropriation or taking under the power of eminent domain.

(d)     If this Lease is not terminated as above provided following any of such actual takings, then Landlord shall, at its expense, make all necessary repairs or alterations to the basic building and exterior work so as to constitute the remaining Premises a complete architectural unit and a proportionate allowance shall be made in Rents based on the proportion of the Premises remaining as compared to the original Premises.

Section 22.2 - Compensation and Awards.

All compensation awarded for any taking of the fee and the leasehold, or any part thereof, shall belong to and be the property of Landlord. Tenant hereby assigns to Landlord all right, title and interest of Tenant in and to any award made for leasehold damages and/or diminution in the value of Tenant's leasehold estate. Tenant shall have the right to claim such compensation as may be separately awarded or allocated by reason of the cost or loss to which Tenant might be put in removing Tenant's merchandise, fixtures, leasehold improvements and equipment. Compensation as used in this Section shall mean any award given to Landlord for such taking in excess of, and free and clear of, all prior claims of the holders of any mortgages or other security interests.

Section 22.3 - Condemnation or Breach of Lease.

Any such appropriation or condemnation proceedings shall not operate as, or be deemed an eviction of, Tenant or a breach of Landlord's covenant of quiet enjoyment.

Tenant hereby waives any statutory rights of termination which may arise by reason of any partial taking of the Premises under the power of eminent domain.

27

Temecula Towne Center - Motion for Administrative Expenses 000111

ARTICLE XXIII

DEFAULT

Section 23.1 - Default.

This Lease is made upon the condition that Tenant punctually and faithfully perform all of the covenants and agreements to be performed by Tenant as herein set forth and the occurrence of any of the following shall constitute a breach of this Lease by Tenant ("Default"):

(a)    Any item comprising Rents required to be paid by Tenant remaining in arrears and unpaid for ten (10) calendar days after receipt of written notice thereof from Landlord.

(b)    If Tenant or any related or affiliated entity shall be a party to any other lease(s) with Landlord for space(s) in the Shopping Center, and there shall exist a Default in either this Lease or in any of said other lease(s), such Default shall be deemed a Default under all such leases with Landlord, pursuant to which Landlord may take appropriate action hereunder.

(c)    Subject to Section 365 of the Bankruptcy Reform Act of 1978, as amended, if there is a filing of a petition proposing the adjudication of Tenant or any Guarantor of Tenant's obligations hereunder as bankrupt and/or insolvent or if there is a reorganization of Tenant or Guarantor(s) (if any) or an arrangement by Tenant or Guarantor(s) (if any) with its creditors, whether pursuant to the Federal Bankruptcy Act or any similar federal or state proceeding, and such action is not dismissed within sixty (60) days after the date of filing.

(d)    Any sale of Tenant's interest in the Premises under an attachment, execution or similar legal process or pursuant to an unauthorized assignment of this Lease.

(e)    Any making by Tenant or Guarantor(s) (if any) of an assignment for the benefit of creditors.

(f)    If Tenant shall vacate or abandon the Premises or shall fail to operate its business in accordance with the days and hours required herein, or fails to continuously occupy and conduct Tenant's business in the Premises.

(g)    Any failure by Tenant to remove any lien or notice of lien on account of an alleged debt of Tenant within the time period provided for in Section 15.1

(h)    With the exception of items (a) through (g) above, a failure by Tenant to observe or perform any other covenant, term, condition, provision, rule or regulation of this Lease on the part of Tenant to be kept or performed and such failure shall continue for a period of twenty (20) calendar days or more after written notice thereof given to Tenant by Landlord (excepting any such failure that cannot reasonably be cured within said twenty (20) calendar day period, provided that Tenant, within said twenty (20) calendar day period, has promptly commenced to proceed with diligence and in good faith to remedy such failure).

Section 23.2 - Remedies and Damages.

(a)    If a Default occurs, Landlord may, at its option, and in addition to any and all other rights and remedies provided Landlord in this Lease or at law or in equity, immediately or at any time thereafter and without demand or notice (except as provided herein):

(i)    Apply all or part of the security deposit, if any, to cure such Default, without waiving the Default, and Tenant shall, on demand, restore the security deposit to its original amount; or

(ii)    Apply any overpayment of Rents to curing such Default, without waiving the Default, in lieu of refunding or crediting same to Tenant; or

(iii)    If the Default pertains to work or other obligations (other than the payment of Rents) to be performed by Tenant, without waiving such Default, enter upon the Premises and perform such work or other obligation, or cause such work or other obligation to be performed, for the account of Tenant, and Tenant shall, on demand, pay to Landlord the cost of performing such work or other obligation plus fifteen percent (15%) thereof for Landlord's administrative costs; or

(iv)    Terminate this Lease by written notice to Tenant.

28

(b)     Notwithstanding any termination of this Lease or termination of Tenant's rights to possession, whether by summary proceedings or otherwise, Tenant shall pay and be liable for (on the days originally fixed herein for payment thereof) all Rents as if this Lease had not been terminated, whether the Premises are relet or remain vacant in whole or in part. However, in the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net sum of Rents received by Landlord in such reletting after deduction of all expenses incurred in reletting the Premises and in collecting such Rents.

(c)     In the event of a reletting, Landlord may apply the rent therefrom first to the payment of Landlord's reasonable expenses, including, but not limited to, attorney fees incurred, expenses attributable to reletting, repairs, brokerage fees, subdividing, renovation or alteration of the Premises and then to the payment of Rents and other sums due from Tenant hereunder, and Tenant shall remain liable for any deficiency thereof.

(d)     In computing damages or Rents due under this Lease, the value of Percentage Rent for any period subsequent to the termination of this Lease or the termination of Tenant's right of possession thereof shall be included and shall be an amount per year equal to one-third (1/3) of the total Percentage Rent chargeable to Tenant for the last three (3) full Lease Years immediately preceding such termination, and if less than three (3) full Lease Years shall have elapsed, such value shall be an amount per Lease Year equal to the average yearly Percentage Rent theretofore chargeable to Tenant.

(e)     In the event of a Default by Tenant, Tenant will be liable to Landlord for all court costs and reasonable attorney fees incurred by Landlord in enforcing its rights and remedies under this Lease, including, without limitation, all costs and fees incurred in connection with obtaining possession of the Premises or in the enforcement of any covenant, condition or agreement herein contained, whether through legal proceedings or otherwise and whether or not any such legal proceedings are prosecuted to a final judgment.

Section 23.3 - Remedy for Failure to Open or Operate.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of Percentage Rent anticipated from Tenant and/or occupants of the Shopping Center or for loss of value of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result from any one or more of the events enumerated in Section 23.1 above, Landlord and Tenant each covenant and agree that in the event that Tenant (i) fails to take possession of, construct and thereafter open the Premises for business, fully fixtured, stocked and staffed on the Rent Commencement Date; or (ii) vacates or abandons the Premises; or (iii) ceases to operate Tenant's business within the Premises in full compliance with the use and business hours requirements set forth in Section 8.1 hereof, then, and in any of such events, Landlord shall have the right, at its option, to (a) collect not only the Rents reserved, but also an amount equal to three fourths (3/4ths) of the Rents reserved for the period(s) during which any of the aforementioned events shall continue, prorated on a daily basis for each and every day during such period, such additional amount to constitute liquidated damages for Tenant's breach, which the parties agree represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach; and/or (b) treat such action or omission by Tenant as a Default under the Lease as hereinabove described and to exercise any remedy therefor, whether reserved in this Lease or available at law or in equity.

Section 23.4 - Repeated Default.

(a)     Notwithstanding anything to the contrary set forth in this Lease, if Tenant shall be in Default in the timely payment of any Rents due Landlord from Tenant, or the payment of any other charges due Landlord from Tenant under the terms of this Lease, or in the timely reporting of Gross Revenue as required by Section 11.2 of this Lease, and any such Default shall be repeated two (2) times in any period of twelve (12) consecutive months, then, notwithstanding that such Default shall have been cured within the period after notice as provided in this Lease, any further similar Default within said twelve (12) month period shall be deemed to be a "Repeated Default".

(b)     In the event of a Repeated Default, Landlord may, in addition to any other rights and remedies provided Landlord in this Lease or at law or in equity, and without notice to Tenant and without affording Tenant an opportunity to cure such Repeated Default, terminate this Lease forthwith.

29

Temecula Towne Center Associates L.P. - The Promenade in Temecula - Administrative Exp. - 000038

Section 23.5 - Waiver of Rights of Redemption.

Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future Applicable Laws in the event that Tenant is in the process of being evicted or dispossessed for any cause, or in the event Landlord obtains possession of the Premises by reason of a violation by Tenant of any of the covenants or conditions of this Lease or otherwise.

### ARTICLE XXIV

### COMPETITION

Section 24.1 - Restriction on Tenant.

Tenant agrees that for so long as this Lease shall remain in effect, Tenant, or if Tenant is a corporation, partnership or limited liability company, its partners, officers, managers, members, directors, shareholders or any affiliates, shall not directly or indirectly operate, manage, or have any interest in any business which is similar or in competition with the permitted use of the Premises set forth in Article I ("Competing Store") within a radius of five (5) miles of the perimeter of the Shopping Center ("Restricted Area").

Section 24.2 - Imposition of Damages.

In the event that Tenant shall violate the provisions of Section 24.1 above, Landlord may, at its option, and without limiting Landlord's remedies, effective as of the date such Competing Store opens for business within the Restricted Area: (i) include seventy-five percent (75%) of the gross sales of such Competing Store in the Gross Revenue generated from the Premises for purposes of computing any Percentage Rent due hereunder; or (ii) increase the Fixed Minimum Rent to the average of the annual "effective rent" (i.e., the aggregate of Fixed Minimum and Percentage Rent) payable by Tenant to Landlord during the immediately preceding two (2) Lease Years; or (iii) increase Tenant's Fixed Minimum Rent then in effect, and any future increases thereto, by fifty percent (50%).

### ARTICLE XXV

### NOTICES

Section 25.1 - Notices to Tenant and Landlord.

Any notice or consent required to be given to, by, or on behalf of either party, shall be in writing and shall be given by mailing such notice or consent by registered or certified mail, return receipt requested, or by a nationally recognized overnight courier which provides written evidence of delivery, addressed to Landlord at Landlord's notice address set forth in Article I, and to Tenant at Tenant's notice address set forth in Article I, and either party may, by written notice similarly given, designate a substitute address at any time hereafter. Any such written notice shall be deemed given when mailed as in this Section 25.1 provided, or delivered personally to the parties hereto or to their authorized agents and/or officers. Rejection, refusal, failure to accept, or the inability to deliver any written notice sent hereunder shall be deemed to be receipt of such notice, demand or request.

Section 25.2 - Notices to Mortgagee.

Tenant shall give written notice to Landlord's mortgagee, at Landlord's mortgagee's notice address set forth in Article I, or at such other address as Landlord may, from time to time, designate in writing, of any default by Landlord hereunder which could give rise to Tenant's termination of this Lease or any expenditure of money on behalf of Landlord. Landlord's mortgagee shall also be given an appropriate time to cure such default, including, but not limited to, the opportunity to obtain possession of Landlord's interest, if necessary, to cure the default. Landlord shall notify Tenant of any change in the mortgagee for the Shopping Center.

### ARTICLE XXVI

### MISCELLANEOUS

Section 26.1 - Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than the Rents herein stipulated shall be deemed to be other than on account of the earliest stipulated Rents, nor shall any endorsement or statement on any check or letter accompanying the payment of any Rents

30

be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rents or pursue any other remedy provided for in this Lease or available at law or in equity.

### Section 26.2 - Complete Agreement.

The parties hereto acknowledge that all of the terms and covenants contained herein were reviewed by both parties and/or their legal counsel, and all negotiations, consideration, representations, inducement and understandings between the parties are incorporated herein and may be modified or altered only by agreement, in writing, between the parties. This Lease contains the entire agreement between the parties hereto, and no agent, representative, employee or officer of Landlord has authority to make, or has made, any statement, agreement or representation, either oral or written, in connection herewith, modifying, adding or changing the terms and conditions herein set forth. No present or past dealings or customs between the parties shall be permitted to contradict or modify the terms hereof.

### Section 26.3 - Consents.

Neither Landlord nor Tenant shall unreasonably withhold approval or consent when required from either party under the terms of this Lease (except where otherwise stated herein); provided, however, that Landlord shall not be deemed to have unreasonably withheld such approval or consent if its mortgagee shall refuse to permit Landlord to grant such consent.

### Section 26.4 - Brokerage.

Landlord and Tenant acknowledge that James Kim of American Realty ("Acknowledged Broker") may be entitled to a fee for broker's services rendered in bringing together the parties to this Lease. Landlord shall be responsible for paying the reasonable fee determined to be due and owing the Acknowledged Broker as a result of this transaction. Tenant warrants that it has had no dealings with any broker or agent in connection with the Lease, other than the Acknowledged Broker. In the event Tenant has had any other dealings, Tenant covenants and agrees to pay, hold harmless and indemnify Landlord from and against any and all costs, expenses or liability for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease or negotiation hereof (including, without limitation, the cost of legal fees in connection therewith).

### Section 26.5 - Effective Date of Lease.

Submission of this Lease by Landlord for examination or execution by Tenant does not constitute a reservation of, nor option for, Lease and this instrument shall not become effective as a lease or otherwise until execution by, and delivery to, both Landlord and Tenant. This Lease shall only become effective and binding upon the parties in establishing the relationship of Landlord and Tenant as of the date first written above, but not earlier than the date Landlord executes this Lease.

### Section 26.6 - Estoppel Certificates.

Tenant agrees at any time and from time to time, within fifteen (15) days after receipt of written request from Landlord, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications), the dates to which Rents have been paid pursuant to this Lease, and such other certification concerning the Lease as may be reasonably required by Landlord or Landlord's mortgagee. Tenant further agrees that said statement may be relied upon by any prospective purchaser of the fee or mortgagee or assignee of any mortgage on the fee of the Premises.

### Section 26.7 - Force Majeure.

Landlord and/or Tenant shall be excused for the period of delay in the performance of any of their respective obligations hereunder, except their obligation to pay any sums of money due under the terms of this Lease, and shall not be considered in Default of this Lease when prevented from so performing by cause(s) beyond Landlord's or Tenant's control, including, but not limited to, civil commotion, war, fire or other casualty, governmental regulations, statutes, ordinance, restrictions or decrees, or through acts of God.

31

**Section 26.8 – Interpretation.**

The laws of the State (or Commonwealth) in which the Shopping Center is located shall govern the validity, performance and enforcement of this Lease. If any provision of this Lease shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not be deemed to affect or impair any other provisions hereunder.

**Section 26.9 – Memorandum of Lease.**

This Lease shall not be recorded, but either party may record a Memorandum of Lease describing the Premises herein demised, the Term of this Lease and renewal rights, if any, and referring to this Lease. The party requesting that the Memorandum of Lease be recorded shall prepare and pay all costs of preparation and recording of the Memorandum of Lease and the other party agrees to execute such instruments as may be reasonably required for such recording. Tenant shall execute such documents as Landlord may require, in recordable form, upon the expiration or earlier termination of the Term of this Lease in order to remove the Memorandum of Lease from record.

**Section 26.10 – Quiet Enjoyment.**

Subject to the terms and conditions of this Lease and to any Encumbrances to which this Lease is subordinate pursuant to Section 18.1 herein, Landlord hereby covenants and agrees that if Tenant shall faithfully perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall, at all times during the continuance hereof, have the peaceful and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person(s) lawfully claiming the Premises, save and except in the event of the taking of the Premises by public or quasi-public authority as hereinbefore provided.

**Section 26.11 – Rent Demand.**

Every demand for Rents due wherever and whenever made shall have the same effect as if made at the time it falls due and at the place of payment, and after the service of any notice or commencement of any suit or final judgment therein, Landlord may receive and collect any Rents due, and such collection or receipt shall not operate as a waiver of, nor affect, such notice, suit or judgment.

**Section 26.12 – Section and Title Headings.**

The section and title headings contained herein are for convenience purposes only and do not define, limit, construe or amplify the contents of any such sections.

**Section 26.13 – Successors and Assigns.**

The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

**Section 26.14 – No Waiver by Landlord.**

(a)    Landlord shall have the right at all times to enforce the covenants, conditions and legal rights and remedies of this Lease in strict accordance with the terms hereof, notwithstanding any conduct or custom(s) on the part of Landlord in refraining from so doing at any time(s). No failure by Landlord to insist upon the strict performance of any term or condition of this Lease, and no failure by Landlord to exercise any right or remedy available, legal or equitable, for a breach thereof, and no acceptance by Landlord of full or partial Rents during the continuance of any such breach shall constitute a waiver of any such breach, term, condition or right.

(b)    No term or condition of this Lease required to be performed by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord.

(c)    A waiver by Landlord with respect to any tenant of the Shopping Center shall not constitute a waiver in favor of any other tenant, nor shall the waiver of any breach or condition be claimed if pleaded to excuse a future breach of the same condition or covenant or any other condition, covenant, provision, rule or regulation of this Lease.

32

**Section 26.15 - Exculpation.**

If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and as a consequence of such failure, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon the execution of such judgment and levy thereon against the right, title and interest of Landlord in the Shopping Center and out of rents or other income from the Shopping Center received by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Shopping Center. Neither Landlord nor any partners, beneficiaries, officers, directors, members, joint venturers, shareholders or affiliated entities of Landlord shall be personally liable for any deficiency.

**Section 26.16 - Transfer of Landlord's Interest.**

Landlord shall be liable under this Lease only while owner of the Shopping Center.  If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, and if such purchaser or transferee assumes Landlord's obligations hereunder, then such purchaser or transferee shall be responsible for all covenants and undertakings thereafter accruing to Landlord. Tenant agrees that after such sale or transfer of Landlord's interest, Landlord shall have no liability to Tenant under this Lease or any modification(s), amendment(s), extension(s) or renewal(s) thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser or transferee.

**Section 26.17 - Litigation.**

(a)    Any claim, demand, right or defense of any kind by Tenant which is based upon, or arises in connection with, this Lease or the negotiations thereof prior to execution of same, including, but not limited to, adjustments to Landlord's billings, shall be barred unless Tenant seeks an adjustment, commences an action thereon, or interposes a defense by reason thereof, within six (6) months after the date of such occurrence of the billing, event or action upon which the adjustment, claim, demand, right or defense relates, whichever applies.

(b)    To the extent permitted by law, Landlord and Tenant each hereby waives all right to trial by jury in any claim, action, proceeding or counterclaim by either Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant, or Tenant's use or occupancy of the Premises.

(c)    If either party hereto be made, or becomes a party to, any litigation commenced by or against the other party involving the enforcement of: (i) any Applicable Laws against such other party; or (ii) any rights or remedies of such party hereunder, then in either of such events, the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorney fees incurred by such party in said litigation.

(d)    Any litigation commenced by Landlord or Tenant against the other with respect to any matter arising out of, or in any way connected with, this Lease, the relationship of Landlord and Tenant hereunder, or Tenant's use and occupancy of the Premises, shall be brought only in the courts of the State (or Commonwealth) in which the Premises is located and the parties hereby consent to the jurisdiction of said courts.

**Section 26.18 - Miscellaneous.**

Tenant hereby represents, covenants and warrants to Landlord that: (i) Tenant (which, for the purpose of this certification, includes its partners, members, principal shareholders, except for those who are members of the public who hold Tenant's stock), to the best of its knowledge, is not in violation of any laws, executive orders or regulations relating to terrorism or money laundering, including Executive Order No. 13224 -- Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, effective September 24, 2001 (the "Executive Order") and/or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (Public Law 107 56) (the "USA Patriot Act"), enacted October 26, 2001, as amended, and Tenant has not been designated as a "Specially Designated National and Blocked Person" or other banned or blocked person, entity, nation, or transaction pursuant to the Executive Order, the Patriot Act or any other law, order, rule, or regulation; (ii) Tenant is currently in compliance with and will at all times during the Term of this Lease (including any extension thereof) remain in compliance with the Executive Order, the USA Patriot Act and regulations of the Office of Foreign Assets Control of the United States Department of the

33

Treasury, and any statute, executive order and other governmental action relating thereto; and (iii) Tenant is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

Section 26.19 - Joint and Several Liability.

Since two (2) individuals are signing this Lease as Tenant, the liability of each such individual to pay Rents and to perform all other obligations hereunder shall be deemed to be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written hereinabove.

Signed in the presence of:

LANDLORD:

TEMECULA TOWNE CENTER ASSOCIATES L.P., a California limited partnership

By: F.C. Temecula, Inc., General Partner

By: _____
Duane F. Bishop, Jr., Vice President

TENANT:

_____
SONG H. KIM
Social Security #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

_____
YOUNG A. KIM
Social Security #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

STATE OF OHIO      )
                   )  SS:
COUNTY OF CUYAHOGA )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named TEMECULA TOWNE CENTER ASSOCIATES L.P., a California limited partnership, by F.C. Temecula, Inc., General Partner, by Duane F. Bishop, Jr., its Vice President, who acknowledged that he did sign the foregoing instrument and that the same is his free act and deed and the free act and deed of said partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 3rd day of _August_, 2008.

_____
Notary Public

ELLA MARIE PUGACZ, Notary Public
STATE OF OHIO
My Commission Expires April 3, 2011
(Recorded in Cuyahoga County)

34

STATE OF _____ )
                            )  SS:
COUNTY OF _____ )

BEFORE ME, the undersigned Notary Public in and for said County and State, personally appeared the above named SONG H. KIM and YOUNG A. KIM, husband and wife, who acknowledged that they did sign the foregoing instrument and that the same is their free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _____ day of _____, 2006.

_____
Notary Public

This Instrument Prepared By:
Deborah J. Metzger
Terminal Tower
50 Public Square, Suite 1360
Cleveland, Ohio 44113-2267
(216) 621-6050

35



PROMENADE IN TEMECULA
SITE PLAN

THE PROMENADE MALL
TEMECULA, CALIFORNIA
FOREST CITY TENANT COORDINATION/CONSTRUCTION

Temecula Towne Center Associates L.P. - The Promenade In Temecula - Administrative Exp. - 000043



**EXHIBIT B**

**EXHIBIT C**

**TENANT HANDBOOK**

[TO BE FORWARDED UNDER SEPARATE COVER]

# EXHIBIT "3"

1  TIMOTHY J. YOO (SBN 155531)
2  JULIET Y. OH (SBN 211414)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234; Facsimile: (310) 229-1244
   Email: tjy@lnbyb.com, jyo@lnbyb.com
5
6  Attorneys for Chapter 11 Debtor and
   Debtor in Possession
7

**FILED & ENTERED**

**JAN 24 2017**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY may          DEPUTY CLERK

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                **LOS ANGELES DIVISION**

11

12

13  In re                              ) Case No. 2:16-bk-23836-SK
                                       )
14  BLUE BEE, INC.,                    )
                                       ) Chapter 11
15              Debtor.                )
                                       ) **ORDER GRANTING MOTION FOR**
16                                     ) **ENTRY OF AN ORDER AUTHORIZING**
                                       ) **DEBTOR TO REJECT CERTAIN**
17                                     ) **UNEXPIRED NON-RESIDENTIAL REAL**
                                       ) **PROPERTY LEASES PURSUANT TO 11**
18                                     ) **U.S.C. § 365 AND ABANDON ANY**
                                       ) **REMAINING PERSONAL PROPERTY**
19                                     ) **LOCATED AT THE LEASED PREMISES**
                                       )
20                                     ) Date:        January 19, 2017
                                       ) Time:        8:30 a.m.
21                                     ) Courtroom:   1575
                                       ) Location:    255 E. Temple Street
22                                     )              Los Angeles, California
                                       )
23                                     )
                                       )
24                                     )
                                       )
25                                     )
                                       )
26

27

28

1    A hearing was held on January 19, 2017 at 8:30 a.m., before the Honorable Sandra R.

2    Klein, United States Bankruptcy Judge for the Central District of California, Los Angeles

3    Division, in Courtroom "1575" located at 255 E. Temple Street, Los Angeles, California, for the

4    Court to consider the motion (the "Motion") filed by Blue Bee, Inc. d/b/a ANGL, the debtor and

5    debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), for the

6    entry of an order of the Court authorizing (but not requiring) the Debtor to reject up to seven (7)

7    of the Debtor's Leases (as defined below and in the Motion), with the rejection of such Leases to

8    be deemed effective as of the later of (i) December 31, 2016 and (ii) the date on which the Debtor

9    actually vacates the applicable Retail Store (the "Vacate Date"), and granting other related relief.

10    Appearances at the hearing on the Motion were made as set forth on the record of the Court.

11    The Court, having considered the Motion and all papers filed by the Debtor in support of

12    the Motion, and the oral arguments, statements and representations of counsel made at the hearing

13    on the Motion, proper and adequate notice of the Motion and the hearing thereon having been

14    provided, having received no opposition to the Motion, and other good cause appearing therefor,

15    IT IS HEREBY ORDERED AS FOLLOWS:

16    A.    The Motion is granted.

17    B.    The Debtor is authorized (but not required) to reject the following seven (7)

18    unexpired non-residential real property leases (collectively, the "Leases") relating to the Debtor's

19    retail stores which are identified in the table below (collectively, the "Retail Stores," or

20    individually, a "Retail Store"), or some portion of the Leases in the discretion of the Debtor, with

21    the rejection of such Leases to be deemed effective as of the later of (a) December 31, 2016 and

22    (b) the Vacate Date for each such applicable Retail Store:

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| Glendale II Mall Associates, LLC c/o Glendale Galleria 110 N. Wacker Drive Attn: Law/Lease Admin. Dept. Chicago, IL 60606 | Glendale Galleria (#31) | 2101 Galleria Way Glendale, California |

2

| Landlord | Store No. & And Name | Store Address |
|---|---|---|
| La Cienega Partners Limited Partnership c/o The Taubman Company Attn: General Counsel 200 East Long Lake Road #300 P.O. Box 200 Bloomfield Hills, MI 48303 | Beverly Center (#27) | 8500 Beverly Blvd., #6622 Los Angeles, California |
| Rancho Mall, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | Rancho Cucamonga Victoria Gardens (#38) | 12543 South Main Street, #1615 Rancho Cucamonga, California |
| The Retail Property Trust c/o M.S. Management Associates, Inc. 225 West Washington St. Indianapolis, IN 46204-3438 | Brea Mall (#43) | 2110 Brea Mall, #2110 Brea, California |
| South Bay Center SPE, LLC Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | South Bay Galleria (#14) | 1815 Hawthorne Blvd., #258 Redondo Beach, California |
| Temecula Towne Center Associates LP Terminal Tower 50 Public Square, Suite 1360 Cleveland, OH 44113-2267 | The Promenade in Temecula (#17) | 40820 Winchester Road, #2610 Temecula, California |
| W/A SVT Holdings VI, LLC 900 N. Michigan Avenue, Suite 1900 Chicago, IL 60611 Attn: David S. Joseph, II | Simi Valley Town Center (#12) | 1555 Simi Town Center Way, #135 Simi Valley, California |

C.    Notwithstanding anything to the contrary herein, the Debtor's Lease with La Cienega Partners Limited Partnership for the Retail Store located at 8500 Beverly Boulevard, Space #6622, Los Angeles, California (Store #27 – Beverly Center) is deemed rejected effective as of January 18, 2017, the Vacate Date for such Retail Store.

3

1       D.       The Debtor is authorized to abandon any of its remaining personal property assets

2    located at each of the Retail Stores as of the applicable Vacate Date.

3        IT IS SO ORDERED.

4                                                    ###

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Date: January 24, 2017

24                                            Sandra R. Klein
                                              United States Bankruptcy Judge
25

26

27

28
                                              4

# EXHIBIT "4"

_Temecula_

| Database: FCE<br>Report ID: FCE_REFHALL | | | | | CM Ledger Reference List<br>FCE PRODUCTION<br>From 10/19/2016 Through 2/17/2017 | | | | Page: 1<br>Date: 2/17/2017<br>Time: 02:26 PM |
|---|---|---|---|---|---|---|---|---|---|
| Tran # | Bldg Id -<br>Lease Id | Transaction<br>Date | Inc<br>Cat | Tran<br>Code | Description | Transaction<br>Amount | Open<br>Amount | Check/<br>Invoice | Batch<br>Number | Ref # |

S21811000276 - ANGL

**Bldg Id-Lease Id:  621811-000276    Master Occupant Id:  00001818-1    ANGL**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 0006863849 | 521811-000276 | 11/1/2016 | FXA | CH | AUTOCHRG @T11/30/2016 @# | 5,691.22 | 5,691.22 | 578467 | 00241173 |
| 0006863850 | 521811-000276 | 11/1/2016 | IUT | CH | AUTOCHRG @T11/30/2016 | 791.89 | 791.89 | 578467 | 00241173 |
| 0006863851 | 521811-000276 | 11/1/2016 | RET | CH | AUTOCHRG @T11/30/2016 | 878.48 | 878.48 | 578467 | 00241173 |
| 0006863852 | 521811-000276 | 11/1/2016 | RNT | CH | AUTOCHRG @T11/30/2016 @# | 12,592.37 | 7,592.37 | 578467 | 00241173 |
| 0006863853 | 521811-000276 | 11/1/2016 | WAT | CH | AUTOCHRG @T11/30/2016 | 50.00 | 50.00 | 578467 | 00241173 |
| 0006875080 | 521811-000276 | 11/2/2016 | REP | NC | FIRST HALF 2011 REFUNDS | -34.07 | -34.07 | 580818 | 00241731 |
| 0006875500 | 521811-000276 | 11/2/2016 | REP | NC | LAST HALF 2010 REFUND | -248.08 | -248.08 | 581027 | 00241659 |
| 0006880793 | 521811-000276 | 12/1/2016 | FXA | CH | AUTOCHRG @T12/31/2016 | 5,691.22 | 5,691.22 | 582531 | 00242989 |
| 0006880794 | 521811-000276 | 12/1/2016 | IUT | CH | AUTOCHRG @T12/31/2016 | 791.89 | 791.89 | 582531 | 00242989 |
| 0006880795 | 521811-000276 | 12/1/2016 | RET | CH | AUTOCHRG @T12/31/2016 | 878.48 | 878.48 | 582531 | 00242989 |
| 0006880796 | 521811-000276 | 12/1/2016 | RNT | CH | AUTOCHRG @T12/31/2016 | 12,592.37 | 12,592.37 | 582531 | 00242989 |
| 0006700276 | 521811-000276 | 12/1/2016 | UNA | CR | CK#20164 | -1,048.39 | -1,048.39 | 20164 | 00243633 |
| 0006880797 | 521811-000276 | 12/1/2016 | WAT | CH | AUTOCHRG @T12/31/2016 | 50.00 | 50.00 | 582531 | 00242989 |
| 0006721442 | 521811-000276 | 12/19/2016 | UNA | CR | CK#20242 | -4,719.85 | -4,719.85 | 20242 | 00244579 |
| 0006716585 | 521811-000276 | 1/1/2017 | FXA | CH | AUTOCHRG @T1/31/2017 | 5,691.22 | 5,691.22 | 588728 | 00244573 |
| 0006716587 | 521811-000276 | 1/1/2017 | IUT | CH | AUTOCHRG @T1/31/2017 @R | 669.25 | 669.25 | 588728 | 00244573 |
| 0006716588 | 521811-000276 | 1/1/2017 | RET | CH | AUTOCHRG @T1/31/2017 @R | 1,062.75 | 1,062.75 | 588728 | 00244573 |
| 0006716589 | 521811-000276 | 1/1/2017 | RNT | CH | AUTOCHRG @T1/31/2017 | 12,592.37 | 7,592.37 | 588728 | 00244573 |
| 0006716590 | 521811-000276 | 1/1/2017 | WAT | CH | AUTOCHRG @T1/31/2017 | 50.00 | 50.00 | 588728 | 00244573 |
| 0006745398 | 521811-000276 | 2/1/2017 | FXA | CH | AUTOCHRG @T2/28/2017 | 5,691.22 | 5,691.22 | 590882 | 00246278 |
| 0006745399 | 521811-000276 | 2/1/2017 | IUT | CH | AUTOCHRG @T2/28/2017 | 669.25 | 669.25 | 590882 | 00246278 |
| 0006745400 | 521811-000276 | 2/1/2017 | RET | CH | AUTOCHRG @T2/28/2017 | 1,062.75 | 1,062.75 | 590882 | 00246278 |
| 0006745401 | 521811-000276 | 2/1/2017 | RNT | CH | AUTOCHRG @T2/28/2017 | 12,592.37 | 12,592.37 | 590882 | 00246278 |
| 0006745402 | 521811-000276 | 2/1/2017 | WAT | CH | AUTOCHRG @T2/28/2017 | 50.00 | 50.00 | 590882 | 00246278 |
| | | | | | S21811000276 - ANGL Totals: | 74,098.71 | 64,098.71 | | |

Temecula Towne Center Associates L.P. - The Promenade in Temecula - Administrative Exp. - 000004

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
3390 University Ave., 5th Floor, Riverside, CA 92501

A true and correct copy of the foregoing document entitled (specify): **TEMECULA TOWNE CENTER ASSOCIATES L.P.'S MOTION FOR ORDER (1) ALLOWING AN ADMINISTRATIVE EXPENSE PRIORITY CLAIM PURSUANT TO 11 U.S.C. SECTION 265(d)(3) AND SECTION 503 FOR POST PETITION RENT; AND (2) DIRECTING IMMEDIATE PAYMENT OF THE ADMINISTRATIVE EXPENSE CLAIM; AND DECLARATION OF CHRISTINE C. PHAM IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) November 1, 2017   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (date) November 1, 2017   , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) November 1, 2017 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| November 1, 2017 | Lisa Spencer | _Lisa Spencer_ |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

## SERVICE LIST

In re: Blue Bee, Inc.
2:16-bk-23836-SK

### No. 1 (NEF)

- Franklin C Adams    franklin.adams@bbklaw.com,
  arthur.johnston@bbklaw.com;lisa.spencer@bbklaw.com
- Marc Andrews    bankruptcycls@wellsfargo.com, andrewma@wellsfargo.com
- Dustin P Branch    branchd@ballardspahr.com,
  carolod@ballardspahr.com;hubenb@ballardspahr.com
- Lynn Brown    notices@becket-lee.com
- Brian W Byun    bbyun@ci.vernon.ca.us
- John H Choi    johnchoi@kpcylaw.com, christinewong@kpcylaw.com
- Brian D Huben    hubenb@ballardspahr.com, carolod@ballardspahr.com
- Dare Law    dare.law@usdoj.gov
- Thor D McLaughlin    tmclaughlin@allenmatkins.com, igold@allenmatkins.com
- Randall P Mroczynski    randym@cookseylaw.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Ernie Zachary Park    ernie.park@bewleylaw.com
- Ronald M Tucker    rtucker@simon.com,
  cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Michael A Wallin    mwallin@slaterhersey.com, mrivera@slaterhersey.com
- Larry D Webb    Webblaw@gmail.com,
  larry@webblaw.onmicrosoft.com;r51666@notify.bestcase.com

### No. 3 (Personal Delivery)

Hon. Judge Sandra R. Klein
United States Bankruptcy Court
Bin Outside Suite 1582
255 E. Temple St.
Los Angeles, CA  90012

### No. 2 (U. S. Mail)

**Debtor**
**Blue Bee, Inc.**
4719 S. Boyle Ave.
Vernon, CA  90058

**20 Largest Unsecured Creditors**

**W/A SVT Holdings VI LLC**
PO Box 749659
Los Angeles, CA 90074-9659

**Nine Planet**
1022 S. Wall Street
Los Angeles, CA 90015

**L'atiste**
424 Towne Avenue
Los Angeles, CA 90021

**Rancho Mall LLC**
PO Box 72439
Cleveland, OH 44192

**Tyler Mall Limited Partnership**
SDS-12-3113
PO Box 86
Minneapolis, MN 55486-3113

**SevenD, Inc.**
2301 E. 7th Street
Suite E-200
Los Angeles, CA 90023

**Macerich SMP LP**
c/o David M. Cohen, Esq.
5950 Canoga Avenue, Suite 605
Woodland Hills, CA 91367

**Century City Mall LLC**
10250 Santa Monica Blvd
Suite 1
Los Angeles, CA 90067

**Paseo Nuevo Owner LLC**
PO Box 780268
Philadelphia, PA 19178-0268

**Internal Revenue Service**
P.O. Box 7346
Philadelphia, PA 19101-7346

**Horton Plaza LP**
PO Box 55708
Los Angeles, CA 90074-5708

**The Retail Property Trust**
Brea Mall
PO Box 772827
Chicago, IL 60677-2827

**CA State Board of Equalization**
P.O. Box 942879
Sacramento, CA 94279

**Alythea**
1016 S. Towne Ave., #106
Los Angeles, CA 90021

**Caribbean Queen Inc.**
1128 S. Crocker Street
Los Angeles, CA 90021

**Shops at Mission Viejo LLC**
7415 Solution Center
Chicago, IL 60677-7004

**Lynx Property Management Inc**
924 Laguna St. Suite B
Santa Barbara, CA 93101

**Plaza Bonita, LLC**
Blackmar, Principe & Schmelter, APC
600 B. Street, Suite 2250
San Diego, CA 92101

**Macerich Fresno LP**
PO Box 849418
Los Angeles, CA 90084-9418

**South Bay Center SPE LLC**
PO Box 72056
Cleveland, OH 44192-0056

<u>**Proofs of Claim**</u>

**Valley Plaza Mall, LP**
c/o GGP Limited Partnership
Attn: Bankruptcy Services Dept.
110 North Wacker Dr.
Chicago, IL  60606

**Grand Canal Chops II, LLC**
c/o GGP Limited Partnership
Attn: Bankruptcy Services Dept.
110 North Wacker Dr.
Chicago, IL  60606

**Tyler Mall Limited Partnership**
c/o GGP Limited Partnership
Attn: Bankruptcy Services Dept.
110 North Wacker Dr.
Chicago, IL  60606

**GGP – Otay Ranch, L.P.**
c/o GGP Limited Partnership
Attn: Bankruptcy Services Dept.
110 North Wacker Dr.
Chicago, IL  60606

**Wells Fargo Bank, NA**
P. O. Box 6165
El Monte, CA  91734

**Caribbean Queen**
c/o Jacqueline N. Anker, Esq.
27 W. Anapamu, Suite 325
Santa Barbara, CA  93101

**State Board of Equalization**
Special Ops, MIC: 55

P. O. Box 942879
Sacramento, CA 94279-0055

**Network Commercial Service, Inc.**
c/o Edwin Siegel
6355 Topanga Canyon Blvd., #255
Woodland Hills, CA 91367

**Shops at Mission Viejo, LLC**
c/o Simon Property Group, Inc.
225 West Washington St.
Indianapolis, IN 46204

**AKF3 Valencia LLC**
c/o Slater Hersey & Lieberman LLP
100 Spectrum Center Dr., Suite 420
Irvine, CA 92618

**South Bay Center, LLC**
50 Public Square, Suite 1360
Cleveland, OH 44113-2267

**Temecula Towne Center Associates L.P.**
50 Public Square, Suite 1360
Cleveland, OH 44113-2267

**Rancho Mall, LLC**
50 Public Square, Suite 1360
Cleveland, OH 44113-2267

**The Commons at Calabasas, LLC**
c/o Caruso
Attn: Jackie Levy
101 The Grove Dr.
Los Angeles, CA 90036

**Marina Waterside, LLC**
c/o Caruso
Attn: Jackie Levy
101 The Grove Dr.
Los Angeles, CA 90036

**Macerich Santa Monica, LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Paseo Nuevo Owner LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Plaza Bonita LLC**
c/o Ballard Spahr LLP

2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Horton Plaza LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Hollicon, LLC**
300 Corporate Point, Suite 380
Culver City, CA 902330

**Macerich Fresno Limited Partnership**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Macerich Cerritos, LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Macerich Oaks LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Macerich Vintage Faire Limited Partnersip**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Macerich Westside Pavilion Property LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Century City Mall, LLC**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Valencia Town Center Venture, L.P.**
c/o Ballard Spahr LLP
2029 Century Park East, Suite 800
Los Angeles, CA 90067-2909

**Ray Mahboob**
Betty L. Jeppesen, Esq.
2000 State Street
Santa Barbara, CA 93105